**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **AMBER RESOURCES COMPANY., et al.,**<br><br>**Plaintiffs,**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | |
| **ANADARKO E&P COMPANY, L.P., et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **Nos. 02-30C**<br>**04-1822C**<br>**05-249C (Consolidated)**<br>**(Senior Judge Eric G. Bruggink)** |
| **NYCAL OFFSHORE DEVELOPMENT CORPORATION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | |

**DEFENDANT'S SUPPLEMENTAL BRIEF PURSUANT TO THE COURT'S ORDER DATED MARCH 9, 2005**

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**PATRICIA M. McCARTHY**
**Assistant Director**
**STEPHEN C. TOSINI**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**1100 L Street, N.W.**
**Attn: Classification Unit**
**8th Floor**
**Washington, DC 20530**
**Tel. (202) 307-0164**
**Fax (202) 514-8640**

**March 18, 2005** **Attorneys for Defendant**

## TABLE OF CONTENTS

**PAGE(S)**

I. Only Three Of The Nine Units Plus One Lease Could Have Been Materially Affected By The Setting Aside Of The 1999 Lease Suspensions . . . . . 1

A. The 2001 Directed Suspensions Did Not Affect The Rocky Point Unit . . . . . 2

B. The Sword Unit Was Unimpaired By The 2001 Directed Suspensions . . . . . 4

C. The Cavern Point Unit Has Been Unaffected By The Directed Suspensions . . . . . 5

D. The Lion Rock And Santa Maria Units And Stand-Alone Lease Have Been Unimpaired . . . . . 6

1. Lion Rock (Leases OCS-P 0396, 0397, 0402, 0403, 0408, and 0414) . . . . . 6

2. The Stand-Alone Lease (Lease OCS-P 0409) . . . . . 7

3. Santa Maria Unit (Leases OCS-P 0425, 0430, 0431, 0433, and 0434) . . . . . 8

4. As A Matter Of Law, Plaintiffs Possess Neither An Absolute Right To, Nor Reasonable Expectation Of, Reunitization . . . . . 9

E. Development Of The Bonito Unit Has Been Unimpaired By The 2001 Directed Suspensions . . . . . 10

## TABLE OF CONTENTS (cont'd)

**PAGE(S)**

II. The Plain Language Of The CZMA Provides That Consistency Review For The Activities Of Lease Operators Is More Stringent Than That For Federal Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

# TABLE OF AUTHORITIES

**CASE** **PAGE(S)**

California v. Norton,
311 F.3d 1162 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Dale Constr. Co. v. United States,
168 Ct. Cl. 692 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Mobil Oil Exploration & Producing S.E. Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**STATUTES AND REGULATIONS**

**PAGE(S)**

16 U.S.C. § 1456(c)(1) . . . . . 11

16 U.S.C. § 1456(c)(1)(A) . . . . . 12

16 U.S.C. § 1456(c)(3)(A) . . . . . 11

16 U.S.C. § 1456(c)(3)(B)(iii) . . . . . 11

15 C.F.R. § 930.32(a)(1) . . . . . 12

15 C.F.R. § 930.32(b) . . . . . 12

30 C.F.R. § 250.110(a)(1) (1999) . . . . . 1, 2

30 C.F.R. § 250.1301(a) (2005) . . . . . 9

30 C.F.R. § 250.203(n) (2) (2005) . . . . . 12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBER RESOURCES COMPANY., et al.,

Plaintiffs,

THE UNITED STATES,

Defendant.

ANADARKO E&P COMPANY, L.P., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

NYCAL OFFSHORE DEVELOPMENT CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Nos. 02-30C
04-1822C
05-249C (Consolidated)
(Senior Judge Eric G. Bruggink)

**DEFENDANT'S SUPPLEMENTAL BRIEF PURSUANT TO THE COURT'S ORDER DATED MARCH 9, 2005**

At a minimum, we are entitled to judgment upon plaintiffs' claims regarding Leases OCS-P 0396, 0397, 0402, 0403, 0408, 0414, 0409, 0425, 0430, 0431, 0433, 0434, 0443, 0445, 0446, 0449, 0499, 0500, 0452, 0453, 0319, 0320, 0322, 0323A, 0210, and 0527. None of these leases was materially affected by the setting aside of the 1999 lease suspensions and the subsequent grant of directed suspensions pursuant to judicial decree.

