# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

****************************************

| | |
|---|---|
| AMBER RESOURCES COMPANY,<br>*et al*., | |
| *Plaintiffs,*<br><br>v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| **************************************** | |
| ANADARKO E & P COMPANY L.P.,<br>*et. al*., | |
| *Plaintiffs,*<br><br>v. | |
| | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| **************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| **************************************** | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S MARCH 9, 2005 ORDER**

# TABLE OF CONTENTS

**Page**

I. MMS's CZMA-Based Suspensions Barred the Scheduled On-the-Water Activities Laid Out in Plaintiffs' November 1999 Suspensions in a Way That Affected All of the 36 Leases Now Before the Court. .......... 1

A. The Bonito, Rocky Point, Cavern Point, Point Sal, Purisima Point, Gato Canyon, and Sword Units. .......... 2

B. The Santa Maria unit, the Lion Rock unit, and Lease 409. .......... 4

II. The Substantive Burdens Imposed By 16 U.S.C. § 1456(c)(1) (2000) and Section 1456(c)(3). .......... 6

A. In any Event, Section 1456(c)(1) Is More Stringent Than (c)(3). .......... 7

B. Section 1456(c)(3) Consistency Objections Can Be Overcome by Administrative Action. .......... 9

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*California Coastal Commission v. United States*, 5 F. Supp. 2d 1106 (S.D. Cal. 1998) ....................7

*California v. Norton*, 311 F.3d 1162 (9th Cir. 2002)....................6

*Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000)....................7, 11

*Conservation Law Foundation v. Watt*, 560 F.Supp. 561 (D. Mass. 1983)....................8

*Secretary of the Interior v. California*, 464 U.S. 312 (1984)....................6

## FEDERAL STATUTES AND REGULATIONS

16 U.S.C. § 1456.................... *passim*

43 U.S.C. § 1334(a)(4)....................1

43 U.S.C. § 1337(b)(2) ....................3

15 C.F.R. § 930.121 ....................10

15 C.F.R. § 930.32(a)(1)....................7

15 C.F.R. § 930.32....................7

30 C.F.R. § 250.1301 ....................1

30 C.F.R. § 256.37 ....................3

## OTHER AUTHORITIES

*Decision and Findings in the Consistency Appeal of Union Oil Company of California to An Objection From the California Coastal Commission* (Nov. 9, 1984) ....................10

*Decision and Findings in the Consistency Appeal of Gulf Oil Corporation to An Objection From the California Coastal Commission* (Dec. 23, 1985) ....................10

**Page(s)**

*Decision and Findings of the Secretary of Commerce in the Consistency Appeal of the Korea Drilling Company, Ltd. From an Objection By the California Coastal Commission* (Jan. 19, 1989) ....10

*Decision and Findings in the Consistency Appeal of Texaco, Inc. From An Objection By the California Coastal Commission* (May 19, 1989)....11

*Decision and Findings in the Consistency Appeal of Amoco Production Company From An Objection By the Division of Governmental Coordination of the State of Alaska* (July 20, 1990) ....11

*Decision and Findings in the Plan of Exploration Consistency Appeal of Mobil Oil Exploration & Producing Southeast From an Objection by the State of North Carolina* (Sept. 2, 1994) ....11

*In the Consistency Appeal of Chevron U.S.A., Inc, From an Objection By the State of Florida,* 1993 NOAA Lexis 2 (Jan. 8, 1993)....11

*In the Consistency Appeal of Mobil Exploration & Producing U.S. Inc., From an Objection By the State of Florida,* 1995 NOAA Lexis 37 (June 20, 1995)....11

**MISCELLANEOUS**

U.S. Dep't of Commerce, *Federal Consistency Requirements* (Sept. 20, 2004), *available at* http://coastalmanagement.noaa.gov/pdf/fedconreqmts.pdf....8

Santa Barbara News-Press, November 17, 1999, at A1 ("State Sues U.S. Over Offshore Oil Leases") ....8

Plaintiff Lessees hereby respond to the questions presented in the Court's March 9, 2005 Order, and in so doing also address the response to that Order filed by the Government on March 18, 2005.

## I. MMS's CZMA-Based Suspensions Barred the Scheduled On-the-Water Activities Laid Out in Plaintiffs' November 1999 Suspensions in a Way That Affected All of the 36 Leases Now Before the Court.

