# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

******************************************

| | |
|---|---|
| AMBER RESOURCES COMPANY, *et al.*, | |
| *Plaintiffs,*<br><br>v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ****************************************** | |
| ANADARKO E & P COMPANY L.P., *et. al.*, | |
| *Plaintiffs,*<br><br>v. | |
| | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ****************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| ****************************************** | |

**THIRD SUPPLEMENTAL DECLARATION OF RONALD G. HECK**

Ronald G. Heck declares and states as follows:

1. I provide this third supplemental declaration in support of plaintiffs' motion for summary judgment as to liability and partial summary judgment as to damages. My background was set forth in the August 27, 2004 declaration I previously submitted in support of that motion.

2. On or about April 7, 2005, the Minerals Management Service of the United States Department of the Interior issued ten consistency determinations with respect to the suspension requests relating to the lawsuit leases. Copies of these consistency determinations may be found at http://www.coastal.ca.gov/energy/ocs/ocs-lease-renewal.html.

3. Attached hereto as Exhibit 116 is a true and correct copy of an April 22, 2005 letter from the Manager of the Energy and Ocean Resources Unit of the California Coastal Commission to the Regional Manager of the Pacific OCS Region of the Minerals Management Service, United States Department of the Interior, sent on or about that date.

4. Attached hereto as Exhibit 117 is a true and correct copy of a May 5, 2005 letter from the Governor of California to the Secretary of the United States Department of the Interior, sent on or about that date.

5. Attached hereto as Exhibit 118 is a true and correct copy of a May 12, 2005 letter from the Associate Director for Offshore Minerals Management of the Minerals Management Service to a Senior Trial Attorney of the United States Department of Justice, sent on or about that date.

6. Attached hereto as Exhibit 119 is a true and correct copy of a May 12, 2005 letter from a Senior Trial Attorney of the United States Department of Justice to a Supervising Deputy Attorney General of the State of California, sent on or about that date.

7. Attached hereto as Exhibit 120 is a true and correct copy of a May 13, 2005 letter from counsel for the lessees in the *California v. Norton* litigation to a Supervising Deputy Attorney General of the State of California, sent on or about that date.

8. Attached hereto as Exhibit 121 is a true and correct copy of a May 13, 2005 motion, without attachments, filed by the State of California in the *California v. Norton* litigation, on or about that date.

9. Attached hereto as Exhibit 122 is a true and correct copy of a May 17, 2005 Order in the *California v. Norton* litigation, issued on or about that date.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on May 24, 2005

Ronald G. Heck

# Exhibit 116

STATE OF CALIFORNIA -- THE RESOURCES AGENCY
ARNOLD SCHWARZENEGGER, GOVERNOR

CALIFORNIA COASTAL COMMISSION
45 FREMONT STREET, SUITE 2000
SAN FRANCISCO, CA 94105-2219
VOICE AND TDD (415) 904-5200

April 22, 2005

Ellen Aronson
Regional Manager
United States Department of the Interior
Minerals Management Service
Pacific OCS Region
770 Paseo Camarillo
Camarillo, California 93010-6064

RE: **Consistency Determinations, Minerals Management Service, OCS Lease Suspensions, Lion Rock Unit (CD-042-05), Point Sal Unit (CD-043-05), Santa Maria Unit (CD-044-05), Purisima Point Unit (CD-045-05), Lease 0409 (CD-46-05), Bonito Unit (CD-047-05), Rocky Point Unit (CD-048-05), Sword Unit (CD-049-05), Gato Canyon Unit (CD-050-05), and Cavern Point Unit (CD-051-05).**

Dear Ms. Aronson:

On April 7, 2005, the Coastal Commission staff received the above-referenced consistency determinations from the Minerals Management Service ("MMS") for lessee requests for OCS oil and gas lease suspensions. The regulations promulgated by the NOAA, which implement the Coastal Zone Management Act ("CZMA") (CFR, Title 15, Part 930; hereinafter referred to as "the CZMA regulations"), describe a consistency determination as a brief statement that the project is consistent to the maximum extent practicable with the CCMP, an analysis of the relevant enforceable policies of the CCMP, a detailed project description, and any necessary data or information to support the analysis. Specifically, the regulations provide:

***§930.39 Content of a consistency determination.***

*(a) The consistency determination shall include a brief statement indicating whether the proposed activity will be undertaken in a manner consistent to the maximum extent practicable with the enforceable policies of the management program. The statement must be based upon an evaluation of the relevant enforceable policies of the management program. A description of this evaluation shall be included in the consistency determination, or provided to the State agency simultaneously with the consistency determination if the evaluation is contained in another document... The consistency determination shall also include a detailed description of the activity, its associated facilities, and their coastal effects, and comprehensive data and information sufficient to support the Federal agency's consistency statement. The amount of detail in the*

> *evaluation of the enforceable policies, activity description, and supporting information shall be commensurate with the expected coastal effects of the activity. The Federal agency may submit the necessary information in any manner it chooses so long as the requirements of this Subpart are satisfied.*

The 1990 amendments to the Coastal Zone Management Act ("CZMA") obligate the Coastal Commission to evaluate reasonably foreseeable direct and indirect effects of a proposed activity, including cumulative and secondary effects. Pursuant to the District Court's order in *State of California v. Norton*, the Commission has begun its review of the MMS's consistency determination submittals and has determined that the following information is necessary for the Commission to complete its review of the consistency of the proposed activities with the enforceable policies of the California Coastal Management Program ("CCMP").

## General Comments Pertaining to all MMS Consistency Determinations

1. The submitted documents acknowledge in many places that an adverse impact may occur due to future exploration, development and production effects (e.g., damage to dune habitat), mentions that its effects could be mitigated by a particular action (e.g., re-routing to avoid dunes), but fails to commit to require a lessee to implement that mitigation measure. MMS instead relies on the following standard statement: "...any conflicts with the enforceable policies can be avoided. Residual and/or remaining effects on coastal public access that cannot be mitigated to a level of insignificant could still be approved by the MMS and Coastal Commission [pursuant to NEPA and CCMP Section 30260]".

   Reliance on this statement is wholly inadequate for determining conformity to Coastal Act policies. Many of those policies, including Section 30260 of the CCMP, require that avoidance and mitigation be provided to the maximum extent feasible; however, for the most part, the submittal documents do not describe feasible mitigation measures that will be incorporated into the proposed development. Even when a potential adverse effect is described as "high" or "significant" (e.g., Table 5.7-1, which summarizes impacts to rocky and sandy beaches from oil spills), there is no description of what types of mitigation measures MMS will require to avoid or reduce those effects.

   Additionally, in many instances, the significance criteria used to characterize the levels of impact do not allow a determination of whether the activities will conform to Coastal Act policies. For example, identifying an impact as "negligible", "low", or "moderate" does not indicate if the activity conforms to the relevant Coastal Act policy and if that impact will be mitigated to the maximum extent feasible.

   We request that MMS: (a) specify in its Coastal Act policy analysis where it has already imposed a lease stipulation that avoids or minimizes to an acceptable level an

environmental effect; (b) where no applicable lease stipulation exists which so avoids or minimizes an identified environmental effect, identify (i) the additional, specific measures that either through the lease suspension approval process or through the review by the MMS of Exploration Plans and/or Development Production Plans the MMS may require to avoid or minimize the identified impact (e.g., MMS will require that all produced oil be pipelined to its final refinery destination); and (ii) the regulatory, including but not limited to 30 CFR § 250.177, or other legal authority under which the MMS possesses the legal ability to impose such requirements.

2. In 1990 and 1992, former President Bush imposed a moratorium on any new leases in specific planning areas of the OCS, including the Southern California Planning Area. The moratorium was based on findings by the National Research Council that information to inform decision-making was inadequate.[1] The moratorium was intended to give MMS time to address those inadequacies. Please describe the extent to which the MMS has addressed those inadequacies regarding the Southern California Planning Area.

