# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

*****************************************

| | |
|---|---|
| AMBER RESOURCES COMPANY, *et al.*, | |
| *Plaintiffs,* v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ***************************************** | |
| ANADARKO E & P COMPANY L.P., *et. al.*, | |
| *Plaintiffs,* v. | |
| | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ***************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| ***************************************** | |

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY WITH RESPECT TO THEIR MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY AND PARTIAL SUMMARY JUDGMENT AS TO DAMAGES, AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT**

In their previous pleadings, Plaintiffs rebutted the Government's contention that their submission of updated suspension requests waived their claim for material breach, pointing, *inter alia*, to the fact that they had carefully and explicitly preserved their right to proceed with this case. *See* Plaintiffs' Reply Brief In Support Of Their Motion For Summary Judgment As To Liability And Partial Summary Judgment As To Damages, And Brief In Opposition To Defendant's Motion To Dismiss And Cross-Motion For Summary Judgment, at 23 (Nov. 18, 2004). Plaintiffs cited, *inter alia*, Judge Hewitt's holding in *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 158 (2002), that the non-breaching party's acceptance of performance from the Government will not give rise to waiver where the non-breaching party "repeatedly informed defendant . . . of its intention to preserve its right to file a [breach] claim."[1]

Plaintiffs file this notice of supplemental authority to bring to the Court's attention the Federal Circuit's recent decision in *Westfed Holdings, Inc. v. United States*, _ F.3d _, 2005 WL 1119654 (Fed. Cir. May 12, 2005) (copy attached), which affirmed Judge Hewitt's ruling on the waiver issue. While noting that "[a] party to a contract may waive the breach of an agreement by the continued acceptance of performance by the breaching party without reservation of rights," the Federal Circuit held:

> When the government knows of the non-breaching party's timely reservation of rights in protest to the breach, the acceptance of payments from the government does not waive the party's rights arising from the breach. *N. Helex Co. v. United States,* 197 Ct.Cl. 118, 455 F.2d 546, 555 (Ct.Cl. 1972). The reservation of rights may be express or implied. *Id.*

2005 WL 119654 at *5.

---

[1] Plaintiffs also demonstrated that they had not received any Government performance under the contract, *see* Plaintiffs' Reply Brief at 22.

Respectfully submitted,

s/ Steven J. Rosenbaum
by s/ Thomas J. Cosgrove______________

E. Edward Bruce
Steven J. Rosenbaum
*Counsel of Record*
Thomas J. Cosgrove
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-5568
Facsimile: (202) 778-5568
Attorneys for All Plaintiffs in Nos. 02-30C
and 04-1822C

May 25, 2005

**H**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Federal Circuit.
**WESTFED** HOLDINGS, INC., Plaintiff-Cross Appellant,
v.
UNITED STATES, Defendant-Appellant.
**No. 03-5131, 03-5145.**

May 12, 2005.

**Background:** Thrift holding company brought *Winstar*-related suit on its own behalf and derivatively on behalf of insolvent thrift, asserting that passage of Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) breached government's agreement as part of supervisory acquisition to forbear from imposing certain regulatory capital maintenance requirements on thrift. Assignee of holding company's assets for benefit of creditors was added as plaintiff. The Court of Federal Claims, 52 Fed.Cl. 135, held that government breached the contract. Following trial on damages, the United States Court of Federal Claims, Emily C. Hewitt, J., granted judgment for holding company, 55 Fed.Cl. 544. Government appealed.

**Holdings:** The Court of Appeals, Prost, Circuit Judge, held that:
(1) risk of future regulatory change had not been allocated to company;
(2) company did not waive government's breach of forbearance agreement;
(3) government's breach of forbearance agreement caused thrift's failure;
(4) company relied upon forbearance agreement;
(5) failure of new thrift to meet regulatory capital requirements was foreseeable;
(6) seizure of new thrift was foreseeable consequence of government's breach;
(7) certain pre-contractual expenditures could be recovered as reliance damages; and
(8) tax benefit that accrued to company as result of acquiring failing thrift could offset acquisition cost.
Affirmed in part and reversed in part.

**[1] Contracts** 🔑**0**

95k0 k.
Terms of forbearance letter issued by Federal Savings and Loan Insurance Corporation (FSLIC) to thrift holding company in connection with supervisory merger did not allocate risk of future regulatory change to company; paragraph that set out FSLIC's promise to forbear from enforcing regulatory capital requirement did not prevent regulators from taking other actions should they have deemed company out of compliance with any other provision of insurance regulations.

**[2] Contracts** 🔑**0**
95k0 k.
The interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless.

**[3] Contracts** 🔑**0**
95k0 k.
Although the government cannot be contractually bound from exercising a sovereign power, if the government, through its regulators, exercises that power and breaches a particular contractual obligation, the injured party will have redress for the breach.

**[4] Contracts** 🔑**0**
95k0 k.
Non-waiver clause in assistance and forbearance agreements between government and new thrift, which provided that "[n]o forbearance, failure, or delay by any party in exercising or partially exercising right [given by the agreement], power, or remedy shall operate as a waiver thereof or preclude its further exercise," precluded government's claim in *Winstar* case that thrift holding company, which had substantial identity of legal interest with new thrift, waived government's breach of agreement by not objecting to it and by continuing to accept government assistance payments.

**[5] Contracts** 🔑**0**
95k0 k.
A party to a contract may waive the breach of an agreement by the continued acceptance of performance by the breaching party without reservation of rights.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[6] Contracts** 0
95k0 k.
Waiver is an affirmative defense, as to which the breaching party bears the burden of proof.

**[7] Contracts** 0
95k0 k.
When the government knows of the non-breaching party's timely reservation of rights in protest to the breach, the acceptance of payments from the government does not waive the party's rights arising from the breach.

**[8] Contracts** 0
95k0 k.
A reservation of rights may be express or implied.

**[9] Contracts** 0
95k0 k.
Implied waiver may be inferred by conduct or actions that mislead the breaching party into reasonably believing that the rights to a claim arising from the breach was waived.

**[10] Damages** 0
115k0 k.
Government's breach of supervisory acquisition agreement, by withdrawal of modified capital requirement through passage of Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), caused thrift's failure, since thrift remained in compliance with modified capital requirement until day it was seized by Office of Thrift Supervision (OTS) for failure to maintain new capital requirements of FIRREA. Federal Deposit Insurance Act, § 2(1) et seq., as amended, 12 U.S.C.A. § 1811 et seq.

**[11] Damages** 0
115k0 k.
Thrift holding company's prior application to acquire failing thrift did not preclude conclusion that company relied upon subsequent forbearance agreement from government in acquiring failing thrift, for purpose of company's claim for reliance damages in *Winstar* case that was based upon government's breach of forbearance agreement, since prior application would not have been approved by government without assistance and forbearance agreements.

**[12] Damages** 0
115k0 k.
In order to be recoverable as reliance damages, a plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation.

