STATE OF CALIFORNIA—THE RESOURCES AGENCY ARNOLD SCHWARZENEGGER, *GOVERNOR*

CALIFORNIA COASTAL COMMISSION

45 FREMONT, SUITE 2000
SAN FRANCISCO, CA 94105-2219
VOICE AND TDD (415) 904-5200
FAX (415) 904-5400

# Th5a-e

| | |
|---|---|
| Staff: | TL-SF |
| File Date: | 4/7/05 |
| 60th Day: | 6/6/05 |
| 75th Day: | 6/21/05 |
| Extended to: | 8/12/05 |
| Hearing Date: | 8/11/05 |

## STAFF REPORT AND RECOMMENDATION ON CONSISTENCY DETERMINATIONS

**Consistency Determination Nos.:** **CD-042-05, CD-043-05, CD-044-05, CD-045-05, and CD-046-05**

**Federal Agency:** **U.S. Department of the Interior, Minerals Management Service**

**Project Location:** Pacific Outer Continental Shelf (OCS) leases in the Lion Rock, Santa Maria, Point Sal, and Purisima Point Units and non-unitized Lease 409, in the northern Santa Maria Basin between Pismo Beach in San Luis Obispo County and the town of Surf in Santa Barbara County.

**Project Description:** Approval of Suspensions of Production (i.e., lease extensions) of 1) 31 months for eight OCS oil and gas leases in the Santa Maria Unit, and 2) 34 months for 15 OCS oil and gas leases in the Lion Rock, Point Sal, and Purisima Point Units and non-unitized Lease 409. Activities during suspension include biological and shallow hazards surveys. Reasonably foreseeable post-suspension activities include 1) drilling two delineation wells using a Mobile Offshore Drilling Unit (MODU) in the Point Sal and the Purisima Point Units, and 2) installing, operating, and decommissioning three offshore oil and gas production platforms and associated pipelines, cables, and other infrastructure.

**Substantive File Documents:** See Exhibit 1

## EXECUTIVE SUMMARY

On April 7, 2005, the U.S. Department of the Interior, Minerals Management Service (MMS) submitted to the Commission consistency determinations for proposed lease suspensions in the following Outer Continental Shelf (OCS) lease areas (see also Exhibit 2 – Map of Region):

| Unit | Lease Numbers[1] | Consistency Determination Number | Suspension Term |
|---|---|---|---|
| Lion Rock | 396, 397, 402, 403, 408, and 414 | CD-042-05 | 34 months |
| Point Sal | 415, 416, 421, and 422 | CD-043-05 | 34 months |
| Santa Maria | 425, 430, 431, 433, 434, (420, 424, and 429*) | CD-044-05 | 31 months |
| Purisima Point | 426, 427, 432 and 435 | CD-045-05 | 34 months |
| Lease 409** | 409 | CD-046-05 | 34 months |

* By decision dated August 16, 1999, the MMS allowed Leases 420, 424, and 429 (and Lease 462 in the Gato Canyon Unit) to expire. The lessees appealed the decision to the Department of Interior Board of Land Appeals, which is currently reviewing the appeal. The MMS states in its consistency determinations that these leases are included within the scope of its analysis pending the outcome of the appeals.

** Lease 409 is a "non-unitized" or stand-alone lease.

These leases and units are collectively referred to in this report as the Northern Santa Maria Basin (NSMB) Leases and Units. They are located in federal waters offshore northern Santa Barbara County and southern San Luis Obispo County between the town of Pismo Beach on the north and the settlement of Surf to the south (see Exhibit 3 – Map of NSMB Units Area).

The MMS submitted consistency determinations for suspensions of 36 leases off the coast of San Luis Obispo, Santa Barbara, and Ventura Counties, grouped into ten consistency determinations. This report provides the Commission's review and findings on five of the ten consistency determinations and 20 of the 36 lease suspensions.

During the proposed suspension periods, the lessee, Aera Energy LLC, proposes to conduct biological and shallow hazards surveys in the Point Sal and Purisima Point Units and to perform in-office activities to support leases in all the Units. After the proposed suspension periods end, the MMS anticipates that Aera will drill up to two delineation wells, one in the Point Sal Unit and one in the Purisima Point Unit. The MMS further anticipates that the NSMB Leases would

[1] The full identification for Lease 396 is: Lease OCS-P-0396. Other leases are identified similarly. For the remainder of this report, lease references will use the shortened name.

be developed using three offshore production platforms proposed to be located in Lease 409, Lease 422, and Lease 431. Anticipated development would also include pipelines, cables, and other associated infrastructure. Oil and gas produced would be transported to shore via pipeline to a proposed processing facility near Casmalia.

Based on the 2001 decision of the U.S. District Court in the case of *State of California v. Norton* (affirmed by the U.S. Court of Appeal, Ninth Circuit), these lease suspensions are subject to the consistency review requirements of Section 307(c) of the Coastal Zone Management Act (CZMA). The court decision clarified that the Commission's review of a lease suspension is similar to its review of a lease sale in the sense that the Commission is to analyze the broad and long-term coastal effects of the activities (i.e., post-suspension exploration, development and production activities) that are reasonably foreseeable results of the MMS's approval of the subject lease suspensions. The court nevertheless acknowledged, and the Commission agrees, that a lease suspension is not identical to a lease sale. The subject lease suspensions have been requested decades after the initial lease sale, after most of these leases have been explored and after detailed environmental and technical evaluations have been performed. Substantially more information on these leases is available now than was available at the original lease sale stage.

The Commission has reviewed the April 7, 2005 consistency determinations by the MMS and has determined that additional information is needed to enable it to complete its review. In an April 22, 2005, letter to MMS, Commission staff requested additional information regarding the "reasonably foreseeable direct and indirect effects" of the requested suspensions, including information about the likely post-suspension exploration, development, and production activities (see Appendix B – Letter from Coastal Commission to MMS). Commission staff informed the MMS that additional information is needed for the Commission to determine whether granting the lease suspensions is consistent with the enforceable policies of the California Coastal Management Program (CCMP). In a June 23, 2005 response letter, the MMS replied that most of the information the Commission staff requested is more appropriate for exploration and production review stages, rather than for a review of the lease suspensions themselves (see Appendix C – Letter from MMS to the Coastal Commission). The Commission disagrees with this position.

The additional information requested in the April 22, 2005 letter that is necessary for the Commission to complete its review includes, but is not limited to:

- a description and analysis of specific, feasible mitigation measures that would be implemented to avoid or minimize adverse impacts to marine biological resources, sensitive species dependent on environmentally sensitive habitat areas, archaeological resources, and other coastal resources;
- updated and more current population counts and analyses about species of concern that could be affected by project-related activities, including the Southern sea otter and the western snowy plover, and re-evaluation of how those species could be affected by project-related activities; and,

- detailed information about worst-case oil discharge volumes, oil spill probabilities, and oil spill trajectories to evaluate potential impacts from an oil spill to marine and coastal resources.

Without this information, the Commission is unable to determine whether or not granting the lease suspensions would be consistent with CCMP policies related to public access and recreation (Coastal Act §§ 30210, 30211, and 30220), marine resources and water quality (Coastal Act §§ 30230 and 30231), commercial fishing (Coastal Act §§ 30230 and 30234.5), environmentally sensitive habitat areas (Coastal Act § 30240), archaeological resources (Coastal Act § 30244), and visual resources (Coastal Act §§ 30251 and 30262(a)(3)).

In addition, while development at these units would normally be subject to the provisions of the coastal-dependent industrial "override" policy (Section 30260) of the Coastal Act, the lack of the above-identified information also makes it impossible for the Commission to make the necessary findings under that policy. The Commission therefore objects to the MMS's consistency determinations, based on lack of adequate information to determine the lease suspensions' consistency with the enforceable policies of the CCMP/Coastal Act.

