### ***California Offshore Oil and Gas Energy Resources (COOGER) Study***

The California Offshore Oil and Gas Energy Resources Study (COOGER Study)[16] was designed by a joint government, industry, and public working group to address concerns about the potential demands on onshore infrastructure from expanded oil and gas development in both State and federal waters. The study assessed and compared a suite of potential Pacific OCS development scenarios for Santa Barbara, Ventura, and San Luis Obispo Counties over a 20-year timeframe (1995 though 2015). The Final COOGER Study, published in January 2000, focused its constraints analysis for the potential development scenarios on industrial and public infrastructure demand within the study area.

### ***North County Siting Study***

Santa Barbara County published its final North County Siting Study in October 2000[17]. This study focused on the Pacific OCS undeveloped leases offshore Santa Barbara County as they relate to potential onshore processing options. The study included technical consideration of the oil and gas produced from these leases, the potential use of existing onshore processing facilities, and an evaluation of the environmental conditions and constraints (including adopted County policies) associated with the siting of a new onshore processing facility. The study concluded that if a new onshore processing facility is necessary for development of the undeveloped leases, the "Casmalia East" and "Casmalia West" sites, located north of Vandenberg Air Force Base, would be strongly preferred.

---

[16] Minerals Management Service. *Final California Offshore Oil and Gas Energy Resources Study: Development Scenarios and Onshore Physical Infrastructure in the Tri-County Area of San Luis Obispo, Santa Barbara and Ventura.* Prepared by Dames & Moore. OCS Report MMS 99-0043. January 26, 2000.

[17] County of Santa Barbara Planning and Development Department, Energy Division. *Final North County Siting Study*, October 2000.

# 3 COASTAL ACT ISSUES

***Introduction***

Because the NSMB Leases share many similar characteristics, all 24 leases are evaluated for CCMP consistency within this one report. Where a particular lease has different characteristics or would be subject to proposed activities that result in a different determination of conformity to a particular Coastal Act policy, the assessments herein differentiate between them in either of two ways. First, the assessments in each policy area distinguish between activities proposed to occur during proposed suspensions (i.e., during the 31- or 34-month suspension periods) and those that would occur after the suspensions – for example, in-water activities are proposed for leases in the Point Sal and Purisima Point Units, while proposed activities for leases in the Lion Rock Unit, Santa Maria Unit, and Lease 409 are in-office activities only. The assessments also distinguish between activities proposed to occur in one lease and not another – for example, the description of proposed activities in the CCMP policy related to placing fill in coastal waters (Coastal Act § 30233) distinguishes between activities planned for the Point Sal Unit, in which a platform is proposed, and those in the Lion Rock Unit, which does not include a proposed platform.

## 3.1 MARINE BIOLOGICAL RESOURCES AND WATER QUALITY

The marine resource protection policy of the CCMP (Coastal Act § 30230) states:

> *Marine resources shall be maintained, enhanced, and where feasible, restored. Special protection shall be given to areas and species of special biological or economic significance. Uses of the marine environment shall be carried out in a manner that will sustain the biological productivity of coastal waters and that will maintain healthy populations of all species of marine organisms adequate for long-term commercial, recreational, scientific, and educational purposes.*

The water quality protection policy of the CCMP (Coastal Act § 30231) states:

> *The biological productivity and the quality of coastal waters, streams, wetlands, estuaries, and lakes appropriate to maintain optimum populations of marine organisms and for the protection of human health shall be maintained and, where feasible, restored through, among other means, minimizing adverse effects of waste water discharges and entrainment, controlling runoff, preventing depletion of ground water supplies and substantial interference with surface water flow, encouraging waste water reclamation, maintaining natural vegetation buffer areas that protect riparian habitats, and minimizing alteration of natural streams.*

### *Biological Characteristics of the Northern Santa Maria Basin Area*

The NSMB Leases are located from three to about 12 miles off the California coast between Pismo Beach in southern San Luis Obispo County and the small settlement of Surf in Santa Barbara County. Environmental conditions in and near the NSMB Leases are substantially different than conditions further south in the Santa Barbara Channel and even differ significantly in many ways from conditions just to the south in the Southern Santa Maria Basin Units. The NSMB lease area extends from about twenty to forty miles north of Point Conception, which is a significant environmental boundary along the California coast and serves as a divide between areas with different marine biology, ocean currents and temperatures, climatic influences, and other environmental characteristics. The ocean waters off Point Conception serve as one of only two major transition zones along the entire west coast of North America for coastal fishes, one of three transition areas for benthic algae, and one of five for marine invertebrates. This convergence of biogeographical areas also provides the nearshore and upland areas near the NSMB Leases with a wide variety of habitat types supporting a number of endangered, threatened, sensitive, or endemic species. Project-related activities that would affect sensitive habitat and species in upland areas are discussed in Section 3.7 of this report.

The NSMB lease area provides habitat for a variety of species, including several dozen designated as endangered, threatened, or sensitive, as well as several endemic to the area. Exhibit 4 (Regional and Northern Santa Maria Basin Biological Resources) provides a summary of the key habitat and species found in the area. The area is between two National Marine Sanctuaries – Monterey Bay and Channel Islands – and is within an area being considered for

expansion of the Channel Islands sanctuary. Offshore, the area includes both hard bottom and sandy habitat, in both the federal and nearby State waters. Hard bottom habitat is relatively rare in California, although the NSMB area includes several extensive hard bottom areas. Water depths range to about 600 feet deep. The coastline near the NSMB Leases consists of a mix of rocky and sandy habitats, including steep cliffs and rock outcrops interspersed with sand and cobble beaches, and several areas have kelp beds just offshore. Many of the beaches are present only part of the year due to seasonal depositional and erosional patterns.

The area supports about three dozen species of marine mammals, numerous marine and coastal birds, and provides important offshore habitat for several hundred species of fish and shellfish. The nearshore environment provides important breeding and nesting areas for numerous seabirds and is considered a key area for the recovery of the Southern sea otter, as is described in more detail below.

Many of the areas in and near the NSMB Leases have been recognized for their high-quality habitat values for both marine and upland species. These specially designated areas are described in more detail in Exhibit 4, and include the Guadalupe-Nipomo Dunes Preserve, the Point Sal Reserve, the Nipomo Dunes – Point Sal Coastal Area National Natural Landmark, the Pismo-Oceano Beach Pismo Clam Preserve, and the Vandenberg State Marine Reserve. Much of the offshore area is considered Essential Fish Habitat.

Specific aspects of potential suspension-related activities on these areas and species are discussed below in this section and in Section 3.2 (Oil Spill Prevention and Response), and Section 3.4 (Commercial Fishing). Characteristics of the upland habitats in these areas are discussed in Section 3.7 (Environmentally Sensitive Habitat Areas).

***Southern sea otter***

In addition to those species and habitats described in Exhibit 4, the Southern sea otter (*Enhydra lutris nereis*) is of particular importance in the NSMB lease area. The Southern sea otter is a "fully protected" species under the California ESA and is listed as "threatened" under the federal ESA. The otter was listed as threatened in 1977 due to its small population and limited distribution, and because of the potential jeopardy to the species and its habitat from oil spills.[18] A major tanker spill in the vicinity of the otter's range has traditionally been considered the most serious potential threat to the species. Offshore oil development and production was not a factor in its original listing, but current recovery objectives continue to look at the risks associated with oil spills as well as newly-understood threats to the population from other sources.

[18] In its July 27, 1999 letter to the Department of Interior asserting authority over the proposed lease suspensions, the Commission identified the situation with the otter as one of the "changed circumstances" making updated review necessary. At the time of its listing and at the time of Lease Sale 53, the otter's range extended south only to Pismo Beach. Since then, the range has expanded into areas directly adjacent to the NSMB Leases.

The total otter population currently consists of about 2,700 individuals living in coastal waters between Half Moon Bay and south of Point Conception[19], along with a small experimental population on San Nicolas Island[20]. Sea otters generally occupy both protected bays and exposed outer coasts in areas with hard- and soft-sediment marine habitats with depths of to about 300 feet. Most individuals are found between the shore and the 65-foot depth contour; however, the MMS reports that otters have been seen up to several miles offshore, including near offshore oil and gas platforms. The overall population is still below the level of 3,090 individuals needed to be reached and maintained for delisting under the ESA and is well under the level of 8,400 individuals needed to no longer be considered "depleted" under the Marine Mammal Protection Act.

Historically, the California population was believed to include up to about 16,000 animals[21]. It was hunted to near extinction during the fur trade era, which ended in 1911. A small remnant population was found near Big Sur's Bixby Creek, which grew steadily until the mid-1970s. A population decline detected during that period was apparently due to mortality caused by entanglement in fishing gear, although the population began to increase again once that problem was identified and rectified through State regulations.

Since the early 1970s, the population has experienced periods of both decline and growth, with population counts ranging between 1,250 and 2,825 animals, and with some expansion of its range. The population increased from the mid-1980s to the mid 1990s, but there was little range expansion during this time. In each of four successive years (1996-1999), the total number of

---

[19] USGS/BRD 2005 spring census.

