The MMS states in the EID that: "the most likely maximum size of a major oil spill from potential future development — the maximum most probable discharge — [is] 2,000 barrels". According to the MMS, this number is based on the volumes of oil in various pipelines and vessels (i.e. tanks and other containers on platforms), and is applicable to all post-suspension hypothetical development scenarios given the spill record for the Pacific Region since 1970[54].

The Commission disagrees with the MMS's position that 2,000 barrels represents the maximum reasonably foreseeable spill size. The term "maximum most probable discharge" is ill defined in the EID,[55] and appears to be an arbitrary volume without substantive basis. The "worst-case discharge volume" is a well-defined quantity that is systematically calculated in each operator's oil spill response plan, following procedures given in 30 CFR 254.47, for offshore facilities, and in 49 CFR 194.105 for onshore pipelines. The estimated worst-case discharge volume varies among existing OCS facilities and can greatly exceed 2,000 barrels. For example, the estimated worst-case discharge for Platforms Hermosa, Hildalgo, and Harvest are 5,796, 2,809, and 8,200 barrels, respectively, and assume prompt leak detection and pipeline shutdown[56]. The current federal worst-case response planning volume for Point Arguello development is 8,200 barrels[57]. These worst-case discharges are based in part on the Point Arguello Unit's current (2005) maximum production of 11,000 barrels per day. The EID estimates that peak production in the NSMB Leases would be 92,000 barrels per day, which indicates that the worst-case discharge volume would most likely be significantly more than the 8,500-barrel worst-case discharge for Point Arguello, and significantly more than the maximum most probable spill size considered in the EID. The 2,000-barrel maximum spill volume is also an inadequate measure of possible worst case spills from onshore pipelines,[58] or vessel-platform collisions.

The worst-case discharge volume is the accepted standard for evaluating the maximum potential volume of oil spills. Information on the worst-case discharge volume for each development scenario is necessary for an assessment of the full range and extent of potential oil spill impacts to coastal resources.

---

[54] EID, p.5.3-14

[55] *Ibid.*

[56] MMS. *Oil Spill Response Plan, Point Arguello and Point Pedernales Fields*. Vol. 2, p. 10-9. November 2004.

[57] *Ibid.*

[58] For example, the worst-case spill planning volume for the Platform Irene onshore pipeline (beginning at the beach) is 4,424 barrels. (*California Office of Spill Prevention and Response Supplement for the Oil Spill Response Plan for the Point Pedernales 20-inch Wet Oil Pipeline*. April 2003. p. 4-2)

***Spill Probabilities***

The oil spill risk discussion in the EID focuses on the probability of "one or more spills", and offers no information on multiple spills.[59] This is an oversight that minimizes the apparent risk of spills. In its information request letter of April 22, 2005, the Commission requested that the MMS provide an analysis of oil spill risk probabilities for multiple oil spills. The MMS responded as follows:[60]

> *Because the EID tables indicate the probability of one* or more *(emphasis added), it does not minimize the risk of multiple spills. As indicated in the table in the comments provided to MMS (without verifying the accuracy of the calculations), the risk of two or more spills, etc. keeps decreasing as the number of spills increases. You are correct in that there is a relatively high probability of multiple spills from existing operations combined with the hypothetical development in the spill size range 50 – 999 barrels. Unfortunately, such statistics contribute very little to assessing hypothetical environmental impacts because the statistics do not give any insight into the risk of coincident spills either in time or space.*

This response does not address the Commission's request that the MMS analyze the probability of multiple oil spills individually – that is, analyze the probability of two independent spills, three independent spills, four independent spills, etc., rather than merely analyzing the probability of "one or more spills". A preliminary analysis by Commission staff, using the MMS data and methodology,[61] shows that the estimated risk of multiple spills is significant, and that post-suspension development could substantially increase the probability of multiple spills over the life of the projects. Anticipated post-suspension development of the 36 leases would increase the estimated probability of *one or more spills* in the 50-999 barrel size range only slightly (from 96.8 percent to 99.9 percent). However, the estimated probability of six independent spills would rise from a current 13.6 percent to 82.5 percent, and the probability of ten independent spills would rise from 0.3 percent to 30.6 percent. Similarly, for spills of 1,000 barrels or more, the estimated probability of one or more spills would rise from 46 percent to 76.8 percent, whereas the probability of two or more spills would rise from 12.8 percent to 42.9 percent.

The Commission provides this information to indicate the importance of a multiple-spill probability analysis. It is accurate to the degree that the Commission uses available the MMS data and methodology. The MMS has data relating to historic spills, recoverable reserves, and

---

[59] EID, p. 5.3-13 to 5.3-14

[60] June 23, 2005. MMS letter, pages 47 and 48.

[61] Spill probability is estimated from historic oil spill data, specifically, the number of spills that have occurred for each billion barrels of crude oil handled. Once the historic spill rate is determined, an estimate of the expected mean number of spills over the expected life of a proposed project can be obtained by multiplying the estimated volume of recoverable reserves (in billions of barrels) times the spill rate (in spills per billion barrels). The probability that *N* spills would occur for the estimated mean number of spills is given by the Poisson distribution. The same model produces estimates of the probability of one or more spills, or multiple spills.

other characteristics of the hypothetical post suspension development scenarios that would allow a full analysis of the probability of multiple oil spills from development of these leases. A multiple-spill probability analysis is information that should be provided by the MMS in the consistency determination. Without this information, the Commission cannot assess the full range, extent, and likelihood of oil spill impacts that may be caused by granting the lease suspensions.

Additionally, the EID and DEIS do not include information on the cumulative spill risk probabilities for individual development scenarios added to existing OCS development – for example, there is no risk probability information specific to the cumulative risk of the Lion Rock Unit development plus the existing OCS development, or the combined risk of the Lion Rock, Purisima Point, Point Sal, and Santa Maria Unit developments together plus the existing OCS development. In its letter of April 22, 2005, Commission staff requested that the MMS provide estimates of cumulative spill probabilities for each hypothetical development scenario plus existing operations. The MMS did not address this request in its response letter. As a result, the Commission is unable to analyze how granting the lease suspensions may individually increase the probability of an oil spill, or the contribution that granting the lease suspensions would make to a cumulatively increased oil spill risk probability.

***Probability of Spills from Delineation Drilling.***

Drilling of delineation wells is a post-suspension activity anticipated in the EID and consistency determinations for the NSMB and Gato Canyon Units. The EID discusses the "minimal" risk of an oil spill from delineation drilling on pages 5.3-12 and 5.3-13:

> *Proposed delineation drilling during post-suspension phase activities involves minimal risks of an oil spill. Oil spills during exploration or delineation drilling of wells from mobile drilling platforms are very rare events according to the MMS and US Coast Guard database... The probability of one or more spills from delineation drilling has been calculated to be less than .05 percent (the lowest value calculated by MMS spill data.) Therefore, the risk of a spill is considered to be minimal and poses almost no risk to the marine environment. Spills during delineation drilling for these proposed projects are not considered further in the spill risk assessment.*

The Commission believes that MMS's statistical model, which is based on production statistics, is misapplied to delineation drilling, and that it is more appropriate to use the MMS' data from 1992-2000 for exploration-related spills to determine the risk probability of a spill from delineation drilling.[62] The MMS' data on exploration-related spills shows that three spills of

---

[62] Specifically, the exposure variable (volume of oil handled) is not logically related to the risk of spills from exploratory drilling, because exploration wells produce only small test quantities of oil, unlike production wells. Although the MMS includes exploratory drilling accidents in its database for developing oil spill occurrence rates, this does not mean that spill probability for exploratory drilling can properly be estimated based on the volume of oil samples extracted from an exploration well. See Smith, R.A., J.R. Slack, T. Wyant, K.J. Lanfear. *The Oil Spill Risk Analysis Model of the U.S. Geological Survey*. USGS Professional Paper 1227, U.S. Geological Survey. Reston, VA. 1982. p. 22.

over 50 barrels occurred in the drilling of 3031 wells. Based on this data, the mean expected number of spills is about 0.0015. This mean number of spills is too small to estimate spill probability with much confidence. However, the data strongly suggest that the estimate of less than 0.05% is unrealistically low, and that the true probability of a spill might be in the range of 0.1% to 0.2% (i.e., between one-in-500 and one-in-1000, versus one-in-2000).

The need for disclosure is underscored by the occurrence of a loss of well control ("blow-out") on Platform Gail as recently as November 18, 2004, due to operator error. Though oil spillage was minor, the incident did result in a significant gas release, platform shutdown, and evacuation. Under different conditions, it could have led to a significant oil spill.

