- Southern steelhead trout: This species is federally listed as endangered. Three streams in the area are considered critical habitat – San Antonio Creek and the Santa Maria and Santa Ynez Rivers. The steelhead could be affected by project-related activities either during its time in the ocean or when it is in the lower reaches of these coastal streams.

Some of the key areas designated or recognized as ESHA include:

- Guadalupe and Nipomo Dunes Preserve: This preserve covers 18 miles of shoreline and upland habitat between Pismo Dunes State Vehicle Recreation Area in San Luis Obispo County and Point Sal State Beach in northern Santa Barbara County. It was established to protect the endangered California least tern and the threatened Western snowy plover, although it provides habitat for over 200 bird species. It is also home to the California red-legged frog, the California tiger salamander, the Morro blue butterfly, the shoulder band dune snail, and 18 rare or endangered plant species.

- Point Sal Reserve: This reserve was established in recognition of its significant geological formations and its botanical and wildlife resources. The area supports an unusual assemblage of vegetation species and fourteen distinct plant communities, including several rare and endemic species. Because the area has had relatively little disturbance compared to surrounding areas, many of these plant communities are relatively intact. The area includes abundant populations of marine birds that nest on the shoreside cliffs, and its upland and wetland areas provides habitat for a number of raptors, including peregrine falcons and black shouldered kites, as well as three regionally rare sparrow species.

- Shuman Canyon: Shuman Canyon runs inland from just south of Point Sal. The coastal zone in this area includes about the first mile landward from the shoreline. Shuman Creek flows through the canyon and is known to provide habitat for several endangered, threatened, or sensitive species, including the California red-legged frog and the tidewater goby. Shuman Creek ends in a coastal dune-creek estuary, a relatively rare form of coastal habitat generally characterized by year-round brackish water, due to the interaction of seawater with the freshwater that emerges from beneath the dune systems. Additionally, Shuman Canyon is known to have archaeological resources dating back at least 9000 years.

  The North County Siting Study, completed by Santa Barbara County in 2000, identified a corridor through Shuman Canyon as a preferred route for any pipelines coming ashore from the NSMB Leases and going to the proposed Casmalia processing site. The study recommended that landfall be in a half-mile-wide area south of the rocky shoreline associated with Point Sal and north of the mouth of Shuman Creek, and that the corridor maintain a separation between the pipelines and Shuman Creek. The EID states that the southern boundary of the proposed corridor would run along the Point Sal Road and would maintain separation with the creek.

- Coastal streams, wetlands, and estuaries: In addition to Shuman Creek, there are a number of other riparian, wetland, and estuarine areas in the coastline between Pismo Beach and Surf. Among them are the Santa Maria River, San Antonio Creek, Honda Creek, the Santa Ynez River, and several unnamed coastal drainages, ponds, and wetlands. Even the smaller waterways provide important habitat – for example, San Antonio Creek is home to the federally-endangered Unarmored Three-Spine Stickleback, and the coastal dune ponds in this area are considered critical habitat for the federally-threatened California red-legged frog.

Insufficient information regarding species populations: In its letter of April 22, 2005, Commission staff noted that many of the data in the MMS submittals used to describe various species populations appeared to be out of date. Staff requested that the MMS incorporate more recent data into its analyses to more accurately reflect how likely project-related impacts could affect the various species. For example, the most recent population figures in the MMS analyses for the Western snowy plover were from 2000, and do not reflect current trends in its population or the most recent generally available population data. As mentioned previously, the Commission concurred earlier this year with a plover protection plan at Vandenberg Air Force Base (#CD-094-04), which used population figures from up to 2004. The analyses in the Commission's findings show trends and more detailed conclusions about the local plover population that are not evident in the MMS's limited review that ends in 2000. The EID also describes generally that a number of sensitive and listed upland species in the project area, but many of its cited references are at least ten years old, from 1985, 1986, and 1994[101]. If current or more recent survey information shows higher or lower populations of the various sensitive species in the area, project-related activities could adversely affect a higher or lower percentage of the overall population of any given species, which could result in an entirely different assessment of project-related impacts. The MMS responded to the request by stating generally that up-to-date information would be provided during any future EP or DPP review.

