STATE OF CALIFORNIA—THE RESOURCES AGENCY ARNOLD SCHWARZENEGGER, *GOVERNOR*

CALIFORNIA COASTAL COMMISSION
45 FREMONT, SUITE 2000
SAN FRANCISCO, CA 94105-2219
VOICE AND TDD (415) 904-5200
FAX (415) 904-5400

# Th5f-h

| | |
|---|---|
| Staff: | ALM/RTB-SF |
| File Date: | 4/7/05 |
| 60th Day: | 6/6/05 |
| 75th Day: | 6/21/05 |
| Extended to: | 8/12/05 |
| Hearing Date: | 8/11/05 |

## STAFF REPORT AND RECOMMENDATION ON CONSISTENCY DETERMINATIONS

**Consistency Determination Nos.:** **CD-047-05**
**CD-048-05**
**CD-049-05**

**Federal Agency:** **US Department of the Interior, Minerals Management Service**

**Project Location:** Pacific Outer Continental Shelf ("OCS") leases in the **Bonito, Rocky Point and Sword Units**, in the southern Santa Maria Basin, adjacent to the Point Arguello Unit between Point Arguello and Point Conception, offshore Santa Barbara County.

**Project Description:** Suspend (i.e., extend the lease term) by 18 months seven OCS oil and gas leases in the Bonito Unit; suspend by 37 months two OCS oil and gas leases in the Rocky Point Unit; and suspend by 25 months four OCS oil and gas leases in the Sword Unit.

**Substantive File Documents:** See Exhibit 1

## SUMMARY

The U.S. Department of the Interior, Minerals Management Service ("MMS") has submitted a consistency determination for the Bonito, Rocky Point and Sword Units, as described below:

| Consistency Determination Number | Unit | Operator | Lease Numbers[1] | Suspension Term |
|---|---|---|---|---|
| CD-047-05 | Bonito | PXP | 443, 445, 446, 449, 450[2], 499, 500 | 18 months |
| CD-048-05 | Rocky Point | Arguello | 452, 453 | 37 months |
| CD-049-05 | Sword | Samedan | 319, 320, 322, 323A | 25 months |

No in-water activities are proposed during the suspension period for these units, and MMS maintains that any subsequent oil and gas drilling and transportation will occur using only existing Point Arguello Unit infrastructure; specifically, Platforms Hermosa, Hidalgo and Harvest, and associated pipelines and facilities. No new platforms or other new infrastructure will be required for development of these units.

The Bonito, Rocky Point and Sword Units are located offshore Santa Barbara County, in the southern portion of the Santa Maria Basin, adjacent to the Point Arguello Unit and existing platforms Hermosa, Hidalgo, and Harvest. These platforms and associated infrastructure were reviewed by the Commission in 1983-1984 under consistency certifications CC-CC-12-83, CC-24-84, and CC-27-83, respectively, and were installed in 1985-1986.

Based on the decision of the US District Court in the case of *State of California v. Norton* (affirmed by the US Court of Appeal, Ninth Circuit), the lease suspensions are subject to the consistency review requirements of Section 307(c) of the Coastal Zone Management Act ("CZMA"). The consistency determinations for the Bonito, Rocky Point and Sword Unit lease suspensions are three of ten MMS has submitted to the Commission.

The court decision clarified that the Commission's review of a lease suspension is similar to its review of a lease sale in the sense that the Commission is to analyze the broad and long-term coastal effects (i.e., post-suspension exploration, development and production activities) that are reasonably foreseeable if a lease suspension is granted. The court nevertheless acknowledged, and the Commission agrees, that a lease suspension is not identical to a lease sale. The subject lease suspensions have been requested decades after the initial lease sale, after most of these leases have been explored and after detailed environmental and technical evaluations have been

[1] The full identification for Lease 443 is: Lease OCS-P 0443. Other leases are identified similarly. For the remainder of this report, lease references will use the shortened name.

[2] Most of Lease 450 is located in the Point Arguello Unit; the entire lease is therefore held by production and is not being considered for suspension. The northwestern portion of Lease 450 is located in the Bonito Unit, however; therefore the lease is included in this report.

performed. Substantially more information on these leases is available now than was available at the original lease sale stage.

In an April 22, 2005, letter to MMS, Commission staff requested additional information regarding the "reasonably foreseeable direct and indirect effects" of the requested suspensions, namely, the likely post-suspension exploration, development, and production activities. Commission staff informed MMS that additional information is needed in order for the Commission to determine whether granting the lease suspensions is consistent with the enforceable policies of the California Coastal Management Program ("CCMP"). Commission staff requested, for example, that MMS estimate how the future development of the Bonito, Rocky Point and Sword Units might extend the life of existing Point Arguello Unit infrastructure. MMS replied that most of the information the Commission staff requested was more appropriate for exploration and production review stages, rather than for a review of the lease suspensions themselves. The Commission disagrees with this position.

Primary concerns raised by the proposed suspensions, and reasonably foreseeable future development using the Point Arguello Unit platforms, pipelines, and onshore facilities, are: 1) whether the reasonably foreseeable additional development will extend the life of the existing infrastructure, and if so, whether any such extension of life of the facilities will be consistent with the applicable policies of the CCMP, and 2) whether new circumstances have arisen (such as increased oil spill risk from aging facilities, and/or new or changed circumstances in the commercial fishing industry) that need to be addressed during the review of the suspensions for consistency with the CCMP. In order to determine whether suspending the leases is consistent with the CCMP, the Commission has requested that MMS provide the following information:

1. **Extension of Platform and Facility Life.** To evaluate potential impacts to commercial fishing and visual resources, and to evaluate safety issues related to the structural soundness of existing infrastructure, the Commission has requested information from MMS regarding the potential for the proposed lease suspensions to extend the lifespan of Platforms Hidalgo, Hermosa and Harvest.

2. **Structural Integrity Analysis.** To evaluate safety issues related to the structural soundness of Platforms Hidalgo, Hermosa, and Harvest, and associated pipelines and facilities, the Commission has requested an analysis of the structural integrity of these platforms and associated infrastructure.

3. **Oil Spill Risk Analysis.** To evaluate potential impacts from an oil spill to marine and shoreline resources, the Commission has requested detailed information on: 1) worst case oil discharge volumes; 2) oil spill probabilities, and 3) oil spill trajectories.

The Commission is unable to determine whether or not suspending the leases is consistent with the policies of the Coastal Act/CCMP related to access and recreation (Sections 30210, 30211, 30212, and 30220), marine resources and water quality (Sections 30230 and 30231), commercial fishing (Sections 30230 and 30234.5), environmentally sensitive habitat areas (Section 30240), cultural resources (Section 30244), visual resources (Section 30251), and hazards (Sections 30253(2) and 30262(a)), because it lacks the information necessary to make these determinations. In addition, while development at these units would be subject to the provisions of the coastal-dependent

industrial "override" policy (Section 30260) of the Coastal Act, the lack of the above-identified information also makes it impossible for the Commission to make the necessary findings under that policy. The Commission therefore objects to MMS's consistency determination, based on lack of adequate information to determine the lease suspensions' consistency with the enforceable policies of the CCMP/Coastal Act.

## TABLE OF CONTENTS

1 STAFF RECOMMENDATION ..... 7
1.1 Motions and Resolutions ..... 7
1.1.1 CD-047-05: Bonito Unit ..... 7
1.1.2 CD-048-05: Rocky Point Unit ..... 7
1.1.3 CD-049-05: Sword Unit ..... 8
1.2 Applicable Legal Authorities ..... 8
1.2.1 Necessary Information ..... 8
1.2.2 Practicability ..... 9
1.2.3 Federal Agency Response to a Commission Objection ..... 10
1.3 Standard of Review ..... 10
2 FINDINGS AND DECLARATIONS ..... 11
2.1 Introduction ..... 11
2.2 Background of Federal OCS Leases ..... 12
2.2.1 Coastal Commission Review of Lease Suspensions ..... 12
2.2.2 Scope of Coastal Commission Review ..... 14
2.2.3 Current OCS Operations in California ..... 17
2.3 Bonito, Rocky Point and Sword Units ..... 20
2.3.1 Bonito Unit ..... 20
2.3.2 Rocky Point Unit ..... 23
2.3.3 Sword Unit ..... 24
2.3.4 Information Lacking from the Project Descriptions ..... 25
2.4 Point Arguello Unit ..... 26
2.4.1 Development History ..... 27
2.4.2 Oil Volumes and Capacity ..... 28
2.5 Related Environmental Documents ..... 29
2.5.1 Environmental Assessments ..... 29
2.5.2 Environmental Information Document ..... 30
2.5.3 Draft EIS for Delineation Drilling ..... 30
2.5.4 COOGER Study ..... 30
3 COASTAL ACT ISSUES ..... 31
3.1 Oil Spills ..... 31
3.1.1 Introduction ..... 31
3.1.2 Regional Oil Spill History ..... 34
3.1.3 Coastal Resources at Risk from an Oil Spill ..... 36
3.1.4 Oil Spill Risk Analysis ..... 40
3.1.5 Prevention and Response Capability ..... 46
3.2 Marine Resources and Water Quality ..... 52
3.3 Commercial Fishing ..... 55
3.4 Visual Resources ..... 56
3.5 Hazards ..... 57
3.6 Air Quality ..... 59
3.7 Consolidation of Oil and Gas Development ..... 61
3.8 Coastal-Dependent Industrial Facility "Override" Provision ..... 62

