STATE OF CALIFORNIA—THE RESOURCES AGENCY ARNOLD SCHWARZENEGGER, *GOVERNOR*

CALIFORNIA COASTAL COMMISSION

45 FREMONT, SUITE 2000
SAN FRANCISCO, CA 94105-2219
VOICE AND TDD (415) 904-5200
FAX (415) 904-5400

# Th5i

| | |
|---|---|
| Staff: | AJD-SF |
| File Date: | 4/7/05 |
| 60th Day: | 6/6/05 |
| 75th Day: | 6/21/05 |
| Extended to: | 8/12/05 |
| Hearing Date: | 8/11/05 |

## STAFF REPORT AND RECOMMENDATION ON CONSISTENCY DETERMINATION

**Consistency Determination No.:** **CD-050-05**

**Federal Agency:** **U.S. Department of the Interior Minerals Management Service**

**Project Location:** Gato Canyon Unit (Leases OCS-P 0460 and OCS-P 0464) located in federal waters, western Santa Barbara Channel offshore Santa Barbara County.

**Project Description:** Approval of a Suspensions of Production (i.e., lease extensions) for 37 months to Samedan Oil Corporation for Gato Canyon Unit leases. Suspension period activities include a 3-4 day shallow hazard survey. Reasonably foreseeable post-suspension activities include (a) drilling a delineation well on Lease OCS-P 0460 using a mobile offshore drilling unit ("MODU"), and (b) installing, operating, and decommissioning one oil and gas production platform, associated pipelines, and power cables.

**Substantive File Documents:** See Exhibit 1

## Executive Summary

On April 7, 2005, the U.S. Department of the Interior, Minerals Management Service ("MMS") submitted to the Coastal Commission a consistency determination for 37-month Suspensions of Production (i.e., extension of a lease term) for the leases in the Gato Canyon Unit located offshore of the Gaviota coast (Leases OCS-P 0460 and OCS-P 0464). Samedan Oil Company is the operator of the Gato Canyon Unit.

The MMS submitted consistency determinations for suspensions of 36 leases off the coast of San Luis Obispo, Santa Barbara, and Ventura Counties, grouped into 10 consistency determinations. This report provides the Commission's review and findings on one of the 10 consistency determinations and two of 36 lease suspensions.

During the proposed suspension period, Samedan proposes to conduct in-office activities (e.g., prepare revisions to an existing Exploration Plan or prepare a new Exploration Plan) and a 3-4 day shallow hazard survey. After the proposed suspension period ends, the MMS anticipates Samedan will drill one delineation well and install, operate, and eventually decommission one oil and gas production platform and associated pipelines and power cables. Produced oil and gas would be transported to shore via pipeline to the existing Las Flores Canyon oil and gas processing facility.

Based on the 2001 decision of the U.S. District Court in the case of *State of California v. Norton* (affirmed by the U.S. Court of Appeal, Ninth Circuit), these lease suspensions are subject to the consistency review requirements of section 307(c) of the Coastal Zone Management Act ("CZMA"). The court decision clarified that the Commission's review of a lease suspension is similar to its review of a lease sale in the sense that the Commission is to analyze the broad and long-term coastal effects of the activities (i.e., post-suspension exploration, development and production activities) that are reasonably foreseeable results of the MMS's approval of the subject lease suspensions. The court nevertheless acknowledged, and the Commission agrees, that a lease suspension is not identical to a lease sale. The subject lease suspensions have been requested decades after the initial lease sale, after most of these leases have been explored and detailed environmental and technical evaluations have already been performed. Substantially more information and details are available now on these leases than were available at the original lease sale stage.

The Commission has reviewed the April 7, 2005, consistency determinations by the MMS and has determined that additional information is needed to enable it to complete its review. In an April 22, 2005, letter to the MMS, the Commission staff requested additional information regarding the "reasonably foreseeable direct and indirect effects" of the requested suspensions, including information about the likely post-suspension exploration, development, and production activities (see Appendix B – Letter from Coastal Commission to MMS). The Commission staff informed the MMS that additional information is needed for the Commission to determine whether granting the lease suspensions is consistent with the enforceable policies of the California Coastal Management Program ("CCMP"). In a June 23, 2005, response letter, the MMS replied that most of the information the Commission staff requested is more appropriate

for exploration and development review stages, rather than for a review of the lease suspensions themselves (see Appendix C – Letter from MMS to Coastal Commission). The Commission disagrees with this position.

The additional information requested in the April 22, 2005 letter that is necessary for the Commission to complete its review of the Gato Canyon Unit leases suspensions is:

- **Oil Spill Risk Analysis**. To evaluate potential impacts from an oil spill to marine and shoreline resources, the Commission requested detailed information on (a) worst case oil discharge volumes, (b) oil spill probabilities, and (c) oil spill trajectories. See Section 3.1: Oil Spills.

- **Alternatives Analysis**. To evaluate if feasible, less environmentally damaging alternatives are available that would eliminate the placement of fill in coastal waters or avoid or lessen adverse individual and cumulative effects of a new platform and associated infrastructure, the Commission requested an evaluation of using (a) existing Santa Ynez Unit Platform Hondo; (b) an onshore site; and (c) subsea well completions (i.e., wells sitting on the seabed) to extract Gato Canyon Unit oil and gas. See Section 3.3: Placing Fill in Coastal Waters and Section 3.5: Scenic and Visual.

Without this information, the Commission is unable to determine whether the granting of the lease suspensions is consistent with the marine resource (Coastal Act Section 30230), water quality (Coastal Act Section 30231), placing fill in coastal waters (Coastal Act Section 30233(a), commercial fishing (Coastal Act Sections 30230 and 30234.5), public access and recreation (Coastal Act Sections (30210, 30211, 30220 and 30234.5), visual (Coastal Act Sections 30251 and 30262(a)(3)), environmentally sensitive habitat area (Coastal Act Section 30240), and cultural resources policies (Coastal Act Section 30244) of the CCMP.

In addition, while development at this unit would normally be subject to the provisions of the coastal-dependent industrial "override" policy (Section 30260) of the Coastal Act, the lack of the above-identified information also makes it impossible for the Commission to make the necessary findings under that policy.

The Commission therefore **objects** to the MMS's consistency determination, based on lack of adequate information to determine the lease suspensions' consistency with the enforceable policies of the CCMP.

## TABLE OF CONTENTS

1 STAFF RECOMMENDATION .......... 6
1.1 Motion and Resolution .......... 6
1.2 Applicable Legal Authorities .......... 6
1.2.1 Necessary Information .......... 6
1.2.2 Practicability .......... 7
1.2.3 Federal Agency Response to Commission Objection .......... 7
1.3 Standard of Review .......... 8
2 FINDINGS AND DECLARATIONS .......... 8
2.1 Introduction .......... 9
2.2 Background of Federal OCS Leases .......... 10
2.2.1 Coastal Commission Review of Lease Suspensions .......... 10
2.2.2 Scope of Coastal Commission Review .......... 11
2.2.3 Current OCS Operations in California .......... 14
2.3 Project Description .......... 17
2.4 Gato Canyon Unit Background .......... 19
2.4.1 Lease Sale 68 .......... 19
2.4.2 Exploratory Drilling on Lease OCS-P 0460 .......... 19
2.4.3 A Series of Suspensions .......... 20
2.5 Related Environmental Documents .......... 20
2.5.1 Environmental Assessments .......... 20
2.5.2 Environmental Information Document .......... 21
2.5.3 Draft EIS for Delineation Drilling .......... 21
2.5.4 COOGER Study .......... 22
3 COASTAL ACT ISSUES .......... 22
3.1 Oil Spills .......... 22
3.1.1 Introduction .......... 22
3.1.2 Regional Oil Spill History .......... 25
3.1.3 Coastal Resources at Risk from an Oil Spill .......... 26
3.1.4 Oil Spill Risk Analysis .......... 30
3.1.5 Prevention and Response Capability .......... 38
3.2 Marine Resources and Water Quality .......... 44
3.3 Placing Fill in Coastal Waters .......... 58
3.4 Commercial Fishing .......... 60
3.5 Scenic and Visual .......... 64
3.6 Recreation and Public Access .......... 67
3.7 Geologic Hazards .......... 70
3.8 Cultural Resources .......... 73
3.9 Air Quality .......... 75
3.10 Coastal-Dependent Industrial "Override" Policy .......... 78

EXHIBITS (ATTACHED TO THIS REPORT)

Exhibit 1: Substantive File Documents
Exhibit 2: Region Map
Exhibit 3: Gato Canyon Unit Map
Exhibit 4: Lease Sale 68 Stipulations
Exhibit 5: Regional Marine Resources
Exhibit 6: Excerpt from June 27, 2005 Letter from EDC to Coastal Commission Staff
Exhibit 7: July 15, 2005 Letter from MMS to Coastal Commission Staff
Exhibit 8: Potential Route of Gato Canyon Unit Pipelines

APPENDICES (IN SEPARATE PACKET)

Appendix A: Summary of Pacific OCS Development
Appendix B: April 22, 2005, Letter from Coastal Commission Staff to MMS
Appendix C: June 23, 2005, Letter from MMS to Coastal Commission Staff

# 1 STAFF RECOMMENDATION

## 1.1 Motion and Resolution

**Motion:**

> *I move that the Commission* ***concur*** *with consistency determination CD-050-05 that the project described therein is consistent to the maximum extent practicable with the enforceable policies of the California Coastal Management Program.*

**Staff Recommendation:**
Staff recommends a **NO** vote on the motion. Failure of this motion will result in an objection to the determination and adoption of the following resolution and findings. An affirmative vote of a majority of the Commissioners present is required to pass the motion.

