The Commission requested that the MMS characterize the worst-case spill scenario using the "worst-case discharge volume," rather than the most likely maximum spill size. The MMS replied to the Commission's request as follows:[32]

> *The maximum spill volumes described in the EID and previously in the [DEIS] are conservative in that they were applied to the largest observed or possible spills that MMS has observed in the Pacific Region subsequent to the 1969 spill in the Santa Barbara Channel. Thus, the hypothetical 2000 barrel spill from the Arguello pipeline described in the EID is based on the size and length of that pipeline, which is anticipated to be the largest of any in the region. Analyses of project specific development and associated pipelines would indicate hypothetical spills of smaller volume…*

The MMS states in the EID that: "the most likely maximum size of a major oil spill from potential future development — the maximum most probable discharge — [is] 2,000 barrels." According to the MMS, this number is based on the volumes of oil in various pipelines and vessels (i.e. tanks and other containers on platforms), and is applicable to all post-suspension hypothetical development scenarios given the spill record for the Pacific Region since 1970.[33]

The Commission disagrees with the MMS's position that 2,000 barrels represents the maximum reasonably foreseeable spill size. The term "maximum most probable discharge" is ill-defined in the EID,[34] and appears to be an arbitrary volume without substantive basis. The "worst-case discharge volume" is a well-defined quantity that is systematically calculated in each operator's oil spill response plan, following procedures given in 30 CFR 254.47, for offshore facilities, and in 49 CFR 194.105 for onshore pipelines. The estimated worst-case discharge volume varies among existing OCS facilities and can greatly exceed 2,000 barrels. For example, the estimated worst-case discharge volumes for platforms Hermosa, Hidalgo, and Harvest are 5,796, 2,809, and 8,200 barrels, respectively, assuming prompt leak detection and pipeline shutdown.[35] These worst-case discharges are based, in part, on the Point Arguello Unit's current (2005) maximum production of 11,000 barrels per day. The EID estimates that peak production at the Gato Canyon Unit will be 22,500 barrels per day,[36] indicating that the worst-case discharge volumes will most likely be above the 8,500 worst-case discharge from the Point Arguello Unit development, and significantly above the 2,000 barrel maximum most probable spill size

---

[32] June 23, 2005, MMS letter, page 47.

[33] EID, p.5.3-14

[34] *Ibid.*

[35] MMS. *Oil Spill Response Plan, Point Arguello and Point Pedernales Fields*. Vol. 2, p. 10-9. November 2004.

[36] EID, Table 5.2-4 p. 5.2-11

provided in the EID. The 2,000-barrel maximum spill volume is also an inadequate measure of possible worst case spills from onshore pipelines,[37] or vessel-platform collisions.

The worst-case discharge volume is the accepted standard for evaluating the maximum potential volume of oil spills. Information on the worst-case discharge volume for each development scenario is necessary for an assessment of the full range and extent of potential oil spill impacts to coastal resources.

***Spill Probabilities***

The oil spill risk discussion in the EID focuses on the probability of "one or more spills," and offers no information on multiple spills.[38] This is an oversight that minimizes the apparent risk of spills. In its information request letter of April 22, 2005, the Commission requested that the MMS provide an analysis of oil spill risk probabilities for multiple oil spills. The MMS responded as follows:[39]

> *Because the EID tables indicate the probability of one* or more *(emphasis added), it does not minimize the risk of multiple spills. As indicated in the table in the comments provided to MMS (without verifying the accuracy of the calculations), the risk of two or more spills, etc. keeps decreasing as the number of spills increases. You are correct in that there is a relatively high probability of multiple spills from existing operations combined with the hypothetical development in the spill size range 50 – 999 barrels. Unfortunately, such statistics contribute very little to assessing hypothetical environmental impacts because the statistics do not give any insight into the risk of coincident spills either in time or space.*

This response does not address the Commission's request that the MMS analyze the probability of multiple oil spills individually – that is, analyze the probability of two independent spills, three independent spills, four independent spills, etc., rather than merely analyzing the probability of "one or more spills". A preliminary analysis by Commission staff, using the MMS data and methodology,[40] shows that the estimated risk of multiple spills is significant, and that post-suspension development could substantially increase the probability of multiple spills over

---

[37] For example, the worst-case spill planning volume for the Platform Irene onshore pipeline (beginning at the beach) is 4,424 barrels. (*California Office of Spill Prevention and Response Supplement for the Oil Spill Response Plan for the Point Pedernales 20-inch Wet Oil Pipeline*. April 2003. p. 4-2)

[38] EID, p. 5.3-13 to 5.3-14

[39] June 23, 2005. MMS letter, pages 47 and 48.

[40] Spill probability is estimated from historic oil spill data, specifically, the number of spills that have occurred for each billion barrels of crude oil handled. Once the historic spill rate is determined, an estimate of the expected mean number of spills over the expected life of a proposed project can be obtained by multiplying the estimated volume of recoverable reserves (in billions of barrels) times the spill rate (in spills per billion barrels). The probability that *N* spills will occur for the estimated mean number of spills is given by the Poisson distribution. The same model produces estimates of the probability of one or more spills, or multiple spills.

the life of the projects. Anticipated post-suspension development of the 36 leases will increase the estimated probability of *one or more spills* in the 50-999 barrel size range only slightly (from 96.8 percent to 99.9 percent). However, the estimated probability of six independent spills will rise from a current 13.6 percent to 82.5 percent, and the probability of ten independent spills will rise from 0.3 percent to 30.6 percent. Similarly, for spills of 1,000 barrels or more, the estimated probability of one or more spills will rise from 46 percent to 76.8 percent, whereas the probability of two or more spills will rise from 12.8 percent to 42.9 percent.

The Commission provides this information to indicate the importance of a multiple-spill probability analysis. It is accurate to the degree that the Commission uses available the MMS data and methodology. The MMS has data relating to historic spills, recoverable reserves, and other characteristics of the hypothetical post suspension development scenarios that will allow a full analysis of the probability of multiple oil spills from development of these leases. A multiple-spill probability analysis is information that should be provided by the MMS in the consistency determination. Without this information, the Commission cannot assess the full range, extent, and likelihood of oil spill impacts that may be caused by granting the lease suspensions.

Additionally, the EID and DEIS do not include information on the cumulative spill risk probabilities for individual development scenarios — for example, there is no risk probability information specific to the cumulative risk of the Gato Unit development plus the existing OCS development. In its letter of April 22, 2005, Commission staff requested that MMS provide estimates of cumulative spill probabilities for each hypothetical development scenario plus existing operations. MMS did not address this request in its response letter. As a result, the Commission is unable to analyze how granting the lease suspensions may individually increase the probability of an oil spill, or the contribution that granting the lease suspensions will make to a cumulatively increased oil spill risk probability.

***Probability of Spills from Delineation Drilling***

Drilling of delineation wells is a post-suspension activity anticipated in the EID and consistency determinations for the NSMB and Gato Canyon Units. The EID discusses the "minimal" risk of an oil spill from delineation drilling on pages 5.3-12 and 5.3-13:

> *Proposed delineation drilling during post-suspension phase activities involves minimal risks of an oil spill. Oil spills during exploration or delineation drilling of wells from mobile drilling platforms are very rare events according to the MMS and US Coast Guard database... The probability of one or more spills from delineation drilling has been calculated to be less than .05 percent (the lowest value calculated by MMS spill data.) Therefore, the risk of a spill is considered to be minimal and poses almost no risk to the marine environment. Spills during delineation drilling for these proposed projects are not considered further in the spill risk assessment.*

The Commission believes that the MMS's statistical model, which is based on production statistics, is misapplied to delineation drilling, and that it is more appropriate to use the MMS's data from 1992-2000 for exploration-related spills to determine the risk probability of a spill

from delineation drilling.[41] The MMS's data on exploration-related spills shows that three spills of over 50 barrels occurred in the drilling of 3031 wells. Based on this data, the mean expected number of spills is about 0.0015. This mean number of spills is too small to estimate spill probability with much confidence. However, the data strongly suggest that the estimate of less than 0.05% is unrealistically low, and that the true probability of a spill might be in the range of 0.1% to 0.2% (i.e., between one-in-500 and one-in-1000, versus one-in-2000).

The need for disclosure is underscored by the occurrence of a loss of well control ("blow-out") on Platform Gail as recently as November 18, 2004, due to operator error. Though oil spillage was minor, the incident did result in a significant gas release, platform shutdown, and evacuation. Under different conditions, it could have led to a significant oil spill.

In its April 22, 2005 letter to the MMS, the Commission requested that the MMS revise the discussion in Section 5.3.3 of the EID to include a probability estimate derived from the MMS's delineation drilling spill data. The MMS responded as follows:[42]

> *The methodology used to estimate spill risks (based upon the amount of oil "handled" via production, pipeline, etc.) is a valid metric to calculate risk. There is a rigorous database on which to base statistics of risk using this metric, and it has the advantage of being comparable to risks of spills from tankering. This latter is significant in being able to estimate hypothetical effects of spills on coastal resources. The reference to "blow-out" only enters into the spill statistics if oil is put into the ocean because this is an analysis of spill risk. The three spills over 50 barrels... are in the MMS spill database and were part of calculating the probability of one or more spills during delineation drilling of 0.05%. Even if one doubles this probability to 0.1%, it is still extremely low, and MMS stands by its conclusion that it "poses almost no risk to the marine environment."*

The Commission agrees that spills from drilling are infrequent; however, it disagrees with the MMS's chosen statistical method and its conclusion that there is "almost no risk" to the environment from a spill from drilling activities. The MMS's spill probability model, based on production statistics, is misapplied to delineation wells, and the probability estimates appear to be statistically invalid. Because such spills are infrequent the probability cannot be estimated with confidence, but historic data suggest the probability of a spill could be two- to four-times as high as the MMS states in the EID. In view of the statistical uncertainty and possible significant

---

[41] Specifically, the exposure variable (volume of oil handled) is not logically related to the risk of spills from exploratory drilling, because exploration wells produce only small test quantities of oil, unlike production wells. Although the MMS includes exploratory drilling accidents in its database for developing oil spill occurrence rates, this does not mean that spill probability for exploratory drilling can properly be estimated based on the volume of oil samples extracted from an exploration well. See Smith, R.A., J.R. Slack, T. Wyant, K.J. Lanfear. *The Oil Spill Risk Analysis Model of the U.S. Geological Survey.* USGS Professional Paper 1227, U.S. Geological Survey. Reston, VA. 1982. p. 22.

