- From October 1 through May 30, ridgeback shrimp are fished in water depths of 540 feet and shallower.
- From February 1 through November 1, spot prawns are trawled between 510 and 840 feet.
- During the winter, sea cucumbers are trawled between 360 and 540 feet.
- During the summer, sea cucumbers are trawled from the 1-mile line out to 240 feet.

***Shallow Hazard Survey***

Vessel traffic, survey-associated obstructions, and space-use conflicts could cause lost fishing time or damage to fishing gear due to Samendan's proposed 3-4 day shallow hazards survey. Acoustic energy/sound from air gun could cause behaviorial changes in target species that could make them more difficult to catch after the survey's completion. Overall, these effects have the potential for cause a financial hardship on commercial fishers.

*Preclusion*

The survey is expected to result in a temporary, minor increase in area vessel traffic. Samedan has committed to comply with traffic corridors established by the Joint Oil/Fisheries Liaison Office ("JOFLO") when going to and from the project area. The 3-4 day survey will restrict other vessel activity, including all commercial fishing, within the 1.5 square-mile survey area. Preclusion from the survey area will cause a short-term impact on commercial fishing. Samedan has proposed to work closely with JOFLO and implement a number of measures to minimize commercial fishing impacts, including:

- Consulting with JOFLO to identify and then meet with commercial fishing fleets that may want to fish in the area at the time of the survey. Samedan will provide affected fishers and JOFLO with information describing the timing and location of the survey in writing at least 30 days prior to the survey and verbally three days prior to the survey;
- Contacting JOFLO prior to vessel arrival at the project area to confirm that fishing fleets are not present or expected at the survey area; and
- Scouting the survey area to ensure fishing (like the salmon fleet) is not being conducted.

In addition, the MMS will require Samedan to:

- File an advisory with the Coast Guard for publication in the Local Notice to Mariners at least 14 days before commencement of survey operations;
- Notify MMS on a daily basis of any conflict or contact with commercial fishermen and the steps Samedan has taken/is taking to resolve any conflicts during and after the survey;
- Use a scout boat captained by a local, knowledgeable fisherman to avoid conflicts including fixed gear trapping and other OCS users; and
- Attend the Western States Petroleum Association's Fisheries' Training Program.

*Acoustic Energy/Sound*

As discussed in the Marine Resources section of this report (Section 3.2), the shallow hazards survey will emit a sound intensity level of 218 dB. Fishermen are concerned that behavioral

changes may cause fish to be less vulnerable to capture. A decrease in catchability of target species would cause a short-term impact on commercial fishing.

There is well-established evidence to demonstrate that fish distribution and feeding behavior can be affected by sound emitted from air gun arrays. This can potentially drive fish away from fishing grounds or reduce their inclination to bite on a baited hook. The Environmental Assessment for the shallow hazard survey summarizes the results of studies that assess effects of high-level sounds on fish. The MMS reports, for example, no changes were observed in the catch rate of prawns before and after a 1991 seismic survey conducted off the southwest coast of Australia. It appears that the acoustic impulse from air guns has relatively little effect on marine invertebrates and shellfish, presumably due to their lack of a swim bladder. Based on these findings, a single air gun would not have an effect on the catchability of prawn/shrimp, lobster, crab, sea urchin, or sea cucumber.

For those species that have swim bladders, there may be effects on catch-rates due to fleeing the sound source, dispersion, etc. The catchability of rockfish, coastal palgics, albacore, and salmon could be temporarily affected for a short period. The MMS concludes that the true areal extent of decreased catchability is difficult to quantify, but indications are that it extends about 6 miles from the center of a seismic survey sound source. Considering the size of the proposed survey, a possible decrease in catchability would extend over most of the CDFG Fish Blocks 654 and 655. The time of decreased catchability is difficult to quantify, but the MMS estimates it could last at least 5 days from a 3D seismic survey with multiple air guns that lasts several weeks. The MMS states, "Without any supporting studies to the contrary, a reasonable conservative estimate may be that catchability would return to normal from the Samedan 6-hour, shallow hazards survey, using a single air gun within one day." A 1-day decrease in catchability within Fish Block 654 and 655 would constitute less than 10 percent of the annual landings/catch value. The MMS therefore concludes that this impact is temporary and not significant, and the Commission agrees.

Nevertheless, the Environmental Assessment details a number of Samedan-proposed measures to avoid or minimize conflicts with commercial fishing during survey operations. Amongst other measures, Samedan proposes to work with JOFLO and representatives of potentially affected fishing fleets to schedule the survey at a time that minimizes impacts to commercial fishing (e.g., scheduling the survey when the salmon fishing fleet is *not* in the area). It will also require that contractors use a scout boat captained by a local, knowledgeable fisherman to avoid conflicts with commercial fishermen including fixed gear (trap) fishing. At least 90 days before survey commencement, Samedan will submit for the MMS's approval a Fisheries Contingency Plan to include details of Samedan's coordination with JOFLO and the affected fishing fleets. No later than 60 days following survey completion, Samedan will submit to the MMS a final report on its success or failure of its plan to avoid or minimize conflicts with commercial fishing.

The Commission believes that with implementation of the above-described measures, commercial fishing will be protected during survey operations.

***Post-Suspension Exploration, Development and Production Activities***

The trawl fishery and drift gill net fishery would likely suffer the most impacts from future exploration and development activities on the Gato Canyon Unit. Also, the hook and line fishery would be precluded from within the MODU anchor spread (moored with 8 anchors). The MMS concludes that it is not possible to predict whether the troll and purse seine fisheries would be active in the area due to the widespread movement of the fish involved in these fisheries.

The area encompassed by the Gato Canyon Unit represents prime thresher shark drift net grounds. Activity on the Unit between August and January would adversely affect this fishery, especially if the MODU were on site for 45-90 days of this season. The hook and line rock cod fishery possibly occurs within the anchoring area of the MODU and would therefore be displaced from this area as long as the MODU is on location.