Thus, even if the Court were to find in plaintiffs' favor as to: (1) threshold liability; and (2) the recovery in restitution of bonus payments made by non-parties whose interests in the leases have been fully extinguished, plaintiffs' maximum recovery in restitution for bonus payments would be $175,327,152, far less than the more than $1.2 billion in restitution that plaintiffs seek at a minimum in this case.

## I. Only Three Of The Nine Units Plus One Lease Could Have Been Materially Affected By The Setting Aside Of The 1999 Lease Suspensions

Because none of the leases in this action was producing oil, in May and June 1999, plaintiffs submitted to the Minerals Management Service of the Department of the Interior ("MMS") requests for suspension of production requirements of their leases, which are divided into nine units and one lease. See Exhs. 15-24 to Declaration of Ronald G. Heck , dated August 27, 2004 ("Heck I Decl."). Ten requests were made pursuant to 30 C.F.R. § 250.110(a)(1) (1999), the regulation then in effect. See id. All 10 applications requested additional time to conduct a variety of in-office activities. See id. Only four units proposed off-shore activities. See id. Performance of the proposed activities theoretically would enable plaintiffs to begin production as required by their leases. See, e.g., Exh. 2 to Heck I Decl. at 0007.

In November 1999, MMS granted the requests for suspended production periods of varying lengths of time (the "1999 suspensions"). See Exhs. 45-54 to Heck I Decl. On July 2,

2001, acting expressly pursuant to a June 2001 judicial decree issued in California v. Norton, No. C 99-4964 CW, (N.D. Cal.), MMS set aside the 1999 suspensions and directed suspensions of operations (the "2001 directed suspensions"). See Exhs. 56-65 to Heck I Decl.

Although recently plaintiffs have orally characterized the 2001 directed suspensions as "red light suspensions," in fact, nothing in the July 2, 2001 notices precluded plaintiffs from conducting in-office activities during the period of suspended operations. See Exhs. 56-65 to Heck I Decl. While it is true that "MMS is not requiring [plaintiffs] to work toward fulfillment of any milestones identified" in the 1999 suspensions, see id., it is equally true that MMS has not prevented plaintiffs from conducting in-office work as a result of the 2001 directed suspensions. Nothing in either the California v. Norton decree or the then-applicable MMS regulation, 30 C.F.R. § 250.110(a)(1), has precluded plaintiffs from conducting in-office activities that would lead to production.

In fact, as to some units, such as Rocky Point, plaintiffs could have circumvented the current consistency review allegedly imposed by the 1990 amendments to the Coastal Zone Management Act ("CZMA") had they simply completed their in-office activities as planned during the directed suspensions. Given the nature of the actions proposed, it makes no difference whether plaintiffs operated under granted or directed suspensions. There has been no material breach of any of the leases specified above.

### A. The 2001 Directed Suspensions Did Not Affect The Rocky Point Unit

On May 13, 1999, Whiting Petroleum Corporation ("Whiting") requested a suspension of production for the Rocky Point unit, comprising Leases OCS-P 0451, 0452, and 0453, Exh. 17 to Heck I Decl., which MMS granted in November 1999. Exh. 45 to Heck I Decl.

With the exception of "spud[ding] a development well" which, by definition, would have terminated the suspension, none of the milestones for the 1999 suspension for the Rocky Point unit included off-shore activities. See id. at 0961. Whiting was to submit to MMS a description of the proposed project and a revised exploration plan ("EP"). Id.

Shortly issuance of the July 2001 directed suspension, Exh. 59 to Heck I Decl., Arguello Inc. ("Arguello"), the operator, submitted a revised schedule to MMS on August 2, 2001. Exh. 1 to Declaration of Joan Barminksi, dated Mar. 17, 2005 ("Barminski Decl."), at 1. Arguello stated that it would perform the 1999 suspension activities during the period of the directed suspension:

> . . . [O]ur approved April 2001 Suspension of Production contained certain milestone activities . . . . Regardless of the status of the Suspension, Arguello is going forward with these activities and will complete them all on or before the milestone dates. These activities will take place wholly within an office workplace; therefore, they have no environmental impacts what-so-ever.