The November 1999 "green light" suspensions for each of the nine units[1] and the one non-unitized leases (Heck Decl., Exh. 44-54) set forth specific "milestone" activities that the lessees had planned to perform during the suspension period. *See, e.g.,* Exh. 45 ("Meeting these milestones is a critical factor in our [MMS's] determination of whether this suspension continues…").

For seven of the units (Bonito, Rocky Point, Cavern Point,[2] Point Sal, Purisima Point, Gato Canyon, and Sword), the on-the-water milestone activities included the drilling of an exploratory or production well, and for some of these units, additional on-the-water activities. For the remaining two units and the non-unitized lease (Santa Maria, Lion Rock, and Lease 409), production drilling was contingent upon the completion of the exploratory drilling scheduled to take place on two adjoining units (Purisima Point and Point Sal), which are operated by the same lessee, Aera Energy, as the Santa Maria and Lion Rock units and Lease 409. Thus, by forbidding all on-the-water activities, the July 2001 directed "red light" suspensions barred on-the-water activities in a way that caused substantial delays for every one of the lawsuit leases.

---

[1] The OCSLA and MMS regulations permit lessees to join their leases into "units" for the purpose of joint exploration and/or development, under "unit agreements" that must be approved by MMS. 43 U.S.C. § 1334(a)(4); 30 C.F.R. § 250.1301. Activity (such as drilling or production) on any lease in the unit is ascribed to all the leases in the unit, for purposes of meeting the requirement that the lessee be engaged in continuous drilling or production (or under suspension) after the primary term of the lease has expired. 30 C.F.R. 250.1301(g).

[2] Presumably by oversight, the Government discuses the Cavern Point unit (Gov't Filing at 5) without mentioning that the November 1999 suspension for this unit also included as a required milestone event the drilling of a well, *see* the Table on p. 2, *infra.*

**A. The Bonito, Rocky Point, Cavern Point, Point Sal, Purisima Point, Gato Canyon, and Sword Units.**

The specific on-the-water milestones set forth in the November 1999 suspensions for the seven units on which further drilling was to occur were as follows:

| **Unit** | **On-the-Water Milestone** | **Deadline** | **Source of Information (the MMS "Green Light" Suspension Letters)** |
|---|---|---|---|
| Bonito | "Spud [begin drilling] a delineation well"[3] | May 1, 2002 | Heck Decl., Exh. 48, p. 0970 |
| Rocky Point | "Spud a development well" | June 30, 2002 | Heck Decl., Exh. 45, p. 0961; Exh. 97, third page |
| Cavern Point | "Spud an exploration well" | July 1, 2002 | Heck Decl., Exh. 49, p. 0973 |
| Point Sal | "Spud a delineation well" | November 1, 2002 | Heck Decl., Exh. 50, p. 0976 |
| Purisima Point | "Spud a delineation well" | February 1, 2003 | Heck Decl., Exh. 51, p. 0979 |
| Gato Canyon | "Spud a delineation well" | May 1, 2003 | Heck Decl., Exh. 46, p. 0964 |
| Sword | "Spud a delineation well" | August 1, 2003 | Heck Decl., Exh. 47, p. 0967 |

The July 2, 2001 "red light" suspensions of operations made it impossible for the Lessees to proceed with their drilling as planned. *See* Heck Decl., Exh. 54-56 (MMS letters "directing a Suspension of Operations" on the nine units and Lease 409). Indeed, the length of delay is even greater than the stated milestone deadlines might suggest. MMS had established chronological deadlines for drilling activities on five of the units because a single Mobile Offshore Drilling Unit (ship) was to be used to drill wells sequentially on those units (Bonito, Point Sal, Purisima Point, Gato Canyon, and Sword). *See* Heck Decl., Exh. 48, 49, 52, 46, 47.

---

[3] As described by the MMS, a "delineation well" is a particular kind of exploration well: one that seeks to further prove, and determine the extent of, an oil or gas reservoir discovered by earlier exploratory drilling. Second Supp. Heck Decl., Exh. 114, p. 0684.

Thus, the most recent targeted drilling date (August 2003 for the Sword unit) was contingent upon meeting the targeted drilling date for the first unit (May 2002 for the Bonito unit).