3. The documents state that CCMP Section 30233 does not apply to the proposed development. This is incorrect. CCMP Section 30233(a) is a fully effective provision of the federally-approved CCMP and thus, to the extent that a proposed activity falls within the scope of its terms, is fully applicable to that activity. It requires that fill placed in coastal waters be permitted only when it is determined there are no feasible less environmentally damaging alternatives, where feasible mitigation measures have been provided to minimize adverse environmental effects, and only for specific types of uses. The proposed placement of new platforms, pipelines, cables, and other infrastructure associated with post-suspension activities constitute "fill" under the Coastal Act, and therefore needs to be evaluated for conformity to Section 30233.

   Please revise all applicable sections of the submitted documents that relate to placement of fill. These include, but are not limited to, analyses of the effects of such structures on shoreline and nearshore habitat areas, alternative locations or methods that would reduce or minimize the amount of fill needed for the development, and materials used in the structures that may reduce adverse effects.

4. To meet the requirements of CCMP Sections 30234.5 and 30250, please submit a revised commercial fishing cumulative impact analysis for anticipated exploration, development and production across all Units that considers:

   - The total area of fishing preclusion zones currently in place as a result of existing OCS oil infrastructure (broken down by location and size).

1 National Research Council. *The Adequacy of Environmental Information for Outer Continental Shelf Oil and Gas Decisions: Florida and California,* 1989.

- The original life and the proposed extended life of all existing preclusion zones that will have a longer life because of the extension of life of existing infrastructure (e.g., zones around the Point Arguello platforms).
- The total area of new fishing preclusion zones that will be necessary because of hypothetical activities associated with the lease suspensions (again, broken down by location and size).

5. The documents contain several inconsistencies related to the expected life of the platforms. For example, EID Section 5.2.2 states that the four new proposed platforms would be removed by 2050, but Table 5.2-5 shows that all platforms would be removed by 2030. Please clarify which date is correct and adjust the appropriate analyses to reflect the corrected date.

6. The documents analyze oil and gas-related structures as "habitat." Please note that the Coastal Commission has in numerous past actions (e.g., Coastal Development Permits E-95-09, E-95-10, E-95-11, E-95-12, E-95-13, E-95-14, E-95-17 and E-96-14) determined that structures such as these, whose express purpose is to provide infrastructure necessary to develop oil and gas leases, do not constitute habitat. Although the Commission acknowledges that structures such as pipelines, pilings, or similar hard-surfaced objects placed in the water column may provide incidental, habitat-related benefits to marine life, those benefits do not constitute marine habitat for purposes of the Commission's environmental review and analysis for conformity to the Coastal Act. During Commission review, these incidental benefits are not incorporated into impact analyses or into mitigation considerations. For example, if an underwater pipeline proposed to be removed acts as a substrate for kelp, the Commission has not required the applicant to mitigate for the loss of any kelp that may be attached to the pipeline.

   We therefore request that the impact analyses that assign habitat value to the various hard structures be revised so that these incidental values are not included in the analyses and do not function to offset or otherwise serve as part of the basis for determining the impacts of retaining or removing the structures.

7. CCMP Sections 30230 and 30231 require that water quality and marine resources be maintained, enhanced, and where feasible, restored. The EID (at Table 5.6-3, for example) provides specific water quality effects for some types of polluting substances (e.g., noncontact cooling water discharges result in additional chlorine in the water column) but describes several other types of polluting substances (e.g., drilling muds, treated sewage, domestic wastes, cement slurry, etc.) as causing only "general pollution." These substances are known to cause specific adverse effects on water quality, and in some cases, are known to contain specific contaminants of concern. Please provide an analysis of the specific effects that would result from these types of substances.

8. With regard to protection of marine biological resources, EID Section 4.7.2 states that MMS has required the Biological Lease Stipulation to protect rare, unique, or sensitive populations in 10 of the 36 leases, but provides no explanation of why it applies only in those leases. Please provide additional explanation of this statement and describe whether the Stipulation will be applied to the additional leases and, if not, explain why not.

9. Many of the data in the EID used to characterize particular species appear to be out-of-date and may therefore not accurately portray the status of those species or recent population trends. For example, the population data for the Guadalupe fur seal are no more recent than 1993 and for the western snowy plover are no more recent than 2000. Up-to-date information is especially important for evaluating the potential effects of the proposed activities on threatened and endangered species. It is additionally clear from perusing other sources of information that more recent data is readily available for many species discussed in the EID. Please incorporate these more recent data into revised assessments of how proposed activities may affect these species.

10. CCMP Section 30244 requires that reasonable mitigation measures be required when development would adversely affect archaeological or paleontological resources. The analysis in the EID (Section 5.8.1.2) defines the degree of impact (high, medium, or low) based on the length of time these resources would be affected. This "duration-based" criterion is not adequately explained or supported in the analysis, and does not appear to reflect the Native American concerns described later in that section. Even short-term disturbances of a cultural resource or site may have long-term and significant adverse effects on its value; however, this recognition does not appear to be incorporated into the criterion above. We therefore request that you reassess the potential effects of suspension and post-suspension activities on these resources based on criteria more suitable to the actual effects likely to be caused by the development – for example, criteria suggested later in the EID at Section 5.8.2.2, which discusses the effects on these resources based on the degree of disturbance, the proximity of post-suspension activities to the various resources, and other characteristics as described in the referenced National Register guidelines.

11. The requirements of CCMP Section 30251 include protecting the scenic and visual qualities of coastal areas, siting development so it is visually compatible with the character of the area, and making development subordinate to the character of highly scenic areas. The documents do not provide the analysis necessary to enable the Commission to determine whether the proposed activities will meet these requirements. Please provide the following additional information:

    a) The significance criteria used in the EID (in Section 5.9.2) are based on whether development would be visible from "major public viewing areas" during high, moderate, and non-peak viewing seasons. These criteria do not adequately describe the level of impact that would occur. Please re-assess the effects using additional

criteria, such as the distance of the development from the viewing area and how the visual effects of the proposed development compares with such effects of existing development in the various public viewsheds within the lease areas.

b) The EID includes an illogical contention that new platforms would not increase the already significant cumulative impact to visual resources, but would only expand the area in which those effects are realized. That is akin to saying because visual blight is present somewhere in California it can be expanded to anywhere in California without increasing the effect of visual blight. Please re-assess how this contention was included in the submittal and either delete it or provide additional justification for it.

c) The documents summarize visual impacts as moderate or high for all the Northern Santa Maria Basin leases. However, the descriptions do not appear to match the actual expected effects in each lease area – for example, both the Lion Rock Unit and Lease 409 are described as having moderate or high impacts, but only Lease 409 is proposed to have a platform. Please clarify the criteria used to describe the visual impacts of the platforms and how those criteria were applied to reach this conclusion.

d) The documents state that the proposal is consistent with Section 30251, despite its moderate or high level of visual impacts – for example, the Lease 409 consistency determination describes new platforms as causing a "high-level, unmitigated, cumulative effect" and states that there is an "inability to reduce the physical intrusions into high quality coastal areas." Please provide a justification for the MMS's conclusion that the proposed activities do not contravene the visual resource protection standards of Section 30251. Additionally, the visual resource sections of the submittals include no analysis of feasible alternatives that would avoid or reduce these impacts through different locations further from shore, smaller platform profiles, or other mitigation measures. Therefore, we request an alternatives analysis that describes feasible measures available to reduce the visual impacts. This analysis should include photo simulations of the four proposed platforms from significant public view areas (e.g., Highway 101, State Parks and beaches).

12. CCMP Section 30253(3) requires projects to be consistent with requirements imposed by an Air Pollution Control District ("APCD") or the State Air Resources Board ("CARB"). Please provide the type and level of data necessary for submittal to the APCD and/or CARB to obtain their approval. This information should include the following:

- A quantitative summary of emissions from activities at each currently producing Unit.

- A quantitative projection of future emissions for two scenarios: 1) production at these Units if activities continued as currently approved under relevant permits with no new production; and 2) production at these Units under the assumed hypothetical activities described in the EID.
- A quantitative projection of expected emissions from Units not currently under production.
- An analysis, for each of these scenarios, of the contribution of OCS oil activities to the non-attainment status of the Santa Barbara County Airshed.
- Information on existing offsets, and a detailed discussion of possibilities for future offsets. The EID, at Page 5.4-10, states that there are currently a limited number of available offsets, and suggest there may not be enough to adequately mitigate potential impacts. Please also describe the status of offsets currently unused by existing offshore production and whether they will be used for future production.
- A cumulative impacts analysis including all projected future emissions from the hypothetical future activities of all proposed lease suspensions.