**[13] Damages** 0
115k0 k.
Failure of new thrift to meet regulatory capital requirements was foreseeable, for purpose of thrift holding company's claim for reliance damages in *Winstar* case that was based upon government's breach of forbearance agreement, where forbearance against future changes in regulatory capital requirement was continuously negotiated by both parties and government knew that new thrift was projected to have declining capital ratio for several years even under forbearance and assistance agreements.

**[14] Damages** 0
115k0 k.
Seizure of new thrift was foreseeable consequence of government's breach of forbearance agreement that applied to acquisition of failing thrift, for purpose of reliance damages claim made by thrift holding company in *Winstar* case, since acquisition without agreement would have caused new thrift to have been out of regulatory capital compliance immediately and government was aware that new thrift projected that it would have been several years before it could meet regulatory capital minimum.

**[15] Damages** 0
115k0 k.
Reliance-like restitution is only supportable when based on actual losses that are fully proven.

**[16] Damages** 0
115k0 k.
Certain pre-contractual expenditures made by thrift holding company in attempt to acquire failing thrift prior to entering into forbearance and assistance agreements with government could not be recovered by company in *Winstar* case for government's breach of forbearance agreement, since those expenditures had not been made in reliance on contract that was subsequently formed in connection with acquisition and merger.

**[17] Damages** 0
115k0 k.
Pre-contractual expenditures made by thrift holding company in attempt to acquire failing thrift under forbearance and assistance agreements with government could be recovered by company in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Winstar* case as reliance damages for government's breach of forbearance agreement, where government knew that new thrift was incurring expenses in preparation for, and reliance upon, that contract.

[18] **Damages** 0
115k0 k.
Thrift holding company was entitled in *Winstar* case to amount that it actually expended to acquire failing thrift in reliance on forbearance promise, which government subsequently repudiated, although new thrift chose to borrow funds from investors to acquire shares of failing thrift rather than through use of its own money.

[19] **Damages** 0
115k0 k.
The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise.

[20] **Damages** 0
115k0 k.
Thrift holding company was not entitled to reliance damages in *Winstar* case based upon "payments-in-kind" (PIKs), which represented issuance of additional paper securities to existing debt or equity holders, for government's repudiation of forbearance promise; although company assumed additional obligations on paper, it never actually made any payments from its account, from which it could have been said that it sustained actual loss as result of government's breach.

[21] **Damages** 0
115k0 k.
Money given to thrift holding company as part of separate transaction, in consideration for third party's release from company's breach of contract claim, could not be applied to offset government's obligation in *Winstar* case to pay reliance damages for its repudiation of forbearance promise.

[22] **Damages** 0
115k0 k.
Tax benefit that accrued to thrift holding company as result of acquiring failing thrift could offset acquisition cost, for purpose of company's claim for reliance damages in *Winstar* case for government's repudiation of forbearance promise.

[23] **Damages** 0
115k0 k.
Damages based on the injured party's reliance interest may be reduced by any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed. Restatement (Second) of Contracts § 349.

[24] **Damages** 0
115k0 k.
Assistance payments that government made to new thrift could not offset reliance damages awarded to thrift holding company in *Winstar* case for government's breach of forbearance promise, since government put most of its money into new thrift, which it eventually seized and it prevented holding company from reaping any dividends from new thrift during most of period that company held new thrift, and government otherwise did not carry its burden of proving quantum of benefit retained by company with reasonable certainty despite government's breach. Restatement (Second) of Contracts § 349.

[25] **Damages** 0
115k0 k.
Thrift holding company was not entitled to reliance damages in *Winstar* case, for government's repudiation of forbearance promise, based upon company's financing obligations in acquiring failing thrift, since holding company did not pay anything out of its pocket toward those obligations.

Appealed from: United States Court of Federal Claims. Judge Emily C. Hewitt.

Rowan D. Wilson, Cravath, Swaine & Moore LLP, of New York, New York, argued for plaintiff-cross appellant. With him on the brief was Thomas G. Rafferty.

Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; and Ashley N. Bailey, Jane M.E. Peterson, Delisa M. Sanchez, Edward P. Sullivan, and Tonia J. Tornatore, Trial Attorneys. Of counsel was Maureen A. Delaney.

Before RADER, GAJARSA, and PROST, Circuit Judges.

PROST, Circuit J.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*1 This appeal is another in a series of *Winstar*-related cases. Westfed Holdings, Inc. ("Westfed") commenced a lawsuit on its behalf and derivatively on behalf of the insolvent thrift, Western Federal Savings and Loan Association ("New Western" or "Western"), alleging that the federal government's passage and imposition of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") breached the government's agreement to forbear from imposing certain regulatory capital maintenance requirements on the thrift. Following a bench trial, the Court of Federal Claims determined that the government breached its contract and that Westfed is entitled to approximately $305 million in reliance damages. The government appeals both of the trial court's determinations. Westfed cross-appeals the trial court's decision to reject its claim for unpaid obligations allegedly owed to holders of debentures and preferred shares, now amounting to over $800 million. For the reasons set forth below, we affirm-in-part and reverse-in-part.

## I. BACKGROUND

Two prior Court of Federal Claims decisions in this case discuss at length the facts of this case. Westfed Holdings, Inc. v. United States, 55 Fed. Cl. 544 (2003) ("*Westfed II* "); Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135 (2002) ("*Westfed I* "). We set forth here only the essential facts necessary to understand this case.

Westfed is a thrift holding company. In 1985, the Federal Savings and Loan Insurance Corporation ("FSLIC") seized Bell Federal Savings & Loan ("Bell"), a failing savings and loan institution, and placed its assets into receivership. *Id.* at 139. Subsequently, in 1985 and 1986, the FSLIC solicited offers to purchase the assets and liabilities of Bell. *Id.* Each time, the FSLIC rejected the submitted offers. *Id.* When the FSLIC again solicited offers in 1987, Bell Holdings, an affiliate organized by Westfed for the purpose of acquiring Bell, submitted a proposal to convert Bell from a mutual company to a stock company and to merge Bell with Western Federal Savings & Loan ("Old Western"). *Id.* At the time of this proposal, Westfed had a pending bid to acquire Old Western, *id.*, which was subject to regulatory approval. In 1988, the Federal Home Loan Bank Board ("FHLBB") approved the proposal to convert Bell from mutual to stock form and to have Westfed acquire and merge Bell with Old Western. *Id.* The merged entity was to be called New Western. In a letter dated September 21, 1988 ("the Forbearance Letter"), the FHLBB informed Westfed that it would not enforce the regulatory capital requirements of 12 C.F.R. § 563.13 as long as New Western met the net worth requirement set out in the Regulatory Capital Maintenance Agreement ("RCMA"), an agreement that the parties executed two days later on September 21. *Id.* at 40. In the RCMA, Westfed and New Western, among other things, agreed to maintain New Western's net worth at the greater of $110 million or 2% of New Western's liabilities for five years after the execution of the RCMA. *Id.* at 140. In addition to executing the RCMA, the FSLIC, Westfed, and New Western executed an Assistance Agreement, in which the FSLIC agreed to contribute to New Western an amount equal to the capital shortfall of Bell. *Id.* at 139-40.