TABLE OF CONTENTS

**1 STAFF RECOMMENDATION ........ 7**
1.1 Motions and Resolutions ........ 7
1.2 Applicable Legal Authorities ........ 9
1.2.1 Necessary Information ........ 9
1.2.2 Practicability ........ 12
1.2.3 Federal Agency Response to Commission Objection ........ 12
1.3 Standard of Review ........ 13

**2 FINDINGS AND DECLARATIONS ........ 14**
2.1 Introduction ........ 14
2.2 Background of Federal OCS Leases ........ 15
2.2.1 Coastal Commission Granted Review of Proposed Lease Suspensions ........ 15
2.2.2 Scope of Coastal Commission Review ........ 17
2.2.3 Current OCS Operations in California ........ 20
2.3 Project Description ........ 24
2.3.1 Background of NSMB Leases ........ 24
2.3.2 Project-Related Activities ........ 26
2.3.3 Information lacking from the project description ........ 28
2.4 Related Environmental Documents ........ 29

**3 Coastal Act Issues ........ 32**
3.1 Marine Biological Resources and Water Quality ........ 33
3.2 Oil Spill Prevention and Response ........ 51
3.2.1 Introduction ........ 51
3.2.2 Background – Regional Oil Spill History ........ 54
3.2.3 Coastal Resources at Risk from an Oil Spill ........ 55
3.2.4 Oil Spill Risk Analysis ........ 60
3.2.5 Prevention and Response Capability ........ 68
3.3 Placing Fill in Coastal Waters ........ 76
3.4 Commercial Fishing ........ 80
3.5 Visual and Scenic Resources ........ 84
3.6 Public Access and Recreation ........ 87
3.7 Environmentally Sensitive Habitat Areas ........ 90
3.8 Seismic and Geologic Hazards ........ 96
3.9 Archaeological Resources ........ 98
3.10 Air Quality ........ 100
3.11 Coastal-dependent Industrial Development ........ 102

TABLES:
TABLE 1: PROPOSED LEASE SUSPENSIONS ADDRESSED IN THIS REPORT ........ 14
TABLE 2: UNDEVELOPED PACIFIC OCS OIL AND GAS UNITS AND LEASES ........ 21
TABLE 3: PACIFIC OCS OIL AND GAS ANNUAL PRODUCTION RATES FROM 1984-2003 ........ 22
TABLE 4: TOTAL PROJECTED RESERVES OF 36 UNDEVELOPED OCS LEASES ........ 23
TABLE 5: SUMMARY OF PREVIOUS COMMISSION ACTIONS IN NSMB UNITS ........ 25

EXHIBITS (attached to this report):
Exhibit 1: Substantive File Documents
Exhibit 2: Map of Region
Exhibit 3: Map of Northern Santa Maria Basin Units Area
Exhibit 4: Regional and Northern Santa Maria Basin Biological Resources
Exhibit 5: Lease Stipulations for Lease Sale 53
Exhibit 6: Excerpt from Environmental Defense Center's June 27, 2005 letter to Coastal Commission staff
Exhibit 7: July 15, 2005 letter from MMS to Coastal Commission staff regarding seismic survey models

APPENDICES (provided in separate packet):
Appendix A: Pacific OCS Development
Appendix B: April 22, 2005, from Coastal Commission to MMS requesting additional information
Appendix C: June 23, 2005, letter from MMS to Coastal Commission responding to additional information request

# 1 STAFF RECOMMENDATION

## 1.1 MOTIONS AND RESOLUTIONS

The Commission is considering five separate consistency determinations in this report; thus, five separate motions and resolutions are required.

**1) Motion for CD-042-05:**

> *I move that the Commission **concur** with consistency determination CD-042-05 that the project described therein is consistent to the maximum extent practicable with the enforceable policies of the California Coastal Management Program.*

**Staff Recommendation:**

Staff recommends a **NO** vote on the motion. Failure of this motion will result in an objection to the determination and adoption of the following resolution and findings. An affirmative vote of a majority of the Commissioners present is required to pass the motion.

**Resolution to Object to Consistency Determinations:**

> *The Commission hereby **objects** to consistency determination CD-042-05 by the Minerals Management Service for the proposed project, finding that the consistency determination lacks information necessary to evaluate the project's consistency with the enforceable policies of the California Coastal Management Program.*

**2) Motion for CD-043-05:**

> *I move that the Commission **concur** with consistency determination CD--043-05 that the project described therein is consistent to the maximum extent practicable with the enforceable policies of the California Coastal Management Program.*

**Staff Recommendation:**

Staff recommends a **NO** vote on the motion. Failure of this motion will result in an objection to the determination and adoption of the following resolution and findings. An affirmative vote of a majority of the Commissioners present is required to pass the motion.

**Resolution to Object to Consistency Determinations:**

> *The Commission hereby **objects** to consistency determination CD-043-05 by the Minerals Management Service for the proposed project, finding that the consistency determination lacks information necessary to evaluate the project's consistency with the enforceable policies of the California Coastal Management Program.*

3) **<u>Motion for CD-044-05</u>:**

> *I move that the Commission **concur** with consistency determination CD-044-05 that the project described therein is consistent to the maximum extent practicable with the enforceable policies of the California Coastal Management Program.*

**Staff Recommendation:**

Staff recommends a **<u>NO</u>** vote on the motion. Failure of this motion will result in an objection to the determination and adoption of the following resolution and findings. An affirmative vote of a majority of the Commissioners present is required to pass the motion.

**Resolution to Object to Consistency Determinations:**

> *The Commission hereby **objects** to consistency determination CD-044-05 by the Minerals Management Service for the proposed project, finding that the consistency determination lacks information necessary to evaluate the project's consistency with the enforceable policies of the California Coastal Management Program.*

4) **<u>Motion for CD–045-05</u>:**

> *I move that the Commission **concur** with consistency determination CD-045-05 that the project described therein is consistent to the maximum extent practicable with the enforceable policies of the California Coastal Management Program.*

**Staff Recommendation:**

Staff recommends a **<u>NO</u>** vote on the motion. Failure of this motion will result in an objection to the determination and adoption of the following resolution and findings. An affirmative vote of a majority of the Commissioners present is required to pass the motion.

**Resolution to Object to Consistency Determinations:**

> *The Commission hereby **objects** to consistency determination CD-045-05 by the Minerals Management Service for the proposed project, finding that the consistency determination lacks information necessary to evaluate the project's consistency with the enforceable policies of the California Coastal Management Program.*

5) **<u>Motion for CD-046-05</u>:**

> *I move that the Commission* ***concur*** *with consistency determination CD-046-05 that the project described therein is consistent to the maximum extent practicable with the enforceable policies of the California Coastal Management Program.*

**Staff Recommendation:**

Staff recommends a **<u>NO</u>** vote on the motion. Failure of this motion will result in an objection to the determination and adoption of the following resolution and findings. An affirmative vote of a majority of the Commissioners present is required to pass the motion.

**Resolution to Object to Consistency Determinations:**

> *The Commission hereby* ***objects*** *to consistency determination CD-046-05 by the Minerals Management Service for the proposed project, finding that the consistency determination lacks information necessary to evaluate the project's consistency with the enforceable policies of the California Coastal Management Program.*

## 1.2 APPLICABLE LEGAL AUTHORITIES

Section 307 of the Coastal Zone Management Act (16 USC § 1456) provides in part:

> *(c)(1)(A) Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of the approved State management programs.*

### 1.2.1 Necessary Information

Section 930.43(b) (15 CFR § 930.43(b)) of the federal regulations that implement the CZMA authorizes the Commission to object to a consistency determination on the basis of a lack of information necessary for it to assess the project's consistency with the enforceable policies of the California Coastal Management Program (CCMP). That section states:

> *If the State agency's objection is based upon a finding that the Federal agency has failed to supply sufficient information, the State agency's response must describe the nature of the information requested and the necessity of having such information to determine the consistency of the Federal agency activity with the enforceable policies of the management program.*

***Nature of Information Requested***

As described in Section 3 below, the Commission finds that the consistency determinations analyzed in this report lack the information the Commission requested from the MMS to enable it to determine whether the granting of the suspensions is consistent with the enforceable policies of the CCMP related to marine biological resources and water quality (Coastal Act §§ 30230 and 30231), placing fill in coastal waters (Coastal Act § 30233), visual and scenic resources (Coastal Act §§ 30251 and 30262(a)(3)), environmentally sensitive habitat areas (Coastal Act § 30240), and archaeological resources (Coastal Act § 30244). To determine if the proposed lease suspensions would be consistent with the CCMP, Commission staff, in a letter of April 22, 2005, requested MMS to provide it with additional necessary information. The requested necessary information is summarized below:

1) A description and analysis of specific, feasible mitigation measures that would be implemented to avoid or minimize project-related impacts.