[20] The 1982 sea otter recovery plan included translocation of a portion of the population as an effective and reasonable recovery action. The original intent and purpose of the San Nicolas Island Translocation (per Public Law 99-625), was to establish a second colony sufficiently far from the existing population to minimize the likelihood of simultaneous loss from catastrophic or chronic events, and to create and maintain a sea otter management zone. This colony in 2004 contained about 32 individuals[20], including pups. Although more than 70 births are known to have occurred at San Nicolas Island from 1987 to 2002, the population size has remained small and its future prospects are uncertain.

The basis for the translocation program has changed since its original inception, due to four main reasons. First, entanglement in gill nets had originally been an important factor limiting the population, but fishing restrictions and closures have since reduced the incidental take caused by entanglement. Also, the 1989 *Exxon Valdez* oil spill confirmed that a similar spill in California could destroy the otter population along both the mainland and on San Nicolas Island. Additionally, the translocation program to San Nicolas Island has been less successful than hoped at establishing a second, viable population. Finally, the maintenance of an otter "management" zone using non-lethal means has proven costly and ineffective. Although otter translocation programs in other states have taken years to flourish and the San Nicolas Island population may be starting to increase, the USFWS is considering declaring the translocation a failure because they believe the intent and purpose of the translocation program have not been met. Further, they have concluded that southern sea otter translocations did not and will not serve as adequate mitigation from the threat of spills (of any size) in the current or prospective sea otter range. The USFWS has also discontinued efforts to maintain the management zone pending reevaluation of the translocation program.

[21] Southern Sea Otter Recovery Plan.

animals counted progressively declined, to a low of 2090 in 1999, although the range expanded to both the north and south, including moving beyond Point Conception. Range delineation for the species is somewhat difficult to identify because individuals frequently wander well beyond the distributional limits of most of the rest of the population. This more recent declining trend is evident in both the yearly counts and in the same data plotted as 3-year running averages (use of a running average is intended to reduce year-to-year vagaries in any given count). The 2000-2005 spring surveys counted 2317, 2161, 2139, 2505, 2825 and 2735 otters. The 2003-2005 data suggest that the population is perhaps growing; however, it is unclear whether the recent (1996-2002) declining trend has been arrested.

The main threats to the otter are habitat degradation due to a wide variety of environmental stressors, including oil spills and other environmental contaminants, and harm caused directly by human activity, such as shooting, entanglement in fishing gear, and harassment. These are discussed in more detail later in this section. Additionally, otters are particularly susceptible to the effects of oil spills, which is discussed in detail in Section 3.4 of this report.

The shoreline area nearest the NSMB Leases includes a population of up to about 100 individuals. Most of the otters in this local population are adult males that typically spend the non-breeding seasons away from the females and in areas closer to the edges of the species' range. This area of the California coast is considered key for recovery of the population, since recovery will require the population to expand both into new areas and into areas that are currently not fully used. The shoreline from Point Sal to Point Conception has relatively good water quality, a low level of development, and an abundant food supply, all of which provide beneficial habitat characteristics for the otter. Recent surveys have determined that this local population spends less time foraging than the population further north and has a higher rate of survival than that population, possibly because of these beneficial habitat characteristics.

***Analysis of Proposed Activities During Suspension***

Activities proposed for the Point Sal and Purisima Point Units include shallow hazards and biological surveys. As described by the MMS, the surveys would result in sound and pressure impacts, air emissions from vessels, and conflicts with commercial and recreational fishing due to the presence of the survey vessels.

The MMS has required for all these Units a lease stipulation (see Exhibit 5, Stipulation #1) that requires the lessee conduct biological surveys if the MMS determines that significant biological resources could be affected by lease-related activities. If survey results suggest that these biological resources could be affected by the lease-related activities, the lessee is to locate activities so as not to adversely affect the resources. Lease Stipulation #8 additionally requires that lessees provide training to personnel on the locations of marine mammal and bird rookery sites in the area, the seasonal abundance and sensitivities of these animals to disturbance, and the federal laws related to protection of endangered and threatened species.

*Shallow Hazards and Biological Surveys*

During the suspension period, Aera proposes to conduct several shallow hazards surveys. These are high-resolution site surveys conducted to investigate the shallow subsurface for geohazards and soil conditions in relatively small areas. In the Point Sal Unit, Aera proposes two surveys that would occur within Leases 416, 421, and 422. In the Purisima Point Unit, Aera proposes a survey within Leases 426 and 432. Each survey would be conducted over an area of from about 1.5 to 2 square miles at distances of from 5 to 11 miles off the coast and in water depths ranging from 200 to 400 feet. The surveys are expected to last a total of approximately 11 to 14 days and would be done during a period from mid-October to mid-December.

Survey methods and effects: The surveys would use a single, small 20-in$^3$ air gun as the acoustic source to acquire seismic data. The air gun would be deployed from a vessel and hydrophones would be towed about 820 feet behind the vessel to pick up the returning sound signals from the air gun. These air guns are designed to project sound and the associated pressures in the water column downward toward the seafloor, although some is propagated horizontally. The sound generated by the air guns is described using decibels (dB), which are units for expressing the relative intensity of sounds on a logarithmic scale. Sound pressure levels (SPLs) are generally reported in units of decibels relative to a standard reference pressure. In this report, "dB" is used as shorthand for "dB re 1 µPa @ 1 m $_{[rms]}$ (decibels referenced to 1 micropascal at 1 meter $_{[rms]}$). Peak sound pressure for the proposed 20-in$^3$ air gun would be 218 dB. The frequency range of the single air gun is 0-128 Hz, although the generated signal would be roughly constant in amplitude over a frequency range of 8-80 Hz[22].

Loud seismic pulses such as those generated by the air gun can disturb and harm marine resources, particularly marine mammals. As noted previously in this section, the NSMB area supports a diverse population of marine mammals, including many that could be adversely affected by the shallow hazards surveys activities. Sound produced by an air gun may have several directly negative effects on marine mammals, including[23]:

- Physical injury to marine mammals' auditory systems, resulting in temporary or permanent reductions in hearing sensitivity. Information from recent stranding events suggest that acoustic noise from military sonar, and possibly seismic air gun sources, have potential to cause non-auditory physical trauma to several species of cetaceans, most notably the beaked whales. Intense but intermittent sound pulses produced by air guns might cause immediate hearing damage at a received level of 195-215 dB.
- Interference with marine mammals' abilities to detect calls, pulses, or other important natural sounds (such as the calls of predators).
- Disturbance to, or alterations in, the behavior of marine mammals.
- Stranding and mortality.

---

[22] *Final Environmental Assessment for Minerals Management Service to Grant Suspensions of Production for Aera Energy LLC*, p. 4-20.

[23] *Ibid.*, p. 4-21-26.

Along with its potential effects on marine mammals, air guns can damage or kill fish and shellfish eggs and larvae exposed to intense acoustic energy at very close range. The MMS states that investigations in 2003 found that acoustic energy/sound from an air gun at or above 180 dB may temporarily or irreversibly damage hearing in fish, which could lead to sub-lethal behavioral changes and potential death[24]. These studies were based on caged fish, however, and researchers note that both juvenile and adult fish in the open ocean would move beyond the potentially lethal and sub-lethal range of an air gun. The acoustic pulse from air guns appears to have relatively little effect on marine invertebrates (sea stars, sea urchin, abalone, sea cucumber, etc.) and shellfish (shrimp, prawn, lobster, crab, etc.), presumably due to their lack of a swim bladder.

The MMS reports in its EA for the proposed suspensions that NOAA Fisheries has concurred with the MMS's findings that the shallow hazards surveys as proposed will not adversely affect marine mammals and sea turtles and will have minimal impacts to species and essential fish habitat managed under the Magnuson-Stevens Fishery Conservation and Management Act. Further, the MMS reports that the U.S. Fish and Wildlife Service concurs with the MMS's findings that the surveys will not adversely affect the brown pelican or southern sea otter.

In determining acceptable levels of impulsive underwater sound under the Marine Mammal Protection Act, NOAA Fisheries has typically relied on a two-part harassment definition. Level A harassment consists of the potential to injure marine mammals in the wild, and occurs at a received level (RL) threshold of 180 dB. Level B harassment consists of the potential to disturb marine mammals in the wild by disrupting behavior such as feeding, breathing, sheltering, nursing, or migration, and occurs at RL of 160 dB for intermittent sounds and at 120 dB for continuous sound[25].

Ample evidence exists that sound levels of 140 dB can cause behavioral responses, and the issue of noise thresholds remains highly controversial. NOAA Fisheries itself is sufficiently aware of the uncertainties and data gaps to the degree it is in the process of developing a matrix that would reflect species diversity in hearing sensitivities as well as the different types and durations of impulse sounds. In addition, the Marine Mammal Commission has convened an Advisory Committee on Acoustic Impacts on Marine Mammals[26], which includes a representative from the Coastal Commission and which will advise Congress on suggested revisions to the Marine Mammal Protection Act, including the following tasks:

- Review and evaluate available information on the impacts of human generated sound on marine mammals, marine mammal populations, and other components of the marine environment;

---

[24] *Ibid.*, p.4-47-48.