In its April 22, 2005 letter to the MMS, the Commission requested that the MMS revise the discussion in Section 5.3.3 of the EID to include a probability estimate derived from the MMS' delineation drilling spill data. The MMS responded as follows:[63]

> *The methodology used to estimate spill risks (based upon the amount of oil "handled" via production, pipeline, etc.) is a valid metric to calculate risk. There is a rigorous database on which to base statistics of risk using this metric, and it has the advantage of being comparable to risks of spills from tankering. This latter is significant in being able to estimate hypothetical effects of spills on coastal resources. The reference to "blow-out" only enters into the spill statistics if oil is put into the ocean because this is an analysis of spill risk. The three spills over 50 barrels... are in the MMS spill database and were part of calculating the probability of one or more spills during delineation drilling of 0.05%. Even if one doubles this probability to 0.1%, it is still extremely low, and MMS stands by its conclusion that it "poses almost no risk to the marine environment".*

The Commission agrees that spills from drilling are infrequent, however it disagrees with the MMS' chosen statistical method, and its conclusion that there is "almost no risk" to the environment from a spill from drilling activities. The MMS' spill probability model, based on production statistics, is misapplied to delineation wells, and the probability estimates appear to be statistically invalid. Because such spills are infrequent, the probability cannot be estimated with confidence, however historic data suggest the probability of a spill could be two- to four-times as high as the MMS states in the EID. In view of the statistical uncertainty and possible significant environmental impacts if a spill were to occur, the possibility of spills during delineation drilling should not be dismissed without further analysis or discussion.

Without a discussion of spill risk probabilities for delineation drilling based on an appropriate statistical method, and a discussion of the potential impacts to coastal resources from an oil spill that may result from drilling activities, the Commission cannot determine if granting the lease suspensions is consistent with the resource policies of the CCMP (Coastal Act Sections 30210, 30211, 30212, 30220, 30230, 30231, 30234.5, 30240, and 30244).

---

[63] June 23, 2005 MMS letter, page 49.

***Spill Trajectories***

The DEIS and EID present three separate oil spill trajectories analyses: 1) the MMS's Oil Spill Risk Assessment (OSRA) model, 2) the National Oceanic and Atmospheric Administration's General NOAA Oil Modeling Environment (GNOME) oil spill model, and 3) an analysis of Scripps Institution of Oceanography (Scripps) free-floating drifter trajectories. The results of the analyses are summarized in the EID as a composite analysis, which covers the general geographic region of anticipated post-suspension development. Upon initial review of the EID, Commission staff determined that the analyses are overly general, and do not provide enough detailed information for the Commission to analyze the risk of oil spill impacts to specific coastal resources. Commission staff requested more specific trajectory information, including:

1. Detailed trajectory analyses for each existing development project and hypothetical post-suspension scenario, using scenario-specific, maximum reasonably foreseeable spill sizes (i.e., worst-case discharge volumes); and,

2. A summary of the analyses that clearly communicates the risk exposure borne by different coastal areas due to potential spills from each hypothetical development scenario, including discussions of variability and uncertainty in the estimates.

The MMS responded to the Commission's request as follows[64]:

> *MMS believes it is appropriate to present generalized spill risk at this stage in the possible hypothetical future development of these undeveloped leases. MMS includes overall risk from a spill from possible future development because a spill could potentially affect geographically diverse resources in the overall area no matter the origin of the spill given the complex and varying circulation in the region…*
>
> *Project specific modeling would not add substantial resolution to the modeling of spill trajectories performed in the DEIS (1999) because the launch points for those trajectories cover the geographic domain of the projects described in the EID. Appendix Figure 5.2-1 in the DEIS indicates the launch points used in modeling. These are very near or within the units for which projects are described.*

The Commission does not agree that the generalized information provided in these analyses is appropriate at this stage of development. As discussed in Section 2.2.2 (Scope of Coastal Commission Review) above, unlike a lease sale, the location and anticipated character of the post-suspension development scenarios are fairly well defined, and the available information would support a more specific analysis. Nor does the Commission agree that scenario-specific spill trajectory analyses would not "add substantial resolution". Rather, the modeling studies are overly generalized by design, and overlook factors important for evaluating oil movement and shoreline contact locations. Some major inadequacies in the analyses are summarized below.

---

[64] June 23, 2005 MMS letter, page 46-47.

*Small scale current features*

Neither the OSRA nor GNOME modeling studies appear to account for relatively fine-scale current features or changes in current patterns[65]. The importance of small scale variations is stressed in a National Research Council report, which states: "In the absence of most of the temporally and spatially varying part of the spectrum, the predicted trajectories may miss many aspects contributing to drift, especially at the shorter time scales. This problem plagues all modeling efforts to some extent, but is of particular concern for southern California where the variable flows are so strong"[66].

A recent study demonstrates the importance of fine-scale current dynamics[67]. The study, which involved intensive deployment of drifters offshore Santa Barbara's southern coast between Ellwood and Naples, indicates that cross-shelf currents intermittently dominate the pattern of circulation within a few kilometers of the shore. Cross-shelf currents could drive spilled oil directly toward shore in some areas. These currents have major importance for understanding the risk of potential spills from Santa Ynez Unit and Gato Canyon Unit, particularly if the spill were from a pipeline rupture within State waters.

*Temporal variability in current patterns*

Both the OSRA and GNOME modeling studies appear to oversimplify the current patterns. The OSRA studies are based on seasonally averaged, modeled ocean current fields, combined with averaged surface drifter data. As a result of the averaging, the range of current pattern variability is greatly reduced. This is a serious error, because different current regimes occur during each season, and the dominant current pattern may change on time scales of days to weeks[68].

Additionally, the GNOME studies are based on the three major characteristic flow regimes that have been identified in Scripps-MMS collaborative studies (i.e., upwelling, convergent, and relaxation regimes). These three flow patterns can clearly be identified about 60% of the time[69]. With this approach, only the conceptually idealized flow patterns are modeled. Trajectories associated with hybrid flow patterns, changing patterns, and less common patterns are not modeled. Neither the OSRA nor the GNOME study analyzes storms or other conditions that could produce unusual trajectories.

---

[65] The model physics seem to incorporate some fine scale processes (OCS Report MMS 2000-057, p. 3-4), but there is no indication that the model was empirically verified at such scales in southern California waters. In any case, much of the fine-scale information would be lost in the seasonal averaging.

[66] National Research Council. *The Adequacy of Environmental Information For Outer Continental Shelf Oil and Gas Decisions: Florida and California*. 1989. p. 23 (see also: NRC – *Assessment of the U.S. Outer Continental Shelf Environmental Studies Program – I. Physical Oceanography*. 1990.)

[67] Ohlmann, Carter, *Transport over the Inner-Shelf of the Santa Barbara Channel, Draft final report to MMS,* March 28, 2005.

[68] DEIS, Table 5.1.3.2-2, p. 5-24.

[69] *Ibid.*, p. 4-48.

*Pipeline spills*

Although subsea pipeline ruptures are the most likely type of oil spill from the anticipated post-suspension activities, GNOME and OSRA model only surface spills from platforms[70]. Because pipelines are closer to shore than platforms, a higher proportion of the spilled oil is likely to affect shoreline and near-shore resources. Also, subsea releases behave differently than surface spills, and require a very different modeling approach[71]. In addition, the modeling fails to consider onshore pipeline spills, which may enter marine waters and affect coastal resources.

*Other weaknesses of the analysis*

- Effect of spill volume on modeled shoreline contact locations: Because the maximum spill volume modeled was only 2,000 barrels, the GNOME model results do not provide complete information concerning the volume of oil that would contact the shore in the event of a maximum worst-case discharge.

- Oil characteristics: The OSRA modeling and drifter studies do not consider properties of the spilled oil, which varies considerably among reservoirs. Oil properties affect subsea plume formation and the behavior of oil on the surface, such as spreading, sinking, and expansion of volume due to mousse formation[72]. It is unclear how realistically the GNOME modeling studies account for such characteristics, if they are considered at all.

- Shoreline contact: The OSRA model generates estimates of conditional probabilities of shoreline contact. However, these estimates are of dubious value, given that the model uses seasonal current averages, fails to include important small-scale currents, and does not account for oil characteristics or volume. The spill trajectory analysis does not adequately connect probable shoreline contact locations with presence of sensitive resources, as necessary for evaluation of impacts.