For several of the sensitive species described in the MMS submittals, there are more recent and easily obtainable population figures (e.g., the Western snowy plover, as noted above). These updated surveys often include descriptions of what measures may have been related to population increases or what adverse effects have led to population decreases, which would likely be useful in the MMS's impact assessments. Without the MMS applying this more recent and obtainable information to its proposed suspension activities, the Commission does not have adequate information to determine the likely effects of granting the suspensions on species dependent on these sensitive habitat areas.

***Analysis of Proposed Activities During Suspension***

No activities would occur directly in environmentally sensitive habitat areas during suspension; however, any helicopter flights used to support the offshore surveys could disrupt the habitat values associated with those areas. This potential impact is described in more detail below.

---

[101] EID, see Sections 4.7 & 5.7.

***Analysis of Proposed Post-Suspension Activities***

The main proposed post-suspension activities include drilling two delineation wells, and constructing, operating, and decommissioning three offshore platforms along with associated pipelines, cables, and infrastructure. The potential impacts associated with these activities are discussed below.

Construction, operation, and decommissioning of onshore structures: The proposed development of the NSMB Leases includes placing pipelines and cables through a corridor in Shuman Canyon to a proposed onshore processing facility at Casmalia East, about seven miles inland. Approximately the first mile of this corridor would be in the coastal zone. The corridor would include pipelines for oil, gas, and return water, along with electrical cables.

Based on similar pipeline construction methods used elsewhere in Santa Barbara County, the MMS estimates that the pipeline would be constructed within a 100-foot wide corridor in the Shuman Canyon area. The recommendation for this Shuman Canyon pipeline corridor in the Santa Barbara County's North County Siting Study was based in part on selecting sites that would be relatively unconstrained for supporting oil and gas-related development and on maintaining a separation between the pipelines and the riparian resources associated with Shuman Creek.

The MMS submittals state that the corridor would maintain separation with the creek, but do not provide any further description of the pipeline route within this proposed corridor. Additionally, while the consistency determinations describe mitigation measures that have been implemented elsewhere in the past – e.g., reducing the construction corridor to 50 feet wide in areas of sensitive dune habitat – the MMS does not commit to implement those measures. However, based on the selection of this corridor in the North County Siting Study and information available about this area showing that a feasible pipeline route could be chosen that avoids sensitive resources, this aspect of granting the suspensions is not likely to adversely affect environmentally sensitive habitat areas. Further, both the Commission and the County would have the ability through future review to ensure the selected route conforms to Coastal Act and Local Coastal Program requirements to avoid and mitigate any potential impacts.

The MMS description also includes separate corridors for electrical cables to Platforms A and C. The MMS submittals do not describe the proposed locations of these corridors, the types of habitats they may affect, or mitigation measures that may be required. In its letter of April 22, 2005, Commission staff requested information about these corridors to determine whether it would be feasible to route all the cables through a single corridor. The MMS response stated that three corridors were proposed to reduce the potential that all the electrical cables could be damaged by a single incident. However, the response did not provide any information about the proposed corridor locations. While there is adequate information about the proposed Shuman Canyon corridor for purposes of this review, the Commission does not have adequate information about this aspect of the proposed development, since there are no specific locations proposed for these additional cable corridors. Absent that information, the Commission cannot determine if the corridors would adversely affect environmentally sensitive habitat areas.

Increased air traffic: Development of the NSMB Leases would involve a substantial increase in air traffic over the area, which is likely to adversely affect upland species dependent on the local environmentally sensitive habitat areas. The adverse effects could include disturbances to behavior, such as disruption of breeding, nesting, feeding, and other activities and life stages.