TABLES

Table 1: Lease Suspensions Addressed in this Report .......... 11
Table 2: Undeveloped Pacific OCS Units and Leases .......... 18
Table 3: Federal Pacific OCS Oil and Gas Annual Production Rates for 1984 through 2003 ..... 19
Table 4: Total Projected Reserves of 36 Undeveloped Leases .......... 19
Table 5: Hypothetical Post-Suspension Development Scenarios for Bonito, Rocky Point and Sword Units .......... 21
Table 6: Well Slots .......... 29
Table 7: Maximum Annual Allowable Discharges (bbls) .......... 54

EXHIBITS (Attached to this report)

Exhibit 1: Substantive File Documents
Exhibit 2: Region Map
Exhibit 3: Point Arguello Map
Exhibit 4: Regional Marine Resources
Exhibit 5: Commission Past Decisions on the Bonito, Rocky Point and Sword Units
Exhibit 6: Commission Past Decisions on the Point Arguello Unit
Exhibit 7: Lease Suspensions for the Bonito, Rocky Point and Sword Units
Exhibit 8: Lease Stipulations for Lease Sales 53 and 68

APPENDICES (In separate packet)

Appendix A: Pacific OCS Development
Appendix B: April 22, 2005, from Coastal Commission to MMS requesting additional information
Appendix C: June 23, 2005, letter from MMS to Coastal Commission responding to additional information request

# 1 STAFF RECOMMENDATION

## 1.1 Motions and Resolutions

### 1.1.1 CD-047-05: Bonito Unit

Motion:

*I move that the Commission **concur** with consistency determination CD-047-05, that the project described therein is consistent to the maximum extent practicable with the enforceable policies of the California Coastal Management Program.*

Staff Recommendation:
Staff recommends a **NO** vote on the motion. Failure of this motion will result in an objection to the determination and adoption of the following resolution and findings. An affirmative vote of a majority of the Commissioners present is required to pass the motion.

Resolution to Object to Consistency Determination:

*The Commission hereby **objects** to the consistency determination by the Minerals Management Service for the proposed project, finding that the consistency determination lacks information necessary to evaluate the project's consistency with the California Coastal Management Program.*

### 1.1.2 CD-048-05: Rocky Point Unit

Motion:

*I move that the Commission **concur** with consistency determination CD-048-05, that the project described therein is consistent to the maximum extent practicable with the enforceable policies of the California Coastal Management Program.*

Staff Recommendation:
Staff recommends a **NO** vote on the motion. Failure of this motion will result in an objection to the determination and adoption of the following resolution and findings. An affirmative vote of a majority of the Commissioners present is required to pass the motion.

Resolution to Object to Consistency Determination:

*The Commission hereby **objects** to the consistency determination by the Minerals Management Service for the proposed project, finding that the consistency determination lacks information necessary to evaluate the project's consistency with the California Coastal Management Program.*

#### 1.1.3 CD-049-05: Sword Unit

Motion:

> *I move that the Commission **concur** with consistency determination CD-049-05, that the project described therein is consistent to the maximum extent practicable with the enforceable policies of the California Coastal Management Program.*

Staff Recommendation:
Staff recommends a **NO** vote on the motion. Failure of this motion will result in an objection to the determination and adoption of the following resolution and findings. An affirmative vote of a majority of the Commissioners present is required to pass the motion.

Resolution to Object to Consistency Determination:

> *The Commission hereby **objects** to the consistency determination by the Minerals Management Service for the proposed project, finding that the consistency determination lacks information necessary to evaluate the project's consistency with the California Coastal Management Program.*

### 1.2 Applicable Legal Authorities

Section 307 of the Coastal Zone Management Act ("CZMA") (16 USC §1456) provides in part:

> *(c)(1)(A) Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of the approved State management programs.*

#### 1.2.1 Necessary Information

Section 930.43(b) of the federal consistency regulations (15 CFR §930.43(b)) requires that, if the Commission bases its objection on a lack of information, the Commission must identify the information necessary for it to assess the project's consistency with the California Coastal Management Program ("CCMP"). That section states:

> *If the State agency's objection is based upon a finding that the Federal agency has failed to supply sufficient information, the State agency's response must describe the nature of the information requested and the necessity of having such information to determine the consistency of the Federal agency activity with the enforceable policies of the management program.*

***Nature of Information Requested***

As described in Section 3: Coastal Act Issues of this report below, the Commission finds these consistency determinations lack the information that the Commission has requested from the Minerals Management Service ("MMS") to enable the Commission to determine whether suspending the leases is consistent to the maximum extent practicable with the policies of the

Coastal Act/CCMP related to: access and recreation (Sections 30210, 30211, 30212, and 30220), marine resources and water quality (Sections 30230 and 30231), commercial fishing (Sections 30230 and 30234.5), environmentally sensitive habitat areas (Section 30240), cultural resources (Section 30244), visual resources (Section 30251), and hazards (Sections 30253(2) and 30262(a)). In order to determine if the lease suspensions are consistent with the CCMP, the Commission has requested that MMS provide it with the following necessary information:

1. **Extension of Platform and Facility Life.** To evaluate potential impacts to commercial fishing and visual resources, and to evaluate safety issues related to the structural soundness of existing infrastructure, the Commission has requested information from MMS regarding the potential for the proposed lease suspensions to extend the lifespan of Platforms Hidalgo, Hermosa and Harvest, and associated facilities. See below Section 2.3.4: Information Lacking from the Project Description

2. **Structural Integrity Analysis.** To evaluate safety issues related to the structural soundness of Platforms Hidalgo, Hermosa, and Harvest, and associated facilities, the Commission has requested an analysis of the structural integrity of this infrastructure. See below Section 3.5: Hazards.

3. **Oil Spill Risk Analysis.** To evaluate potential impacts from an oil spill to coastal resources, the Commission has requested detailed information on: 1) worst case discharge volumes; 2) oil spill probabilities, and 3) oil spill trajectories. See below Section 3.1.4: Oils Spill Risk Analysis.

*Necessity for Information Requested*

The need for this information is discussed in the findings below, as follows:

1. **Extension of Platform and Facility Life.** See below Section 3.3: Commercial Fishing, Section 3.4: Visual Resources, and Section 3.5: Hazards.

2. **Structural Integrity Analysis.** See below Section 3.5: Hazards.

3. **Oil Spill Risk Analysis.** See below Section 3.1: Oil Spills.

In addition, as discussed in Section 3.8: Coastal Dependent Industrial Facility "Override" Provision, this information is also necessary for the Commission's analysis under Section 30260 of the Coastal Act/CCMP.

### 1.2.2 Practicability

The federal consistency regulations implementing the CZMA include the following provision:

> *Section 930.32 Consistent to the maximum extent practicable.*
>
> *(a)(1) The term ''consistent to the maximum extent practicable'' means fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency.*

Since MMS has raised no issue of practicability, as so defined, the standard before the Commission is full consistency with the policies of the CCMP.

### 1.2.3 Federal Agency Response to a Commission Objection

Section C(a)(i) of Chapter 11 of the CCMP requires federal agencies to inform the Commission of their response to a Commission objection. This section provides:

> *If the Coastal Commission finds that the Federal activity or development project... is not consistent with the management program, and the federal agency disagrees and decides to go forward with the action, it will be expected to (a) advise the Coastal Commission in writing that the action is consistent, to the maximum extent practicable, with the coastal management program, and (b) set forth in detail the reasons for its decision. In the event the Coastal Commission seriously disagrees with the Federal agency's consistency determination, it may request that the Secretary of Commerce seek to mediate the serious disagreement as provided by Section 307(h) of the CZMA, or it may seek judicial review of the dispute.*

The federal consistency regulations reflect a similar obligation; 15 CFR §930.43 provides:

> *State agency objection...*
>
> *(d) In the event of an objection, Federal and State agencies should use the remaining portion of the 90-day notice period (see §930.36(b)) to attempt to resolve their differences. If resolution has not been reached at the end of the 90-day period, Federal agencies should consider using the dispute resolution mechanisms of this part and postponing final federal action until the problems have been resolved. At the end of the 90-day period the Federal agency shall not proceed with the activity over a State agency's objection unless: (1) the Federal agency has concluded that under the ''consistent to the maximum extent practicable'' standard described in section 930.32 consistency with the enforceable policies of the management program is prohibited by existing law applicable to the Federal agency and the Federal agency has clearly described, in writing, to the State agency the legal impediments to full consistency (See §§930.32(a) and 930.39(a)), or (2) the Federal agency has concluded that its proposed action is fully consistent with the enforceable policies of the management program, though the State agency objects.*
>
> *(e) If a Federal agency decides to proceed with a Federal agency activity that is objected to by a State agency, or to follow an alternative suggested by the State agency, the Federal agency shall notify the State agency of its decision to proceed before the project commences.*

## 1.3 Standard of Review

The standard of review for federal consistency determinations is the enforceable policies of the CCMP, of which the substantive policy component is the Chapter 3 policies of the Coastal Act (California PRC §§30200-30265.5).