**Resolution to Object to Consistency Determination:**

> *The Commission hereby* ***objects*** *to the consistency determination by the Minerals Management Service for the proposed project, finding that the consistency determination lacks information necessary to evaluate the project's consistency with the California Coastal Management Program.*

## 1.2 Applicable Legal Authorities

Section 307 of the Coastal Zone Management Act ("CZMA") (16 USC § 1456) provides in part:

> *(c)(1)(A) Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of the approved State management programs.*

### 1.2.1 Necessary Information

Section 930.43(b) of the federal consistency regulations (15 CFR § 930.43(b)) requires that, if the Commission bases its objection on a lack of information, the Commission must identify the information necessary for it to assess the project's consistency with the California Coastal Management Program ("CCMP"). That section states:

> *If the State agency's objection is based upon a finding that the Federal agency has failed to supply sufficient information, the State agency's response must describe the nature of the information requested and the necessity of having such information to determine the consistency of the Federal agency activity with the enforceable policies of the management program.*

*Nature of Information Requested*

As described in Section 3: Coastal Act Issues of this report, the Commission finds this consistency determination lacks the information that the Commission has requested from the

Minerals Management Service ("MMS") to enable the Commission to determine whether granting the lease suspensions is consistent with the policies of the CCMP related to: marine resources (Section 30230), water quality (Section 30231), fill (Section 30233(a)), commercial fishing (Sections 30230 and 30234.5), scenic and visual (Sections 30251 and 30262(a)(3)), public access and recreation (Sections 30210, 30211, 30220, and 30234.5), environmentally sensitive habitat areas (Section 30240) and cultural resources (Section 30244). To determine if the lease suspensions are consistent with the CCMP, the Commission has requested the MMS provide it with the following necessary information:

1. **Oil Spill Risk Analysis**. To evaluate potential impacts from an oil spill to marine and shoreline resources, the Commission has requested detailed information on (a) worst case oil discharge volumes, (b) oil spill probabilities, and (c) oil spill trajectories. See Section 3.1: Oil Spills.

2. **Alternatives Analysis**. To evaluate if feasible, less environmentally damaging alternatives are available that would eliminate the placement of fill in coastal waters or avoid or lessen adverse individual and cumulative effects of a new platform and associated infrastructure, the Commission requested an evaluation of using (a) existing Santa Ynez Unit Platform Hondo; (b) an onshore site; and (c) subsea well completions (i.e., wells sitting on the seabed) to extract Gato Canyon oil and gas. See Section 3.3: Placing Fill in Coastal Waters and Section 3.5: Scenic and Visual.

The need for this information is discussed in the findings below, as follows: Oil Spill Risk Analysis, see pages 30-43, and Alternatives Analysis, see pages 56-58 and pages 62-65. In addition, as discussed in Section 10: Coastal-Dependent Industrial "Override" Policy, pages 76-79, this information is also necessary for the Commission's analysis under Coastal Act Section 30260.

### 1.2.2 Practicability

The federal consistency regulations implementing the CZMA include the following provision:

> *Section 930.32 Consistent to the maximum extent practicable.*
>
> *(a)(1) The term ''consistent to the maximum extent practicable'' means fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency.*

Since MMS has raised no issue of practicability, as so defined, the standard before the Commission is full consistency with the policies of the California Coastal Management Program.

### 1.2.3 Federal Agency Response to Commission Objection

Section C(a)(i) of Chapter 11 of the CCMP requires federal agencies to inform the Commission of their response to a Commission objection. This section provides:

> *If the Coastal Commission finds that the Federal activity or development project ... is not consistent with the management program, and the federal agency disagrees and decides to go forward with the action, it will be expected to (a) advise the Coastal Commission in writing that the action is consistent, to the maximum extent practicable, with the coastal management program, and (b) set forth in detail the reasons for its decision. In the event the Coastal Commission seriously disagrees with the Federal agency's consistency determination, it may request that the Secretary of Commerce seek to mediate the serious disagreement as provided by Section 307(h) of the CZMA, or it may seek judicial review of the dispute.*

The federal consistency regulations reflect a similar obligation; 15 CFR §930.43 provides:

> ***State agency objection.***
>
> *(d) In the event of an objection, Federal and State agencies should use the remaining portion of the 90-day notice period (see §930.36(b)) to attempt to resolve their differences. If resolution has not been reached at the end of the 90-day period, Federal agencies should consider using the dispute resolution mechanisms of this part and postponing final federal action until the problems have been resolved. At the end of the 90-day period the Federal agency shall not proceed with the activity over a State agency's objection unless: (1) the Federal agency has concluded that under the ''consistent to the maximum extent practicable'' standard described in section 930.32 consistency with the enforceable policies of the management program is prohibited by existing law applicable to the Federal agency and the Federal agency has clearly described, in writing, to the State agency the legal impediments to full consistency (See §§930.32(a) and 930.39(a)), or (2) the Federal agency has concluded that its proposed action is fully consistent with the enforceable policies of the management program, though the State agency objects.*
>
> *(e) If a Federal agency decides to proceed with a Federal agency activity that is objected to by a State agency, or to follow an alternative suggested by the State agency, the Federal agency shall notify the State agency of its decision to proceed before the project commences.*

### 1.3 Standard of Review

The standard of review for federal consistency determinations is the enforceable policies of the CCMP, of which the substantive policy component is the Chapter 3 policies of the Coastal Act (California PRC §§ 30200-30265.5).

## 2 FINDINGS AND DECLARATIONS

The Commission finds and declares as follows:

**2.1 Introduction**

Samedan Oil Corporation ("Samedan") has submitted a request to the Minerals Management Service ("MMS") for a 37-month suspension[1] of undeveloped Outer Continental Shelf ("OCS") oil and gas leases (OCS-P 0460, OCS-P 0462[2] and OCS-P 0464) that comprise the Gato Canyon Unit. The Gato Canyon Unit is located offshore Santa Barbara County. See Exhibit 3.

Pursuant to section 307(c) of the CZMA,16 USC § 1456(c)(1), the MMS's review and approval of the operator's requested lease suspensions is a federal agency activity subject to consistency review by the California Coastal Commission ("Commission"). Accordingly, on April 7, 2005, the MMS provided the Coastal Commission with a consistency determination (CD-050-05) in response to the operator's request for lease suspensions.

This report is one of four Commission staff reports prepared to review the consistency determinations submitted by the MMS for 36 OCS lease suspensions. Other Commission reports address lease suspension requests for the Cavern Point, Bonito, Rocky Point, Sword, Northern Santa Maria Basin units and OCS-P 0409.

In consistency determination CD-050-05, the MMS is requesting approval of the lease suspensions to allow Samedan time to undertake a shallow hazards survey and prepare a new or revised Exploration Plan.

Before any drilling or development activity can actually occur in the subject units, Exploration and Development and Production Plans must also be separately approved by the MMS (pursuant to 30 CFR §§ 250.203, 250.204). The MMS cannot approve any such further activity unless the Commission concurs with a consistency certification from the operator, or the Secretary of Commerce determines on appeal of a Commission objection that the activity is consistent with the objectives or purposes of the CZMA, or is necessary in the interest of national security (15 CFR §930.120).

The goal of the oil and gas operators, beyond the requested suspension period, is to explore, develop, and produce marketable quantities of oil and gas from reservoirs underlying the Gato Canyon Unit.

---

[1] A suspension is defined in 30 CFR § 250.105 as: "a granted or directed deferral of the requirement to produce (Suspension of Production) or to conduct leaseholding operations (Suspension of Operations)." A lease suspension is effectively an extension of the life of the lease. (30 CFR § 250.169(a)) See Section 2.2: Background of Federal OCS Leases of this report, below.

[2] On August 16, 1999, the MMS removed Lease OCS-P 0462 (i.e., it did not approve Samedan's requested suspension of Lease OCS-P 0462) from the Gato Canyon Unit and it expired. Samedan has appealed this decision to the Interior Board of Land Appeals. Although Samedan proposes to conduct a shallow hazards survey on the Gato Canyon Unit (including Lease OCS-P 0462) during its proposed suspension period, the scope of this consistency determination does not include Lease OCS-P 0462. If Samedan were to win its appeal pending before the Interior Board of Land Appeals, the MMS would need to submit to the Coastal Commission a consistency determination for suspending Lease OCS-P 0462.

## 2.2 Background of Federal OCS Leases

### 2.2.1 Coastal Commission Review of Lease Suspensions

The MMS has submitted consistency determinations for a total of 36 lease suspensions off the coast of San Luis Obispo, Santa Barbara and Ventura Counties. The leases are organized into nine separate "units," and one lease not within a unit (Lease 409).[3]

Each lease was issued by the US Department of the Interior before 1984, and had a primary term of five years[4]. After the initial term of a lease lapses, the lease continues in effect so long as oil and gas are produced in paying quantities or drilling operations are underway. If production or approved drilling is not underway at the end of the lease term, the lease expires and the lessee loses the right to exploit the oil and gas resources in the lease area (30 CFR § 250.180).