[42] June 23, 2005 MMS letter, page 49.

environmental impacts if a spill were to occur, the possibility of spills during delineation drilling should not be dismissed without further analysis.

Absent an analysis of spill risk probabilities for delineation drilling based on an appropriate statistical method, and a discussion of the potential impacts to coastal resources from an oil spill that may result from drilling activities, the Commission cannot determine if granting the lease suspensions is consistent with the resource policies of the CCMP (Coastal Act Sections 30210, 30211, 30220, 30230, 30231, 30234.5, 30240, and 30244).

***Spill Trajectories***

Three separate oil spill trajectories analyses are presented in the DEIS and EID: 1) the MMS's Oil Spill Risk Assessment ("OSRA") model, 2) the National Oceanic and Atmospheric Administration's "General NOAA Oil Modeling Environment" ("GNOME") oil spill model, and 3) an analysis of Scripps Institution of Oceanography ("Scripps") free-floating drifter trajectories. The results of the analyses are summarized in the EID as a composite analysis, which covers the general geographic region of anticipated post-suspension development. Upon initial review of the EID, Commission staff determined that the analyses are overly general, and do not provide enough detailed information for the Commission to analyze the risk of oil spill impacts to specific coastal resources. Commission staff requested more specific trajectory information, to include:

1. Detailed trajectory analyses for each existing development project and hypothetical post-suspension scenario, using scenario-specific, maximum reasonably foreseeable spill sizes (i.e., worst-case discharge volumes); and

2. A summary of the analyses that clearly communicates the risk exposure borne by different coastal areas due to potential spills from each hypothetical development scenario, including discussions of variability and uncertainty in the estimates.

The MMS responded to the Commission's request as follows:[43]

> *MMS believes it is appropriate to present generalized spill risk at this stage in the possible hypothetical future development of these undeveloped leases. MMS includes overall risk from a spill from possible future development because a spill could potentially affect geographically diverse resources in the overall area no matter the origin of the spill given the complex and varying circulation in the region...*
>
> *Project specific modeling would not add substantial resolution to the modeling of spill trajectories performed in the DEIS (1999) because the launch points for those trajectories cover the geographic domain of the projects described in the EID. Appendix Figure 5.2-1 in the DEIS indicates the launch points used in modeling. These are very near or within the units for which projects are described.*

[43] June 23, 2005 MMS letter, page 46-47.

The Commission does not agree that the generalized information provided in these analyses is appropriate at this stage of development. As discussed in Section 2.2.2: Scope of Coastal Commission Review, above, unlike a lease sale, the location and anticipated character of the post-suspension development scenarios are fairly well defined, and the available information would support a more specific analysis. Nor does the Commission agree that scenario-specific spill trajectory analyses would not "add substantial resolution." Rather, the modeling studies are overly generalized by design, and overlook factors important for evaluating oil movement and shoreline contact locations. Some major inadequacies in the analyses are summarized below.

*Small scale current features*

Neither the OSRA nor GNOME modeling studies appear to account for relatively fine-scale current features or changes in current patterns.[44] The importance of small scale variations is stressed in a National Research Council report,[45] which states: "In the absence of most of the temporally and spatially varying part of the spectrum, the predicted trajectories may miss many aspects contributing to drift, especially at the shorter time scales. This problem plagues all modeling efforts to some extent, but is of particular concern for southern California where the variable flows are so strong."

A recent study demonstrates the importance of fine-scale current dynamics.[46] The study, which involved intensive deployment of drifters offshore Santa Barbara's southern coast between Ellwood and Naples, indicates that cross-shelf currents intermittently dominate the pattern of circulation within a few kilometers of the shore. Cross-shelf currents could drive spilled oil directly toward shore in some areas. These currents have major importance for understanding the risk of potential spills from Santa Ynez Unit and Gato Canyon Unit, particularly if the spill were from a pipeline rupture within State waters.

*Temporal variability in current patterns*

Both the OSRA and GNOME modeling studies appear to oversimplify the current patterns. The OSRA studies are based on seasonally averaged and modeled ocean current fields, combined with averaged surface drifter data. As a result of the averaging, the range of variability of current patterns is greatly reduced. This is a serious error, because different current "regimes" occur during each season, and the dominant current pattern may change on time scales of days to weeks.[47]

---

[44] Although the model physics seem to incorporate some fine scale processes (OCS Report MMS 2000-057, p. 3-4), there is no indication that the model was empirically verified at such scales in southern California waters. In any case, much of the fine-scale information would be lost in the seasonal averaging.

[45] National Research Council. *The Adequacy of Environmental Information For Outer Continental Shelf Oil and Gas Decisions: Florida and California*. 1989. p. 23 (see also: NRC. *Assessment of the U.S. Outer Continental Shelf Environmental Studies Program – I. Physical Oceanography*. 1990.)

[46] Ohlmann, Carter, *Transport over the Inner-Shelf of the Santa Barbara Channel, Draft Final Report to MMS,* March 28, 2005.

[47] DEIS, Table 5.1.3.2-2, p. 5-24.

Additionally, the GNOME studies are based on the three major characteristic flow regimes that have been identified in Scripps-MMS collaborative studies (i.e., upwelling, convergent, and relaxation regimes). These three flow patterns can clearly be identified about 60% of the time.[48] With this approach, only the conceptually idealized flow patterns are modeled. Trajectories associated with hybrid flow patterns, changing patterns, and less common patterns are not modeled. Neither the OSRA nor the GNOME study analyzes storms or other conditions that could produce unusual trajectories.

*Pipeline spills*

Although subsea pipeline ruptures are the most likely type of oil spill from the anticipated post-suspension activities, GNOME and OSRA model only surface spills from platforms.[49] Because pipelines are closer to shore than platforms, a higher proportion of the spilled oil is likely to affect shoreline and near-shore resources. Also, subsea releases behave differently than surface spills, and require a very different modeling approach.[50] In addition, the modeling fails to consider onshore pipeline spills, which may enter marine waters and affect coastal resources.

*Other weaknesses of the analysis*

- **Effect of spill volume on modeled shoreline contact locations.** Because the maximum spill volume modeled was only 2,000 barrels, the GNOME model results don't provide complete information concerning the volume of oil that will contact the shore in the event of a maximum worst-case discharge.

- **Oil characteristics.** The OSRA modeling and drifter studies do not consider properties of the spilled oil, which varies considerably among reservoirs. Oil properties affect subsea plume formation and the behavior of oil on the surface, such as spreading, sinking, and expansion of volume due to mousse formation.[51] It is unclear how realistically the GNOME modeling studies account for such characteristics, if they are considered at all.

---

[48] DEIS, p. 4-48.

[49] See DEIS, p. 5-20. OSRA modeling of spills from several currently existing pipelines is included in the *Oil-Spill Risk Analysis* [MMS 2000-057] cited above. However, the surface spill model is used, and the modeling is not tied into the spill analysis in the DEIS or EID. The modeled spill locations are approximately 2.5 to 6.3 miles offshore and fail to consider possible spills closer to shore, where environmental impacts would be greater.

[50] Subsea spill models are under development by MMS, and other models may be available. See: *Technical Documentation for the Pipeline Oil Spill Volume Computer Model, SINTEF Report to MMS.* January 20, 2003. Availiable at: http://www.mms.gov/tarprojects/390/WCD%20Technical%20Description_Final-170203.pdf Accessed July 8, 2005.

[51] Mousse formation is the tendency of some oils to form emulsion, which can expand the spill volume by a factor of two to three, as apparently was the case for the 1997 Irene pipeline spill. Sinking may be a very important consideration for the heavier local oils.

- **Shoreline contact**. The OSRA model generates estimates of conditional probabilities of shoreline contact. However, these estimates are of dubious value, given that the model uses seasonal current averages, fails to include important small-scale currents, and does not account for oil characteristics or volume. The spill trajectory analysis does not adequately connect probable shoreline contact locations with presence of sensitive resources, as necessary for evaluation of impacts.

- **Uncertainty.** The trajectory modeling does not include an error analysis or discussion of model sensitivity analysis, as recommended in the National Resource Council assessments.[52]

The oil spill modeling in the EID and DEIS is over-generalized and lacks crucial information. Hence, it does not provide the information needed for a realistic appraisal of potential impacts to specific resources in the Santa Barbara Channel and Santa Maria Basin. The modeling lacks an appraisal of what resources are likely to be affected by an oil spill incident. Without this information, the Commission cannot evaluate in appropriate detail the full range and extent of potential oil spill impacts to marine and shoreline resources.

***Conclusion***

The oil spill risk analysis in the EID is overly general, and lacks specific information crucial to the Commission's analysis of potential oil spill impacts on coastal resources. The Commission requested additional information from the MMS regarding: 1) the worst-case discharge volumes; 2) spill probability analyses for multiple spills; and 3) detailed spill trajectory analyses for each hypothetical post-suspension development scenario. Without this information, the Commission cannot evaluate in appropriate detail the full range and extent of potential oil spill impacts to coastal resources. The Commission therefore finds it does not have sufficient information to determine if granting the lease suspensions is consistent with CCMP policies related to: marine resources and water quality (Coastal Act Sections 30230 and 30231), environmentally sensitive habitat areas (Coastal Act Section 30240), commercial fishing (Coastal Act Sections 30230 and 30234.5), access and recreation (Coastal Act Sections 30210, 30211, 30212, and 30220), and cultural resources (Coastal Act Section 30244).