Constructing a platform, associated pipelines and power cables within Lease OCS-P 0460 would have similar, but longer period, commercial fishing effects as the delineation drilling. Impacts would include preclusion of trawling, set netting, and trap fisheries during the time needed to complete the construction activities. Once in place, the platform would permanently reduce available fishing grounds within a 0.25-mile radius area around the platform.

If these leases are explored and developed, space-use conflicts and preclusion will increase over present levels. Within the Santa Maria Basin and Santa Barbara Channel combined, the total area for fishing preclusion for drift gillnetting due to the presence of platforms located in federal waters is currently 17.6 square miles. If several offshore projects were to overlap in time and space during the peak fishing seasons, cumulative impacts to commercial fishing could be significant. If, for example, 4 additional platforms are placed in the Santa Maria Basin and Santa Barbara Channel along with associated pipelines and power cables, fishermen could be greatly affected over the next 15-20 years. If 4 new platforms are installed, *and* the operating life of the Point Arguello and Cavern Point platforms are extended to develop the 36 OCS leases, the adverse cumulative impacts become more significant (i.e., greater preclusion over a longer period of time). The MMS estimates that the total area of fishing preclusion for drift gill netting due to 4 new platforms would be an additional 6.3 square miles. The MMS acknowledges that mitigation could temper adverse impacts to the commercial fishing industry, but it does not describe nor commit to imposing any mitigation measures (such as those mitigation measures required by the MMS for the shallow hazard survey) to eliminate or minimize identified impacts.

For these reasons, the Commission finds that the reasonably foreseeable post-suspension activities that would result from granting of the lease suspensions will adversely affect commercial fishing and therefore the granting of the lease suspensions is inconsistent with the commercial fishing policies of the CCMP. Because such suspensions, if granted, would lead to or result in the construction of new "industrial facilities" that are "coastal-dependent," the proposed project is presumptively subject to analysis under Section 30260 of the Coastal Act. See Section 3.10: Coastal-Dependent Industrial "Override" Policy of this staff report, below.

### 3.5 Scenic and Visual

The scenic and visual resource protection policies of the CCMP (Coastal Act §§ 30251 and 30262(a)(3)) state:

> *30251.*
>
> *The scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas, to minimize the alteration of natural land forms, to be visually compatible with the character of the surrounding areas, and where feasible, to restore and enhance visual quality in visually degraded areas. New development in highly scenic areas such as those designated in the California Coastline Preservation and Recreation Plan prepared by the Department of Parks and Recreation and by local government shall be subordinate to the character of the setting.*
>
> *30262.*
>
> *(a) Oil and gas development shall be permitted ... if the following conditions are met:*
>
> ...
>
> *(3) Environmentally safe and feasible subsea completions are used when drilling platforms or islands would substantially degrade coastal visual qualities unless the use of <u>those</u> structures will result in substantially less environmental risk.*

The Gato Canyon Unit is located offshore Santa Barbara County's Gaviota Coast. The scenic and visual resources of the Gaviota Coast are frequently described as unique, representing the largest continuous stretch of rural coastal land in southern California. A recent study by the National Parks Service used the following descriptions:

> *Scenery on the Santa Barbara Coast is world-renowned. The 76-mile rural coastline* [between Coal Oil Point at UC Santa Barbara and Point Sal to the north] *is a unique combination of striking beauty and rich biological and cultural resources providing exceptional opportunities for coastal enjoyment.*[74]

---

[74] National Park System, U.S. Department of the Interior, *Gaviota Coast Feasibility Study*, 2003, p. 36. State park and beach attendance in vicinity of the proposed Gato Canyon Unit averaged approximately 578,860 during the last six years (*Ibid*, p. 57). This attendance includes local County residents and tourists.

> *The east west trending of the Transverse Range creates the longest south facing shoreline on the Pacific with the exception of Alaska. The shoreline in the study is also sheltered by the offshore Channel Islands, creating a warmer, milder environment for coastal species and recreation. The continuous stretch of south-facing seashore from Ellwood to Point Conception cannot be found in any other comparably managed area along the west coast. Agricultural land, including ranchland, row crops and orchards add to the unique character of the coastal landscape.*
>
> *The scenic vistas, sandy beaches, rugged and rocky shoreline, and warmer climate provide outstanding opportunities for public use and enjoyment. Recreational activities along the study area coast include world-class surfing, hiking, diving, swimming, sunbathing, beach combing, exceptional marine mammal watching, birding, boating, sport fishing, picnicking, camping, bicycling, horseback riding, nature study, photography and painting. State and county parks and beaches and private preserves provide for visitor enjoyment.* [75]

The segment of U.S. Highway 101 where the scenic viewshed is affected adversely by the platforms is eligible for designation as a California Scenic Highway. Moreover, the County has established a View Corridor Overlay in its Local Coastal Program and has applied this overlay to coastal lands between U.S. Highway 101 and the ocean along the Gaviota coast. The County, with assistance of several grants from the State of California, has expended millions of dollars to purchase land and conservation easements along the Gaviota coast in order to preserve its scenic and rural character, among other things.

Use of a mobile offshore drilling unit ("MODU") and installation of a new platform offshore the Gaviota coast will add industrial facilities to the Gaviota viewshed. A MODU is essentially a semi-submersible vessel capable of drilling into the ocean floor, and a typical MODU measures 295 feet in length, 249 feet in breadth, and 130 feet in depth with an 83-foot operating draft. The MMS characterizes its visual profile from onshore as somewhat lower than a fixed platform. The MODU would be situated between approximately 3-to-5 miles offshore for an estimated 92 days. A 2001 Draft Environmental Impact Statement prepared and published by the MMS found that the MODU would constitute a moderate to high cumulative impact to visual resources.[76] This conclusion led the agency in 2001 to examine potential mitigation, finding that placement of the MODU offshore State beaches at a time of non-peak usage would reduce the level of impact.