Id. (emphasis supplied).

On April 20, 2004, Arguello submitted an updated suspension request to MMS. Exh. 109 to Supplemental Declaration of Ronald G. Heck, dated Nov. 15, 2004 ("Heck II Decl."). Because Arguello intends to develop the Rocky Point unit through existing platforms, it must revise its previously-approved development and production plan ("DPP"). Exh. 93 to Heck Decl. at 6. "No activities will be conducted off-shore" during the suspension period if granted. Id. at 7.

Thus, neither the 1990 CZMA amendments nor the 2001 directed suspension affected, or could have affected, the Rocky Point unit. There is no conceivable "total breach" of the Rocky Point unit leases by the Government. See Mobil Oil Exploration & Producing S.E. Inc. v. United

States, 530 U.S. 604, 608 (2000) ("'total breach' is a breach that 'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.'") (citation omitted). Plaintiffs seek restitution in the total amount of $133,282,800 for bonus payments by them and their predecessors with regard to the Rocky Point unit. Exh. 4 to Heck I Decl. at 5. This amount should be deducted from any potential restitution award due to plaintiffs' inability to demonstrate that this unit was materially affected, much less materially impaired, by the 2001 directed suspensions.

**B. The Sword Unit Was Unimpaired By The 2001 Directed Suspensions**

In May 1999, Conoco Inc. ("Conoco") submitted to MMS a request for suspension of production for the Sword unit, comprising Leases OCS-P 0319, 0320, 0322, and 0323A, Exh. 18 to Heck I Decl., which MMS granted. Exh. 47 to Heck I Decl. Again, with the exception of spudding a well, which would terminate the suspension, none of the milestones for suspension of production granted with regard to the Sword unit included off-shore activities. See id. at 0967.

Following issuance of the 2001 directed suspensions, Exh. 56 to Heck I Decl., Samedan Oil Corp. ("Samedan"), the current operator, submitted an updated suspension request to MMS in April 2004. Exh. 102 to Heck II Decl. "In its update for the Sword Unit suspension request, Samedan requested a 25-month suspension. During the suspension period, Samedan will submit revisions to its previously approved EP. Preparation of the revised EP is an administrative activity that will be completed in-office. Samedan contemplates no offshore activity during the suspension period." Exh. 93 to Heck I Decl. at 7.

Thus, like the Rocky Point unit, the Sword Unit has been affected in no way by the 2001directed suspension. Plaintiffs seek restitution in the total amount of $9,653,500 in bonus payments. Exh. 4 to Heck I Decl. at 1-3. This amount, too, should be deducted from any potential restitution award.

**C. <u>The Cavern Point Unit Has Been Unaffected By The Directed Suspensions</u>**

In May 1999, Venoco Inc. ("Venoco") submitted to MMS a request for suspension of production for the Cavern Point unit, comprising Leases OCS-P 0210 and 0527, Exh. 19 to Heck I Decl., which MMS granted. Exh. 49 to Heck I Decl. The Cavern Point unit is the only unit in this action that has never had an EP approved by MMS or the California Coastal Commission ("CCC"). Exh. 93 to Heck I Decl. at 7.

After MMS issued the 2001 directed suspensions, Exh. 65 to Heck I Decl., Venoco submitted an updated suspension request in April 2004. Exh. 101 to Heck II Decl. "In its update of the suspension request for the Cavern Point Unit, Venoco has requested a thirteen month suspension. During the suspension period, Venoco will update and resubmit its EP for the Cavern Point Field. The preparation of the Cavern Point EP is an administrative activity that will be completed in-office. No offshore activities will be conducted . . . during the suspension period." Ex. 93 to Heck I Decl. at 7-8.

Thus, like the Rocky Point and Sword units, the 2001 directed suspensions have not affected the Cavern Point unit because its operator could have performed all of the proposed activities. Any potential restitution award should be reduced by $272,971.20, the total amount of bonus payments that plaintiffs seek for the Cavern Point unit. <u>See</u> Exh. 4 to Heck I Decl. at 1, 6.