The July 2001 "red light" suspensions of operations also precluded the other on-the-water activities/operations—shallow hazard surveys and biological surveys—which had been set forth by the Lessees in the suspension requests for five of the units. These activities constituted essential preparation for the planned delineation drilling, but were not themselves designated as milestone events, and had not been completed at the time of the July 2001 "red light" suspensions.[4]

The Government's attempt to obscure the significance of the well-spudding milestones by noting that "by definition [they] would have terminated the suspension[s]" is absurd. *See* Gov't Filing at 3, 4, 10. These drilling efforts were the only way that the Lessees could pursue exploration and development of the leases. The fact that "green light" suspensions would have reached their natural end upon commencement of the drilling, because that drilling would itself maintain the leases,[5] is simply irrelevant since the application of the 1990 CZMA Amendments caused the "green light" suspensions to be cancelled and resulted in "red light" suspensions that have already caused a minimum four year delay in operations on the leases.[6]

---

[4] *See* Heck Decl., Exh. 15, p. 0558 (Bonito unit); Exh. 16, p. 0568 (Gato Canyon unit); Exh. 20, p. 0606 (Point Sal unit); Exh. 21, p. 0618 (Purisima Point unit); Exh. 18, p. 0577 (Sword unit); Heck Second Supp. Decl., ¶ 4, and Exh. 114 thereto (MMS description of the activities during the suspension period as including "shallow high-resolution surveys and analysis of the data for the presence of archaeological resources, hard-bottom biological habitats, and geologic hazards"). For a discussion of how long it would take to re-start these efforts were new "green light" suspensions to be issued, *see* Supp. Heck Decl., Exh. 106, pp. 4-5 (Purisima Point unit).

[5] Gov't Filing 3, *see generally* 43 U.S.C. § 1337(b)(2); 30 C.F.R. § 256.37.

[6] The Government purports to characterize certain of the "updated" green light suspension requests, which the Government required the lessees to file in April 2004 (*see* Lessees' Summary Judgment Memorandum at 20), as not calling for on-the water activities during the "green light" suspension period. *See* Gov't Filing at p. 3 (Rocky Point unit); p. 4 (Sword unit); p. 5 (Cavern Point unit), p. 10 (Bonito unit). In fact, as had been the case in their 1999 suspension requests, (continued…)

**B. The Santa Maria unit, the Lion Rock unit, and Lease 409.**

Plaintiff Aera Energy LLC is the operator of the Point Sal and Purisima Point units, on which exploratory wells were to be drilled during the suspension periods (*see* the Table on p. 2 *supra*), as well as the Santa Maria and Lion Rock units and Lease 409, where no such activities were planned. These four units and the lease form a physically contiguous block, and are collectively referred to as the "Offshore Santa Maria Basin" or "OSMB." *See, e.g.,* Heck Decl., Exh. 22, p. 0627.

As set forth in Aera Energy's 1999 suspension requests, seventeen exploratory wells had already been drilled on the Santa Maria and Lion Rock units and Lease 409.[7] Aera did not believe it necessary to drill additional exploratory wells on these two units and lease, but rather intended to re-unitize all of the Offshore Santa Maria Basin leases into one or two larger units, which would then be jointly developed. *See e.g.,* Heck Decl., Exh. 24, p. 0654 ("During the [suspension] period, Aera will propose consolidating the existing four units and one non-unitized lease into one, possibly two, units.").

---

*see* Table on p. 2 *infra*, each and every one of these updated requests explicitly called for drilling a well. *See* Heck Suppl. Decl., Exh. 109, p. 3 (Rocky Point unit); Exh. 102, p. 4 (Sword unit); Exh. 101, p. 4 (Cavern Point unit); Exh. 100, pp. 5-6 (Bonito unit). The only authority the Government cites for its position is one of its own pleadings, Heck Decl., Exh. 93 (Government's June 4, 2004 Report to the Court). The Government apparently is advancing a purely technical argument based on the fact that, were it to occur, drilling activity would cause the "green light" suspensions to reach their natural end, *see note* 5, *supra*, which is of course irrelevant given that the very purpose of the *California v. Norton* decision was to bar all on-the-water activity pending a successful consistency determination with respect to the very issuance of "green light" suspensions.

The Government also references a post-red light suspension letter from the operator of the Rocky Point unit that mentions certain activities as not requiring on-the-water activities, but the Government fails to mention the part of that letter that references the drilling of a well. *See* Barminski Decl., Exh. 1. It is indisputable that such drilling on the Rocky Point unit had been a milestone event required by the November 1999 suspensions, *see* the Table on p. 2 *supra*, and that such activity was forbidden by the July 2001 red light suspension, *see supra*.

[7] *See* Heck Decl., Exh. 23, p. 0647 (six wells on the Lion Rock unit); Exh. 24, p.0660 (five wells on the Santa Maria unit); Exh. 22, p. 0636 (six wells on Lease 409).