13. The consistency determinations and EID assume only one option for moving crude oil produced on platforms to shore, namely, by pipeline. Please explain the basis of this assumption in light of: 1) the fact that applicable regulatory authority, specifically 30 CFR § 250.204(a)(8)(i)(B) appears to leave to the discretion of the producer the means of transportation to shore of oil and gas produced on the OCS; and 2) efforts, described below, by the oil and gas production industry to preserve marine tankering as a transportation option. The Western States Petroleum Association ("WSPA"), acting on behalf of offshore lessees, has opposed and continues to oppose legislation that would prohibit marine tankering of crude oil produced from these leases.[2] For example, WSPA contends that limiting transportation of oil produced offshore California to pipelines would adversely impact the national interest. In its February 18, 2004, letter to John King of the National Oceanic and Atmospheric Administration ("NOAA"), for example, WSPA states:

> *AB 16 will adversely impact OCS oil development by eliminating transportation options for moving the crude to refineries. Currently, the majority of crude produced offshore California is transported to refineries by pipeline. However, other modes of transportation are also used, and there is a growing need for transportation flexibility in order to assure that offshore crude can be delivered to the refining locations at which it will be most needed.*[3]

2 That legislation includes: (1) Recently enacted California law (Assembly Bill (AB) 16 ( 2003), codified as California Public Resources Code §§ 30262(a)(7), (8)) and (2) amendments that Santa Barbara County adopted into its Local Coastal Program (LCP) in 2004 and that are pending certification by the California Coastal Commission.

3 Letter to John King, Acting Chief, Coastal Programs Division, Office of Ocean and Coastal Resource Management, National Oceanic and Atmospheric Administration, from Suzanne Noble, Senior Coordinator, WSPA and John Martini, Chief Executive Officer,

> *AB 16's restrictions on transportation flexibility would have several corollary consequences impacting national interest. Concerns regarding the lack of transportation options may deter further development of existing oil leases, even where such development was envisioned in the original permits and approvals. Such unreasonable restrictions on transportation could even be considered a material breach of contract, with attendant governmental liabilities, to the extent that these restrictions impede the development of oil and gas leases entered into at a time when no such restrictions existed.*[4]

These and other statements[5] appear to provide ample evidence that lessees continue to seek the ability to transport offshore crude oil by marine tankers and barges. It also suggests that, in reviewing the MMS's consistency determinations, the Coastal Commission should consider the substantially increased risk of shipping crude via marine tankers, as described in the EID (p. 5.7-4, for example), absent substantial and compelling evidence to the contrary. Please submit any such evidence that reconciles conflicting representations of how this oil will be transported to shore, and from landfall to refineries. If none is available, please correct transportation assumptions and address consistency in light of the potential for POCS crude oil to be transported via marine vessels.

14. CCMP Section 30232 requires: a) the protection of coastal and marine resources against the spillage of crude oil, gas, petroleum products, or hazardous substances in relation to any proposed development or transportation of materials; and b) the provision of effective containment and clean-up facilities and procedures for any accidental spills that do occur.

    The analysis of oil spill risks and potential impacts to resources in Section 5.3 of the EID does not provide sufficient information to enable the Commission to evaluate consistency of anticipated post-suspension activities with Coastal Act policies. Oil spill risk is treated in only a very general manner, with very few references to project-specific information for either existing OCS operations or hypothetical future projects. Additionally, the analyses throughout do not sufficiently distinguish the differences in spill response strategies that may result from the lighter oil in the some parts of the lease area and the heavy oil in the Northern Santa Maria Basin Units and the Sword Unit. Consequently, the oil spill impact analyses throughout the subsequent sections (5.4-5.15) are overly general, uninformative, and provide insufficient factual basis for consistency evaluation.

---

California Independent Petroleum Association, date February 18, 2004, p. 5.

4 *Ibid*, p. 6.

5 See also letters submitted to Ms. Meg Caldwell, Chair, California Coastal Commission by Ms. Jocelyn Thompson of Weston Benshoff Rochefort Rubalcava & MacCuish LLP, attorneys representing WSPA, dated January 31, 2005 and February 14, 2005, and submitted in opposition to County adopted LCP amendments restricting shipment of offshore oil via marine tanker (and other restrictions).

We recognize that the hypothetical post-suspension scenarios are uncertain. However, the scenarios presented are the best information currently available on what can reasonably be expected if suspensions are granted and development of the undeveloped leases proceeds. The hypothetical post-suspension scenarios are concrete and detailed enough to support far more informative analysis than has been presented in either the EID or the draft EIS for Delineation Drilling[6], upon which the EID is substantially based. Project-specific estimation of maximum spill volumes and trajectory modeling are not only feasible but are necessary to disclose incremental increases in oil spill risks to coastal resources for the various development scenarios. Some major areas of deficiency include:

a) Three spill volumes are used throughout the environmental impact analyses. The "most likely spill" size from oil and gas activities is given as 200 barrels, and the "mean spill size for a tanker spill" is given as 22,800 barrels, both of which may be reasonable. However, the "most likely maximum size of a major oil spill from potential future development – the maximum most probable discharge" is given as 2,000 barrels, based on the probability of a spill from the Point Arguello pipeline assuming current operations. This same number is applied to all projects, including both current operations and post-suspension development. This is a gross over-simplification, as expected worst-case spills may vary greatly from project to project due to large differences in anticipated production and other factors. (Volumes of oil transported by offshore pipelines range from a current 6,000 barrels per day from Platform Irene to a projected 92,000 barrels per day from hypothetical SMB "B" platform.) The maximum reasonably foreseeable spill size should be computed for each current project and estimated for hypothetical scenarios, in order to adequately portray the risks to the environment in subsequent sections of the EID.

b) The estimated probabilities of offshore spills from existing and hypothetical future development scenarios are summarized in Table 5.3-2, for spills of 50-999 barrels, and Table 5.3-3, for spills of 1,000 barrels or more. In principal, the tables and an accompanying explanation could be effective in communicating the estimated risks. The spill probabilities are based on historic spill rates, and reflect a conservative approach to risk analysis. However, the information is presented unclearly in these tables, so that the information is somewhat misleading, and risks are identified and/or described poorly. Please revise the table to address the following concerns:

- There is no description of cumulative oil spill risks from both existing production and future hypothetical development. The last row of these tables describes the spill risk of the hypothetical development scenario only, not the hypothetical development plus existing production. It is at best unrealistic, and at worst misleading, to present information that assumes that all existing production will cease before the hypothetical future development occurs. Please

6 Minerals Management Service, Pacific OCS Region. *Delineation Drilling Activities in Federal Waters Offshore Santa Barbara County, California.* Draft Environmental Impact Statement. Published by the US Department of the Interior, MMS, Pacific OCS Region. Document 2001-046. June, 2001.

revise these tables to show the estimated mean number of spills and probability of one or more spills for each existing operation and hypothetical project. Please summarize the data as the probability of one or more spills from a) existing operations, and b) existing operations plus hypothetical projects.

- Please clarify the time frame over which the data applies. The second row of Table 5.3-2, for example, indicates that the estimated mean number of spills from existing production during 2006-2009 is 1.42 spills. Please provide information for existing production covering the lifespan of the existing projects, not only for the upcoming three-year time span. The last row of the tables, "Hypothetical Development Scenario" does not list a time span over which the data apply. Obviously, 5.155 spills in a five-year period is a greater concern than 5.115 spills in a 30-year period. Please provide information on estimated mean number of spills and spill probabilities for the entire lifespan of both existing projects and future hypothetical development.

- We understand that these tables were derived from Tables 5.1.3.1-2 and 5.1.3.1-3 in the Draft EIS.[7] The proposed project in that document involved drilling four to five delineation wells, and therefore the first row of Tables 5.3-2 and 5.3-3 of the EID discuss oil spill risks from these proposed wells. The project in the EID is different, however, from that proposed in the original Draft EIS, and because under the hypothetical development scenario presented in the EID many operators may be performing delineation, exploration and development drilling at the same time in the post-suspension period, the separate analysis of delineation drilling risks is inapplicable to the current analysis. We believe the text of section 5.3.3: Estimated Spill Risk of Delineation Drilling is helpful, but suggest removing the first row of Tables 5.3-2 and 5.3-3 describing delineation drilling risks.