*2 After its creation in 1988, New Western began implementing a business plan that called for aggressive growth over the next five years. *Westfed II*, 55 Fed. Cl. at 554. By the end of 1989, New Western just fell short of reaching the target asset size of $4.831 billion. *Id.* Moreover, New Western produced earnings of $28.96 million and paid dividends of $5.552 million in the first half of 1989. *Id.* On August 9, 1989, Congress enacted FIRREA, which abolished FHLBB and the FSLIC, and transferred their regulatory functions to the Office of Thrift Supervision ("OTS"). Nine days later, on August 18, 1989, OTS denied New Western permission to pay further dividends because it was found to be out of compliance with the capital requirements of FIRREA. *Id.* Despite the modifications to the capital requirements in the RCMA, OTS required New Western to file a capital restoration plan to meet the new capital maintenance requirement imposed by FIRREA. *Id.* By December 1992, OTS informed New Western that it was still undercapitalized, and imposed additional restrictions on capital distributions New Western could make until it complied with FIRREA. *Id.* In March 1993, OTS informed New Western that it was "significantly undercapitalized" and that it intended to impose further restrictions on New Western's operations. *Id.* Finally, on June 3, 1993, OTS seized New Western and placed it into receivership. *Id.* Throughout the period after the parties executed the Assistance Agreement, the government met its obligation to provide assistance payments to New Western, which totaled at least $780 million by the time OTS placed New Western into receivership.

Westfed brought suit against the government for breach of contract. After a fourteen-day trial, the Court of Federal Claims awarded Westfed reliance damages in the amount of about $305 million, but denied Westfed's request for alleged damages related

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to unpaid obligations to holders of Westfed's debentures and preferred shares, then exceeding $800 million. The government timely appeals the awarded reliance damages, while Westfed timely appeals the denial by the court to award money for the unpaid obligations. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

II. STANDARD OF REVIEW

We review interpretations of contracts by the Court of Federal Claims de novo and its findings of fact for clear error. *E.I. Du Pont de Nemours and Co. v. United States,* 365 F.3d 1367, 1372 (Fed.Cir.2004). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

III. DISCUSSION

[1] The government argues that the trial court erred because (1) Westfed assumed the risk of a change in the law; (2) Westfed waived the breach by continuing to accept assistance from the government; (3) the trial court adopted the incorrect causation standard for reliance damages and, moreover, applied the adopted standard incorrectly; and lastly, (4) the trial court failed to deduct from Westfed's gross damages claim the financial benefits reaped from the government's performance. In Westfed's cross-appeal, it contends that the trial court incorrectly held that Westfed may recover only "amounts actually expended," which the court used as the basis to deny Westfed's claim for debts arising from the securities it issued allegedly to make the acquisition and merger of Old Western and Bell possible. We address each argument in turn.

A. Assumption of the Risk

***3** The government argues that terms of the Forbearance Letter, which was integrated into the contract, indicate that Westfed assumed the risk of regulatory change to the capital maintenance requirement. The trial court interpreted the language found in paragraph 1 of the Forbearance Letter to mean that the government "unconditionally promised to take no action pursuant to § 563.13 of the Insurance Regulations so long as New Western maintained a net worth of approximately $95 million calculated in accordance with GAAP." *Westfed I,* 52 Fed. Cl. at 147. Paragraph 1 is set forth below:

> The FSLIC will forbear from taking action pursuant to Section 563.13 of the Rules and Regulations for Insurance of Accounts ("Insurance Regulations") for any failure by New Western to comply with its regulatory capital requirement provided for in Section 563.13 as long as New Western satisfies either (1) the regulatory capital maintenance requirement or (2) the net worth maintenance requirement set forth in Section 2 of the Regulatory Capital Maintenance Agreement (either of which may be referred to herein as the "Modified Capital Requirement."

The government argues that paragraph 8 of the Forbearance Letter, as set forth below, limited the bargained-for forbearance in paragraph 1:

> So long as New Western is in compliance with its Modified Capital Requirement ["MCR"] it will be deemed in compliance with any form of minimum capital test or calculation *to which it is or becomes subject* pursuant to the Insurance Regulations, *to the extent, in the opinion of the [Principal Supervisory Agent ("PSA") ], not inconsistent [sic] with the purposes of any such regulation.*

The trial court interpreted paragraph 8 to mean that "Westfed received the additional benefit of being deemed in compliance with *any* form of minimum capital test or calculation 'to the extent, in the opinion of the Board ... [it is] not inconsistant [sic] with the purposes of the regulation in question." ' *Id.*

The government contends the trial court wrongly held "that, in paragraph 1, the parties implicitly addressed regulations which succeeded section 563.13(b)." In other words, according to the government, paragraph 1 "does not encompass the future." Unlike paragraph 1, the government asserts that paragraph 8 addresses both the present regulation and the effect of future regulations. Furthermore, paragraph 8 allegedly demonstrates that the regulators retained discretion to determine whether New Western's compliance with the MCR is inconsistent with any insurance regulations.

[2] We agree with the trial court that a plain reading of paragraph 8 shows that it protects New Western "from adverse consequences beyond the compass of Section 563.13 of the Insurance Regulations." *Id.* While paragraph 1 unconditionally exempts New Western from the consequences of § 563.13 should it fail to meet the capital requirement provided under that section, the paragraph does not forebear regulators from taking other actions should it be deemed out of compliance with any other provision of the Insurance Regulations. As the trial court correctly observed, if paragraph 1 were subject to the same discretionary proviso as paragraph 8 ("subject pursuant to the Insurance Regulations, to the extent, in the opinion of the [PSA]"), paragraph 1 would have added nothing to the agreement. It is of course

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

firmly established as a general rule of contract interpretation that the "interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed.Cir.1983).

*4 [3] Despite this general rule of contract interpretation, which appears to militate that we affirm the trial court's interpretation of paragraphs 1 and 8, the government argues that such an interpretation conflicts with other provisions of the contract. *See id.* ("nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible"). Specifically, according to the government, the trial court's interpretation conflicts with (1) the language in the Assistance Agreement, which acknowledges the possibility that New Western could be placed in receivership if required for safety and soundness reasons, and (2) the language in the RCMA, which established that the rights reserved to the regulators by the RCMA "shall be in addition to the all rights, powers, and remedies given by applicable statute or rule of law." We disagree that there is a conflict. As the government acknowledged earlier before the trial court, New Western was placed in receivership not because of insufficient capital under § 563.13, but rather because it was found "unsafe and unsound." The regulators' seizure and placement of New Western in receivership under the Assistance Agreement is not barred by paragraph 1. Moreover, the seizure is fully consistent with the trial court's construction of paragraph 8, which expands, with qualifications, the circumstances under which New Western may be deemed in compliance with the capital requirements that are imposed by any other provision of the Insurance Regulations. As for the second ground raised to challenge the trial court's interpretation, it speaks to the rights reserved by the regulators by the contract terms and those given by any applicable statute or rule of law. As construed above, the regulators contractually promised to forebear action under § 563.13 should New Western fail to meet the capital requirement of that section. While it is true that the government cannot be contractually bound from exercising a sovereign power, if the government, through its regulators, exercises that power and breaches a particular contractual obligation, the injured party will have redress for the breach. Centex Corp. v. United States, 395 F.3d 1283, 1309 (Fed.Cir.2005). The government does not cite any applicable statute or rule of law that bars redress for its breach. We are unpersuaded by the government that the trial court's interpretation creates a conflict with any other provision of the contract that would preclude us from affirming the trial court and that would compel us to conclude that Westfed assumed the risk of a change in the law.