2) An evaluation of impacts and necessary mitigation measures to address the placement of fill in coastal waters.

3) A more thorough description of project-related impacts on commercial fishing.

4) Clarification about the number and the expected operating life of proposed platforms.

5) Re-assessment of project-related impacts without considering the oil- and gas-related structures as "habitat".

6) An analysis of the effects that would result from contaminants present in discharges characterized in the project description.

7) An explanation of how a lease stipulation requiring the protection of rare, unique, or sensitive species was applied in only 10 of the 36 leases.

8) Re-assessment of effects to various sensitive species using more up-to-date population figures for those species and more accurate descriptions of species ranges.

9) Re-assessment of the criteria used to determine adverse effects on archaeological and paleontological resources and re-evaluation of the described effects.

10) Re-assessment of the criteria used to determine adverse effects to visual and scenic resources and re-evaluation of the described effects.

11) Resolution of conflicting statements about whether oil would be transported by pipeline or by tanker.

12) Re-assessment of the risks and impacts associated with potential oil spills.

13) An evaluation of whether there are practical alternatives to the conventional fixed platforms described in the MMS submittals and whether the total amount fill could be reduced by using a single corridor for cables rather than three corridors.

14) Clarification of whether effects associated with development of the four expired leases are included in the MMS submittals.

15) Re-assessment of impacts and mitigation measures that may be necessary to develop the heavy and extra-heavy oils found in the NSMB Leases.

16) Re-assessment of impacts and mitigation measures that may be necessary to address the helicopter overflights in the NSMB Leases.

While the MMS provided some of the necessary information, it declined to provide most of it, for the reasons stated in its June 23, 2005 letter:

> *...[t]he standard of review for suspensions envisioned by the Court of Appeals for the Ninth Circuit under (c)(1) is of a general nature, much like lease sales, a phased approach in contemplation that a more specific scrutiny will occur when and if the lessees submit detailed exploration or development and production plans for 307(c)(3) CZMA consistency concurrence. Therefore, it would not be appropriate for the MMS to provide information that, according to the Ninth Circuit, is to be provided by the lessees in the form of an Exploration Plan or a Development and Production Plan under §307(c)(3).*
>
> *The MMS believes that the original information submitted with the 10 consistency determinations for the decision to grant suspensions is sufficient for the State to determine concurrence with the California Coastal Management Program (CCMP) pursuant to a §307(c)(1) review, and is consistent with the more broad approach of lease sales as described by the Ninth Circuit. In most cases, the additional information that the Commission requested in the letter of April 22 pertains to hypothetical post-suspension activity that may or may not occur after the suspensions have ended. The information contained in the EID that you received on April 7 is not derived from suspension activities, but is intended to provide the State with a purely hypothetical post-suspension, exploration and development scenario, from which environmental consequences are projected. Any actual post-suspension exploration and development proposals would be analyzed in detail in the future in connection with specific industry applications to conduct exploration and development activities. Those post-suspension activities would be subject to §307(c)(3) of the CZMA review by the State, as appropriate.*

***Necessity of Information Requested***

The need for this information is discussed in the findings of Section 3 below. Overall, the Commission believes that the MMS erred in refusing to provide the requested information. The Commission recognizes that a level of uncertainty exists in the details of post-suspension development scenarios and that such scenarios must be expressed in very general terms. Notwithstanding this uncertainty, the MMS has available necessary and important information about the effects that would result in a reasonably foreseeable manner from the suspensions that it has not provided in its submittals.

As discussed in the analysis of CCMP issues in Section 3 below, an analysis of potential impacts relating to marine resources, water quality, placing fill in coastal waters, visual and scenic resources, environmentally sensitive habitat areas, and archaeological resources is impossible without the information described above. The Commission therefore has insufficient information about the proposed activities to complete its review of the consistency of the proposed lease suspensions with the enforceable policies of the CCMP.

### 1.2.2 Practicability

The federal consistency regulations implementing the CZMA include the following provision:

> *Section 930.32 Consistent to the maximum extent practicable.*
>
> *(a)(1) The term "consistent to the maximum extent practicable" means fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency.*

As the MMS has raised no issue of practicability, as so defined, the standard before the Commission is full consistency with the policies of the California Coastal Management Program (CPRC §§ 30200-30265.5).

### 1.2.3 Federal Agency Response to Commission Objection

Section C(a)(i) of Chapter 11 of the CCMP requires federal agencies to inform the Commission of their response to a Commission objection. This section provides:

> *If the Coastal Commission finds that the Federal activity or development project ... is not consistent with the management program, and the federal agency disagrees and decides to go forward with the action, it will be expected to (a) advise the Coastal Commission in writing that the action is consistent, to the maximum extent practicable, with the coastal management program, and (b) set forth in detail the reasons for its decision. In the event the Coastal Commission seriously disagrees with the Federal agency's consistency determination, it may request that the Secretary of Commerce seek to mediate the serious disagreement as provided by Section 307(h) of the CZMA, or it may seek judicial review of the dispute.*

Sections 930.43(d) and (e) (15 CFR § 930.43(d) and (e)) of the federal regulations that implement the CZMA reflect a similar obligation:

> *State agency objection. ...*
>
> *(d) In the event of an objection, Federal and State agencies should use the remaining portion of the 90-day notice period (see §930.36(b)) to attempt to resolve their differences. If resolution has not been reached at the end of the 90-day period, Federal agencies should consider using the dispute resolution mechanisms of this part and postponing final federal action until the problems have been resolved. At the end of the 90-day period the Federal agency shall not proceed with the activity over a State agency's objection unless: (1) the Federal agency has concluded that under the ''consistent to the maximum extent practicable'' standard described in section 930.32 consistency with the enforceable policies of the management program is prohibited by existing law applicable to the Federal agency and the Federal agency has clearly described, in writing, to the State agency the legal impediments to full consistency (See §§ 930.32(a) and 930.39(a)), or (2) the Federal agency has concluded that its proposed action is fully consistent with the enforceable policies of the management program, though the State agency objects.*
>
> *(e) If a Federal agency decides to proceed with a Federal agency activity that is objected to by a State agency, or to follow an alternative suggested by the State agency, the Federal agency shall notify the State agency of its decision to proceed before the project commences.*

## 1.3 STANDARD OF REVIEW

The standard of review for federal consistency determinations is the enforceable policies of the CCMP, of which the substantive policy component is the policies set forth in Chapter 3 of the California Coastal Act of 1976 (California Public Resources Code (PRC) §§ 30200-30265.5).

# 2 FINDINGS AND DECLARATIONS

The Commission finds and declares as follows:

## 2.1 INTRODUCTION

Aera Energy LLC (Aera) has submitted requests to the Minerals Management Service (MMS) for suspension[2] of its undeveloped Outer Continental Shelf (OCS) oil and gas leases located offshore San Luis Obispo and Santa Barbara Counties, in the northern portion of the Santa Maria Basin (see Exhibit 3 – Map of Northern Santa Maria Basin Leases Area). The affected leases are in federal waters offshore of the central California coast between the Nipomo Dunes area of San Luis Obispo County and Vandenberg Air Force Base in Santa Barbara County. The proposed lease suspensions addressed in this report are listed in Table 1.

TABLE 1: PROPOSED LEASE SUSPENSIONS ADDRESSED IN THIS REPORT

| Unit | Lease Numbers[3] | Consistency Determination Number | Suspension Term |
|---|---|---|---|
| Lion Rock | 396, 397, 402, 403, 408, and 414 | CD-042-05 | 34 months |
| Point Sal | 415, 416, 421, and 422 | CD-043-05 | 34 months |
| Santa Maria | 425, 430, 431, 433, 434, (420, 424, and 429*) | CD-044-05 | 31 months |
| Purisima Point | 426, 427, 432 and 435 | CD-045-05 | 34 months |
| Lease 409** | 409 | CD-046-05 | 34 months |

* By decision dated August 16, 1999, the MMS allowed Leases 420, 424, and 429 (and Lease 462 in the Gato Canyon Unit) to expire. The lessees appealed the decision to the Department of Interior Board of Land Appeals, which is currently reviewing the appeal. The MMS has stated in its consistency determinations that these leases are included within the scope of its analysis pending the outcome of the appeals.