[25] *Ibid.*, p. 4-16.

[26] See http://www.mmc.gov/sound/welcome.html .

- Identify areas of general scientific agreement and areas of uncertainty or disagreement related to such impacts;
- Identify research needs and make recommendations concerning priorities for research in critical areas to resolve uncertainties or disagreements; and,
- Recommend management actions and strategies to help avoid and mitigate possible adverse effects of anthropogenic sounds on marine mammals and other components of the marine environment.

While these efforts are pending, based on available scientific evidence, NOAA Fisheries presumes that acoustic harassment of marine mammals will not occur below the current Level A and B harassment levels. NOAA Fisheries has adopted 180 dB for all cetaceans, and 190 dB for pinnipeds as the maximum impulse sound pressure level to which these marine mammals should be exposed. The Commission has questioned this difference and generally sought 180 dB as an upper limit for both cetaceans and pinnipeds. As noted below, the MMS is requiring Aera to use a more precautionary 160 dB threshold for this survey.

The estimated distance to expected received sound levels depends on form of propagation and inclusion of attenuating modifiers. Using an attenuation ($A\log_{10}R$) model (where $A$ = attenuation factor of propagation type, and $R$ = the distance in meters form a sound source to a specific attenuated sound level) recommended by NOAA Fisheries, the MMS concluded the resulting distances to be[27]:

- 190 dB – 80 feet
- 180 dB – 261 feet
- 160 dB – 2,607 feet or 0.50 miles

In calculating these distances, the MMS used a spherical attenuation factor of $A$=20, which it asserts has been verified by existing field data. The MMS is requiring a 160 dB impact (or "safety") zone (i.e., the air gun is to be turned off if a marine protected species enters this zone). The MMS estimates the 160 dB impact zone to be a 0.50-mile radius.

On June 27, 2005, the Environmental Defense Center (EDC), on behalf of a group of environmental organizations, submitted a comment letter[28] to the Coastal Commission regarding the Coastal Commission's consideration of the lease suspension requests. In its letter, the EDC, in part, asserts that the MMS knowingly used an improper or invalid model for determining underwater sound propagation in its analysis of the effects of the proposed shallow hazard survey, thereby greatly understating the marine mammal impact zone. The EDC argues that a cylindrical model, instead of a spherical spread model, is the correct model to use in this case to calculate the impact zone. By applying the cylindrical model, the EDC believes that the 160 dB impact zone could extend much farther than a half-mile radius.

---

[27] *Final Environmental Assessment for Minerals Management Service to Grant Suspensions of Production for Aera Energy LLC*, p. 4-26.

[28] June 27, 2005 letter from Environmental Defense Center. This letter is provided in the attached Correspondence Packet, and an excerpt from the letter is included in Exhibit 6.

In a letter dated July 15, 2005, the MMS stood by its use of the spherical spread model (Exhibit 7). After conferring with several underwater acoustics experts, the MMS concludes that the spherical spread model, using 20 log R, is the appropriate and most conservative model for use in the Santa Barbara Channel and Santa Maria Basin because it is based on empirical data available from *in situ* sound verification studies (an Exxon 1995 Santa Ynez Unit sound propagation study and an Exxon 1998 Platform Harmony sound propagation study). The MMS's letter states:

> *Sound transmission loss in water is affected by many physical variables. Consequently, there are a number of simple and complex models available to predict that loss. Over the last 10 years, MMS applicants and the U.S. Geological Survey, have used the spherical spreading model in their environmental documentation for seismic surveys conducted offshore southern California. While there are other sound transmission loss models available, MMS determined that results from sound transmission loss verification studies conducted on previous seismic surveys in southern California support the use of the theoretical spherical spreading model in the project area. This is stated in both the Samedan (Gato Canyon) and the Aera (Santa Maria Basin) EA's.*
>
> *In January 2005, after attending a presentation about cylindrical spreading models, MMS consulted with several underwater acoustic experts to better understand cylindrical spreading loss and to ensure that we used the appropriate model in assessing sound transmission loss. In our discussions, it was suggested that the cylindrical spreading modeling may be appropriate when empirical data are not available. However, given all the physical variables, it was confirmed that the best estimate for determining sound transmission loss is modeling that is based on empirical data. This was also a recommendation from the High Energy Seismic Survey (HESS) Team. Based on the empirical data available from in situ sound verification studies, MMS determined that the spherical spreading model, using 20 log R, would be appropriate and conservative (protective) for use in the Santa Barbara Channel and Santa Maria Basin.*
>
> *We conducted our discussions with scientists from NOAA Fisheries Service; Dr. Charles Greene, Greeneridge Sciences, Inc.; and Dr. Aaron Thode, UCSD. Empirical data are available from two field verification studies that were conducted in the Santa Barbara Channel: (1) BBN Acoustic Technologies, 1995. Exxon SYU sound propagation study. BBN Report No: 8120; and, (2) Greeneridge Sciences, Inc. 1998. Sound levels of an airgun array operating at Platform Harmony on 17 March 1998. Report 2006-2. Dr. Roger Gentry, NOAA Fisheries Service, and Dr. Greene confirmed that empirical data was considered to be superior to theoretical model results whenever such data are available.*

The use of the spherical spread model in the open ocean is consistent with past Commission practice – for example, the Commission concurred with the use of this model in several recent consistency determinations, including CD-14-02, CD-16-00, and CD-32-99, all for seismic surveys to be conducted by the U.S. Geological Survey in waters off of Southern California from the nearshore out to about twenty miles. However, according to Dr. Greene, the question of

which model to apply is complicated and dependent on site-specific factors; thus, there is a high degree of uncertainty about which model works better in different environmental conditions.[29] When there is a question about the appropriateness of a model used and therefore the size of the marine mammal safety zone, an operator can use during the first day of each survey an array of hydrophones placed at different depths and distances to verify the model's results. This field verification of the model would allow Aera and the MMS to calibrate predicted results with actual field conditions and then adjust the 160 dB impact zone accordingly. On July 21, 2005, the Commission staff requested that the MMS require field verification during the first day of each survey.[30] As of the issuance date of this report, the MMS has not agreed to provide field verification. The Commission believes that without field verification, serious questions remain as to whether the proposed 0.50-mile 160 dB impact zone is sufficient to protect marine mammals.

Nonetheless, Aera is proposing, and the MMS is requiring, a number of other mitigation measures, many selected from the guidelines developed by the High Energy Seismic Survey (HESS) Team[31]. The HESS Team, convened in 1999 and composed of federal, state and local agencies, industry, and environmental interest groups, has prepared interim operational guidelines for high-energy seismic surveys. The guidelines were prepared for 2D and 3D seismic surveys that employ multiple air guns. For these surveys, the MMS used selected HESS Guidelines to develop mitigating measures for impacts associated with a single air gun for the shallow hazards survey. These measures, listed in Appendix E of the Point Sal and Purisima Point Units consistency determinations, include:

- The survey would be conducted during daylight hours only within the mid-October to mid-December window to minimize impacts to migrating large whales (gray, blue, fin, and humpback).
- Aera would establish a 160 dB impact zone (estimated to be 0.50 miles) around the air gun.
- Aera would use two NOAA Fisheries-approved observers during all air gun operations and would ensure the observers do not stand watches lasting longer than 4 hours (with 2-3 hour watches recommended). Monitoring would begin at least 30 minutes before the air gun is turned on. The air gun would be ramped up (at a rate not to exceed 6 dB per minute to operating level) to allow both fish and marine protected species that may have been missed by the observers to move away. The air gun would be shut down if marine protected species are observed within or appear likely to enter the 160 dB impact zone.
- If the impact zone or survey area cannot be adequately monitored due to weather conditions (e.g., fog) or sea state (greater than Beaufort 4), all operations would be delayed until conditions improve.

---

[29] Pers. Comm. between Alison Dettmer, Coastal Commission staff and Dr. Charles Greene, July 22, 2005.

[30] Pers. Comm. between Alison Dettmer, Coastal Commission staff, and Maurice Hill, MMS staff.

[31] *High Energy Seismic Survey Review Process and Interim Operational Guidelines for Marine Surveys Offshore Southern California.*

- Aera would log all sightings of marine protected species. Data to be recorded includes the species, numbers, and behavior observed, the estimated number of animals that may have entered the 160 dB impact zone, any air gun shutdowns due to marine protected species migrations, and any behavioral responses to vessel or survey activities. Aera would notify the MMS on a daily basis of any sightings data made that day, and the steps taken to avoid adversely affecting protected species.
- Aera would submit to the MMS and NOAA Fisheries, no later than 60 days after completion of survey operations, a report of all sightings and data collected. The report would include an analysis of the effectiveness of the mitigation measures and recommendations for improving mitigation measures required to protect marine protected species. Within two weeks of submitting the report to the MMS and NOAA Fisheries, Aera would submit the report to the Coastal Commission.