---

[70] See DEIS, p. 5-20. OSRA modeling of spills from several currently existing pipelines is included in the *Oil-Spill Risk Analysis* [MMS 2000-057] cited above. However, the surface spill model is used, and the modeling is not tied into the spill analysis in the DEIS or EID. The modeled spill locations are approximately 2.5 to 6.3 miles offshore, and fail to consider possible spills closer to shore, where environmental impacts would be greater.

[71] Subsea spill models are under development by MMS, and other models may be available. See: *Technical Documentation for the Pipeline Oil Spill Volume Computer Model, SINTEF Report to MMS.* January 20, 2003. Available at: http://www.mms.gov/tarprojects/390/WCD%20Technical%20Description_Final-170203.pdf, accessed July 8, 2005.

[72] Mousse formation is the tendency of some oils to form emulsion, which can expand the spill volume by a factor of two to three, as apparently was the case for the 1997 Irene pipeline spill. Sinking may be a very important consideration for the heavier local oils.

- Uncertainty: The trajectory modeling does not include an error analysis or discussion of model sensitivity analysis, as recommended in the National Resource Council assessments[73].

The oil spill modeling in the EID and DEIS is over-generalized and lacks crucial information. Hence, it does not provide the information needed for a realistic appraisal of potential impacts to specific resources in the Santa Barbara Channel and Santa Maria Basin. The modeling lacks an appraisal of what resources are likely to be affected by an oil spill incident. Without this information, the Commission cannot evaluate in appropriate detail the full range and extent of potential oil spill impacts to marine and shoreline resources.

***Conclusion***

The oil spill risk analysis in the EID is overly general, and lacks specific information crucial to the Commission's analysis of potential oil spill impacts on coastal resources. The Commission requested additional information from the MMS regarding: 1) the worst-case discharge volumes; 2) spill probability analyses for multiple spills; and 3) detailed spill trajectory analyses for each hypothetical post-suspension development scenario. Without this information, the Commission cannot evaluate in appropriate detail the full range and extent of potential oil spill impacts to coastal resources. The Commission therefore finds it does not have sufficient information to determine if granting the lease suspensions is consistent with CCMP policies related to: marine resources and water quality (Coastal Act §§ 30230 and 30231), environmentally sensitive habitat areas (Coastal Act § 30240), commercial fishing (Coastal Act §§ 30230 and 30234.5), access and recreation (Coastal Act §§ 30210, 30211, and 30220), and cultural resources (Coastal Act § 30244).

### 3.2.5 Prevention and Response Capability

Coastal Act § 30232 requires an operator to provide "protection against the spillage of crude oil, gas, petroleum products, or hazardous substances…" and to provide "effective containment and cleanup facilities and procedures" for accidental spills that do occur.

After the 1989 *Exxon Valdez* oil spill, the federal and California State governments imposed tough new statutory and regulatory standards for oil spill prevention and response. Under the Oil Pollution Act of 1990, the federal government agency with the primary regulatory authority over marine waters is the U.S. Coast Guard (USCG). The USCG also serves as the Federal On-Scene Coordinator (FOSC) during an oil spill response. Under California's Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (Cal. Gov't Code §8670 *et seq.*), the California State government agency with the primary regulatory authority over oil spills in state marine waters is the California Department of Fish and Game's Office of Spill Prevention and Response (OSPR). OSPR is the State On-Scene Coordinator during an oil spill response.

---

[73] *Ibid.*, NRC, 1989, p. 24.

A Regional Response Team (RRT) composed of representatives from the USCG, the U.S. EPA, the MMS, the California Office of Emergency Services, and OSPR oversees the development and implementation of three Area Contingency Plans for all waters offshore California. The Plans present procedures for joint response efforts, including procedures for mechanical recovery, dispersal, shoreline cleanup, protection of sensitive environmental areas, and protection, rescue, and rehabilitation of fisheries and wildlife[74].

Oil spill prevention and response for the hypothetical post-suspension development scenarios are discussed in detail below.

***Prevention***

To reduce the likelihood of spills, OCS operators must comply with a multitude of oil spill prevention, environmental management, and worker safety regulations from federal, State, and local agencies. These include the MMS, U.S. Office of Pipeline Safety regulations, USCG Facility Response Plan regulations (33 CFR Part 154 and 155), the California OSPR regulations (14 CCR §§790 –886) for oil spill contingency plans, inspections, and drills for pipelines in state waters and onshore facilities, State Lands Commission regulations (14 CCR §§2000-2017, §§2300–2407) for onshore marine terminals, Coastal Commission consistency certification and permit requirements, and Santa Barbara County permit conditions for onshore facilities.

According to the EID and DEIS Appendix 5,[75] the MMS's prevention strategy includes regulations that require the use of best available technologies, training standards for operator personnel, and a rigorous inspection program. This strategy encourages industry to operate well-engineered facilities with good housekeeping practices, adequate equipment maintenance, and proper and safe operational procedures to reduce the likelihood of a spill. The MMS has established inspection protocols and reporting requirements designed to effect timely detection of any spills, notification of proper authorities, and initiation of cleanup. Operators are required to conduct frequent periodic inspections to determine if pollution is occurring and to report sources of pollution to the MMS.

To ensure that a facility is prepared in the event that oil is spilled, the MMS has a comprehensive oil spill response program[76]. In addition, the MMS tests a facility operator's response, as well as its knowledge and understanding of the Oil Spill Response Plan through oil spill exercise programs that incorporate announced and unannounced drills each quarter. For planning purposes, the MMS adheres to the requirements of the USCG's National Preparedness for

---

[74] US Coast Guard, California Office of Oil Spill Prevention and Response. *2000 Area Contingency Plan, Los Angeles and Long Beach.* 2000. Available at http://www.uscg.mil/d11/m/rrt9web/

[75] EID p. 5.3-7, DEIS Appendix 5 p. A5-69

[76] In accordance with MMS regulations 30 CFR §250.204 (b)(3) and Part 254, each of the OCS operators must have an approved oil spill response plan.

Response Exercises Program[77]. Facility operators must exercise their entire response plan at least once every three years. To satisfy this triennial exercise requirement, an owner or operator must conduct the following elements of the response plan: annual spill management tabletop exercise; annual deployment exercise of spill response equipment staged at an onshore location; annual notification exercise; and semiannual deployment exercise of any response equipment which the owner or operator must maintain at the facility[78].

The Commission notes that even with these regulations and programs in place, oil spills do still occur due to human error. For example, the size of the 163-barrel Platform Irene pipeline spill in 1997 was exacerbated by the operator manually restarting the pipeline flow after the SCADA system had automatically shutdown the pipeline due to a drop in pipeline pressure. To reduce operator accidents, the MMS and other federal, State, and local regulations provide feedback mechanisms for the continual improvement of operator training programs and leak detection systems.

As discussed above, new platforms, pipelines, and supporting facilities in the NSMB Leases would be required to be designed in accordance with the MMS and other applicable federal, State, and local regulations for the prevention of hazardous spills. The three proposed NSMB Unit platforms would be required to operate in compliance with the most recent versions of the MMS, federal, State, and local oil spill prevention, safety, environmental management, and operator training regulations and programs discussed above. The Commission finds that the MMS's and other applicable prevention regulations and programs provide measures for maximum feasible "protection against the spillage of crude oil, gas, petroleum products, and hazardous substance". The Commission therefore finds that granting the lease suspensions is consistent with the prevention requirements of the CCMP (Coastal Act § 30232).

***Response Technologies and Capability***

Oil spill prevention measures, such as blowout protection devices and regular platform inspections, have reduced the frequency of oil spills from OCS platforms since the 1980's. However, offshore oil development in the Pacific OCS continues to pose a significant risk to the environment from oil spills[79]. Oil spill response strategies generally include: mechanical containment and recovery equipment, chemical dispersants, and in-situ burning. Each is discussed in more detail below.

[77] USCG. *National Preparedness for Response Exercise Program (PREP).* August 1994. Available at http;//www.uscg.mil/hq/g-m/nmc/response/msprep.pdf

[78] EID p. 5.3-7; DEIS Appendix 5, p. A5-69.

[79] The term "risk" encompasses both the likelihood and environmental impacts of oil spills.

*Mechanical Containment and Recovery Equipment*

According to the EID and DEIS Appendix 5,[80] operators in the Pacific OCS are required to keep sufficient equipment on or near the platforms to enable the immediate initiation of containment activities. Primary response equipment at the platforms is supplemented by onshore equipment operated by oil spill cooperatives formed by the lessees and operators.