As noted previously in Section 3.1 (Marine Biological Resources and Water Quality), the MMS submittals state that from 2006 to 2030 there would be from about two to ten flights per day in the NSMB Unit area. Flight paths to the three proposed NSMB platforms from either the Santa Maria or Santa Barbara airports would go over environmentally sensitive habitat areas that are currently not subject to this level of overflight and could cause disruption of associated habitat values. The MMS submittals do not specify the likely flight paths, but describe the likely level of disturbance as "negligible to low". Only two of the measures mentioned in the EID as available to minimize adverse effects of helicopter flights are regulatory requirements – the National Marine Fisheries Service requires minimum flight levels of 1,000 feet over marine mammals, and there is a similar 1,000-foot minimum flight level over seabird colonies at Vandenberg Air Force Base. The rest are recommendations or policies – e.g., the Federal Aviation Administration's encouragement to pilots to maintain higher than minimum flight levels over noise-sensitive areas, company policies to fly at least 1,000 over undeveloped areas, etc. – and the MMS does not commit to implement those measures.

In its April 22, 2005 letter, Commission staff requested from the MMS additional information and further explanation regarding the effects of helicopter flights on affected sensitive species and about the MMS determination that the effects would not be substantial. Staff also asked MMS to describe what feasible mitigation measures would be implemented to avoid or minimize the associated impacts. The MMS response stated that these issues would be more specifically addressed during review of an EP or DPP. It also stated that there was no anticipated increased disturbance due to these flights because, while the number of flights would increase, the helicopters would use the same airports and flight paths as are currently being used and would be subject to existing flight restrictions. It did not describe what feasible mitigation measures would be required.

The MMS response does not appear to accurately characterize the likely impacts associated with these flights. As the three proposed NSMB Unit platforms are in an area 10 to 20 miles north of the nearest existing platform, it is not plausible that the flight paths used to serve the new platforms would be the same as existing flight paths. The most direct flight paths, for example, from the Santa Maria Airport to the two northernmost NSMB platforms would be over sensitive habitat areas of the Nipomo-Guadalupe Dunes and other areas used by birds for breeding and nesting. Further, absent an evaluation of feasible mitigation measures and a commitment to require them, neither the initial MMS submittals nor its response adequately address the requirements of CCMP § 30240 that environmentally sensitive habitat areas be protected against significant disruption of habitat values and that development be compatible with continuance of those values. For example, while the MMS submittals describe the 1,000-foot buffer over seabird colonies on Vandenberg Air Force Base, they do not commit to implement that type of apparently feasible mitigation measure over other sensitive areas that would be subject to these

flights. Therefore, while it is generally possible for helicopter flights to be implemented in a manner that avoids or minimizes impacts – for example, by selecting flight paths away from sensitive bird habitat, enforcing a minimum flight level, etc. – it is not clear from the information provided whether there are flight paths available that would completely avoid impacts to sensitive shorebird areas or whether there are measures that would mitigate potential impacts.

***Conclusion***

Based on the discussion above, the Commission has determined there is a lack of adequate information to determine whether the proposal would be consistent with CCMP's policy on environmentally sensitive habitat areas (Coastal Act § 30240).

## 3.8 SEISMIC AND GEOLOGIC HAZARDS

The CCMP's hazards policies (in Coastal Act § 30253 and § 30262) state, in relevant part:

CCMP § 30253:

> *New development shall:*
>
> *(1) Minimize risks to life and property in areas of high geologic, flood, and fire hazard.*
>
> *(2) Assure stability and structural integrity, and neither create nor contribute significantly to erosion, geologic instability, or destruction of the site or surrounding area or in any way require the construction of protective devices that would substantially alter natural landforms along bluffs and cliffs...*

CCMP § 30262:

> *Oil and gas development shall be permitted ... if the following conditions are met:*
>
> *(a) The development is performed safely and consistently with the geologic conditions of the well site. ...*
>
> *(e) Such development will not cause or contribute to subsidence hazards unless it is determined that adequate measures will be undertaken to prevent damage from such subsidence.*
>
> *(f)... Where appropriate, monitoring programs to record land surface and near-shore ocean floor movements shall be initiated in locations of new large-scale fluid extraction on land or near shore before operations begin and shall continue until surface conditions have stabilized. Costs of monitoring and mitigation programs shall be borne by liquid and gas extraction operators.*

### *Background*

The NSMB Leases are located in a region subject to several geologic hazards, including those related to seismic events, tsunamis, and subsidence. Several dozen nearby onshore and offshore faults are classified as either active or potentially active and could affect oil and gas development in the area. During the past several hundred years, the area has experienced several earthquakes of over 6 on the Richter Scale. The nearby coastline has also experienced a number of tsunamis, which are generally caused by large underwater events such as seismic activity, slides, or slumps. Tsunamis are usually not apparent in deep water, and gain size and destructive power only when they approach the shoreline. Large tsunamis are rare along the California coast, but could cause severe damage to structures in the shoreline area. Subsidence, or lowering of the

earth's surface due to removal of material underneath, is a more common concern in onshore areas, and is caused by seismic events or by removing oil and gas deposits from beneath an area. The latter cause can sometimes be controlled by re-injecting fluids into the reservoir.