## 2 FINDINGS AND DECLARATIONS

The Commission finds and declares as follows:

### 2.1 Introduction

Samedan Oil Corporation ("Samedan"), Arguello, Inc. ("Arguello"), and Plains Exploration and Production Company ("PXP") have submitted requests to the MMS for a suspension[3] of its undeveloped OCS oil and gas leases. The units are located offshore Santa Barbara County, in the southern portion of the Santa Maria Basin, adjacent to the Point Arguello Unit and existing platforms Hermosa, Hidalgo, and Harvest. (See Exhibits 2 and 3.) The lease suspensions addressed in this report are listed in Table 1, below.

**Table 1: Lease Suspensions Addressed in this Report**

| Unit | Operator | Lease Numbers[4] | Consistency Determination Number | Suspension Term |
|---|---|---|---|---|
| Bonito | PXP | 443, 445, 446, 449, 450[5], 499, 500 | CD-047-05 | 18 months |
| Rocky Point | Arguello | 452, 453 | CD-048-05 | 37 months |
| Sword | Samedan | 319, 320, 322, 323A | CD-049-05 | 25 months |

Pursuant to Section 307(c) of the CZMA (16 USC §1456(c)(1)), the MMS review and approval of the operators' requested lease suspensions is a federal activity subject to consistency review by the Commission. Accordingly, on April 7, 2005, MMS provided the Commission with consistency determinations for the operators' requests for lease suspensions.

This report is one of four Commission reports prepared to review the consistency determinations submitted by MMS for all 36 OCS lease suspensions. Other Commission reports address lease suspensions in the Cavern Point Unit, the Gato Canyon Unit, and the Northern Santa Maria Basin Units, discussed in more detail in Section 2.2.3: Current OCS Operations in California below.

---

[3] A suspension is defined in 30 CFR § 250.105 as: "a granted or directed deferral of the requirement to produce (Suspension of Production) or to conduct leaseholding operations (Suspension of Operations)." A lease suspension is effectively an extension of the life of the lease. (30 CFR §250.169(a)) See Section 2.2.3: Current OCS Operations in California of this report, below.

[4] The full identification for Lease 443 is: Lease OCS-P 0443. Other leases are identified similarly. For the remainder of this report, lease references will use the shortened name.

[5] Most of Lease 450 is located in the Point Arguello Unit; the entire lease is therefore held by production and is not being considered for suspension. The northwestern portion of Lease 450 is located in the Bonito Unit, however; therefore the lease is included in this report.

In consistency determinations CD-047-05, CD-048-05 and CD-049-05, the operators are requesting the lease suspensions to allow time to prepare revisions to the Exploration Plan (for exploration of the Sword Unit) and to the Development and Production Plans for Platforms Hidalgo and Hermosa (for development of the Bonito and Rocky Point Units.) During the lease suspension term, the operators will conduct in-office activities to revise the existing Exploration Plan and Development and Production Plans. No "on the water" activities are proposed to take place during the suspension.

Before any drilling or development activity can actually occur in the subject units, the revised Exploration Plan and Development and Production Plans must also be separately approved by MMS (pursuant to 30 CFR §250.203, 250.204). MMS can not approve any such further activity unless the Commission concurs with a consistency certification from the operator, or the Secretary of Commerce determines on appeal of a Commission objection that the activity is consistent with the objectives or purposes of the CZMA, or is necessary in the interest of national security (15 CFR §930.120).

The goal of the oil and gas operators, beyond the requested suspension period, is to explore, develop and produce marketable quantities of oil and gas from reservoirs underlying the Bonito, Rocky Point, and Sword Units, using extended-reach directional drilling from existing Platforms Hermosa and Hidalgo, located in the adjacent Point Arguello Unit.

## 2.2 Background of Federal OCS Leases

### 2.2.1 Coastal Commission Review of Lease Suspensions

MMS has submitted consistency determinations for a total of 36 lease suspensions off the coast of San Luis Obispo, Santa Barbara and Ventura Counties. The leases are organized into nine separate "units," and one lease not within a unit (Lease 409).[6] (See Section 2.2.3: Current OCS Operations in California below.)

Each lease was issued by the US Department of the Interior before 1984, and had a primary term of five years.[7] After the initial term of a lease lapses, the lease continues in effect so long as oil and gas are produced in paying quantities or drilling operations are underway. If production or approved drilling is not underway at the end of the lease term, the lease expires and the lessee loses the right to exploit the oil and gas resources in the lease area (30 CFR § 250.180).

Alternatively, a lease may be "suspended." A suspension allows a lessee to suspend exploration, development, and/or production activities for a period of time without having the lease expire,

---

[6] Consistent with the Outer Continental Shelf Lands Act ("OCSLA") (as amended), MMS's regulations define the purpose of unitization to include 1) conserving natural resources; 2) preventing waste; and/or 3) protecting correlative rights (30 CFR § 250.1300).

[7] MMS has not conducted a lease sale off the coast of California since 1984. See Appendix A for details on the lease sales conducted since 1963, including those sales relevant to the 36 subject leases. In 1990, former President George H. W. Bush, imposed a leasing moratorium offshore California, among other areas. President Bush imposed the moratorium in response to findings by the National Research Council that environmental information was inadequate to properly inform leasing offshore Florida and California.

thereby extending the life of the lease (OCSLA § 5(a)(1); 43 USC §1334(a)(1)). Suspensions can occur in two ways: first, the federal government can direct suspensions; for example, in order to comply with federal law or with court orders. Second, a lessee can request a suspension in order to keep the lease in effect under certain conditions specified in regulation without the lessee having to engage in exploration, development or production activities (30 CFR §§ 250.168-177). During a directed suspension, no activities can occur. During a granted suspension, MMS can require that certain specified activities and milestones be met in order to demonstrate that the lessee intends to keep the lease from expiring.

Of the leases issued before 1984, 40 have not begun producing paying quantities of oil or gas. Additionally, a portion of Lease 450 that is assigned to the undeveloped Bonito Unit has not begun producing quantities of oil and gas. These leases would have expired if MMS had not repeatedly extended the terms of the leases, through both directed and requested suspensions.

Until October 1992, MMS, at the request of the lessees, had granted suspension of the 40 leases. On October 15, 1992, MMS directed suspensions of the leases in order to conduct the *California Offshore Oil and Gas Energy Resources Study: Development Scenarios and Onshore Physical Infrastructure in the Tri-County Area of San Luis Obispo, Santa Barbara and Ventura* (known as the "COOGER Study"). In 1999, when the directed suspensions were about to end, MMS advised the lessees that they would need to request suspensions in order to keep the leases from expiring. In May 1999, the lessees submitted requests for suspensions. MMS declined to extend the lease terms of four of the leases,[8] but approved the requested suspensions for the remaining 36 leases.

By letter dated July 27, 1999, the Coastal Commission informed the Department of Interior and MMS that, pursuant to the CZMA (16 USC §1456(c)(3)), the Commission was asserting its authority to review the lease suspensions for consistency with the CCMP. In an August 5, 1999, follow-up letter to MMS, the Commission's Executive Director identified a number of concerns related to changed circumstances and new information that needed to be addressed in the MMS review, including the age of the leases, the poor quality of the oil, the proximity of the leases to marine sanctuaries, and potentially changed environmental circumstances. The Coastal Commission also advised MMS that pursuant to the CZMA the lessees were required to provide the Coastal Commission with a certification of consistency with the CCMP.