Alternatively, a lease may be "suspended." A suspension allows a lessee to suspend exploration, development, and/or production activities for a period of time without having the lease expire, thereby extending the life of the lease (OCSLA § 5(a)(1); 43 USC §1334(a)(1)). Suspensions can occur in two ways: first, the federal government can direct suspensions; for example, in order to comply with federal law or with court orders. Second, a lessee can request a suspension in order to keep the lease in effect under certain conditions specified in regulation without the lessee having to engage in exploration, development or production activities (30 CFR §§ 250.168-177). During a directed suspension, no activities can occur. During a granted suspension, the MMS can require that certain specified activities and milestones be met in order to demonstrate that the lessee intends to keep the lease from expiring.

Of the leases issued before 1984, 40 have not begun producing paying quantities of oil or gas. Additionally, a portion of Lease OCS-P 0450 that is assigned to the undeveloped Bonito Unit has not begun producing quantities of oil and gas. These leases would have expired if the MMS had not repeatedly extended the terms of the leases, through both directed and requested suspensions.

Until October 1992, the MMS, at the request of the lessees, had granted suspension of the 40 leases. On October 15, 1992, the MMS directed suspensions of the leases in order to conduct the *California Offshore Oil and Gas Energy Resources Study: Development Scenarios and Onshore Physical Infrastructure in the Tri-County Area of San Luis Obispo, Santa Barbara and Ventura* (known as the "COOGER Study"). In 1999, when the directed suspensions were about to end, the MMS advised the lessees that they would need to request suspensions in order to keep the

---

[3] Consistent with the Outer Continental Shelf Lands Act (as amended) ("OCSLA"), the MMS's regulations define the purpose of unitization to include 1) conserving natural resources; (2) preventing waste; and/or (3) protecting correlative rights (30 CFR § 250.1300).

[4] The MMS has not conducted a lease sale off the coast of California since 1984. See Appendix A for details on the lease sales conducted since 1963, including those sales relevant to the 36 subject leases. In 1990, former President George H. W. Bush, imposed a leasing moratorium offshore California, among other areas. President Bush imposed the moratorium in response to findings by the National Research Council that environmental information was inadequate to properly inform leasing offshore Florida and California.

leases from expiring. In May 1999, the lessees submitted requests for suspensions. The MMS declined to extend the lease terms of four of the leases[5], but approved the requested suspensions for the remaining 36 leases.

By letter dated July 27, 1999, the Coastal Commission informed the Department of the Interior and the MMS that, pursuant to the Coastal Zone Management Act ("CZMA"), 16 USC §1456(c)(3), the Commission was asserting its authority to review the lease suspensions for consistency with the California Coastal Management Program ("CCMP"). In an August 5, 1999, follow-up letter to the MMS, the Commission's Executive Director identified a number of concerns related to changed circumstances and new information that needed to be addressed in the MMS review, including the age of the leases, the poor quality of the oil, the proximity of the leases to marine sanctuaries, and potentially changed environmental circumstances. The Coastal Commission also advised the MMS that pursuant to the CZMA the lessees were required to provide the Coastal Commission with a certification of consistency with the CCMP.

The MMS disagreed with the Coastal Commission's position that the lease suspensions were subject to the consistency review requirements of the CZMA, and refused to submit consistency certifications to the Commission. In November 1999, the MMS notified the lessees that it had approved their requests for suspensions. The State of California challenged the MMS's failures to comply with the requirements of the CZMA with respect to the lease suspensions in U.S. District Court in the case of *State of California v. Norton*. On June 15, 2001, the district court held that the approval of the lease suspensions by the MMS is a federal agency activity subject to consistency review by California under the CZMA. The federal defendants appealed. On December 2, 2002, the U.S. Court of Appeals for the Ninth Circuit affirmed the district court judgment (311 F.3d 1162 (9th Cir. 2002)).

On April 7, 2005, pursuant to the court's order, the MMS submitted to the Commission 10 consistency determinations — one consistency determination for each of the nine units, plus one for Lease OCS-P 409. This report reviews the suspensions of leases in the Gato Canyon Unit. The lease suspensions for other units are analyzed in separate Commission reports.

### 2.2.2 Scope of Coastal Commission Review

At the time of issuance of the 36 subject leases, a lease sale was not a federal agency activity that required federal consistency review by the Commission. See *Secretary of the Interior v. California* (1984) 464 U.S. 312. In 1990, in the Coastal Zone Act Reauthorization Amendments of 1990 ("CZARA"), Congress amended the CZMA specifically to extend the consistency requirements of that statute to the sale of leases on the OCS as a federal agency activity. Congress clarified its intent in enacting the CZARA amendments to the CZMA in the following manner:[6]

---

[5] By decision dated August 16, 1999, the MMS removed three leases in the Santa Maria Unit (Leases 420, 424, and 429) and one in the Gato Canyon Unit (Lease 462) and they expired. The lessees appealed the decision to the Interior Board of Land Appeals, and the appeals are currently under review.

[6] House Conference Report No. 101-964; 1990 *U.S. Code Cong. & Adm. News*, p. 2017.

> *The conferees intend the determination of whether a specific federal agency activity may affect any natural resource, land use, or water use in the coastal zone to include ... cumulative and secondary effects. Therefore, the term "affecting"[in CZMA §307(c)] is to be construed broadly, including direct effects which are caused by the activity and occur at the same time and place, and indirect effects which may be caused by the activity and are later in time or farther removed in distance, but are still reasonably foreseeable.* [Emphasis added.]

Because these leases predated the 1990 amendments to the CZMA, the State of California never had the opportunity to review these leases for CZMA consistency at the lease sale stage.

In its decision in *California v. Norton,* the Appeals Court specifically rejected the argument that review of the lease suspensions would duplicate review of activities described in Exploration Plans or Development and Production Plans. The court stated:

> *In subjecting lease sales to consistency review, Congress has made it clear that the statute does not prohibit consistency review of federal agency activities that are not subsidiary to exploration and development and production plans. The exploration and development and production plan stages are* not *the only opportunities for review afforded to States under the statutory scheme...*
>
> *...These lease suspensions represent a significant decision to extend the life of oil exploration and production off California's coast, with all of the far reaching effects and perils that go along with offshore oil production.* (*State of California v. Norton* 311 F.3d 1162, 1173 (9th Cir. 2002))

Furthermore, the court stated that the review of lease suspensions is similar to the review of a lease sale, in that the effects to be analyzed are "very broad" and "long term."

> *Although a lease suspension is not identical to a lease sale, the very broad and long term effects of these suspensions more closely resembles the effects of a sale than they do the highly specific activities reviewed [in an Exploration Plan or Development and Production Plan]...[Lease suspension] review is available now for the broader effects implicated in suspending the leases. This phasing of review fits closely the expressed intent of Congress...* (*ibid.*at 1174)

The court made clear that the Commission's review of a lease suspension is similar to its review of a lease sale in the sense that the Commission is to analyze the broad and long-term coastal effects (i.e., post-suspension exploration, development and production activities) that are reasonably foreseeable if a lease suspension is granted. The court nevertheless acknowledged, and the Commission agrees, that a lease suspension is not identical to a lease sale. The subject lease suspensions have been requested decades after the initial lease sale, after most of these leases have been explored and detailed environmental and technical evaluations have already been performed. Substantially more information and details are available now on these leases than were available at the original lease sale stage. In fact, many of the undeveloped leases can

be developed from existing platforms for which Development and Production Plans have been prepared, but would require only revision. In *Secretary of the Interior v. California,* the U.S. Supreme Court noted there are four distinct stages to developing an OCS oil lease: (1) formulation of a 5-year leasing plan by the Department of the Interior; (2) the lease sale; (3) exploration; and (4) development and production. Most of the 36 leases currently fall between stages (3) and (4).

The MMS chose, however, to model its consistency determinations for the lease suspensions on recent Alaska Lease Sale 191. The Commission believes the Alaska model is not adequate for the review of the lease suspensions for several reasons:

- Lease Sale 191 comprised an area over 200 million acres in the Cook Inlet Planning Area as compared to the 184,191 acres encompassing the 36 undeveloped California leases. The difference is an order of magnitude (i.e., a factor of 10).
- Lease Sale 191 occurred in an OCS planning area (Cook Inlet) where no production and development of OCS oil and gas has ever been proposed, examined in detailed in environmental impact statements, or permitted, because no economically recoverable reserves have been discovered. Little environmental information is available. Thus, the available information is very general in scope.
- By contrast, the Commission's consideration of the lease suspensions takes place 2-4 decades following the 10 lease sales the federal government conducted offshore California. Forty-two of the remaining 79 OCS leases offshore California are producing oil and gas or are situated on producing units, and their development was preceded by detailed environmental review. All but one of the 36 leases have been consolidated into 9 units that have identifiable and named oil and gas fields. All but one unit have been granted Exploration Plans and, decades ago, lessees drilled exploratory wells discovering paying quantities of oil and gas. In the early 1990s, the lessees developed hypothetical, but likely, development scenarios for each of the leases so that MMS could prepare the COOGER Study, a 1999 study that evaluated the potential onshore constraints of developing the then-40 undeveloped leases.