### 3.1.5 Prevention and Response Capability

Section 30232 of the Coastal Act requires an operator to provide "protection against the spillage of crude oil, gas, petroleum products, or hazardous substances…" and to provide "effective containment and cleanup facilities and procedures" for accidental spills that do occur.

After the 1989 *Exxon Valdez* oil spill, the federal and California State governments imposed tough new statutory and regulatory standards for oil spill prevention and response. Under the Oil Pollution Act of 1990, the federal government agency with the primary regulatory authority over marine waters is the US Coast Guard ("USCG"). The USCG also serves as the Federal On-Scene Coordinator ("FOSC") during an oil spill response. Under California's Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (Cal. Gov't Code §8670 *et seq.*), the California State government agency with the primary regulatory authority over oil spills in state marine

---

[52] *Ibid.*, NRC, 1989, p. 24.

waters is the California Department of Fish and Game's Office of Spill Prevention and Response ("OSPR"). OSPR is the State On-Scene Coordinator during an oil spill response.

A Regional Response Team ("RRT") composed of representatives from the USCG, the US EPA, the MMS, the California Office of Emergency Services, and OSPR oversees the development and implementation of three Area Contingency Plans for all waters offshore California. The Plans present procedures for joint response efforts, including procedures for mechanical recovery, dispersal, shoreline cleanup, protection of sensitive environmental areas, and protection, rescue, and rehabilitation of fisheries and wildlife.[53]

Oil spill prevention and response for the hypothetical post-suspension development scenarios are discussed in detail below.

***Prevention***

To reduce the likelihood of spills, OCS operators must comply with a multitude of oil spill prevention, environmental management, and worker safety regulations from federal, State, and local agencies. These include the MMS, US Office of Pipeline Safety regulations; US Coast Guard Facility Response Plan regulations (33 CFR Part 154 and 155); the California Office of Spill Prevention and Response regulations (14 CCR §§790 –886) for oil spill contingency plans, inspections, and drills for pipelines in state waters and onshore facilities; State Lands Commission regulations (14 CCR §§2000 – 2017, §§2300–2407) for onshore marine terminals; Coastal Commission consistency certification and permit requirements; and Santa Barbara County permit conditions for onshore facilities.

According to the EID and DEIS Appendix 5,[54] the MMS's prevention strategy includes regulations that require the use of best available technologies, training standards for operator personnel, and a rigorous inspection program. This strategy encourages industry to operate well-engineered facilities with good housekeeping practices, adequate equipment maintenance, and proper and safe operational procedures to reduce the likelihood of a spill. The MMS has established inspection protocols and reporting requirements designed to effect timely detection of any spills, notification of proper authorities, and initiation of cleanup. Operators are required to conduct frequent periodic inspections to determine if pollution is occurring and to report sources of pollution to the MMS.

To ensure that a facility is prepared in the event that oil is spilled, the MMS has a comprehensive oil spill response program.[55] In addition, the MMS tests a facility operator's response, as well as its knowledge and understanding of the Oil Spill Response Plan through oil spill exercise programs that incorporate announced and unannounced drills each quarter. For planning

---

[53] US Coast Guard, California Office of Oil Spill Prevention and Response. *2000 Area Contingency Plan, Los Angeles and Long Beach.* 2000. Available at http://www.uscg.mil/d11/m/rrt9web/

[54] EID p. 5.3-7, DEIS Appendix 5 p. A5-69

[55] In accordance with MMS regulations 30 CFR §250.204 (b)(3) and Part 254, each of the OCS operators must have an approved oil spill response plan.

purposes, the MMS adheres to the requirements of the USCG's National Preparedness for Response Exercises Program.[56] Facility operators must exercise their entire response plan at least once every three years. To satisfy this triennial exercise requirement, an owner or operator must conduct the following elements of the response plan: annual spill management tabletop exercise; annual deployment exercise of spill response equipment staged at an onshore location; annual notification exercise; and semiannual deployment exercise of any response equipment which the owner or operator must maintain at the facility.[57]

The Commission notes that even with these regulations and programs in place, oil spills do still occur due to human error. For example, the size of the163-barrel Torch Platform Irene pipeline spill in 1997 was exacerbated by the operator manually restarting the pipeline flow after the SCADA system had automatically shutdown the pipeline due to a drop in pipeline pressure. To reduce operator accidents, the MMS and other federal, State, and local regulations provide feedback mechanisms for the continual improvement of operator training programs and leak detection systems.

The new platform and pipelines proposed for the Gato Canyon Unit would be designed in accordance with the MMS and other applicable federal, State, and local regulations for the prevention of hazardous spills (as discussed above on the previous page). The platform and pipelines would also be required to operate in compliance with the most recent versions of the MMS, federal, State, and local oil spill prevention, safety, environmental management, and operator training regulations and programs discussed above. The Commission finds that the MMS's and other applicable prevention regulations and programs provide measures for maximum feasible "protection against the spillage of crude oil, gas, petroleum products, and hazardous substance." The Commission therefore finds that granting the lease suspensions is consistent with the prevention requirements of the CCMP (Coastal Act Section 30232).

***Response Technologies and Capability***

Oil spill prevention measures, such as blowout protection devices and regular platform inspections, have reduced the frequency of oil spills from OCS platforms since the 1980's. However, offshore oil development in the Pacific OCS continues to pose a significant risk to the environment from oil spills.[58] Oil spill response strategies generally include: mechanical containment and recovery equipment, chemical dispersants, and in-situ burning. Each is discussed in more detail below.

*Mechanical Containment and Recovery Equipment*

According to the EID and DEIS Appendix 5,[59] operators in the Pacific OCS are required to keep sufficient equipment on or near the platforms to enable the immediate initiation of containment

---

56 USCG. *National Preparedness for Response Exercise Program (PREP)*. August 1994. Available at http;//www.uscg.mil/hq/g-m/nmc/response/msprep.pdf

57 EID p. 5.3-7; DEIS Appendix 5, p. A5-69.

58 The term "risk" encompasses both the likelihood and environmental impacts of oil spills.

59 EID, p. 5.3-7. DEIS, p. A5-70.

activities. Primary response equipment at the platforms is supplemented by onshore equipment operated by oil spill cooperatives formed by the lessees and operators.

Platform operators are required to have MMS-approved Oil Spill Response Plans ("OSRP"), which are updated on a biennial basis. The Commission reviews each OSRP update to ensure that any changes in the equipment and procedures at the platforms continue to provide equal or better protection of the marine resources than that reviewed during the original consistency certifications for the platforms. The Commission notes that as part of the consistency review process for the Development and Production Plan for the Gato Canyon Unit, Samedan will be required to provide detailed information pertaining to the placement of oil spill response equipment at or near the platforms. The Commission agrees with the MMS that the Development and Production Plan stage is the more appropriate time for the review of the detailed information pertaining to primary response capability at the platform.

For regional response capability, Clean Seas provides two dedicated oil spill response vessels — Mr. Clean III at Platform Harvest and Mr. Clean at Santa Barbara harbor — in addition to pre-staged equipment located at Morro Bay, Avila Bay, Santa Barbara Harbor, the Carpinteria Yard, in the Ventura/Port Hueneme area, and at Point Mugu Navy Base. As the MMS notes,[60] the additional resources of the Marine Services Response Corporation, National Response Corporation and the USCG Oil Spill Response Team are also available to assist Clean Seas in the event of catastrophic spill.

In the 25-30 years since installation of the existing OCS platforms, Clean Seas has continued to upgrade and improve the containment and recovery capability of their state-of-the art response equipment to best match the characteristics of the oil produced in the offshore fields. Notwithstanding these improvements, the Commission does not agree with the MMS's assessment that an "effective" oil spill response can be conducted for an oil spill incident.

The Commission interprets the "effective containment and clean up" standard in the CCMP (Section 30232 of the Coastal Act) as the ability to keep an offshore oil spill from adversely affecting the shoreline resources of California. In the consistency certifications pertaining to OCS oil and gas development projects the Commission reviewed in the 1980's,[61] the Commission found that although the on-water oil spill containment and clean-up equipment available for response to offshore oil spills was state-of-the art, research and oil spill experience showed that its effectiveness in keeping a marine oil spill from causing significant impacts to sensitive shoreline resources was severely limited by weather, currents, and wave conditions.

Although oil spill response equipment and cleanup methods have significantly improved in the past 20 years, research and experience shows that the response capability of current state-of-the art containment and clean-up equipment continue to be very limited during conditions of rough

---

[60] EID, page 5.3-7

[61] CC-7-83 (Platforms Harmony and Heritage), CC-12-83 (Platform Hermosa), CC-27-83 (Platform Harvest), CC-24-84 (Platform Hidalgo), and CC-36-86 (Platform Gail).

weather and sea conditions. EPA tests have demonstrated that oil skimmers can generally only recover about 50 percent of spilled oil in calm water conditions, with decreasing effectiveness if sea conditions are rougher.[62] Booms and skimmers are also limited in their effectiveness by wave height and wind speed. According to the National Oceanic and Oceanographic Administration's ("NOAA") Office of Response and Restoration, historical data indicates that only 10-30 percent of spilled oil can be recovered by mechanical means.[63]

The lack of real-time current information can also affect the accuracy of on-water response operations. A system of buoys was deployed during the 1990s in the Santa Barbara Channel and Santa Maria Basin by Scripps Institution of Oceanography, to provide wind and current data for circulation studies. Through a cooperative agreement between MMS and Scripps, and an interagency agreement with NOAA, a monitoring array was deployed in 1999, providing real-time wind and current data. The data was made available on the internet for use in trajectory analysis during oil spill response.[64, 65] The buoys were removed in October/November, 2004, and real-time current data is no longer available. Some up-to-date oil spill response plans cite the Scripps website for access to real-time current data;[66] however no plans to resume the real-time current monitoring have been announced.