The development/production phase of post-suspension activities includes installation of a new platform between 3-5 miles offshore the Gaviota Coast. The MMS estimates that a new Platform Gato would operate for 14-18 years; however, based on the lives of other Pacific OCS platforms, it could have a lifecycle of 40 years.[77] This phase would also include temporary location of

---

[75] *Ibid*, p. 57.

[76] DEIS, p. 5-147.

[77] No Pacific OCS platforms have been removed to date and the oldest ones were installed in 1968, suggesting a minimum economic life of 40 years.

workboats to install the platform and pipelines, routine visits by crew and supply boats, and another assortment of ships and boats onsite to remove the platform at the end of its economic life.

Three Santa Ynez Unit platforms (Platforms Hondo, Harmony and Heritage) currently sit in federal waters west of the Gato Canyon Unit leases. (Exhibit 8) Placement of an additional platform offshore Gaviota would result in a further industrialization of this unique stretch of rural, scenic Santa Barbara County coastline. It will impair the full panoramic view, east-to-west, of the ocean view from Amtrak, U.S. 101, and from the otherwise pristine beaches and beachfront parks of this coast.

Notwithstanding the foregoing, the MMS finds the post-suspension activities to be consistent with the CCMP's visual protection policy, Coastal Act Section 30251. The MMS reasons that since the area already has 3 Santa Ynez Unit platforms, the effects of adding a fourth platform is negligible because the fourth platform simply adds to an existing cluster of platforms. The Coastal Commission disagrees with this conclusion for the following reasons:

- The Commission found the existing Santa Ynez Unit platforms to have significant and unavoidable impacts on scenic and visual resources of this stretch of coast.
- The existing Santa Ynez Unit platforms are not clustered, as is the case with groups of platforms situated in the eastern Santa Barbara Channel, but rather are separated by distances of 6.8 miles (Heritage to Harmony) and 2.5 miles (Harmony to Hondo), for a total spread of 9.3 miles in a direction nearly parallel to the coastline. In contrast, 7 platforms in the eastern Santa Barbara Channel are situated into two closer groupings of 3 and 4 with a separation of approximately 0.7 miles between platforms.
- A new Platform Gato would be situated approximately 6-8 miles east of the current Santa Ynez Unit platforms, which would increase total spread of these 4 platforms to about 17 miles, parallel with the coastline.
- The MMS acknowledges that the new platform expands the existing impact geographically (i.e., eastward); this acknowledgement conflicts with the MMS's characterization of the platforms as a "cluster."

The Commission thus believes that adding an additional industrial oil and gas platform to the Gaviota Coast will result in degradation of the exceptional visual qualities of this section of coast.

Section 30262(a)(3) of the Coastal Act requires "environmentally safe and feasible subsea completions" to be used "when drilling platforms or islands would substantially degrade coastal visual qualities unless the use of <u>those</u> structures will result in substantially less environmental risk." Subsea well completions are wells (including the wellhead and production control equipment) located on the seabed. Subsea well completions, if feasible for a particular development, eliminate visible structures above the ocean surface.

In its consistency determination for the Gato Canyon Unit, the MMS state that Section 30262 is "not applicable" because "activities conducted during the suspension would not involve actual

development and production of oil and gas resources…"[78] The MMS therefore provided no analysis of the feasibility of using subsea well completions instead of a fixed platform. In its April 22, 2005, letter to the MMS, the Commission staff requested that the MMS evaluate the feasibility of alternatives to fixed platform structures, such as semi-submersibles and subsea well completions. The MMS declined to do so, stating that an evaluation of alternatives "will be provided by the operator of the Gato Canyon Unit pursuant to §307(c)(3) of the CZMA if and when they submit their consistency certification with their DPP [Development and Production Plan] for the Gato Canyon Unit."[79] As discussed in the Fill section of this report (Section 3.3), the potential for feasible alternatives to platform structures, like subsea well completions, is a critical question that must be addressed by the MMS as part of the lease suspension review stage. A feasible alternative to a fixed platform could eliminate the significant adverse coastal resource effects identified in this and other sections of this report, including the visual degradation of the scenic Gaviota coast.

Because the MMS has refused to provide an evaluation of the feasibility of using subsea well completions for development of the Gato Canyon Unit, the Commission lacks the information necessary to determine the lease suspensions' conformity with Sections 30262(a)(3) and 30251 of the Coastal Act.

### 3.6 Recreation and Public Access

The recreation and public access policies of the CCMP (Coastal Act §§ 30210, 30220 and 30234.5) state:

> *30210.*
>
> *In carrying out the requirement of Section4 of Article X of the California Constitution, maximum access, which shall be conspicuously posted, and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse*
>
> *30211.*
>
> *Development shall not interfere with the public's right of access to the sea where acquired through use or legislative authorization, including, but not limited to, the use of dry sand and rocky coastal beaches to the first line of terrestrial vegetation.*
>
> *30220.*

---

[78] Gato Canyon Consistency Determination, 2005, p. 42.

[79] June 23, 2005, Letter from MMS to Coastal Commission, p. 93.

*Coastal areas suited for water-oriented recreational activities that cannot readily be provided at inland water areas shall be protected for such uses.*

*30234.5.*

*The economic, commercial, and recreational importance of fishing activities shall be recognized and protected.*

***Shallow Hazard Survey***

The proposed shallow hazards survey is located in an area that may be used for recreational fishing. Most recreational fishers go to the Channel Islands, coastal kelp beds, or Naples reef, but some types of recreational fishing (e.g., private boat trolling) could be affected by the proposed 3-4 day survey. In addition, sound from the survey could be heard underwater by recreational and research divers at Naples Reef and the nearest coastal kelp beds, and could potentially annoy, interrupt or end diving for the duration of the survey.