**D. The Lion Rock And Santa Maria Units And Stand-Alone Lease Have Been Unimpaired By The 2001 Directed Suspensions**

**1. Lion Rock (Leases OCS-P 0396, 0397, 0402, 0403, 0408, and 0414)**

On May 27, 1999, Aera Energy LLC ("Aera") submitted to MMS a request for suspension of production for the Lion Rock unit, which consists of Leases OCS-P 0396, 0397, 0402, 0403, 0408, and 0414, Exh. 23 to Heck I Decl., which MMS granted. Exh. 53 to Heck I Decl. None of the milestones for the suspension included off-shore activities. See id. at 0985.

Following the 2001 directed suspension, Exh. 60 to Heck I Decl., Aera submitted an updated suspension of production request for the Lion Rock unit in April 2004. Exh. 104 to Heck II Decl. As reported to the district court in California v. Norton in June 2004, "Aera has requested a 23 to 34 month suspension" for the Lion Rock unit, but "there are no activities planned for the Lion Rock unit during this period." Exh. 93 to Heck I Decl. at 3. Although it is undisputed that the Lion Rock leases are not unitized with the Purisima Point and Point Sal, Aera nonetheless "proposes to conduct certain activities on the Purisima Point and Point Sal units, and then use that information to determine the feasibility of developing the Aera group as one entity." Id. Aera's proposal is irrelevant from a liability standpoint because there is no contractual nexus between the Lion Rock unit leases and leases from wholly separate units.

Accordingly, the Lion Rock leases have been unaffected by the 2001 directed suspension because that suspension has not caused Lion Rock to do anything differently. The Government has done nothing to prevent the Lion Rock unit from accomplishing all that it planned to accomplish in 1999.

Plaintiffs seek restitution in the total amount of $423,240,560 for bonus payments with regard to the Lion Rock unit. Exh. 4 to Heck I Decl. at 3. This amount should be deducted from any potential restitution award.

**2. The Stand-Alone Lease (Lease OCS-P 0409)**

In May 1999 Aera also submitted to MMS a request for suspension of production for Lease OCS-P 0409, the single lease in this case that is not unitized. Exh. 22 to Heck I Decl. MMS granted the request in November 1999. Exh. 54 to Heck I Decl. Like the 1999 suspension for the Lion Rock unit, none of the milestones for the suspension of Lease OCS-P 0409 included off-shore activities. See id. at 0988.

Following the July 2, 2001 directed suspension, Exh. 64 to Heck I Decl., Aera submitted an updated suspension of production request in April 2004. Exh. 108 to Heck II Decl. As with the updated request for the Lion Rock unit, "Aera has requested a 23 to 34 month suspension" for Lease OCS-P 0409, but "[n]o activities during the suspension period are planned for lease OCS-P 0409." Exh. 93 to Heck I Decl. at 4. Again, although it is undisputed that this stand-alone lease is not unitized with the Purisima Point and Point Sal, Aera nonetheless "proposes to develop Lease OCS-P 0409 in concert with the Aera group" and rely upon "information derived from the activities conducted on the Point Sal and Purisima Point Units . . . to determine the feasibility of development of the Aera group in its entirety." Id.

Like the Lion Rock unit, Lease OCS-P 0409 has been unaffected by the 2001 directed suspension because that suspension has not caused Aera to do anything differently. Accordingly, the amount of $42,125,000 for bonus payments by plaintiffs and their predecessors with regard to

Lease OCS-P 0409, Exh. 4 to Heck I Decl. at 3, should be deducted from any potential restitution award.

### 3. Santa Maria Unit (Leases OCS-P 0425, 0430, 0431, 0433, and 0434)

Aera also submitted to MMS in May 1999 a request for suspension of production for the Santa Maria unit, comprising Leases OCS-P 0425, 0430, 0431, 0433, and 0434, plus three other leases that have since expired. Exh. 24 to Heck I Decl. (Leases OCS-P 0420, 0424, and 0429, once part of the Santa Maria unit, expired by their terms on August 16, 1999. See Exh. 52 to Heck I Decl.). MMS granted Aera a suspension of production for the remaining leases in the Santa Maria unit in November 1999. Id. Again, as with the 1999 suspensions granted to Aera for the Lion Rock and stand-alone Lease OCS-P 0409 units, none of the milestones for the Santa Maria unit included off-shore activities. See id. at 0982.