The results of the planned exploratory drilling on the Point Sal and Purisima Point units during the suspension period would provide the basis for the subsequent development of the one or two large, re-unitized units. *See id.* at p. 0655 ("the new delineation well(s) will provide valuable subsurface geologic, petrophysical, stratigraphic, and reservoir data that can be applied to all areas of the OSMB leasehold. This is particularly important since co-developing the…OSMB leases is anticipated.")

MMS in 1999 explicitly acknowledged that Aera intended to jointly develop all of the Outer Santa Maria Basin leases, *and that* the development of the Santa Maria Unit, Lion Rock Unit and Lease 409 was contingent upon the completion of the exploratory drilling on the Purisima Point and Point Sal units and the reunitization of the Offshore Santa Maria Basin leases. In its June 2, 1999 letter to Interested Stakeholders (Heck Second Supp. Decl., Exh. 114, p. 0685), MMS stated as follows:

> **The Santa Maria Basin** is made up of four units and one non-unitized lease. While the suspensions will be handled separately for these entities, they are all covered by a co-development strategy, which will likely result in re-unitization of the properties once delineation is completed and all relevant data is processed. Aera, the operator of these properties, has applied for a 3-year Suspension of Production (SOP). During the suspension, they propose to analyze existing 3-D seismic data, conduct shallow high-resolution surveys, modify two previously approved EP's, *and drill up to two delineation wells from a mobile drilling unit. Aera's schedule of activities illustrates proceeding toward development with first production anticipated in 2008.* (emphasis added).

Thus Aera proposed and MMS agreed that limited, non-drilling activities would take place during the suspension period with respect to the Santa Maria Unit, the Lion Rock Unit and Lease OCS-P 0409, with development activities contingent upon the results of the additional delineation wells to be drilled on the Point Sal and Purisima Point units during the suspension period. The "red light" suspensions' prohibition against this planned delineation drilling thus

also precluded the lessees from moving forward with their development efforts with respect to the Santa Maria unit, the Lion Rock unit, and Lease 409.

The Government's brief contains a highly misleading and ultimately irrelevant discussion of MMS's treatment of Aera's reunitization proposal. Aera's 1999 suspension request had stated its intent to seek to reunitize the OSMB into one or two larger units (*see* pp. 4-5 *supra*). While MMS rejected Aera's subsequent proposal for a single unit (Barminski Decl., Exh. 2), MMS did not revoke the green light suspensions for the Lion Rock and Santa Maria units or for Lease 0409 on that ground, but instead invited Aera to provide new information to support its proposed re-unitization (*id*). Aera later proposed a two-unit reunitization, upon which MMS has not taken action. Heck Second Suppl. Decl. ¶ 3 and Exh. 115.

None of this has any impact on or relevance to the only salient fact, which is that all development activity on the OSMB was contingent upon the completion of the Point Sal and Purisima Point delineation wells, and that those wells have been precluded by the July 2001 red light suspensions.

## II. The Substantive Burdens Imposed By 16 U.S.C. § 1456(c)(1) (2000) and Section 1456(c)(3).

The Government's argument that § 1456(c)(3) is more stringent than (c)(1) is ultimately irrelevant. However one resolves that dispute, it is indisputable that only § 1456(c)(1) applies to lease suspensions (as a result of the 1990 CZMA amendments),[8] and that the (c)(1) hoop has now added four years of additional delay. The lessees must now jump through two hoops—(c)(1) in connection with suspensions, and (c)(3) in connection with

---

[8] Only § 1456(c)(1) applies to lease suspensions, *see California v. Norton*, 311 F.3d 1162, 1174 (9th Cir. 2002); *see also Secretary of the Interior v. California,* 464 U.S. 312, 333-35 (1984) (holding, prior to the 1990 CZMA amendments, that Section 1456(c)(3)(B)—which by its express terms applies only to exploration plans (EPs) and development and production plans (DPPs)—is the only part of Section 1456(c)(3) that is "relevant to oil and gas activities on the OCS").

exploration or development plans. Under *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000), that is more than enough to make the application of (c)(1) a material breach.

Moreover, there is a comparison of § 307(c)(1) with something else that is relevant—the Outer Banks Protection Act at issue in *Mobil Oil*. The Government does not deny that CZMA § 307(c)(1) puts the leases at risk, either by virtue of MMS's conclusion that the suspensions are not consistent to the maximum extent practicable or the District Court's finding that MMS's contrary conclusion is arbitrary and capricious. The OBPA posed no such threat. It required only that the Secretary of the Interior have additional information before him, by way of scientific studies, when he made the decisions he was already authorized to make under the OCSLA regarding exploration or development plans.