- Please clarify the content of the second and third rows of data. The second row provides information on "Cumulative w/o Hypothetical Scenario," while the third row provides information on "Cumulative w/o Undeveloped Leases." As the hypothetical development scenarios are proposed for the undeveloped leases, it is unclear what exactly these two rows are describing. This confusion is especially problematic as both the estimated mean number of spills and the spill probabilities are very different in rows two and three. Please clarify the scenarios and the information presented in rows two and three of these tables.

c) The oil spill risk discussion focuses on the probability of "one or more spills" and offers no information on multiple spills. This is a serious oversight that minimizes the apparent risk of spills. Our analysis of MMS data using the Poisson model according to MMS methodology shows that the estimated risk of multiple spills is significant, and that post-suspension development would substantially increase the probability of multiple spills over the life of the projects. For instance, estimated

7 *ibid.*

probability of spills from existing state and federal platforms and pipelines and from existing plus hypothetical, post-suspension production offshore Santa Barbara County are shown below. Please revise Tables 5.3-2 and 5.3-3 to include an analysis of oil spill risks from multiple oil spills.

| | Estimated probability of spills 50-999 barrels | | Estimated probability of spills 1,000 barrel or greater | |
|---|---|---|---|---|
| | existing operations | existing + hypothetical | existing operations | existing + hypothetical |
| 1 or more spills | 96.8% | 100.0% | 46.0% | 76.8% |
| 2 " | 85.9% | 99.7% | 12.8% | 42.9% |
| 3 " | 67.0% | 98.8% | 2.5% | 18.1% |
| 4 " | 45.3% | 96.3% | 0.4% | 6.1% |
| 5 " | 26.5% | 91.0% | 0.0% | 1.7% |
| 6 " | 13.6% | 82.5% | | |
| 7 " | 6.2% | 70.8% | | |
| 8 " | 2.5% | 57.2% | | |
| 9 " | 0.9% | 43.3% | | |
| 10 " | 0.3% | 30.6% | | |

d) In EID section 5.3.3 the probability of oil spills during delineation drilling is estimated to be less than 0.05%, and the possibility of spills in the delineation phase is dismissed: "Therefore, the risk of a spill is considered to be minimal, and poses almost no risk to the marine environment." (Page 5.3-12.) We believe that MMS's statistical model, which is based on production statistics, was misapplied to delineation drilling. We believe it is more appropriate to use MMS data from 1992-2000 for exploration-related spills. The need for disclosure is underscored by the occurrence of a "blow-out" on Platform Gail as recently as November 18, 2004, due to operator error. The loss of well control (or "blow-out") occurred during a recompletion operation on well E-15. Though oil spillage was minor, the incident did result in a significant gas release, platform shutdown, and evacuation. Under different conditions, it could have led to a significant oil spill.

MMS data on exploration-related spills shows that 3 spills of over 50 barrels occurred in the drilling of 3031 wells. Based on this data, the mean expected number of spills is about 0.0015. This mean number of spills is too small to estimate spill probability with much confidence. However, the data strongly suggest that the estimate of less than 0.05% is unrealistically low, and that the true probability of a spill might be in the range of 0.1% to 0.2% (i.e., between one-in-500 and one-in-1000, versus one-in-2000). Therefore, please revise the discussion in Section 5.3.3 to include a probability estimate derived from MMS delineation drilling spill data. Furthermore, the probability numbers should be put in some

familiar context (i.e., what familiar risks have odds in the range of 1/500-1/1000), so the reader can interpret what the probabilities mean).

e) Oil spill trajectories and possibility of shoreline contact are presented cursorily in Sections 5.3.4.2 to 5.6 and Appendix J of the EID. The trajectory analyses are treated in much greater detail in the 2001 Draft EIS for Delineation Drilling. However, none of the analyses describes the anticipated risk that oil spills from the specific existing or hypothetical projects would contact different stretches of shoreline. Please provide trajectories that are computed for likely spill locations for each project, and that are based on scenario-specific, maximum reasonably foreseeable spill sizes and anticipated oil characteristics. The summary in the EID is overly general and does not provide a realistic picture of oil spill risk to shoreline resources. The analysis in the 2001 Draft EIS provides interesting detail, but does not offer scenario-specific interpretations. In short, what is lacking are: a) adequate trajectory analysis for each existing project and hypothetical scenario, using scenario-specific, maximum reasonably foreseeable spill sizes; and b) a summary review of the analyses that clearly communicates the risk exposure borne by different coastal areas due to potential spills from each project, including discussions of variability and uncertainty in the estimates. Without this level of analysis, the representations about resource impacts in subsequent sections lack a realistic foundation.

f) The discussion and conclusions in Sections 5.3.5 and 5.3.6 of the EID provide only a very general description of the shoreline areas that may be potentially affected within a 10-day trajectory period. Information is readily available from the USCG Area Contingency Plan (ACP) for Los Angles/Long Beach - Northern and Southern Sectors that identifies and lists the sensitive resources in detailed maps of the coastlines that can be potentially affected by oil spills from the hypothetical developments. Please include, at least, these ACP lists/maps in the EID, or reference them with a citation. In addition, the trajectories only show potential impacts for the 10-day duration. The GNOME models can provide trajectories for shorter duration. A spill that happens from a pipeline close to shore will likely have faster and very different shoreline impacts than a spill from a platform further from shore. The EID should provide the data and discussion to show the potential impacts at different critical points in time from different spill locations.

g) The EID Section 5.3.1.3 provides only a very general description of the response equipment available to respond and clean up a spill. Detailed information about response capability in the region currently exists and should be added to the EID. Please provide: a) a list of the response equipment that is currently in place on platforms Hermosa, Hidalgo, and Harvest, or provide a citation to the platforms' oil spill response plans that list the equipment available; and b) a list of Clean Seas' and MSRC's oil spill response vessels/fast response vessels, including response times to the platforms, which are located within the Santa Barbara and Santa Maria

Basin regions, or provide a citation to the applicable Clean Seas and MSRC Response Manuals' sections.

h) The EID provides only a very general discussion of the federal and state regulations and programs for oil spill prevention measures. More detailed information is readily available. Please include in the EID: a) the prevention measures currently in place on the existing platforms, platforms, onshore facilities; and b) types of prevention measures that will be required by MMS and other federal and state agencies in the hypothetical development scenarios.

i) Please provide description and citations to the oil spill response plans for the existing platforms that will be used in some of the hypothetical development scenarios.

j) The EID's analysis of oil spills (at Page 5.7-96) states it is unlikely that spilled oil would enter coastal wetlands or estuaries in part because the water flow from those landscape features is outward. Please note that the water flow in most of these coastal features is affected by the tide, so it is therefore more accurate to assume that oil could readily enter and affect these features. Please revise the analyses to reflect this condition.

For each of the revisions and additional information requests above, please also distinguish as appropriate between the heavy and lighter oils found in different parts of the lease area.

15. The EID assumes only fixed platforms. As required by Sections 30233 and 30260 of the Coastal Act, we need to understand better the feasibility of platform design alternatives (e.g., a semi-submersible), including their relative advantages and disadvantages to the use of fixed platforms. Platform operators have opposed current MMS requirements to remove existing fixed platforms that sit offshore California. Additionally, the MMS has noted that removal of deeper water platforms invoke technological challenges that may be insurmountable. Therefore, we request you analyze whether there are practical alternatives to fixed platforms.

## Specific Comments

**Comments applying to Lion Rock Unit (CD-042-05), Point Sal Unit (CD-043-05), Santa Maria Unit (CD-044-05), Purisima Point Unit (CD-045-05), and Lease 409 (CD-046-05), collectively referred to as the Northern Santa Maria Basin (NSMB) Units**

16. The EID states that although the removal by MMS of three leases in the Santa Maria Unit (Leases 430, 424, and 429) is under appeal, its environmental analyses consider the effects associated with developing those leases. It appears, however, that effects of

these leases are not included in some analyses – for example, the Hypothetical Development Scenario described in Section 5.2.3.2 does not include development of these leases. Additionally, these leases lie beyond the four-mile extended reach drilling limits described later in that section, which suggests that their development would require additional platforms or additional capabilities in extended reach drilling. Please clarify the status of these removed leases and either incorporate them into the necessary analyses throughout the submitted documents or delete them. Please also clarify whether development of these leases would require additional platforms or infrastructure. If additional exploration and development activities, including new platforms, are proposed to access these leases, please evaluate their consistency with all relevant policies of the CCMP including the fill, marine resource, water quality, oil spill, commercial fishing, visual, environmental sensitive habitat, public access, recreation, archaeology, hazards, air, consolidation and coastal-dependent policies.