B. Waiver of Breach

[4] Next, the government contends that Westfed waived its right to bring a claim for the government's material breach of their contract by accepting hundreds of millions of dollars from the government. The trial court found that Westfed had reserved its rights to bring a claim for the breach despite its alleged continued acceptance of the government's payments. Westfed I, 52 Fed. Cl. at 158. The government responds that only New Western, but not its holding company, Westfed, preserved its legal rights, and the trial court erred by assuming that having substantially identical interests between the holding company and the held corporation suffices to preserve the holding company's right to claim breach of contract. In support of its position, the government notes that: (1) when New Western failed, Westfed hid behind the corporate form to shield itself from New Western's liabilities; and (2) the trial court's holding allegedly conflicts with rulings it made during trial, in which it found that there was no showing that Westfed had ever authorized New Western to speak on its behalf. Westfed II, 55 Fed. Cl. at 564.

*5 [5][6][7][8] A party to a contract may waive the breach of an agreement by the continued acceptance of performance by the breaching party without reservation of rights. *Ling-Temco-Vought, Inc. v. United States,* 474 F.2d 630, 637-38 (Ct.Cl.1973). Waiver is an affirmative defense, as to which the breaching party bears the burden of proof. *See* Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1299 (Fed.Cir.2002). When the government knows of the non-breaching party's timely reservation of rights in protest to the breach, the acceptance of payments from the government does not waive the party's rights arising from the breach. *N.* Helex Co. v. United States, 197 Ct.Cl. 118, 455 F.2d 546, 555 (Ct.Cl.1972). The reservation of rights may be express or implied. *Id.*

The government takes issue with the trial court's conclusion that New Western's reservation of rights sufficed to preserve Westfed's rights to remedies from the government's breach, particularly when the trial court found that no agency relationship existed to allow attributing New Western's statements to Westfed as party-opponent admissions under Federal Rules of Evidence ("FRE") 801(d)(2)(D). *See* Westfed II, 55 Fed. Cl. at 564. The court noted that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FRE 801(d)(2)(D) "expressly provides that the statement be made by the 'party's agent." ' *Id.* Because it found insufficient evidence to conclude that Westfed established an agency relationship with New Western, it declined to attribute statements by New Western to Westfed. *Id.* Nevertheless, in view of the substantial identity of legal interest between New Western and Westfed, the trial court found that New Western's repeated statements of its intent to preserve its rights and remedies negated any inference of waiver by Westfed. *Westfed I,* 52 Fed. Cl. at 159 n. 21.

[9] As the party claiming waiver, the government bears the burden of proof to show by a preponderance of evidence that Westfed waived its rights to assert its breach of contract claim. The government does not dispute that it never received an express statement of intent to waive the breach. Rather, it contends that we should find that Westfed impliedly expressed an intent to waive the breach from its acceptance of the government's monetary assistance. Implied waiver may be inferred by conduct or actions that mislead the breaching party into reasonably believing that the rights to a claim arising from the breach was waived. *See N. Helex,* 455 F.2d at 551 ("As a general proposition, one side cannot continue after a material breach by the other, ... act as if the contract remains fully in force ..., run up damages, and then go suddenly to court."). Although in some instances, silence by the non-breaching party in response to the breaching party's conduct might be evidence of a waiver, *Ling-Temco-Vought,* 475 F.2d at 637, we find Westfed's alleged failure to object does not amount to evidence of a waiver in view of the non-waiver clauses at section 22 of the Assistance Agreement and section 11 of the RCMA. *Coast Fed. Bank, FSB v. United States,* 48 Fed. Cl. 402, 417-18 (2000).

***6** Like the non-waiver clause in *Coastal Federal, id.* at 417, section 22 of the Assistance Agreement provides that "[n]o forbearance, failure, or delay by any party in exercising or partially exercising ... right [given by the Agreement], power, or remedy shall operate as a waiver thereof or preclude its further exercise." Similarly, section 11 of the RCMA contains language that is virtually identical to the non-waiver clause in *Coastal Federal. Id.* The government cites no controlling federal contract law to demonstrate that a non-waiver clause in a *Winstar*-related case is unenforceable. According to the choice of law provision in the contract, "[t]o the extent that Federal law does not control, [the Assistance Agreement and RCMA] and the parties' rights and obligations under it shall be governed by the law of the state of California." Again, the government cites no laws or cases from the state of California that preclude application of the non-waiver clause. We find no persuasive reason supplied by the government to justify ignoring the terms of the parties' contract, so as to find Westfed's alleged failure to object to the government's breach to be a waiver of its right to assert a claim. Moreover, the government cites no other record evidence from which we might otherwise infer that Westfed intended in fact to waive the government's breach. [FN1] We agree with the trial court that the government has failed to meet its burden to support its affirmative defense that Westfed waived its right to assert its claim.

C. Causation and Foreseeability

1. Causation

[10] The government contends that to recover the cost of acquiring Old Western, Westfed must show it incurred the cost *solely* in order to perform the contract. The government asserts that the trial court applied the wrong legal standard, and contends that had it properly applied the "but-for" standard of causation, it would have held that Westfed failed to meet its burden to show that it is entitled to reliance damages. *White River Levee District v. McWilliams Dredging Co.,* 40 F.2d 873 (8th Cir.1930) and *J.D. Hedin Const. Co. v. United States,* 197 Ct.Cl. 782, 456 F.2d 1315 (Ct.Cl.1972) are the only authorities the government cites to support its view that the costs incurred must be solely for performing the contract. *White River* is not controlling, much less applicable to the facts of our case here. The United States Court of Appeals for the Eighth Circuit in *White River* denied the contractor's claim for costs associated with building a new boat to perform dredging under the contract. 40 F.2d at 877-78. The court first acknowledged that recoverable "expenditures ... must not be extravagant, and unnecessary for the purpose of carrying out the contract." In *White River,* nothing in the contract required the plaintiff to build the new boat. Indeed, the old boat that began the work was the only one that ever did any excavation. *Id.* at 877. The court observed that there was substantial evidence indicating that the new boat was built for purposes other than to just perform the contract. *Id.* In particular, the hull was made stronger than ordinary hulls. *Id.* at 878. According to the court, "the only effect, if any, which this work had on the building of this new hull was to make it more expensive." *Id.* Evidently, the court found the added expense for the stronger hull unnecessary to complete the work under the contract. Assuming the old boat did need a new hull, the court found no showing as to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

what amount, if any, was expended over and above what would have been paid to replace the hull with one of ordinary strength, and thus, the court declined to award any costs associated with the new boat. *Id.*