** Lease 409 is a "non-unitized" or stand-alone lease.

---

[2] A suspension is defined in 30 CFR § 250.105 as: "a granted or directed deferral of the requirement to produce (Suspension of Production) or to conduct leaseholding operations (Suspension of Operations)". A lease suspension is effectively an extension of the life of the lease (30 CFR § 250.169(a)).

[3] The full identification for Lease 396 is: Lease OCS-P-0396. Other leases are identified similarly. For the remainder of this report, lease references will use the shortened name.

Pursuant to Section 307(c) of the CZMA (16 USC § 1456(c)), the review and approval by the MMS of the lease suspensions requested by the operators is a federal activity subject to consistency review by the Commission. Accordingly, on April 7, 2005, the MMS provided the Commission with consistency determinations for the requested suspensions.

This report is one of four Commission staff reports prepared to review the consistency determinations submitted by the MMS for all 36 OCS lease suspensions. Other Commission reports address proposed lease suspensions in the Cavern Point Unit, the Gato Canyon Unit, and the Bonito, Rocky Point and Sword Units, as discussed in more detail in Section 2.2 below.

The NSMB Leases share a number of similar characteristics, including their biogeographical setting and the type of oil and gas within the various fields. These leases are located over five distinct oil and gas fields that extend roughly northwest to southeast. The five fields are referred to as "Unnamed 0395", "A", "B", "Santa Maria", and "Unnamed 0435" (see Exhibit 2 – Map of Region). Additionally, these leases are all operated by the same lessee, which allows proposed activities in these leases to be coordinated. This report, therefore, evaluates all the proposed lease suspensions for these leases together for their conformity to CCMP policies. Where their characteristics are different and may result in a different determination of conformity to a particular policy, the report distinguishes between the particular leases or units.

For all the proposed lease suspensions in the NSMB Leases, Aera would perform in-office activities. For the Point Sal Unit (CD-043-05) and the Purisima Point Unit (CD-045-05), in addition to the in-office activities, Aera is planning to conduct shallow hazards and biological surveys during the lease suspension period. There are no "on the water" activities proposed to take place during the suspensions for the Santa Maria Unit (CD-044-05), Lion Rock Unit (CD-042-05), and Lease 409 (CD-046-05).

At the end of these or subsequent suspension periods, Aera's goal is to explore, develop, and produce marketable quantities of oil and gas from reservoirs underlying the NSMB Leases. Before any drilling or development activity can actually occur in the subject leases, Exploration Plans (EPs) and Development and Production Plans (DPPs) must also be separately approved by the MMS (pursuant to 30 CFR §§ 250.203 and 250.204, respectively). The MMS cannot approve any such EPs or DPPs unless the Commission concurs with (a) consistency certification(s) for any such plan from the operator, or the Secretary of Commerce determines on appeal of a Commission objection that the activity is consistent with the objectives or purposes of the CZMA, or is necessary in the interest of national security (16 USC § 1456(c)(3)(B)).

## 2.2 Background of Federal OCS Leases

### 2.2.1 Coastal Commission Granted Review of Proposed Lease Suspensions

The MMS has submitted consistency determinations for a total of 36 lease suspensions off the coast of San Luis Obispo, Santa Barbara and Ventura Counties. The MMS has organized the leases into nine separate "units", and one lease not within a unit (Lease 409) (see Section 2.2.3 – Current OCS Operations in California). Consistent with the Outer Continental Shelf Lands Act

(OCSLA), current federal regulations define the purpose of "unitization" to include: 1) conserving natural resources; 2) preventing waste; and/or, 3) protecting correlative rights (30 CFR § 1300). Organizing leases into units is intended to allow the lessees to minimize the number of platforms and other infrastructure necessary for the efficient production of a single oil and/or gas reservoir.

Each lease was issued by the U.S. Department of the Interior prior to 1984, and had a primary term of five years.[4] After the initial lease term lapses, the lease continues in effect so long as oil and gas are being produced in paying quantities or drilling operations are underway. If production or approved drilling is not underway at the end of the lease term, the lease expires and the lessee loses the right to exploit the oil and gas resources in the lease area (30 CFR § 250.180).

Alternatively, a lease may be "suspended." A suspension allows a lessee to suspend exploration, development, and/or production activities for a period of time without having the lease expire, thereby extending the life of the lease (OCSLA § 5(a)(1), 43 USC § 1334(a)(1)). Suspensions can occur in two ways: first, the federal government can direct suspensions; for example, in order to comply with federal law or with court orders. Second, a lessee can request a suspension in order to keep the lease in effect under certain conditions specified in regulation without the lessee having to engage in exploration, development or production activities (30 CFR §§ 250.168-177). During a directed suspension, no activities can occur. During a granted suspension, the MMS can require that certain specified activities and benchmarks be met in order to demonstrate that the lessee intends to keep the lease from expiring.

Of the 79 leases issued before 1984, 40 have not begun producing paying quantities of oil or gas. Additionally, a portion of Lease 450 assigned to the undeveloped Bonito Unit has not begun producing quantities of oil and gas. These leases would have expired if the MMS had not repeatedly extended the terms of the leases, through both directed and requested suspensions.

Until October 1992, the MMS, at the request of the lessees, had granted suspension of the 40 leases. On October 15, 1992, the MMS directed suspensions of the leases in order to conduct the *California Offshore Oil and Gas Energy Resources Study: Development Scenarios and Onshore Physical Infrastructure in the Tri-County Area of San Luis Obispo, Santa Barbara and Ventura* (known as the "COOGER Study). In 1999, when the directed suspensions were about to end, the MMS advised the lessees that they would need to request suspensions in order to keep the leases from expiring. In May 1999, the lessees submitted requests for suspensions. The MMS declined to extend the lease terms of four of the leases, but approved the requested suspensions for the remaining 36 leases.

---

[4] MMS has not conducted a lease sale off the coast of California since 1984. See Appendix A for details on the lease sales conducted since 1963, including those sales relevant to the 36 subject leases. In 1990, former President George H.W. Bush imposed a leasing moratorium offshore of California and other areas, in response to findings by the National Research Council that environmental information was inadequate to properly inform leasing offshore Florida and California.

By letter dated July 27, 1999, the Coastal Commission informed the Department of Interior and the MMS that, pursuant to section 307(c) of the CZMA (16 USC §1456(c)), the Commission was asserting its authority to review the lease suspensions for consistency with the CCMP. In an August 5, 1999 follow-up letter to the MMS, the Commission identified a number of concerns related to changed circumstances and new information that needed to be addressed in the MMS review, including the age of the leases, the poor quality of the oil, the proximity of the leases to marine sanctuaries, and potentially changed environmental circumstances. The Coastal Commission also advised the MMS that, pursuant to the CZMA, the lessees were required to provide the Coastal Commission with a certification of consistency with the CCMP.

The MMS disagreed with the Commission's position that the lease suspensions were subject to the consistency review requirements of the CZMA and refused to submit consistency certifications to the Commission. In November 1999, the MMS notified lessees that it had approved their requests for suspensions. The State of California then sued the federal government, asserting State review authority over the lease suspensions, in *State of California v. Norton*. On June 15, 2001, the district court held that approval of the lease suspensions by the MMS was a federal agency activity subject to consistency review by California pursuant to CZMA § 307(c). The federal defendants appealed. On December 2, 2002, the U.S. Court of Appeals for the Ninth Circuit affirmed the district court judgment (311 F.3d 1162 (9th Cir. 2002)).

On April 7, 2005, pursuant to the court's order, the MMS submitted to the Commission ten consistency determinations – one consistency determination for each of the nine units, plus one for Lease 409. This report reviews the suspensions of leases in the Lion Rock, Point Sal, Santa Maria and Purisima Point Units and Lease 409. The lease suspensions for the other Units are analyzed in separate Commission staff reports.