Along with requiring mitigation measures to avoid or minimize impacts associated with the survey's acoustic characteristics, the MMS is also prohibiting the anchoring of vessels associated with the surveys[32]. This would result in avoidance of impacts associated with marine mammal entanglement in anchor lines and would also avoid potential impacts to hard bottom habitats and those related to turbidity.

The MMS is not requiring two types of mitigation included in the HESS guidelines – aerial surveys and passive acoustic monitoring:

- <u>Aerial surveys</u>: The HESS guidelines recommend, in addition to using onboard observers, that aerial surveys be conducted for seismic surveys lasting seven days or longer and when there are substantial numbers of first or second priority marine mammal species of concern known to be present in or near the survey area. First priority species include gray, blue, humpback, and fin whales, and second priority species include baleen and sperm whales.

  The MMS, however, is not requiring Aera to conduct aerial surveys, despite these proposed surveys lasting longer than seven days. Additionally, according to the data presented in the MMS submittals (see, for example, EA Table 4.2-2 and EID Table 4.7-8), several of the priority species would be expected to be present in the area during the proposed surveys, including the gray, blue, and fin whales. In declining to require aerial surveys, the MMS refers to a statement in the HESS guidelines that notes aerial surveys would be most useful during June through October and mid-December through mid-May when these species are likely to be in the area. Therefore, although the surveys could occur when these species are present, it appears that the MMS believes there would not be a substantial number of individuals present during the allowable survey period from mid-October through mid-December. The MMS further describes the aerial surveys as an "excessive mitigation measure" because nearby target animals are likely to be detected by the required shipboard

[32] See Consistency Determinations for the Point Sal and Purisima Point Units, Appendix E.

observers, and noise from aircraft used for aerial surveys may cause marine wildlife to avoid the surface and therefore reduce observers' ability to detect them[33].

- Passive acoustic monitoring: The MMS is also not requiring the use of passive acoustic monitoring for these surveys. Passive acoustic monitoring uses either towed or stationary hydrophones to record animal sounds and determine where they come from. For animals that regularly vocalize, a hydrophone system can track the animals from a distance, and measure both their patterns of movement and patterns of sound production. It can also be used to determine whether a sound source is affecting the behavior of marine mammals, as well as to detect animals underwater and not visible to surface observers. Passive acoustic monitoring technology is therefore only functional for vocalizing animals, such as some baleen and toothed whales, dolphins and porpoises, and pinnipeds. It does not appear to be useful for detecting sea otters or sea turtles. Multiple hydrophones are needed to triangulate and determine an animal's location.

  The HESS guidelines describe this type of monitoring as not recommended as standard mitigation protocol, except when substantial numbers of sperm whales are likely to be present in the survey area. It appears from a recent study that sperm whales are more readily detected by passive acoustic monitoring than by shipboard observers. Again, however, while the EA for the proposed suspensions states that sperm whales could be present in nearby waters at any time of year, it appears that the MMS believes the number of individuals present would not be substantial, and it is therefore not requiring passive acoustic monitoring as a mitigation measure.

Additionally, as noted above, the MMS has not agreed to require field verification during the first day of each survey that would provide better calibration of the model to conditions at the survey sites. Without this field verification, it is not possible to conclude whether potential impacts to marine mammals are adequately mitigated.

***Analysis of Proposed Post-Suspension Activities***

The main proposed post-suspension activities include the following:

- Drilling delineation wells: Two delineation wells are proposed, one each in the Point Sal Unit and the Purisima Point Unit. Drilling for each well is expected to take about 68 days and each would produce about 12,250 barrels of drill muds and cuttings. The MODU used to drill the wells would require placement of up to eight anchors, which would result in turbidity and disturbance to the seafloor.

- Constructing, operating, and decommissioning offshore platforms and associated pipelines, cables, and infrastructure: The MMS's hypothetical post-suspension scenario for the NSMB Leases involves using three offshore platforms to develop the area's oil and gas reserves.

---

[33] *Final Environmental Assessment for Minerals Management Service to Grant Suspensions of Production for Aera Energy LLC*, p. 4-38. February 2005.

Related activities would include barging the platforms into location, anchoring, constructing, and stabilizing the platforms, and placing the various pipelines, cables, and associated infrastructure. The MMS submittals anticipate that the platforms would be installed in 2006 and would be decommissioned and removed by 2030.

These anticipated development activities include the following:

- Platform A: proposed for Lease 409 in about 450 feet of water and would include 60 well slots and 45 development wells to be drilled from 2009-2017.
- Platform B: proposed for Lease 422 in the Point Sal Unit in about 300 feet of water and would include 60 well slots and 49 development wells to be drilled from 2009-2020.
- Platform C: proposed for Lease 431 in the Santa Maria Unit in about 300 feet of water and would include 60 well slots and 46 development wells to be drilled from 2008-2016.

Other significant related activities include new or increased vessel and air traffic, and new discharges to the water column and seafloor.

The effects of these activities on marine biological resources and water quality are described in detail below.

***Effects Due to Ocean Discharges***

Discharges associated with future exploration, development, and production of the NSMB Leases could adversely affect water quality and marine resources. A variety of discharges are associated with offshore oil and gas activities, including muds and cuttings, produced water, well treatment, completion and workover fluids, deck drainage, and sanitary/domestic wastes. Drilling muds and cuttings and produced water generally contain heavy metals and several toxic chemicals, including arsenic, PCBs, benzene, mercury, and hexavalent chromium.

The MMS estimates that over the life of the NSMB Leases, Aera would discharge from three platforms a total of about 1.9 million barrels of muds, 459,000 barrels of muds, and 323 million barrels of produced water. Cumulatively, if all undeveloped leases are fully developed, the MMS estimates 199 total wells drilled over a period of 13 years, discharging up to 2.8 million barrels of drilling muds, 627,000 barrels of cuttings, and 896 million barrels of produced water. These figures do not take into account discharges from existing platforms.

The U.S. Environmental Protection Agency (EPA) regulates OCS oil and gas-related effluents through issuance of National Pollutant Discharge Elimination System (NPDES) permits. NPDES permits issued by the EPA, including those for OCS oil and gas platform discharges, are "listed" federal permits in the CCMP and subject to the federal consistency review requirements of section 307(c) of the CZMA.

Discharges associated with the two proposed delineation wells would be regulated under the effluent requirements of new General NPDES Permit CAG280000, which EPA submitted and the Commission concurred with on January 9, 2001, and which has been in effect since

December 2004[34]. This new 5-year General NPDES permit covers discharges from existing OCS oil and gas platforms and any exploration activities. Notwithstanding effluent discharge requirements contained in this new General NPDES permit, platform operators continue to discharge toxic pollutants into the ocean from muds and cuttings, produced water and other wastes. For discharges from the proposed new platforms, Aera would be required to apply to the U.S. EPA for new and separate NPDES permits for the new platforms, which would require separate review and concurrence by the Coastal Commission under the federal consistency requirements of the CZMA.

Methods and techniques necessary to treat discharges so that they meet NPDES permit limits vary by the type of oil and gas being developed. The MMS submittals describe most of the oil reserves in the NSMB Leases as "heavy" or "extra-heavy"; however, the submittals do not include an adequate analysis of how these characteristics are likely to affect discharges associated with developing these reserves. Commission staff requested in its letter of April 22, 2005 that the MMS provide information about what different techniques may be required to develop, process, and transport these heavier oils due to their characteristics (e.g., high viscosity, relatively high levels of metals, etc.), and whether they would require additional treatment measures to allow Aera to meet NPDES permit limits. The MMS responded by stating briefly that all discharges would have to meet permit limits, and that the oil could require different chemical treatments, heating, and oil/water separation measures to meet those limits; however, it did not specify what effects these measures would likely have on the platform discharges or operations. The MMS additionally stated it would be premature to provide this type of information at this point in the Commission's review and that it would likely be provided by Aera during the DPP review.

Even without the specific information requested about these discharges from the NSMB Leases, but knowing the scale of the proposed development and the characteristics of the relatively toxic oils found in these reserves, it is likely that the eventual discharge and associated treatment requirements for these Units would result in at least the same, if not greater level of impacts as existing activities elsewhere in the OCS leasing area authorized by the recent General NPDES permit. The Commission previously determined that this new General Permit does not conform to the CCMP's marine resources and water quality policies,[35] Based on this precedential decision

---

[34] Although platform operators are currently discharging under the requirements of General NPDES Permit CAG280000, the Western States Petroleum Association has challenged this permit in court (*Western States Petroleum Association v. Nastri*, No. 04-75605 (9th Cir.)).

[35] In its concurrence with the new General NPDES permit (see Consistency Certification CC-126-00), the Commission made clear its concern that scientific research on the effects of oil and gas wastes on marine resources and water quality is inconclusive, and that the mass of, and toxic concentrations in, projected discharges, both individually and cumulatively may still damage the biological productivity of coastal waters. It found that the discharges (1) may reduce the long-term productivity of certain marine species to a level below that necessary to sustain healthy populations; (2) potentially contaminate or cause changes in fish species that dwell near the platforms; and (3) cause cumulatively significant adverse impacts, such as chronic sublethal effects. The Commission therefore found that the discharges that occur under the new NPDES permit are inconsistent with the marine resource, water quality, and cumulative impact policies of the CCMP. The Commission nevertheless applied the "override" provision of the CCMP (Coastal Act Section 30260) for coastal-dependent industrial development activities and

and the reasons stated therein, the Commission makes the same finding of inconsistency for these proposed activities.