Platform operators are required to have MMS-approved Oil Spill Response Plans (OSRP), which are updated on a biennial basis. The Commission reviews each OSRP update to ensure that any changes in the spill response equipment and procedures continue to provide equal or better protection of the coastal resources than that reviewed during the original consistency certifications for the platforms. The Commission notes that as part of the review process for Development and Production Plans for the NSMB Leases, Aera would be required to provide detailed information pertaining to the placement of oil spill response equipment at or near the platforms. The Commission agrees with the MMS that the Development and Production Plan stage is the more appropriate time for the review of the detailed information pertaining to primary response capability at the platforms.

For regional response capability, Clean Seas provides two dedicated oil spill response vessels – Mr. Clean III at Platform Harvest and Mr. Clean at Santa Barbara harbor – in addition to pre-staged equipment located at Morro Bay, Avila Bay, Santa Barbara Harbor, the Carpinteria Yard, in the Ventura/Port Hueneme area, and at Point Mugu Navy Base. As the MMS notes,[81] the additional resources of the Marine Services Response Corporation, National Response Corporation and the USCG Oil Spill Response Team are also available to assist Clean Seas in the event of catastrophic spill.

In its April 22, 2005 letter, the Commission staff requested additional information from the MMS about the capability of existing oil spill response equipment to contain and recover the heavier grade oil that exists in the NSMB Leases. the MMS replied as follows:[82]

> *Mechanical techniques (i.e., booms and skimmers) would be the primary oil spill response tools that would be used for oil spills in the NSMB. Local oil spill response organizations, Clean Seas and Marine Spill Response Corporation (MSRC), have invested in mechanical tools particularly suited to recover heavy oil. Primary among these tools are Lori brush skimmers, a rotating belt with oleophilic brushes. They pick the oil from the water surface with little water entrained, and the oil is squeegeed off into a holding tank. The Lori brush skimming system is on all of the Clean Seas vessels as well as on the MSRC (formerly Clean Coastal Water) vessels located in Long Beach Harbor.*

[80] EID, p. 5.3-7. DEIS, p. A5-70.

[81] EID, page 5.3-7

[82] June 23, 2005 letter, p. 57

. . .

*A good example of the behavior of spilled NSMB heavy oil in the open ocean is the 1997 Platform Irene pipeline incident. The gravity of the oil was 13 degree API (slightly lighter than water).*

. . .

*Within 24 hours after the initial spill, the oil had formed large, thick (up to 1 foot) patties which had very little sheen and which were very cohesive. To recover this oil, the patties were broken up in to smaller chunks and directed through the doors on the Clean Seas vessels where the Lori Brush skimmers are mounted. The skimmers collected the oil where it was transferred into the holding tanks. Since then, Clean Seas has developed a water jetting mechanism which breaks up the heavy oil patties and directs them toward the Lori brush skimmers so that they can more efficiently pick up the oil.*

*In summary, an effective oil spill response can be conducted for an incident in the NSMB. Oils produced in the NSMB would most likely be a heavy, viscous crude that when spilled may tend to form thick patties with very little sheen but substantial cohesiveness. Spill response cooperatives in the area have modified their techniques and response equipment to improve the effectiveness of the mechanical recovery of these oils as demonstrated at the Platform Irene pipeline spill. Alternative response technologies, dispersants and in-situ burning may prove to be effective on continuous spill where the fresh oil is encountered.*

The Commission notes that in the 25-30 years since the installation of the OCS platforms, Clean Seas has continued to upgrade and improve the containment and recovery capability of their state-of-the art response equipment to best match the characteristics of the oil produced in the offshore fields. For example, as a result of the Torch pipeline spill, Clean Seas has developed a water jetting mechanism that breaks up the heavy oil patties and directs them toward the Lori brush skimmers so that they can more efficiently pick up the oil. However, notwithstanding Clean Seas' continual improvements to its state-of-the-art oil spill response equipment, the Commission disagrees with the MMS's statement that "an effective oil spill response can be conducted for an incident in the NSMB".

The Commission interprets the "effective containment and clean up" standard in the CCMP (Coastal Act § 30232) as the ability to keep an offshore oil spill from adversely affecting the shoreline resources of California. In the consistency certifications pertaining to OCS oil and gas development projects the Commission reviewed in the 1980s,[83] the Commission found that although the on-water oil spill containment and clean-up equipment available for response to offshore oil spills was state-of-the art, research and oil spill experience showed that its effectiveness in keeping a marine oil spill from causing significant impacts to sensitive shoreline resources was severely limited by weather, currents, and wave conditions.

---

[83] CC-7-83 (Platforms Harmony and Heritage), CC-12-83 (Platform Hermosa), CC-27-83 (Platform Harvest), CC-24-84 (Platform Hidalgo), and CC-36-86 (Platform Gail).

Although oil spill response equipment and cleanup methods have significantly improved in the past 20 years, research and experience shows that the response capability of current state-of-the art containment and clean-up equipment continue to be very limited during conditions of rough weather and sea conditions. EPA tests have demonstrated that oil skimmers can generally only recover about 50 percent of spilled oil in calm water conditions, with decreasing effectiveness if sea conditions are rougher[84]. Booms and skimmers are also limited in their effectiveness by wave height and wind speed. According to the National Oceanic and Oceanographic Administration's Office of Response and Restoration, historical data indicates that only 10-30 percent of spilled oil can be recovered by mechanical means[85].

The lack of real-time current information can also affect the accuracy of on-water response operations. Scripps deployed a system of buoys during the 1990s in the Santa Barbara Channel and Santa Maria Basin to provide wind and current data for circulation studies. Through a cooperative agreement between the MMS and Scripps, and an interagency agreement with NOAA, a monitoring array was deployed in 1999, providing real-time wind and current data. The data was made available on the Internet for use in trajectory analysis during oil spill response[86, 87]. The buoys were removed in October/November, 2004, and real-time current data is no longer available. Some up-to-date oil spill response plans cite the Scripps website for access to real-time current data;[88] however no plans to resume the real-time current monitoring have been announced.

Recent ocean oil spills, even those as small as the 163-barrel Torch Platform Irene pipeline spill in 1997, have demonstrated that state-of-the-art response equipment, even under the best weather and calm-sea conditions, are not effective in keeping oil off the shoreline. Current state-of-the-art mechanical response equipment cannot effectively protect California's shoreline and marine resources from significant oil spill impacts. The Commission therefore finds that the CCMP standard of "effective containment and clean up" (Coastal Act § 30232) cannot be met using the on-water containment and clean-up equipment currently available to respond to marine oil spills from oil and gas exploration development offshore California.

---

[84] Environmental Protection Agency. *Summary of U.S. EPA OHMSETT Testing 1974-1979.*

[85] Michel, Christopherson, & Whipple. *Mechanical Protection Guidelines.* NOAA, USCG, Research Planning, Inc. 1994.

[86] http://ccs.ucsd.edu/research/sbcsmb/; http://ccs.ucsd.edu/research/sbcsmb/moorings/ Accessed July 15, 2005.

[87] DEIS, p. 4-46 to 4-48; EID, pp. 4.5-14 and -15.

[88] PXP Arguello, Inc. *Core Oil Spill Response Plan.* Vol. 1, p. E-1. February 2004.

*Chemical Dispersants*

The effectiveness of chemical dispersants can be limited by the characteristics of the oil found in the Pacific OCS oil reserves, especially for the type of heavier oil found in the NSMB Leases, as well as rough weather and sea conditions.

The Regional Response Team recently updated its policy for the use of chemical dispersants in federal offshore waters through an updated California Dispersant Plan[89]. This Plan would become part of the three California Area Contingency Plans. The California Dispersant Plan includes the results of a net environmental benefit analysis conducted for all habitats and species from the California shoreline to 200 miles offshore, and lists the oils commonly tankered into California or produced from its offshore fields. It also included an evaluation of the "dispersibility" of these oils. Most oils transported into California by tanker ship have a chemical composition that might, under favorable conditions, make them candidates for chemical dispersion. However, most oils produced from California offshore fields are too heavy, persistent, and non-volatile to be suitable candidates for effective chemical dispersion with the products and resources currently available. Clean Seas has 18,000 gallons of Corexit 9527 – which is marginally effective for some of the lighter OCS crude oil – stored at its Carpinteria yard. However, Corexit 9500, which is the dispersant most appropriate for use on the heavy-grade oil that is produced from the OCS leases, is not stored in California. The closest available supply is in Texas, which could arrive in about six hours by plane. As noted in the EID,[90] the effectiveness of dispersants decreases the longer the oil is weathered due to emulsification. To be most effective, dispersants must be applied in the first 24 hours of a spill.