The upland areas where proposed post-suspension activities would involve placing pipelines and cables, include several areas with geologic hazards. According to the Santa Barbara County North County Siting Study, most of the immediate shoreline area would be subject to tsunami runup and many of the areas along the beach and near Shuman Creek would be subject to liquefaction. The final corridors selected for the pipelines and cables could also be constrained in some areas by nearby steep slopes that could be subject to failure.

***Analysis of Proposed Post-Suspension Activities***

The proposed post-suspension activities would include construction, operation, and decommissioning of numerous structures that would be subject to geologic hazards. The offshore structures could be subject to any of the hazards mentioned above, and the proposed pipeline and cable route from the shoreline to Casmalia could cross areas of potential tsunami runup, liquefaction, and slope failure. All of these structures would need to be sited and designed in a manner that assures stability and structural integrity and would not cause or contribute to hazards.

The MMS requires that the final design of platforms and pipelines meet design parameters established to allow the structures to withstand the maximum credible seismic or seismic-related hazard predicted for the area. In Lease Stipulation #3 (see Exhibit 5), the MMS prohibits exploratory drilling operations or placement of structures (e.g., platforms, wellheads, pipelines, and others) until the lessee has demonstrated to the satisfaction of the MMS that those activities are safely designed to prevent environmental harm in areas that may be subject to mass movement, seismic activity, or other unstable conditions on the seafloor. The stipulation also requires the mapping of fault zones and unstable areas of the seafloor before construction of platforms or wellheads. Additionally, at this time, there is no evidence about geologic hazards in the area that would prevent design, siting, construction, and operation of the necessary "state of the art" facilities. While there are no existing platforms this far north in OCS waters with which to compare potential effects, the Commission determined its previous review of proposed Platform Julius (#CC-49-86, November 1986) that there were no major hazards that would preclude safe development. During any future EP or DPP reviews, the Commission would determine whether the proposed design is reasonably safe from potential geologic hazards. Therefore, the evidence before the Commission at this time suggests that the proposed infrastructure can be designed to operate safely in the event of geologic hazards.

***Conclusion***

Based on the discussion above, the Commission believes that the proposed post-suspension activities would be carried out in a manner that assures stability and structural integrity of the development and will not cause or contribute to geologic hazards. The Commission therefore finds that the proposed activities would be consistent with the CCMP's geologic hazard provisions (Coastal Act §§ 30253 and 30262).

## 3.9 ARCHAEOLOGICAL RESOURCES

The cultural resources policy of the CCMP (Coastal Act § 30244) states:

> *Where development would adversely impact archaeological or paleontological resources as identified by the State Historic Preservation Officer, reasonable mitigation measures shall be required.*

### *Background*

There are several distinct types of archaeological and paleontological resources known or expected in the area of the NSMB. The Units themselves are located over areas of prehistoric shoreline, portions of which may include remnant archaeological resources. Additionally, this section of the coast is known to have numerous shipwrecks, many at known locations, but a number of which have not yet been found and could be located during lease-related activities.

Onshore, some areas of this stretch of coastline are known to be archaeologically rich. According to Santa Barbara County's North County Siting Study, Vandenberg Air Force Base and Point Sal are considered to have the highest density of archaeological sites along the California mainland coast. The Shuman Canyon area is known to have archaeological resources that go back at least 9000 years.

### *Analysis of Proposed Activities During Suspension*

Activities proposed for the Point Sal and Purisima Point Units include biological and shallow hazards surveys. Because the MMS prohibits vessels from anchoring during these surveys, they are not likely to adversely effect archaeological or paleontological resources during these activities. The shallow hazards surveys are intended in part to locate historic and archaeological resources, such as shipwrecks, so they can be avoided during subsequent development of the lease area.