MMS disagreed with the Coastal Commission's position that the lease suspensions were subject to the consistency review requirements of the CZMA, and refused to submit consistency certifications to the Commission. In November 1999, MMS notified the lessees that it had approved their requests for suspensions. The State of California challenged MMS's failure to comply with the requirements of the CZMA with respect to the lease suspensions in US District Court, in the case of *State of California v. Norton*. On June 15, 2001, the district court held that the approval of the lease suspensions by MMS is a federal agency activity subject to consistency

---

[8] By decision dated August 16, 1999, MMS removed three leases in the Santa Maria Unit (Leases 420, 424, and 429) and one in the Gato Canyon Unit (Lease 462) and they expired. The lessees appealed the decision to the Interior Board of Land Appeals, and the appeals are currently under review.

review by California under the CZMA. The federal defendants appealed. On December 2, 2002, the US Court of Appeals for the Ninth Circuit affirmed the district court judgment (311 F.3d 1162 (9th Cir. 2002)).

On April 7, 2005, pursuant to the court's order, MMS submitted to the Commission 10 consistency determinations — one consistency determination for each of the nine units, plus one for Lease 409. This report reviews the suspensions of leases in the Bonito, Rocky Point and Sword Units. The lease suspensions for other units are analyzed in separate Commission reports.

### 2.2.2 Scope of Coastal Commission Review

At the time of issuance of the 36 subject leases, a lease sale was not a federal agency activity that required federal consistency review by the Commission. (See *Secretary of the Interior v. California* (1984) 464 U.S. 312.) In 1990, in the Coastal Zone Act Reauthorization Amendments of 1990 ("CZARA"), Congress amended the CZMA specifically to extend the consistency requirements of that statute to the sale of leases on the OCS as a federal agency activity. Congress clarified its intent in enacting the CZARA amendments to the CZMA in the following manner:[9]

> *The Conferees intend the determination of whether a specific federal agency activity may affect any natural resource, land use, or water use in the coastal zone to include...cumulative and secondary effects. Therefore, the term "affecting"* [in CZMA §307(c)] *is to be construed broadly, including direct effects which are caused by the activity and occur at the same time and place, <u>and indirect effects which may be caused by the activity and are later in time or farther removed in distance, but are still reasonably foreseeable.</u>* [Emphasis added.]

Because these leases predated the 1990 amendments to the CZMA, the State of California never had the opportunity to review these leases for CZMA consistency at the lease sale stage.

In its decision in *California v. Norton*, the Appeals Court specifically rejected the argument that review of the lease suspensions would duplicate review of activities described in Exploration Plans or Development and Production Plans. The court stated:

> *In subjecting lease sales to consistency review, Congress has made it clear that the statute does not prohibit consistency review of federal agency activities that are not subsidiary to exploration and development and production plans. The exploration and development and production plan stages are* not *the only opportunities for review afforded to States under the statutory scheme...*
>
> *...These lease suspensions represent a significant decision to extend the life of oil exploration and production off California's coast, with all of the far reaching effects and perils that go along with offshore oil production.* (State of California v. Norton 311 F.3d 1162, 1173 (9th Cir. 2002))

---

[9] House Conference Report No. 101-964; 1990 *U.S. Code Cong. & Adm. News*, p. 2017.

Furthermore, the court stated that the review of lease suspensions is similar to the review of a lease sale, in that the effects to be analyzed are "very broad" and "long term."

> *Although a lease suspension is not identical to a lease sale, the very broad and long term effects of these suspensions more closely resembles the effects of a sale than they do the highly specific activities reviewed [in an Exploration Plan or Development and Production Plan]...[Lease suspension] review is available now for the broader effects implicated in suspending the leases. This phasing of review fits closely the expressed intent of Congress...* (*ibid.* at 1174)

The court made clear that the Commission's review of a lease suspension is similar to its review of a lease sale in the sense that the Commission is to analyze the broad and long-term coastal effects (i.e., post-suspension exploration, development and production activities) that are reasonably foreseeable if a lease suspension is granted. The court nevertheless acknowledged, and the Commission agrees, that a lease suspension is not identical to a lease sale. The subject lease suspensions have been requested decades after the initial lease sale, after most of these leases have been explored and detailed environmental and technical evaluations have already been performed. Substantially more information on these leases is available now than was available at the original lease sale stage. In fact, many of the undeveloped leases can be developed from existing platforms for which Development and Production Plans have been prepared, but would require only revision. In *Secretary of the Interior v. California,* the U.S. Supreme Court noted there are four distinct stages to developing an OCS oil lease: 1) formulation of a 5-year leasing plan by the Department of the Interior; 2) the lease sale; 3) exploration; and 4) development and production. Most of the 36 leases currently fall between stages 3) and 4).

MMS chose, however, to model its consistency determinations for the lease suspensions on recent Alaska Lease Sale 191. The Commission believes the Alaska model is not adequate for the review of the lease suspensions for several reasons:

- Lease Sale 191 comprised an area over 200 million acres in the Cook Inlet Planning Area as compared to the 184,191 acres encompassing the 36 undeveloped California leases. The difference is an order of magnitude (i.e., a factor of 10).

- Lease Sale 191 occurred in an OCS planning area (Cook Inlet) where no production and development of OCS oil and gas has ever been proposed, examined in detailed in environmental impact statements, or permitted, because no economically recoverable reserves have been discovered. Little environmental information is available. Thus, the available information is very general in scope.

- By contrast, the Commission's consideration of the lease suspensions takes place 2-4 decades following the 10 lease sales the federal government conducted offshore California. Forty-two of the remaining 79 OCS leases offshore California are producing oil and gas or are situated on producing units, and their development was preceded by detailed environmental review. All but one of the 36 leases have been consolidated into 9 units that have identifiable and named oil and gas fields. All but one unit have been

granted Exploration Plans and, decades ago, lessees drilled exploratory wells discovering paying quantities of oil and gas. In the early 1990s, the lessees developed hypothetical, but likely, development scenarios for each of the leases so that MMS could prepare the COOGER Study, a 1999 study that evaluated the potential onshore constraints of developing the then-40 undeveloped leases.

Therefore, answers to the questions "if, when, and how exploration, development and production would actually occur" are far better understood for these leases as compared to a lease sale such as Alaska Lease Sale 191. Notwithstanding the level of information available about the potential development of the 36 leases, MMS chose not to submit for the Commission's review data and environmental analysis that is either readily available or could be developed now. Instead, because MMS is treating the review of the lease suspensions strictly as a "lease sale" stage, it believes it needs to provide "general" information only, *even if specific information is available.*

In an April 22, 2005, letter to MMS (included in this report as Appendix B), Coastal Commission staff requested additional information regarding the "reasonably foreseeable direct and indirect effects" of the requested suspensions, namely, the likely post-suspension exploration, development, and production activities. Commission staff informed MMS that additional information is needed in order for the Coastal Commission to determine if the proposed lease suspensions are consistent with the enforceable policies of the CCMP. For example, Commission staff requested that MMS estimate how the future development of Bonito, Rocky Point, Sword, and Cavern Point Units might extend the life of existing Point Arguello Unit platforms and Platform Gail. In its original submittal, MMS provided no information regarding how the extension of life of existing platforms, pipelines, and other infrastructure could affect coastal resources (e.g., increase risks of an oil spill, lengthen fishery preclusion areas). In its June 23, 2005, response letter (included in this report as Appendix C), MMS refused to provide certain requested information, such as an estimate of extension of platform operations, or the results of *already completed* surveys (like onshore archeology or offshore hard bottom surveys), stating that it would not be "appropriate" for MMS to provide information during the lease suspension review stage that it believes should be provided by the lessees in the form of an Exploration Plan or a Development and Production Plan. In refusing to comply with the Commission's information request, MMS states repeatedly that the operator will provide project details and further analysis if and when operators submit new or revised Exploration Plans and/or Development and Production Plans. MMS's refusal to comply with the Commission's information requests effectively results in deferral until the exploration and development stages of the consistency review that both the District Court and the Ninth Circuit Court of Appeals has directed to occur at the lease suspension stage. There is no basis for MMS's failure to fully describe now the exploration and production scenarios that the lease suspensions will make possible, or to conduct now full environmental and consistency review.

Further, Section 930.39(a) of the federal consistency regulations states that the amount of detail in the evaluation of the enforceable policies, activity description and supporting information of a consistency determination "shall be *commensurate with the expected coastal effects of the activity.*" (Emphasis added). Given the potential magnitude of coastal effects of offshore oil and gas development, Section 930.39(a) requires MMS to provide as much detailed information as is available or that can reasonably be generated at the time of the review. MMS cannot defer

examination of the reasonably foreseeable future effects of the lease suspensions to future reviews of Exploration Plans and Development and Production Plans.[10]

### 2.2.3 Current OCS Operations in California[11]

Exhibit 2 illustrates leases, platforms and other oil and gas-related infrastructure off the coast of southern California. A total of seventy-nine Federal OCS oil and gas leases are currently located offshore California, not including the four expired leases that are under appeal. Forty-three of these leases are developed (i.e., oil and/or gas is being produced from them). The remaining 36 undeveloped leases are the subjects of the consistency determinations currently before the Commission. These leases are located between 3 and 12 miles offshore San Luis Obispo, Santa Barbara, and Ventura Counties. Table 2 presents a summary of the undeveloped leases.