Therefore, answers to the questions "if, when, and how exploration, development and production would actually occur" are far better understood for these leases as compared to a lease sale such as Alaska Lease Sale 191. Notwithstanding the level of information available about the potential development of the 36 leases, the MMS chose not to submit for the Commission's review data and environmental analysis that is either readily available or could be developed now. Instead, because the MMS is treating the review of the lease suspensions strictly as a "lease sale" stage, it believes it need provide "general" information only, *even if specific information is available.*

In an April 22, 2005, letter to the MMS, the Coastal Commission staff requested additional information regarding the "reasonably foreseeable direct and indirect effects" of the requested suspensions, namely, the likely post-suspension exploration, development, and production activities. The Commission staff informed the MMS that additional information is needed in order for the Coastal Commission to determine if the proposed lease suspensions are consistent with the enforceable policies of the CCMP. For example, the Coastal Commission staff

requested that the MMS estimate how the future development of Sword, Bonito, Rocky Point, and Cavern Point Units might extend the life of existing Point Arguello Unit platforms and Platform Gail. In its original submittal, the MMS provided no information regarding how the extension of life of existing platforms, pipelines, and other infrastructure could affect coastal resources (e.g., increase risk of an oil spill, lengthen fishery preclusion areas). In its June 23, 2005, response letter, the MMS refused to provide certain requested information, such as an estimate of extension of platform operations, or the results of *already completed* surveys, stating that it would not be "appropriate" for the MMS to provide information during the lease suspension review stage that it believes should be provided by the lessees in the form of an Exploration Plan or a Development and Production Plan (Appendix B). In refusing to comply with the Commission's information request, the MMS states repeatedly that the operator will provide project details and further analysis if and when operators submit new or revised Exploration Plans and/or Development and Production Plans. The MMS's refusal to comply with the Commission's information requests effectively results in deferral until the exploration and development stages of the consistency review that both the District Court and the Ninth Circuit Court of Appeals has directed to occur at the lease suspension stage. There is no basis for the MMS's failure to fully describe now the exploration and production scenarios that the lease suspensions will make possible and conduct full environmental and consistency review.

Further, section 930.39(a) of the federal consistency regulations states that the amount of detail in the evaluation of the enforceable policies, activity description and supporting information of a consistency determination "shall be *commensurate with the expected coastal effects of the activity.*" (Emphasis added). Given the potential magnitude of coastal effects of offshore oil and gas development, section 930.39(a) requires the MMS to provide as much detailed information as is available or that can reasonably be generated at the time of the review. The MMS cannot defer examination of the reasonably foreseeable future effects of the lease suspensions to future reviews of Exploration Plans and Development and Production Plans.[7]

### 2.2.3 Current OCS Operations in California[8]

Exhibit 2 illustrates leases, platforms and other oil and gas-related infrastructure off the coast of southern California. A total of 79 federal OCS oil and gas leases are currently located offshore southern California, not including the 4 expired leases that are under appeal. Forty-three of these leases are developed (i.e., oil and/or gas is being produced from them). The remaining 36 undeveloped leases are the subjects of the 10 consistency determinations currently before the Commission. These leases are located between 3 and 12 miles offshore San Luis Obispo, Santa Barbara, and Ventura counties. Table 1 presents a summary of the undeveloped leases.

---

[7] The Commission acknowledges that there are distinctions between the broader review conducted now for a lease suspension and the detailed review of future exploration, development and production activities. Currently, only general locations for "hypothetical" platforms and pipelines are known, which the Commission believes is appropriate for this stage of review. During review of an Exploration Plan or Development and Production Plan, once the specific locations of platform, pipelines and other infrastructure are specifically defined, the Commission would, for example, require site-specific marine and terrestrial biological, geotechnical and cultural surveys.

[8] This information is taken from the EID, section 2.2

**Table 1: Undeveloped Pacific OCS Units and Leases**

| Unit | Operator | Lease Number(s) | Consistency Determination Number |
|---|---|---|---|
| Lion Rock | Aera Energy LLC | 396, 397, 402, 403, 408, 414 | CD-042-05 |
| Point Sal | Aera Energy LLC | 415, 416, 421, 422 | CD-043-05 |
| Santa Maria | Aera Energy LLC | 425, 430, 431, 433, 434 | CD-044-05 |
| Purisima Point | Aera Energy LLC | 426, 427, 432, 435 | CD-045-05 |
| Lease 409 | Aera Energy LLC | 409 | CD-046-05 |
| Bonito | PXP | 443, 445, 446, 449, 450[9], 499, 500 | CD-047-05 |
| Rocky Point | Arguello | 452, 453 | CD-048-05 |
| Sword | Samedan Oil Corporation | 319, 320, 322, 323A | CD-049-05 |
| Gato Canyon | Samedan Oil Corporation | 460, 464 | CD-050-05 |
| Cavern Point | Venoco, Inc. | 210, 527 | CD-051-05 |

Nineteen platforms support production of the developed leases offshore Santa Barbara and Ventura Counties. No platforms are located offshore San Luis Obispo County. The 19 existing platforms are supported by pipelines, processing and separation facilities, and other associated infrastructure. Onshore facilities supporting Pacific OCS oil and gas development include:

**Ventura County**
Mandalay Onshore Separation Facility
West Montalvo Operations
Rincon Oil and Gas Processing Facility
La Conchita Oil and Gas Processing Facility

**Santa Barbara County**
Carpinteria Onshore Gas Facility connected to offshore Platform Habitat
Carpinteria Oil and Gas Processing Terminal connected to offshore Platforms Gail and Grace
Las Flores Canyon Santa Ynez Unit Oil and Gas Processing Facility
Gaviota Oil Heating Facility
Gaviota Storage Terminal (soon to be decommissioned)
Lompoc Oil and Gas Processing Facility
Several pipeline systems

[9] Most of Lease 450 is located in the Point Arguello Unit; the entire lease is therefore held by production and is not being considered for suspension. The northwestern portion of Lease 450 is located in the Bonito Unit, however; therefore, the lease is included in this report.

In addition to Pacific OCS activities, the region includes oil and gas leases and production in California State waters (State tide and submerged lands). State leases fall under the management and administration of the California State Lands Commission. The State Lands Commission has issued thirty-two leases located in State waters, seventeen of which are producing, and fifteen of which are non-producing. No State platforms are located offshore San Luis Obispo County; however there are onshore support facilities located in San Luis Obispo or northern Santa Barbara County, including pipelines, oil pump stations, and a heavy, high sulfur oil upgrader refinery. Platform Holly, located offshore Goleta (Santa Barbara County), and Rincon Island, located offshore Rincon Beach (Ventura County) are the only two offshore production facilities associated with State leases that are operational in the tri-county region. Platform Holly is supported onshore by the Ellwood Processing Oil and Gas Processing Facility, and Rincon Island is supported onshore by the Rincon Island and State Lease 145/410 Oil and Gas Processing Facility. (See Exhibit 2) Venoco has applied to restart production from one of its two piers that extend from shore into State waters (PRC 421).

Offshore oil and gas production rates peaked in State waters in 1969 and in federal waters in 1995-1996. Federal offshore oil and gas annual production rates for the years 1984 through 2003, for the Santa Maria Basin and Santa Barbara Channel are presented in Table 2.

**Table 2. Federal Pacific OCS Oil and Gas Annual Production Rates for 1984 through 2003.**

| Year | Total Oil (million bbls) | Total Gas (billion $ft^3$) | Year | Total Oil (million bbls) | Total Gas (billion $ft^3$) |
|---|---|---|---|---|---|
| 1984 | 25.3 | 44.1 | 1994 | 54.8 | 52.7 |
| 1985 | 23.2 | 60.8 | 1995 | 69.3 | 61.9 |
| 1986 | 21.7 | 55.5 | 1996 | 61.1 | 66.1 |
| 1987 | 24.4 | 53.0 | 1997 | 51.5 | 76.0 |
| 1988 | 25.5 | 47.7 | 1998 | 43.5 | 75.7 |
| 1989 | 27.4 | 49.4 | 1999 | 37.5 | 79.4 |
| 1990 | 24.5 | 48.2 | 2000 | 34.8 | 75.4 |
| 1991 | 27.0 | 51.0 | 2001 | 32.1 | 70.5 |
| 1992 | 38.3 | 54.0 | 2002 | 31.0 | 67.3 |
| 1993 | 46.8 | 50.8 | 2003 | 28.7 | 58.1 |
| **Total** | **728.4** | **1197.6** | | | |

Source: MMS, Pacific OCS Region. *Annual Summary of Production for Entire Region.* December 14, 2004

Total projected reserves for the 36 undeveloped leases is listed in Table 3, below:

**Table 3: Total Projected Reserves of 36 Undeveloped Leases**

| Location | | Oil Reserves (million bbls) | Gas Reserves (billion ft$^3$) |
|---|---|---|---|
| Northern Santa Maria Basin | Northern Platform | 115 | 47 |
| | Central Platform | 118 | 24 |
| | Southern Platform | 90 | 18 |
| Bonito and Electra Fields (Bonito Unit) | | 22 | 11 |
| ROCKY POINT FIELD (Rocky Point Unit and Lease 451) | | 39 | 11.7 |
| Sword | | 29 | 7.3 |
| Gato Canyon | | 77 | 46 |
| Cavern Point | | 22 | 20 |
| **Total** | | **512** | **185** |

Source: EID Table 5.2-4. pp 5.2-10 and 5.2-11

The United States consumes approximately 20 million barrels of oil per day, or approximately 7,300 million barrels annually.[10] California consumes approximately 615 million barrels of petroleum annually, and 2,000 billion cubic feet of natural gas annually.[11] The total projected reserves of the 36 undeveloped oil leases would therefore supply California with petroleum for approximately ten months, and with natural gas for approximately one month. Total reserves represent approximately 25 days of national consumption.