Recent ocean oil spills, even those as small as the 163-barrel Torch Platform Irene pipeline spill in 1997, have demonstrated that state-of-the-art response equipment, even under the best weather and calm-sea conditions, are not effective in keeping oil off the shoreline. Current state-of-the-art mechanical response equipment cannot effectively protect California's shoreline and marine resources from significant oil spill impacts. The Commission therefore finds that the CCMP standard of "effective containment and clean up" (Coastal Act Section 30232) cannot be met using the on-water containment and clean-up equipment currently available to respond to marine oil spills from oil and gas exploration development offshore California.

*Chemical Dispersants*

The effectiveness of chemical dispersants can be limited by the characteristics of the oil found in the Pacific OCS oil reserves (especially the heavier oil found in the Sword Unit), as well as rough weather and sea conditions.

---

[62] Environmental Protection Agency. *Summary of U.S. EPA OHMSETT Testing 1974-1979.*

[63] Michel, Christopherson, & Whipple. *Mechanical Protection Guidelines*. NOAA, USCG, Research Planning, Inc. 1994.

[64] http://ccs.ucsd.edu/research/sbcsmb/; http://ccs.ucsd.edu/research/sbcsmb/moorings/ Accessed July 15, 2005.

[65] DEIS, p. 4-46 to 4-48; EID, pp. 4.5-14 and -15.

[66] PXP Arguello, Inc. *Core Oil Spill Response Plan*. Vol. 1, p. E-1. February, 2004.

The Regional Response Team recently updated its policy for the use of chemical dispersants in federal offshore waters through an updated California Dispersant Plan.[67] This Plan will become part of the three California Area Contingency Plans. The California Dispersant Plan includes the results of a net environmental benefit analysis conducted for all habitats and species from the California shoreline to 200 miles offshore, and lists the oils commonly tankered into California or produced from its offshore fields. An evaluation of the "dispersibility" of these oils was included. Most oils transported into California by tanker ship have a chemical composition that might, under favorable conditions, make them candidates for chemical dispersion. However, most oils produced from California offshore fields are too heavy, persistent, and non-volatile to be suitable candidates for effective chemical dispersion with the products and resources currently available. Clean Seas has 18,000 gallons of Corexit 9527 – which is marginally effective for some of the lighter OCS crude oil – stored at its Carpinteria yard. However, Corexit 9500, which is the dispersant most appropriate for use on the heavy-grade oil that is produced from the OCS leases, is not stored in California. The closest available supply is in Texas, which could arrive in about six hours by plane. As noted in the EID,[68] the effectiveness of dispersants decreases the longer the oil is weathered due to emulsification. To be most effective, dispersants must be applied in the first 24 hours of a spill.

The California Dispersant Plan also includes: 1) a description of federal offshore waters "pre-approved" by the RRT for dispersant use, with an accompanying decision-making flowchart and resources to be used by the FOSC to assist her decision, and 2) a description of federal offshore waters for which case-by-case RRT approval must be received before the FOSC can deploy dispersants. Areas pre-approved for dispersant use include all federal waters (more than 3 miles from shore) except those areas within National Marine Sanctuaries (e.g., Channel Islands and Monterey Bay National Marine Sanctuaries). RRT approval on a case- by-case basis is required for State waters, sanctuary waters, and within 3 miles of California-Oregon or California-Mexico borders. Even in areas where the use of dispersants is approved, dispersants cannot be applied directly over marine mammals. The presence of marine mammals may therefore further limit the potential use of dispersants.

In conclusion, factors such as the heavy viscosity of the oil in the OCS reserves, weather and sea conditions at the time of the spill, proximity of marine mammals, and the RRT approval process may severely limit the effectiveness of dispersants as a spill response measure.

In Situ *Burning*[69]

The three California Area Contingency Plans include policies for the *in situ* burning of oil on the water's surface. RRT "pre-approval" for *in situ* burns exists for waters 35 nautical miles and further from shore. An FOSC decision to conduct an *in situ* burn in waters closer to shore

---

[67] Region IX Regional Response Team. *Draft Final California Dispersant Plan and Federal On-Scene Coordinator (FOSC) Checklist for California Federal Offshore Waters*. 2005. 49 pp. + Appendix.

[68] EID, p. 5.3 -8

[69] July 11, 2005. Pers. Comm. Addassi, CDFG-OSPR, and Faurot-Daniels, CCC.

requires case-by-case approval from the RRT, in consultation with the regional air board and health department.

The heavy oils produced by California offshore oil fields may, if contained properly, be burnable. The physical and chemical characteristics of this oil may require the addition of accelerants to facilitate combustion, and de-emulsifiers. There is no fire boom stored in California; however, a regular boom could be used sacrificially for *in situ* burning. The presence of marine mammals in the area would preclude *in situ* burning.

As is the case with the use of chemical dispersants, factors such as the heavy viscosity of the oil in Pacific OCS reserves, weather and sea conditions at the time of the spill, proximity to sensitive marine resources, and the RRT approval process may severely limit the effectiveness of *in situ* burning as a spill response measure.

*Conclusion*

Current state-of-the-art mechanical response equipment, chemical dispersants, and *in situ* burning cannot effectively protect California's coastal resources from significant oil spill impacts. The Commission therefore finds that the CCMP standard of "effective containment and clean up" (Coastal Act Section 30232) cannot be met using the oil spill response strategies currently available. The Commission finds that granting the lease suspensions is inconsistent with the oil spill response requirement of the CCMP (Coastal Act Section 30232). Because the Gato Canyon Unit platform and pipelines would be "coastal-dependent industrial facilities," granting the lease suspensions would presumptively be subject to analysis under Coastal Act Section 30260. See Section 3.10: Coastal Dependent Industrial "Override" Policy of this report, below.

## 3.2 Marine Resources and Water Quality

The marine resource protection policy of the CCMP (Coastal Act § 30230) states:

> *Marine resources shall be maintained, enhanced, and where feasible, restored. Special protection shall be given to areas and species of special biological or economic significance. Uses of the marine environment shall be carried out in a manner that will sustain the biological productivity of coastal waters and that will maintain healthy populations of all species of marine organisms adequate for long-term commercial, recreational, scientific, and educational purposes.*

The water quality protection policy of the CCMP (Coastal Act § 30231) states:

> *The biological productivity and the quality of coastal waters, streams, wetlands, estuaries, and lakes appropriate to maintain optimum populations of marine organisms and for the protection of human health shall be maintained and, where feasible, restored through, among other means, minimizing adverse effects of waste water discharges and entrainment, controlling runoff, preventing depletion of ground water supplies and substantial interference with surface water flow, encouraging waste water reclamation,*

*maintaining natural vegetation buffer areas that protect riparian habitats, and minimizing alteration of natural streams.*

The Gato Canyon Unit leases are 3-5 miles offshore of the Gaviota coast within the Santa Barbara Channel. The extensive marine resources of the Santa Barbara Channel are well documented. The Channel is recognized for its nationally significant natural and cultural resources. The area includes incredible biodiversity due to its location at the confluence of two major ocean currents, the ecological transition zone between cool northern waters and warm southern waters. The Channel contains a convergence of species from both ecosystems and provides habitat for a rich and diverse community of marine life. The area supports large kelp beds and complex intertidal and subtidal communities. The Channel also supports many endangered and threatened species, and Species of Concern, including white abalone, California brown pelicans, gray whales, and northern elephant seals. The Channel is an important migration route for marine mammals such as blue, gray, and humpback whales. For these reasons, in 1980, the federal government established the Channel Islands National Marine Sanctuary. In addition, in 2003, the California Fish and Game Commission created the largest network of marine reserves off the West Coast by setting aside 175 square miles (in 12 separate Marine Protected Areas) within the Sanctuary in which fishing is prohibited. Exhibit 5 of this report documents the array of the Channel's sensitive marine species.

Samedan's proposed shallow hazard survey (to be conducted during the lease suspension period) and hypothetical post-suspension exploration, development, and production activities could significantly harm the Channel's sensitive marine resources and water quality. The following analysis focuses on the potential effects of conducting a shallow hazard survey and the construction, operation, and decommissioning phases of post-suspension activities. The probability of and potential effects from an oil spill are addressed in Section 3.1: Oil Spill of this report.

In this section, the Commission focuses its analysis on six key issues of concern: (1) marine mammals, (2) hard bottom habitat, (3) surfgrass, kelp and other sensitive nearshore resources; (4) marine and coastal birds, (5) ocean discharges, and (6) fish.

***Shallow Hazard Survey***

Samedan proposes to conduct, during the suspension period, a 3-4 day shallow hazard survey on Lease OCS-P 0460 to obtain information on geohazards associated with a potential delineation (exploration) well. A shallow hazard survey is a high-resolution site survey conducted to investigate the shallow subsurface for geohazards and soil conditions in relatively small areas. A shallow hazard survey is commonly used at the exploratory stage for initial site evaluation for drilling rig emplacement. Geotechnical information is typically collected from the seafloor to a depth of 980-1,475 feet. By contrast, a "3D" seismic survey is conducted to obtain data on geological formations from the seafloor to a depth of several thousand meters. The geotechnical information obtained by a 3D seismic survey is used by the oil and gas industry to assess potential hydrocarbon reservoirs and optimally locate exploration and development wells. The areas covered by 3D seismic surveys are typically much larger than those areas covered by shallow hazard surveys.