Samedan has committed to notify all commercial and recreational fishermen in writing 30 days before the survey and verbally three days before the survey. It will notify the Coast Guard, the Joint Oil Fisheries Liaison Office ("JOFLO"), and the Marine Advisory Newsletter in Goleta, and distribute and post notices at area fuel docks, ice supply house, wholesale fish buyers, and in the Harbor Master's offices of Santa Barbara, Ventura, Oxnard, and Port Hueneme harbors. Samedan will not fire the air gun within 0.5 miles of a dive boat or vessel or unknown function (i.e., it will treat boats of unknown function as a dive boat). The two marine mammal observers aboard the survey vessel (discussed more in Section 3.2 of this report) will also look for divers and dive boats. If a diver or dive boat is observed in the survey area or safety zone, Samedan shall contact them and advise them to leave the area for the duration of the survey. Many of the commercial fishing mitigation measures either proposed by Samedan or required by the MMS, such as advance notification requirements, will apply to recreational fishing as well. Given the short duration of the survey, and implementation of the above-described measures, the Commission finds that recreational fishing activities will be protected.

***Post-Suspension Exploration, Development, and Production Activities***

The MMS's proposed hypothetical development scenario for the Gato Canyon Unit envisions drilling of a delineation well from a mobile offshore drilling unit ("MODU") and installing a new fixed platform approximately 4 miles offshore Capitan, with 3 new pipelines connecting that platform to the existing onshore oil and gas processing facilities in Las Flores Canyon. If feasible, the pipelines would make an underground beach crossing using horizontal directional drilling ("HDD") between Refugio and El Capitan State Beaches within the existing pipeline corridor currently used for 3 similar pipelines that connect existing Platform Hondo to shore. The delineation drilling activities are expected to take 92 days;[80] platform and pipeline

---

[80] DEIS, p. 5-147.

installation would take approximately 6 months.[81] Production is projected to occur during the subsequent 14-18 years. The MMS projects platform and pipeline decommissioning and abandonment to take place between 2026 and 2030.[82]

Impacts to recreation during delineation drilling would be principally degradation of the coastal recreational experience due to the visual presence of the MODU and support vessels, including crew boats, supply boats, and barges.[83] Impacts to recreational fishing would be limited to preclusion of fishing in the vicinity of the MODU.

Pipeline construction would result in significant impacts to recreation, as follows:

> *... [C]onstruction activities would temporarily preclude certain water contact uses in the near-shore area and certain beach activities (i.e., scuba diving, kayaking, swimming, use of bike path) between Refugio State Park and El Capitan State Park (MMS, 2005b). In addition, campground use by project construction workers could affect campground availability during pipeline construction. This use would incrementally contribute to cumulative effects from existing offshore oil and gas projects that have been found moderate to high, especially during construction.*[84]

The pipelines would cross the beach in a recreationally important, scenic stretch of the Gaviota coastline, between two popular State parks and campgrounds. Pipeline construction would affect onshore and near-shore recreational activities, as noted above, and others such as surfing, jogging, etc. Although construction impacts would be temporary, onshore and nearshore pipeline construction activities could affect also the availability of public beach parking depending on the onshore site selected for staging and construction. Pipeline installation would cause significant aesthetic impacts (visual, noise, odors, dust, construction vehicle and offshore vessel traffic, etc.), resulting in disruption and degradation of the recreational experience for campers and beach users. Installation of the Gato platform and pipelines would interfere with recreational fishing by precluding it in and near construction areas, particularly during pipelaying in nearshore waters.

The new platform would be located directly offshore Capitan and in plain view from the coastline, day and night. It would be visible from the coastal bike path and trail and the adjacent State beaches and campgrounds. During the production life of the platform, the major impacts to

---

[81] Estimated timeframes are: 93 days for pipeline installation; 153 days to drive platform piles and set topsides; and 214 days until platform commissioning. (EID, 2005, p. 5.2-13)

[82] EID, p. 5.2-5.

[83] In addition to the MODU and one barge, the following vessels would be used in connection with delineation drilling: One 180-foot workboat, one 110-foot crew boat, one 110-foot standby vessel, one 180-foot supply boat, and one anchor handling boat. Support activities would entail an estimated 350 miles of crew boat travel, 2,500 miles of supply boat travel, 21 hours of helicopter flight time, and one barge trip. (DEIS, 2001, pp. 2-13 to 2-15)

[84] Gato Canyon Consistency Determination, 2005, p. 16.

recreation would be degradation of the recreational experience of thousands of visitors, due to the platform and associated industrial activities,[85] which would detract from the natural surroundings. As is acknowledged in the Gato Canyon consistency determination:

> *The hypothetical new platform would degrade the visual character of the area, which in turn would degrade the quality of the coastal recreational experience (MMS, 2005b).*[86]

During the production phase, the major impacts to recreational fishing would be limited to "short-term preclusion and space-use conflicts due to vessel traffic and routine maintenance and repairs of platforms and pipeline facilities."[87] Impacts to recreation and recreational fishing due to platform and pipeline decommissioning are expected to be comparable to those from construction activities.

For these reasons, the Commission finds that granting the lease suspensions would adversely affect coastal recreational opportunities and therefore is inconsistent with the public access and recreation policies of the CCMP (Sections 30210 and 30220). Because such suspensions, if granted, would lead to or result in the construction of new "industrial facilities" that are "coastal-dependent," the proposed project is presumptively subject to analysis under Section 30260 of the Coastal Act. See Section 3.10: Coastal-Dependent Industrial "Override" Policy of this staff report, below.