After MMS issued a directed suspension in July 2001, Exh. 62 to Heck I Decl., Aera submitted an updated suspension of production request in April 2004. Exh. 107 to Heck II Decl. "Aera requested a 23 to 34 month suspension," and "no activities are proposed to be conducted on the Santa Maria Unit." Exh. 93 to Heck I Decl. at 4. Again, although not unitized with the Purisima Point, Point Sal, Lease OCS-P 0409, and Lion Rock units, Aera nonetheless "proposes to develop the Santa Maria unit in concert with development of the other units in the Aera group." Id.

Thus, the Santa Maria unit, too, has been unaffected by the 2001 directed suspension because Aera has not done anything differently with regard to this unit. Plaintiffs seek restitution in the total amount of $258,306,000 for bonus payments made by them and their predecessors

with regard to the remaining leases in the Santa Maria unit. Exh. 4 to Heck I Decl. at 4-5. This amount, too, should be deducted from any potential restitution award.

#### 4. As A Matter Of Law, Plaintiffs Possess Neither An Absolute Right To, Nor Reasonable Expectation Of, Reunitization

At oral argument on March 8, 2005, plaintiffs implied that a contractual or other legal relationship exists among leases in the Lion Rock, Santa Maria, Point Sal, and Purisima Point units, and stand-alone Lease OCS-P 0409. (The transcript is unavailable as of the date of this filing.) They indicated that they would unilaterally "reunitize" their leases, and thus, the 2001 directed suspensions that admittedly prohibited off-shore activities proposed by the Point Sal and Purisima Point units somehow affected the Lion Rock and Santa Maria units and stand-alone Lease OCS-P 0409. Plaintiffs' suggestions are incorrect.

First, there is no legal relationship between a lease in one unit and a lease in another unit. They are separate, unrelated contracts. Accordingly, a material breach of one lease would not constitute a material breach of a separate lease in another unit. See, e.g., Dale Constr. Co. v. United States, 168 Ct. Cl. 692, 841 (1964) (in case with "separate contracts," Government's assumed substantial breach of one contract "was not a breach of the subject contract").

Second, plaintiffs cannot unilaterally reunitize their leases. MMS must approve any request for voluntary reunitization, which must meet MMS's criteria. 30 C.F.R. § 250.1301(a) (2005). The decision to reunitize does not belong to plaintiffs.

Third, even assuming, for argument's sake, that plaintiffs' "reasonable expectations" were germane, plaintiffs had no "reasonable expectation" that MMS would permit them to reunitize. In 2000, MMS rejected Aera's plan for re-unitization of Lion Rock, Point Sal, Purisima Point,

and Santa Maria units, and the stand-alone Lease OCS-P 0409 into one unit. Exh. 2 to Barminski Decl. This decision was never appealed. Simply put, reunitization is not a foregone conclusion.

### E. Development Of The Bonito Unit Has Been Unimpaired By The 2001 Directed Suspensions

On May 11, 1999, Nuevo Energy Company ("Nuevo") submitted to MMS a request for suspension of production for the Bonito unit, comprising Leases OCS-P 0443, 0445, 0446, 0449, 0499, and 0500, Exh. 15 to Heck I Decl., which was granted. Exh. 48 to Heck I Decl.

With the exception of spudding a well, which would itself terminate the suspension, none of the milestones for the 1999 suspension of production of the Bonito unit included off-shore activities. See id. at 0970. MMS directed a suspension in July 2001. Exh. 58 to Heck I Decl.

In its April 2004 updated suspension request, Exh. 100 to Heck II Decl., Nuevo described two alternatives during the suspension period, one involving off-shore activities and the other involving only preparation of a revised EP, which is a strictly in-office activity. Exh. 93 to Heck I Decl. at 5-6. Arguello, which owns two existing platforms, recently purchased Nuevo, and the second alternative appears to more feasible because it involved use of existing platforms to conduct post-suspension activities. Id. We understand that Arguello intends to pursue the second alternative, which involves no off-shore activities. See id.