**A. In any Event, Section 1456(c)(1) Is More Stringent Than (c)(3).**

Section 1456(c)(1)(A) provides in pertinent part:

> Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs.

Consistency "to the maximum extent practicable" has been defined by regulation in the broadest possible terms:

> The term "consistent to the maximum extent practicable" means fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency.

15 C.F.R. § 930.32(a)(1) (2003).

Absent emergency circumstances (*see* 15 C.F.R. 930.32(b)), proposed federal activities that are not fully consistent with the state program cannot go forward. *See California Coastal Comm'n* v. *United States*, 5 F. Supp. 2d 1106, 1111 (S. D. Cal. 1998) (granting

preliminary injunction because "the Navy has not shown that [its proposed offshore] dredging and disposal is consistent to the maximum extent practicable with the enforceable policies of approved state management programs [and the dredging is thus] in violation of the CZMA"). In fact, prior to the Supreme Court's 1984 decision that § 1456(c)(1) did not apply to the issuance of OCS leases, the Secretary of the Interior was enjoined from conducting an OCS lease sale because, among other reasons, the Secretary "failed to articulate a proper basis for his finding that the proposed Lease Sale is consistent with the Massachusetts Coastal Zone Management Program." *Conservation Law Foundation v. Watt*, 560 F. Supp. 561, 578 (D. Mass. 1983), *aff'd*, 716 F.2d 946 (1st Cir. 1983).

The *only* exception to this blanket prohibition arises if a court has issued a final judgment that federal action is not fully consistent with the state program, and the President, upon the written request of the Secretary of Commerce, exempts compliance on grounds that the activity at issue "is in the ***paramount interest*** of the United States." 16 U.S.C. § 1456(c)(1)(B) (emphasis added). As the United States itself recently reported, "[t]his exemption was added to the statute in 1990 and has not yet been used." U.S. Department of Commerce, *Federal Consistency Requirements*, at 9 (Sept. 20, 2004), *available at* http://coastalmanagement.noaa.gov/pdf/fedconreqmts.pdf.

The Government's argument that "nine of the ten units have already survived consistency review [during the 1980s] pursuant to" § 1456(c)(3) says nothing about the current fate of the leases under § 1456(c)(1). As the federal government well knows, the sole purpose behind California's filing of the *California v. Norton* lawsuit in 1999 was to attain the right to assert such inconsistency against the 1999 suspensions. As the California Attorney General publicly pronounced in filing the lawsuit: "[The filing is] an attempt to terminate the offshore leases . . . We want to end this threat to the coastline." Santa Barbara News-Press, November 17,

1999, at A1 ("State Sues U.S. Over Offshore Oil Leases"). (Heck Decl. ¶ 46 and Exh. 95 thereto).

**B. Section 1456(c)(3) Consistency Objections Can Be Overcome by Administrative Action.**

Section 1456(c)(3)(B) provides in pertinent part that a lessee submitting an EP or a DPP to MMS for approval must "attach to such plan a certification that each activity which is described in detail in such plan complies with the enforceable policies of such state's approved management program and will be carried out in a manner consistent with such program." A federal agency cannot grant any license or permit for any activity described in detail in the EP or DPP unless the state concurs with that certification *or* the Secretary of Commerce overrides the state objection, finding "that each activity which is described in detail in such plan is consistent with the objectives of this chapter or is otherwise necessary in the interest of national security." *Id.*

Thus, unlike section 1456(c)(1), activity subject to Section 1456(c)(3) review (*i.e.*, EPs and DPPs) *can* go forward even if deemed inconsistent with the state's coastal management program, if the Secretary of Commerce finds the activities set forth in the EP or DPP are either "consistent with the objectives of" the CZMA *or* "necessary in the interest of national security."

The Secretary of Commerce's power under Section 1456(c)(3) to override a state objection because the proposed activities are "consistent with the objectives of" the CZMA (commonly referred to as "Ground I") have been defined by regulation as follows:

> A federal license or permit activity, or a federal assistance activity, is "consistent with the objectives or purposes of the Act" if it satisfies each of the following three requirements:
>
> (a) The activity furthers the national interest as articulated in Sec. 302 or Sec. 303 of the Act, in a significant or substantial manner,

> (b) The national interest furthered by the activity outweighs the activity's adverse coastal effects, when those effects are considered separately or cumulatively.
>
> (c) There is no reasonable alternative available which would permit the activity to be conducted in a manner consistent with the enforceable policies of the management program. When determining whether a reasonable alternative is available, the Secretary may consider but is not limited to considering, previous appeal decisions, alternatives described in objection letters and alternatives and other new information described during the appeal.