17. Please note that the EID's Table 4.6-3 listing dischargers in San Luis Obispo County does not include the Morro Bay-Cayucos Wastewater Treatment Plant, which represents a substantial discharge that may affect the project area. The plant discharges up to about two million gallons per day of less than secondary-treatment sewage, and concerns have been raised about the potential effects of this discharge on sea otters. This discharge should be incorporated into the document's cumulative impacts analyses.

18. The Northern Santa Maria Basin ("NSMB") Units are described as having heavier oil than other areas; however, the submitted documents do not analyze how the different characteristics of this heavy oil may result in different effects on coastal resources. CCMP Sections 30230 and 30231 require that water quality and marine biological resources be protected, enhanced, and where feasible restored. CCMP Section 30232 requires that development protect coastal resources by preventing oil spills and by providing effective containment and cleanup for spills that do occur. Exploration and development activities may require substantially different processes to produce, treat, and transport this type of oil, and development of these Units may result in substantially different impacts to coastal resources. For example, the measures needed to effectively contain and clean up spills of this type of oil may be very different from those used for lighter oil, and the effects on marine organisms of the relatively high metals content of heavy oil are likely significantly different than those of lighter oil.

    Please submit additional information throughout the submittal documents describing: a) how the characteristics of this heavy oil will require different development, treatment, and transport methods (e.g., additional heat, water injection, various emulsions, etc.); b) how those characteristics and methods may have different effects on coastal resources (e.g., greater persistence in the water column); and c) whether the characteristics of heavy oil will allow leaseholders to meet various permit limits (e.g., NPDES discharge limits) or use specific mitigation measures. Specific examples include, but are not limited to, the following:

a) What additional measures are necessary for platform operations in the NSMB to meet NPDES permit discharge requirements? In addition, the new NPDES general permit requires the evaluation of alternatives to open water discharges – e.g., re-injection, processing, barging, etc. The EID should evaluate these alternatives as part of its assessments.

b) The EID also describes differences between wet and dry oil in pipelines, but does not differentiate between light and heavy oil. The analyses should incorporate this differentiation.

c) Are the contaminant concentrations in produced water, drilling muds, cuttings, and other fluids different in heavy oil than in light oil, and what result do these differences have on the analyzed coastal resources?

d) The EID describes various spill response measures – e.g., dispersants, in-situ burning, etc. It does not, however, analyze the effectiveness of these measures to the site-specific characteristics of the NSMB, with its heavy oil, rough seas, sensitive nearshore habitats and populations, etc. Please provide additional evaluation of how effective these measures are with heavy oil, what other measures might be more effective, and other similar assessments of spill response characteristics in the NSMB area.

19. CCMP Sections 30230 and 30231 require that water quality and marine biological resources be maintained, enhanced, and where feasible, restored. Several of the impact analyses and statements in the submitted documents do not contain adequate data to determine whether activities in the NSMB will conform to those policies, or do not appear to accurately characterize potential impacts. These include the following:

a) The increased disturbance to marine mammals and birds from helicopter flights is described as "negligible to low"; however, the number of flights and the area over which flights would occur would increase substantially. The number of flights would roughly quadruple as platforms in the Santa Maria Basin increased from one to four, and the area over which they occur would extend significantly northward in an area not subject to daily flights for oil and gas production support. The EID describes a mitigation measure implemented in the Channel Islands area that requires helicopters to stay above 1000 ft. (above mean sea level), but does not state whether this or other mitigation measures would be implemented in the NSMB area. Please provide additional analysis of the disturbance likely to be caused by the increases noted above and describe feasible mitigation measures that would be implemented to avoid or minimize those disturbances.

b) Similarly, the consistency determinations for the NSMB anticipates that routine activities (e.g., drilling, production, and vessel and helicopter support traffic) will

remain at levels typical for ongoing offshore oil and gas activities in the Santa Maria Basin. For reasons similar to those expressed above, these activities would actually increase about fourfold and would cover a much larger area than current activities. Please provide additional analysis that reflects the effects of this substantial increase in routine activities.

c) The EID's evaluation of the potential impacts of post-suspension activities on sea otters uses only a simplistic numeric count of otters and uses census data from 1999. There are more sophisticated evaluation techniques that should be used and there are more recent data available. For example, research is available that describes the success and sustainability of the population based in part on the ratio of breeding-age females to males, rather than using only absolute numbers of individuals. Please re-assess the potential effects on the otter population using more recent population data and using a more comprehensive approach to determining impacts on the sustainability and recovery of the population.

d) Please note that Section 4.7.7.1 of the EID states that the "current range of the unarmored threespine Stickleback (*Gasterosteus aculeatus williamsoni*) is not within the project area." This is incorrect. This species is found in San Antonio Creek and Hondo Creek within the boundaries of Vandenberg Air Force Base, which is one of the creeks that could be affected by oil spills from the proposed activities. Please revise the analyses in the EID to reflect the presence of this species, which would need special protection in the event a spill reached shore.

20. Section 30233(a) of the Coastal Act requires the effects of fill placed in coastal waters be minimized. Section 5.2 of the EID proposes three separate power cable corridors from the new platforms to shore. Please describe whether it is feasible to reduce the impacts associated with that fill by designing the development to share a single power cable corridor, much like the proposed single pipeline corridor. Please also describe why two pipelines are necessary to allow "operational flexibility" in handling the heavy oil being transported from the NSMB leases, as stated in that section of the EID.

**Comments applying to Bonito Unit (CD-047-05), Rocky Point Unit (CD-048-05) and Sword Unit (CD-049-05)**

21. The documents do not present clear information concerning how the proposed suspension of leases or oil and gas exploration and/or production activity to which said suspensions may lead in the Sword, Rocky Point and Bonito Units will extend the life of existing Point Arguello Unit infrastructure. Nor does the document present a quantitative analysis of how the extension of life of these structures could potentially cause impacts to coastal resources. Please provide the following information:

- A complete list of all infrastructure whose life could be extended by the lease suspensions and future exploration or production activity including platforms, pipelines, power cables, and onshore facilities (such as the Arguello pumping

station and the Gaviota Heating/Transfer Facility). A list of structures whose life would not be extended by the lease suspensions would also be helpful.

- The projected extension of life for all infrastructure. Please provide information concerning when each structure would have been decommissioned without the suspensions, and when it would be decommissioned with the suspensions.
- The type and frequency of inspections that will be performed to ensure that structures will safely last the proposed extended lifespan.
- A quantitative analysis, for each issue raised by Coastal Act policies, of how the extension of life will affect coastal resources. The extension of life has the potential to cause impacts in the following issue areas: oil spills, air quality, water quality, commercial and recreational fishing, visual resources, marine biological resources, and recreation.

22. Table 5.2-4 in the EID provides peak production for the Bonito, Sword, and Rocky Point Units as follows:

| Unit/Field/Platform | Date Production starts | Peak Production Oil and Gas Volume: Oil bbl/day (Gas mcf/day) | Date |
|---|---|---|---|
| Bonito Unit/Electra and Bonito Fields/from Existing Platform Hidalgo | 2007 | 11,000 (5,500) | 2012 |
| Rocky Point/Rocky Point Field/ from existing Platforms Hermosa and Hidalgo | 2008 | 18,500 (5, 550) | 2013 |
| Sword/Sword Field/ from existing Platform Hermosa | 2007 | 12,500 (3,125) | 2012 |

Current production from the existing platforms Hidalgo, Hermosa, and Harvest is 10,000 bbls per day (from Point Arguello Unit and the eastern half of Lease 451), which is processed on the platforms before being piped to the onshore Gaviota Plant for transfer to the All American pipeline for transport to the final refinery destination. The maximum throughput capacity that can be processed on the platforms with the existing processing units is 35,000 bbls per day of oil. In previous documents, MMS has

estimated that current production of the Point Arguello Field and the eastern half of Lease 451 will peak at 31,000 bbls per day in 2006, and then decline after that.