***7** The facts of *White River* are distinguishable from the instant case. In Paragraph A of the Recitals to the Assistance Agreement, it required, among other things, that DP Holdings (the predecessor to Westfed) merge Bell with Old Western. DP Holdings would have needed, among other things, to acquire Old Western to consummate this transaction. In the government's view, "nothing in the assistance agreement logically leads to the conclusion that the parties intended the recitals to be incorporated as obligations under the contract." The government's view is meritless. The Assistance Agreement is replete with references incorporating the obligations arising from the transactions described in the Recitals. The Agreement states, for instance, that the "obligations of the parties are subject to the Transaction becoming effective no later than October 1, 1988." The contract clearly defines "Transaction" to encompass "the consummation of all of the transactions set forth ... in Paragraph A of the Recitals" and all transactions related thereto. Moreover, the parties explicitly agreed in the Assistance Agreement that the FSLIC's obligations would be conditioned on the acquisition and merger of Bell with Old Western "in the manner set forth ... in Paragraph A of the Recitals of this Agreement." The government cannot claim, unlike *White River,* that the cost incurred by the non-breaching party, at least in regard to purchasing Old Western, was gratuitous. [FN2]

In regard to *J.D. Hedin,* the Court of Claims held, in view of the numerous other obligations assumed by the plaintiff, that it could not conclude the reason the plaintiff "was required to borrow the $480,000 was attributable solely to defendant's termination breach on the instant project, and that, but for such breach, it would not have had to borrow such funds." 456 F.2d at 1330. The government contends in the case before us that it was reversible error for the trial court to have relied on the substantial factor test in connection with proof of reliance damages, and suggests that a different conclusion would have been reached had the trial court properly applied the "but-for" test.

The trial court reviewed the previous decisions by the Court of Federal Claims that have decided reliance damages in *Winstar*-related cases, and found that they have generally applied the substantial factor test. *Westfed II,* 55 Fed. Cl. at 553. The trial court found no rational basis to depart from past decisions and apply a different standard to the recovery of reliance damages. *Id.* Assuming, *arguendo,* that the government was correct in asserting that the but-for standard should apply, the trial court found "credible evidence presented in this case also supports a finding of causation under the 'but for' test urged by defendant." *Id.*

Specifically, the trial court found "[p]rior to the imposition of FIRREA, New Western was successfully implementing the 1988 Business Plan (the Plan)." *Id.* at 554. Under the 1988 Plan, Westfed had "negotiated for and gained approval to grow at a rate that would double the size of the institution." *Id.* The court found that the Office of Thrift Supervision ("OTS") required New Western to scrap that plan in favor of a new business plan to place it in compliance with the capital requirement called for by FIRREA. *Id.* While the proposed capital restoration plan ("CRP") was under consideration, OTS imposed various limitations that limited growth of New Western to "net interest credit," which according to witness testimony, meant "essentially no growth" at all. *Id.* Even after the CRP was approved on March 7, 1990, OTS maintained a cap on New Western's growth to "an amount equal to net interest credited on deposit liabilities." *Id.* at 554-555. In addition to limiting New Western growth in an attempt to force it into compliance with FIRREA, the trial court found that OTS placed other operating restrictions on institutions, including New Western, that were found to be undercapitalized by FIRREA standards. *Id.* at 555. Namely, "New Western ... could not accept, renew, or roll over broker deposits, nor could they make types of loans or investments that were not specified in their [CRP] or approved in writing by the OTS assistant director." *Id.* In summary, the court found the restrictions imposed by OTS to put New Western in compliance with FIRREA stymied New Western's growth, and in fact, caused the company to contract. *Id.*

***8** The trial court then examined at length the evidence the government presented to show the existence of other factors that allegedly contributed to New Western failing, including the uneven management of New Western, the poor asset quality it held, and the weak economy. *Id.* at 556-58. Despite early complaints about management, by 1993, the assistant regional director of OTS found the management in place to be a "highly capable, efficient, and committed senior management team that had already achieved remarkable progress." *Id.* at 556. Moreover, the examiner-in-charge for the 1993

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

OTS examination testified that New Western's executives were doing a "good job" and "had much improved." *Id.* Despite the poor quality of the assets held, OTS determined that New Western's management had "made some progress in addressing significant on and off balance sheet risks." *Id.* at 557. Further, despite the economic difficulties it encountered, "there was uncontroverted evidence that, in addition to meeting its contractual capital requirements, New Western had sufficient liquidity to readily meet all the anticipated cash out-flow needs of the institution without any difficulty at all." *Id.* (internal quotes omitted). The trial court found that "it was apparent from testimony of the various examiner-in-charge [sic] that capital inadequacy [under FIRREA] was the primary reason for the downgrading of New Western's composite ratings." *Id.* Although the government offered the testimony of several witnesses who testified that New Western would have incurred millions of dollars in losses and failed, irrespective of the government's breach, the trial court did not give credit to their testimony because none of the witnesses developed a model to support their opinion of what losses New Western would have incurred in the "but-for" world of no breach. [FN3] *Id.* at 558. In conclusion, the trial court found that the defendant's breach was a substantial factor in causing Westfed's downfall. *Id.* The trial court further determined, after weighing all of the credible evidence presented, "that but for defendant's breach, New Western would not have been seized." *Westfed II*, 55 Fed. Cl. at 559. Thus, the trial court expressly found that Westfed had met its burden of showing causation under the but-for standard, the standard that the government urged the trial court to adopt. The government criticizes the trial court largely on grounds that certain evidence allegedly contradicts the trial court's factual determinations. Causation is a question of fact, which we review for clear error. *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1356 (Fed.Cir.2001). We are unpersuaded that the trial court was clearly erroneous in concluding that a causal connection had been definitely established between the breach and the loss claimed by Westfed. *See Cal. Fed. Bank, FSB v. United States*, 395 F.3d 1263, 1268 (Fed.Cir.2005).

***9** [11] Alternatively, the government argues that if the contract to merge Bell with Old Western had not been formed Westfed would have nonetheless "possibly" acquired Old Western on a stand-alone basis because of the business benefits arising from its purchase. Because the trial court could not with absolute certainty rule out the "possibility" that Westfed would purchase Old Western irrespective of the formation of the breached contract, the government contends the trial court wrongly "placed the burden on the Government to prove to a certainty that Westfed would not have acquired Old Western on a stand-alone basis." Accordingly, the government suggests that the trial court erroneously ruled that Westfed is not barred from recovering the costs it incurred in reliance on the contract that the government approved. Bearing in mind that reliance damages seeks to put the non-breaching party in "as good a position as he would have been in had the contract not been made," Restatement (Second) of Contracts § 344(b), the government contends that awarding Westfed the cost of acquiring Old Western impermissibly places Westfed in a better position than it would have been had there been no contract.