### 2.2.2 Scope of Coastal Commission Review

At the time the 36 subject leases were issued, a lease sale was not considered a federal agency activity that was subject to the consistency review requirements of the CZMA. See *Secretary of the Interior v. California* (1984) 464 U.S. 312. In 1990, in the Coastal Zone Reauthorization Amendments of 1990 (CZARA), Congress amended the CZMA for the express purpose of extending the consistency requirements of that statute to the sale of leases on the OCS as a federal agency activity. Congress clarified its intent in enacting the CZARA amendments to the CZMA in the following manner:[5]

> *The conferees intend the determination of whether a specific federal agency activity may affect any natural resource, land use, or water use in the coastal zone to include...cumulative and secondary effects. Therefore, the term "affecting" [in CZMA § 307(c)] is to be construed broadly, including direct effects which are caused by the activity and occur at the same time and place, <u>and indirect effects which may be caused</u>*

[5] House Conference Report No.101-964; 1990 *U.S. Code Cong. & Adm. News*, p. 2017.

> *by the activity and are later in time or farther removed in distance, but are still reasonably foreseeable.* [Emphasis added.]

Because these leases predated the CZARA amendments to the CZMA, the State of California did not have the opportunity to review them for CZMA consistency at the lease sale stage.

In its decision in *California v. Norton,* the Court of Appeals specifically rejected the argument that review of the lease suspensions would duplicate review of activities described in Exploration Plans or Development and Production Plans. The Court stated:

> *In subjecting lease sales to consistency review, Congress has made it clear that the statute does not prohibit consistency review of federal agency activities that are not subsidiary to exploration and development and production plans. The exploration and development and production plan stages are* not *the only opportunities for review afforded to States under the statutory scheme…*
>
> *…These lease suspensions represent a significant decision to extend the life of oil exploration and production off California's coast, with all of the far reaching effects and perils that go along with offshore oil production.* (*State of California v. Norton,* 311 F.3d at 1173)

The Court further stated that the review of lease suspensions is similar to the review of a lease sale, in that the effects to be analyzed are "very broad" and "long term":

> *Although a lease suspension is not identical to a lease sale, the very broad and long term effects of these suspensions more closely resembles the effects of a sale than they do the highly specific activities reviewed [in an Exploration Plan or Development and Production Plan]…[Lease suspension] review is available now for the broader effects implicated in suspending the leases. This phasing of review fits closely the expressed intent of Congress…* (*ibid. at* 1174)

The court makes clear that the Commission's review of a lease suspension is similar to a lease sale in the sense that the Commission is to analyze the broad and long-term coastal effects of activities (i.e., post-suspension exploration, development and production activities) that are reasonably foreseeable results of the approval of a lease suspension. The court acknowledges, however, that a lease suspension is not identical to a lease sale, and the Commission agrees. The subject lease suspensions have been requested decades after the initial lease sale, after most of these leases have been explored and detailed environmental and technical evaluations have already been performed. There is substantially more information and details available now on these leases than were available at the original lease sale stage. In fact, many of the undeveloped leases can be developed from existing platforms for which Development and Production Plans have been prepared, and would require only revision. In 1984, the U.S. Supreme Court in *Secretary of the Interior v. California, supra*, noted there are four distinct stages to developing an OCS oil lease: 1) formulation of a 5-year leasing plan by the Department of the Interior; 2) the lease sale; 3) exploration; and 4) development and production. Most of the 36 leases currently fall between Stages 3 and 4.

The MMS states in its consistency determinations for these lease suspensions that they are modeled on recent Lease Sale 191[6] in Alaska. The Commission believes the Alaska model is not adequate for the review of the lease suspensions for several reasons:

- Lease Sale 191 encompasses more than ten times the area of these 36 undeveloped California leases. Lease Sale 191 covers an area of over 200 million acres in the Cook Inlet Planning Area, while these 36 leases in California cover 184,191 acres.

- Lease Sale 191 occurred in an OCS planning area (Cook Inlet) where no production and development of OCS oil and gas has ever been proposed, examined in detailed in environmental impact statements, or permitted, because no economically recoverable reserves have been discovered. Little environmental information is available. Thus, the available information is very general in scope.

By contrast, the Commission's consideration of these lease suspensions takes place two to four decades following the ten lease sales the Federal government conducted offshore California. Of the remaining 79 OCS leases offshore California, 42 are producing oil and gas or are situated on producing units, and their development was preceded by detailed environmental review. All but one of the 36 leases has been consolidated into nine units that have identifiable and named oil and gas fields. All but one unit has been granted Exploration Plans and, decades ago, lessees drilled exploratory wells discovering paying quantities of oil and gas. In the early 1990s, the lessees developed hypothetical, but likely, development scenarios for each of the leases so that the MMS could prepare the COOGER Study, a 1999 study that evaluated the potential onshore constraints of developing those undeveloped leases.

Therefore, answers to the questions "if, when, and how exploration, development and production would actually occur" are far better understood for these leases as compared to a lease sale such as Alaska Lease Sale 191. Notwithstanding the level of information available about the potential development of the 36 leases, the MMS has chosen not to submit for the Commission's review data and environmental analysis that is either readily available or feasibly developable. Instead, because the MMS is treating the review of the lease suspensions strictly as a "lease sale"-type review, it believes it needs to provide "general" information only, *even if specific information is available.*

In an April 22, 2005 letter to the MMS, Commission staff requested additional information regarding the "reasonably foreseeable direct and indirect effects" of the requested suspensions, including information about future activities expected to occur both during and after the suspension periods (see Appendix B – Letter from Coastal Commission to MMS). Commission staff informed the MMS that additional information is needed in order for the Commission to determine if the proposed lease suspensions are consistent with the enforceable policies of the

---

[6] The introduction of each of these 36 lease suspension consistency determinations includes a statement by the MMS that the consistency determination done for the OCS Cook Inlet Lease Sale 191 in May 2004 served as a model for these 36 lease suspensions, and each includes Lease Sale 191 as an appendix.

CCMP. For example, Commission staff requested the MMS specify in its analyses what mitigation measures are either be in place (e.g., through a lease stipulation) or would be required to ensure consistency with those CCMP policies that require impacts be avoided or minimized to the maximum extent feasible. The MMS had referenced several of the existing lease stipulations in its April 7, 2005 consistency determination submittals and described mitigation measures that would apply to expected activities during the proposed suspensions, but did not specify which of those or other mitigation measures would apply during expected post-suspension activities.

In its June 23, 2005, response letter the MMS refused to provide certain requested information, such as mitigation measures known to be applicable during post-suspension activities, and stated that such information would be made available and reviewed upon submittal by the lease operators of EPs or DPPs pursuant to the OCSLA (see Appendix C – Letter from MMS to Coastal Commission). The MMS's refusal to comply with the Commission's information requests effectively results in deferral until the exploration and development stages of the consistency review that both the District Court and the Ninth Circuit Court of Appeals directed occur at the lease suspension stage. There is no basis for the MMS's failure to fully describe now the exploration and production scenarios that the lease suspensions would make possible and conduct a full environmental and consistency review of those scenarios.

Further, section 930.39(a) of the federal consistency regulations state that the amount of detail in the evaluation of the enforceable policies, activity description and supporting information of a consistency determination "shall be *commensurate with the expected coastal effects of the activity*" [emphasis added]. Given the potential magnitude of coastal effects of offshore oil and gas development, section 930.30(a) requires the MMS to provide as much detailed information as is available or that can reasonably be generated at the time of the review. The MMS cannot defer examination of the reasonably foreseeable future effects of exploration and development activities to future reviews of Exploration Plans and Development and Production Plans[7].

### 2.2.3 Current OCS Operations in California[8]

Exhibit 2 illustrates the leases, platforms and other oil and gas-related infrastructure off the coast of southern California. There are seventy-nine Federal OCS oil and gas leases currently located offshore California, not including the four expired leases that are under appeal. Of these, 43 are developed (i.e., oil and/or gas is being produced from them). The remaining 36 undeveloped leases are the subjects of the consistency determinations currently before the Commission.