In its review of the NPDES General Permit, the Commission was able to apply the CCMP's "override" policy at § 30260, which is available for coastal-dependent facilities that are not fully consistent with other applicable CCMP policies. However, as noted in Section 3.11 below, the Commission lacks adequate information about many aspects of the granting of the suspensions to apply CCMP § 30260.

***Effects on the southern sea otter***

As noted previously, the otter is subject to a variety of threats, some of which may be caused by or associated with development of the NSMB Leases. Since the time of the otter's ESA listing, pollution and incidental take due to fisheries have been recognized as substantial problems in additional to potential oil spills. Given that the sea otter population in California is not increasing at the rate anticipated in recovery efforts, despite the absence of major spills, a broader range of threats to the population must be considered. It appears that the otter and its coastal habitat are threatened by events occurring in adjacent habitat, both on land and in the open sea. Also, as noted before, the otter was not present near the NSMB Leases at the time of the lease sale in 1981, and was therefore not a factor in the reviews done at that time.

Overall, the otter population is experiencing shifts that do not appear optimal for recovery of the species. While recent surveys show a population increase, it appears to be comprised largely of males and juvenile females. Additionally, the greatest reduction in survival rates is for adult females (those older than 4 years), which represent the part of the population with the highest reproductive value. While the female survival rate has declined, that of males has apparently either remained the same or increased, thus shifting the overall population sex ratio towards males and juvenile females. The survival rate also differs by area. It is currently lowest in the north-central portion of the sea otter's range[36], and is higher in the area nearest the NSMB Leases.

Reasons for the recent decline in southern sea otter abundance are not entirely known, but are believed in part to be related to the following factors, any of which may act either individually or cumulatively on particular individuals: 1) infectious disease resulting from increased immune deficiencies or elevated parasite and pathogen exposure; 2) incidental mortality caused by commercial fishing activities; or 3) food resource limitation. Regarding infectious diseases, it appears they are almost entirely the consequence of parasites and microbes for which the sea otter is not a natural host. Even though most otters do not show signs of chronic health problems and diagnostic measures such as blood tests, immune function tests, and the like do not show

---

concurred with the new General NPDES permit, finding that it met the tests of 30260, because (1) alternative locations were infeasible or more environmentally damaging; (2) to do otherwise would adversely affect the public welfare; and (3) adverse environmental effects would be mitigated to the maximum extent feasible.

[36] Tinker, T., personal communication, 02/2005.

unusual results, over 40% of recovered sea otter carcasses indicate the presence of infectious disease at the time of death, which suggests it is an important factor in causing the slow growth rate of the otter population[37]. There are still, however, considerable unknowns about the otter's contaminant burdens, nutrition, immune function, and genetics. At this point, it can be concluded that infectious disease is a significant demographic driver of the otter population, although the degree to which this reflects a disease-rich environment or increased vulnerability due to food limitation, immune dysfunction, or some interactive effect of these factors remains unknown and must be researched and resolved before further impacts to otter population recovery are approved. These sources of mortality appear rare or absent in growing sea otter populations in Washington, Canada, and parts of Alaska. It appears, too, that with the higher survival rates of the NSMB area otters, these factors may be less present in this area and have less of an effect on the local population.

The types of discharges associated with post-suspension activities include several that are likely to adversely affect otters. As noted in the EID, otters are vulnerable to contaminant loading due in part to their high metabolic rate and daily foraging demands. The contaminants associated with discharges from delineation wells (e.g., metals, hydrocarbons, etc.) include several that if introduced into the food web could either directly affect the health of the otters or could act in concert with other environmental stressors to reduce the otters' immunity to disease, reduce their ability to feed or reproduce, or result in other similar problems.

Other proposed post-suspension activities include platform construction, operation, and decommissioning. Construction activities also include placement and removal of pipelines and electrical cables in at least three corridors from deep water to the shoreline, which would very likely cause potentially significant adverse effects to otters unless adequate mitigation measures are implemented. These impacts could include direct "take" of otters due to the use of construction equipment, disturbance of otter habitat due to both direct and indirect effects of anchoring and placing the pipelines or cables, or long-term displacement of otters from the selected corridor areas. These types of impacts could be avoided if either the areas are not used by otters or various mitigation measures are used to avoid and minimize potential impacts. The MMS submittals identify generally a proposed pipeline corridor landing area between Point Sal and the mouth of Shuman Creek; however, they do not describe whether that area is used by otters and if so, if there are mitigation measures or alternative locations that may be needed to avoid impacts to otters. Similarly, the submittals do not identify specific landings for two of the cable corridors and whether those corridors provide otter habitat.

Commission staff noted in its letter of April 22, 2005 that the potential impacts to otters evaluated in the MMS submittals were based only on a simplistic numeric count of the otter population, and used only census data up to 1999. Staff requested that the MMS re-evaluate potential impacts to the otter using more recent data and more sophisticated techniques that address the concerns about different survival rates and gender ratios described above. While the June 27, 2005 response from the MMS provided more recent population counts (up to 2004), the MMS did not re-assess the potential impacts, either by using the more sophisticated techniques

---

[37] Southern sea otter recovery plan.

requested, or by updating its previously provided evaluation using the several additional years of population data. Absent this information, it is unclear what the potential impacts would be to the otter population, and what feasible mitigation is available to avoid such impacts.

***Effects on kelp and hard bottom habitat***

Post-suspension activities that could affect kelp and hard bottom habitat include anchoring, drilling, placement of platforms, pipelines, or other structures, and smothering due to discharges. The MMS has established some mitigation measures meant to avoid or minimize impacts to hard bottom habitat, including prohibiting drilling within 1,500 feet of such features and requiring operators to submit an anchoring plan that shows avoidance of hard bottom features during placement of pipelines. However, while the MMS submittals mention several other measures that could avoid or reduce impacts to hard bottoms, those measures are not described as being required for future activities. For example, the EID describes the different degree of impacts that would result from structures being placed at least 3,280 feet from hard bottom versus being placed closer than 3,280 feet. Additionally, the consistency determinations describe a situation in which impacts could result from pipelines being placed near hard bottom features, but does not state that measures are in place to prevent that type of impact.

Commission staff requested in its letter of April 22, 2005 that the MMS identify the measures that would be implemented to reduce the impacts associated with fill placement, such as placing the structures that could adversely affect hard bottom habitat. The MMS response described the total amount of structures anticipated for all the undeveloped lease areas – platforms covering approximately 3.6 acres of seafloor, pipelines and cables covering about 116 miles and 91 miles, respectively – but then stated:

> *In the past, operators have submitted plans to MMS showing avoidance of hard bottom features. If and when the operators submit revised or new DPP's* [sic], *the MMS will review those submittals to determine if they are acceptable or whether new or additional measures are warranted to protect hard bottom habitats.*

This response does not provide the information necessary to determine during this current lease suspension review that suspension-related activities would be implemented in a manner that minimizes effects on hard bottom habitat. For example, at least one of the hard bottom features identified in the EID (near the center of Lease 426) appears to be in the general vicinity of the proposed pipeline corridor between Platforms B and C. The question that this information compels the Commission to answer is whether there are one or more alternative pipeline alignments that will allow negative impacts to this area of hard bottom habitat to be avoided. In the absence of the information that the Commission has requested from the MMS, the Commission cannot answer this question and thus cannot make a determination of consistency with respect to this impact.

Further, the MMS submittals do not include adequate information about hard bottom areas located within the State waters through which the pipeline and power cables corridors would pass to their onshore landing sites. The MMS submittals generally describe the NSMB nearshore as having both kelp and hard bottom habitat areas, but do not describe the offshore

conditions near the proposed landing areas. While impacts to kelp and hard bottom associated with pipeline and cable-laying may often be avoided or minimized through appropriate measures, it is not clear from the information provided whether these resources are absent or found throughout the corridor areas, so the Commission is unable to determine whether mitigation is necessary or would be effective.

***Effects on marine life***

Placement, operation, and removal of the various structures could cause harm to all forms of marine life, including fish, marine mammals and seabirds. Fish would likely be adversely affected by activities associated with delineation drilling, discharges from the platforms, habitat disturbance, and decommissioning. These same activities would also likely cause harm to both marine mammals and birds. Several of these effects are noted above in the section on discharges to the ocean.

Several of the proposed activities, such as plugging and abandoning the two delineation wells and removing platform supports, would likely be done using explosives, which would kill nearby fish. The effects of explosions can be mitigated to some degree by placing them below the mudline, using temporary barriers such as "bubble curtains" to keep fish at a distance, and others; however, these do not entirely eliminate fish kills.

***Effects of increased air traffic***

Development of the NSMB Leases would involve a substantial increase in air traffic over the area, which is likely to adversely affect marine mammals, including sea otters, and marine and coastal birds. The adverse effects are likely to include general disturbances to behavior, as well as disruption of breeding, nesting, feeding, and other activities and life stages.