The California Dispersant Plan also includes a description of federal offshore waters "pre-approved" by the RRT for dispersant use, with an accompanying decision-making flowchart and resources to be used by the FOSC to assist her decision; and, a description of federal offshore waters for which case-by-case RRT approval must be received before the FOSC can deploy dispersants. Areas pre-approved for dispersant use include all federal waters (more than 3 miles from shore) except those areas within National Marine Sanctuaries (e.g., Channel Islands and Monterey Bay National Marine Sanctuaries). RRT approval on a case- by-case basis is required for State waters, sanctuary waters, and within 3 miles of California-Oregon or California-Mexico borders. Even in areas where the use of dispersants is approved, dispersants cannot be applied directly over marine mammals. The presence of marine mammals may therefore further limit the potential use of dispersants.

In conclusion, factors such as the heavy viscosity of the oil in the OCS reserves, weather and sea conditions at the time of the spill, proximity of marine mammals, and the RRT approval process may severely limit the effectiveness of dispersants as a spill response measure.

---

[89] Region IX Regional Response Team. *Draft Final California Dispersant Plan and Federal On-Scene Coordinator (FOSC) Checklist for California Federal Offshore Waters.* 2005. 49 pp. + Appendix.

[90] EID, p. 5.3 -8

In Situ *Burning*[91]

The three California Area Contingency Plans include policies for the *in situ* burning of oil on the water's surface. RRT "pre-approval" for *in situ* burns exists for waters 35 nautical miles and further from shore. An FOSC decision to conduct an *in situ* burn in waters closer to shore requires case-by-case approval from the RRT, in consultation with the regional air board and health department.

The heavy oils produced by California offshore oil fields may, if contained properly, be burnable. The physical and chemical characteristics of this oil may require the addition of accelerants to facilitate combustion, and de-emulsifiers. There is no fire boom stored in California; however, a regular boom could be used sacrificially for *in situ* burning. The presence of marine mammals in the area would preclude *in situ* burning.

As is the case with the use of chemical dispersants, factors such as the heavy viscosity of the oil in Pacific OCS reserves, weather and sea conditions at the time of the spill, proximity to sensitive marine resources, and the RRT approval process may severely limit the effectiveness of *in situ* burning as a spill response measure.

***Conclusion***

Current state-of-the-art mechanical response equipment, chemical dispersants, and *in situ* burning cannot effectively protect California's coastal resources from significant oil spill impacts. The Commission therefore finds that the CCMP standard of "effective containment and clean up" (Coastal Act § 30232) cannot be met using the oil spill response strategies currently available. The Commission finds that granting the lease suspensions would be inconsistent with the oil spill response requirement of the CCMP (Section 30232 of the Coastal Act). Because such suspensions, if granted, would lead to or result in the construction of new "industrial facilities" that are "coastal-dependent", the granting of the suspensions is presumptively subject to analysis under Section 30260 of the Coastal Act. See Section 3.11 of this staff report, below.

[91] July 11, 2005. Pers. Comm. Addassi, CDFG-OSPR, and Faurot-Daniels, CCC.

### 3.3 PLACING FILL IN COASTAL WATERS

The "fill and dredging" policy of the CCMP (Coastal Act § 30233) states, in relevant part:

> *(a) The diking, filling, or dredging of open coastal waters, wetlands, estuaries, and lakes shall be permitted in accordance with other applicable provisions of this division, where there is no feasible less environmentally damaging alternative, and where feasible mitigation measures have been provided to minimize adverse environmental effects, and shall be limited to the following:*
>
> *(l) New or expanded port, energy, and coastal-dependent industrial facilities...*

CCMP § 30108.2 defines "fill" as "earth or any other substance or material, including pilings placed for the purposes of erecting structures thereon, placed in a submerged area".

***Analysis of Proposed Activities During Suspension***

Activities proposed for the Point Sal and Purisima Point Units include biological and shallow hazards surveys; however, these activities would not result in fill of coastal waters. Mitigation Measure MPS-20 described in the relevant consistency determinations would prohibit offshore anchoring during these activities, and there would be no fill or structures placed in the water.

***Analysis of Proposed Post-Suspension Activities***

Proposed post-suspension activities include drilling two delineation wells, and constructing, operating, and decommissioning three offshore platforms and associated pipelines, cables, and infrastructure. The fill associated with these activities would be located in the following areas[92]:

- Lease 409: Proposed fill includes Platform A, a portion of the four pipelines and an electrical cable running from Platform A to Platform B in the Point Sal Unit, and a portion of an electrical cable running from shore to Platform A. Platform A is proposed to be placed about nine miles offshore in approximately 450 feet of water.

- Point Sal Unit: Proposed fill includes placement of up to eight anchors to operate the MODU for drilling a delineation well, which is expected to produce about 12,250 barrels of drill muds and cuttings. Proposed fill also includes Platform B, to be placed in Lease 422 about nine miles offshore in about 300 feet of water, and four pipelines and three electrical cables running between the platform and shore. Platform B would serve as the central hub of the three proposed platforms in the NSMB Leases. Oil and gas from Platforms A and C would be piped to Platform B and would then be transported to shore via pipeline.

---

[92] As noted above in Section 2.3.3, the MMS submittals include several inconsistencies that suggest development of the NSMB Leases may result in substantially more fill and more impacts. For example, development may require four, rather than three platforms. The review herein, however, is based on three proposed platforms.

- Santa Maria Unit: Proposed fill includes Platform C, a portion of four pipelines and an electrical cable extending from that platform to Platform B in the Point Sal Unit, and a portion of an electrical cable running from shore to Platform C. Platform C would be placed in Lease 431 about seven miles offshore in approximately 300 feet of water.

- Purisima Point Unit: Proposed fill would include placement of up to eight anchors to operate the MODU for drilling a delineation well, which is expected to produce about 12,250 barrels of drill muds and cuttings. Proposed fill would also consist of part of a pipeline and electrical cables crossing the Unit and extending from Platform C in the Santa Maria Unit to Platform B in the Point Sal Unit.

- Lion Rock Unit: The submitted documents propose no placement of fill in the Lion Rock Unit. Oil and gas resources in that Unit would be developed using subsurface drilling from proposed Platform A to be located in Lease 409.

The pipelines included in the descriptions above include the following:

- From Platform A to Platform B: 16" oil emulsion, 10" water, 8" gas. Each pipeline would be approximately six to seven miles long.
- From Platform C to Platform B: same as above, plus 8" service utility. Each pipeline would be approximately six to seven miles long.
- From Platform B to shore: 24" oil emulsion, 12" water return, 10" gas, 8" service utility. Each pipeline would be approximately nine miles long.

Electrical cables are proposed to run in three separate corridors from the shore to each platform. One corridor would be from Platform B to shore, but the MMS submittals do not specify the locations of the other two corridors. At minimum, however, the corridors are assumed to be at least as long as the distance of each platform from shore, which is about nine, nine, and seven miles, respectively.

There may also be fill associated with the onshore portion of the pipelines running from Platform B to the proposed processing facility at Casmalia. The submitted documents state that the corridor route would come onshore at a sandy shoreline near the mouth of Shuman Creek and would go through a one-half mile-wide corridor in Shuman Canyon; however, the submittals do not state what measures would be implemented to either avoid placing fill in coastal waters or wetlands in this area or minimize the effects of such fill.

CCMP § 30233(a) allows the Coastal Commission to authorize a project that includes fill or dredging in open coastal water if it meets three tests. First, the proposed activity must be one of eight types of use described in CCMP §§ 30233(a)(1)-(8). Second, there must be no feasible less environmentally damaging alternative. Third, feasible mitigation measures must be provided to minimize the project's adverse environmental effects.

The three tests are applied as follows:

1) Allowable Use Test: CCMP § 30233(a)(1) allows fill in support of new or expanded energy facilities. The Commission thus finds that the granting of the suspensions meets the allowable use test of CCMP § 30233(a).

2) No Feasible, Less Environmentally Damaging Alternatives: The second test of CCMP § 30233(a) requires an assessment of whether there are feasible, less environmentally damaging alternatives for placing fill in coastal waters. CCMP § 30108 defines "feasible" as "…capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors".

   In its June 23, 2005 letter, the MMS briefly described the likely amounts of fill that would be placed post-suspension. The response stated that that the four proposed new platforms throughout the entire proposed OCS lease suspension area would collectively cover about 3.6 acres of seafloor and that the proposed pipelines and cables would be installed on the seabed and cross 116 miles and 91 miles, respectively, of seafloor. The MMS also stated that jetting, trenching, or burying of pipelines would occur only in very short segments within the surf zone.