### *Analysis of Proposed Post-Suspension Activities*

Offshore: Activities proposed to occur offshore include placing platforms, pipelines, cables, and other project-related infrastructure. These project components would be sited using the results of the shallow hazards surveys to avoid disturbing known or suspected archaeological resources. The MMS would require through Lease Stipulation #2 (see Exhibit 5) that Aera conduct remote sensing surveys prior to any drilling activity or construction on the lease to determine whether historical or archaeological resources are present. If such resources are located, the stipulation additionally requires that Aera site its operations to not adversely affect known archaeological resources and that the survey results be reported to the MMS. The surveys are therefore meant to avoid direct impacts to archaeological resources. Their results may also be used to develop mitigation measures, if needed.

Onshore: Proposed post-suspension activities include constructing and operating a pipeline and associated facilities in the Shuman Canyon area. The EID notes that the proposed pipeline corridor contains several prehistoric and historic sites. It also notes that Native American representatives have expressed concerns about potential direct and indirect effects due to the loss of traditional resources during pipeline construction and operation, and states that while the use of these traditional resources has not been evaluated, the effects of their loss could be moderate to high if they are present and unavailable for use for some period of time.

The MMS did not identify reasonable mitigation measures that would protect nearby resources. Commission staff requested in its letter of April 22, 2005 that the MMS explain its "duration-based" criterion used to determine the degree of impact these resources might experience. Staff also requested the MMS reassess the potential effects of project-related activities on these resources based on more suitable criteria, such as those based on the degree of disturbance, proximity of activities to the resources, and other similar criteria more in line with National Register guidelines, which are referenced, but not used, in the EID. The MMS responded by stating that specific details and further analyses would be provided by Aera as part of submittal of EPs or DPPs.

Based on the characteristics of the area and the number of options available for possible pipeline routes, it does not appear infeasible for the MMS to mitigate all or some of the potential impacts to archaeological resources. However, because the MMS did not adequately respond to the information request and did not provide an assessment of feasible mitigation measures, the Commission does not have the information necessary to determine conformity of the suspension-related activities with CCMP § 30253.

***Conclusion***

The activities proposed during suspension would not affect archaeological resources. However, based on the discussion above regarding proposed post-suspension activities, the Commission finds it does not have adequate information to determine whether the proposal would be consistent with the CCMP's policy on archaeological resources (Coastal Act § 30244).

## 3.10 AIR QUALITY

The air quality policy of the CCMP (Coastal Act § 30253(3)) states:

> *New development shall:*
>
> *...(3) Be consistent with requirements imposed by an air pollution control district or the State Air Resources Control Board as to each particular development...*

### *Environmental and Regulatory Background*

The NSMB Leases are offshore of the South Central Coast Air Basin, which includes both Santa Barbara and San Luis Obispo Counties. The Federal government has established ambient air quality standards to protect public health (primary standards) and secondary standards to protect public welfare. The 1990 Clean Air Act Amendments (Section 328) transferred to the U.S. EPA authority for air quality on the OCS. Federal 1992 regulations require OCS sources to comply with applicable onshore air quality rules in the corresponding onshore area. The EPA has delegated authority to the Santa Barbara County Air Pollution Control District and to the San Luis Obispo County Air Pollution Control District to implement and enforce the federal air requirements of 40 CFR Part 55.

The State of California has established separate, more stringent ambient air quality standards to protect human health and welfare. National and California standards have been established for ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, suspended particulate matter 10 microns ($PM_{10}$), suspended particulate matter ($PM_{2.5}$) and lead. In addition, California has standards for sulfates, hydrogen sulfide, vinyl chloride, and visibility reducing particles. Santa Barbara County is in attainment of all the National Ambient Air Quality Standards, including the 1-hour ozone standard; however, the County is considered a non-attainment area for both the California ozone and 24-hour $PM_{10}$ air quality standards. San Luis Obispo County is in attainment of all national standards and the state ozone standard but is in non-attainment of the state $PM_{10}$ standards.