Nineteen platforms support production of the developed leases offshore Santa Barbara and Ventura Counties. No platforms are located offshore San Luis Obispo County. The 19 existing platforms are supported by pipelines, processing and separation facilities, and other associated infrastructure. Onshore facilities supporting Pacific OCS oil and gas development include:

**Santa Barbara County**
Carpinteria Onshore Gas Facility connected to offshore Platform Habitat
Carpinteria Oil and Gas Processing Terminal connected to offshore Platforms Gail and Grace
Las Flores Canyon Santa Ynez Unit Oil and Gas Processing Facility
Gaviota Oil Heating Facility
Gaviota Storage Terminal (soon to be decommissioned)
Lompoc Oil and Gas Processing Facility
Several pipeline systems

**Ventura County**
Mandalay Onshore Separation Facility
West Montalvo Operations
Rincon Oil and Gas Processing Facility
La Conchita Oil and Gas Processing Facility

[10] The Commission acknowledges that there are distinctions between the broader review conducted now for a lease suspension and the detailed review of future exploration, development and production activities. Currently, only general locations for "hypothetical" platforms and pipelines are known, which the Commission believes is appropriate for this stage of review. During review of an Exploration Plan or Development and Production Plan, once the specific locations of platform, pipelines and other infrastructure are specifically defined, the Commission would, for example, require site-specific marine and terrestrial biological, geotechnical and cultural surveys.

[11] This information is taken from the EID, Section 2.2

**Table 2: Undeveloped Pacific OCS Units and Leases**

| Unit | Operator | Lease Number(s) | Consistency Determination Number |
|---|---|---|---|
| Lion Rock | Aera Energy LLC | 396, 397, 402, 403, 408, 414 | CD-042-05 |
| Point Sal | Aera Energy LLC | 415, 416, 421, 422 | CD-043-05 |
| Santa Maria | Aera Energy LLC | 425, 430, 431, 433, 434 | CD-044-05 |
| Purisima Point | Aera Energy LLC | 426, 427, 432, 435 | CD-045-05 |
| Lease 409 | Aera Energy LLC | 409 | CD-046-05 |
| Bonito | PXP | 443, 445, 446, 449, 450[12], 499, 500 | CD-047-05 |
| Rocky Point | Arguello | 452, 453 | CD-048-05 |
| Sword | Samedan Oil Corporation | 319, 320, 322, 323A | CD-049-05 |
| Gato Canyon | Samedan Oil Corporation | 460, 464 | CD-050-05 |
| Cavern Point | Venoco, Inc. | 210, 527 | CD-051-05 |

In addition to Pacific OCS activities, the region includes oil and gas leases and production in California State waters (State tide and submerged lands). State leases fall under the management and administration of the California State Lands Commission. The State Lands Commission has issued thirty-two leases located in State waters, seventeen of which are producing, and fifteen of which are non-producing. No State platforms are located offshore San Luis Obispo County; however there are onshore support facilities located in San Luis Obispo and northern Santa Barbara County, including pipelines, oil pump stations, and a heavy, high sulfur oil upgrader refinery. Platform Holly, located offshore Goleta (Santa Barbara County), and Rincon Island, located offshore Rincon Beach (Ventura County) are the only two offshore production facilities associated with State leases that are operational in the tri-county region. Platform Holly is supported onshore by the Ellwood Processing Oil and Gas Processing Facility, and Rincon Island is supported onshore by the Rincon Island and State Lease 145/410 Oil and Gas Processing Facility (see Exhibit 2). Venoco has applied to restart production from one of its two piers that extend from shore into State waters (PRC 421).

Offshore oil and gas production rates peaked in State waters in 1969 and in federal waters in 1995-1996. Federal offshore oil and gas annual production rates for the years 1984 through 2003, for the Santa Maria Basin and Santa Barbara Channel are presented in Table 3.

[12] Most of Lease 450 is located in the Point Arguello Unit; the entire lease is therefore held by production and is not being considered for suspension. The northwestern portion of Lease 450 is located in the Bonito Unit, however; therefore the lease is included in this report.

**Table 3: Federal Pacific OCS Oil and Gas Annual Production Rates for 1984 through 2003**

| Year | Total Oil (million bbls) | Total Gas (billion ft$^3$) | Year | Total Oil (million bbls) | Total Gas (billion ft$^3$) |
|---|---|---|---|---|---|
| 1984 | 25.3 | 44.1 | 1994 | 54.8 | 52.7 |
| 1985 | 23.2 | 60.8 | 1995 | 69.3 | 61.9 |
| 1986 | 21.7 | 55.5 | 1996 | 61.1 | 66.1 |
| 1987 | 24.4 | 53.0 | 1997 | 51.5 | 76.0 |
| 1988 | 25.5 | 47.7 | 1998 | 43.5 | 75.7 |
| 1989 | 27.4 | 49.4 | 1999 | 37.5 | 79.4 |
| 1990 | 24.5 | 48.2 | 2000 | 34.8 | 75.4 |
| 1991 | 27.0 | 51.0 | 2001 | 32.1 | 70.5 |
| 1992 | 38.3 | 54.0 | 2002 | 31.0 | 67.3 |
| 1993 | 46.8 | 50.8 | 2003 | 28.7 | 58.1 |
| **Total** | **728.4** | **1197.6** | | | |

Source: MMS, Pacific OCS Region. *Annual Summary of Production for Entire Region.* December 14, 2004

Total projected reserves for the 36 undeveloped leases is listed in Table 4, below:

**Table 4: Total Projected Reserves of 36 Undeveloped Leases**

| Location | | Oil Reserves (million bbls) | Gas Reserves (billion ft$^3$) |
|---|---|---|---|
| Northern Santa Maria Basin | Northern Platform | 115 | 47 |
| | Central Platform | 118 | 24 |
| | Southern Platform | 90 | 18 |
| Bonito and Electra Fields (Bonito Unit) | | 22 | 11 |
| Rocky Point Field (Rocky Point Unit and Lease 451) | | 39 | 11.7 |
| Sword | | 29 | 7.3 |
| Gato Canyon | | 77 | 46 |
| Cavern Point | | 22 | 20 |
| **Total** | | **512** | **185** |

Source: EID Table 5.2-4. pp 5.2-10 and 5.2-11

The United States consumes approximately 20 million barrels of oil per day, or approximately 7,300 million barrels annually.[13] California consumes approximately 615 million barrels of

[13] US Energy information Administration. (See eia.doe.gov) http://www.eia.doe.gov/mer/pdf/pages/ sec11_7.pdf Accessed July 8, 2005.

petroleum annually, and 2,000 billion cubic feet of natural gas annually.[14] The total projected reserves of the 36 undeveloped oil leases will therefore supply California with petroleum for approximately ten months, and with natural gas for approximately one month. Total reserves represent approximately 25 days of national consumption.

## 2.3 Bonito, Rocky Point and Sword Units

The leases and oil fields associated with the Bonito, Rocky Point and Sword Units are depicted in Exhibit 3. Table 5 presents information on the hypothetical post-suspension development scenarios for each unit.

### 2.3.1 Bonito Unit

***Project Description***

MMS proposes to grant a Suspension of Production for Plains Exploration and Production Company's Bonito Unit for a period of 18 months. During the suspension period, PXP will revise the Development and Production Plan for Platform Hidalgo (in the Point Arguello Unit) and submit it to MMS for approval (including technical and environmental review). Activities during the suspension period will be administrative in nature, completed by PXP and/or their consultant(s) in an office setting, and involve no physical activities on the unit itself.

As discussed in Section 2.2.2: Scope of Coastal Commission Review, the Commission's environmental analysis includes hypothetical post-suspension development activities that will result from the lease suspensions. Post-suspension development of the Bonito Unit will be undertaken from facilities associated with the Point Arguello Unit, and will not require new infrastructure such as new platforms or pipelines, although minor modifications to the platforms may be necessary.

Oil and gas will be produced via extended reach drilling from Platform Hidalgo, passed through Platform Hermosa, and sent to the Gaviota Oil Heating Facility via the PAPCO and PANGL pipelines. At the Gaviota Oil Heating Facility, the oil will be metered and heated, stored temporarily in the Gaviota Terminal Company storage tanks, then transported via the All American Pipeline to various refining facilities. Gas from the Bonito Unit will be processed on the platforms, and either: 1) sent via pipeline for sale onshore, 2) used to generate electricity and heat for platform operations, 3) sent to shore to fuel the Gaviota co-generation units, and/or 4) injected into the Point Arguello Field, the Bonito field, or both.