## 2.3 Project Description

The proposed activity analyzed in this report is the granting by the Minerals Management Service ("MMS") of a 37-month suspension of production ("SOP") request filed by Samedan Oil Company ("Samedan"), operator of the Gato Canyon Unit (Lease OCS-P 0460 and OCS-P 0464) under 43 U.S.C. 1334(a)(1) of the Outer Continental Shelf Lands Act ("OCSLA"). Samedan has requested of the MMS a lease suspension to conduct certain in-office activities (e.g., prepare either revisions to a previously-approved Exploration Plan or a new Exploration Plan) and a 3-4 day shallow hazards survey on Lease OCS-P 0460. After it obtains either approval of a new Exploration Plan or a revision to a previously-approved Exploration Plan, Samedan intends to use a mobile offshore drilling unit ("MODU") to drill one "delineation" well. Samedan would

---

[10] US Energy information Administration. (see eia.doe.gov) http://www.eia.doe.gov/mer/pdf/pages/sec11_7.pdf Accessed July 8, 2005.

[11] US Energy information Administration. (see eia.doe.gov) http://www.eia.doe.gov/emeu/sep/ca/frame.html Accessed July 8, 2005.

then use the results of delineation drilling to prepare plans to extract oil and gas (called a Development and Production Plan) from the Gato Canyon Unit. The MMS's "hypothetical development scenario" for the Gato Canyon Unit includes one platform on Lease OCS-P 0460 and three new pipelines from the platform to the Las Flores Canyon Processing Facility. The suspension period and post-suspension period activities are more specifically described below.

***Shallow Hazards Survey***

During the suspension period, Samedan proposes to conduct a 3-4 day shallow hazards survey. A shallow hazards survey is a high-resolution survey conducted to investigate the shallow subsurface for geohazards and soil conditions in relatively small areas. The geotechnical information collected is commonly used at the exploratory stage for initial site evaluation for drilling rig emplacement. Geotechnical information is typically collected from the seafloor to a depth of 980-1,475 feet (as compared to a 3D seimic survey that collects data on geologic formations to a depth of several thousand meters (9,000 feet)).

Samedan's proposed survey will be conducted using a small single 20-inch$^3$ airgun within a 1.5 square mile area of Lease OCS-P 0460, in water depths ranging from 300 to 1,200 feet. The survey site is 4-5 miles from the coast. The survey will be conducted in the fall (likely October 2005 or October 2006) to minimize interactions and interference with commercial fishing seasons and marine mammal migrations. Samedan proposes to conduct survey operations during daylight hours only to facilitate observation and monitoring of marine mammals.

The 20-inch$^3$ air gun produces a sound intensity level of 218 dB re 1 µPa [rms][12] and is deployed about 10 feet below the surface of the water. The hydrophone cables trail about 820 feet behind the vessel. More detail on the proposed shallow hazard survey is provided in the Marine Resources section (Section 3.1) of this report.

***Delineation Drilling***

Hypothetical post-suspension activities include the use of a mobile offshore drilling unit ("MODU"), such as a floating semi-submersible, to drill a delineation well on Lease OCS-P 0460. The purpose of a delineation well is to gather additional information about the characteristics and configuration of discovered hydrocarbon reservoirs in areas already explored. The MODU has two hulls upon which floats while being towed to the designated location. At the designated site, the hulls are flooded with seawater to submerge them to their drilling position, a depth a little below the water's surface. Typically, eight anchors are deployed in predetermined locations. The MODU is estimated to be onsite for approximately 92 days, during which the rig would be positioned and the delineation well drilled. Drilling of the well will take about 52 days.

---

[12] Underwater sound is measured in pressure levels. The zero point of the measurement scale is set at 1 micropascal (µPa) where I pascal (Pa) corresponds to the pressure resulting from a force of 1 newton exerted over an area 1 m$^2$. Root mean square [rms] is a measure of the magnitude of a varying quantity of sound. Thus, sound pressure levels are typically given as decibels (dB) relative to 1 µPa.

***Platform and Pipelines***

To extract oil and gas resources of the Gato Canyon Unit, the MMS prepared a hypothetical post-suspension development scenario that includes:

- Installation and operation of one platform at the 560-foot water depth (3-6 miles from shore) on Lease OCS-P 0460;
- Three pipelines (one 14-inch oil/water line, one 8-inch gas line, and 8-inch water return line) running approximately 3.5-6.5 miles in length from the platform to the Las Flores Canyon Onshore Processing Facility; and
- Two power cables from the platform to an existing co-generation facility at Las Flores Canyon.

The MMS estimates the Gato Canyon Unit reserves to contain 77 million barrels of oil ("MMbbl") and 46 billion cubic feet ("Bcf") of gas. The MMS estimates the platform will operate for 14-18 years. Production from the platform would be processed at ExxonMobil's Las Flores Canyon facilities using existing capacity and the oil would then be shipped to refinery destinations via the All American Pipeline. The gas would be processed at the Exxon Gas Plant using existing capacity and sold to The Gas Company. The produced water would be treated at the existing water treatment plant at Las Flores Canyon, transported offshore by pipeline, and discharged at the Gato Canyon Unit platform. It is unclear of the existing water treatment plant has sufficient capacity or would require further expansion.

## 2.4 Gato Canyon Unit Background

### 2.4.1 Lease Sale 68

The leases in the Gato Canyon Unit (OCS-P 0460 and 0464) were issued in 1982 in Lease Sale 68. The Lease Sale 68 leases include lease-term "stipulations," which are mitigation measure designed to protect potentially sensitive resources in an affected lease and to reduce multiple – use conflicts. In order to mitigate adverse environmental impacts for actions associated with a specific exploration, development and decommissioning project, the MMS can impose additional mitigation requirements. The list of stipulations for Lease Sale 68 is attached as Exhibit 4.

### 2.4.2 Exploratory Drilling on Lease OCS-P 0460

In 1984, the Commission concurred in Atlantic Richfield Company's ("ARCO") consistency certification CC-28-84 to use a semi-submersible drilling rig on Lease OCS-P 0460 to drill up to four oil and gas exploration wells. In the report containing its findings for CC-28-84, the Commission found ARCO's proposed exploration activities to be inconsistent with Coastal Act Sections 30230 (Marine Resources), 30231 (Water Quality), 30232 (Oil Spills), 30234 (Commercial Fishing), 30253(3) (Air Quality), and 30250(a) (Cumulative Impacts). Notwithstanding the project's inconsistency with the above-referenced Coastal Act policies, the Commission applied the Coastal Act's coastal-dependent industrial "override" policy (30260) and found (a) other alternative locations were either infeasible or more environmentally damaging, (b) the activities' adverse environmental effects will be mitigated to the maximum extent feasible, and (c) it is in the national public interest to pursue exploring oil and gas resources underlying Lease OCS-P 0460. The Commission thus concurred in CC-28-84.

ARCO drilled two of the four approved exploration wells, one in 1985 and the other in 1989. The Gato Canyon Unit was formed in 1987.

#### 2.4.3 A Series of Suspensions

The Gato Canyon Unit leases remained active, although undeveloped, through November 1999 by virtue of a series of lease suspensions issued for a variety of reasons (e.g., reinterpretation of seismic data, permitting activities). A lengthy suspension directed by the MMS in order to prepare the *California Offshore Oil and Gas Energy Resources Study* ("COOGER Study") ended in November 1999. In May 1999, Samedan submitted to MMS a request for a 37-month Suspension of Production ("SOP") for the Gato Canyon Unit. In August 1999, the MMS determined that the Gato Canyon Unit was not properly unitized and removed Lease OCS-P 0462 from the Unit. As a result, Lease OCS-P 0462 expired on August 16, 1999. Sameden appealed the MMS decision to the Interior Board of Land Appeals, where the appeal is currently pending. In November 1999, the MMS granted a suspension for the Gato Canyon Unit (Lease OCS-P 0460 and 0464). In June 2001, the district court in *California v. Norton* set aside the MMS's November 1999 suspension decision and found that a lease suspension is an activity subject to the federal consistency review requirements of the federal Coastal Zone Management Act. The MMS submitted this consistency certification in response to the court's decision in *California v. Norton*. In the meantime, until the Coastal Commission and the MMS act on Samedan's May 1999 SOP request, the court directed the MMS to direct (i.e., impose) a Suspension of Operations ("SOO") for the Gato Canyon Unit.