The duration of Samedan's proposed shallow hazard survey is 3-4 days on a 1.5 square-mile area of Lease OCS-P 0460 located 4-5 miles from the coast. The depth of the survey below the seafloor ranges from 300-1,200 feet. A single, small 20-in$^3$ air gun would be used as the acoustic source to acquire seismic data. An air gun is designed to project sound downward toward the seafloor, although some sound is also propogated horizontally. Sound intensity is usually expressed in decibels (dB), units for expressing the relative intensity of sounds on a logarithmic scale. Since sound pressure is easier to measure than intensity, sound pressure level (SPL) os usually reported in units of decibels relative to a standard reference pressure. In this report, "dB" is used as shorthand for "dB re 1 µPa @ 1 m $_{[rms]}$ (decibels referenced to 1 micropascal at 1 meter $_{[rms]}$ ). Peak sound pressure for the proposed 20-in$^3$ air gun would be 218 dB. The frequency range of the single air gun is 0-128 Hz, although the generated signal would be roughly constant in amplitude over a frequency range of 8-80 Hz. The air gun would be deployed about 10 feet below the surface, and the hydrophone cables would trail about 820 feet behind the vessel.

Loud seismic pulses can disturb and harm marine resources, particularly marine mammals. Marine mammals are protected under the Marine Mammal Protection Act of 1972. Some marine mammals and all sea turtle species are currently federally listed as endangered or threatened with extinction, and are protected under the Endangered Species Act of 1973. At least 34 species of marine mammals inhabit or visit California waters, including 6 species of pinnipeds (seals and sea lions), 27 species of cetaceans (whales, porpoises, and dolphins) and the sea otter. Of the marine mammals possibly occurring in the Santa Barbara Channel, 6 species of large whales (blue, fin, sei, humpback, northern right, and sperm) are listed as endangered, and two species of pinnipeds (Guadalupe fur seal and Stellar sea lion) and the southern sea otter are threatened under the Endangered Species Act.

Blues and humpbacks feed on krill in the western Santa Barbara Channel during summer and fall. Fin whales, also present during the summer, are found far offshore. Sei and northern right whales are rare in California waters. Sperm whales are present year-round, but tend to inhabitat waters with depths greater than 1,000 meters. According to MMS, aerial and shipboard surveys have not documented any sperm whales between 1991 and 2001 within the Santa Barbara Channel. Migrating gray whales and therir calves generally travel within 3 kilometers of the shoreline, and are generally absent from Southern California waters from August through November. Beaked whales, rarely sighted, normally inhabitat deep ocean waters (>2000 meters) or continental slopes and only rarely stray over the continental shelf. Aerial and shipboard surveys conducted between 1991 and 2001 reported one sighting of a beaked whale approximately 25 nautical miles west of Purisima Point. It's unlikely that beaked whales would be found in the Santa Barbara Channel or the Southern California Bight, except in deep water regions.

Southern sea otters now range in coastal waters from near Half Moon Bay south past Point Conception. Most individuals occur between shore and and the 65-foot isobath. Stellar sea lions and Guadalupe fur seals do not breed in the area and are uncommon. Although they exist in California waters, sea turtles are rarly observed or encountered.

Commonly found in the project area are dolphins, California sea lions and harbor seals.

Anthropogenic sound in the sea may have several direct, negative effects on marine mammals, including:

- Physical injury to marine mammals' auditory systems, resulting in temporary or permanent reductions in hearing sensitivity;
- Interfering with marine mammals' abilities to detect calls, pulses, or other important natural sounds (such as the calls of predators);
- Disturbing or altering the behavior of marine mammals; and
- Causing stranding and mortality. Information from recent stranding events suggest that acoustic noise from military sonar, and possibly seismic air gun sources, have potential to cause non-auditory physical trauma to several species of cetaceans, most notably the beaked whales. Intense but intermittent sound pulses produced by air guns might, at a received level of 195-215 dB, cause immediate hearing damage.

In determining acceptable levels of impulsive underwater sound under the Marine Mammal Protection Act, NOAA Fisheries has typically relied on a two-part harassment definition – Level A harassment (injury), occurring at a received level (RL) threshold of 180 dB, and Level B harassment (not causing direct injury, but potentially affecting important biological functions), occurring at 160 dB (and at 120 dB for continuous sound). NOAA Fisheries currently defines these two levels as follows:

1. Level A Harassment – has the potential to injure a marine mammal or marine mammal stock in the wild; or
2. Level B Harassment – has the potential to disturb a marine mammal or marine animal stock in the wild by causing disruption or behavioral patterns, including but not limited to migration, breathing, nursing, breeding, feeding, or sheltering.

Ample evidence exists that sound levels of 140 dB can cause behavioral responses, and the issue of noise thresholds remains highly controversial. NOAA Fisheries itself is sufficiently aware of the uncertainties and data gaps to the degree it is in the process of developing a matrix, which would reflect species diversity in hearing sensitivities, as well as the different types and durations of impulse sounds. In addition, the Marine Mammal Commission has convened an Advisory Committee on Acoustic Impacts on Marine Mammals, which includes a representative from the Coastal Commission and which will advise Congress on suggested revisions to the Marine Mammal Protection Act, including the following tasks:

- Review and evaluate available information on the impacts of human generated sound on marine mammals, marine mammal populations, and other components of the marine environment,

- Identify areas of general scientific agreement and areas of uncertainty or disagreement related to such impacts,

- Identify research needs and make recommendations concerning priorities for research in critical areas to resolve uncertainties or disagreements, and

- Recommend management actions and strategies to help avoid and mitigate possible adverse effects of anthropogenic sounds on marine mammals and other components of the marine environment.

While these efforts are pending, based on available scientific evidence, NOAA Fisheries presumes that acoustic harassment of marine mammals will not occur below the current Level A and B harassment levels. NOAA Fisheries has adopted 180 dB for all cetaceans, and 190 dB for pinnipeds as the maximum impulse sound pressure level to which these marine mammals should be exposed. The Commission has questioned this difference and generally sought 180 dB as an upper limit for both cetaceans and pinnipeds. As noted below, the MMS is requiring Samedan to use a more precautionary 160 dB threshold for this survey.

The estimated distance to expected received sound levels depends on form of propagation and inclusion of attenuating modifiers. Using an attenuation ($A\log_{10}R$) model (where $A$ = attenuation factor of propagation type, and $R$ = the distance in meters form a sound source to a specific attenuated sound level) recommended by NOAA Fisheries, the MMS concluded the resulting distances to be:

- 190 dB – 80 feet
- 180 dB – 261 feet
- 160 dB – 2,607 feet or 0.50 miles

In calculating these distances, the MMS used a spherical attenuation factor of $A$=20, which it asserts has been verified by existing field data. The MMS is requiring a 160 dB impact (or "safety") zone (i.e., the air gun is to be turned off if a marine protected species enters this zone). Therefore, the MMS estimates the 160 dB impact zone to be a 0.50-mile radius.

On June 27, 2005, the Environmental Defense Center ("EDC"), on behalf of a group of environmental organizations, submitted a comment letter to the Coastal Commission regarding the Coastal Commission's consideration of the lease suspension requests. (The EDC's letter is provided in the attached Correspondence Packet). In that letter, the EDC, in part, asserts that the MMS knowingly used an improper or invalid model for determining underwater sound propagation in its analysis of the effects of the proposed shallow hazard survey, thereby greatly understating the marine mammal "impact zone." The EDC argues that a cylindrical model, instead of a spherical spread model, is the correct model to use in this case to calculate the impact zone. By applying the cylindrical model, the EDC believes that the "160 dB impact zone" could extend much farther than a half-mile radius. (An excerpt of the EDC's letter is attached as Exhibit 6).

In a letter dated July 15, 2005, to Commission staff, the MMS stands by its use of the spherical spread model (Exhibit 7). The MMS believes that the spherical spread model, using 20 log R, is the appropriate model for use in the Santa Barbara Channel and Santa Maria Basin because it is

based on empirical data available from *in situ* sound verification studies (an Exxon 1995 Santa Ynez Unit sound propagation study and an Exxon 1998 Platform Harmony sound propagation study). The MMS's letter states the following:

> *Sound transmission loss in water is affected by many physical variables. Consequently, there are a number of simple and complex models available to predict that loss. Over the last 10 years, MMS applicants and the U.S. Geological Survey, have used the spherical spreading model in their environmental documentation for seismic surveys conducted offshore southern California. While there are other sound transmission loss models available, MMS determined that results from sound transmission loss verification studies conducted on previous seismic surveys in southern California support the use of the theoretical spherical spreading model in the project area. This is stated in both the Samedan (Gato Canyon) and the Aera (Santa Maria Basin) EA's.*
>
> *In January 2005, after attending a presentation about cylindrical spreading models, MMS consulted with several underwater acoustic experts to better understand cylindrical spreading loss and to ensure that we used the appropriate model in assessing sound transmission loss. In our discussions, it was suggested that the cylindrical spreading modeling may be appropriate when empirical data are not available. However, given all the physical variables, it was confirmed that the best estimate for determining sound transmission loss is modeling that is based on empirical data. This was also a recommendation from the High Energy Seismic Survey (HESS) Team. Based on the empirical data available from in situ sound verification studies, MMS determined that the spherical spreading model, using 20 log R, would be appropriate and conservative (protective) for use in the Santa Barbara Channel and Santa Maria Basin.*
>
> *We conducted our discussions with scientists from NOAA Fisheries Service; Dr. Charles Greene, Greeneridge Sciences, Inc.; and Dr. Aaron Thode, UCSD. Empirical data are available from two field verification studies that were conducted in the Santa Barbara Channel: (1) BBN Acoustic Technologies, 1995. Exxon SYU sound propagation study. BBN Report No: 8120; and, (2) Greeneridge Sciences, Inc. 1998. Sound levels of an airgun array operating at Platform Harmony on 17 March 1998. Report 2006-2. Dr. Roger Gentry, NOAA Fisheries Service, and Dr. Greene confirmed that empirical data was considered to be superior to theoretical model results whenever such data are available.*

Use of the spherical spread model in the open ocean is consistent with past Commission practice – for example, the Commission concurred with the use of this model in several recent consistency determinations, including CD-14-02, CD-16-00, and CD-32-99, all for seismic surveys to be conducted by the U.S. Geological Survey in waters off of Southern California from the nearshore out to about 20 miles. However, according to Dr. Greene, the question of which model to apply is complicated and dependent on site-specific factors; thus, there is a high degree of uncertainty about which model works better in different environmental conditions.[70] When

[70] Pers. Comm. between Alison Dettmer, Coastal Commission staff, and Dr. Charles Greene, Greeneridge Sciences, Inc., July 22, 2005.

there is a question about the appropriateness of a model used and therefore the size of the marine mammal safety zone, an operator can use during the first day of the survey an array of hydrophones placed at different depths and distances to verify the model's results. This field verification of the model would allow Samedan and the MMS to calibrate predicted results with actual field conditions and then adjust accordingly the 160 dB impact zone. On July 21, 2005, the Commission staff requested that the MMS require field verification during the first day of the survey.[71] As of the issuance date of this report, the MMS has not agreed to provide field verification. The Commission believes that without field verification, there remains a serious question as to whether the proposed 0.50-mile 160 dB impact zone is sufficient to protect marine mammals.