### 3.7 Geologic Hazards

The hazards policies of the CCMP (Coastal Act §§ 30253(2) and 30262(a)(1)) state that:

> *30253. New development shall:*
>
> *(2) Assure stability and structural integrity, and neither create nor contribute significantly to erosion, geologic instability, or destruction of the site or surrounding area or in any way require the construction of protective devices that would substantially alter natural landforms along bluffs and cliffs*
>
> *30262.*
>
> *(b) Oil and gas development shall be permitted ... if the following conditions are met:*

---

[85] Routine platform activities would include 156 helicopter trips and 364 crew boat trips annually. (EID, 2005, Table 5.2-5.)

[86] Gato Canyon Consistency Determination, 2005, p. 12.

[87] DEIS, p. 6-88.

> *(1) The development is performed safely and consistently with the geologic conditions of the well site.*

The subsidence policies of the CCMP (Coastal Act §§ 30262(a)(5) and (b)) state:

*(a) Oil and gas development shall be permitted ... if the following conditions are met:* ...

> *(5) The development will not cause or contribute to subsidence hazards unless it is determined that adequate measures will be undertaken to prevent damage from such subsidence.*
>
> ...
>
> *(b) Where appropriate, monitoring programs to record land surface and near-shore ocean floor movements shall be initiated in locations of new large-scale fluid extraction on land or near shore before operations begin and shall continue until surface conditions have stabilized. Costs of monitoring and mitigation programs shall be borne by liquid and gas extraction operators.*

The Gato Canyon Unit leases are located within the Santa Barbara Channel, which is part of the Santa Barbara-Ventura Basin. Three principal geologic hazards in the Southern California region are seismic events, tsunamis, and subsidence. If the lease suspensions are granted, it could result in the construction or placement of new facilities for oil and gas exploration, development, and production. This infrastructure must be sited and designed in a manner that assures stability and structural integrity and will not cause or contribute to subsidence hazards.

*Seismic Events*

Southern California is located along a seismically active plate margin. The major transform fault in the region is the San Andreas Fault. The last significant earthquake along the segment of the fault that borders the Santa Barbara and Ventura county areas happened in 1857 and is known as the "Fort Tejon" earthquake (an estimated 8.3 magnitude earthquake). Since then, the area has experienced several significant (Richter magnitude 6 or greater) earthquakes. The MMS's consistency determination does not provide any analysis of the probabilistic or deterministic hazard associated with the project area or any particular fault, nor does it address the potential specific effects of seismic activity (in addition to ground shaking) such as surface rupture and liquefaction. At the Development and Production Plan review stage, the MMS would require final seismic design parameters for the platform and pipelines to ensure the ability of those structures to withstand the maximum credible seismic or seismic-related hazard predicted for the area.

If Samedan were to come forward in the future with a Development and Production Plan for a new platform and pipelines, the Commission would have to be able to make a finding that the development would be reasonably safe from geologic hazards. Detailed geologic studies will

need to identify all potential hazards (e.g., ground shaking, surface rupture, liquefaction, submarine landslides), provide at least a quantitative probabilistic assessment of the likelihood hazard occurrence, and provide measures to avoid the hazard or mitigate its effects (e.g., special engineering if pipelines cross active faults).

In 1983, the Commission concurred in a consistency certification (CC-7-83) to expand development of the Santa Ynez Unit by adding additional platforms (as many as 3-4) and associated infrastructure. The SYU development currently consists of 3 platforms and pipelines to shore, and is located directly west of the Gato Canyon Unit. In the Santa Ynez Unit matter, since the MMS required the operator to (a) meet current "state-of-the-art" seismic design standards for the platform and pipelines that take into account a maximum credible seismic force; (b) site the platform and route the pipelines to avoid any identified site specific hazards (e.g., gas seeps, known hazardous faults, etc.); and (c) specially engineer pipelines (to increase strength) if all site-specific hazards cannot be avoided, the Commission found the design of the platforms and pipelines to be consistent with Coastal Act Section 30253(2)). The Commission at this time sees no reason to believe that Samedan cannot meet these same requirements during development of the Gato Canyon Unit. Accordingly, the proposed lease suspensions for the Gato Canyon Unit satisfies the requirements of Coastal Act Section 30253(2) with respect to hazards associated with seismic events.

*Tsunamis*

Tsunamis are potentially destructive ocean waves formerly called "tidal waves." Large-scale, underwater block movements, slumps, or slides are the mechanisms for generating these "seismic sea" waves, and are generally associated with large earthquakes. Tsunamis are usually apparent only at the coastline. Due to their long wavelength and low amplitude, they are rarely noted in deep water. As a tsunami approaches and strikes the coast, the wavelength becomes attenuated and the amplitude grows. The first sign of an impending tsunami is sometimes a sudden recession of the ocean away from the coast. Most tsunamis are generated on the margins of the Pacific Ocean basin and, consequently, small, trans-Pacific tsunamis strike the California coast with regularity. Large tsunamis striking the California coast area are rare.

Although rare along the Southern California coast, tsunamis do pose a potential hazard to coastal communities and facilities. Tsunamis are unlikely to affect offshore facilities constructed in deep water, such as a new platform at the Gato Canyon Unit, but pipe landings and onshore facilities may be impacted. If Samedan were to develop a Development and Production Plan for the Gato Canyon Unit, it would need to provide the MMS and the Commission with a detailed assessment of the magnitude or likelihood of tsunami hazards, such as modeling tsunami runup and deriving probabilistic hazard assessments. Gato Canyon Unit infrastructure located nearshore or along the shoreline may need to be specially engineered to withstand a tsunami striking this area of coast. The evidence before the Commission today contains no suggestion that Samedan, as operator of the Gato Canyon Unit, cannot design the infrastructure to withstand any identified tsunami hazard Accordingly, the Commission finds that the proposed lease suspension for the Gato Canyon Unit satisfies the requirements of Coastal Act Section 30253(2) with respect to hazards associated with tsunami events.