Accordingly, the Bonito unit has been unaffected by the 2001 directed suspension because its operator has not done anything differently with regard to this unit. Any restitution award should be reduced by the total amount of $64,616,600 for bonus payments sought with regard to the Bonito unit. Exh. 4 to Heck I Decl. at 5.

## II. The Plain Language Of The CZMA Provides That Consistency Review For The Activities Of Lease Operators Is More Stringent Than That For Federal Activities

The Ninth Circuit's holding in California v. Norton required nothing of plaintiffs. Rather, it required the Government to perform consistency review pursuant to 16 U.S.C. § 1456(c)(1). California v. Norton, 311 F.3d 1162, 1174-75 (9th Cir. 2002). Nine of the ten units have already survived consistency review pursuant to 16 U.S.C. § 1456(c)(3)(A) at the EP stage. See Ex. 93 to Heck I Decl. at 3-8, 10.

Section (c)(3) applies when lessees apply for licenses or permits to conduct certain activities, including approval of EPs and DPPs. The lessee must certify that its plan's proposed activities are fully consistent with the enforceable policies of the state coastal management plan. No Federal agency may grant approval until the state has concurred (or is presumed to concur) with applicant's certification. If the applicant is not fully consistent, it cannot move forward. See generally 16 U.S.C. § 1456(c)(3).

If the state does not concur, the applicant's only recourse is to appeal that decision to the Secretary of Commerce pursuant to 16 U.S.C. § 1456(c)(3)(B)(iii). The applicant bears the burden to demonstrate that the activity in its plan is consistent with the statute's objectives, or is otherwise necessary in the interest of national security. Only upon a finding of the Secretary of Commerce to this effect may the Federal licensing agency issue the license or permit or approve the plan. See id.

Here, the majority of the lessees are requesting suspensions to amend previously approved EPs. See Ex. 93 to Heck I Decl. at 3-8. Approval of those plans may or may not require section (c)(3) consistency review. If MMS determines that the amended EP would

impose significant change, then the amended EP is required to undergo state consistency process pursuant to section (c)(3). 30 C.F.R. § 250.203(n)(2). After exploration is completed, the lessee may not proceed to the development and production stage without submitting a DPP for approval. The DPP is subject to full CZMA scrutiny, and the lessee cannot proceed unless its plan is fully consistent with the enforceable policies of the state, or the Secretary of Commerce makes the findings discussed above.

In stark contract, section (c)(1) applies to activities of the Government and imposes no requirements upon the lessees. Unlike the absolute consistency required under section (c)(3), the plain language of section (c)(1) requires that the Federal activity be consistent "to the maximum extent practicable" with the state's coastal management program. 16 U.S.C. § 1456(c)(1)(A). The Federal agency determines effects and submits a consistency determination to the affected state. Even if the affected state disagrees with the Federal agency's certification, the Federal agency is free to proceed with its proposed action. The state's only recourse is to sue.

At the March 8 oral argument, plaintiffs cited to regulations defining "consistent to the maximum extent practicable" as "fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency." 15 C.F.R. § 930.32(a)(1). The regulation did not alter the plain meaning of the statute, and, further, it explicitly provides for an exception to full consistency. See id.; see also 15 C.F.R. §930.32(b) (describing circumstances when a Federal agency may deviate from full consistency). Plaintiffs cite no authority for their argument that section (c)(1) review is more stringent than section (c)(3) review.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen by Mark A. Melnick
DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director
STEPHEN C. TOSINI
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530
Tel. (202) 307-0164
Fax (202) 514-8640

March 18, 2005

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify under penalty of perjury that on this 18th day of March, 2005, I caused to be delivered by overnight mail copies of "DEFENDANT'S SUPPLEMENTAL BRIEF PURSUANT TO THE COURT'S ORDER DATED MARCH 9, 2005" addressed as follows:

STEVEN J. ROSENBAUM, ESQ.
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-2401

JEFFREY D. ANTONSON, ESQ.
Jackson Walker L.L.P.
901 Main Street, Suite 6000
Dallas, Texas 75202

s/Patricia M. McCarthy