15 C.F.R. § 930.121 (2004).

The Secretary of Commerce has frequently overridden a state objection and allowed lessees to proceed with its planned EP or DPP activity. *See, e.g., Decision and Findings in the Consistency Appeal of Union Oil Company of California to An Objection From the California Coastal Commission* (Nov. 9, 1984) ("The Secretary has found that [Union Oil's] appeal has met the requirements…set forth in 15 CFR 930.121, and, therefore, that [Union Oil's] proposed drilling of two exploratory wells on OCS P-0203, although inconsistent with the CCMP [California Coastal Management Program], is consistent with the objectives of the CZMA and may be permitted by Federal agencies.")[9]; *Decision and Findings in the Consistency Appeal of Gulf Oil Corporation to An Objection From the California Coastal Commission* (Dec. 23, 1985) ("The Secretary has found that Gulf's appeal has met the requirements…set forth in 15 CFR 930.121, and, therefore, that Gulf's proposed exploratory well on OCS P 0505, although inconsistent with the California Coastal Management Program, is consistent with the objectives of the CZMA and may be permitted by Federal agencies."); *Decision and Findings of the Secretary of Commerce in the Consistency Appeal of the Korea Drilling Company, Ltd. From an Objection By the California Coastal Commission,* (Jan. 19, 1989) ("Having found all elements of

---

[9] A courtesy copy of the decisions of the Secretary of Commerce that are unavailable on Lexis-Nexis or Westlaw has been provided to Chambers and counsel under separate cover.

15 C.F.R. § 930.121 satisfied, the Secretary concluded that the proposed activity [exploratory drilling] may be Federally permitted because it is consistent with the objectives or purposes of the Act"); *Decision and Findings in the Consistency Appeal of Texaco, Inc. From An Objection By the California Coastal Commission* (May 19, 1989) ("Because Texaco's proposed project has satisfied the requirements of Ground I, the proposed project [exploratory drilling] may be permitted by Federal agencies"); *Decision and Findings in the Consistency Appeal of Amoco Production Company From An Objection By the Division of Governmental Coordination of the State of Alaska* (July 20, 1990) ("Because Amoco's proposed project [exploratory drilling] meets the requirements of Ground I, it is consistent with the objectives or purposes of the CZMA. As a result, Federal agencies may issue permits to Amoco to allow it to conduct the proposed activity."); *In the Consistency Appeal of Chevron U.S.A., Inc, From an Objection By the State of Florida,* 1993 NOAA Lexis 2, at * 4 (Jan. 8, 1993) ("Because Chevron's proposed project [exploratory drilling] has met the requirements of Ground I, the proposed project may be permitted by federal agencies"); *In the Consistency Appeal of Mobil Exploration & Producing U.S. Inc., From an Objection By the State of Florida,* 1995 NOAA Lexis 37, at * 6-7 (June 20, 1995) ("Because Mobil's proposed SPOE [Supplemental Plan of Exploration] meets the requirements of Ground I, the project may proceed as proposed").[10]

---

[10] Of course, not every CZMA appeal has succeeded, *see, e.g.*, *Decision and Findings in the Plan of Exploration Consistency Appeal of Mobil Oil Exploration & Producing Southeast From an Objection by the State of North Carolina* (Sept. 2, 1994) (rejecting Mobil's CZMA appeal with respect to the proposed exploratory drilling at issue in *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000)). The important point, however, is that many CZMA appeals under section 1456(c)(3) have succeeded.

Respectfully submitted,

s/ Jeremy D. Kernodle

E. Edward Bruce
Steven J. Rosenbaum
*Counsel of Record*
Jeremy D. Kernodle
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-5568
Facsimile: (202) 778-5568

March 28, 2005

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify under penalty of perjury that on this 28th day of March, 2005, I caused to be delivered by United States Mail, First-Class, a copy of the foregoing Plaintiffs Supplemental Brief In Response To The Court's March 9, 2005 Order, along with the accompanying Second Supplemental Declaration of Ronald G. Heck, as follows:

Patricia A. McCarthy
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

Jeffrey D. Antonson
Jackson Walker, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202

s/ Jeremy D. Kernodle
Jeremy D. Kernodle