It appears that peak production from Sword, Bonito, and Rocky Point (41,000 bbls per day) plus existing Point Arguello (10,000 bbls per day) will exceed the maximum processing/throughput limit of 35,000 bbls per day. Will there be any adjustments or new processing facilities that will need to be added to the existing platforms to accommodate processing of this increase in production? Or, will production be phased so that no more than a maximum of 35,000 bbls per day of oil is produced and processed during the peak production periods? Or, is the existing Point Arguello 10,000 bbl per day production expected to decline, and the new fields expected to gradually rise in production, peaking and then declining, which would offset the increase in production so as to be under the maximum throughput of 35,000 bbls per day processing limit?

- Please provide the variable peak oil production curves for Rocky Point, Pinon Electra, Sword, and Bonita Units plotted individually and cumulatively to determine if extended reach drilling from Point Arguello platforms and use of existing infrastructure without substantial modifications may be feasibly accomplished. These curves should also depict the expected lifecycle for development of each field. Should these data indicate that changes to infrastructure might be necessary, please describe the changes and how they might increase adverse effects on the environment.

- Please provide information that indicates the viability of processing and transporting Bonito Unit production via current infrastructure, without major modifications or increases in permitted throughput, considering overlapping development of Rocky Point and Sword Units.

According to the EID Table 4.1-6, Platforms Hermosa, Hidalgo, and Harvest are to be decommissioned some time 2015 - 2020. Is that date based on the most current estimates for the production life of the Point Arguello Unit and the eastern half of Lease 451?

23. The Rocky Point and Pinon Electra crude oils appear have similar qualities and lend themselves to being developed concomitantly by the same operator. The Sword Unit, on the other hand, has a different operator, which, as we understand, does not yet have guaranteed access to Point Arguello infrastructure. Additionally, the COOGER study identifies Sword crude as ultra-heavy (9-11° API gravity), and it is not clear how compatible this oil may be with current infrastructure or the capacity of Point Arguello infrastructure to handle production from all three units simultaneously. We also understand from COOGER that the heavy Sword Unit crude would need to be blended with the lighter crudes handled by Point Arguello infrastructure in order to be transported via pipeline to shore and, subsequently, to refinery.

We understand that development of the Bonito, Rocky Point and Sword Units will rely completely on current Point Arguello infrastructure. Please provide more information to establish the viability of handling Sword Unit production with Point Arguello infrastructure, without any need to substantially modify that infrastructure. Or, if changes in offshore infrastructure might be required to process and blend Sword oil with other crudes, what might be the nature of those changes? Also, does PXP have an obligation to accept Sword Unit crude oil and gas at Hermosa under current MMS regulations or lease requirements? Does the timing of development work well to enable blending of Sword Unit crude with other lighter production to the extent necessary to allow pipeline transport of ultra-heavy Sword Unit crude oil?

24. The EID covers "hypothetical development" of all known hydrocarbon resources under the undeveloped leases with one notable exception – the Bonito Unit. In this case, the Bonito and Sugar Maple fields (identified in COOGER) are not listed for development. We note that both the COOGER study and the DEIS for Delineation Drilling identified the need for one additional platform to develop these fields in the Bonito Unit. The information in the EID, on the other hand, indicates development would occur by extended reach only. PXP informs us that it is not economically feasible to develop northern Bonito Unit leases from Platform Irene.

    Please identify which specific leases within the Bonito Unit are capable of being developed from Platform Hidalgo. Also, please clarify the difference between the EID (i.e., development of Bonito without need of an additional platform) and the 2001 Draft EIS for Delineation Drilling and the COOGER study.[8] We understand that the operator of the Bonito Unit has changed and may have some influence on the extent to which Bonito is developed. Please provide information about why the northern leases of the Bonito Unit are being extended if no development is anticipated or, on the other hand, why their extension is being determined as consistent with the CCMP without consideration of new infrastructure required to develop the northern leases of this unit. If an additional platform is proposed to access the northern Bonito Unit leases, please evaluate that project's consistency with all relevant policies of Chapter 3 of the Coastal Act including the fill, marine resource, water quality, oil spill, commercial fishing, visual, environmental sensitive habitat, public access, recreation, archaeology, hazards, air, consolidation and coastal-dependent policies.

25. Sections 30234 and 30234.5 of the Coastal Act recognize the economic, commercial and recreational importance of fishing activities, and require that these activities be protected. Please provide more detailed information on current commercial fishing activities in the area around the Point Arguello, Bonito, Rocky Point, and Sword Units, including a list of fish blocks, the average annual total landings, average economic

---

8 The MMS consistency determinations assume only four new platforms (Page 5.2-7 of the Environmental Information Document) wherein previous MMS documents (DEIS for Delineation Drilling, 2001, Page 6-12, and COOGER, 2000, Page 3-44) considered five, with the additional platform being installed in the Bonito Unit.

value, and most common species landed. Please provide more detailed information on the types of commercial fishing that occurs in each area (such as purse seining, trawling, etc.), including the economic value of each fishery and the locations where each type of fishing occurs. Please provide information on the size and location of existing and proposed additional preclusion zones. Please provide a quantitative analysis of lost catch (including economic impacts) under two scenarios: 1) continuation of the existing preclusion zone until the originally scheduled decommissioning of the Point Arguello infrastructure; and 2) continuation of the existing preclusion zone (and any new preclusion zones) until the proposed later decommissioning date, under the proposed project.

26. Section 30231 of the Coastal Act requires the biological productivity and the quality of coastal waters to be maintained, and restored where feasible. Please provide quantitative data on current discharges at the Point Arguello Unit platforms from all sources, including drilling muds and cuttings, produced water, well treatment fluids, deck drainage, etc. (see Table 5.6-1 on Page 5.2-2 of the EID). Please provide a quantitative projection of future discharges from all sources for two scenarios: 1) production at Point Arguello if activities continued as currently approved under relevant permits, with no new production at Bonito, Rocky Point and Sword Units; and 2) production at Point Arguello, Bonito, Rocky Point and Sword Units under the assumed hypothetical activities described in the EID.

    On Page 5.6-11, the discussion of produced water concludes: "more information is needed." While we understand that MMS is not responsible for this lack of information, and that ongoing and future studies on impacts from produced water are anticipated, we are concerned about the lack of information available on the potential impacts of produced water.

27. Section 30251 provides that the scenic and visual qualities of the coastal areas shall be considered and protected as a resource of public importance. The EID and CDs for Sword, Bonito, and Rocky Point Units indicate that there will be no change in visual or scenic qualities of the area because any future hypothetical development will use the existing Point Arguello Unit platforms, associated pipelines, and the onshore Gaviota facilities. However, the CDs and EID fail to analyze potential impacts on visual and resources caused by the need for the platforms and onshore facilities to remain in use beyond the current projected life of the Point Arguello Unit. Please provide information on how the projected extension of life of this infrastructure will affect visual resources.

28. The EID discusses a study conducted recently on the affect of drilling muds on the marine environment. Page 5.6-4 of the EID refers to this study as the "CaMP" study, however no citation is given. Please provide a reference for this study; a copy of the study would also be helpful.

For example, Page 5.7-27 of the EID states: "Direct smothering and turbidity can adversely affect filter-feeding organisms such as the sponges, cup corals, and anemones found on naturally occurring hard bottom reefs… [H]abitat supporting these animals occurs within the immediate vicinity of the Point Arguello platforms and pipelines." Please provide detailed information on the total area that will be affected by drilling discharges that will take place as a result of the suspension of leases in the Bonito, Rocky Point and Sword Units. Please characterize the biotic resource present in the area of effect, in terms of species diversity and abundance. Please indicate if any special-status species are present in the area of effect. Please provide an analysis of the expected impacts of drilling discharges on these ecosystems. Please analyze the indirect impacts that degradation of the benthic habitat will have on pelagic species. Data on impacts from existing infrastructure should be included in the EID, possibly as provided in the "CaMP" study. Data on projected impacts from future activities resulting from the suspension of leases in the Bonito, Rocky Point, and Sword Units should also be included.