The government ignores evidence that supposing the merger agreement had not been approved, the purchase of Old Western by Westfed would likely have not been approved. Had Westfed not agreed to acquire and merge Old Western and Bell, the regulators would have likely never permitted Westfed to acquire Old Western in the first place. The trial court's finding is supported by evidence from Sidney Mar, a Supervisory Agent for the Federal Home Loan Bank Board ("FHLBB") and later assistant district director of OTS, that "Westfed could not acquire Old Western without regulatory approval." Mar had met with Westfed in connection with the application to buy Old Western on a stand-alone basis and commented that he had a "number of financial concerns with the proposed transaction." Given the current structure of the proposed transaction, Mar stated that "there is a reasonable likelihood that we will recommend denial" of the application. Other than the delayed withdrawal of the application to acquire Old Western on a stand alone basis, the government cites little evidence that Westfed would have agreed to "provide and maintain a substantially higher projected GAAP and tangible net worth for [Old] Western," than would have been needed to allay Mar's concerns. In a memorandum from David Wall, the head of the FHLBB, to Jay Jupiter, the deputy director for the Mergers and Acquisition Department at the FSLIC, he acknowledged that Mar was "likely to recommend against the Western acquisition on a 'stand-alone' basis, but is much more likely to recommend favorably the combined [acquisition of Bell and Old Western]." Wall added that "[w]e seem to be moving towards a position that Western and Bell *must* be considered jointly." (Emphasis added). In brief, the trial court found:

> ***10** The evidence presented at trial clearly establishes that Westfed acquired Old Western in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> reliance on the contract between the parties. The FHLBB approved plaintiff's acquisition of Bell as a multi-step transaction .... The testimony of principals and executives of plaintiff is consistent on this point and is supported by the documentary evidence. Mr. John Harding, a negotiator for Westfed in preparation for the merger and later a director of New Western ... testified that Westfed viewed the acquisition and merger of Bell and Old Western as "a single transaction." Ms. Joan Manning, the chief financial officer of Westfed ... confirmed that all of the documents involved in the merger and acquisition were considered part of a single transaction. See Tr. at 623-24. As a result, the acquisition of Bell could not have been completed without the additional acquisition of Old Western by Westfed and, therefore, the purchase of Old Western was in reliance on the contract between the parties.

*Westfed II*, 55 Fed. Cl. at 550. We perceive no clear error in the trial court's determination that Westfed would not have been permitted to acquire Old Western had it not agreed to acquire and merge Old Western with Bell, and that Westfed did indeed purchase Old Western in reliance upon the contract eventually breached by the government.

2. Foreseeability

[12][13] "In order to be recoverable as reliance damages, ... plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation." *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1378 (Fed.Cir.2001). The government contends that it was not foreseeable that substituting the MCR with FIRREA's capital requirement would cause the claimed reliance costs. More specifically, the government claims that the "trial court erred in finding it foreseeable that a 'likely result of the removal of the RCMA and the forbearance letter would be New Western's failure to meet regulatory capital requirements." '

We find no merit to the government's contention. The deputy director for the Mergers and Acquisitions Department of the FSLIC during the acquisition negotiations admitted that without the MCR, New Western would have been in immediate regulatory difficulty because it would have been out of regulatory capital compliance. *Westfed II*, 55 Fed. Cl. at 553. Moreover, based on Westfed's 1988 Business Plan, which the government scrutinized before contracting with Westfed, the government knew that New Western was projected to have a declining capital ratio for several years. Thus, the government was well aware that New Western's capital standard would not improve, even with the MCR in place, for several years to meet the regulatory capital minimum. Furthermore, both parties' witnesses testified that the forbearance against future changes in the regulatory capital requirement was "continuously negotiated by both parties," and that the government understood it was important to preserve the MCR so that Westfed could put into effect its proposed 1988 Business Plan, and thus enable or help it to service its interest and dividend obligations arising from debts incurred to undertake the merger of Old Western with Bell. *Id.* at 553. "Foreseeability is a question of fact reviewed for clear error." *Bluebonnet*, 266 F.3d at 1355. We are not convinced that the trial court clearly erred in finding it foreseeable that New Western would likely fail to meet regulatory capital requirements if the terms of the MCR and the Forbearance Letter were not honored by the government.

***11** [14] Alternatively, the government argues that even if it were foreseeable that New Western would to be found out of capital compliance, it was unforeseeable that "it would be seized." For instance, the government points out that New Western was permitted to remain open for nearly four years after the MCR was lifted, even though it was not in full compliance with the capital requirements of FIRREA. Further, the government contends that the blame for the seizure lies with Westfed because it "refused to restore any of [New] Western's lost real capital, and ... failed to produce any acceptable plan for recovery." Additionally, the government cites to post-contractual statements made by Westfed in its 1989 Business Plan, suggesting that New Western could survive imposition of the FIRREA capital requirement.

It is undisputed that the government, in the absence of a contract, would have been entitled to seize New Western if it failed for an extended to period to meet the regulatory capital requirements in effect at the time. As discussed above, the government knew that the MCR and the terms of the Forbearance Letter were important, because without it, New Western would have been immediately out of regulatory capital compliance. Moreover, it was aware that Westfed projected that it would be several years, even with the aggressive growth plan outlined by the 1988 Business Plan and the reprieve offered by the MCR, before it could meet the regulatory capital minimum. The government enlists no persuasive evidence to demonstrate that it was unforeseeable that a seizure would probably take place if the government ignored its promise not to impose the regulatory capital maintenance requirements. We find

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

none of the government's allegations to be sufficiently persuasive to leave us with a "definite and firm conviction" that the trial court erred in concluding that the seizure of New Western would be a foreseeable consequence of the breach. Landmark, 256 F.3d at 1378.

Lastly, the government attempts to argue that non-breach factors worsened the harm endured by Westfed beyond what would have been foreseeable with the breach alone. For example, the government asserts that the parties could not have foreseen the effects of the recession in the early 1990's or the impact of Old Western's assets on the merged entity. Thus, according to the government, the magnitude and kind of injury suffered was not a foreseeable consequence of its breach. Again, the government's arguments come short of persuading us that the trial court clearly erred with respect to this factual question of foreseeability.

D. Calculation of Damages [FN4]

1. Pre-contract costs

[15][16] The government contends, at the very least, that the trial court erred in determining the compensable damages. First, the government asserts that the trial court erroneously awarded $10 million in pre-contract costs to acquire Old Western. We agree in part with the government. While acknowledging that pre-contract damages have often been denied, the trial court noted that courts have in special circumstances permitted recovery of foreseeable damages arising from preparation to perform under the to-be-formed contract. *Westfed I,* 52 Fed. Cl. at 161-12. In this case, about $3.1 million was paid to acquire Old Western stock on the open market in October 1987, a month after it had submitted its application to acquire Old Western on a stand-alone basis and a year before Westfed submitted its application for the acquisition and merger of Bell with Old Western. Another $6.9 million was incurred to purchase Old Western before formation of the breached contract. The trial court does not identify any persuasive reasons based on the record evidence to demonstrate that the expenditures in 1987 were in fact made pursuant to a binding agreement with the government in preparation for the performance under the breached contract, rather than pursuant to an attempt to acquire Old Western on a stand-alone basis. The evidence does not demonstrate that the October 1987 pre-contract expenditures were in fact made in reliance on the contract to be formed in connection with the acquisition and merger. Given the dearth of evidence proffered, we must conclude that the trial court's finding in regard to the alleged preparatory pre-contract costs is clearly erroneous. Accordingly, we reverse the trial court's award of $3.1 million in pre-contract damages.