---

[7] The Commission acknowledges that there are distinctions between the broader review conducted now for a lease suspension and review of the exploration, development and production stages. Currently, only general locations for "hypothetical" platforms and pipelines are known, which the Commission believes is appropriate for this stage of review. During review of an Exploration Plan or Development and Production Plan, however, the Commission would require, for example, site-specific marine and terrestrial biological, geotechnical and cultural surveys because the specific proposed locations for platforms, pipelines and other infrastructure are known at that stage.

[8] This information is taken from Section 2.2 of the EID.

These leases are located between about three and 12 miles offshore Santa Barbara, Ventura, and San Luis Obispo Counties. Table 2 presents a summary of the undeveloped leases.

TABLE 2: UNDEVELOPED PACIFIC OCS OIL AND GAS UNITS AND LEASES

| Unit | Operator | Lease Number(s) | Consistency Determination Number |
|---|---|---|---|
| Lion Rock | Aera Energy LLC | 396, 397, 402, 403, 408, 414 | CD-042-05 |
| Point Sal | Aera Energy LLC | 415, 416, 421, 422 | CD-043-05 |
| Santa Maria | Aera Energy LLC | 425, 430, 431, 433, 434 | CD-044-05 |
| Purisima Point | Aera Energy LLC | 426, 427, 432, 435 | CD-045-05 |
| Lease 409 | Aera Energy LLC | 409 | CD-046-05 |
| Bonito | PXP | 443, 445, 446, 449, 450[9], 499, 500 | CD-047-05 |
| Rocky Point | Arguello | 452, 453 | CD-048-05 |
| Sword | Samedan Oil Corporation | 319, 320, 322, 323A | CD-049-05 |
| Gato Canyon | Samedan Oil Corporation | 460, 464 | CD-050-05 |
| Cavern Point | Venoco, Inc. | 210, 527 | CD-051-05 |

Nineteen platforms support production of the developed leases offshore Santa Barbara and Ventura Counties. No platforms are located offshore San Luis Obispo County. The 19 existing platforms are supported by pipelines, processing and separation facilities, and other associated infrastructure. Onshore facilities supporting Pacific OCS oil and gas development include:

**Ventura County**
Mandalay Onshore Separation Facility
West Montalvo Operations
Rincon Oil and Gas Processing Facility
La Conchita Oil and Gas Processing Facility
**Santa Barbara County**
Carpinteria Onshore Gas Facility connected to offshore Platform Habitat
Carpinteria Oil and Gas Processing Terminal connected to offshore Platforms Gail and Grace
Las Flores Canyon Santa Ynez Unit Oil and Gas Processing Facility
Gaviota Oil Heating Facility
Gaviota Storage Terminal (soon to be decommissioned)
Lompoc Oil and Gas Processing Facility
Several pipeline systems

[9] Most of Lease 450 is located in the Point Arguello Unit; the entire lease is therefore held by production and is not being considered for suspension. The northwestern portion of Lease 450 is located in the Bonito Unit, however; therefore, the lease is included in this report.

In addition to Pacific OCS activities, the region includes oil and gas leases and production in California State waters (State tide and submerged lands). State leases fall under the management and administration of the California State Lands Commission. The State Lands Commission has issued thirty-two leases located in State waters, seventeen of which are producing, and fifteen of which are non-producing. No State platforms are located offshore San Luis Obispo County; however there are onshore support facilities located in San Luis Obispo or northern Santa Barbara County, including pipelines, oil pump stations, and a heavy, high sulfur oil upgrader refinery. Platform Holly, located offshore Goleta (Santa Barbara County), and Rincon Island, located offshore Rincon Beach (Ventura County) are the only two offshore production facilities associated with State leases that are operational in the tri-county region. Platform Holly is supported onshore by the Ellwood Processing Oil and Gas Processing Facility, and Rincon Island is supported onshore by the Rincon Island and State Lease 145/410 Oil and Gas Processing Facility (see Exhibit 2). Venoco has applied to restart production from one of its two piers that extend from shore into State waters (PRC 421).

In State waters, offshore oil and gas production rates peaked in 1969, while peak production in federal waters occurred in 1995-1996. Federal offshore oil and gas annual production rates for the years 1984 through 2003, for the Santa Maria Basin and Santa Barbara Channel are presented in Table 3.

TABLE 3: PACIFIC OCS OIL AND GAS ANNUAL PRODUCTION RATES FROM 1984-2003

| Year | Total Oil (million bbls) | Total Gas (billion ft$^3$) | Year | Total Oil (million bbls) | Total Gas (billion ft$^3$) |
|---|---|---|---|---|---|
| **1984** | 25.3 | 44.1 | 1994 | 54.8 | 52.7 |
| 1985 | 23.2 | 60.8 | 1995 | 69.3 | 61.9 |
| 1986 | 21.7 | 55.5 | 1996 | 61.1 | 66.1 |
| 1987 | 24.4 | 53.0 | 1997 | 51.5 | 76.0 |
| 1988 | 25.5 | 47.7 | 1998 | 43.5 | 75.7 |
| 1989 | 27.4 | 49.4 | 1999 | 37.5 | 79.4 |
| 1990 | 24.5 | 48.2 | 2000 | 34.8 | 75.4 |
| 1991 | 27.0 | 51.0 | 2001 | 32.1 | 70.5 |
| 1992 | 38.3 | 54.0 | 2002 | 31.0 | 67.3 |
| 1993 | 46.8 | 50.8 | 2003 | 28.7 | 58.1 |
| | | | **Totals:** | **728.4** | **1197.6** |

Source: MMS, Pacific OCS Region. *Annual Summary of Production for Entire Region.* December 14, 2004

Total projected reserves for the 36 undeveloped leases is listed in Table 4 below:

TABLE 4: TOTAL PROJECTED RESERVES OF 36 UNDEVELOPED OCS LEASES

| Location | | Oil Reserves (million bbls) | Gas Reserves (billion ft³) |
|---|---|---|---|
| Northern Santa Maria Basin | Northern Platform | 115 | 47 |
| | Central Platform | 118 | 24 |
| | Southern Platform | 90 | 18 |
| Bonito and Electra Fields (Bonito Unit) | | 22 | 11 |
| Rocky Point Field (Rocky Point Unit and Lease 451) | | 39 | 11.7 |
| Sword | | 29 | 7.3 |
| Gato Canyon | | 77 | 46 |
| Cavern Point | | 22 | 20 |
| **Totals:** | | **512** | **185** |

Source: EID Table 5.2-4, pp. 5.2-10 and 5.2-11

The United States consumes approximately 20 million barrels of oil per day, or approximately 7.3 billion barrels annually[10]. California consumes approximately 615 million barrels of petroleum annually, and 2,000 billion cubic feet of natural gas annually[11]. The total projected reserves of the 36 undeveloped oil leases would therefore supply California with petroleum for approximately ten months, and with natural gas for approximately one month. The total reserves represent approximately 25 days of national consumption.

[10] U.S. Energy information Administration (see eia.doe.gov): http://www.eia.doe.gov/mer/pdf/pages/sec11_7.pdf, accessed July 8, 2005.

[11] U.S. Energy information Administration (see eia.doe.gov): http://www.eia.doe.gov/emeu/sep/ca/frame.html, accessed July 8, 2005.

## 2.3 PROJECT DESCRIPTION

The proposed activity evaluated in this report is the granting by the MMS of a 31-month Suspension of Production (SOP) for leases contained in the Point Sal Unit and 34-month SOPs for Lease 409 and leases contained in the Lion Rock, Santa Maria, and Purisima Point Units, all requested by the operator of those leases, Aera Energy LLC, pursuant to applicable provisions of the OCSLA (43 U.S.C. 1334(a)(1)).

The NSMB Leases are located from three to about twelve miles off the coast between the Pismo Beach area of San Luis Obispo County and the small settlement of Surf in northern Santa Barbara County (see Exhibit 3 – Map of Northern Santa Maria Basin Units Area). Water depths in the Units range from about 300 to 600 feet. The leases stretch from about twenty to forty miles north of Point Conception and are several miles north of Platform Irene, which is the northernmost existing offshore oil and gas platform in California. The project would result in an expansion of offshore oil and gas development along the California coast into areas in which such development has not previously occurred.