The EID includes several different descriptions for the number of likely flights. In Table 5.2-1, it states that there would be over 31,000 helicopter flights (about 1300 per year) associated with development of the currently undeveloped leases during the period from 2006 to 2030. Three of the four proposed new platforms associated with these leases would be in the NSMB Leases (the other is proposed for the Gato Canyon Unit), so they would likely be associated with about three-quarters of the flights, roughly 23,000 (or about 950 per year or 2 to 3 per day). In Section 5.7.5.2, the EID states that there are routinely eight to 10 helicopter flights per day, though it is not clear whether this is for each platform, for groups of platforms, or for all platforms in the OCS region together. Appendix K of the EID states that there are about five trips per day to the three platforms in the southern part of the Santa Maria Basin. For the NSMB Leases, therefore, the total number of flights could therefore be somewhere between two to ten per day. These flights would occur over an extensive area not currently subject to this level of activity and roughly 10 to 20 miles north of the nearest existing platform, yet the MMS submittals describe this level of disturbance as "negligible to low."

The EID describes several measures that could reduce impacts associated with these flights, two of which would be required – the National Marine Fisheries Service requires a minimum flight level of 1,000 feet over marine mammals, and there is a similar 1,000-foot minimum flight level

over seabird colonies at Vandenberg Air Force Base. The other described measures are recommendations or policies – e.g., encouragement by the Federal Aviation Administration for pilots to fly higher than minimum flight levels over noise-sensitive areas, company policies to fly at least 1,000 feet over undeveloped areas, etc. – but the MMS does not commit to implement those measures and does not discuss whether they are feasible.

In its April 22, 2005 letter, Commission staff requested from the MMS additional information and further explanation regarding the effects of helicopter flights on affected marine mammals and birds and about the MMS determination that the effects would not be substantial. Staff also asked MMS to describe what feasible mitigation measures would be implemented to avoid or minimize the associated impacts. In its June 23, 2005 response, the MMS states that these issues will be more specifically addressed during review of an EP or DPP. It also stated that there was no anticipated increased disturbance due to these flights because, while the number of flights would increase, the helicopters would use the same airports and flight paths as are currently being used and would be subject to existing flight restrictions. It did not describe feasible mitigation measures that would be implemented.

This response does not appear to accurately characterize the likely impacts associated with these flights. As the three proposed NSMB Unit platforms are in an area 10 to 20 miles north of the nearest existing platform, it is not plausible that the flight paths used to serve those platforms would be the same as existing flight paths. Further, absent an evaluation of feasible mitigation measures, neither the initial MMS submittals nor its response adequately describe how the proposed activities would be consistent with provisions of the CCMP's marine resource policies to maintain, enhance, and where feasible, restore, marine resources and to provide special protection to areas of special biological or economic importance.

***Conclusion***

Based on the discussion above, the Commission finds that there is not adequate information to determine whether activities anticipated both during suspension and post-suspension would be consistent with the CCMP's marine biological resource and water quality policies (Coastal Act §§ 30230 and 30231).

## 3.2 Oil Spill Prevention and Response

### 3.2.1 Introduction

***Summary***

Since the time of the first federal lease sale offshore Santa Barbara in 1966, the potential for oil spills from offshore oil and gas development has been a major environmental concern. Oil spills resulting from such events as well blowouts, pipeline ruptures, operational errors, or vessel-platform collisions can lead to significant adverse effects on the marine and coastal resources of the Santa Barbara Channel, Santa Maria Basin, and southern California region. These resources include endangered or threatened species of seabirds and shorebirds (e.g., California brown pelicans, western snowy plovers), marine mammals (e.g., sea otters, stellar sea lions, humpback whales), and fishes and invertebrates (e.g., steelhead trout, tidewater goby, white abalone). These are further described in Exhibit 4.

Since the time of the Commission's initial review of existing platforms and support facilities, the national and even international significance of the value of the coastal and marine resources in the region – including the environmentally sensitive habitats of sandy beaches, rocky intertidal areas, and estuaries – has continued to grow. In addition to the Channel Islands National Park and Marine Sanctuary, the Santa Barbara Oil and Gas Sanctuary, the Santa Barbara Channel Federal Ecological Preserve and the Monterey Bay National Marine Sanctuary, the region now includes the San Luis Obispo State Seashore, Santa Barbara Coast Seashore, Marine Protected Areas, Areas of Special Biological Significance, Marine Preserves, State Reserves, State Refuges, State Wildlife Areas, and numerous state parks and beaches. These, too, are described further in Exhibit 4.

The MMS has submitted information to the Commission on oil spill risk in the consistency determinations and the EID. A document previously released by the MMS, the Draft EIS for Delineation Drilling (DEIS)[38] also contains pertinent information on the risk of oil spills from the granting of the lease suspensions. As discussed in more detail in Section 3.2.4 (Oil Risk Analysis) below, the EID and DEIS do not provide enough information for the Commission to analyze the potential impacts to marine and coastal resources in appropriate detail.

In its letter of April 22, 2005, Commission staff requested additional information from the MMS regarding oil spill risks. The MMS's response reiterated the agency's position that the appropriate time for a detailed analysis is when operators have submitted specific Exploration Plans and Development and Production Plans, not at the lease suspension stage.

---

[38] See Section 2.5: Related Environmental Documents, above. Minerals Management Service, Pacific OCS Region. *Delineation Drilling Activities in Federal Waters Offshore Santa Barbara County, California.* Draft Environmental Impact Statement. Published by the US Department of the Interior, MMS, Pacific OCS Region. Document 2001-046. June 2001.

The MMS stated:

> *Drilling activities, if and when they occur, can only occur after the suspension period ends and must be detailed in EP's and DPP's that are approved by the MMS and certified consistent with the CCMP by the State. Pursuant to Federal regulations at 30 CFR 250.203 and 204, and reviewable pursuant to §307(c)(3) of the CZMA, EP's and DPP's* [sic] *will provide details regarding oil spill risk, volumes, oil quality, etc. No EP or DPP will be approved by MMS without State concurrence with an operator-provided consistency certification or a determination by the Secretary of Commerce to override the State's objections.*

As discussed in Section 2.2.2 (Scope of Coastal Commission Review) above, the Commission disagrees with the MMS's position that the appropriate time to review all issues concerning oil spill risks, environmental consequences, and prevention and response capabilities for each of the hypothetical development scenarios is at the Development and Production Plan and Exploration Plan stage. Granting the lease suspensions could *prima facie* significantly increase the risk of oil spills, and consequent environmental impacts. The Commission must conduct a detailed oil spill risk analysis at the lease suspension stage in order to determine whether it is appropriate to facilitate through approval of the proposed suspensions future development of the undeveloped lease areas.

The Commission requested specific information regarding: 1) worst-case discharge volumes, 2) oil spill probabilities, and 3) oil spill trajectories. As discussed in relevant sections below, MMS has failed to provide this information to the Commission, and as a result, the Commission finds it does not have sufficient information to analyze even on a conceptual level potential impacts to coastal resources from a reasonably foreseeable oil spill. The Commission's lack of information in this regard is relevant to its analyses of the consistency of the granting of the lease suspensions with CCMP policies related to marine resources and water quality (Coastal Act §§ 30230 and 30231), environmentally sensitive habitat areas (Coastal Act § 30240), commercial fishing (Coastal Act §§ 30230 and 30234.5), access and recreation (Coastal Act §§ 30210, 30211, and 30220), and cultural resources (Coastal Act § 30244).

***Relevant Coastal Act Sections***

Coastal Act § 30232 requires protection of coastal resources from oil spills, and requires effective spill containment and clean-up, as follows:

> *Protection against the spillage of crude oil, gas, petroleum products, or hazardous substances shall be provided in relation to any development or transportation of such materials. Effective containment and cleanup facilities and procedures shall be provided for accidental spills that do occur.*

Coastal Act § 30232 requires the applicant to provide "protection against the spillage of crude oil, gas, petroleum products, or hazardous substances…" and to provide "effective containment and cleanup facilities and procedures" for accidental spills that do occur. As discussed in more detail below, the Commission finds that current prevention regulations and programs provide

measures for maximum feasible protection against the spillage of crude oil and other hydrocarbons, and therefore granting the lease suspensions is consistent with the prevention standard of Coastal Act § 30232. The Commission also finds that current state-of-the-art response measures cannot effectively protect California's shoreline and coastal resources from significant oil spill impacts, and therefore granting the lease suspensions is inconsistent with the response standard of Coastal Act § 30232.

Potential impacts from an oil spill are relevant to the Commission's analyses under CCMP policies related to: marine resources and water quality (Coastal Act §§ 30230 and 30231), environmentally sensitive habitat areas (Coastal Act § 30240), commercial fishing (Coastal Act §§ 30230 and 30234.5), public access and recreation (Coastal Act §§ 30210, 30211, and 30220), and cultural resources (Coastal Act § 30244).