   Development of the NSMB oil and gas reserves will require some amount of fill in coastal waters, due to the location of those reserves and their distance from shore. The MMS states in the EID that the maximum drilling reach from a platform would be about four miles.[93] There is no information available to suggest these leases could be developed without placing fill in coastal waters. The Commission therefore finds that there are no feasible, less environmentally damaging alternatives for the placement of fill in coastal waters, thus the granting of the lease suspensions meets the second test of CCMP § 30233(a). The Commission recognizes that future review of proposed EPs or DPPs would include more specific evaluations of whether there are feasible alternative locations for placing fill or ways to reduce the amounts of fill. For example, the MMS's post-suspension scenario assumes three platforms at specific locations; however, during future review of EPs or DPPs, the Commission would consider whether there are feasible and less environmentally damaging alternatives for placing platforms at those three locations and whether there are alternatives to one or more of the platforms.[94]

---

[93] EID, Section 5.2.

[94] Many aspects of post-suspension activities would be more thoroughly evaluated during EP or DPP review. For example, there are clearly potential feasible alternatives that could result in fewer environmental impacts, such as other possible locations for the proposed platforms that might reduce impacts. The MMS submittals also assume that the leases would be developed using conventional welded steel platforms; however, there may be several other feasible alternatives, such as subsea wellheads or similar designs that could reduce the overall amount of fill and its associated adverse effects. Also, the MMS stated that each of the three NSMB platforms would have two electrical cables to provide a redundant power source if one cable failed. It further stated that while it was feasible to have the cables share a single corridor from shore, such a system could result in the electrical system for all three platforms being damaged by a single incident within that corridor. It also stated that using three corridors would result in less overall fill. There was no basis or analysis, however, provided to support

Feasible Mitigation Measures: The third test of CCMP §30233(a) allows filling of coastal waters if feasible mitigation measures are provided to minimize any adverse environmental effects related to the placement of fill in open coastal waters. The measures generally considered in connection with the placement of oil and gas production infrastructure in coastal waters include reducing the amount of fill required, using materials that cause fewer adverse environmental effects, and reducing the time that the fill is in the water. However, similar to the discussion above about the second test, the necessary detailed evaluation of feasible mitigation measures would be done concurrently with the alternatives analysis needed as part of the Commission's future EP or DPP review. There is no evidence in the record to suggest that this third test of section 30233 cannot be satisfied in the context of such reviews. It is premature during this review of the MMS's consistency determinations for granting lease suspensions for the Commission to evaluate consistency with the third test of the fill policy requiring that fill-related impacts be mitigated to the maximum extent feasible.

***Conclusion***

Activities proposed to occur during suspension would not involve fill. For proposed post-suspension activities, the Commission finds that granting the suspensions are consistent with the first and second tests of the CCMP's fill policy (Coastal Act § 30233(a)).

---

these statements. For example, the MMS did not provide any assessment of the effects on the nearshore, shoreline, and upland habitats of having three cable landings rather than one, and did not describe the type of incident that might damage the cables, the risks of such an incident, or mitigation measures that might reduce the risks of such an incident. It further appears from the MMS map showing the proposed platform locations that having three corridors would actually require more miles of cable and more fill than having only one cable corridor from the shoreline to Platform B and then to the other two platforms. Regarding the proposed two pipelines to transport heavy oil from Platform B to the shore, the MMS stated that two pipelines would be needed rather than one due to the nature of the heavy/viscous oil that would be produced from these leases. All these issues would be thoroughly evaluated during an EP or DPP review, along with any limitations imposed either by the characteristics of the lease areas or by technological or regulatory requirements. For example, there are areas of hard bottom within the lease sale area that would likely not be suitable locations for placing platforms or other structures. There are also technological considerations that limit the distance between a production platform and the oil field being developed.

## 3.4 COMMERCIAL FISHING

The marine resource protection policy of the CCMP (Coastal Act § 30230) states:

> *Marine resources shall be maintained, enhanced, and where feasible, restored. Special protection shall be given to areas and species of special biological or economic significance. Uses of the marine environment shall be carried out in a manner that will sustain the biological productivity of coastal waters and that will maintain healthy populations of all species of marine organisms adequate for long-term commercial, recreational, scientific, and educational purposes.*

The commercial fishing policy of the CCMP (Coastal Act § 30234.5) states:

> *The economic, commercial, and recreational importance of fishing activities shall be recognized and protected.*

### *Environmental and Regulatory Setting*

The area in and around the NSMB Leases provides important commercial fishing resources. The Units are located within portions of six California Department of Fish and Game Fish Blocks. These blocks encompass an area of about 600 square miles, and the NSMB Leases cover about 200 square miles within those blocks. Most of the area is designated as Essential Fish Habitat pursuant to the requirements of the federal Sustainable Fisheries Act (P.L.104-297), and much of the area is within designated Rockfish Conservation Areas (RCAs), established to assist in recovery of several groundfish species determined by NOAA to be "overfished".

This area includes a variety of marketable species and is fished using several different methods:

- Purse seining: used primarily for market squid and mackerel.
- Trawling: used for bottom-dwelling fish and shellfish, including flounder, sole, and shrimp.
- Hook and Line/Longline: used for various rockfish and black cod.
- Trap Fishing: used for lobster and crab.
- Drift/Set Gillnetting: used for thresher shark and swordfish (use of set gillnets is prohibited in waters out to the 60 fathom line between Point Reyes and Point Arguello).
- Trolling: used for salmon, albacore, halibut, and bonito.

### *Analysis of Proposed Activities During Suspension*

Activities proposed for the Point Sal and Purisima Point Units include biological and shallow hazards surveys, which could affect commercial fishing activities. The surveys would occur within Fish Blocks 632 and 638. Data provided by the MMS for these two blocks from 1998-2002 show average annual landings were about 52,000 pounds from Block 632 and 838,000 pounds from Block 638, and average annual values were $92,642 and $88,838, respectively.

The surveys would cause two main types of adverse effects – those associated with preclusion of fishing vessels from the survey areas and those associated with the acoustic impacts caused by the shallow hazards survey equipment. The surveys could also result in adverse effects if equipment is lost during the surveys and results in seafloor hazards to fishing gear.

- Preclusion: The surveys are expected to last from 11 to 13 days and would cover about ten square miles of the approximately 164 square miles in Fish Blocks 632 and 638. Survey activities would result in a temporary and minor increase in area vessel traffic and activity that would interfere with any fishing vessels in the immediate vicinity.

  The surveys are proposed to occur between mid-October and mid-December. This period was selected primarily to minimize the risk of impacts to marine mammals; however, it also creates some potential impacts to some of the fisheries – for example, both the shrimp and crab fisheries start about October 1 and extend through the proposed survey period, and the peak drift/set gillnetting fishery is from September through December.

- Shallow Hazards Survey Acoustic Energy/Sound: As discussed in Section 3.1 (Marine Resources and Water Quality), the shallow hazards survey would emit a sound intensity level of up to 218 dB. These levels may result in behavioral changes that cause fish to be less vulnerable to capture, which would cause a short-term impact on commercial fishing.

  There is well-established evidence to demonstrate that fish distribution and feeding behavior can be affected by sound emitted from air gun arrays. This can drive fish away from fishing grounds or reduce their inclination to bite on a baited hook. The Environmental Assessment for the shallow hazards surveys summarizes the studies completed to date that assess effects of high-level sounds on fish. The MMS reports, for example, no changes were observed in the catch rate of prawns before and after a 1991 seismic survey conducted off the southwest coast of Australia. It appears that the acoustic impulse from air guns has relatively little effect on marine invertebrates and shellfish, presumably due to their lack of a swim bladder. Based on these findings, a single air gun would not have an effect on the catchability of prawn/shrimp, lobster, crab, sea urchin, or sea cucumber.

  For those species that have swim bladders, there may be effects on catch-rates due to fleeing the sound source, dispersion, etc. The catchability of rockfish, coastal pelagics, albacore, and salmon could be temporarily affected for a short period. The MMS states that it is difficult to quantify the areal extent of decreased catchability, but that it appears to extend about 6 miles from the center of a seismic survey sound source[95]. The time period, too, is difficult to quantify, but the MMS estimates the acoustic effects from a survey using a single air gun could result in decreased catchability for one to three days. For the proposed survey activities in Fish Blocks 632 and 638, the total anticipated catchability decrease would represent less than 10% of the average annual landings and values in those blocks.

---

[95] EA, p. 4-59.