### *Analysis of Proposed Activities During Suspension*

Activities proposed for the Point Sal and Purisima Point Units include biological and shallow hazards surveys. These surveys are expected to take approximately 11-14 days and would require the use of vessels. Emissions resulting from the surveys may increase concentrations of pollutants onshore. The primary pollutants of concern are nitrogen oxides ($NO_x$), and reactive organic compounds (ROC). Both $NO_x$ and ROC are precursors to ozone formation. $NO_x$ is the major pollutant of concern due to the use of stationary and propulsion equipment used by the survey vessel.

MMS studied the impacts of Aera's projected offshore emissions from the survey vessels' engines using the Offshore and Coastal Dispersion (OCD) model. The OCD model computes both short-term (1-hour, 3-hour, 8-hour, and 24-hour average) and annual averaged pollutant concentrations. The MMS used the model to predict the concentrations of nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), and fine particulates ($PM_{10}$) that could affect onshore areas due to survey activities. It concludes in the Environmental Assessment prepared for the shallow hazards survey that increases in the onshore average concentrations of $NO_2$, $SO_2$ and $PM_{10}$ would be well below the maximum increases allowed under Federal, State and local ambient standards.

To reduce and minimize impacts to air quality, the MMS would require Aera to:

- Prepare and submit to the MMS Emissions Reporting Plans that detail anticipated and actual vessels and internal combustion engines to be used, and their duration of use, fuel consumed and calculated emissions; and,
- Use fuel with less than 0.2% sulfur by weight when operating within waters adjacent to Santa Barbara County.

No air district permits are required for the shallow hazards survey. A permit would be required of the survey vessel is either permanently or temporarily attached to the seabed and used for the purpose of exploring, developing or producing resources; or, physically attached to an OCS facility, in which case only the stationary aspects of the vessels are regulated. Since there are no existing "OCS sources" attached to the NSMB Leases and the vessel is not attached to the seabed, no air permit is required for the survey.

***Analysis of Proposed Post-Suspension Activities***

Air emissions expected from developing the NSMB Leases would come from a variety of sources including the MODU for the delineation wells, well drilling, platform, pipeline and power construction, oil production, and support activities (e.g., crew and supply helicopters and vessels). There would be onshore emissions associated with the construction and operation of a processing facility, including both processing and transport of oil and gas products.

The MODU delineation well drilling may require air permits if the annual emissions are greater than 25 tons/year. Equipment that is not part of the drilling phase (marine vessel emissions and various ROC sources) would require a Permit to Operate, and emission sources subject to the permit must meet Best Available Control Technology (BACT) and emission offset requirements to ensure a net air quality benefit. Air permits would be required for any new platforms.

***Conclusion***

Based on the discussion above, the Commission finds that activities proposed during both the suspension and post-suspension phases of the project would be implemented consistent with the rules and requirements of the local air districts and are therefore consistent with the air quality policy of the CCMP (Coastal Act § 30253(3)).

### 3.11 COASTAL-DEPENDENT INDUSTRIAL DEVELOPMENT

The "coastal-dependent" industrial development policy of the CCMP (Coastal Act § 30260) states:

> *Coastal-dependent industrial facilities shall be encouraged to locate or expand within existing sites and shall be permitted reasonable long-term growth where consistent with this division. However, where new or expanded coastal-dependent industrial facilities cannot feasibly be accommodated consistent with other policies of this division, they may nonetheless be permitted in accordance with this section and Sections 30261 and 30262 if (1) alternative locations are infeasible or more environmentally damaging; (2) to do otherwise would adversely affect the public welfare; and (3) adverse environmental effects are mitigated to the maximum extent feasible.*

CCMP § 30101 defines a coastal-dependent development or use as that which "requires a site on or adjacent to the sea to be able to function at all." Ports, commercial fishing facilities, and offshore oil and gas platforms are coastal-dependent development types that the Coastal Act gives priority over other types of development on or near the shoreline. CCMP § 30001.2 finds that notwithstanding the environmental effects of offshore petroleum and gas development, the location of such developments in the coastal zone may be necessary. Consequently, CCMP § 30260 provides for special consideration of coastal-dependent industrial facilities that may otherwise be found inconsistent with the Coastal Act's Chapter 3 policies. This section is relevant to the Commission's review of suspensions of OCS oil and gas leases because such suspensions, if granted, would lead to construction of new "industrial facilities" that are "coastal-dependent". The hypothetical post-suspension development scenario reviewed in this report involves the construction and operation of "coastal-dependent industrial facilities", including three new offshore oil and gas platforms and much of their associated infrastructure.