---

[14] US Energy information Administration. (see eia.doe.gov) http://www.eia.doe.gov/emeu/sep/ca/frame.html Accessed July 8, 2005.

**Table 5: Hypothetical Post-Suspension Development Scenarios for Bonito, Rocky Point and Sword Units**

| Platforms | | | | Associated Infrastructure | | Production | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Peak Production: Oil and Gas | | |
| Unit | Operator | Production Wells, Service Wells | Platform, Installation Date | Pipeline, Installation Date | Onshore Facility (pipeline destination) | Field | Date of First Production | Volume Oil (bbl/day) Gas (Mcf/day) | Year | Expected Total Reserves Oil (MMbbl), Gas (Bcf) |
| Bonito | PXP | 7<br>2 | Hidalgo 1986 | Hidalgo to Hermosa, 1987 | Lompoc and/or Gaviota | Bonito and Electra | 2007/2009[2] | 11,000<br>5,500 | 2012 | 22<br>11 |
| Rocky Point | Arguello | 12<br>0 | Hermosa, 1985 and Hidalgo, 1986 | PAPCO (Hermosa to Gaviota Facility), 1986 and Hidalgo to Hermosa, 1987 | Gaviota | Rocky Point[1] | 2008 | 18,500<br>5,550 | 2013 | 39<br>11.7 |
| Sword | Samedan | 10<br>1 | Hermosa 1985 | PAPCO 1986 | Gaviota | Sword | 2007 | 12,500<br>3,125 | 2012 | 29<br>7.3 |

[1]The Rocky Point Field is already in production via wells drilled from existing Point Arguello Unit platforms through the eastern half of Lease 451. The reserve numbers and peak production (vol/day) reflect the entire field's development potential.

[2]Table 5.2-4 in the EID lists the date of first production for the Bonito Unit as 2009, however Table 5.2-5 lists the date of first production as 2007. The text of the EID offers no clarification.

### ***Background***

The seven leases in the Bonito Unit, Lease Numbers 443, 445, 446, 449, 450[15], 499, and 500 were issued in Lease Sales 53 and RS2, in 1981 and 1982, respectively. (See Appendix A for details on federal lease sales.) In 1986, MMS unitized the leases into the Bonito Unit. Three oil fields lie within the Bonito Unit: from north to south, the Unnamed 443 field, the Bonito Field and the Electra Field (sometimes also referred to as the Piñon-Electra Field.) A summary of past lease suspensions for the Bonito Unit is included in Exhibit 7.

Included in each of the Bonito Unit leases are lease stipulations to mitigate potential environmental effects that may occur as a result of exploration and development, including, for example, requirements to protect sensitive biological and cultural resources, and educate operator personnel about commercial fishing activities. The full text of all lease stipulations is included as Exhibit 8. These stipulations will remain in effect during the lease suspension and the post-suspension period.

The Commission has reviewed activity in the Bonito Unit a total of six times, from 1982 until 1985. In those three years, the Commission reviewed a total of five Exploration Plans authorizing 21 exploration wells, of which seven were drilled. A complete list of Commission actions related to the Bonito Unit can be found in Exhibit 5.

### ***Northern Bonito Unit Development***

The Bonito Unit consists of seven leases (or parts of leases) containing three oil fields. As shown in Exhibit 3, Leases 499, 500 and 443 contain an oil field in the north referred to as Unnamed 443 (also known as the "Sugar Maple Field" in some reports). Leases 445, 446 and 449 contain the Bonito Oil Field in the middle of the unit, and Leases 446, 449 and 450 cover the small Electra Oil Field in the very southeast of the unit.

The EID's hypothetical development scenario provides that the existing Platform Hidalgo will be used to develop oil reserves in the southern part of the Bonito Unit, specifically the Electra and Bonito Oil Fields. (See page 5.2-14 of the EID.) The EID does not describe if or how the oil reserves in the Bonito Unit's northern Unnamed 443 Oil Field or the northern part of the Bonito Oil Field will be developed. The Commission notes that both the COOGER study and the Draft EIS for Delineation Drilling identified the need for one additional platform to develop the northern Bonito and Unnamed 443 Oil Fields in the Bonito Unit.[16]

The consistency determination specifies that all seven leases in the Bonito Unit are being considered for suspension.[17] However, there is no discussion in the consistency determination or

---

[15] Most of Lease 450 is located in the Point Arguello Unit; the entire lease is therefore held by production and is not being considered for suspension. The northwestern portion of Lease 450 is located in the Bonito Unit, however; therefore the lease is included in this report.

[16] See COOGER Study, page 3-44 and the Draft EIS, page 6-16.

[17] See, for example, the cover page of the Bonito Unit consistency determination, the table on page 7 of the consistency determination, and Table 2.2-1 on page 2-1 of the EID.

the EID regarding the need for a new platform to develop the northern oil fields. The consistency determination and the EID are unclear as to why the northern leases of the Bonito Unit are being extended if no development is anticipated or, on the other hand, why their extension is being determined as consistent with the CCMP without consideration of new infrastructure required to develop the northern leases of this unit. In its April 22, 2005, letter to MMS, the Commission requested clarification on this point. MMS responded to the Commission's request as follows:

> *As stated previously, extended-reach drilling technology now can reach over 7 miles under the right geological conditions. Whether those conditions exist for the development of the Bonito Unit and whether they can be economically developed is a decision that resides with the operator, depending on their development strategy. As of December, 2004, development of the Bonito Unit via extended reach drilling from Platform Hidalgo in the Point Arguello Unit, is the current development strategy proposed by the operator, and the hypothetical scenario discussed in the EID. At this time, PXP [the operator] had decided not to pursue development of this Unit from a new platform as discussed in the 2001 Draft EIS for Delineation Drilling and COOGER Study.*

Accordingly, the Commission is assuming for purposes of conducting this federal consistency review that the northern oil fields in the Bonito Unit will be developed via extended reach drilling from Platform Hidalgo, and that no new platform is needed to develop these fields. The Commission notes that any substantial modification of the proposed project, such as installing a new platform in the northern Bonito Unit, will constitute grounds for the Commission to re-open its consistency review of the lease suspensions pursuant to Section 930.45 of the regulations which implement the CZMA (15 CFR Part 930).

### 2.3.2 Rocky Point Unit

***Project Description***

MMS proposes to grant a Suspension of Production for Arguello's Rocky Point Unit for a period of 37 months. Granting the suspension will allow Arguello to prepare revisions to the Platforms Hermosa and Hidalgo Development and Production Plans and submit them to MMS for approval (including technical and environmental review). Activities during the suspension period will be administrative in nature, completed by Arguello and/or their consultant(s) in an office setting, and involve no physical activities on the unit itself.

As discussed in Section 2.2.2: Scope of Coastal Commission Review, the Commission's environmental analysis includes hypothetical post-suspension development activities that will result from the lease suspensions. Post-suspension development of the Rocky Point Unit will be undertaken from facilities associated with the Point Arguello Unit, and will not require new infrastructure such as new platforms or pipelines, although minor modifications to the platforms may be necessary. During post-suspension development, twelve extended-reach development wells will be drilled from Platforms Hermosa and Hidalgo. Each well will have a horizontal displacement of 2.5 to 3.5 miles, and will require three to four months to drill.

Oil will be dehydrated and stabilized on the platforms, then sent to the Gaviota Oil Heating Facility via the PAPCO pipeline. At the Gaviota Oil Heating Facility, the oil will be metered and heated, stored temporarily in the Gaviota Terminal Company storage tanks, then transported via the All American Pipeline to various refining facilities. Gas from the Rocky Point Unit will be processed on the platforms, and either: 1) sent via pipeline for sale onshore, 2) used to generate electricity and heat for platform operations, 3) sent to shore to fuel the Gaviota co-generation units, and/or 4) injected into the Point Arguello Field, the Rocky Point field, or both.

Hypothetical post-suspension development of the Rocky Point Unit will not require new infrastructure such as new platforms or pipelines, although minor modifications to the platforms may be necessary.

***Background***

The Rocky Point Unit includes two leases, 452 and 453, issued in Lease Sale 53 in 1981. The leases were unitized as the Rocky Point Unit in 1985. The Rocky Point Oil Field is already in production via wells drilled from existing Point Arguello Unit platforms into the eastern half of Lease 451 (which is not a part of any unit). The Jalama Oil Field lies to the east of the Rocky Point Oil Field within the Rocky Point Unit. A summary of past lease suspensions for the Rocky Point Unit is included in Exhibit 7.

Included in both of the Rocky Point Unit leases are lease stipulations to mitigate potential environmental effects that may occur as a result of exploration and development, including, for example, requirements to protect sensitive biological and cultural resources, and educate operator personnel about commercial fishing activities. The full text of all lease stipulations is included in Exhibit 8. These stipulations will remain in effect during the lease suspension and the post-suspension period.