### 2.5 Related Environmental Documents

#### 2.5.1 Environmental Assessments

Under the National Environmental Policy Act ("NEPA"), the MMS prepared six Environmental Assessments ("EAs") discussing the potential impacts of activities that will occur during the suspensions.[13] The EAs include:

- MMS Proposal to Grant Suspensions of Production for Aera Energy LLC's Lion Rock Unit, Point Sal Unit, Purisima Point Unit, Santa Maria Unit, and Lease 409
- MMS Proposal to Grant Suspension of Production for Plains Exploration & Production Company's Bonito Unit
- MMS Proposal to Grant Suspension of Production for Arguello Inc.'s Rocky Point Unit
- MMS Proposal to Grant Suspension of Production for Samedan Oil Corporation's Sword Unit
- MMS Proposal to Grant Suspension of Production for Samedan Oil Corporation's Gato Canyon Unit

---

[13] U. S. Department of the Interior, Minerals Management Service. *Environmental Assessments and Findings of No Significant Impact For Granting Suspensions of Production or Operations*. February 11, 2005. Available at http://www.mms.gov/omm/pacific/lease/2005-final-eas.htm

- MMS Proposal to Grant Suspension of Operations for Venoco, Inc.'s Cavern Point Unit

The EAs are far more limited in scope than the subject consistency determinations because they only address potential impacts from activities occurring during the suspension period (i.e., they do not examine potential impacts from hypothetical post-suspension development activities). The Eas conclude that all potential impacts from activities occurring during the suspension period can be mitigated to an insignificant level. The MMS issued findings of no significant impact based on each of the EA's on February 11, 2005. On March 9, 2005, ten conservation groups, led by the Natural Resources Defense Council and the Environmental Defense Center, filed a lawsuit in federal district court against the MMS, challenging the adequacy of the EAs (*League for Coastal Protection, et al. v. Norton, et al.,* No. C 05-00991-CW (N.D. Cal.))..

### 2.5.2 Environmental Information Document

Acknowledging that the Appeals Court envisioned an analysis of post-suspension activities, MMS submitted, along with the consistency determinations, an Environmental Information Document ("EID")[14]. The EID evaluates the potential post-suspension activities, presented as hypothetical scenarios in the period following the suspensions. The EID analyzes activities that could potentially take place during the 2006–2030 time period, including: 1) exploration and delineation drilling, 2) platform and pipeline construction, 3) production activities, and 4) decommissioning of facilities.

### 2.5.3 Draft EIS for Delineation Drilling

In June 2001, the MMS published a Draft EIS for Delineation Drilling ("Draft EIS")[15] addressing the potential environmental effects of proposed delineation drilling from a Mobile Offshore Drilling Unit in Federal waters offshore Santa Barbara County. The DEIS addressed potential impacts from drilling activities, as well as potential cumulative impacts for the periods 2002 through 2006, and 2002 through 2030, including those for developing the leases. The Draft EIS analyzed proposed delineation drilling in the Point Sal Unit, Purisima Point Unit, Bonito Unit, and Gato Canyon Unit. The EID is based substantially on information presented in the Draft EIS.

After publishing the Draft EIS, on July 2, 2001, the MMS directed suspensions on all of the undeveloped leases to provide time to prepare consistency determinations and NEPA documentation, as directed by the District Court in California v. Norton. Also, as a result of the Court decision, the MMS postponed work on finalizing the Draft EIS, including the public hearings, and extended the comment period.

---

[14]Minerals Management Service, Pacific OCS Region. *Environmental Information Document for Post-Suspension Activities on the Nine Federal Undeveloped Units and Lease OCS-P 409 Offshore Santa Barbara, Ventura, and San Luis Obispo Counties.* Prepared by Aspen Environmental Group. January 2005.

[15] Minerals Management Service, Pacific OCS Region. *Delineation Drilling Activities in Federal Waters Offshore Santa Barbara County, California.* Draft Environmental Impact Statement. Published by the US Department of the Interior, MMS, Pacific OCS Region. Document 2001-046. June 2001.

#### 2.5.4 COOGER Study

*The California Offshore Oil and Gas Energy Resources Study* ("COOGER Study")[16] was designed by a joint government, industry, and public working group to address concerns about the potential demands on onshore infrastructure from expanded oil and gas development in both State and federal waters. The study assessed and compared a suite of potential Pacific OCS development scenarios for Santa Barbara, Ventura, and San Luis Obispo counties over a 20-year timeframe (1995 though 2015). The Final COOGER Study, published in January 2000, focused its constraints analysis for the potential development scenarios on industrial and public infrastructure demand within the study area.

## 3 COASTAL ACT ISSUES

### 3.1 Oil Spills

#### 3.1.1 Introduction

***Summary***

Since the first federal lease sale offshore Santa Barbara in 1966, the potential for oil spills from offshore oil and gas development has been a major environmental concern. Oil spills resulting from such events as well blowouts, pipeline ruptures, operational errors, or vessel-platform collisions can lead to significant adverse effects on the marine and coastal resources of the Santa Barbara Channel, Santa Maria Basin, and southern California region. These resources include endangered or threatened species of seabirds and shorebirds (e.g., California brown pelicans, western snowy plovers), marine mammals (e.g., sea otters, stellar sea lions, humpback whales), and fishes and invertebrates (e.g., steelhead trout, tidewater goby, white abalone).

Since the time of the Commission's review of the existing platforms and support facilities, the national and even international significance of the value of the coastal and marine resources in the region — including the environmentally sensitive habitats of sandy beaches, rocky intertidal areas, and estuaries — has continued to grow. In addition to the Channel Islands National Park and Marine Sanctuary, the Santa Barbara Oil and Gas Sanctuary, the Santa Barbara Channel Federal Ecological Preserve and the Monterey Bay National Marine Sanctuary, the region now includes the San Luis Obispo State Seashore, Santa Barbara Coast Seashore, Marine Protected Areas, Areas of Special Biological Significance, Marine Preserves, State Reserves, State Refuges, State Wildlife Areas, and numerous state parks and beaches.

The MMS has submitted information to the Commission on oil spill risk in the consistency determinations and the EID. A document previously released by the MMS, the Draft EIS for

---

[16] Minerals Management Service. *Final California Offshore Oil and Gas Energy Resources Study: Development Scenarios and Onshore Physical Infrastructure in the Tri-County Area of San Luis Obispo, Santa Barbara and Ventura.* Prepared by Dames & Moore. OCS Report MMS 99-0043. January 26, 2000.

Delineation Drilling ("DEIS")[17] also contains pertinent information on the risk of oil spills from the granting of the lease suspensions. As discussed in more detail in Section 3.1.4: Oil Spill Risk Analysis below, the EID and DEIS do not provide enough information for the Commission to analyze the potential impacts to marine and coastal resources in appropriate detail.

In a letter dated April 22, 2005, Commission staff requested additional information from the MMS regarding oil spill risks. The MMS's response reiterated the agency's position that the appropriate time for a detailed analysis is when operators have submitted specific Exploration Plans and Development and Production Plans, not at the lease suspension stage. MMS stated:

> *Drilling activities, if and when they occur, can only occur after the suspension period ends and must be detailed in EP's and DPP's that are approved by the MMS and certified consistent with the CCMP by the State. Pursuant to Federal regulations at 30 CFR 250.203 and 204, and reviewable pursuant to §307(c)(3) of the CZMA, EP's and DPP's will provide details regarding oil spill risk, volumes, oil quality, etc. No EP or DPP will be approved by MMS without State concurrence with an operator-provided consistency certification or a determination by the Secretary of Commerce to override the State's objections.*

As discussed in Section 2.2.2: Scope of Coastal Commission Review, above, the Commission disagrees with the MMS's position that the appropriate time to review details of oil spill risks, environmental consequences, and prevention and response capabilities for each of the hypothetical development scenarios is at the Development and Production Plan and Exploration Plan stage. Granting the lease suspensions could *prima facie* significantly increase the risk of oil spills, and consequent environmental impacts. The Commission must conduct a detailed oil spill risk analysis at the lease suspension stage in order to determine whether it is appropriate to facilitate through approval of the proposed suspensions future development of the undeveloped lease areas.

The Commission requested detailed information specifically regarding: 1) worst-case discharge volumes, 2) oil spill probabilities, and 3) oil spill trajectories. As discussed in relevant sections below, the MMS has failed to provide this information to the Commission, and as a result, the Commission finds it does not have sufficient information to analyze in appropriate detail potential impacts to coastal resources from a reasonably foreseeable oil spill. The Commission's lack of information in this regard is relevant to its analyses of the consistency of the granting of the lease suspensions with CCMP policies related to: marine resources and water quality (Coastal Act Sections 30230 and 30231), environmentally sensitive habitat areas (Coastal Act Section 30240), commercial fishing (Coastal Act Sections 30230 and 30234.5), access and recreation (Coastal Act Sections 30210, 30211, 30220, and 30234.5), and cultural resources (Coastal Act Section 30244).

---

[17] See Section 2.5: Related Environmental Documents, above. Minerals Management Service, Pacific OCS Region. *Delineation Drilling Activities in Federal Waters Offshore Santa Barbara County, California.* Draft Environmental Impact Statement. Published by the US Department of the Interior, MMS, Pacific OCS Region. Document 2001-046. June 2001.