Nonetheless, Samedan is proposing, and the MMS is requiring, a number of other mitigation measures, many selected from the guidelines developed by the High Energy Seismic Survey (HESS) Team. The HESS Team, convened in 1999 and composed of federal, state and local agencies, industry, and environmental interest groups, has prepared interim operational guidelines for high-energy seismic surveys. The guidelines were prepared for 2D and 3D seismic surveys that employ multiple air guns. For this survey, the MMS used selected HESS guidelines to develop mitigating measures for impacts associated with a single air gun for the shallow hazards survey. These measures include:

- The survey would be conducted *during daylight hours only* within the mid-October to mid-December window to minimize impacts to large whales (gray, blue, fin, and humpback), as this period lies outside of, or is on the cusp of, their predictable periods of occurrences within the survey area.
- Samedan shall establish a 160 dB impact zone (estimated to be 0.50 miles) around the air gun.
- Samedan shall use two NOAA Fisheries-approved observers during all air gun operations. Samedan shall ensure that observers do not stand watches lasting longer than 4 hours (and 2-3 hours watches are recommended). Monitoring will begin at least 30 minutes before the air gun is turned on. The air gun will be ramped up (at a rate not to exceed 6 dB per minute to operating level) to allow marine protected species that may have been missed by the observers to move away. The air gun shall be shut down if marine protected species are observed within or appear likely to enter the 160 dB impact zone.
- If the impact zone zone or survey area cannot be adequately monitored due to weather conditions (e.g., fog) or sea state (greater than Beaufort 4), all operations will be delayed until conditions improve.
- Samedan shall log all sightings of marine protected species. Data to be recorded includes the species, numbers, and behavior observed, the estimated number of animals that may have entered the 160 dB impact zone, any air gun shutdowns due to marine protected species migations, and any behavioral responses to vessel or survey activities. Samedan is to notify the MMS on a daily basis of any sightings data made that day, and the steps that Samedan has taken /is taking to avoid affecting adversely protected species.

---

[71] Pers. Comm. between Alison Dettmer, Coastal Commission staff, and Maurice Hill, MMS staff.

- Samedan shall submit to the MMS and NOAA Fisheries, no later than 60 days after completion of survey operations, a report of all sightings and data collected. An analysis of the effectiveness of the mitigation measures and recommendations for improving mitigation measures required to protect marine protected species shall also be included in the report. Within two weeks of submitting the report to the MMS and NOAA Fisheries, Samedan shall submit the report to the Coastal Commission.

For this short survey, the MMS is not requiring Samedan to conduct aerial surveys. The 1999 HESS guidelines recommend that aerial surveys be conducted for seismic surveys lasting 7 days or longer in duration *and* when marine mammals that have been identified as first or second priority species of concern are known to be present in substantial numbers in or near the survey area. First priority species include gray, blue, humpback, and fin whales. Second priority species include the sperm whale (absent from the survey area) and baleen whale species. Aerial surveys would be required if a survey is undertaken during the gray whale migration period (approximately mid-December through mid-May) and when blue and humpback whales are present and foraging in the Santa Barbara Channel and Santa Maria Basin (roughly June to October). Since the MMS is limiting the survey to the mid-October through mid-December window, it determined that aerial surveys are not needed. The Commission agrees that due to the short duration of this survey, its timing, and implementation of onboard marine protected species observer requirements, aerial surveys need not be required.

The MMS also is not requiring the use of passive acoustic monitoring for this survey. Passive acoustic monitoring uses hydrophones, which can be towed or stationary, to record animal sounds and determine where they come from. For animals that regularly vocalize, a hydrophone system can track the animals from a distance, and measure both their patterns of movement and patterns of sound production. It can also be used to determine whether a sound source is affecting the behavior of marine mammals, as well as to detect animals underwater and not visible to surface observers. Passive acoustic monitoring technology is therefore only functional for vocalizing animals, such as some baleen and toothed whales, dolphins and porpoises, and pinnipeds. It does not appear to be useful for detecting sea otters or sea turtles. Multiple hydrophones are needed to triangulate and determine an animal's location.

A 2004 MMS report, *Geological and Geophysical Exploration for Mineral Resources on the Gulf of Mexico Outer Continental Shelf*, notes, "Although the hardware and software for passive acoustic monitoring are available and technologically advanced, compete integrated systems specifically designed and validated for use with marine mammals during seismic surveys are not. Systems for detecting and recording sounds from marine mammals and determining their bearing and distance relative to the receiver are readily available. However, systems that can provide real-time information to allow operational decisions to be made during a seismic survey are limited."

Due to its substantial cost, and its limitations during seismic surveys, the HESS guidelines do not recommend passive acoustic monitoring as a standard mitigation protocol. It does, however, suggest that passive acoustic monitoring be considered if there is evidence that sperm whales may be present in a survey area. A 1997 study indicates that sperm whales may be detected

more effectively by a towed passive acoustic array than by shipboard observers. However, given that (1) sperm whales and beaked whales are not known to occur at Samedan's proposed survey area and that (2) passive acoustic monitoring systems capable of providing real-time information to adjust operation decisions are limited, the MMS is not requiring its use for this survey. Given the relatively short duration of the survey, and relatively low maximum intensity for seismic surveys, the Commission believes this approach is warranted in this situation.

Fish or shellfish eggs and larvae could also be damaged or killed if exposed to intense acoustic energy at very close range. The MMS states that 2003 investigations found that acoustic energy/sound from an air gun at or above 180 dB may temporarily or irreversibly damage hearing in fish, which could lead to sub-lethal behavioral changes and potential death. These studies were based on *caged* fish, however, and researchers note that both juvenile and adult fish in the open ocean would move beyond the potentially lethal and sub-lethal range of an air gun. The required ramp up period will alert fish and should provide sufficient time for fish to move beyond the potentially sub-lethal range (at or above 180 dB) of an air gun where hearing may be impaired. The acoustic pulse from air guns appears to have relatively little effect on marine invertebrates (sea stars, sea urchin, abalone, sea cucumber, etc.) and shellfish (shrimp, prawn, lobster, crab, etc.) presumably due to their lack of a swim bladder.

***Post-Suspension Exploration, Development and Production Activities***

*Marine Mammals*

Four groups of marine mammals are found in the Santa Maria Basin and Santa Barbara Channel: (1) mysticetes, or large baleen whales; (2) odontocetes, or toothed whales (which include sperm whales, dolphins, porpoises, and beaked whales; (3) pinnipeds (which include true seals, eared seals, sea lions, and fur seals); and (4) muselids (sea otters). The marine mammal population includes eight baleen whale species; more than 20 species of porpoises, dolphins and other toothed whales; six species of pinnipeds; and the sea otter. Some species are migrants that pass through southern and central California on their way to calving or feeding grounds elsewhere, some are seasonal visitors that remain for a few weeks or months, and others are resident for much or all of the year. At certain times of the year, hundreds of thousands of marine mammals may be present.

Construction activities associated with platform, pipeline, and power cable installation may affect resident and migrating marine mammals. In general, marine mammal reactions of offshore construction activities involve making temporary course changes around construction activities; impacts therefore tend to be temporary and localized. Typically, the MMS and other permitting agencies prohibit offshore and nearshore construction activities during the winter gray whale migration period. Also, it has been the Commission's practice to require ongoing marine mammal monitoring and the observance of marine mammal "safety" zones (including shipboard observers and aerial surveys) to minimize any harm to marine mammals and other sensitive species during offshore construction projects (e.g., fiber optic cable installation, pipeline repairs).

Any adverse effects to marine mammals due to ongoing platform operations would be noise generated by drilling activities. Although the sound levels produced by conventional drilling rigs are relatively low (about 154 dB in the 10 to 500 Hz band), underwater noise is a concern. The

platform removal phase also raises marine mammal concerns due to the potential use of explosives to remove platform jackets. Although explosives are typically placed below mudline (below the seafloor) removing these massive structures could require large amounts of explosives. Marine mammals in the area could be killed or significantly harmed by blast effects.

*Hard Bottom Habitat*

Hard substrate (also commonly referred to as "hard bottom") areas are exposed rocky substrates that provide habitat for a diverse assemblage of plants and animals. Hard substrate, as compared to "soft," sandy bottom areas, is rare along the southern California coast. Hard substrates, including rocky bottoms, rock outcrops, and rock crevices, provide a nursery ground, food, and shelter for numerous sessile organisms, demersal fish, and mobile invertebrates such as lobsters and crabs. In shallow waters (less than 200 meters), algae and anemones are present. In deeper waters (greater than 600 meters), hard substrate supports amphipods, polychaetes, gorgonians, large sponges, shrimp, brittle stars, and seastars. Epibota residing on rocky substrates are sensitive to disturbance and increased sediment loads. Significant impacts to rocky substrate (e.g., crushing of rock, burial of epibota, and other disturbances) can occur due to anchoring activities, placement of platforms, installation of pipelines and power cables, platform discharges, and eventual removal of the structures.