*Subsidence*

Coastal Act Section 30262(a)(5) and (b) provides that oil and gas development may be permitted if the activities do not cause or contribute to subsidence and if appropriate monitoring programs are carried out. Subsidence is the dropping or lowering of the earth's surface, and has long been a concern with oil and gas extraction projects although it is also linked to earthquake events. Subsidence can be extremely hazardous to shoreline areas, and has been a particular problem in the Long Beach area of California. The Wilmington oil field, for example, documented over 29 feet of subsidence over a 53-year period (which was eventually controlled by re-pressurizing the oil field). Subsidence of the nearshore area will allow larger waves to come closer to the dry beach, increasing wave energy and sand movement. A gradual increase in beach erosion can occur. Re-pressurizing the oil field, such as re-injecting a fluid like produced water in volumes somewhat comparable to the total amount of fluid being withdrawn, can control subsidence.

According to the Commission's geologist, subsidence historically has not been a problem in the Santa Barbara-Ventura Basin, and is less likely in over pressurized reservoirs such as those in the Basin. Although the problem is unlikely, a closer examination of whether continued extraction of oil and gas in this area could lead to subsidence in the nearshore area would need to be conducted during review of a Development and Production Plan. If subsidence could occur, the operator would be required to monitor and undertake well-established measures to re-pressurize the reservoir. Any occurrence of subsidence should therefore be readily addressed by appropriate remedial action.

For the above-described reasons, the Commission believes that the reasonably foreseeable post-suspension activites that result from granting the lease suspensions would be carried out in a manner that assures stability and structural integrity of the development and will not cause or contribute to subsidence hazards. The Commission therefore finds the proposed lease suspensions to be consistent with the geologic hazard policies of the CCMP (Coastal Act Sections 30253(2) and 30262(a)(1) and (5) and (b)).

### 3.8 Cultural Resources

The cultural resources policy of the CCMP (Coastal Act § 30244) states:

> *Where development would adversely impact archaeological or paleontological resources as identified by the State Historic Preservation Officer, reasonable mitigation measures shall be required.*

Archaeological resources are any material remains (sites) of human life or activities that are at least 50 years of age and are of archaeological interest. Historic archaeological sites can be subsurface remains that contain buried foundations or other structures such as pier footings and depositional sites like refuse dumps. The sites may include surface remains of walkways, roads, or other structural elements. These sites may also include historic and prehistoric (spanning the time between 13,000 years ago until the time of European contact in 1542) surface and subsurface artifacts (e.g., stone tools and art).

The MMS's proposed hypothetical development scenario envisions temporary use of a mobile offshore drilling unit ("MODU") for the delineation well and then installation of a new fixed platform offshore on lease OCS-P 0460 with three new pipelines connecting the platform to the existing onshore oil and gas processing facilities in Las Flores Canyon. At landfall, these new pipelines would be placed in or near the existing pipeline corridor dedicated to three similar pipelines that connect existing Platform Hondo to the processing facility.

Physical disturbance of the seafloor is the primary cause of direct impacts to offshore archaeological resources. The MMS requires operators to avoid known sites. The greatest potential for impact comes from seafloor disturbance of previously undetected sites due to platform and pipeline installation. Drilling operations can directly affect prehistoric cultural resources by drilling through buried archaeological deposits.

Based on current information, the MMS does not anticipate impacts to offshore archaeological resources if exploration, development, and production activities are undertaken. As part of its review of an Exploration Plan and Development and Production Plan, the MMS would require a pre-construction survey and analysis to detect any seafloor anomalies. The platform and pipelines would need to be sited and routed to avoid any target sites. Based on existing information, it appears that a platform and pipeline could be sited to avoid any offshore cultural (e.g, shipwrecks) and archaeological sites.

Construction of the onshore pipeline segments may affect known archaeological sites. Installation of the existing Santa Ynez Unit pipelines in the early 1990s significantly affected specific onshore archaeological sites, including prehistoric Site SBa-1733, the surrounding zones of secondary and low sensitivity, and the Ortega Adobe site in the Lower Corral Canyon.[88] The Office of Public Archaeology found that the Ortega Adobe site may be a scientific and ethnically significant cultural resource because (1) it has vertical and horizontal integrity, (2) it is ethnically significant to local Native Americans, and (3) it can yield information important to the study of prehistory.[89] The mitigation included preparation of a Cultural Resources Management Plan that was approved by the County and the State Office of Historic preservation. Mitigation also entailed capping of these sites with approximately 10 feet of fill, affecting a substantial portion of the lower Corral Canyon. This mitigation, in itself, posed a potential significant impact. First, the weight of the fill could damage fragile archaeological deposits. Second, the fill soil may not be sufficiently sterile to avoid diminishing the site's integrity. Third, the fill renders future archaeological investigation less feasible.

Based on this previous experience with construction of the Santa Ynez Unit pipelines, the Commission believes that additional pipelines in this area may affect these same archaeological sites. Compaction and erosion through the years may have reduced fill that was placed over the

---

[88] *Ibid*, p. 3.5-9.

[89] Santa Barbara County Planning and Development Department, Energy Division and U.S. Department of the Interior, Minerals Management Service, *ExxonMobil Offshore Power System Repair Project, Mitigated Negative Declaration/Environmental Assessment,* December 2002, p. 96.

site to cover and protect it. Additionally, presence of heavy equipment over top may further harm fragile artifacts of the site.

For these reasons, the Commission finds that the post-suspension activities likely to result from granting the lease suspensions may affect a significant onshore archaeological resource, and therefore the lease suspensions are inconsistent with the cultural resource policy of the CCMP. Because such suspensions, if granted, would lead to or result in the construction of new "industrial facilities" that are "coastal-dependent," the proposed project is presumptively subject to analysis under Section 30260 of the Coastal Act. See <u>Section 3.10: Coastal-Dependent Industrial "Override" Policy</u> of this staff report, below.