29. Please provide a list of special-status species that are present in the area that could be potentially affected by an oil spill.

**Gato Canyon Unit (CD-050-05)**

30. The EID states that although the removal by MMS of one lease in the Gato Canyon Unit (Lease 462) is under appeal, its environmental analyses include the effects of developing that lease. It appears, however, that effects of that lease is not included in some analyses – for example, the Hypothetical Development Scenario described in Section 5.2.3.2 does not mention that that lease will be developed. Please clarify the status of that removed lease, and either incorporate it into the necessary analyses throughout the submitted documents, or delete it.

31. Due to the potential placement of platforms and pipelines in offshore waters the Coastal Act's fill policy (CCMP Section 30233) is relevant here. That policy allows for filling of open coastal waters if the following three tests are met: (1) that the purpose of the fill meets one of eight allowable uses (e.g., a major energy facility); (2) that no feasible, less environmentally damaging alternative to the placement of fill exist; and (3) that all adverse environmental effects have been mitigated to the maximum extent feasible. With respect to (2), please explain why a new platform and pipelines are needed to produce oil and gas from the Gato Canyon Unit. Please analyze whether the oil and gas could be recovered from an existing platform (e.g., one of the SYU platforms) or from an onshore site.

32. Please provide information that compares the relative effects on the environment of the pipeline routes shown in the EID to those that would connect the new proposed platform to existing Platform Hondo. Please examine if the alternative routing, which

would include using Hondo as the "mother platform" configuration of offshore development, would reduce impacts to eelgrass, kelp, nearshore and intertidal habitat, and recreation (e.g., visual, night lights, and noise to nearby state beaches/campgrounds).

33. Please provide production curves, including oil, gas and produced water, for SYU leases and Gato Canyon Unit leases that demonstrate that overlap in producing SYU and Gato Canyon would not result in the need to expand onshore infrastructure. Additionally, please clarify how production from Gato Canyon would be handled onshore if the production curves of Gato Canyon and SYU not coincide (e.g., should Gato production extend further into the future than SYU production). Should the latter case occur, would it result in offshore processing and other modes of transportation? Cumulatively, the capacity question should also be addressed if full-field development of the South Ellwood field and Unocal leases adjacent to Gato Canyon are developed. Santa Barbara County policies would direct this production into Las Flores Canyon.

34. CCMP Section 30244 requires that "reasonable" mitigation measures be provided where development would adversely affect archaeological or paleontological resources identified by the State Historic Preservation Officer. The EID states on Page 5.8-5 that development of the Gato Canyon Unit would not likely result in impacts to offshore or onshore archaeological resources. It notes that onshore pipeline construction would occur in the Las Flores Canyon area, which has been previously surveyed and currently is a used pipeline corridor. Has the onshore area been surveyed that would connect the Gato Canyon pipelines with the existing SYU pipelines? If so, what do the survey results show regarding archaeological resources for the area where the Gato Canyon Unit pipelines land and connect to the SYU processing facilities?

35. The EID concludes that "moderate" impacts to hard substrate and kelp could occur due to proposed activities at the Gato Canyon Unit. The EID states that nearshore habitat is rocky and therefore pipeline crossings would adversely affect this hard substrate. However, in other sections of the EID, it acknowledges that horizontal directional drilling (HDD) could be used to install pipelines under the beach. In the kelp section of the EID (Page 5.7-16), it states that existing conduits exist to minimize construction effects. Please provide clarification and details on the location of hard bottom and kelp and how these resources might be avoided. Has the area been surveyed for hard substrate? If so, a map of known hard bottom (sand kelp, if available) would be helpful.

36. The proposed platform for the Gato Canyon Unit is relatively close to shore (near State waters). We need additional information to assess this activity's consistency with the visual policy of the CCMP such as a visual simulation of a hypothetical MODU and new platform from various public viewing points (like Highway 101) and any other information MMS can provide to assist us in evaluating the visual effects of the proposed MODU and platform.

**Cavern Point Unit (CD-051-05)**

37. We are confused by MMS's statement in the consistency determination (Page 7) that: "At this stage, MMS is not aware of the specific plans the operator may be making in its [Exploration Plan] EP." MMS has had in its possession for a number of years a specific plan for exploration, as well as a fairly specific discussion of the likely production scenario for the Cavern Point Unit if an exploratory plan were to confirm Venoco Inc.'s estimates of likely hydrocarbons present. Because the plan we have is now five years old, we request that MMS provide us with the most up-to-date available scenario for Venoco's proposed exploration and production of the Cavern Point Unit. In addition, because the previous scenario assumed possible production wells from both Platforms Grace and Gail, this analysis should provide up-to-date information about the availability and feasibility of drilling from Platform Grace. Without such information, the Commission cannot evaluate the project's consistency with the marine resources, oil spill, geologic hazards, water quality, air quality, commercial fishing, environmentally sensitive habitat, view protection, consolidation and coastal-dependency policies (Sections 30230, 30231, 30233, 30234, 30234.5, 30240, 30251, 30253, 30260, and 30262) of the CCMP.

38. Since exploration and development of the Cavern Point Unit would both occur from an existing platform(s) (Platform Gail or both Grace and Gail), and since MMS regularly conducts tests to analyze the structural integrity of the existing infrastructure (at a minimum the platform(s) and pipelines to shore), we do not understand why MMS has not included this information in its consistency determination/EID, especially as the development of the new unit would extend the life of the platforms and pipelines, possibly exceeding their design life. Moreover, while some of the infrastructure is relatively new (installed within the last two decades), as discussed below this newer infrastructure (the pipeline between Platforms Gail and Grace) was placed across a landslide, and other infrastructure that would serve the Cavern Point unit is far older (e.g., pipelines from Platform Grace to shore, and the onshore processing facility in Carpinteria). Platform Gail and the pipelines that connect this platform to Platform Grace were installed in 1987. Platform Grace and the pipelines that connect it to shore were installed in 1979. The onshore processing facilities were installed in the 1959, according to COOGER.[9] We request that all these facilities be analyzed for their structural integrity, design life, and potential to cause oil spill risks, which could result in significant adverse effects to a number of coastal zone resources. We therefore request that MMS provide us with an analysis of the integrity of the existing infrastructure, including a description of inspections (type, frequency, findings of discrepancies and required fixes), maintenance practices, and other problems that may

---

9 U.S. Department of the Interior, Minerals Management Service, Pacific OCS Region, *Final California Offshore Oil and Gas Energy Resources Study*. 2000, p. 2-84.

influence the risk of a mishap. This information is critical in determining if extended reach drilling where the infrastructure has aged somewhat may still be accomplished with any heightened concern for spills. Also, please identify potential added risk to public safety that might occur from processing Cavern Point hydrocarbons within the City of Carpinteria, addressing if this location remains suitable, or if other locations would be more appropriate should there be an increased risk to public safety. Without such information, the Commission cannot evaluate MMS' claim that no new infrastructure would be required to develop the estimated 22 mmbbl of oil and 20 Bcf of gas in the Cavern Point field, and, therefore, the project's consistency with the marine resources, oil spill, geologic hazards, water quality, air quality, commercial fishing, environmentally sensitive habitat, view protection, consolidation and coastal-dependency policies (Sections 30230, 30231, 30233, 30234, 30234.5, 30240, 30251, 30253, 30260, and 30262) of the CCMP.

39. In performing this analysis, from information we have it appears that one development scenario for the Cavern Point Unit anticipates an approximately 13-year production curve (with peak production occurring in approximately years 5-6). However, this production curve appears to be based on the assumption that 16 production wells would be in operation – 9 wells from Platform Grace and 7 wells from Platform Gail. It also appears quite possible that Platform Grace may not continue to operate as an oil and gas platform, in which case the development scenario (according to Venoco Inc.'s 2000 EP) would be limited to 7 wells from Platform Gail (2 into the Monterey Formation, 2 into the Sespe Formation, and 3 into the Upper Topanga Formation). Therefore, we request that the analysis of extending the life of Platform Gail and the integrity of existing infrastructure take into account the greater length of time the Cavern Point field would be producing under this latter scenario. Without such information, the Commission cannot evaluate the project's consistency with the marine resources, oil spill, geologic hazards, water quality, air quality, commercial fishing, environmentally sensitive habitat, view protection, consolidation and coastal-dependency policies (Sections 30230, 30231, 30233, 30234, 30234.5, 30240, 30251, 30253, 30260, and 30262) of the CCMP.