***12** [17] However, there is evidence, such as a Letter of Intent dated June 22, 1988, suggesting that the FSLIC knew by that point in time that Westfed was incurring expenses in preparation for and reliance upon the contract. The appellate record does not indicate the timing of the $6.9 million in pre-contractual expenditures. Without evidence that these expenses were incurred before the FSLIC issued its Letter of Intent, we cannot find clear error in the trial court's decision that these damages were foreseeable and were suffered in reliance on the contract. We therefore affirm the remainder of the award of pre-contract damages, which amounts to $6.9 million.

2. Out-of-pocket expenses to acquire Old Western

[18] The government insists that the trial court erred in awarding Westfed $148 million, which is the total amount Westfed had spent to acquire Old Western's stock. According to the government, Westfed issued subordinated debentures and preferred stock to raise the necessary cash to acquire Old Western, but the securities to this day remain unredeemed or paid off by Westfed. In the government's view, the $148 million Westfed spent is not an "out-of-pocket expense," and it is therefore not an "actually sustained loss."

[19] "The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise." *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1382 (Fed.Cir.2001). As the government acknowledges, Westfed spent the proceeds from its sale of debentures and stock in order to purchase Old Western's stock. Except for the $10 million spent in the pre-contract stage, it is clear that the remainder of the expenditure was made in reliance on the terms set forth in the Assistance Agreement that the government breached. *See supra* Section III.A. It is inconsequential that Westfed chose to borrow the funds from investors to acquire Old Western's shares rather than use its own money. The government cites no legal authority to support distinguishing the "losses actually sustained" based on whether Westfed used its own funds or the funds of investors to whom it is indebted. Westfed is entitled to that amount it actually expended to acquire Old Western in reliance on the forbearance promise, which the government repudiated. *Id.; see also DPJ Co. v. FDIC,* 30 F.3d 247, 250 (1st Cir.1994)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(reliance damages aim to "restore to the claimant what he or she spent before the opportunity was withdrawn.").

3. Payments-in-kind costs

[20] The government contends that the $71.3 million made for payments-in-kind is not recoverable because it "constitute[s] potential future obligations, not current, out-of-pocket costs." Westfed responds by arguing that the losses incurred in foreseeable reliance on a breached promise are not limited to only cash losses. Further, Westfed frames its actions as mitigation, to comply with the regulators' demands that Westfed raise additional capital for Western.

***13** As the trial court recognized, "payments-in-kind" ("PIKs") represent the issuance of additional paper securities to existing debt or equity holders. *Westfed II,* 55 Fed. Cl. at 552. Over a series of years, Westfed provided PIKs, instead of cash, as interest payments came due on existing debentures. Thus, although Westfed assumed additional obligations on paper, it never actually made any payments from its account, from which it could be said that Westfed sustained an actual loss as a result of the government's breach. *Glendale,* 239 F.3d at 1382. Westfed merely agreed through the PIKs to prospectively to take on future payment obligations, which may or may not come due in the future. Because PIKs are only potential future obligations, they do not count yet as an actually sustained loss, and therefore the trial court was in error to award Westfed $71.3 million for these alleged "expenditures."

4. Acquisition and financing cost from Ariadne

[21] The trial court awarded Westfed $22.1 million in transaction costs associated with the issuance of debentures and preferred stock to finance the acquisition of Old Western. The government contends that Westfed did not pay $17.5 million of that amount because a foreign investor group, Ariadne, was the actual source of those funds. Ariadne had advanced $14 million to help finance Westfed's acquisition of Old Western, but then failed to honor its commitment to pay the remaining amount owed. After Westfed refused to return the monies advanced, the parties reached a settlement agreement in which Westfed retained the advance plus interest, totaling $17.5 million, which Westfed then applied to the purchase of Old Western.

The trial court acknowledged that Ariadne had agreed to finance Westfed's acquisition of Old Western but had to withdraw because of its financial problems. *Westfed II,* 55 Fed. Cl. at 559. The trial court stated that "[t]he evidence presented at trial supports [Westfed's] contention that the $17.5 million from Ariadne is not appropriate as an offset against plaintiff's reliance damages" because the money was given to Westfed as part of a separate transaction, in consideration for Ariadne's release from Westfed's breach of contract claim. *Id.* The government points to no persuasive evidence to undercut the trial court's factual determination here, and therefore we find insufficient reason to conclude it was clearly erroneous. The trial court's judgment refusing to deduct $17.5 million from the award to Westfed is affirmed.

5. Costs incurred to acquire Bell

[22] The government contends that the tax benefits arising from Westfed's ownership of Bell negated the cost to acquire the company. As evidence, the government notes that Westfed's 1991 audited consolidated financial statement reported "[i]n connection with the acquisition of Bell, the purchase price was zero." In answer, Westfed points to testimony credited by the court and other documentary evidence suggesting it outlaid $20 million to acquire Bell's shares. *See* *Westfed II,* 55 Fed. Cl. at 551 & n. 10. This evidence, however, neither refutes nor addresses the government's contention. Neither the trial court nor Westfed explains why the tax benefit accruing to Westfed as a result of acquiring Bell should not offset the acquisition cost. Given that no one disputes that as a consequence of tax benefits from acquiring Bell, Bell's "purchase price was zero," we conclude that the trial court clearly erred in finding that Westfed actually sustained a loss of $20 million in connection with the purchase of Bell, for which it should be compensated. *See* *Glendale,* 239 F.3d at 1382; Dan B. Dobbs, *Law of Remedies,* § 12.3(1) at 51-52 (2d ed. 1993) ("The reliance damages recovery is a recovery for net reliance loss, so the defendant is credited with any benefit the plaintiff receives from the expenditure in reliance.").

6. Offset by financial benefits

***14** [23][24] Damages based on the injured party's reliance interest may be reduced by "any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." Restatement (Second) of Contracts § 349. Further, the defendant may be credited with any benefit the plaintiff retained from its expenditure in reliance of the breached agreement. Dan B. Dobbs, *Law of Remedies,* § 12.3(1) at 51-52 (2d ed.1993). Here, the government argues that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assistance payments it made should offset any reliance costs incurred by Westfed. According to the government, it committed only a partial breach and that it is entitled to a dollar-for-dollar credit of its partial performance from the assistance payments it made. Thus, because the government paid about $780 million, which exceeds the amount awarded in reliance costs, the government suggests it owes Westfed nothing for its breach.