### 2.3.1 Background of NSMB Leases

#### *Lease Sale 53*

The leases in the NSMB area were issued in 1981 in Lease Sale 53. These leases contain lease "stipulations", which are mitigation measures designed to protect potentially sensitive resources in an affected lease area and to reduce multiple-use conflicts. To mitigate adverse environmental impacts for actions associated with a specific exploration, development and decommissioning project, the MMS can impose additional mitigation requirements. The list of stipulations for Lease Sale 53 is attached as Exhibit 5.

#### *Characteristics of NSMB Oil and Gas Reserves*

Development of the NSMB Leases would entail drilling for oil and gas reserves located in five separate fields at depths of from about 3,000 to 7,000 feet. The MMS has provided production estimates for the NSMB Leases that would entail production from about 2006 to 2030. The NSMB Leases are estimated to contain about 323 million barrels of oil and about 89 billion cubic feet of natural gas. This represents approximately 63% and 48%, respectively, of the predicted oil and gas reserves in the 36 undeveloped leases. However, most of the oil is expected to be highly viscous "heavy" or "extra-heavy" oil with an API gravity[12] averaging between about 8° and 11°, which makes it most suitable for producing asphalt. Exploratory testing in these Units has shown the oil to have a sulphur content of from about 6-7% and a hydrogen sulfide ($H_2S$) level of about 1%, making it "sour" gas, from which the $H_2S$ must be removed during processing. These oils also have high levels of metals. Other products that might be produced from these leases include natural gas and associated liquids, petroleum coke, naphtha, and sulfur.

[12] API gravity is a relative scale measured in degrees used to describe the density of petroleum products. Oil can have an API gravity of from 0° to 100° – light oil is above about 30°; medium oil is between about 22° and 30°; heavy oil is between 10° and 22°; and extra heavy oil is less than 10°.

Heavy and extra heavy oils of this type require different and more complex methods than lighter oils found elsewhere in the OCS area for drilling, transporting from platforms to shore, refining, and final shipment. They generally require heat or dilution to flow into a well or through a pipeline and often require additional processing. When spilled, these oils also react in the marine environment differently than lighter oils. They are generally more persistent and are more likely to form tar balls and mats. Their heavy metal content combined with their persistence makes them toxic to marine organisms for a longer time than light oil, much of which evaporates or is weathered more quickly.

***Previous Commission Actions***

The Commission previously reviewed a number of proposed activities in the NSMB Leases, as shown in Table 5 below.

TABLE 5: SUMMARY OF PREVIOUS COMMISSION ACTIONS IN NSMB LEASES

| **Units** | **Lease #** | **CCC Consistency Concurrences** | **Notes** |
|---|---|---|---|
| ***CD-042-05:*** Lion Rock (Lease Sale 53, 1981) | 396, 397, 402, 403, 408, 414 | 1982-83: Approved 4 EPs including 24 exploratory wells. | 1982-85: 6 of the 24 wells drilled. [Note: 1 well was drilled in 1965.] Results show the presence of oil and gas, with the oil having an average gravity of 10.7E API. |
| ***CD-043-05:*** Point Sal (Lease Sale 53, 1981) | 415, 416, 421, 422 | 1983: Approved 1 EP, 14 exploratory wells. | 1984-85: 4 of the 14 wells were drilled. All four wells showed the presence of oil and gas, with the oil having an average gravity of between 10E-15E API. |
| ***CD-044-05:*** Santa Maria (Lease Sale 53, 1981) | 424, 425, 430, 431, 433, 434 | 1982-84: Approved 4 EPs, 29 exploratory wells. | 5 of the 29 wells have been drilled. |
| ***CD-045-05:*** Purisima Point (Lease Sale 53, 1981) | 426, 427, 432, 435 | 1982-83: Approved 3 EPs, 21 exploratory wells. | 3 of the 21 wells have been drilled. |
| ***CD-046-05:*** Lease 409 (Lease Sale 53, 1981) | 409 | 1982: Approved 1 EP, 1 DPP, 9 exploratory wells. | 1983-84: 6 of the 9 wells were drilled. The oil has an average gravity of 10.7E API. 1987 – CCC approved DPP for Platform Julius, though never built due to passage of Prop A in San Luis Obispo County. |
| **Totals:** | | | 13 EPs, and 97 approved exploratory wells with 24 drilled. |

### 2.3.2 Project-Related Activities

***Activities Proposed to Occur during Suspensions***

For all of the NSMB leases, the proposed lease suspensions would allow Aera to conduct in-office activities necessary to maintain the leases. For the Point Sal and Purisima Point Units, the proposed SOPs would additionally allow Aera to conduct shallow hazards and biological surveys. Aera would use the survey information to develop new or revised EPs.

- Shallow Hazards Surveys: The proposed shallow hazards surveys would identify seafloor and shallow subsurface hazards to determine appropriate locations for delineation wells that would be drilled later during the post-suspension phase. The surveys in the Point Sal Unit would be done would be done within Leases 416, 421, and 422. In the Purisima Point Unit, the surveys would be done within Leases 426 and 432. Each survey would cover from about 1.5 to 2 square miles. The survey locations would be from about 5 to 11 miles offshore in water depths ranging from 200 to 400 feet.

  The surveys would be conducted by towing seismic reflection equipment from a vessel. The vessel would follow a grid pattern over survey lines throughout the survey areas. The primary equipment used would be a single 20 cubic-inch airgun, which produces a sound pressure level of 218 dB re 1 uPa@1m. The surveys would be conducted during daylight hours and during the fall to avoid or reduce impacts to marine mammals and commercial fishing, and to avoid hard weather conditions. The surveys are expected to take from 11 to 13 days.

- Biological Surveys: Aera would perform biological surveys to examine areas of potential biological habitat, such as hard bottom areas, that the MMS has determined may be affected by future drilling activity. The surveys would be done by towing from a ship a remotely-operated vessel (ROV) equipped with cameras, lights, sampling arms, and sonar capability. The ROV is towed a few feet above the ocean bottom and records images of the habitat features and organisms. The surveys would be used to characterize the biological community on the identified hard bottom features in the area, including identifying organisms, estimating abundance of species, and collecting rocks for analysis.

  These surveys would occur over three areas of hard bottom habitat at depths of from 300 to 400 feet in Leases 421 and 422 in the Point Sal Unit and Lease 426 in the Purisima Point Unit. Depending on weather, biological survey work can be done twenty-four hours per day. The total time expected to conduct all three surveys is from one to three days.

***Activities Proposed to Occur Post-Suspension***

The MMS has also provided in its consistency determinations a description of hypothetical activities that would occur post-suspension and that would result from the lease suspensions. Proposed post-suspension activities include those necessary to conduct exploration and development of the NSMB Leases.

The MMS states that the post-suspension activities are expected to include the following:

- Delineation Drilling: Aera proposes to drill one or two delineation wells from the Point Sal and/or the Purisima Point Units. These wells would be used to provide additional data about the characteristics and configurations of already known hydrocarbon reservoirs in the area. Data from the wells would be applied to all of the NSMB Leases and used in determining future development plans.

  The wells would be drilled from a Mobile Offshore Drilling Unit (MODU). MODUs are floating, semi-submersible vessels used for temporary drilling projects. When they arrive at a drilling site, they are anchored with up to about eight anchors to maintain stability during the drilling process.

  Aera estimates that each delineation well would take about 68 days to drill. Each well is expected to result in about 12,250 barrels of muds and cuttings. The anchor spread for each MODU location is expected to be between 1,00 and 1,900 feet. The MMS estimates that delineation drilling activities would also include approximately eight to 12 supply boat trips per month and about 30 helicopter trips per month for each well.

- Platforms, Pipelines, and Cables: The submitted documents contemplate construction and operation of three platforms to develop the NSMB Leases (see Exhibit 3). The proposed platforms are, from north to south:

  - Platform A: would be located in Lease 409, approximately nine miles offshore and in about 450 feet of water.
  - Platform B: would be located in Lease 422 within the Point Sal Unit, approximately nine miles offshore and in about 300 feet of water.
  - Platform C: would be located in Lease 431 within the Santa Maria Unit, approximately seven miles offshore and in about 300 feet of water.