The environmentally sensitive habitat areas policy of the CCMP (Coastal Act § 30240) states:

> *(a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas.*
>
> *(b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas.*

The public access and recreation policies of the CCMP include:

Coastal Act § 30210:

> *In carrying out the requirement of Section4 of Article X of the California Constitution, maximum access, which shall be conspicuously posted, and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse.*

Coastal Act § 30211:

> *Development shall not interfere with the public's right of access to the sea where acquired through use or legislative authorization, including, but not limited to, the use of dry sand and rocky coastal beaches to the first line of terrestrial vegetation.*

Coastal Act § 30220:

> *Coastal areas suited for water-oriented recreational activities that cannot readily be provided at inland water areas shall be protected for such uses.*

The cultural resources policy of the CCMP (Coastal Act § 30244) states:

> *Where development would adversely impact archaeological or paleontological resources as identified by the State Historic Preservation Officer, reasonable mitigation measures shall be required.*

CCMP and Coastal Act policies related to marine resources, water quality, and commercial fishing are cited in the relevant sections of this report, below. The following discussion is organized into the following topics: 1) background information, 2) oil spill risk analysis, and 3) oil spill prevention and response.

### 3.2.2 Background – Regional Oil Spill History

Oil spills may occur from such events as well blowouts, pipeline breaks, operational errors, and vessel-platform collisions. The largest spill in the Pacific OCS region occurred in 1969, when a well blowout on Platform A in federal waters offshore Santa Barbara spilled an estimated 80,000 barrels of crude oil into the Santa Barbara Channel. Since 1969, there have been no further spills of this magnitude. Between 1970 and 1999, there were 843 spills ranging from one barrel to 163 barrels, with most being less than one barrel.

The largest was a 163-barrel spill from the Platform Irene pipeline in State waters in September 1997[39]. This spill had significant adverse impacts on the coastal resources of Santa Barbara County, and the operator was required to pay $3.25 million in damages and penalties to county, State, and federal agencies[40]. The spill was caused by a failed flange on the subsea wet oil pipeline, exacerbated by the operator's decision to manually restart pipeline flow following an automatic shutdown caused by a pressure drop. Despite favorable weather conditions and rapid response and recovery efforts, which included use of state-of-the-art response equipment, the Platform Irene pipeline oil spill resulted in the oiling of approximately 17 miles of the Santa Barbara coastline, including both sandy beaches and rocky intertidal areas. Some stretches of the shoreline had oil coverage exceeding 50 percent, and the estuaries of San Antonio Creek, Honda Creek, and the Santa Ynez River were also affected. Clean-up actions required heavy equipment, many personnel, and removal of marine plants and other biota at the wrack line, and also resulted in physical disturbances to habitat[41].

---

[39] EID, pp. 5.3 -11 to 5.3 -12

[40] Consent Decree, *United States and People of the State of California v Torch Energy Services*. 2002. (Settlement for Natural Resources Damage Assessment.)

[41] *Torch/Platform Irene Oil Spill, Scoping Document for Restoration Planning.* Prepared by: Platform Irene Trustee Council, US Fish and Wildlife Service, CA Department of Fish and Game, US Air Force: Vandenberg Air Force Base, CA State Lands Commission, with assistance from Santa Barbara County Planning Development Department, Energy Division. October 20, 2004.

The spill most heavily affected the sandy beach nearest the origin of the spill, with light sheen, tarballs and tar patties found at several other beaches. A 2004 report indicates that Pismo clams and spiny sand crabs, "likely suffered significant mortality from the spill"[42]. This report also states that rocky intertidal species including black abalone and mussels were injured by the spill, and reported observations of black abalone and mussel beds coated with oil along or near the shores of Vandenberg Air Force Base. An estimated 635 to 815 seabirds were oiled as a result of the spill. Animal species in the rocky intertidal zone were injured, as were beach-dwelling invertebrates. Shorebird numbers also decreased, including the endangered western snowy plover. The physical oiling of the beaches and subsequent clean-up activities affected beach-related recreational activities including walking, jogging, swimming, surfing, tidal pool viewing, picnicking, and fishing.

In November 2004, a loss of well control or "blowout" incident occurred on Platform Gail, which did not result in a serious oil spill but necessitated platform shutdown and evacuation[43]. The cause was operator error: a contract employee had removed a lockdown pin, which circumvented the blow-out preventer system so that it failed to function as intended when an unbalanced condition developed in the well. The result was an uncontrolled flow of oil, gas, and seawater from the well.

Even small spills can cause significant impacts to sensitive resources. On June 15, 2005, twelve to fifteen barrels of light crude oil washed ashore onto Breton Island, Louisiana, from an offshore platform during a storm. The incident occurred during nesting season for thousands of birds at the Breton National Wildlife Refuge. Hundreds of endangered brown pelicans were killed. Approximately 1,000 oiled pelicans were recovered, including 268 live chicks[44]. Although this incident did not occur in California, it demonstrates that a very small spill from an OCS pipeline could have devastating effects on the coastal resources of the region.

### 3.2.3 Coastal Resources at Risk from an Oil Spill

The coastal resources at risk from a marine oil spill from OCS oil and gas development include marine biota, water quality, environmentally sensitive habitat areas (e.g., rocky intertidal areas, sandy beaches, wetlands, and estuaries), commercial fishing, access and recreation, and cultural resources. The sections that follow provide a summary of potential impacts from an oil spill to each of these resources.

---

[42] *Ibid*. pp. 3-7

[43] http://www.mms.gov/omm/pacific/lease/Gail_Incident_Final_Draft_Report.pdf Accessed July 7, 2005.

[44] International Bird Rescue Research Center, http://www.ibrrc.org/louisiana-05.html Accessed July 7, 2005.

***Marine Biota***[45]

A more complete description of marine resources found in the area is included in this report in Section 3.1 and in Exhibit 4. The descriptions below focus on the potential effects of an oil spill to marine biota.

*Sea Otters*

The southern sea otter is extremely sensitive to oil spills. Lacking a layer of fat, these animals are dependent on maintaining an intact layer of air next to their skin. Oil on just a portion of the fur can cause hypothermia and death. Otters can also ingest oil when they attempt to groom their oiled fur, or when they consume prey that has also consumed oil.

The U.S. Fish and Wildlife Service (USFWS) and the Southern Sea Otter Recovery Team have specifically identified "managing petroleum exploration, extraction, and tankering to reduce the likelihood of a spill along the California coast to insignificant levels", as critical to southern sea otter population recovery[46]. The USFWS does not believe it is possible to avoid a catastrophic loss to the sea otter population in the event of a major spill in or near the sea otter's current range. The Southern Sea Otter Recovery Plan[47] concludes that, 1) an oil spill is likely to occur over the next 30 years (the period during which the 36 leases would be developed), 2) the probability of death in sea otters as a result of contact with oil following an oil spill is likely to be no less than 50 percent, and 3) rehabilitation of oiled sea otters following a major spill is expensive, may be detrimental to some individuals and is of questionable benefit to the population. As noted in Section 3.1 (Marine Biological Resources and Water Quality), the NSMB Leases are within an area considered key to the recovery of the otter population.

*Other Marine Mammals*

Oil may affect marine mammals through various pathways: surface contact, inhalation, ingestion, and baleen fouling. Since whales and most adult pinnipeds rely on layers of body fat and vascular control rather than a coat of fur to retain body heat, they are generally resistant to the thermal stresses associated with oil contact. However, exposure to oil can cause damage to skin, mucous, and eye tissues. The membranes of the eyes, mouth, and respiratory tract can be irritated and damaged by light oil and the resulting vapors. If oil compounds are absorbed into the circulatory system, they attack the liver, nervous system, and blood-forming tissues. Oil can collect in baleen plates, temporarily obstructing the flow of water between the plates and thereby reducing feeding efficiency. Reduction of food sources from acute or chronic hydrocarbon pollution can be an indirect effect of oil and gas activities.

---

[45] EID, Chapter 4.7 pp. 4.7-1 to 69 and Chapter 5.7, pp. 5.7-1 to 104

[46] *US Fish and Wildlife Service. Final Revised Recovery Plan for the Southern Sea Otter (*Enhydra lutris nereis*).* Portland, Oregon. xi + 165 pp. 2003

[47] *Ibid.*

Since oil can destroy the insulating qualities of hair or fur, resulting in hypothermia, marine mammals that depend on hair or fur for insulation are most likely to suffer mortality from exposure. Most vulnerable to the direct effects of oiling among the pinnipeds are fur seals and newborn pups, which lack a thick insulating layer of fat. More than 300 harbor seals are estimated to have died in Prince William Sound due to the *Exxon Valdez* oil spill, and pup production and survival were also affected. The majority of the dead harbor seals recovered were pups. Seasonally, the most vulnerable marine mammal resources along the California coast between Point Conception and Ragged Point would be harbor seal haul-out areas and pupping beaches, during early spring.

*Marine Birds*

Direct contact of birds with oil can cause matting of plumage, resulting in reduced flying or swimming ability; loss of buoyancy, which can lead to exhaustion and death from drowning; loss of insulation, which can lead to death from hypothermia; and increased physiological stresses and reproductive failure due to ingestion of oil. In 1997, the 163-barrel Platform Irene pipeline spill injured or killed between 635- 815 birds.