*Mitigation*

The MMS and Aera have committed to a number of mitigation measures to reduce the adverse effects on commercial fishing activities, including the following:

- At least 90 days before starting the surveys, Aera will submit for the MMS's approval a Fisheries Contingency Plan that includes details of Aera's work with JOFLO and the affected fishing fleets.
- Survey vessels will comply with traffic corridors established by JOFLO.
- Aera will consult with JOFLO to identify and meet with commercial fishing fleets that may want to fish in the area at the time of the surveys. Aera will provide affected fishers and JOFLO with information describing survey timing and locations in writing at least 30 days prior to the surveys and verbally three days prior to the surveys.
- Aera will contact JOFLO prior to vessel arrival at the project area to confirm that fishing fleets are not present or expected at the survey areas.
- The survey areas will be scouted to ensure fishing is not being conducted.
- Aera will file an advisory with the USCG for publication in the Local Notice to Mariners at least 14 days before commencement of survey operations.
- Aera will notify MMS on a daily basis of any conflict or contact with commercial fishermen and the steps taken to resolve any conflicts during and after the surveys.
- Aera will use a scout boat captained by a local, knowledgeable fisherman to avoid conflicts including fixed gear trapping and other OCS users.
- Aera will attend the Western States Petroleum Association's Fisheries' Training Program.
- No more than 60 days after the surveys are completed, Aera will submit a report to MMS describing its success or failure in avoiding or minimizing conflicts with commercial fishing.

The Commission believes that with implementation of the above-described measures, commercial fishing would be protected during survey operations.

***Analysis of Proposed Post-Suspension Activities***

Proposed post-suspension activities include drilling two delineation wells, and constructing, operating, and decommissioning three offshore platforms and associated pipelines, cables, and infrastructure. Commercial fishing would be adversely affected by placement, operation, and decommissioning of these structures, which would increase space-use conflicts and preclusion to greater than existing levels. Delineation drilling would create preclusion areas around the MODU, and discharges associated with the delineation wells could affect commercial species found in the NSMB area. The MMS estimates that placement of four new platforms for development of the 36 leases would create long-term preclusion areas of 6.3 square miles in which drift gillnetting would not be possible. Available fishing grounds would be eliminated within a quarter-mile of each platform. The pipelines and cables could also result in fishing gear being loss or damage due to snagging. Additionally, discharges during oil and gas production could adversely affect the commercial species found in the NSMB area.

These preclusions would cause cumulative effects as well. The total area of fishing preclusion for drift gillnetting within both the Santa Maria Basin and Santa Barbara Channel due to the presence of platforms federal waters is currently 17.6 square miles. If several offshore projects were to overlap in time and space during the peak fishing seasons, additional cumulative impacts to commercial fishing could be significant. Four additional platforms in the Santa Maria Basin and Santa Barbara Channel, along with associated pipelines and power cables, would have ongoing adverse affects to commercial fishing for the next 20 or more years. If the four proposed new platforms are installed and the operating life of the Point Arguello and Cavern Point platforms are extended to develop the 36 OCS leases, the adverse cumulative impacts become more significant (i.e., greater preclusion over a longer period of time).

The MMS describes two mitigation measures to address some of the expected post-suspension impacts. Lease Stipulation #7 (see Exhibit 5), for example, requires all subsea wellheads and pipelines be designed to prevent damage to or from commercial trawling gear. Lease Stipulation #8 requires Aera include a proposed fisheries training program as part of exploration and development plans. These programs are to familiarize project personnel with the value of commercial fishing, its methods, and potential conflicts between oil and gas operations and commercial fishing activities. The MMS acknowledges that other mitigation measures could reduce adverse impacts to the commercial fishing industry but does not describe or commit to implementing any such measures (such as those required by MMS for the shallow hazards survey) that would eliminate or minimize identified impacts.

***Conclusion***

Based on the discussion above, the Commission finds that the proposed activities during suspension would be consistent with the CCMP's commercial fishing policies (Coastal Act §§ 30230 and 30234.5). However, for the reasons stated above related to proposed post-suspension activities, the Commission finds that those activities would adversely affect commercial fishing and therefore finds the project would be inconsistent with those policies. Because such suspensions, if granted, would lead to or result in the construction of new "industrial facilities" that are "coastal-dependent", the granting of the suspensions is presumptively subject to analysis under Section 30260 of the Coastal Act. See Section 3.11 of this staff report, below.

## 3.5 VISUAL AND SCENIC RESOURCES

The visual resource provision of the CCMP's oil and gas development policy (Coastal Act § 30262(a)) states, in relevant part:

> *Oil and gas development shall be permitted ... if the following conditions are met:*
>
> ...
>
> *(3) Environmentally safe and feasible subsea completions are used when drilling platforms or islands would substantially degrade coastal visual qualities unless use of those structures will result in substantially less environmental risks.*

The scenic and visual protection policy of the CCMP (Coastal Act § 30251) states:

> *The scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas, to minimize the alteration of natural land forms, to be visually compatible with the character of surrounding areas, and, where feasible, to restore and enhance visual quality in visually degraded areas. New development in highly scenic areas such as those designated in the California Coastline Preservation and Recreation Plan prepared by the Department of Parks and Recreation and by local government shall be subordinate to the character of its setting.*

***Background***

The coastal areas near the NSMB Leases are recognized for their many scenic qualities. The EID cites the Santa Barbara County Local Coastal Program's description of the area's scenic resources as "outstanding" and states that Point Sal is "one of the most picturesque points in the County"[96]. It further notes that most of the coastal zone north of Point Sal has been federally-designated as a National Natural Landmark, in part due to its relatively pristine nature. The County's North County Siting Study additionally describes the coast route rail line in this area as a scenic corridor[97], and the EID notes that Purisima Point has been identified as one of the most important aesthetic resources in the area[98].

---

[96] EID, p.4.9-1.

[97] North County Siting Study, p. 5.5-3.

[98] EID, p.4.9-3.

The three proposed platforms in the NSMB lease areas would be about seven to nine miles offshore and would be visible from near Pismo Beach in the north to Vandenberg Air Force Base in the south, from several state and local parks along the shoreline between those areas, and from the Amtrak passenger rail line adjacent to the shoreline from Purisima Point south. The area is not heavily developed, though structures within the Air Force Base related to military use are visible along parts of the coast and missile launches from the Base create a short-term but significant visual effect in the area. Platform Irene in the Point Pedernales Unit can be seen from parts of the southern stretches of this shoreline area.

***Analysis of Proposed Post-Suspension Activities***

The proposed activities include use of a MODU for delineation drilling in the Point Sal and Purisima Point Units, and construction, operation, and decommissioning of at least three new offshore oil and gas platforms, along with pipelines, cables, and associated infrastructure necessary to support oil and gas development. The proposal would additionally result in several hundred trips per year of vessel and helicopter traffic between the shore and the platforms. The platforms are expected to be in place until about 2030.

The proposed MODU would be sited at two locations, both over five miles from shore, for about 68 days at each location. The consistency determinations for the Point Sal and Purisima Point Units state that these drilling activities would create moderate to high levels of visual effects due to vessel and crew traffic[99]. The DEIR examined potential mitigation measures and found that performing the drilling during non-peak public use periods (e.g., during other than the summer season) would reduce the level of impact; however, the visual protection policies of the CCMP are operative at all times of the year, not just during "peak public use periods." At this distance from shore, the MODU would create a temporary industrial visual effect and thus severely degrade the exceptional scenic values of this section of the coast.

For the proposed new platforms, the NSMB Unit consistency determinations state that they would result in "a high-level, unmitigated, cumulative effect because of the incremental increase of industrial structures offshore and the inability to reduce the physical intrusions into high quality coastal vistas"[100]. They further state both that the visual effects on coastal communities would be moderate and incremental and that development and production would create high visual effects. Overall, the MMS submittals describe moderate to high and unmitigated effects on scenic resources, but do not identify feasible alternatives or mitigation measures that may be available to protect scenic qualities or to make the development visually compatible with the surrounding area.

---

[99] CD for Point Sal Unit, p. 37; CD for Purisima Point Unit, p. 37.

[100] See Consistency Determination for Granting a Suspension of Production for Aera Energy LLC's Point Sal Unit, P. 36. April 2005.

In its April 22, 2005 letter, Coastal Commission staff requested that the MMS provide additional information about the visual characteristics of the proposed platforms and their likely adverse effects, including an evaluation of feasible mitigation measures and alternatives that could reduce visual impacts. In that same letter, staff requested similar information about feasible alternatives and mitigation measures to determine whether activities resulting from the granting of the suspensions would be consistent with the CCMP's fill policy (as described in Section 3.3 – Fill in Coastal Waters). These types of measures generally include consideration of alternative locations, subsea completions, and alternative designs that would reduce impacts to coastal resources. This type of information is necessary during this consistency review for the Commission to determine whether the proposed suspension-related activities would protect the visual and scenic qualities of the coast and would be consistent with both CCMP § 30262(a)(3) and § 30251. This is particularly important in this area, which, as noted above, has been recognized as a high quality scenic resource.