Such coastal-dependent proposals must be evaluated under all applicable policies and standards contained in Chapter 3. If granting the suspensions is inconsistent with any Chapter 3 policy, Section 30260 provides for its approval , notwithstanding its inconsistencies with other policies. As determined previously in these findings, the Commission has determined that granting the suspensions is inconsistent with several policies of the CCMP, including those related to oil spill prevention and response (Coastal Act § 30232), commercial fishing (Coastal Act §§ 30230 and 30234.5), and public access and recreation (Coastal Act §§ 30210, 30211, 30220, and 30234.5). Because the suspensions would result in "coastal-dependent industrial facilities", the Commission may apply Coastal Act § 30260 to "override" those inconsistencies and nonetheless approve the project if the three requirements of § 30260 can be met: first, that alternative locations are infeasible or more environmentally damaging; next, that to do otherwise would adversely affect the public welfare; and third, that adverse environmental effects are mitigated to the maximum extent feasible. However, for these consistency determinations, the Commission cannot fully apply any of these three tests due to the lack of necessary information as identified above related to marine resources and water quality (Coastal Act §§ 30230 and 30231), visual and scenic resources (Coastal Act §§ 30251 and 30262(a)(3)), environmentally sensitive habitat areas (Coastal Act § 30240), and archaeological resources (Coastal Act § 30244). In addition to the lack of information regarding

these policies, the Commission has determined that there is insufficient information about the risk of oil spills (pursuant to Coastal Act § 30232) to determine effects on public access and recreation (Coastal Act §§ 30210, 30211, and 30220), marine resources and water quality (Coastal Act §§ 30230 and 30231), environmentally sensitive habitat areas (Coastal Act § 30240), commercial fishing (Coastal Act § 30234.5), and archaeological resources (Coastal Act § 30244).

The first test of § 30260 requires an assessment of alternative locations. Because the Commission has not been provided sufficient information about the CCMP policies noted above, it cannot determine whether alternative locations would be infeasible or would be more environmentally damaging. This lack of information is similar to that identified in Section 3.3 of this report regarding fill policy and in Section 3.5 regarding the visual aspects of oil and gas development. The second test of § 30260 states that coastal-dependent industrial development may be permitted if to do otherwise would adversely affect the public welfare. However, as noted above and in previous sections of this report, the Commission has determined that a lack of information makes it unable to determine whether the proposed project is consistent with a number of CCMP policies. Without being provided the necessary information to assess the likely environmental impacts of granting the suspensions, the Commission cannot determine whether or not the public welfare would be adversely affected if they are not granted. The third test requires that adverse environmental effects be mitigated to the maximum extent feasible. Again, because the Commission does not have adequate information to determine likely environmental impacts , it cannot determine what mitigation measures would be necessary to mitigate those impacts to the maximum extent feasible. The information needed to determine conformity to the various CCMP policies, including § 30260, was requested by Commission staff in its letter of April 22, 2005; however, the MMS declined to provide most of that information.

***Conclusion***

Based on the discussion above and the findings in previous sections of this report, the Commission cannot make findings regarding CCMP § 30260. Due to the lack of information about whether activities resulting from granting of the suspensions would be inconsistent with the CCMP policies noted above, it is not evident whether the respects in which the Commission has determined the proposed activities to be inconsistent with CCMP policies would be subject to "override" through application of CCMP § 30260. Specifically, the information that the MMS has refused to provide is necessary to enable the Commission to determine whether the proposed lease suspensions and the activities in which such suspensions will with reasonable foreseeability result satisfy the three tests for a § 30260 "override". The Commission therefore objects to the MMS consistency determinations CD-042-05, CD-043-05, CD-044-05, CD-045-05, and CD-046-05 due to a lack of necessary information.