The Commission has reviewed activity in the Rocky Point Unit a total of three times, all in 1982. The Commission reviewed one Exploration Plan authorizing six exploration wells, of which four were drilled. A complete list of Commission actions related to the Rocky Point Unit can be found in Exhibit 5.

### 2.3.3 Sword Unit

***Proposed Project***

MMS proposes to grant a Suspension of Production for Samedan Oil Corporation's Sword Unit for a period of 25 months. Granting the suspension will allow Samedan to update and submit a revised Exploration Plan to MMS for approval (including technical and environmental review). Activities during the suspension period will be administrative in nature, completed by Samedan and/or their consultant(s) in an office setting, and involve no physical activities on the unit itself.

As discussed in <u>Section 2.2.2: Scope of Coastal Commission Review</u>, the Commission's environmental analysis includes hypothetical post-suspension activities that will result from the lease suspensions. Post-suspension development of the Sword Unit will be undertaken from facilities associated with the Point Arguello Unit, and will not require new infrastructure such as new platforms or pipelines, although minor modifications to the platforms may be necessary.

During the post-suspension period, eleven development wells — ten oil wells and one service well — will be drilled from Platform Hermosa. The wells will be extended-reach wells with horizontal displacements of 3.5 to 4.5 miles. Drilling each well will require three to four months.

Oil will be dehydrated and stabilized on the platforms, then sent to the onshore Gaviota Oil Heating Facility via the PAPCO pipeline. At the Gaviota Oil Heating Facility, the oil will be metered and heated, stored temporarily in the Gaviota Terminal Company storage tanks, then transported via the All-American Pipeline to various refinery destinations. Gas from the Sword Unit will be processed on Platform Hermosa and either, 1) sent via pipeline for sale onshore, 2) used to generate electricity and heat for platform operations, 3) sent to shore to fuel the Gaviota co-generation units, and/or 4) injected into the Point Arguello Field.

***Background***

The Sword Unit includes four leases — Leases 319, 320, 322, and 323A — which were issued in Lease Sale 68 in 1982. In 1984, the leases were unitized as the Sword Unit. A portion of Lease 323 was relinquished and the remaining lease was redesignated 323A to reflect the change. The Sword Unit contains only the Sword Oil Field. A summary of past lease suspensions for the Sword Unit is included in Exhibit 7.

Included in all of the Sword Unit leases are lease stipulations to mitigate potential environmental effects that may occur as a result of exploration and development, including, for example, requirements to protect sensitive biological and cultural resources. The full text of all lease stipulations is included in Exhibit 8. These stipulations will remain in effect during the lease suspension and the post-suspension period.

The Commission has reviewed activity in the Sword Unit a total of four times, during the time period from 1981 until 1985. The Commission reviewed four Exploration Plans authorizing eleven exploration wells, of which three were drilled. A complete list of Commission actions related to the Sword Unit can be found in Exhibit 5.

### 2.3.4 Information Lacking from the Project Descriptions

The Commission recognizes that a great deal of uncertainty exists in how the post-suspension development scenarios will actually be implemented, and consequently the scenarios have been written in very general terms. Notwithstanding this uncertainty, there is important information that is currently available but which has not been included in the post-suspension development scenarios. In addition, some information presented in the scenarios is inconsistent with information presented by the operators or found in other reports. The Commission has found that MMS has not provided enough information in the consistency determinations and supporting EID regarding if and for how long the proposed post-suspension development and production activities will extend the life of existing Point Arguello Unit infrastructure. Associated infrastructure includes platforms, pipelines, power cables, and onshore facilities (e.g., Gaviota Oil Heating Facility and Arguello Pumping Station).

The Commission requested clarification from MMS regarding how the proposed suspension of leases may extend the life of existing Point Arguello Unit infrastructure.[18] The Commission requested that MMS provide the following information:

- A complete list of all infrastructure whose life could be extended by the lease suspensions and future exploration or production activity including platforms, pipelines, power cables, and onshore facilities (such as the Arguello pumping station and the Gaviota Heating/Transfer Facility). A list of structures whose life would not be extended by the lease suspensions would also be helpful.

- The projected extension of life for all infrastructure. Please provide information concerning when each structure would have been decommissioned without the suspensions, and when it would be decommissioned with the suspensions.

MMS responded to the Commission's request as follows[19]:

> *At this time, it is not possible for MMS to predict how the life the Point Arguello Unit will be affected by the additional development of the Bonito, Sword and Rocky Point Units. Field longevity is determined by many factors including economics, geological, geophysical, and engineering advancements, and development strategy. The operator of the Point Arguello Unit will be required to submit a revision(s) to the Point Arguello platform's DPP(s) to develop the surrounding fields with extended reach technology...*

As discussed in relevant sections of this report below, information regarding the potential for the lease suspensions to extend the life of existing Point Arguello Unit infrastructure is necessary for the Commission to evaluate the consistency of the lease suspensions with the CCMP. Specifically, this information is necessary for the Commission's analysis in the following issue areas: commercial fishing (Sections 30230 and 30234.5), visual resources (Section 30251), and structural stability (Sections 30253(2) and 30262(a)).

### 2.4 Point Arguello Unit

Point Arguello Unit leases, infrastructure and oil fields are depicted in Exhibit 3. Arguello, Inc. (a wholly owned subsidiary of PXP) operates Point Arguello Unit infrastructure to produce oil and gas from: 1) the Point Arguello Oil Field which underlies the Point Arguello Unit, consisting of Leases 315, 316, 450, and the western half of Lease 451; and 2) the Rocky Point Oil Field, which underlies the eastern half of Lease 451 (a separate "ununitized" lease, which is not part of either the Point Arguello Unit or the Rocky Point Unit). Point Arguello Unit infrastructure consists of the following major facility components:

- Platforms Harvest, Hermosa, and Hidalgo, which are located approximately ten to fifteen miles northwest of Point Conception, offshore Santa Barbara County.

---

[18] April 22, 2005. Letter from Alison Dettmer, CCC, to Ellen Aronson, MMS.

[19] June 23, 2005. Letter from Ellen Aronson, MMS, to Alison Dettmer, CCC.

- Subsea crude oil and natural gas pipelines that connect Platforms Harvest and Hidalgo to Platforms Hermosa.
- Subsea PAPCO crude oil pipeline and PANGL natural gas pipeline from Platform Hermosa to the onshore Gaviota Oil Heating Facility ("Gaviota Facility").
- The onshore Gaviota Facility, which is located 28 miles west of the City of Santa Barbara, on the east side of Highway 101.
- The onshore Gaviota Terminal Storage Facility, which is located adjacent to the Gaviota Facility, on the west side of Highway 101.
- The All American Pipeline Gaviota Pump Station, which is located at the Gaviota Facility.
- The All American Pipeline, which transports oil from the Gaviota Facility to refineries.

Platforms Harvest, Hermosa, and Hidalgo produce oil and gas from the underlying Point Arguello Oil Field, and use extended-reach drilling to produce oil and gas from the adjacent Rocky Point Oil Field underlying the eastern half of Lease 451. All oil and gas currently extracted from the Point Arguello Unit and Lease 451 is processed offshore on the platforms. Processed ("sweet") gas is used onsite to power the platforms, while unprocessed ("sour") gas is reinjected. Excess sweet gas and all processed oil are transported via the subsea PANGL and PAPCO pipelines to the onshore Gaviota Facility. The Gaviota Facility uses the sweet gas to generate electricity and steam for use onsite. Excess electricity can be sold to the public utility grid. The processed crude oil is pumped into the All American Pipeline for transport to the final refining destination.

### 2.4.1 Development History

Exhibit 6 provides a history of the Coastal Commission federal consistency actions for the Point Arguello Unit, development of the eastern half of Lease 451, and related facilities. In 1983-1984, the Commission concurred in consistency certifications (CC-12-83, CC-27-83, CC-24-84) to construct and operate Platforms Hermosa, Harvest and Hidalgo and associated subsea infrastructure (pipelines, etc.). Platforms Harvest and Hermosa were installed in 1985, and Hidalgo in 1986. The first wells started producing in 1991.

In August 2003, MMS, the Commission (NE-042-03),[20] and the County of Santa Barbara approved Arguello's proposal to develop the eastern half of Lease 451 using extended-reach drilling from Platforms Hermosa and Hidalgo. Arguello drilled five wells from Hermosa and three wells from Hidalgo, using the existing pre-approved well slots. Arguello began producing the eastern half of Lease 451 in October 2004. Under the current production scenarios for the Point Arguello Unit and eastern half of Lease 451, the estimated decommissioning/removal date for the Point Arguello platforms and pipelines is between 2015-2020.