Section 30232 of the Coastal Act requires the applicant to provide "protection against the spillage of crude oil, gas, petroleum products, or hazardous substances…" and to provide "effective containment and cleanup facilities and procedures" for accidental spills that do occur. As discussed in more detail below, the Commission finds that current prevention regulations and programs provide measures for maximum feasible protection against the spillage of crude oil and other hydrocarbons, and therefore granting the lease suspensions is consistent with the prevention standard of 30232. The Commission also finds that current state-of-the-art response measures cannot effectively protect California's shoreline and coastal resources from significant oil spill impacts, and therefore granting the lease suspensions is inconsistent with the response standard of 30232.

The following discussion is organized into the following topics: 1) background information, 2) oil spill risk analysis, and 3) oil spill prevention and response.

***Relevant Coastal Act Sections***

Section 30232 of the Coastal Act requires protection of coastal resources from oil spills, and requires effective spill containment and clean-up, as follows:

> *Protection against the spillage of crude oil, gas, petroleum products, or hazardous substances shall be provided in relation to any development or transportation of such materials. Effective containment and cleanup facilities and procedures shall be provided for accidental spills that do occur.*

Potential impacts from an oil spill are relevant to the Commission's analyses under CCMP policies related to: marine resources and water quality (Coastal Act Sections 30230 and 30231), environmentally sensitive habitat areas (Coastal Act Section 30240), commercial fishing (Coastal Act Sections 30230 and 30234.5), access and recreation (Coastal Act Sections 30210, 30211, 30220, and 30234.5), and cultural resources (Coastal Act Section 30244).

The environmentally sensitive habitat areas policy of the CCMP (Coastal Act Section 30240) states:

> *(a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas.*
>
> *(b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas.*

Coastal Act policies related to marine resources, water quality, public access, recreation, commercial fishing and cultural resources are cited in the relevant sections of this report, below.

### 3.1.2 Regional Oil Spill History

Oil spills may occur from such events as well blowouts, pipeline breaks, operational errors, and vessel-platform collisions. The largest spill in the Pacific OCS region occurred in 1969, when a well blowout on Platform A in federal waters offshore Santa Barbara spilled an estimated 80,000 barrels of crude oil into the Santa Barbara Channel. Since 1969, there have been no further spills of this magnitude. Between 1970 and 1999, 843 spills occurred that ranged from 1 barrel to 163 barrels. Most of these were less than 1 barrel. The largest was a 163-barrel spill from the Platform Irene pipeline in State waters in September 1997.[18] This spill had significant adverse impacts on the coastal resources of Santa Barbara County, and the operator was required to pay $3.25 million in damages and penalties to county, State, and federal agencies.[19]

The spill was caused by a failed flange on the subsea wet oil pipeline, exacerbated by the operator's decision to manually restart pipeline flow following an automatic shutdown caused by a pressure drop. Despite favorable weather conditions and rapid response and recovery efforts, which included use of state-of-the-art response equipment, the Platform Irene pipeline oil spill resulted in the oiling of approximately 17 miles of the Santa Barbara coastline. The oil came ashore on sandy beaches and rocky intertidal areas. Some stretches of the shoreline had oil coverage exceeding 50 percent, and the estuaries of San Antonio Creek, Honda Creek, and the Santa Ynez River were affected. Clean-up actions, which required heavy equipment, many personnel, and removal of marine plants and other biota at the wrack line, resulted in physical disturbances to habitat.[20]

The spill most heavily affected the sandy beach nearest the origin of the spill, with light sheen, tarballs and tar patties found at several other beaches. A 2004 report indicates that Pismo clams and spiny sand crabs, "likely suffered significant mortality from the spill."[21] This report also states that rocky intertidal species including black abalone and mussels were "injured" by the spill, and reported observations of black abalone and mussel beds coated with oil along or near the shores of Vandenberg Air Force Base. An estimated 635 to 815 seabirds were oiled from the spill. Animal species in the rocky intertidal zone were injured, as were beach-dwelling invertebrates. Shorebird numbers also decreased, including the endangered western snowy plover. The physical oiling of the beaches and subsequent clean-up activities affected beach-related recreational activities including walking, jogging, swimming, surfing, tidal pool viewing, fishing, and picnicking.

---

[18] EID, pp. 5.3 -11 to 5.3 -12

[19] Consent Decree, *United States and People of the State of California v Torch Energy Services*. 2002. (Settlement for Natural Resources Damage Assessment.)

[20] *Torch/Platform Irene Oil Spill, Scoping Document for Restoration Planning*. Prepared by: Platform Irene Trustee Council, US Fish and Wildlife Service, CA Department of Fish and Game, US Air Force: Vandeberg Air Force Base, CA State Lands Commission, with assistance from Santa Barbara County Planning and Development Department, Energy Division. October 20, 2004.

[21] *Ibid*. pp. 3-7

A loss of well control or "blowout" incident occurred on Platform Gail in November 2004, which did not result in a serious oil spill but necessitated platform shutdown and evacuation.[22] The cause was operator error: a contract employee had removed a lockdown pin, circumventing the blow-out preventer system, so that it failed to function as intended when an unbalanced condition developed in the well. The result was an uncontrolled flow of oil, gas, and seawater from the well.

Even small spills can cause significant impacts to sensitive resources. On June 15, 2005, twelve to fifteen barrels of light crude oil washed ashore onto Breton Island, Louisiana, from an offshore platform during a storm. The incident occurred during nesting season for thousands of birds at the Breton National Wildlife Refuge. Hundreds of endangered brown pelicans were killed. Approximately 1,000 oiled pelicans were recovered, including 268 live chicks.[23] Although this incident did not occur in California, it demonstrates that a very small spill from an OCS pipeline could have devastating effects on the coastal resources of the region.

### 3.1.3 Coastal Resources at Risk from an Oil Spill

The coastal resources at risk from a marine oil spill from OCS oil and gas development include marine biota, water quality, environmentally sensitive habitat areas (e.g., rocky intertidal areas, sandy beaches, wetlands, and estuaries), commercial fishing, access and recreation, and cultural resources. The sections that follow provide a summary of potential impacts from an oil spill to each of these resources.

***Marine Biota***[24]

A complete description of marine resources found in the area is included in this report in Section 3.2: Marine Resources and Water Quality and as Exhibit 5. Subsections below focus on the potential effects of an oil spill on marine biota.

*Sea Otters*

The southern sea otter is extremely sensitive to oil spills. Lacking a layer of fat, these animals are dependent on maintaining an intact layer of air next to their skin. Oil on just a portion of the fur can cause hypothermia and death. Otters can also ingest oil when they attempt to groom their oiled fur, or when they consume filter-feeding prey that has also consumed oil.

The US Fish and Wildlife Service ("USFWS") and the Southern Sea Otter Recovery Team have specifically identified: "Managing petroleum exploration, extraction, and tankering to reduce the likelihood of a spill along the California coast to insignificant levels," as critical to southern sea

---

[22] http://www.mms.gov/omm/pacific/lease/Gail_Incident_Final_Draft_Report.pdf Accessed July 7, 2005.

[23] International Bird Rescue Research Center, http://www.ibrrc.org/louisiana-05.html Accessed July 7, 2005.

[24] EID, Chapter 4.7 pp. 4.7-1 to 69 and Chapter 5.7, pp. 5.7-1 to 104

otter population recovery.[25] The USFWS does not believe it is possible to avoid a catastrophic loss to the sea otter population in the event of a major spill in or near the sea otter's current range. The Southern Sea Otter Recovery Plan[26] concludes that, 1) an oil spill is likely to occur over the next 30 years (the period during which the 36 leases will be developed), 2) the probability of death in sea otters as a result of contact with oil following an oil spill is likely to be no less than 50 percent, and 3) rehabilitation of oiled sea otters following a major spill is expensive, may be detrimental to some individuals and is of questionable benefit to the population.

*Other Marine Mammals*

Oil may affect marine mammals through various pathways: surface contact, inhalation, ingestion, and baleen fouling. Since whales and most adult pinnipeds rely on layers of body fat and vascular control rather than a coat of fur to retain body heat, they are generally resistant to the thermal stresses associated with oil contact. However, exposure to oil can cause damage to skin, mucous, and eye tissues. The membranes of the eyes, mouth, and respiratory tract can be irritated and damaged by light oil and the resulting vapors. If oil compounds are absorbed into the circulatory system, they attack the liver, nervous system, and blood-forming tissues. Oil can collect in baleen plates, temporarily obstructing the flow of water between the plates and thereby reducing feeding efficiency. Reduction of food sources from acute or chronic hydrocarbon pollution can be an indirect effect of oil and gas activities.

Since oil can destroy the insulating qualities of hair or fur, resulting in hypothermia, marine mammals that depend on hair or fur for insulation are most likely to suffer mortality from exposure. Most vulnerable to the direct effects of oiling among the pinnipeds are fur seals and newborn pups, which lack a thick insulating layer of fat. More than 300 harbor seals are estimated to have died in Prince William Sound from the *Exxon Valdez* oil spill, and pup production and survival were affected. The majority of the dead harbor seals recovered were pups. Seasonally, the most vulnerable marine mammal resources along the California coast between Point Conception and Ragged Point would be harbor seal haul-out areas and pupping beaches, during early spring.