The EID states that the northern half of lease OCS-P 0460 is hard substrate. Lease OCS-P 0460 is the proposed location for the temporary Mobile Offshore Drilling Unit ("MODU") (to drill the one delineation well), the platform, and pipelines. Neither the EID nor the MMS's consistency determination provides any information on whether hard substrate is found within the State lease through which the three pipelines and two power cables would pass to their onshore landing sites. The Commission staff, in its April 22, 2005 letter to the MMS, requested that the MMS provide additional information on the location of hard substrate within the project area, and an assessment of whether it can be avoided. In its June 23, 2005, response letter to Coastal Commission staff, the MMS states that there may be patchy hard bottom close to shore and concludes that post-suspension activities will likely cause unavoidable hard substrate impacts due to anchoring associated with the pipelaying barge (unless a method is available that would not require anchors).

Although the MMS does not address the potential specific effects of the MODU or platform on hard bottom, it implies that the MODU and platform can be sited on sandy bottom and therefore avoid hard bottom. If feasible, the MMS requires that platforms be sited at least 3,280 feet from identified hard bottom habitat. If a platform is sited within 1,000 feet of hard bottom, discharges associated with the platform (such as muds and cuttings) will result in smothering of organisms and a significant adverse impact. If a platform sits within 1,000-3,280 feet of hard bottom, the severity of the impact would depend on factors such as water depth and current direction. The MMS states that if Samedan proposes in the future activities that could affect hard bottom habitat, it would require a "full biological survey" along with mitigation of any potential impacts. Other than siting structures away from hard bottom, the MMS does not describe what other mitigation it may require.

Although the Commission does not have benefit of a site-specific hard bottom survey, there is enough information available at this time to conclude that future post-suspension activities, particularly due to pipeline construction, will cause unavoidable and adverse impacts to hard bottom habitat.

*Surfgrass, Kelp, and Other Nearshore Sensitive Resources*

As described above, the MMS's post-suspension development scenario for the Gato Canyon Unit contemplates three new pipelines connecting a new platform with the existing onshore Santa Ynez Unit oil and gas processing facility. The pipelines would come onshore at the same landing as the existing Santa Ynez Unit pipelines (which connect Santa Ynez Unit's three platforms with the onshore processing facility). Construction of the Santa Ynez Unit pipelines and power cables resulted in loss of surfgrass (*Phyllospadix spp.*) through the pipeline/power cable corridor.

Surfgrass is a long-lived, slow-growing marine angiosperm (i.e., flowering plant) that forms dense beds in the inter-tidal and sub-tidal zones on rocky substrates. Surfgrass is also known to provide important nursery and rearing habitat for a number of commercial and recreational species of fish and invertebrates such as the spiny lobster, rock crab, kelp bass, and permit. Because of its important role in the early life stages of these and other species, the Coastal Commission, State Lands Commission, and County of Santa Barbara required the Santa Ynez Unit operator to implement a surfgrass restoration program at the mouth of Las Flores Canyon/Corral Creek. After implementing the restoration program, the agencies required the operator to monitor the restoration area for four years. The restoration program was not successful; many of the transplants did not survive. Surfgrass is difficult to restore. If the rhizome (root) systems remain viable, then recovery following disturbance can be rapid; recovery is long, however, if the entire bed is lost because recruitment is irregular. Installing additional pipelines along this nearshore stretch of coast could result in a long-term of permanent loss of surfgrass.

Kelp beds are also found in the shallow water area where the pipelines and power cables to be installed. Kelp beds are important because they provide vertical water column habitat for many types of adult and juvenile fish, marine mammals such as the sea otter, and other marine animals. Kelp beds are located in the photic zone (20-30 foot water depth), that is, where the sunlight penetrates the water. Kelp beds were also damaged during installation of the Santa Ynez Unit pipelines and power cables. A new nearshore pipeline and power cable crossing would cause further damage to kelp. Similar to surfgrass, if the rhizome systems remain intact, kelp recovers quickly. If the rhizomes are destroyed, kelp recovery, while generally more successful than surfgrass, can also be difficult.

Trenching the beach and laying pipelines and cables through the surf zone and out to a new platform will therefore likely cause unavoidable significant impacts to surfgrass, kelp and other marine plants found in the nearshore project area. If damaged or destroyed, their recovery through implementation of post-constuction restoration programs is questionable.

The MMS notes that Samedan may be able to use horizontal directional drilling (commonly referred to as "HDD") to bore pipelines and power cables *under* the beach and surf zone. In recent years, fiber optic cable companies have used HDD to install cable from an onshore site to offshore waters (surfacing a half-mile or more offshore). If feasible, use of this technology can result in avoiding, or greatly minimizing, nearshore affects to sensitive marine resources like kelp, surfgrass, and rocky intertidal areas. It's questionable, however, if HDD technology can successfully be used for large diameter pipelines. If Samedan were to come forward in the future with a Development and Production Plan for a new platform and pipelines, the Commission would require an evaluation of the feasibility of using HDD to install the pipelines in lieu of a traditional beach crossing.

*Marine and Coastal Birds*

The marine and coastal bird populations of southern California are diverse and complex, and include about 195 species. Many of these birds are protected under the Migratory Bird Treaty Act of 1918, which is enforced by the U.S. Fish and Wildlife Service. Threatened and endangered birds are protected under the Endangered Species Act. Of the many types of birds that occur in the project area, MMS concludes that two groups are generally the most sensitive to the potential impacts of oil and gas development: seabirds (e.g., loons, grebes, shearwaters, sea ducks, and gulls) and shorebirds (e.g., sandpipers and plovers). Other types of birds, such as waterfowl and marshbirds (e.g., herons and egrets) may be vulnerable when they occupy coastal wetlands and estuaries. While some breed in the area, others spend their non-breeding or "wintering" period there or pass through during migration.

The most danger to birds is an oil spill (which is addressed in the Oil Spill section (Section 3.1) of this report). In addition, helicopter flights associated with offshore platforms can disturb birds. According to the MMS, 8-10 offshore oil and gas-related helicopter trips occur now daily. Helicopter traffic will increase if undeveloped OCS leases are developed. The most sensitive to helicopter traffic are likely nesting birds, especially those that nest on cliffs and offshore rocks. Low-flying aircraft, especially helicopters, can disturb nesting birds, causing them to leave their nests unattended. Although the adult(s) may be absent from the nest for only a short period of time, eggs and nestlings may be lost either due to exposure or predators, such as western gulls.

Well abandonment and platform removal could also harm seabirds. The delineation well proposed at Gato Canyon will need to be permanently plugged and abandoned. As part of the abandonment process, the casings for this well would be cut mechanically or with explosives. To remove a fixed platform structure, such as that contemplated for the Gato Canyon Unit, explosives are typically used to remove the platform's legs. Explosive charges for well abandonment would be set off 15 feet below the seafloor, which dampens the effect of the blast and reduces the area in which birds could be injured or killed. For platform removal, discharges are also typically used below mudline (below the seafloor). A bird would likely need to be directly below the mobile offshore drilling unit ("MODU") or platform to be affected by explosives use.

*Fish*

Fish are likely to be adversely affected by post-suspension exploration, development, and production activities mainly due to habitat disturbance (e.g., rocky substrate, kelp, surfgrass), discharges, and platform decommissioning (i.e., removal).

Construction-related habitat impacts, and the potential effects to fish that may result from operational discharges, are discussed in other subsections above and below. The decommissioning of a platform typically involves use of explosives to remove the fixed platform "jacket" (i.e., the large subsea structure that sits on the seafloor). Use of explosives can kill many fish. The extent of fish kills depends on the type, amount, and location of explosives. Typically, before detonation of the charges, a bubble curtain is placed around the area to create a continuous stream of bubbles around the perimeter of the project area thereby reducing the effects of the explosion on fish. The bubble curtain will also produce enough underwater noise and visual activity to reduce the number of fish within the area before detonation. While use of bubble curtains may lessen fish kills, they do not eliminate them.

*Ocean Discharges*

Discharges associated with future exploration, development, and production of the Gato Canyon Unit could adversely affect water quality and marine resources (e.g., fish, marine mammals). A variety of discharges are associated with offshore oil and gas activities, including muds and cuttings, produced water, well treatment, completion and workover fluids, deck drainage, and sanitary/domestic wastes. Drilling muds and cuttings and produced water contain heavy metals and several toxic chemicals, including arsenic, PCBs, benzene, mercury, and hexavalent chromium.

The MMS estimates that over the life of the Gato Canyon project, Samedan would discharge 193,000 barrels of muds, 68,000 barrels of cuttings, and 39 million barrels of produced water. Cumulatively, if all undeveloped leases are fully developed, the MMS estimates 199 total wells drilled over a period of 13 years, discharging up to 2.8 million barrels of drilling muds, 627,000 barrels of cuttings, and 896 million barrels of produced water. These figures do not take into account discharges from existing platforms.

The Environmental Protection Agency ("EPA") regulates OCS oil and gas-related effluents through issuance of a National Pollutant Discharge Elimination System ("NPDES") permit. EPA NPDES permits, including those for OCS oil and gas platform discharges, are "listed" federal permits in the CCMP and subject to the federal consistency review requirements of the Coastal Zone Management Act ("CZMA").

Discharges associated with exploration wells (such as the delineation well contemplated at the Gato Canyon Unit) would fall under the effluent requirements of new General NPDES Permit CAG280000, which EPA submitted and the Commission concurred with on January 9, 2001, and which has been in effect since December 2004.[72] This new 5-year General NPDES permit

[72] Although platform operators are currently discharging under the requirements of General NPDES Permit CAG280000, the Western States Petroleum Association has challenged this permit in court. (*Western States Petroleum Association v. Nastri*, No. 04-75605 (9th Cir.))

covers discharges from *existing* OCS oil and gas platforms and oil and gas exploration activities. It imposes more stringent discharge requirements than the former NPDES permits that were in effect for platforms.