### 3.9 Air Quality

The air quality policy of the CCMP (Coastal Act § 30253(3)) states:

> *New development shall:*
>
> *(3) Be consistent with the requirements imposed by an air pollution control district or the State Air Resources Control Board as to each particular development.*

Coastal Act § 30414 further provides:

> *(a) The State Air Resources Board and air pollution control districts established pursuant to state law and consistent with requirements of federal law are the principal public agencies responsible for the establishment of ambient air quality and emission standards and air pollution control programs. The provisions of this division do not authorize the commission or any local government to establish any ambient air quality standard or emission standard, air pollution control program or facility, or to modify any ambient air quality standard, emission standard, or air pollution control program or facility which has been established by the state board or by an air pollution control district.*
>
> *(b) Any provision of any certified local coastal program which establishes or modifies any ambient air quality standard, any emission standard, any air pollution control program or facility shall be inoperative.*
>
> *(c) The State Air Resources Board and any air pollution control district may recommend ways in which actions of the commission or any local government can complement or assist in the implementation of established air quality programs.*

In addition, Section 307(f) of the federal CZMA specifically incorporates the Clean Air Act into the CCMP. Under the Clean Air Act, the federal government has established ambient air quality standards to protect public health (primary standards) and secondary standards to protect public welfare. The State of California has established separate, more stringent ambient air quality standards to protect human health and welfare. National and California standards have been

established for ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, suspended particulate matter 10 microns ($PM_{10}$), suspended particulate matter ($PM_{2.5}$) and lead. In addition, California has adopted standards for sulfates, hydrogen sulfide, vinyl chloride, and visibility reducing particles. Santa Barbara County is in attainment of all the National Ambient Air Quality Standards, including the 1-hour and 8-hour ozone standards. The County is also in attainment for all the state standards except the state's 1-hour and 8-hour ozone standards and the 24-hour $PM_{10}$ standard. There is not yet enough data to determine whether the County is in attainment for the federal or state $PM_{2.5}$ standards.

The 1990 Clean Air Act Amendments (Section 328) transferred to the Environmental Protection Agency ("EPA") authority for air quality on the OCS. Federal regulations contained in 30 CFR 250.204(b)(14), 250.303, and 250.304 specifically apply to air emissions from OCS oil and gas facilities. Regulations at 30 CFR 250.204(b)(14) require an operator to supply detailed information to the MMS when the operator applies for a new or amended Development and Production Plan, including:

- Projected emissions for each proposed or modified facility for each year of operation;
- The model(s) used to determine the effect on the onshore air quality of emissions from each facility and the result obtained through the use of the model(s);
- The air quality status of any onshore area where the air quality is significantly affected by projected emissions from each facility proposed in the plan;
- The emission-reduction controls available to reduce emissions, including the source, emission-reduction control technology, reductions to be achieved, and monitoring system.

Federal regulations at 30 CFR 250.303 set significance standards for carbon monoxide, total suspended particles, sulfur dioxide, nitrogen oxides and volatile organic compounds for OCS facilities. Facilities that significantly affect air quality in a nonattainment area are required to fully reduce emissions (through Best Available Control Technology ("BACT"), additional emissions controls, or offsets), while facilities causing significant impacts in attainment or unclassifiable areas are required to reduce emissions through BACT. These regulations also prohibit any air pollutant to exceed the concentration permitted under the national secondary ambient air quality standard or the national primary air quality standard, whichever is lowest.

Federal (EPA) regulations enacted in 1992 require OCS sources to comply with applicable onshore air quality rules in the corresponding onshore area. In 1993, the EPA delegated authority to the Santa Barbara County Air Pollution Control District ("SBCAPCD") to implement and enforce the federal air requirements of 40 CFR Part 55.

***Shallow Hazard Survey***

Emissions resulting from the shallow hazard survey may increase concentrations of pollutants onshore. The primary pollutants of concern are nitrogen oxides ("$NO_X$"), and reactive organic compounds ("ROC"). Both $NO_X$ and ROC are precursors to ozone formation. The major pollutant of concern is $NO_X$ emissions due to the use of stationary and propulsion equipment used by the survey vessel.

The MMS studied the impacts of Samedan's projected offshore emissions from the survey vessels' engines using the Offshore and Coastal Dispersion ("OCD") model. The OCD model computes both short-term (1-hour, 3-hour, 8-hour, and 24-hour average) and annual averaged pollutant concentrations. The MMS used the model to predict the concentrations of nitrogen dioxide ("$NO_2$"), sulfur dioxide ("$SO_2$"), and fine particulates ("$PM_{10}$") that could affect onshore areas due to survey activities. It concludes in the Environmental Assessment prepared for the shallow hazard survey that increases in the onshore average concentrations of $NO_2$, $SO_2$ and $PM_{10}$ will be well below the maximum increases allowed under federal, state and SBCAPCD ambient standards.

To reduce adverse air quality impacts, the MMS will require Samedan to:

- Prepare and submit to MMS an Emissions Reporting Plan that details actual vessels and internal combustion engines to be used, duration of use, fuel consumed and calculated emissions; and
- Use fuel with less than 0.2% sulfur by weight when operating within waters adjacent to Santa Barbara County.

No air district permits from the SBCAPCD are required for the shallow hazard survey. A permit would be required if the survey vessel is either (a) permanently or temporarily attached to the seabed and erected thereon, and used for the purpose of exploring, developing or producing resources; or (b) physically attached to an OCS facility, in which case only the stationary aspects of the vessels are regulated. Since there are no existing "OCS sources" attached to the Gato Canyon Unit, and the vessel is not attached to the seabed, no air permits are required for the survey.

***Post-Suspension Exploration, Development, and Production Activities***
Air emissions expected from developing the Gato Canyon Unit would come from a variety of sources including the Mobile Offshore Drilling Unit ("MODU") for the delineation well, well drilling, platform, pipeline and power cable construction, oil production, and support activities (e.g., crew and supply boats). The CCMP's air quality policy requires any future exploration, development, and production activities to be carried out consistent with the rules and requirements of SBCAPCD.