40. In addition to or in combination with your infrastructure integrity analysis, we request an analysis of whether sufficient capacity exists in the existing oil and gas pipelines to shore, and at the onshore processing facility in Carpinteria, to accommodate the anticipated future production from the Cavern Point unit (projected by Venoco in 2000 for peak years at 8,000-9,000 BOP/Day (oil) and 25,000 MCF/Day (gas)). Without such information, the Commission cannot evaluate: (1) MMS claim that new infrastructure would not be needed for developing this unit, or whether new pipelines, onshore processing, and possibly even marine tankering might be needed, and, therefore; (2) the project's consistency with the marine resources, oil spill, geologic hazards, water quality, air quality, commercial fishing, environmentally sensitive habitat, view protection, consolidation and coastal-dependency policies (Sections

30230, 30231, 30233, 30234, 30234.5, 30240, 30251, 30253, 30260, and 30262) of the CCMP.

41. In looking at the likely locations for hydrocarbons to be extracted, although the information contained in our files may be out-of-date, it appears that the oil and gas fields are likely to be located in a broad area roughly trending from the northwestern to the southeastern portion of Leases OCS-P 0120 and 0527. If so, this would bring the recoverable fields nearer to Platform Grace than to Platform Gail, and common sense would lead us to assume that if the exploratory (or further in the future, production) wells were drilled from Platform Grace and were shorter in length, they would entail fewer air emissions, and smaller drilling muds and cuttings discharges, and thus be less environmentally damaging than from wells drilled from Platform Gail. Moreover, oil spill risks would also appear to be reduced, as Platform Grace is farther than Platform Gail from the Channel Islands National Marine Sanctuary and further from relatively-recently established Scorpion Point Marine Protected Area (MPA) just north of the eastern side of Santa Cruz Island. We therefore request an alternatives analysis that compares drilling from either platform. Without such information, the Commission cannot evaluate the project's consistency with the alternatives tests of the fill, consolidation and coastal-dependency policies (Sections 30233(a), 30260 and 30262) of the CCMP.

42. Although we may not have up-to-date information, it would appear that up to three more wells could be drilled from Platform Gail without triggering the need for emissions offsets. We request that MMS provide us with up-to-date information about the number of wells permitted at the Platform, any additional capacity under the existing Ventura County APCD air permit for Platform Gail, and a summary of what is currently known about the potential availability of offsets for production drilling from Platform Gail (i.e., drilling which *would* clearly trigger the need for offsets). Without such information, the Commission cannot evaluate the project's consistency with the air quality policy (Section 30253(3)) of the CCMP.

43. When the Commission was originally considering Platform Gail, it noted the existence of a submarine landslide (across which the pipeline to Platform Grace was placed), located to the north and west of the platform. We request a reassessment of that landslide, including informing us as to whether any additional studies/mapping have occurred since 1986 further defining that landslide, whether the landslide poses any geologic risks to the pipeline between Platforms Gail and Grace, whether production from the Sockeye Field from which Platform Gail is producing has had any effect on the landslide, whether the pipeline has been buried under or suspended over seafloor sediments, and, in general, whether any new information has been developed since 1986 that could shed new light on the size and potential effects of the landslide. Without such information, the Commission cannot evaluate the project's consistency with the geologic hazards policies (Sections 30253 and 30262) of the CCMP.

44. Information in our files (Venoco's December 2000 Draft EA) indicates that under certain oceanographic conditions, drilling muds discharges would enter the Channel Islands National Marine Sanctuary (Sanctuary). Considering the extensive drilling which has occurred at Platform Gail, which may have been monitored, please submit monitoring data or other evidence of the extent to which past discharges have entered the Sanctuary, as well as any biological effects from these discharges, along with an estimate of the maximum future discharges into the Sanctuary from the estimated additional 2 exploratory and 7 production wells at the platform. We also request that MMS inform us as to whether discharges into the Sanctuary are allowed under current Sanctuary regulations, and finally, as discussed above, whether feasible alternatives are available (e.g., drilling from Platform Grace) which would avoid discharges entering the Sanctuary. Finally, based on available knowledge we request that MMS indicate whether the potential exists for drainage of oil from beneath either the Sanctuary or State Tidelands, and, for the former, whether any such drainage would be consistent with Sanctuary regulations. Without such information, the Commission cannot evaluate the project's consistency with the marine resources, oil spill, water quality, commercial fishing, environmentally sensitive habitat, consolidation and coastal-dependency policies (Sections 30230, 30231, 30233, 30234, 30234.5, 30240, 30260, and 30262) of the CCMP.

45. MMS's website reports on a small oil spill that occurred at Platform Gail on November 18, 2004, which appears to have been due primarily to operator error. (See http://www.mms.gov/omm/pacific/lease/ Gail_Incident_ MMS_2005-017.htm). We request an explanation about the extent to which the recommendations of MMS' investigation (OCS Report MMS 2005-017, Investigation of Loss of Well Control and Oil Spill, Platform Gail, Channel Islands Block 4661, Lease OCS-P-0205, November 18, 2004) have been implemented. Without such information, the Commission cannot evaluate the project's consistency with the oil spill policy (Section 30232) of the CCMP.

46. Venoco Inc.'s EP states it intends to comply with Lease Sale 80 Stipulations for drilling into OCS Lease OCS-P 0210, despite the fact that no lease sale stipulations were attached to the lease, which was created during Lease Sale P-4. Among other things, the Lease Sale 80 stipulations require pipeline transport where feasible, protect biological and cultural resources, fisheries and wildlife training, state of the art oil spill equipment, oil spill drills, onshore processing, commercial fisheries interaction, and drilling mud modeling when discharging within 1000 meters of a National marine Sanctuary. We appreciate Venoco's statement of intent, but we request that MMS explain the mechanism available that allows it to assure and enforce compliance with any Lease Sale 80 Stipulations. Is there some process associated with the unitization of OCS Lease OCS-P 0210 and OCS Lease OCS-P 0527 (which was a Lease Sale 80 lease, but on which no development is anticipated) that allows such enforcement/application of newer stipulations? If not, how will these stipulations be enforced? Without such an information, the Commission cannot evaluate the project's

consistency with the marine resources, oil spill, geologic hazards, water quality, air quality, commercial fishing, environmentally sensitive habitat, consolidation and coastal-dependency policies (Sections 30230, 30231, 30233, 30234, 30234.5, 30240, 30253, 30260, and 30262) of the CCMP.

**Conclusion**

In conclusion, the Commission staff believes that MMS's consistency determination submittals do not contain all the necessary data and information to enable us to evaluate fully the consistency of the activities described in the submittals with the policies of the CCMP. We recognize that gathering this additional information will take time. We therefore ask that you grant an extension of time to review these consistency determinations beyond the 60-day review period (and one automatic 15-day extension) allowed by 15 CFR § 930.41(b). The Commission recognizes that the District Court in State of California v. Norton adopted the timetable proposed by MMS in the order dated June 28, 2004. The timetable contemplated that the Commission have 90 days in which to review the consistency determinations and anticipated a hearing by July 7, 2005. In order to avoid any argument that either the MMS or the Commission is not in compliance with the Court's order, the Commission offers to stipulate to an extension of the timetable for a period sufficient to allow adequate time for the MMS to gather the requested additional information and for the Commission's review. If the MMS declines to grant a time extension, and the information we are requesting is not submitted within the next 2-3 weeks, we will have no choice but to recommend at the June 2005 Commission meeting that the Commission object to the lease suspensions due to lack of information to assess the activities' consistency with the CCMP (see 15 CFR § 930.43(b)). Thank you for your cooperation in submitting this consistency determination and in considering the information and time extension requests contained herein. Please contact me at (415) 904-5205 if you have any questions about this information request.

Sincerely,

Alison Dettmer

ALISON DETTMER
Manager
Energy and Ocean Resources Unit