The trial court determined that the government seized New Western before Westfed had the opportunity sell the company or to recoup its losses, and that the government failed to prove with reasonable certainty that Westfed would have incurred the losses it sustained absent the breach. *Westfed II*, 55 Fed. Cl. at 560. Westfed notes, in addition, that the payments were made to New Western, which the government seized. Thus, whatever value the government put into assets held by Westfed, it was taken when the government seized New Western. Further, by 1989, the government barred Western from paying any dividends to Westfed, preventing Westfed from tapping into the benefit arising from the payments by the government. Most importantly, Westfed notes that it was the government's burden to prove with reasonable certainty the amount of offsetting benefit retained by Westfed, which, in the trial court's opinion, the government failed to do. *Westfed II*, 55 Fed. Cl. at 560; *see* Restatement (Second) of Contracts § 349 (placing burden on breaching party to prove the amount by which the reliance damages award should be reduced).

The government articulates no persuasive rationale, much less cites any legal authority, for its assertion that it is the aggrieved party, not the breaching party, that "bears the burden of proving the value ... of [the breaching party's] undisputed performance." If the government wanted an offset, it was the government's burden to prove with reasonable certainty the quantum of benefit retained by Westfed despite the government's breach. According to the government, "Westfed received the benefit of the use of the Government's assistance payments for its own purposes during the five-year period that Westfed owned and operated Western." In particular, the government highlights the assistance payments and other reimbursements it made to New Western. The government provides no analysis, however, of how its expenditures translate into any retained quantifiable benefit by Westfed. Instead, the government relies on largely conclusory claims that its entire expenditure should be effectively treated as a benefit retained by Westfed. The government ignores the fact that it put most of its money into New Western, which it eventually seized from Westfed, and that it prevented Westfed from reaping any dividends from New Western during most of the period that Westfed held New Western. Stripped of New Western and the opportunity for benefits that Westfed hoped to achieve under the agreed upon RCMA, the government cannot, based on the evidence and arguments presented, claim its breach on the whole was harmless. We find no clear error in the trial court's factual determination that the government failed to sustain its burden in showing that any offset from the damage award is appropriate.

E. Westfed's Cross-Appeal

***15** [25] Westfed contends that the trial court incorrectly held that it may recover for only "amounts actually expended" and challenges whether the indebtedness incurred from the issued securities, which now allegedly exceeds $800 million (excluding principal), is an amount that should be treated as a loss that has been actually sustained. Westfed observes that reliance damages are meant to put the nonbreaching party "in as good a position as he would have been had the contract not been made" (quoting Restatement (Second) of Contracts § 344(b) (1981)), and asserts it is by no means in as good a position as it would have been had no contract been made. For much the same reasons we expressed in rejecting the trial court's award of PIK costs, we must reject Westfed's attempt to claim the more than $800 million it allegedly owes on its financing obligations. Because the amount claimed is not an actual loss because Westfed has not paid anything out of its pocket, *see Glendale,* 378 F.3d at 1312, we agree that Westfed is not entitled to the amount it seeks in its cross-appeal.

IV. CONCLUSION

The judgment of the trial court is affirmed-in-part and reversed-in-part. We affirm the trial court judgment rejecting the government's argument that: (1) Westfed assumed the risk of regulatory changes; (2) Westfed waived its right to claims damages from the government's breach; (3) Westfed failed to adduce sufficient proof of causation and foreseeability of the damage claimed under the appropriate legal standard; (4) the funds spent to acquire Old Western in reliance upon the breached contract (including $6.9 million of pre-contract expenditures) is not a legally compensable loss; (5) the settlement fee from Ariadne should be deducted from the damage award; and (6) the government is entitled to a reduction in the damages awarded

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because of its partial performance under the contract. Further, we affirm the trial court's judgment denying Westfed the sum sought in its cross-appeal arising from its debts to finance the acquisition and merger of Old Western with Bell. We reverse the trial court judgment awarding Westfed: (1) $3.1 million of pre-contract costs to purchase Old Western; (2) the costs to acquire Bell; and (3) PIK costs.

AFFIRMED-IN-PART AND REVERSED-IN-PART

FN1. Although the government feigns ignorance of Westfed's reservation of rights, multiple witnesses at trial provided uncontroverted testimony that Westfed had in fact made known to federal regulators its dispute in regard to whether it was subject to the capital requirement imposed by FIRREA. Although the government dismisses the testimony as self-serving, it cites no evidence or testimony to rebut Westfed's witnesses.

FN2. Although the government notes that Westfed originally had intentions to acquire Old Western on a stand-alone basis, the facts, as found by the trial court, indicate that the approval required to undertake the acquisition would likely have not been given had Westfed not agreed to also acquire and merge Bell with Old Western in accordance with the Assistance Agreement. *See infra.* We find no persuasive basis to conclude, as the government does, that Westfed did not acquire Old Western in reliance on the agreement negotiated with the government.

FN3. The government does not dispute the trial court's statement that no model from its experts was put into evidence of New Western's losses in a but-for world, but instead complains that the trial court appeared to improperly shift the burden of proof to the government, requiring that it show "in the absence of breach, [New] Western would have incurred losses that would have resulted in its seizure." We find no merit to the government's complaint. The trial court expressly stated that "[p]laintiff must ... prove that its damages were lost as a result of the breach" and acknowledged the dispute in regard to which standard the "plaintiff must satisfy ." *Westfed II,* 55 Fed. Cl. at 553. In view of the lack of foundation in the record evidence to support the government's experts, we discern no error in the trial court's discredit of the claims made by them that New Western would have failed regardless of the breach by the government.

FN4. Westfed suggests that all of the damages awarded and the damages it now seeks in its cross-appeal may be awarded alternatively under a theory of restitution. "We have allowed restitution for the limited purpose of returning the acquiring thrift to the status quo ante when specific initial contributions to an acquired thrift have been established." *Glendale Fed. Bank, FSB v. United States,* 378 F.3d 1308, 1312 (Fed.Cir.2004). This type of restitution is sometimes said to be "more properly viewed as a form of reliance damages[,]" as distinguished from restitution based on the breaching party's return of the value of benefits conferred by the non-breaching party's performance. *Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297, 1314 & n. 13 (Fed.Cir.2004). Reliance-like restitution is only "supportable when based on actual losses that are fully proven." *Glendale,* 378 F.3d at 1312. In the instances below where we reverse the portions of the judgment awarding damages under a reliance theory, we find that Westfed's attempt to resort to a restitution theory does not alter our conclusion, because in those instances such damages were erroneously awarded when the actual loss sustained by Westfed was not fully proven or demonstrated.

2005 WL 1119654 (Fed.Cir.)

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 1753235 (Appellate Brief) Reply Brief for Defendant-Appellant, the United States (Jan. 09, 2004)Original Image of this Document (PDF)

• 2004 WL 419463 (Appellate Brief) Reply Brief for Defendant-Appellant, the United States (Jan. 09, 2004)

• 2003 WL 23145504 (Appellate Brief) Brief of Plaintiff-Appellee-Cross-Appellant (Nov. 12, 2003)

• 2003 WL 23145513 (Appellate Brief) Brief for Defendant-Appellant, the United States (Sep. 29,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003)

- 03-5145 (Docket)
(Aug. 13, 2003)

- 03-5131 (Docket)
(Jul. 03, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.