  The proposal would include pipeline corridors between the platforms and between Platform B and the shoreline totaling about 25 miles long by one-half mile wide. Pipelines would connect Platforms A and C with Platform B, which would serve as the central collecting point for offshore production. Pipelines would then run from Platform B to shore, with landfall within a half-mile wide corridor between Point Sal and the mouth of Shuman Creek. Pipelines running from Platforms A and C to Platform B would include a 16" oil emulsion pipeline, a 10" water pipeline, and an 8" gas pipeline. There would be an additional 8" service/utility pipeline running from Platform C to Platform B. Pipelines running from Platform B to shore would include a 24" oil emulsion pipeline, a 12" water return pipeline, a 10" gas pipeline, and an 8" service/utility line. There would also be redundant cables providing electrical power to each platform, with three running from shore to Platform B and then one each to Platforms A and C, and one each to Platforms A and C through separate platform-to-shore corridors.

- Processing Facilities: The onshore activities would include construction and operation of a processing facility proposed to be located outside the coastal zone at Casmalia in northern Santa Barbara County. Pipelines from Platform B would be used to carry oil emulsion and gas to the facility for processing and eventual transport through local existing pipelines. The facility could also include an asphalt plant. Some of the produced gas could be used at a co-generation facility located at the Casmalia facility to produce the electricity used at the offshore platforms.

- Decommissioning: The proposed activities include the eventual decommissioning and removal of the platforms and associated infrastructure. The MMS submittals and analyses are based on the new proposed platforms being decommissioned and removed by 2030; however, they provide no details on particular activities and impacts associated with those actions.

### 2.3.3 Information lacking from the project description

The Commission recognizes that a great deal of uncertainty exists as to how post-suspension development would occur, and that the MMS submittals must accordingly describe these development scenarios in relatively general terms. Notwithstanding this constraint, there is important information that is necessary to enable the Commission to conduct the review envisioned by the CZMA and that is either currently available or is feasibly developable but which has not been included in the MMS descriptions or analyses of the post-development scenario. The Commission requested that the MMS provide this necessary information, as described in Section 1.2.1 of this report.

In addition, some of the information presented in the MMS submittals is internally inconsistent or is inconsistent with information provided in other reports. For example, the hypothetical development scenario described in the MMS submittals proposes the NSMB oil and gas reserves would be developed using three platforms located in Leases 409, 422, and 431. The scenario also states that extended reach drilling techniques would allow development of reserves up to four miles from a platform. However, it appears that some of the NSMB reserves are further than four miles from the proposed platform locations.

In its letter of April 22, 2005, the Commission requested additional information about development of reserves that lay beyond the described capabilities of extended reach drilling. Based on the size and locations of the oil and gas reserves, the locations of the three proposed platforms in the NSMB Leases, and the description in the MMS's submittals of the limitations of extended reach drilling, it appeared that that development of the NSMB Leases would require at least four, rather than three, platforms. The letter requested the MMS to clarify whether development of the NSMB Leases would require additional platforms and to revise the analyses in the submittals as necessary to incorporate the anticipated effects of additional platforms. This information is necessary at this time for the Commission to fully evaluate the likely effects on coastal resources that would be expected from the proposed lease suspensions, including whether the anticipated development of the leases would require three, or more than three, platforms.

The MMS responded by stating that extended reach drilling methods are continually evolving and that information about development of the Units would be provided during Aera's future submittal of a DPP. This response, however, does not provide the Commission information needed during this review to fully evaluate the effects of suspension-related activities on coastal resources and to determine conformity to the enforceable policies of the CCMP. Many of the already substantial adverse effects associated with three proposed platforms could be significantly greater if development required four or more platforms.

Based on the MMS response, the Commission is assuming for purposes of conducting its consistency review that development of the NSMB Leases would require three platforms and the associated pipelines, cables, and other infrastructure described in the MMS submittals. The Commission notes that any substantial modification, such as additional platforms or realignment of the proposed pipelines or cables, will constitute grounds for the Commission to re-open its consistency review of the lease suspensions pursuant to §930.45 of the regulations which implement the CZMA (15 CFR Part 930).

## 2.4 RELATED ENVIRONMENTAL DOCUMENTS

### *Environmental Assessments*

Pursuant to the National Environmental Policy Act (NEPA), the MMS prepared six Environmental Assessments (EAs) discussing the potential impacts of activities that would occur during the suspensions.[13] The EAs include:

- MMS Proposal to Grant Suspensions of Production for Aera Energy LLC's Lion Rock Unit, Point Sal Unit, Purisima Point Unit, Santa Maria Unit, and Lease 409.
- MMS Proposal to Grant Suspension of Production for Plains Exploration & Production Company's Bonito Unit.
- MMS Proposal to Grant Suspension of Production for Arguello Inc.'s Rocky Point Unit.
- MMS Proposal to Grant Suspension of Production for Samedan Oil Corporation's Sword Unit.
- MMS Proposal to Grant Suspension of Production for Samedan Oil Corporation's Gato Canyon Unit.
- MMS Proposal to Grant Suspension of Operations for Venoco, Inc.'s Cavern Point Unit.

The EAs addressed only the potential impacts of activities proposed to occur during the suspension periods and were far more limited in scope that the subject consistency determinations. They concluded that all potential impacts from activities occurring during the suspensions could be mitigated to an insignificant level. The MMS issued findings of "no

---

[13] U.S. Department of the Interior, Minerals Management Service. *Environmental Assessments and Findings of No Significant Impact For Granting Suspensions of Production or Operations.* February 11, 2005. Available at http://www.mms.gov/omm/pacific/lease/2005-final-eas.htm

significant impacts" based on each of the EAs on February 11, 2005. On March 9, 2005, ten conservation groups, led by the Natural Resources Defense Council and the Environmental Defense Center, filed a lawsuit in federal district court against the MMS, challenging the adequacy of the EAs (*League for Coastal Protection, et al. v. Norton, et al.*, No. C 05-00991-CW (N.D. Cal.)). That appeal has not yet been decided.

***Environmental Information Document***

Acknowledging that the Appeals Court envisioned more extensive analysis of activities that could occur as a consequence of the suspensions, the MMS submitted, along with the consistency determinations, an Environmental Information Document (EID).[14] The EID evaluates potential post-suspension activities, presented as hypothetical scenarios in the period following the suspensions. The EID analyzes activities that could potentially take place during the 2006–2030 time period, including: 1) exploration and delineation drilling, 2) platform and pipeline construction, 3) production activities, and 4) decommissioning of facilities. The MMS did not prepare the EID under the requirements of NEPA and therefore, the EID did not have the benefit of scoping, review, and comment by interested members of the public.

***Draft EIS for Delineation Drilling***

In June 2001, the MMS published a Draft EIS for Delineation Drilling (DEIS)[15] addressing the potential environmental effects of proposed delineation drilling from a Mobile Offshore Drilling Unit in federal waters offshore Santa Barbara County. The DEIS addressed potential impacts from delineation drilling activities, as well as potential cumulative impacts for the periods 2002-2006 and 2002-2030. It also analyzed proposed delineation drilling in the Point Sal Unit, Purisima Point Unit, Bonito Unit, and Gato Canyon Unit. The EID is based substantially on information presented in the DEIS.

On July 2, 2001, after publishing the DEIS, the MMS directed suspensions on all of the undeveloped leases to provide time to prepare consistency determinations and NEPA documentation, as directed by the District Court in *California v. Norton*. Also, as a result of the Court decision, the MMS postponed work on finalizing the Draft EIS, including the public hearings, and extended the comment period.

---

[14] Minerals Management Service, Pacific OCS Region. *Environmental Information Document for Post-Suspension Activities on the Nine Federal Undeveloped Units and Lease OCS-P 409 Offshore Santa Barbara, Ventura, and San Luis Obispo Counties.* Prepared by Aspen Environmental Group. January 2005.

[15] Minerals Management Service, Pacific OCS Region. *Delineation Drilling Activities in Federal Waters Offshore Santa Barbara County, California.* Draft Environmental Impact Statement. Published by the US Department of the Interior, MMS, Pacific OCS Region. Document 2001-046. June 2001. Federal Register: June 21, 2001 (Volume 66, Number 120), pages 33268-33269.