Oil-related mortality is highly dependent on the life histories of the bird species involved. Birds that spend much of their time feeding or resting on the surface of the water are more vulnerable to oil spills. Cleanup efforts to remove spilled oil may also cause impacts to coastal birds. The presence of human beings during clean-up activities, and attempts to capture oiled wildlife for rehabilitation, may have the effect of flushing birds into oiled water.

*Sea Turtles*

Oil spills can adversely affect sea turtles by toxic external contact, ingestion or blockage of the digestive tract, disruption of salt gland function, asphyxiation, and displacement of preferred habitats. Sea turtles are known to ingest oil during feeding (as tar balls may be confused with food) or while attempting to clean oil from flippers. Oil ingestion frequently results in blockage of the respiratory system or digestive tract. Some fractions of ingested oil may also be retained in the animal's tissues, as was detected in turtles collected after the *Ixtoc* spill in the Gulf of Mexico. Breathing toxic fumes from floating oil can also cause harm to sea turtles.

*Red-legged frog*

Oil may affect amphibians through various pathways including direct contact, ingestion of contaminated prey, and lingering sublethal impacts from oil sequestered in sediments that may linger for years. Adult red-legged frogs move down to the brackish coastal lagoons formed seasonally behind sand berms that close the mouths of rivers and streams along the south central coast. Though no direct oil contact with frogs is expected, some red-legged frogs could return to lagoons in which oil has become sequestered in sediments, before contaminated sediments are flushed into the ocean. In addition, habitat destruction could result from clean-up efforts.

*Fish*

Fish can be affected directly by oil, through direct ingestion or by ingesting oiled prey. They can also be affected by uptake of dissolved petroleum compounds through the gills, by effects on fish eggs and larval survival, and by changes in the ecosystems that support fish. Many effects can be sub-lethal, transient, or slightly debilitating, however any stress requires energy for recovery, which can ultimately lead to increased vulnerability to disease or to decreased growth or reproductive success.

The egg, early embryonic, and larval-to-juvenile stages of fish seem to be the most sensitive to oil. The *Exxon Valdez* oil spill occurred within weeks of Pacific herring spawning along the shores of Prince William Sound, resulting in increased egg mortality, larval deformations, and site-specific occurrences of instantaneous mortality. Studies estimate that toxic levels of that spill affected over 40 percent of the 1989 year-class. Also, pink salmon fry emerged from their gravel spawning redds and entered the nearshore environment during the spill. Salmon and trout exposed to oil from the *Exxon Valdez* spill showed reduced growth rates in the season following the spill. Studies estimate that 1.9 million adult pink salmon failed to return to Prince William Sound in 1990, primarily because of a lack of growth in the critical nearshore life stage. Returns in 1991 and 1992 were most likely reduced by 11 percent. As noted in Exhibit 4, the Southern steelhead trout is present in the NSMB area and could be adversely affected by any spills.

*Abalone*

A spill that resulted in substantial coating of subtidal rocky habitats or significant loss of attached algae within an area that supports white abalone poses the greatest risk. White abalone in water depths of less than 33 feet could also be affected by oil treated with chemical dispersants, as the oil disperses through the water column. Recovery of the black abalone could exceed seven to ten years if a significant portion of the local population was directly contacted and heavily oiled by a spill.

*Plants*

Plant mortality from oil spills can be caused by smothering and toxic reactions to hydrocarbon exposure. Generally, oiled marsh vegetation dies above the soil interface, but roots and rhizomes survive when oiling is not too severe. The cleanup process could exacerbate the effects of an oil spill on threatened and endangered plants.

***Environmentally Sensitive Habitat Areas***

*Rocky Intertidal and Sandy Beach Habitat*

Primary oil spill impacts to rocky intertidal and sandy beach areas include smothering, uptake in tissues, and contamination of animals using rocky habitat and beaches, such as invertebrates, seabirds, and marine mammals. Oil tends to strand high in the intertidal in the barnacle zone. Tarballs in this zone are persistent, and can last several seasons. Oil can also persist in individual tidepools.

*Estuaries and Wetlands*

If oil from an offshore spill enters a wetland or estuary, impacts to the resource could include irreversible alteration of the habitat, mortality of endangered birds, plants and fish, and loss of plants and animals that may be unable to populate from adjacent areas. In addition to the potential for offshore spills, several hundreds of miles of pipelines onshore carry oil products that, if spilled, could affect estuarine and wetland habitat. A spill originating from an onshore pipeline (supporting offshore OCS oil production), especially from a pipeline break crossing a river or streambed, could send oil directly into a wetland. The cleanup process, which is another source of impacts, would consist of removal and replacement of contaminated soil and revegetation with native species. Although limited in extent, recovery could take several years, depending on the type of vegetation and wildlife affected by the spill.

***Commercial Fishing[48]***

Impacts to commercial fishing from an oil spill could include fouling of commercial fishing gear and vessels, closure of harbors, and preclusion of access to fishing areas. For example, as a result of the 1997 Torch oil spill, several fishermen filed claims for damages related to the spill and cleanup operations. Steve Dunn, representing the Santa Barbara Trappers, asserts that response, cleanup and repair vessels violated Vessel Traffic Corridor restrictions, resulting in lost or destroyed gear. Other fishermen similarly sought damages from loss of nets resulting from the spill and cleanup activities[49].

***Access and Recreation[50]***

The mainland coast in the project region includes a number of recreational beaches and parks that attract visitors throughout the year. Oil spills have the potential to affect access and recreation at the coast by causing beach and harbor closures. Cleanup of a smaller spill (200 barrels or less) can take up to two weeks, whereas a larger spill may take 30 days or more. The wider the area that is oiled, the more locations that could be affected, and as the area of effect increases, the more difficult it becomes to substitute near-by locations in order to enjoy recreational activities. Closing a beach or recreation area could have impacts on the people who enjoy overnight camping, swimming, surfing, walking, jogging, and tidepool-watching at these parks. In addition, the Channel Islands are restricted with regard to the maximum number of visitors at any given time, and the hauling capacity of park concessionaires is limited by boat occupancy restrictions. Anacapa and Santa Cruz Islands are the most vulnerable to losing visitor days due to an oil spill. Region-wide, deployment of containment booms could result in the closure of small craft harbors. As noted elsewhere in this report, the NSMB Unit area includes several important areas used for public access to the shoreline.

---

[48] EID, p. 5.13-3

[49] *County of Santa Barbara Planning and Development Memorandum. Subject: Update on Torch Oil Spill for January 20, 1998 Hearing.* From John Patton, Director, to Board of Supervisors. January 13, 1998.

[50] EID, p. 5.10-3

***Cultural Resources***[51]

Oil-spill related impacts are not expected to affect offshore cultural resources because of the nature of clean-up operations. Onshore, oil spills could alter the chemical composition of archeological materials and render them useless for carbon-14 dating. Oil spill containment and cleanup activities could result in extensive impacts to site deposits from the excavation of containment barriers (e.g., dams, berms, and trenches), and the mechanized removal of oil-soaked earth.

### 3.2.4 Oil Spill Risk Analysis

***Spill Volumes***

The EID states that the "most likely maximum size of a major oil spill" for all 36 undeveloped leases is 2,000 barrels,[52] and uses this quantity to characterize the worst-case spill scenario for all anticipated post-suspension hypothetical development scenarios. The Commission finds this characterization is overly simple and an underestimation, because expected worst-case spills may vary greatly from scenario to scenario due to large differences in anticipated production and other factors. (Volumes of oil transported by offshore pipelines range from a current 6,000 barrels per day from Platform Irene to a projected 92,000 barrels per day from the hypothetical Platform B in the NSMB Leases.

The Commission requested that the MMS characterize the worst-case spill scenario using the "worst-case discharge volume", rather than the most likely maximum spill size. the MMS replied to the Commission's request as follows[53]:

> *The maximum spill volumes described in the EID and previously in the [DEIS] are conservative in that they were applied to the largest observed or possible spills that MMS has observed in the Pacific Region subsequent to the 1969 spill in the Santa Barbara Channel. Thus, the hypothetical 2000 barrel spill from the Arguello pipeline described in the EID is based on the size and length of that pipeline, which is anticipated to be the largest of any in the region. Analyses of project specific development and associated pipelines would indicate hypothetical spills of smaller volume…*

---

[51] *Ibid.*, p. 5.8-3

[52] "The most likely maximum size of a major oil spill from potential future development – the maximum most probable discharge – 2,000 bbl, is based on the volumes of oil in various pipelines and vessels (i.e., tanks and other containers on platforms) as described in the U.S. Coast Guard Area Contingency Plans for oil spill response (e.g., USCG, 1999) (see MMS, 2001). This is the maximum volume of oil calculated to be spilled from a break in the longest Point Arguello Unit pipeline, the Hermosa to shore pipeline (A. D. Little, 2001 as cited in MMS, 2001)." EID, p. 5.3-14.

[53] June 23, 2005, MMS letter, page 47.