Overall, the MMS response was largely nonresponsive to Commission staff's requests. Absent the needed information, the Commission is unable to determine the specific visual effects associated with the proposed suspension-related activities. CCMP § 30262(a)(3) requires that when drilling platforms would substantially degrade coastal visual qualities, environmentally safe and feasible subsea completions be used unless they would create increased environmental risk. "Subsea completions" include relatively low-profile wellheads and other production and transport equipment that are placed on the ocean floor and do not rise to the water surface. Because the MMS stated in its consistency determinations that review under § 30262 should be largely deferred until consideration of an EP or DPP, and because it did not provide the requested information about feasible alternatives (such as subsea completions), the Commission is unable to determine whether there are feasible alternatives to any or all of the proposed platforms that would reduce or eliminate their visual impacts. As a result, the Commission does not have adequate information to determine conformity with either CCMP § 30262(a)(3) or § 30251. Without the information needed to determine consistency with § 30262(a)(3), the Commission does not know what aspects, if any, of the proposed activities would need to be reviewed for consistency with CCMP § 30251.

***Conclusion***

For the reasons stated above, the Commission finds that it lacks information necessary to determine whether the proposed post-suspension activities would be consistent with the CCMP's policies relating to visual resources (Coastal Act §§ 30262(a)(3) and 30251).

## 3.6 Public Access and Recreation

The public access and recreation policies of the CCMP (Coastal Act) include:

CCMP § 30210:

> *In carrying out the requirement of Section4 of Article X of the California Constitution, maximum access, which shall be conspicuously posted, and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse.*

CCMP § 30211:

> *Development shall not interfere with the public's right of access to the sea where acquired through use or legislative authorization, including, but not limited to, the use of dry sand and rocky coastal beaches to the first line of terrestrial vegetation.*

CCMP § 30220:

> *Coastal areas suited for water-oriented recreational activities that cannot readily be provided at inland water areas shall be protected for such uses.*

CCMP § 30234.5

> *The economic, commercial, and recreational importance of fishing activities shall be recognized and protected.*

### *Background*

Public access to the shoreline and recreation play important roles in both San Luis Obispo and Santa Barbara Counties. Both counties receive hundreds of thousands of visitors each year and tourism and tourist-related activities provide significant revenues for both.

The coastline along the northern part of the NSMB Leases is a popular recreational area. The area around Pismo Beach, the Oceano Dunes, and the Nipomo Dunes receive tens of thousands of visitors each year. The coastline closest to the central and southern portion of the NSMB Leases provides important but more limited public access opportunities. There are five main public access points along the shoreline nearest the NSMB Leases, between the Santa Maria River and Point Arguello:

- Guadalupe Dunes: is just south of the mouth of the Santa Maria River. It includes a day-use area with barbecues, bike and equestrian trails, the informational Dunes Center, and is a popular fishing area.

- Point Sal State Beach: provides relatively secluded access to about a one-mile stretch of beach, and is popular for fishing.

- Vandenberg Air Force Base Fishing Access: provides access along up to an eight-mile stretch of coastline between Purisima Point to from the month of the Santa Ynez River. Access is by a pass system and is limited to up to 50 people per day on weekends and holidays only.

- Ocean Beach County Park: a 28-acre park at the mouth of the Santa Ynez River, it includes a day use area with barbecues, picnic tables, a playground, and other amenities, and is a popular fishing area.

- Vandenberg Air Force Base Beach Access: provides access up to about 1 ½ miles north of Ocean Beach County Park and about 3 ½ miles south. It is popular for fishing.

***Analysis of Activities Proposed During Suspension***

Activities proposed for the Point Sal and Purisima Point Units include biological and shallow hazards surveys. These surveys are expected to take approximately 11-14 days and would require the use of vessels. The proposed surveys would be located about five miles offshore and would not directly affect public access. They would occur in areas that may be used for recreational fishing. In addition, sound from the survey could be heard underwater by recreational divers. However, impacts are likely to be low due to several mitigation measures. Many of the mitigation measures provided by the MMS or by Aera to minimize conflicts with commercial fishing would be effective in reducing conflicts with recreational fishing as well. Aera would notify the USCG and JOFLO of the survey schedule and would distribute and post notices at area fuel docks, ice supply house, and wholesale fish buyers. Additionally, the marine mammal observers on the survey vessel would also look for nearby boats, including dive boats, which would be alerted to the survey activities.

***Analysis of Proposed Post-Suspension Activities***

Proposed post-suspension activities include drilling two delineation wells, and constructing, operating, and decommissioning three offshore platforms and associated pipelines, cables, and infrastructure. The pipelines and cables would come ashore just to the south of Point Sal and at two unspecified locations. Decommissioning is anticipated sometime after 2030.

Impacts to public access and recreation during delineation drilling would be involve degradation of the recreational experience due to the presence of the MODU and support vessels, including crew boats, supply boats, and barges during the two 68-day drilling periods. The survey locations would be about five miles offshore, and would also create preclusion for recreational fishing near the MODU during those times.

Project construction would affect access to the shoreline and recreation in several ways. Activities during construction, such as pipeline and cable placement would create noise, dust, increase vehicular traffic, and other similar effects along the shoreline. The main landing point for pipelines and cables would be within an area about one-half mile wide between Point Sal and the mouth of Shuman Creek, and public access to this area would be adversely affected during construction. Additionally, many of the construction workers are expected to live in local campgrounds for some part of the construction period, thus limiting available space for other visitors.

During production, the new platforms would be visible from several shoreline access points, including popular areas, such as the Oceano and Nipomo Dunes, as well as less popular areas with limited access, such as the Vandenberg fishing access point. These areas would also be subject to an estimated two to ten helicopter flights per day. These less popular areas are prized in part for their relatively pristine setting; therefore, the experience of coastal visitors seeking that setting would likely be degraded. Recreational fishing would also be affected during production, due to preclusion and space-use conflicts at and near the platforms and pipelines. Decommissioning activities and their effects on access and recreation would likely be similar to those occurring during construction.

***Conclusion***

For the reasons stated above, the Commission finds that the activities proposed during suspension would conform to the CCMP's public access and recreation provisions (Coastal Act §§ 30210, 30211, 30220, and 30234.5). However, based on the discussion above, the Commission finds that the proposed post-suspension activities would adversely affect public access and coastal recreational opportunities in a manner inconsistent with those CCMP policies. Because such suspensions, if granted, would lead to or result in the construction of new "industrial facilities" that are "coastal-dependent", the granting of the suspensions is presumptively subject to analysis under Coastal Act § 30260. See Section 3.11 of this report, below.

### 3.7 ENVIRONMENTALLY SENSITIVE HABITAT AREAS

The environmentally sensitive habitat area policy of the CCMP (Coastal Act § 30240) states:

> *(a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas.*
>
> *(b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas.*

***Characteristics of Environmentally Sensitive Habitat Areas (ESHA) Potentially Affected by NSMB Development***

Upland areas potentially affected by development of the NSMB Leases include an extensive stretch of coastline designated or recognized for its habitat values and other high quality coastal resources, including several streams, wetlands, and estuaries. Most of these areas include shoreline and nearshore resources and were described in Section 3.1 (Marine Biological Resources and Water Quality) or in Exhibit 4.

In addition to the descriptions and species in those sections, the following are key habitats and species dependent on ESHA in the area:

- Western snowy plover: The plover is listed as threatened under the federal Endangered Species Act and as a California state-listed species of concern. The plover is known to nest along the shoreline adjacent to the NSMB Leases. Its preferred nesting habitat is in relatively open sandy beach areas.

  In February 2005, the Commission recognized the importance of the plover habitat provided in this area in its concurrence with a five-year beach management plan (CD-094-04) at Vandenberg Air Force Base. That plan established several measures meant to protect plover habitat during nesting season. Among the Commission's conclusions in that concurrence were findings that the beaches used by the plover along Vandenberg's shoreline were ESHAs, and that these areas were necessary for survival and recovery of the plover.

- Tidewater goby: This species, federally listed as endangered, is known to exist in San Antonio Creek. Its historic range included estuaries and the lower reaches of coastal streams along most of the California coast; today, however, it is believed to exist in only about half its former range.