---

[20] In August 2003, in no effects letter NE-042-03, the Commission concurred in the MMS approval of the project by determining that the proposed DPP amendment was not subject to additional consistency review by the Commission, because the proposed extended reach drilling would not cause effects on coastal resources substantially different than those reviewed by the Commission in the original consistency certifications for the two platforms (CC-12-83 and CC-24-84).

Until 1998, Arguello shipped Point Arguello Unit crude oil and gas to shore by pipeline for processing at the onshore Gaviota Facility. To reduce operating costs associated with declining volumes, in 1998 the operators received approval from MMS, the Commission,[21] and the County of Santa Barbara to reconfigure Point Arguello Unit operations to process (dehydrate and stabilize) all oil and gas at the offshore platforms. One oil and gas processing unit was installed on each of the platforms, Hermosa and Harvest, to process the oil and gas at these platforms. The oil and gas from Platform Hidalgo is transported by pipeline and processed on Platform Hermosa. Once oil and gas is processed at the platforms, the subsea PAPCO and PANGL pipelines transport the oil and gas from Platform Hermosa to the onshore Gaviota Facility.

### 2.4.2 Oil Volumes and Capacity

The 1984 Point Arguello Unit EIR/EIS estimated total recoverable oil reserves in the Point Arguello Field at 500 million barrels of oil. As of May 2005, the Point Arguello Unit and the eastern half of Lease 451 had produced a total of approximately 167 million barrels of oil. [22] Total remaining recoverable oil reserves for the Point Arguello Unit and the eastern half of Lease 451 is projected at 20 million barrels of oil.[23]

Arguello estimates that the Point Arguello Unit and the eastern half of Lease 451, combined, will produce a maximum of 31,000 barrels per day ("bpd") of oil in 2006, and that annual yields will quickly decline after 2006. Current production (2005) for both the Point Arguello Unit and eastern half of Lease 451 is 11,000 bpd of oil and 18 million standard cubic feet per day ("mmscf/d") of gas.

Daily and annual yields as well as total volume of oil and gas reserves are substantially less than the amounts anticipated when the Commission concurred in the consistency certifications for Platforms Hermosa, Hidalgo and Harvest.

The oil processing units that have been installed on the platforms restrict the maximum oil production throughput capacity of the platforms to approximately 35,0000 bpd. The equipment on Platform Harvest can process 20,000 bpd, while Platform Hermosa can process 15,000 bpd. Because oil from Platform Hidalgo is processed at Platform Hermosa, the 15,000 bpd capacity of the equipment on Platform Hermosa restricts the combined oil production of Platforms Hidalgo and Hermosa. Similarly, the design capacity of the gas processing units on each of the platforms restricts the total maximum amount of gas that can be processed at all platforms to 18 mmscf/d. Excess sour gas extracted from the wells is reinjected at the platforms.

---

[21] In a letter to MMS dated December 31, 1998, Commission staff determined that the proposed amendment to the DPPs did not require federal consistency review by the Coastal Commission, because the proposed reconfiguration project would not cause coastal zone effects substantially different from those originally reviewed by the Commission.

[22] May 5, 2005. Pers. comm. Robin Blanchfield, CCC, to Joan Barminski, MMS, who obtained data from PXP/Arguello.

[23] May 19, 2005. Pers. comm. Robin Blanchfield, CCC, to Drew Mayerson, MMS, who obtained data from PXP/Arguello.

The Commission originally approved a total of 154 well slots for Platforms Hermosa, Hidalgo, and Harvest. Currently, 46 of the 154 well slots are being used for production of the Point Arguello Unit and the eastern half of Lease 451. Another five slots on Platform Hermosa will be used for future production of the eastern half of Lease 451.[24] Therefore, 103 well slots are available for future production. Table 6 describes the distribution of the well slots among the three platforms.

**Table 6: Well Slots**

| | Harvest | Hermosa | Hidalgo |
|---|---|---|---|
| Originally approved | 50 | 48 | 56 |
| Currently in use | 19 | 14 | 13 |
| Future Lease 451 wells | 0 | 5 | 0 |
| Available | 31 | 34 | 38 |

## 2.5 Related Environmental Documents

### 2.5.1 Environmental Assessments

Under the National Environmental Policy Act, MMS prepared six Environmental Assessments ("EAs") discussing the potential impacts of activities that will occur during the suspensions.[25] The EAs include:

- MMS Proposal to Grant Suspensions of Production for Aera Energy LLC's Lion Rock Unit, Point Sal Unit, Purisima Point Unit, Santa Maria Unit, and Lease 409
- MMS Proposal to Grant Suspension of Production for Plains Exploration & Production Company's Bonito Unit
- MMS Proposal to Grant Suspension of Production for Arguello Inc.'s Rocky Point Unit
- MMS Proposal to Grant Suspension of Production for Samedan Oil Corporation's Sword Unit
- MMS Proposal to Grant Suspension of Production for Samedan Oil Corporation's Gato Canyon Unit
- MMS Proposal to Grant Suspension of Operations for Venoco, Inc.'s Cavern Point Unit

The EAs were far more limited in scope than the subject consistency determinations, because they only addressed potential impacts from activities occurring during the suspension periods (i.e., they did not examine potential impacts from hypothetical post-suspension development). The EAs concluded that all potential impacts from activities occurring during the suspension

---

[24] May 5, 2005. Pers. comm. Robin Blanchfield, CCC, to Joan Barminiski, MMS. See the Commission's letter of no effects, NE-042-03.

[25] U. S. Department of the Interior, Minerals Management Service. *Environmental Assessments and Findings of No Significant Impact For Granting Suspensions of Production or Operations*. February 11, 2005. Available at http://www.mms.gov/omm/pacific/lease/2005-final-eas.htm

periods can be mitigated to an insignificant level. MMS issued findings of no significant impact based on each of the EAs on February 11, 2005. On March 9, 2005, ten conservation groups, led by the Natural Resources Defense Council and the Environmental Defense Center, filed a lawsuit in federal district court against MMS, challenging the adequacy of the EAs (*League for Coastal Protection, et al. v Norton, et al.*, No. C 05-00991-CW (N.D. Cal.)).

### 2.5.2 Environmental Information Document

Acknowledging that the Appeals Court envisioned more extensive analysis of activities that could occur after the suspensions were granted, MMS submitted, along with the consistency determinations, an Environmental Information Document ("EID").[26] The EID evaluates the potential post-suspension activities, presented as hypothetical scenarios in the period following the suspensions. The EID analyzes activities that could potentially take place during the 2006–2030 time period, including: 1) exploration and delineation drilling, 2) platform and pipeline construction, 3) production activities, and 4) decommissioning of facilities.

### 2.5.3 Draft EIS for Delineation Drilling

In June 2001, MMS published a Draft EIS for Delineation Drilling ("Draft EIS" or "DEIS")[27] addressing the potential environmental effects of proposed delineation drilling from a Mobile Offshore Drilling Unit in federal waters offshore Santa Barbara County. The Draft EIS addressed potential impacts from drilling activities, as well as potential cumulative impacts for the periods 2002 through 2006, and 2002 through 2030. The Draft EIS analyzed proposed delineation drilling in the Point Sal Unit, Purisima Point Unit, Bonito Unit, and Gato Canyon Unit. The EID is based substantially on information presented in the Draft EIS.

After publishing the Draft EIS, on July 2, 2001, MMS directed suspensions on all of the undeveloped leases to provide time to prepare consistency determinations and NEPA documentation, as directed by the District Court in *California v. Norton*. Also, as a result of the Court decision, MMS postponed work on finalizing the Draft EIS, including the public hearings, and extended the comment period.

### 2.5.4 COOGER Study

The California Offshore Oil and Gas Energy Resources Study ("COOGER Study")[28] was designed by a joint government, industry, and public working group to address concerns about the potential demands on onshore infrastructure from expanded oil and gas development in both State and federal waters. The study assessed and compared a suite of potential Pacific OCS development scenarios for San Luis Obispo, Santa Barbara, and Ventura Counties over a 20-year

---

[26] Minerals Management Service, Pacific OCS Region. *Environmental Information Document for Post-Suspension Activities on the Nine Federal Undeveloped Units and Lease OCS-P 409 Offshore Santa Barbara, Ventura, and San Louis Obispo Counties.* Prepared by Aspen Environmental Group. January 2005.

[27] Minerals Management Service, Pacific OCS Region. *Delineation Drilling Activities in Federal Waters Offshore Santa Barbara County, California.* Draft Environmental Impact Statement. Published by the US Department of the Interior, MMS, Pacific OCS Region. Document 2001-046. June 2001.

[28] Minerals Management Service. *Final California Offshore Oil and Gas Energy Resources Study: Development Scenarios and Onshore Physical Infrastructure in the Tri-County Area of San Louis Obispo, Santa Barbara and Ventura.* Prepared by Dames & Moore. OCS Report MMS 99-0043. January 26, 2000.