*Marine Birds*

Direct contact of birds with oil can cause matting of plumage, resulting in reduced flying or swimming ability; loss of buoyancy, which can lead to exhaustion and death from drowning; loss of insulation, which can lead to death from hypothermia; and increased physiological stresses and reproductive failure due to ingestion of oil. In 1997, the 163 barrel Torhc Platform Irene pipeline spill injured or killed between 635- 815 birds. Oil-related mortality is highly dependent on the life histories of the bird species involved. Birds that spend much of their time feeding or resting on the surface of the water are more vulnerable to oil spills. Cleanup efforts to remove spilled oil may also cause impacts to coastal birds. The presence of human beings during clean-

---

[25] *US Fish and Wildlife Service. Final Revised Recovery Plan for the Southern Sea Otter (*Enhydra lutris nereis*).* Portland, Oregon. xi + 165 pp. 2003

[26] *Ibid.*

up activities, and attempts to capture oiled wildlife for rehabilitation, may have the effect of flushing birds into oiled water.

*Sea Turtles*

Oil spills can adversely affect sea turtles by toxic external contact, toxic ingestion or blockage of the digestive tract, disruption of salt glad function, asphyxiation, and displacement of preferred habitats. Sea turtles are known to ingest oil; this may occur during feeding (tar balls may be confused with food) or while attempting to clean oil from flippers. Oil ingestion frequently results in blockage of the respiratory system or digestive tract. Some fractions of ingested oil may also be retained in the animal's tissues, as was detected in turtles collected after the *Ixtoc* spill in the Gulf of Mexico. Breathing toxic fumes from floating oil can also cause harm to sea turtles.

*Red-legged frog*

Oil may affect amphibians through various pathways including direct contact, ingestion of contaminated prey, and lingering sublethal impacts from oil sequestered in sediments that may linger for years. Adult red-legged frogs move down to the brackish coastal lagoons formed seasonally behind sand berms that close the mouths of rivers and streams along the south central coast. Though no direct oil contact with frogs is expected, some red-legged frogs could return to lagoons in which oil has become sequestered in sediments, before contaminated sediments are flushed into the ocean. In addition, habitat destruction could result from clean-up efforts.

*Fish*

Fish can be affected directly by oil, either by ingestion of oil or oiled prey. They can also be affected by uptake of dissolved petroleum compounds through the gills, by effects on fish eggs and larval survival, and by changes in the ecosystem that supports fish. Many effects can be sub-lethal, transient, or slightly debilitating, however any stress requires energy for recovery, which can ultimately lead to increased vulnerability to disease or to decreased growth or reproductive success.

The egg, early embryonic, and larval-to-juvenile stages of fish seem to be the most sensitive to oil. The *Exxon Valdez* oil spill occurred within weeks of Pacific herring spawning along the shores of Prince William Sound, resulting in increased egg mortality and larval deformations, and site-specific occurrences of instantaneous mortality. Studies estimate that over 40 percent of the 1989 year-class was affected by *Exxon* Valdez at toxic levels. Also, fry from pink salmon emerged from their gravel spawning redds and entered the nearshore environment during the spill. Salmon and trout exposed to oil from the *Exxon Valdez* spill all showed reduced growth rates the season following the oil spill. Studies estimate that 1.9 million adult pink salmon failed to return to Prince William Sound in 1990, primarily because of a lack of growth in the critical nearshore life stage. Returns in 1991 and 1992 were most likely reduced by 11 percent.

*Abalone*

A spill that resulted in substantial coating of subtidal rocky habitats or significant loss of attached algae within an area that supports white abalone poses the greatest risk. White abalone in water depths of less than 33 feet could also be affected by oil treated with chemical dispersants, as the oil disperses through the water column. Recovery of the black abalone could

exceed seven to ten years if a significant portion of the local population was directly contacted and heavily oiled by a spill.

*Plants*

Plant mortality from oil spills can be caused by smothering and toxic reactions to hydrocarbon exposure. Generally, oiled marsh vegetation dies above the soil interface, but roots and rhizomes survive when oiling is not too severe. The cleanup process could exacerbate the effects of an oil spill on threatened and endangered plants.

***Environmentally Sensitive Habitat Areas***

*Rocky Intertidal and Sandy Beach Habitat*

Primary oil spill impacts to rocky intertidal and sandy beach areas include smothering, uptake in tissues, and contamination of animals using rocky habitat and beaches, such as invertebrates, seabirds, and marine mammals. Oil tends to strand high in the intertidal in the barnacle zone. Tarballs in this zone are persistent, lasting several seasons. Oil can also persist in individual tidepools.

*Estuaries and Wetlands*

If oil from an offshore spill enters a wetland or estuary, impacts to the resource could include irreversible alteration of the habitat, mortality of endangered birds, plants and fish, and loss of plants and animals that may be unable to populate from adjacent areas. In addition to the potential for offshore spills, several hundreds of miles of pipelines onshore carry oil products that, if spilled, could affect estuarine and wetland habitat. A spill originating from an onshore pipeline (supporting offshore OCS oil production), especially from a pipeline break crossing a river or streambed, could send oil directly into a wetland. The cleanup process, which is another source of impacts, would consist of removal and replacement of contaminated soil and revegetation with native species. Although limited in extent, recovery could take several years, depending on the type of vegetation and wildlife affected by the spill.

***Commercial Fishing***[27]

Impacts to commercial fishing from an oil spill could include fouling of commercial fishing gear and vessels, closure of harbors, and preclusion of access to fishing areas. For example, as a result of the 1997 Torch oil spill, several fishermen filed claims for damages related to the spill and cleanup operations. Steve Dunn, representing the Santa Barbara Trappers, asserts that response, clean up and repair vessels violated Vessel Traffic Corridor restrictions, resulting in lost or destroyed gear. Other fishermen similarly sought damages from loss of nets resulting from the spill and cleanup activities.

***Access and Recreation***[28]

The mainland coast in the project region includes a number of recreational beaches and parks that attract visitors throughout the year. Oil spills have the potential to affect access and

---

[27] EID, p. 5.13-3

[28] EID, p. 5.10-3

recreation at the coast by causing beach and harbor closures. Cleanup of a smaller spill (200 barrels or less) can take up to two weeks, whereas a larger spill may take 30 days or more. The wider the area that is oiled, the more locations that could be affected, and as the area of effect increases, the more difficult it becomes to substitute near-by locations in order to enjoy recreational activities. Closing a beach or recreation area could have impacts on the people who enjoy overnight camping, swimming, surfing, walking, jogging, and tidepool-watching at these parks. In addition, the Channel Islands are restricted with regard to the maximum number of visitors at any given time, and the hauling capacity of park concessionaires is limited by boat occupancy restrictions. Anacapa and Santa Cruz Islands are the most vulnerable to losing visitor days due to an oil spill. Region-wide, deployment of containment booms could result in the closure of small craft harbors. Notably, a spill from the Gato Canyon Unit has potential for significantly affecting the sensitive and scenic shoreline resources of the Gaviota Coast, an area that is world-renown for its scenic rural beauty and recreational opportunities.[29]

***Cultural Resources***[30]

Oil-spill related impacts are not expected to affect offshore cultural resources because of the nature of clean-up operations. Onshore, oil spills could alter the chemical composition of archeological materials and render them useless for carbon-14 dating. Oil spill containment and cleanup activities could result in extensive impacts to site deposits from the excavation of containment barriers (e.g., dams, berms, and trenches), and the mechanized removal of oil-soaked earth.

### 3.1.4 Oil Spill Risk Analysis

***Spill Volumes***

The EID states that the "most likely maximum size of a major oil spill" for all 36 undeveloped leases is 2,000 barrels,[31] and uses this quantity to characterize the worst-case spill scenario for all anticipated post-suspension hypothetical development scenarios. The Commission finds this characterization is overly simple, because expected worst-case spills may vary greatly from scenario to scenario due to large differences in anticipated production and other factors. (Volumes of oil transported by offshore pipelines range from a current 6,000 barrels per day from Platform Irene to a projected 92,000 barrels per day from hypothetical SMB "B" platform in Northern Santa Marina Basin.

---

[29] National Park System, U.S. Department of the Interior, *Gaviota Coast Feasibility Study,* 2003, p. 36. State park and beach attendance in vicinity of the proposed Gato Canyon Unit averaged approximately 578,860 during the last six years (*Ibid,* p. 57). This attendance includes local County residents and tourists.

[30] EID, p. 5.8-3

[31] "The most likely maximum size of a major oil spill from potential future development — the maximum most probable discharge — 2,000 bbl, is based on the volumes of oil in various pipelines and vessels (i.e., tanks and other containers on platforms) as described in the U.S. Coast Guard Area Contingency Plans for oil spill response (e.g., USCG, 1999) (see MMS, 2001). This is the maximum volume of oil calculated to be spilled from a break in the longest Point Arguello Unit pipeline, the Hermosa to shore pipeline (A. D. Little, 2001 as cited in MMS, 2001)." EID, p. 5.3-14.