Notwithstanding stricter effluent discharge requirements contained in the new General NPDES permit, platform operators continue to discharge toxic pollutants into the ocean from muds and cuttings, produced water and other wastes. In its concurrence with the new General NPDES permit (Consistency Certification CC-126-00), the Commission made clear its concern that scientific research on the effects of oil and gas wastes on marine resources and water quality is inconclusive, and that the mass of, and toxic concentrations in, projected discharges, both individually and cumulatively may still damage the biological productivity of coastal waters. It found that the discharges (1) may reduce the long-term productivity of certain marine species to a level below that necessary to sustain healthy populations; (2) potentially contaminate or cause changes in fish species that dwell near the platforms; and (3) cause cumulatively significant adverse impacts, such as chronic sublethal effects.

The Commission therefore found that the discharges that occur under the new NPDES permit are inconsistent with the marine resource, water quality, and cumulative impact policies of the CCMP. The Commission nevertheless applied the "override" provision of the CCMP (Coastal Act Section 30260) for coastal-dependent industrial development activities and concurred with the new General NPDES permit, fnding that it met the tests of 30260, because (1) alternative locations were infeasible or more environmentally damaging; (2) to do otherwise would adversely affect the public welfare; and (3) adverse environmental effects would be mitigated to the maximum extent feasible.

As stated above, discharges associated with Samedan's proposed delineation well are covered under existing NPDES Permit CAG280000. However, the EPA would require Samedan to apply for a separate NPDES permit for a new platform. That new NPDES permit would require separate review and concurrence by the Coastal Commission under the federal consistency requirements of the CZMA. Through that review, the Commission will have the ability to assure that future discharges will be performed in a manner consistent with applicable Coastal Act requirements.

***Conclusion***

As discussed above, the proposed shallow hazard survey and reasonably foreseeable post-suspension activities could result in significant adverse effects that may not be able to be mitigated in a manner that results in protection of the Santa Barbara Channel's sensitive marine resources and water quality. The Commission therefore finds that granting the lease suspensions is inconsistent with the marine resource and water quality policies of the CCMP (Coastal Act Sections 30230 and 30231). Because such suspensions, if granted, would lead to or result in the construction of new "industrial facilities" that are "coastal-dependent," the proposed project is presumptively subject to analysis under Section 30260 of the Coastal Act. See Section 3.10: Coastal –Dependent Industrial "Override" Policy of this report, below.

### 3.3 Placing Fill in Coastal Waters

The "fill and dredging" policy of the CCMP (Coastal Act § 30233(a)) states in part:

> *The diking, filling, or dredging of open coastal waters, wetlands, estuaries, and lakes shall be permitted in accordance with other applicable provisions of this division where there is no feasible less environmentally damaging alternative, and where feasible mitigation measures have been provided to minimize adverse environmental effects, and shall be limited to the following:*
>
> *(1) New or expanded port, energy, and coastal-dependent industrial facilities, including commercial fishing facilities.*

CCMP Section 30108.2 defines "fill" as "earth or any other substance or material ... placed in a submerged area." Reasonably foreseeable post-suspension period activities, including anchors used for a mobile offshore drilling unit ("MODU") and placement of a platform, pipelines, and power cables on the seafloor, constitute fill under this definition. CCMP Section 30233(a) allows the placement of fill in open coastal waters if three tests can be met. The first test requires the proposed activity to fit into one of eight categories of uses enumerated in CCMP Section 30233(a)(1)-(8). The second test requires that there be no feasible less environmentally damaging alternative. The third and last test mandates that feasible mitigation measures be provided to minimize the project's adverse environmental effects.

***Allowable Use Test***

The subject fill is proposed for a new energy project, which is an allowable use under the CCMP's fill policy. The Commission thus finds that the first test of Section 30233(a) is satisfied.

***No Feasible Less Environmentally Damaging Alternative***

After qualifying as an allowable use, the Commission must find that there is no feasible and less environmentally damaging alternative to the fill. Coastal Act Section 30201 defines "feasible" as "...capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." This test generally requires consideration of alternatives to fill or, if fill is unavoidable, consideration of alternative locations, configurations, or materials that would reduce its damaging effects.

During exploration, Samedan needs to use a MODU to drill the one delineation well. The fill associated with this activity is the use of anchors to hold the MODU in place (for an estimated 92 days). The anchors would be temporary and any alternatives would likely require greater amounts of fill. The Commission thus finds that the "fill" proposed for exploration activities is the least environmentally damaging feasible alternative.

However, Commission staff has identified some possible alternatives to platform and pipeline construction that, if feasible, could eliminate fill altogether or at least mininize the amount of it. Given advances in extended reach drilling technology, is it feasible now, or might it be in the near future, for Samedan to access Gato Canyon oil and gas using existing Platform Hondo? In

such an alternative, Gato Canyon Unit oil and gas would be commingled with ExxonMobil's Santa Ynez Unit production and brought onshore via existing pipelines for delivery to the Santa Ynez Unit's onshore processing facility. Additionally, since the Gato Canyon Unit is relatively close to shore (4-5 miles from the coast), could Samedan produce the oil and gas from an onshore site? Either of these alternatives, if feasible, would eliminate the need for a new platform, pipelines, and power cables. If a new platform structure is determined to be necessary to develop the Gato Canyon Unit, another potential alternative to is to use a semi-submersible or floating ship instead of a fixed platform. Using a semi-submersible or floating ship, which are tethered to the seafloor using cables and anchors, would require less ocean "fill" than a traditional fixed platform. In its letter of April 22, 2005, to the MMS, the Commission staff requested that the MMS evaluate the feasibility of these alternates. In its June 23, 2005, response letter to the Coastal Commission, the MMS declined to do so, stating,

> *It is conceivable, that with advancing extended-reach technology, the Gato Canyon Unit could be produced from an alternative location, including an existing platform, or, from shore, if geologic and economic conditions are right; however, for the EID, the hypothetical scenario analyzed production from a new platform. Specific details regarding development of the Gato Canyon Unit will be provided by the operator of the Gato Canyon Unit pursuant to §307(c)(3) of the CZMA if and when they submit their consistency certification with their DPP [Development and Production Plan] for the Gato Canyon Unit.*[73]

The MMS acknowledges that it is "conceivable" that Gato Canyon oil and gas could be developed by means other than installing a new platform and associated infrastructure. It nevertheless argues that such an analysis be provided by the lessee at the future Development and Production Plan stage. The Commission believes strongly that an evaluation of alternatives to a new platform is warranted now as part of the lease suspension review stage. In other sections of this report, the Commission examines the potentially significant short- and long-term individual and cumulative adverse marine resource, water quality, commercial fishing, visual, public access and recreation, terrestrial biology, and oil spill effects caused by new platform and pipeline construction, operation, and decommissioning. If the Gato Canyon Unit can be developed by a means other than a new platform, many significant adverse coastal impacts are either eliminated or greatly reduced. Therefore, the potential for feasible alternatives to the "hypothetical" future new fixed platform scenario is a critical question that must be addressed by the MMS now.

Without a thorough analysis of potential alternatives to "fill," the Commission cannot find that there is no feasible, environmentally preferable alternative to fill. Therefore, the Commission finds that it lacks information to evaluate the lease suspensions for consistency with the second test of the fill policy of the CCMP.

---

[73] June 23, 2005 Letter from MMS to Coastal Commission, p.93.

***Fill Impacts Mitigated to the Maximum Extent Feasible***

The final requirement of CCMP Section 30233(a) is that filling of open coastal waters may be permitted if feasible mitigation measures have been provided to minimize any adverse effects of fill. As discussed above, the Commission has identified potential alternatives that, if feasible, could eliminate the need for the placement of fill in coastal waters. The Commission does not need to reach a conclusion as to whether the effects of fill are mitigated to the maximum extent feasible since it lacks at this time information necessary to make a determination if fill is even necessary.

***Conclusion***

Without the information required by the second test, the Commission finds it does not have enough information to evaluate if the granting of the lease suspensions is consistent with the CCMP's fill policy, Coastal Act Section 30233(a).

## 3.4 Commercial Fishing

The marine resource protection policy of the CCMP (Coastal Act § 30230) states:

> *Marine resources shall be maintained, enhanced, and where feasible, restored. Special protection shall be given to areas and species of special biological or economic significance. Uses of the marine environment shall be carried out in a manner that will sustain the biological productivity of coastal waters and that will maintain healthy populations of all species of marine organisms adequate for long-term commercial, recreational, scientific, and educational purposes.*

The commercial fishing policy of the CCMP (Coastal Act § 30234.5) states:

> *The economic, commercial, and recreational importance of fishing activities shall be recognized and protected.*

The Gato Canyon Unit is located within two California Department of Fish and Game ("CDFG") Fish Blocks, 654 and 655, encompassing a 164 square mile area. Historically the area has been fished using several gear types targeting multiple species: (1) purse seine for coastal pelagics such as sardinem northern anchovy, mackerel, and market quid; (2) trawl for Pacific ocean shrimp, sole, flounder, and halibut; (3) hook and line/longline for rockfish and other rocky outcrop fish; (4) trap for crab and lobster; (5) drift/set gillnet for shark and swordfish; and (6) troll for albacore and tuna. Fishing occurs on a seasonal, quota and trip limit basis, and in response to market forces. Drift and set netting and trawling are the most common gear types within the project area. Occasional purse seining operations for wetfish, and large salmon and albacore in the troll fishery occur in the area. Hook and line fishing occurs along the hard bottom areas inshore of the Gato Canyon Unit area. According to the EID, the following fisheries are active every year in the Gato Canyon Unit area out to Point Conception:

- From August through January the drift gillnet shark fishery occurs outside the 3-mile limit from shore.