MODU delineation well drilling may require air permits from the SBCAPCD if the annual emissions are greater than 25 tons/year. SBCAPCD Rule 202 F.6 (Drill Rig Engine Exemption) provides a permit exemption for drilling equipment if emissions from the equipment are less than 25 tons/year. Equipment that is not part of the drilling phase (marine vessel emissions; drilling mud systems handling ROC compounds; all tanks, vessels, sumps and oil/water separators handling ROC compounds; and flares and emission control equipment) would require a Permit to Operate, and emission sources subject to the permit must meet Best Available Control Technology ("BACT") and emission offset requirements to ensure a net air quality benefit. MMS estimates that exploratory drilling operations will result in emission levels that require BACT and emission offsets.

Air permits will also be required from the SBCAPCD for any new platforms, pipelines, power cables, and associated onshore activities. Short- and long-term emissions from these sources will be above New Source Review threshold emission levels and therefore future development projects will need to comply with SBCAPCD's rules and regulations for BACT and emission offsets. The SBCAPCD will determine the BACT and emission offset requirements once an applicant has developed the specific details of an exploration or development project (e.g., specific equipment and engines to be used, duration of activities). If a project requires offsets, but the applicant cannot procure them, the SBCAPCD cannot issue a permit.

The CCMP's air quality policy requires the Commission to rely on the applicable rules of the SBAPCD for air quality measures. Because some activities will not require permits from the SBCAPCD, and others will be subject to the SBCAPCD's future review and permitting requirements, the Commission finds that the reasonably foreseeable activities likely to result from the granting of the lease suspensions will be carried out consistent with the rules and requirements of the SBCAPCD and are therefore consistent with the air quality policy of the CCMP (Coastal Act Section 30253(3)).

### 3.10 Coastal-Dependent Industrial "Override" Policy

Coastal Act Section 30101 defines a coastal-dependent development or use as that which "requires a site on or adjacent to the sea to be able to function at all." Ports, commercial fishing facilities, and offshore oil and gas platforms are coastal-dependent development types that the Coastal Act gives priority over other types of development on or near the shoreline. Coastal Act Section 30001.2 finds that notwithstanding the environmental effects of offshore petroleum and gas development, the location of such developments in the coastal zone may be necessary. Consequently, Coastal Act Section 30260 provides for special consideration of coastal-dependent industrial facilities that may otherwise be found inconsistent with the Coastal Act's Chapter 3 policies. Section 30260 is relevant to the Commission's review of suspensions of OCS oil and gas leases because such suspensions, if granted, would lead to or result in the construction of new, or new use of existing, "industrial facilities" that are "coastal-dependent." The hypothetical post-suspension exploration, development, and production scenarios reviewed in this report involve the use of "coastal-dependent industrial facilities," including a new platform.

Coastal-dependent industrial facilities must be evaluated under all applicable policies and standards contained in Chapter 3. If the proposed project is inconsistent with any Chapter 3 policy, Section 30260 provides for approval of the coastal-dependent industrial development under certain conditions, notwithstanding such inconsistencies of the development. Coastal Act Section 30260 specifically states:

> *Coastal-dependent industrial facilities shall be encouraged to locate or expand within existing sites and shall be permitted reasonable long-term growth where consistent with this division. However,where new or expanded coastal-dependent industrial facilities cannot feasibly be accommodated consistent other policies of this division, they may nonetheless be permitted in accordance with this section and Sections 30261 and 30262*

> *if (1) alternative locations are infeasible or more environmentally damaging; (2) to do otherwise would adversely affect the public welfare; and (3) adverse environmental effects are mitigated to the maximum extent feasible.*

As described in Sections 3.1, 3.2, 3.4, 3.6 and 3.8 of this report, granting the lease suspensions does not meet the standards of Coastal Act Sections 30230, 30231, 30232, 30234.5, 30210, 30212, 30220, and 30244 due to the potential for significant adverse individual and cumulative marine resource, water quality, oil spill, commercial fishing, recreation, public access, and cultural resource impacts caused by reasonably foreseeable post-suspension exploration, production and/or decommissioning activities. Since the project qualifies as a "coastal-dependent industrial facility" the Commission may nevertheless approve the project if the three requirements of Section 30260 can be met: 1) alternative locations are infeasible or more environmentally damaging; 2) to do otherwise would adversely affect the public welfare; and 3) adverse environmental effects are mitigated to the maximum extent feasible.

The second test of 30260 states that coastal-dependent industrial development may be permitted if to do otherwise would adversely affect the public welfare. In previous sections of this report, the Commission has found that it is unable to determine whether the granting of the lease suspensions is consistent with the resource protection policies of the CCMP, because it lacks the information necessary to make that determination. Specifically, the Commission lacks adequate information to determine the following:

- Impacts to marine resources, water quality, commercial fishing, public access, recreation, environmentally sensitive habitat areas, and cultural resources due to potential oil spills; and

- If a feasible, less environmentally damaging alternative to installing a new platform and associated infrastructure is available to develop the Gato Canyon Unit that would eliminate the placement of fill in coastal waters or avoid or lessen significant adverse individual and cumulative impacts (e.g., marine resource, water quality, commercial fishing, visual, public access, recreation, and cultural resources).

Without a detailed assessment of the potential environmental impacts that may be caused by granting the lease suspensions and subsequent post-suspension development, the Commission cannot make a determination about whether or not the public welfare will be adversely affected if the lease suspensions are not granted. The Commission is therefore unable to determine if the lease suspensions should be granted because to do otherwise would adversely affect the public welfare. Because the Commission is unable to determine if granting the lease suspensions and subsequent post-suspension development meet, at least, the second test of 30260, it is unable to analyse the lease suspensions for consistency with Section 30260.