STATE OF CALIFORNIA—THE RESOURCES AGENCY

ARNOLD SCHWARZENEGGER, GOVERNOR

CALIFORNIA COASTAL COMMISSION

45 FREMONT, SUITE 2000
SAN FRANCISCO, CA 94105-2219
VOICE AND TDD (415) 904-5200
FAX (415) 904-5400

# Th 5j

| | |
|---|---|
| Staff: | MPD-SF |
| File Date: | 4/7/05 |
| 60th Day: | 6/6/05 |
| 75th Day: | 6/21/05 |
| Extended to: | 8/12/05 |
| Commission Meeting: | 8/11/05 |

## STAFF REPORT AND RECOMMENDATION ON CONSISTENCY DETERMINATION

**Consistency Determination No.:** **CD-051-05**

**Federal Agency:** **U.S. Department of the Interior's Minerals Management Service**

**Project Location:** Outer Continental Shelf (OCS) lease suspension (i.e., extension of the lease term) by 13 months, for the leases in the Cavern Point Unit (lease numbers OCS-P 0210, and OCS-P 0527), located in federal waters, eastern Santa Barbara Channel, north of Anacapa Island, offshore Ventura County. (Exhibits 2-3)

**Project Description:** Grant a Suspension of Production (i.e., lease extension) for 13 months to Venoco, Inc. No suspension period physical activities are proposed. Potential post-suspension activities include drilling two new exploratory and ten new production wells from existing Platform Gail. The oil and gas would be transported to shore using existing pipelines and processed at the existing Carpinteria onshore processing facility.

**Substantive File Documents:** See Exhibit 1

## EXECUTIVE SUMMARY

The U.S. Department of the Interior, Minerals Management Service (MMS) has submitted a consistency determination for a 13-month Outer Continental Shelf (OCS) lease suspension (i.e., extension of the lease term), for the leases in the Cavern Point Unit, north of Anacapa Island in the eastern Santa Barbara Channel (lease numbers OCS-P 0210, and OCS-P 0527). Venoco, Inc., is the operator of the Unit. No in-water activities are proposed during the suspension period for this unit, and MMS maintains that any subsequent oil and gas drilling and transportation would occur using Platform Gail and the oil and gas pipelines to shore, and thus that any development of the Unit would only occur using existing oil and gas infrastructure.

Based on the decision of the U.S. District Court in the case of *State of California v. Norton* (affirmed by the U.S. Court of Appeal, Ninth Circuit), the lease suspension is subject to the consistency review requirements of section 307(c) of the Coastal Zone Management Act (CZMA). This Cavern Point suspension is one of ten MMS has submitted to the Commission.

The court decision clarified that the Commission's review of a lease suspension is similar to its review of a lease sale in the sense that the Commission is to analyze the broad and long-term coastal effects (i.e., post-suspension exploration, development and production activities) that are reasonably foreseeable if a lease suspension is granted. The court nevertheless acknowledged, and the Commission agrees, that a lease suspension is not identical to a lease sale. The subject lease suspensions have been requested decades after the initial lease sale, after most of these leases have been explored and detailed environmental and technical evaluations have already been performed. Substantially more information and details are available now on these leases than were available at the original lease sale stage.

In an April 22, 2005, letter to MMS, the Commission staff requested additional information regarding the "reasonably foreseeable direct and indirect effects" of the requested suspensions, namely, the likely post-suspension exploration, development, and production activities. The Commission staff informed MMS that additional information is needed in order for the Commission to determine whether the proposed lease suspensions are consistent with the enforceable policies of the California Coastal Management Program (CCMP). The Commission staff requested, for example, that MMS estimate how the future development of the Cavern Point Unit might extend the life of existing Platform Gail, its pipelines, and the onshore processing facility in Carpinteria. MMS has provided scant information in response, and MMS believes most of the information the Commission staff requested was more appropriate for exploration and production review stages, rather than for a review of the lease suspensions themselves.

Platform Gail is located in the Santa Clara Unit, adjacent to and directly east of the Cavern Point Unit, on OCS-P 0205. Both exploration and production activities on this lease were controversial and involved extensive Commission review and analysis. The Commission twice objected to Chevron's consistency certifications for Platform Gail; however, through a settlement agreement, the project was ultimately authorized. Chevron installed the platform in 1987 and began producing oil in 1988. At that time Chevron estimated the Platform have a lifespan of 32 years.

Primary concerns were the site's proximity to vessel traffic lanes and to the Channel Islands National Marine Sanctuary and Anacapa Island (raising both habitat and visual/recreational concerns), as well as geologic hazards. The project was 2,053 feet from the northern buffer zone of the northbound Vessel Traffic Separation Scheme (VTSS) lane, 6.5 miles from the Channel Islands National Park and a major nesting area for the endangered brown pelican (Anacapa Island), and one half mile from the Channel Islands National Marine Sanctuary. In addition, both Platform Gail and the pipeline to Platform Grace were installed over geologically unstable areas.

Primary concerns raised by the proposed suspension, and reasonably foreseeable further development using the platform, pipelines, and onshore facilities, are: (1) whether the reasonably foreseeable additional development would extend the life of the existing infrastructure, and if so, whether any such extension of life of the facilities would be consistent with the enforceable Coastal Act policies; and (2) whether new circumstances have arisen (such as increased oil spill risk from aging facilities, changed geologic conditions, new or changed fishing practices in the area, and the implementation of Marine Protected Areas near the platform) that need to be addressed before authorizing the suspension and determining its consistency with the enforceable policies of the CCMP. In order to determine the project's consistency with the CCMP, the Commission has requested MMS to provide it with the following necessary information:

1. An analysis of the structural integrity, and, if it would be extended, the likely modified design life if the Cavern Point Unit is developed, for: (1) the pipelines from Platform Gail to Grace, which is newer but crosses an underwater landslide; (2) the older (18-year old) pipeline from Platform Grace to shore; and (3) the 46-year-old onshore processing facility in Carpinteria.
2. If the analysis in #1 establishes that the project would extend the life of Platform Gail and its associated pipelines, analysis of the current level of commercial and recreational fishing that would be affected.
3. An analysis of the structural integrity of Platform Gail and its associated pipelines, including but not limited to copies of the most recent tests MMS has conducted on Platform Gail, and on the pipelines from Platform Gail to Grace and from Grace to shore.
4. An analysis of the ability of onshore facilities in Carpinteria to process Cavern Point petroleum hydrocarbons, to enable a determination of, among other things, whether that onshore facility remains suitable, or if an increased risk to public safety makes other locations more appropriate. This analysis should include an explanation of whether the onshore facility would exceed permitted throughput limits if oil and gas production to which this suspension, if granted, may result in, occurs (and/or whether sufficient offshore processing that previously took place at Platform Grace has been relocated to occur at Platform Gail).
5. To evaluate potential impacts from an oil spill to coastal resources, detailed information on: (1) worst case discharge volumes; (2) oil spill probabilities; and (3) oil spill trajectories.

Without this information, the Commission is unable to determine whether or not the proposed project is consistent with the marine resources, water quality, oil spills, commercial fishing, geologic

hazards, visual, and recreation policies (Sections 30230, 30231, 30232, 30234.5, 30253, 30262(a)(1), 30251, and 30213) of the Coastal Act, because it lacks the information necessary to make these determinations. In addition, while development at this unit would be subject to the provisions of the coastal-dependent industrial "override" policy (Section 30260) of the Coastal Act, the lack of the above-identified information also makes it impossible for the Commission to make the necessary findings under that policy. The Commission therefore objects to MMS' consistency determination, based on lack of adequate information to determine the suspension's consistency with the enforceable policies of the CCMP/Coastal Act.

## TABLE OF CONTENTS

EXHIBITS ..... 5
1 STAFF RECOMMENDATION ..... 6
1.1 Motion and Resolution ..... 6
1.2 Applicable Legal Authorities ..... 6
1.2.1 Necessary Information ..... 6
1.2.2 Practicability ..... 8
1.2.3 Federal Agency Response to Commission Objection ..... 8
1.3 Standard of Review ..... 9
2 FINDINGS AND DECLARATIONS ..... 9
2.1 Introduction ..... 9
2.2 Background of Federal OCS Leases ..... 10
2.2.1 Coastal Commission Review of Lease Suspensions ..... 10
2.2.2 Scope of Coastal Commission Review ..... 12
2.2.3 Current OCS Operations in California ..... 15
2.3 Project Description ..... 17
2.4 Cavern Point Unit Background ..... 19
2.4.1 Lease Sales P4 and 80 ..... 19
2.4.2 Platform Gail History ..... 19
2.4.3 A Series of Suspensions ..... 21
2.5 Related Environmental Documents ..... 21
2.5.1 Environmental Assessments ..... 21
2.5.2 Environmental Information Document ..... 22
2.5.3 COOGER Study ..... 22
3 COASTAL ACT ISSUES ..... 23
3.1 Marine Resources/Water Quality ..... 23
3.1.1 Oil Spills ..... 26
3.1.2 Ocean Discharges ..... 47
3.2 Commercial Fishing ..... 49
3.3 Scenic, Visual, and Recreational Impacts ..... 52
3.4 Hazards ..... 53
3.5 Air Quality ..... 56
3.6 Consolidation of Oil and Gas Development ..... 59
3.7 Coastal-Dependent Industrial Facility "Override" Provision ..... 59

Appendix A: Pacific OCS Development
Appendix B: April 22, 2005 Commission Information Request Letter
Appendix C: June 23, 2005 MMS Response to Commission Information Request Letter

Exhibits

Exhibit 1: Substantive File Documents
Exhibit 2: Overview map
Exhibit 3: Individual area map

Exhibit 4: Marine Resources
Exhibit 5: Channel Islands, Marine Protected Areas
Exhibit 6: Geologic Hazards, Platform Gail/Santa Clara Unit

# 1 STAFF RECOMMENDATION

## 1.1 Motion and Resolution

**Motion:**

> *I move that the Commission* ***concur*** *with consistency determination CD-051-05 that the project described therein is consistent to the maximum extent practicable with the enforceable policies of the California Coastal Management Program.*

**Staff Recommendation:**

Staff recommends a **<u>NO</u>** vote on the motion. Failure of this motion will result in an objection to the determination and adoption of the following resolution and findings. An affirmative vote of a majority of the Commissioners present is required to pass the motion.

**Resolution to Object to Consistency Determination:**

> *The Commission hereby* ***objects*** *to the consistency determination by the Minerals Management Service for the proposed project, finding that the consistency determination lacks information necessary to evaluate the project's consistency with the California Coastal Management Program.*

## 1.2 Applicable Legal Authorities

Section 307 of the Coastal Zone Management Act (16 USC § 1456) provides in part:

> *(c)(1)(A) Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of the approved State management programs.*

### 1.2.1 Necessary Information

Section 930.43(b) of the federal consistency regulations (15 CFR Section 930.43(b)) requires that, if the Commission bases its objection on a lack of information, the Commission must identify the information necessary for it to assess the project's consistency with the CCMP. That section states:

> *If the State agency's objection is based upon a finding that the Federal agency has failed to supply sufficient information, the State agency's response must describe the nature of the information requested and the necessity of having such information to determine the*

*consistency of the Federal agency activity with the enforceable policies of the management program.*

**Nature of Information Requested**

As described in Section 3: Coastal Act Issues of this report below, the Commission finds this consistency determination lacks the information that the Commission has requested from the Minerals Management Service ("MMS") to enable the Commission to determine whether the proposed project is consistent with the marine resources, water quality, oil spills, commercial fishing, geologic hazards, visual, public access, and recreation policies (Sections 30230, 30231, 30232, 30234.5, 30253, 30262(a)(1), 30251, and 30213) of the Coastal Act. In order to determine the project's consistency with the CCMP, the Commission has requested MMS to provide it with the following necessary information:

1. An analysis of the structural integrity, and, if it would be extended, the likely modified design life if the Cavern Point Unit is developed, for: (1) the pipelines from Platform Gail to Grace, which is newer but crosses an underwater landslide; (2) the older (18-year old) pipeline from Platform Grace to shore; and (3) the 46-year-old onshore processing facility in Carpinteria.
2. If the analysis in #1 establishes that the project would extend the life of Platform Gail and its associated pipelines, analysis of the current level of commercial and recreational fishing that would be affected.
3. An analysis of the structural integrity of Platform Gail and its associated pipelines, including but not limited to copies of the most recent tests MMS has conducted on Platform Gail, and on the pipelines from Platform Gail to Grace and from Grace to shore.
4. An analysis of the ability of onshore facilities in Carpinteria to process Cavern Point petroleum hydrocarbons, to enable a determination of, among other things, whether that onshore facility remains suitable, or if an increased risk to public safety makes other locations more appropriate. This analysis should include an explanation of whether the onshore facility would exceed permitted throughput limits if oil and gas production to which this suspension, if granted, may result in, occurs (and/or whether sufficient offshore processing that previously took place at Platform Grace has been relocated to occur at Platform Gail).
5. To evaluate potential impacts from an oil spill to coastal resources, the Commission has requested detailed information on: (1) worst case discharge volumes; (2) oil spill probabilities; and (3) oil spill trajectories.

**Necessity for Information Requested**

The need for this information is explained in the findings below, as follows:

Information request No.1 – see pages 49-56, Commercial Fishing (Section 3.2), Visual and Recreation (Section 3.3), and Geologic Hazards (Section 3.4).
Information request No. 2 – see pages 49-52, Commercial Fishing (Section 3.2).
Information request No. 3 – see pages 53-56, Geologic Hazards (Section 3.4).
Information request No. 4 – see page 56, last paragraph, Geologic Hazards (Section 3.4).
Information request No. 5 – see pages 26-47, Oil Spill Risk Analysis (in Section 3.1.1).

In addition, as discussed on pages 60-61 (Coastal Dependent Industrial Facility "Override" Provision (Section 3.9)), all five information requests are necessary for the Commission's analysis under Section 30260 of the Coastal Act.

### 1.2.2 Practicability

The federal consistency regulations implementing the CZMA include the following provision:

> *Section 930.32 Consistent to the maximum extent practicable.*
>
> *(a)(1) The term ''consistent to the maximum extent practicable'' means fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency.*

Since MMS has raised no issue of practicability, as so defined, the standard before the Commission is full consistency with the policies of the California Coastal Management Program (CPRC §§ 30200-30265.5) .

### 1.2.3 Federal Agency Response to Commission Objection.

Section C(a)(i) of Chapter 11 of the CCMP requires federal agencies to inform the Commission of their response to a Commission objection. This section provides:

> *If the Coastal Commission finds that the Federal activity or development project ... is not consistent with the management program, and the federal agency disagrees and decides to go forward with the action, it will be expected to (a) advise the Coastal Commission in writing that the action is consistent, to the maximum extent practicable, with the coastal management program, and (b) set forth in detail the reasons for its decision. In the event the Coastal Commission seriously disagrees with the Federal agency's consistency determination, it may request that the Secretary of Commerce seek to mediate the serious disagreement as provided by Section 307(h) of the CZMA, or it may seek judicial review of the dispute.*

The federal consistency regulations reflect a similar obligation; 15 CFR §930.43 provides:

> ***State agency objection.*** ...
>
> *(d) In the event of an objection, Federal and State agencies should use the remaining portion of the 90-day notice period (see §930.36(b)) to attempt to resolve their differences. If resolution has not been reached at the end of the 90-day period, Federal agencies should consider using the dispute resolution mechanisms of this part and postponing final federal action until the problems have been resolved. At the end of the 90-day period the Federal agency shall not proceed with the activity over a State agency's objection unless: (1) the Federal agency has concluded that under the ''consistent to the maximum extent practicable'' standard described in section 930.32 consistency with the enforceable policies of the management program is prohibited by existing law applicable to the Federal agency and the Federal agency has clearly described, in writing, to the State agency the legal impediments to full consistency (See §§930.32(a) and 930.39(a)), or (2) the Federal agency has concluded that its proposed action is fully consistent with the enforceable policies of the management program, though the State agency objects.*
>
> *(e) If a Federal agency decides to proceed with a Federal agency activity that is objected to by a State agency, or to follow an alternative suggested by the State agency, the Federal agency shall notify the State agency of its decision to proceed before the project commences.*

### 1.3 Standard of Review

The standard of review for federal consistency determinations is the enforceable policies of the CCMP, of which the substantive policy component is the Chapter 3 policies of the Coastal Act.

## 2 FINDINGS AND DECLARATIONS

The Commission finds and declares as follows:

### 2.1 Introduction

Venoco, Inc., has submitted a request to the Minerals Management Service ("MMS") for a 13-month suspension[1] of undeveloped Outer Continental Shelf ("OCS") oil and gas leases (OCS-P 0210, and OCS-P 0527) that comprise the Cavern Point Unit. The Cavern Point Unit is located offshore Ventura County, approximately 6 miles north of the east side of Santa Cruz Island and the west side of Anacapa Island. See Exhibits 2-3.

Pursuant to section 307(c) of the CZMA, 16 USC §1456(c)(1), the MMS's review and approval of the operator's requested lease suspensions is a federal agency activity subject to Commission consistency review. Accordingly, on April 7, 2005, MMS provided the Coastal Commission

---

[1] A suspension is defined in 30 CFR § 250.105 as: "a granted or directed deferral of the requirement to produce (Suspension of Production) or to conduct leaseholding operations (Suspension of Operations)." A lease suspension is effectively an extension of the life of the lease. (30 CFR § 250.169(a)) See Section 2.3 of this report, below.

with a consistency determination (CD-051-05) in response to the operator's request for lease suspensions.

This report is one of four Commission staff reports prepared to review the consistency determinations submitted by MMS for 36 OCS lease suspensions. Other Commission reports address lease suspension requests for the Gato Point, Bonito, Rocky Point, Sword, Northern Santa Maria Basin units and OCS-P 0409, discussed in more detail in Section 2.3 below.

Before any drilling or development activity can actually occur in the subject units, Exploration and Development and Production Plans must also be separately approved by MMS (pursuant to 30 CFR §§ 250.203, 250.204). MMS can not approve any such further activity unless the Commission concurs with a consistency certification from the operator, or the Secretary of Commerce determines on appeal of a Commission objection that the activity is consistent with the objectives or purposes of the CZMA, or is necessary in the interest of national security (15 CFR §930.120).

The goal of the oil and gas operators, beyond the requested suspension period, is to explore, develop, and produce marketable quantities of oil and gas from reservoirs underlying the Cavern Point Unit.

## 2.2 Background of Federal OCS Leases

### 2.2.1 Coastal Commission Review of Lease Suspensions

MMS has submitted consistency determinations for a total of 36 lease suspensions off the coast of San Luis Obispo, Santa Barbara and Ventura Counties. The leases are organized into nine separate "units," and one lease not within a unit (Lease 409).[2] (See Section 2.2.3: Current OCS Operations in California below.)

Each lease was issued by the US Department of the Interior before 1984, and had a primary term of five years[3]. After the initial term of a lease lapses, the lease continues in effect so long as oil and gas are produced in paying quantities or drilling operations are underway. If production or approved drilling is not underway at the end of the lease term, the lease expires and the lessee loses the right to exploit the oil and gas resources in the lease area (30 CFR § 250.180).

---

[2] Consistent with the Outer Continental Shelf Lands Act (as amended) ("OCSLA"), MMS's regulations define the purpose of unitization to include 1) conserving natural resources; (2) preventing waste; and/or (3) protecting correlative rights (30 CFR § 250.1300).

[3] MMS has not conducted a lease sale off the coast of California since 1984. See Appendix A for details on the lease sales conducted since 1963, including those sales relevant to the 36 subject leases. In 1990, former President George H. W. Bush, imposed a leasing moratorium offshore California, among other areas. President Bush imposed the moratorium in response to findings by the National Research Council that environmental information was inadequate to properly inform leasing offshore Florida and California.

Alternatively, a lease may be "suspended." A suspension allows a lessee to suspend exploration, development, and/or production activities for a period of time without having the lease expire, thereby extending the life of the lease (OCSLA § 5(a)(1); 43 USC §1334(a)(1)). Suspensions can occur in two ways: first, the federal government can direct suspensions; for example, in order to comply with federal law or with court orders. Second, a lessee can request a suspension in order to keep the lease in effect under certain conditions specified in regulation without the lessee having to engage in exploration, development or production activities (30 CFR §§ 250.168-177). During a directed suspension, no activities can occur. During a granted suspension, MMS can require that certain specified activities and milestones be met in order to demonstrate that the lessee intends to keep the lease from expiring.

Of the leases issued before 1984, 40 have not begun producing paying quantities of oil or gas. Additionally, a portion of Lease OCS-P 0450 that is assigned to the undeveloped Bonito Unit has not begun producing quantities of oil and gas. These leases would have expired if MMS had not repeatedly extended the terms of the leases, through both directed and requested suspensions.

Until October 1992, MMS, at the request of the lessees, had granted suspension of the 40 leases. On October 15, 1992, MMS directed suspensions of the leases in order to conduct the *California Offshore Oil and Gas Energy Resources Study: Development Scenarios and Onshore Physical Infrastructure in the Tri-County Area of San Luis Obispo, Santa Barbara and Ventura* (known as the "COOGER Study"). In 1999, when the directed suspensions were about to end, MMS advised the lessees that they would need to request suspensions in order to keep the leases from expiring. In May 1999, the lessees submitted requests for suspensions. MMS declined to extend the lease terms of four of the leases[4], but approved the requested suspensions for the remaining 36 leases.

By letter dated July 27, 1999, the Coastal Commission informed the Department of Interior and MMS that, pursuant to the Coastal Zone Management Act (CZMA), 16 USC §1456(c)(3), the Commission was asserting its authority to review the lease suspensions for consistency with the California Coastal Management Program (CCMP). In an August 5, 1999, follow-up letter to MMS, the Commission's Executive Director identified a number of concerns related to changed circumstances and new information that needed to be addressed in the MMS review, including the age of the leases, the poor quality of the oil, the proximity of the leases to marine sanctuaries, and potentially changed environmental circumstances. The Coastal Commission also advised MMS that pursuant to the CZMA the lessees were required to provide the Coastal Commission with a certification of consistency with the CCMP.

MMS disagreed with the Coastal Commission's position that the lease suspensions were subject to the consistency review requirements of the CZMA, and refused to submit consistency certifications to the Commission. In November 1999, MMS notified the lessees that it had approved their requests for suspensions. The State of California challenged MMS's failures to comply with the requirements of the CZMA with respect to the lease suspensions in U.S. District

---

[4] By decision dated August 16, 1999, the MMS removed three leases in the Santa Maria Unit (Leases 420, 424, and 429) and one in the Gato Canyon Unit (Lease 462) and they expired. The lessees appealed the decision to the Interior Board of Land Appeals, and the appeals are currently under review.

Court in the case of *State of California v. Norton*. On June 15, 2001, the district court held that the approval of the lease suspensions by MMS is a federal agency activity subject to consistency review by California under the CZMA. The federal defendants appealed. On December 2, 2002, the U.S. Court of Appeals for the Ninth Circuit affirmed the district court judgment (311 F.3d 1162 (9th Cir. 2002)).

On April 7, 2005, pursuant to the court's order, MMS submitted to the Commission 10 consistency determinations — one consistency determination for each of the nine units, plus one for Lease OCS-P 409. This report reviews the suspensions of leases in the Cavern Point Unit. The lease suspensions for other units are analyzed in separate Commission reports.

### 2.2.2 Scope of Coastal Commission Review

At the time of issuance of the 36 subject leases, a lease sale was not a federal agency activity that required federal consistency review by the Commission. See *Secretary of the Interior v. California* (1984) 464 U.S. 312. In 1990, in the Coastal Zone Act Reauthorization Amendments of 1990 ("CZARA"), Congress amended the CZMA specifically to extend the consistency requirements of that statute to the sale of leases on the OCS as a federal agency activity. Congress clarified its intent in enacting the CZARA amendments to the CZMA in the following manner:[5]

> *The conferees intend the determination of whether a specific federal agency activity may affect any natural resource, land use, or water use in the coastal zone to include...cumulative and secondary effects. therefore, the term "affecting" [in CZMA § 307(c)] is to be construed broadly, including direct effects which are caused by the activity and occur at the same time and place, <u>and indirect effects which may be caused by the activity and are later in time or farther removed in distance, but are still reasonably foreseeable.</u> [Emphasis added.]*

Because these leases predated the 1990 amendments to the CZMA, the State of California never had the opportunity to review these leases for CZMA consistency at the lease sale stage.

In its decision in *California v. Norton,* the Appeals Court specifically rejected the argument that review of the lease suspensions would duplicate review of activities described in Exploration Plans or Development and Production Plans. The court stated:

> *In subjecting lease sales to consistency review, Congress has made it clear that the statute does not prohibit consistency review of federal agency activities that are not subsidiary to exploration and development and production plans. The exploration and development and production plan stages are* not *the only opportunities for review afforded to States under the statutory scheme...*
>
> *...These lease suspensions represent a significant decision to extend the life of oil exploration and production off California's coast, with all of the far reaching effects and*

[5] House Conference Report No. 101-964; 1990 *U.S. Code Cong. & Adm. News*, p. 2017.

> *perils that go along with offshore oil production.* (*State of California v. Norton* 311 F.3d 1162, 1173 (9th Cir. 2002))

Furthermore, the court stated that the review of lease suspensions is similar to the review of a lease sale, in that the effects to be analyzed are "very broad" and "long term."

> *Although a lease suspension is not identical to a lease sale, the very broad and long term effects of these suspensions more closely resembles the effects of a sale than they do the highly specific activities reviewed [in an Exploration Plan or Development and Production Plan]...[Lease suspension] review is available now for the broader effects implicated in suspending the leases. This phasing of review fits closely the expressed intent of Congress...* (*ibid. at* 1174)

The court made clear that the Commission's review of a lease suspension is similar to its review of a lease sale in the sense that the Commission is to analyze the broad and long-term coastal effects (i.e., post-suspension exploration, development and production activities) that are reasonably foreseeable if a lease suspension is granted. The court nevertheless acknowledged, and the Commission agrees, that a lease suspension is not identical to a lease sale. The subject lease suspensions have been requested decades after the initial lease sale, after most of these leases have been explored and detailed environmental and technical evaluations have already been performed. Substantially more information and details are available now on these leases than were available at the original lease sale stage. In fact, many of the undeveloped leases can be developed from existing platforms for which Development and Production Plans have been prepared, but would require only revision. In *Secretary of the Interior v. California,* the U.S. Supreme Court noted there are four distinct stages to developing an OCS oil lease: (1) formulation of a 5-year leasing plan by the Department of the Interior; (2) the lease sale; (3) exploration; and (4) development and production. Most of the 36 leases currently fall between stages (3) and (4).

MMS chose, however, to model its consistency determinations for the lease suspensions on recent Alaska Lease Sale 191. The Commission believes the Alaska model is not adequate for the review of the lease suspensions for several reasons:

- Lease Sale 191 comprised an area over 200 million acres in the Cook Inlet Planning Area as compared to the 184,191 acres encompassing the 36 undeveloped California leases. The difference is an order of magnitude (i.e., a factor of 10).

- Lease Sale 191 occurred in an OCS planning area (Cook Inlet) where no production and development of OCS oil and gas has ever been proposed, examined in detailed in environmental impact statements, or permitted, because no economically recoverable reserves have been discovered. Little environmental information is available. Thus, the available information is very general in scope.

- By contrast, the Commission's consideration of the lease suspensions takes place 2-4 decades following the 10 lease sales the federal government conducted offshore California. Forty-two of the remaining 79 OCS leases offshore California are producing

oil and gas or are situated on producing units, and their development was preceded by detailed environmental review. All but one of the 36 leases have been consolidated into 9 units that have identifiable and named oil and gas fields. All but one unit have been granted Exploration Plans and, decades ago, lessees drilled exploratory wells discovering paying quantities of oil and gas. In the early 1990s, the lessees developed hypothetical, but likely, development scenarios for each of the leases so that MMS could prepare the COOGER Study, a 1999 study that evaluated the potential onshore constraints of developing the then-40 undeveloped leases.

Therefore, answers to the questions "if, when, and how exploration, development and production would actually occur" are far better understood for these leases as compared to a lease sale such as Alaska Lease Sale 191. Notwithstanding the level of information available about the potential development of the 36 leases, the MMS chose not to submit for the Commission's review data and environmental analysis that is either readily available or could be developed now. Instead, because MMS is treating the review of the lease suspensions strictly as a "lease sale" stage, it believes it needs to provide "general" information only, *even if specific information is available.*

In an April 22, 2005, letter to MMS, Coastal Commission staff requested additional information regarding the "reasonably foreseeable direct and indirect effects" of the requested suspensions, namely, the likely post-suspension exploration, development, and production activities. The Commission staff informed MMS that additional information is needed in order for the Coastal Commission to determine whether the proposed lease suspensions are consistent with the enforceable policies of the CCMP. For example, the Coastal Commission staff requested that MMS estimate how the future development of Sword, Bonito, Rocky Point, and Cavern Point Units might extend the life of existing Point Arguello Unit platforms and Platform Gail. In its original submittal, MMS provided no information regarding how the extension of life of existing platforms, pipelines, and other infrastructure could affect coastal resources (e.g., increase risk of an oil spill, lengthen fishery preclusion areas). In its June 23, 2005, response letter, MMS refused to provide certain requested information, such as an estimate of extension of platform operations, or the results of *already completed* surveys (like onshore archeology or offshore hard bottom surveys), stating that it would not be "appropriate" for MMS to provide information during the lease suspension review stage that it believes should be provided by the lessees in the form of an Exploration Plan or a Development and Production Plan. (Appendix B). In refusing to comply with the Commission's information request, MMS states repeatedly that the operator will provide project details and further analysis if and when operators submit new or revised Exploration Plans and/or Development and Production Plans. MMS's refusal to comply with the Commission's information requests effectively results in deferral until the exploration and development stages of the consistency review that both the District Court and the Ninth Circuit Court of Appeals has directed to occur at the lease suspension stage. There is no basis for MMS's failure to fully describe now the exploration and production scenarios that the lease suspensions will make possible and conduct full environmental and consistency review.

Further, section 930.39(a) of the federal consistency regulations states that the amount of detail in the evaluation of the enforceable policies, activity description and supporting information of a consistency determination "shall be *commensurate with the expected coastal effects of the activity.*" (Emphasis added). Given the potential magnitude of coastal effects of offshore oil and

gas development, section 930.39(a) requires MMS to provide as much detailed information as is available or that can reasonably be generated at the time of the review. MMS cannot defer examination of the reasonably foreseeable future effects of the lease suspensions to future reviews of Exploration Plans and Development and Production Plans.

### 2.2.3 Current OCS Operations in California[6]

Exhibit 2 illustrates leases, platforms and other oil and gas-related infrastructure off the coast of southern California. A total of seventy-nine Federal OCS oil and gas leases are currently located offshore California, not including the four expired leases that are under appeal. Forty-three of these leases are developed (i.e., oil and/or gas is being produced from them). The remaining 36 undeveloped leases are the subjects of the consistency determinations currently before the Commission. These leases are located between 3 and 12 miles offshore Santa Barbara, Ventura, and San Luis Obispo Counties. Table 2 presents a summary of the undeveloped leases.

Table 2. Undeveloped Pacific OCS Oil and Gas Units and Leases.

| Unit | Operator | Lease Number(s) | Consistency Determination Number |
|---|---|---|---|
| Lion Rock* | Aera Energy LLC | 396, 397, 402, 403, 408, 414 | CD-042-05 |
| Point Sal* | Aera Energy LLC | 415, 416, 421, 422 | CD-043-05 |
| Santa Maria* | Aera Energy LLC | 425, 430, 431, 433, 434 | CD-044-05 |
| Purisima Point* | Aera Energy LLC | 426, 427, 432, 435 | CD-045-05 |
| Lease 409 | Aera Energy LLC | 409 | CD-046-05 |
| Bonito | PXP | 443, 445, 446, 449, 450[7], 499, 500 | CD-047-05 |
| Rocky Point | Arguello | 452, 453 | CD-048-05 |
| Sword | Samedan Oil Corporation | 319, 320, 322, 323A | CD-049-05 |
| Gato Canyon | Samedan Oil Corporation | 460, 464 | CD-050-05 |
| Cavern Point | Venoco, Inc. | 210, 527 | CD-051-05 |

*Collectively referred to as Northern Santa Maria Basin Units

Nineteen platforms support production of the developed leases offshore Santa Barbara and Ventura Counties. No platforms are located offshore San Luis Obispo County. The 19 existing platforms are supported by pipelines, processing and separation facilities, and other associated infrastructure. Onshore facilities supporting Pacific OCS oil and gas development include:

[6] This information is taken from the EID, section 2.2

[7] Most of Lease 450 is located in the Point Arguello Unit; the entire lease is therefore held by production and is not being considered for suspension. The northwestern portion of Lease 450 is located in the Bonito Unit.

**Ventura County -** Mandalay Onshore Separation Facility, West Montalvo Operations, Rincon Oil and Gas Processing Facility, and La Conchita Oil and Gas Processing Facility

**Santa Barbara County,** Carpinteria Onshore Gas Facility connected to offshore Platform Habitat, Carpinteria Oil and Gas Processing Terminal connected to offshore Platforms Gail and Grace, Las Flores Canyon Santa Ynez Unit Oil and Gas Processing Facility, Gaviota Oil Heating Facility, Gaviota Storage Terminal (soon to be decommissioned), Lompoc Oil and Gas Processing Facility, and Several pipeline systems

In addition to Pacific OCS activities, the region includes oil and gas leases and production in California State waters (State tide and submerged lands). State leases fall under the management and administration of the California State Lands Commission. The State Lands Commission has issued thirty-two leases located in State waters, seventeen of which are producing, and fifteen of which are non-producing. No State platforms are located offshore San Luis Obispo County; however there are onshore support facilities located in San Luis Obispo or northern Santa Barbara County, including pipelines, oil pump stations, and a heavy, high sulfur oil upgrader refinery. Platform Holly, located offshore Goleta (Santa Barbara County), and Rincon Island, located offshore Rincon Beach (Ventura County) are the only two offshore production facilities associated with State leases that are operational in the tri-county region. Platform Holly is supported onshore by the Ellwood Processing Oil and Gas Processing Facility, and Rincon Island is supported onshore by the Rincon Island and State Lease 145/410 Oil and Gas Processing Facility. (See Exhibit 3) Venoco has applied to restart production from one of its two piers that extend from shore into State waters (PRC 421).

Offshore oil and gas production rates peaked in State waters in 1969 and in federal waters in 1995-1996. Federal offshore oil and gas annual production rates for the years 1984 through 2003, for the Santa Maria Basin and Santa Barbara Channel are presented in Table 3.

**Table 3. Federal Pacific OCS Oil and Gas Annual Production Rates for 1984 through 2003.**

| Year | Total Oil (million bbls) | Total Gas (billion $ft^3$) | Year | Total Oil (million bbls) | Total Gas (billion $ft^3$) |
|---|---|---|---|---|---|
| 1984 | 25.3 | 44.1 | 1994 | 54.8 | 52.7 |
| 1985 | 23.2 | 60.8 | 1995 | 69.3 | 61.9 |
| 1986 | 21.7 | 55.5 | 1996 | 61.1 | 66.1 |
| 1987 | 24.4 | 53.0 | 1997 | 51.5 | 76.0 |
| 1988 | 25.5 | 47.7 | 1998 | 43.5 | 75.7 |
| 1989 | 27.4 | 49.4 | 1999 | 37.5 | 79.4 |
| 1990 | 24.5 | 48.2 | 2000 | 34.8 | 75.4 |
| 1991 | 27.0 | 51.0 | 2001 | 32.1 | 70.5 |
| 1992 | 38.3 | 54.0 | 2002 | 31.0 | 67.3 |
| 1993 | 46.8 | 50.8 | 2003 | 28.7 | 58.1 |
| **Total** | **728.4** | **1197.6** | | | |

Source: MMS, Pacific OCS Region. *Annual Summary of Production for Entire Region.* December 14, 2004

Total projected reserves for the 36 undeveloped leases is listed in Table 4, below:

**Table 4: Total Projected Reserves of 36 Undeveloped Leases**

| Location | | Oil Reserves (million bbls) | Gas Reserves (billion $ft^3$) |
|---|---|---|---|
| Northern Santa Maria Basin* | Northern Platform | 115 | 47 |
| | Central Platform | 118 | 24 |
| | Southern Platform | 90 | 18 |
| Bonito and Electra Fields (Bonito Unit) | | 22 | 11 |
| Rocky Point Field (Rocky Point Unit and Lease 451) | | 39 | 11.7 |
| Sword | | 29 | 7.3 |
| Gato Canyon | | 77 | 46 |
| Cavern Point | | 22 | 20 |
| **Total** | | **512** | **185** |

Source: EID Table 5.2-4. pp 5.2-10 and 5.2-11
* Lion Rock, Pt. Sal, Purisima Pt., and Santa Maria Units

The United States consumes approximately 20 million barrels of oil per day, or approximately 7,300 million barrels annually.[8] California consumes approximately 615 million barrels of petroleum annually, and 2,000 billion cubic feet of natural gas annually.[9] The total projected reserves of the 36 undeveloped oil leases would therefore supply California with petroleum for approximately ten months, and with natural gas for approximately one month. Total reserves represent approximately 25 days of national consumption.

## 2.3 Project Description

Venoco, Inc., has submitted a request to the MMS for a 13-month suspension[10] of undeveloped OCS oil and gas leases (OCS-P 0210, and OCS-P 0527) that comprise the Cavern Point Unit. The Cavern Point Unit is located offshore Ventura County, approximately 6 miles north of the east side of Santa Cruz Island and the west side of Anacapa Island. See Exhibit 1.

---

[8] US Energy information Administration. (see eia.doe.gov) http://www.eia.doe.gov/mer/pdf/pages/sec11_7.pdf Accessed July 8, 2005.

[9] US Energy information Administration. (see eia.doe.gov) http://www.eia.doe.gov/emeu/sep/ca/frame.html Accessed July 8, 2005.

[10] A suspension is defined in 30 CFR § 250.105 as: "a granted or directed deferral of the requirement to produce (Suspension of Production) or to conduct leaseholding operations (Suspension of Operations)." A lease suspension is effectively an extension of the life of the lease. See Section 2.3 of this report, below.

The proposed activity analyzed in this report is the granting by the MMS of a 13-month suspension of production ("SOP") request filed by Venoco, Inc., operator of the Cavern Point Canyon Unit (Lease OCS-P 0210 and OCS-P 0527) under 43 U.S.C. 1334(a)(1) of the Outer Continental Shelf Lands Act ("OCSLA"). Venoco has requested of MMS a lease suspension to conduct certain in-office activities (e.g., prepare either revisions to a previously-approved Exploration Plan or a new Exploration Plan). Any subsequent development of these leases would occur from existing Platform Gail and would not, acording to MMS, entail new infrastructure. No "on-the-water" activities are proposed for this unit during the suspension period.

After the suspension ends, Venoco intends to drill exploratory wells (Venoco had previously proposed two exploratory wells) from existing Platform Gail. Venoco would use the results of the exploratory drilling to prepare a Development and Production Plan for MMS's review and approval. For these phases, MMS also states that any produced water would be injected or disposed overboard at Platform Gail, and that any oil and gas produced could be processed using existing capacity.

MMS states (CD, p. 7):

> *At this stage, MMS is not aware of the specific plans the operator may be making in its EP. Further, based upon the results of the implementation of those plans, the lessees may or may not actually proceed to development and production. Even if they do progress to development and production, the MMS has no specific knowledge as to how the lessees would choose to develop the unit until the submission of a DPP or revisions to a DPP.*

MMS' assertion that it has "no specific knowledge as to how the lessees would choose to develop the unit" appears internally inconsistent with: (1) MMS' receipt in 2000 of an EP for the unit from Venoco, which proposed a specific exploratory scenario and estimated future production[11]; and (2) with MMS' own estimates of hypothetical development in its consistency determination and EID, which hypothesize: (a) a development scenario for the Cavern Point Canyon Unit of 10 production wells (and one service well) drilled from Platform Gail, and (b) an assumption that any oil and gas produced would be transported through existing pipelines from Platform Gail to Platform Grace, and then to the onshore processing facility in Carpinteria. Although it does not provide the basis for the hypothetical estimates contained in the EID, MMS estimates in the EID's hypothetical future scenario that the Cavern Point Unit reserves may contain 22 million barrels of oil ("MMbbl") and 20 billion cubic feet ("Bcf") of gas. MMS further estimates in the EID that the peak production would be 9,600 bbl. oil/day, 8,640 MCF (million cu. ft./day), with the peak occurring in year 3 of production, and that the platform will operate for another approximately 14-18 years (i.e., an estimated removal date of 2020-2025). The Commission does not have an understanding of what information these estimates are based on, and, even if they are accurate, MMS has not provided an analysis of whether they would extend the life of the existing infrastructure.

[11] Venoco's Draft EP (later withdrawn) discussed a production scenario possibly using wells drilled from both Platforms Gail and Grace, a scenario which is likely one that is now obsolete.

## 2.4 Cavern Point Unit Background

### 2.4.1 Lease Sales P4 and 80

The leases in the Cavern Point Unit (OCS-P 0210 and 0527) were issued in Lease Sales P-4 (in 1968) and Lease Sale 80 (in 1984), respectively. No stipulations were attached to Lease Sale P-4. The Lease Sale 80 leases include lease-term "stipulations," which are mitigation measures designed to protect potentially sensitive resources in an affected lease area and to reduce multiple –use conflicts. Among other things, the Lease Sale 80 stipulations require pipeline transport where feasible, protection of biological and cultural resources, fisheries and wildlife training, state of the art oil spill equipment, oil spill drills, onshore processing, commercial fisheries interaction, and drilling mud modeling when discharging within 1000 meters of a National Marine Sanctuary. In order to mitigate adverse environmental impacts for actions associated with a specific exploration, development and decommissioning project, MMS can impose additional mitigation requirements. MMS states that Venoco would comply with Lease Sale 80 Stipulations for both leases.

### 2.4.2 Platform Gail History

According to MMS, any subsequent development of the the Cavern Point Unit would occur from existing Platform Gail and would not entail new infrastructure. Platform Gail is located in the Santa Clara Unit, adjacent to and directly east of the Cavern Point Unit, on OCS-P 0205 (Exhibit 3). Both exploration and production activities on this lease were controversial and involved extensive Commission review and analysis.

In August 1980 the Commission objected to Chevron's proposal for exploratory drilling on OCS-P 0205 (CC-7-80). The primary basis for the objection was that the drill site was within the Channel Islands National Marine Sanctuary, within the buffer zone of the vessel traffic separation scheme (VTSS) in the Santa Barbara Channel, and in between the northbound and southbound VTSS lanes. Chevron had originally proposed to drill directly in the middle of the northbound lane; however, at the Commission's initial 1980 hearing Chevron's preferred position was relocated and pushed back as far as was practicable (from a geological perspective) from the lane, and re-sited to be between the lanes, and in the buffer zone.

Chevron revised and resubmitted its exploratory plan a year later (CC-9-81), in which the Commission concurred in January 1982. Chevron proposed a new location further away from Anacapa Island and outside the Sanctuary, but still within 500 meters of one of the VTSS lanes (and within the buffer zone).

After Chevron notified the Coast Guard of its desire to eventually site a production platform in the vicinity, working with the oil and shipping companies, the Coast Guard agreed to move the lanes southward in order to accommodate Chevron's development of the Sockeye Field. On February 1, 1985, the Coast Guard and the International Maritime Organization (IMO) approved the VTSS lane modification, at which point the lanes were repositioned one-half mile southward, thus removing Platform Gail from either the traffic lanes or the buffer zones. On January 30, 1986, Chevron submitted its consistency certification for the platform to the Commission.

On July 8, 1986, the Commission objected to Chevron's consistency certification for Platform Gail (and its associated pipelines to Platform Grace and to shore) (CC-2-86). Primary Commission concerns were the site's proximity to vessel traffic lanes and the National Marine Sanctuary and Anacapa Island, as well as geologic hazards. The project was 2,053 feet from the northern buffer zone of the northbound Vessel Traffic Separation Scheme (VTSS) lane, 6.5 miles from the Channel Islands National Park and a major nesting area for the endangered brown pelican (Anacapa Island), one half mile from the Channel Islands National Marine Sanctuary, and over a geologically unstable area. Despite the mitigation proposed by Chevron, the Commission found that a platform at this location would pose unacceptable risks to vessel traffic safety, with consequent risk of oil spills and damage to coastal resources of particular value and sensitivity. The Commission found the project inconsistent with Coastal Act policies regarding marine and coastal resources (Sections 30230 and 30231); water quality (Sections 30230, 30231 and 30250); commercial fishing (Sections 30230, 30231, 30234, 30250(a) and 30255); oil spills (Section 30232); vessel traffic safety (Section 30262(d)); scenic and recreational resources (Sections 30001(b), 30210, 30221 and 30251); and cumulative impacts (Section 30250) with respect to commercial fishing, air quality, and onshore facilities. In considering whether the project could be found consistent with the Coastal Act by virtue of Section 30260, the Commission determined that alternative locations should have been considered by Chevron, since these might have allowed the benefits of development with reduced risks and less severe impacts to the unique habitat and recreational values of the Channel Islands National Park and Marine Sanctuary. The Commission therefore found the project inconsistent with Section 30260(1). The Commission further determined that adverse impacts of the project were not mitigated to the maximum extent feasible as required by Section 30260(3), and that, the project was inconsistent with the public welfare provision set forth in Section 30260(2).

On July 15, 1986, Chevron resubmitted the project in modified form and with additional information and mitigation intended to address the Commission's concerns. The revised submittal, CC-36-86, included all of the mitigation measures of the previous submittal (CC-2-86), plus the following additional mitigation: the purchase of an additional 5 tons of oxides of nitrogen (NOx) offsets[12] so that all of the construction emissions of the project would be mitigated; installation and use of an Automatic Radar Plotting Aid (ARPA) on the platform to reduce vessel traffic safety hazard; a $150,000 contribution to the Friends of the Channel Islands National Park to provide for scenic and recreational amenities within the park (such as trails and interpretive facilities on Anacapa Island); and a $250,000 contribution[13] to a commercial fishing contingency fund specifically administered to mitigate potential impacts of the platform on the San Pedro purse seine fishing industry. Chevron also provided additional information on the feasibility of alternative locations, as well as the feasibility of installing mid-line valves in the oil pipeline, to reduce spill volume in the event of a pipeline rupture (the pipeline crossed an underwater landslide)(Exhibit 6). Despite these additional measures, on September 9, 1986, the Commission again objected to Chevron's consistency certification (CC-36-86).

---

[12] Note – this was in addition to 185 tons of NOx offsets Chevron had previously agreed to.

[13] Note – this was in addition to $600,000 Chevron had previously agreed to for mitigating fishing impacts: $250,000 for a "lost and damaged gear" contingency fund for local fishermen; $250,000 for an "insurance trust" fund for the local trawl fleet; and $100,000 to be used towards a study of the cumulative economic impacts of OCS development in the Santa Barbara Channel.

Chevron appealed the Commission's objection to the Secretary of Commerce on September 10, 1986, and filed suit against the Commission on November 3, 1986. On November 13, 1986, before findings could be adopted for the Commission's September 9, 1986, objection, Chevron, MMS, and the Commission entered into a settlement agreement allowing the project to proceed with some of the mitigation measures deleted. The measures deleted in the settlement agreement were: the installation of the ARPA; the $150,000 for park improvements intended to offset the platform's adverse impact on the scenic and recreational resources of the Channel Islands National Park and Marine Sanctuary; the contribution of $250,000 to the San Pedro purse seiner's contingency fund; and the purchase of the last 5 tons of emission offsets for construction emissions. All other mitigation measures proposed by Chevron agreed to in CC-36-86 were incorporated into the project. Chevron installed the 36-well slot platform in 1987.

#### 2.4.3 A Series of Suspensions

The Cavern Point Unit leases remained active, although undeveloped, through November 1999 by virtue of a series of lease suspensions issued for a variety of reasons (e.g., reinterpretation of seismic data, permitting activities). In November 1999, the MMS granted a suspension for the Cavern Point Unit. As described in Section 2.2.1 above, in June 2001, the district court in *California v. Norton* set aside MMS's November 1999 suspension decision and found that a lease suspension is an activity subject to the federal consistency review requirements of the federal Coastal Zone Management Act. MMS submitted this consistency determination in response to the court's decision in *California v. Norton*. In the meantime, until the Coastal Commission and the MMS act on Venoco's suspension request, the court directed MMS to direct (i.e., impose) a Suspension of Operations for the Cavern Point Unit. During the period described in this paragraph, Venoco also submitted an EP, which MMS deemed "submitted" on June 4, 2001. Venoco withdrew the EP from review on July 3, 2001.

### 2.5 Related Environmental Documents

#### 2.5.1 Environmental Assessments

Under the National Environmental Policy Act ("NEPA"), MMS prepared six Environmental Assessments ("EAs") discussing the potential impacts of activities that will occur during the suspensions.[14] The EAs include:

- MMS Proposal to Grant Suspensions of Production for Aera Energy LLC's Lion Rock Unit, Point Sal Unit, Purisima Point Unit, Santa Maria Unit, and Lease 409
- MMS Proposal to Grant Suspension of Production for Plains Exploration & Production Company's Bonito Unit
- MMS Proposal to Grant Suspension of Production for Arguello Inc.'s Rocky Point Unit
- MMS Proposal to Grant Suspension of Production for Samedan Oil Corporation's Sword Unit

---

[14] U. S. Department of the Interior, Minerals Management Service. *Environmental Assessments and Findings of No Significant Impact For Granting Suspensions of Production or Operations*. February 11, 2005. Available at http://www.mms.gov/omm/pacific/lease/2005-final-eas.htm

- MMS Proposal to Grant Suspension of Production for Samedan Oil Corporation's Gato Canyon Unit
- MMS Proposal to Grant Suspension of Operations for Venoco, Inc.'s Cavern Point Unit

The EAs, which were far more limited in scope than the subject consistency determinations, concluded that all potential impacts from activities occurring during the suspensions can be mitigated to an insignificant level. MMS issued findings of no significant impact based on each of the EAs on February 11, 2005. On March 9, 2005, ten conservation groups, led by the Natural Resources Defense Council and the Environmental Defense Center, filed a lawsuit in federal district court against MMS, challenging the adequacy of the EAs (*League for Coastal Protection, et al. v. Norton, et al.*, No. C 05-00991-CW (N.D. Cal.)).

### 2.5.2 Environmental Information Document

Acknowledging that the Appeals Court envisioned more extensive analysis of activities that could occur after the suspensions were granted, MMS submitted, along with the consistency determinations, an Environmental Information Document ("EID")[15]. The EID evaluates the potential post-suspension activities, presented as hypothetical scenarios in the period following the suspensions. The EID analyzes activities that could potentially take place during the 2006–2030 time period, including: 1) exploration and delineation drilling, 2) platform and pipeline construction, 3) production activities, and 4) decommissioning of facilities.

### 2.5.3 COOGER Study

*The California Offshore Oil and Gas Energy Resources Study* ("COOGER Study")[16] was designed by a joint government, industry, and public working group to address concerns about the potential demands on onshore infrastructure from expanded oil and gas development in both State and federal waters. The study assessed and compared a suite of potential Pacific OCS development scenarios for Santa Barbara, Ventura, and San Luis Obispo Counties over a 20-year timeframe (1995 though 2015). The Final COOGER Study, published in January 2000, focused its constraints analysis for the potential development scenarios on industrial and public infrastructure demand within the study area.

---

[15] Minerals Management Service, Pacific OCS Region. *Environmental Information Document for Post-Suspension Activities on the Nine Federal Undeveloped Units and Lease OCS-P 409 Offshore Santa Barbara, Ventura, and San Luis Obispo Counties.* Prepared by Aspen Environmental Group. January 2005.

[16] Minerals Management Service. *Final California Offshore Oil and Gas Energy Resources Study: Development Scenarios and Onshore Physical Infrastructure in the Tri-County Area of San Luis Obispo, Santa Barbara and Ventura.* Prepared by Dames & Moore. OCS Report MMS 99-0043. January 26, 2000.

## 3 Coastal Act Issues

### 3.1 Marine Resources/Water Quality

Coastal Act § 30230 provides:

> *Marine resources shall be maintained, enhanced, and where feasible, restored. Special protection shall be given to areas and species of special biological or economic significance. Uses of the marine environment shall be carried out in a manner that will sustain the biological productivity of coastal waters and that will maintain healthy populations of all species of marine organisms adequate for long-term commercial, recreational, scientific, and educational purposes.*

Coastal Act § 30231 provides:

> *The biological productivity and the quality of coastal waters, streams, wetlands, estuaries, and lakes appropriate to maintain optimum populations of marine organisms and for the protection of human health shall be maintained and, where feasible, restored through, among other means, minimizing adverse effects of waste water discharges and entrainment, controlling runoff, preventing depletion of ground water supplies and substantial interference with surface water flow, encouraging waste water reclamation, maintaining natural vegetation buffer areas that protect riparian habitats, and minimizing alteration of natural streams.*

**Background**

Exhibit 4 contains a description of the regional marine resources common to all the OCS lease suspensions. More specifically for the subject suspension, the extensive marine resources in the eastern Santa Barbara Channel are well documented. In its previous review of Platform Gail (CC-36-06), the Commission noted the proximity of the site to the gray whale migration path, the only brown pelican nesting site in the United States (brown pelicans are highly susceptible to adverse effects from oil spills), the close proximity of the platform to the Channel Islands National Marine Sanctuary, which is host to a large number of important and sensitive marine resources, including extensive intertidal habitats, ecologically important kelp ecosystems, wetlands, rocky bottom reef substrate habitats, Essential Fish Habitat for hundreds of fish, and seabird species (including Critical Habitat for at least 10 of these species), at least 33 species of cetaceans (including blue, fin, right, sperm, sei, gray and humpback whales), six pinniped species, and five species (all federally listed as endangered) of sea turtles. In addition, as the Commission previously noted, extensive sensitive mainland nearshore and wetland habitats, which could be damaged by any oil spills reaching the mainland, include the Carpinteria Slough, Santa Clara River estuary, and Mugu Lagoon wetland habitats, grunion spawning on many area beaches, least tern nesting at the Santa Clara River mouth, Point Mugu, and Ormond Beach, and pismo clam habitat.

Since the time of the Commission's review of the platform, the national and even international recognition of the value of the marine resources in the area has continued to grow in significance. In 2002 the Department of Fish and Game designated a series of Marine Protected Areas within state waters of the Sanctuary (Exhibit 5), and efforts are underway to expand these MPAs into federal waters. Two of these MPAs are close to Platform Gail – the Scorpion Point MPA north of Santa Rosa Island, and the Anacapa Island MPA north of Anacapa Island. In addition, several endangered and threatened species have been listed since 1986, including white abalone (2001), tidewater goby (1994), southern steelhead (1997), Santa Ana sucker (2000), Stellar sea lion (1990), Guadalupe fur seal (1985), western snowy plover (1993), and California red-legged frog (1996)). These new listings must be given serious weight, as these species are on the brink of extinction and would be severely impacted by an oil spill from development of these leases.

**<u>MMS' Marine Resources Analysis</u>**

MMS states in its consistency determination:

> *During the suspension phase, Venoco will conduct certain in-office activities that will result in the submission of a new Exploration Plan (EP). No "on the water" activities are proposed to take place during the suspension.*
>
> *In the hypothetical post-suspension phase, routine activities associated with the development of the Cavern Point Unit may result in temporary, localized disturbances to marine resources, including fish resources, marine mammals, and marine and coastal birds (see EID Section 5.7). Once production begins, support vessel traffic is anticipated to remain at levels typical for ongoing offshore oil and gas activities in the Santa Barbara Channel. Hypothetical post-suspension phase activities would not involve the construction or operation of any new onshore facilities, and therefore would not affect onshore biological resources.*
>
> *Post-suspension phase activities that may affect seafloor resources include discharges during drilling. Effects on seafloor resources in the Cavern Point Unit are anticipated to be insignificant because no new offshore construction would occur and because drilling would take place from Platform Gail.*
>
> *During drilling and production, platform discharges would be regulated under the new Pacific OCS National Pollutant Discharge Elimination System (NPDES) permit and would be required to meet NPDES water quality criteria (see EID Section 5.7.7). Platform Gail is operating under a General NPDES permit and no change in operation is anticipated with development of the Cavern Point Unit. Effects would be anticipated to be low. No measurable effects on threatened and endangered marine mammals or sea turtles in the area would be anticipated.*
>
> *A potential oil spill during development and production may contribute to a negligible to high level effect on water quality. However, the hypothetical post-suspension activities at the Cavern Point Unit would not substantially increase the existing risk of an oil spill*

> *from Platform Gail and associated pipelines. Other than a potential oil spill, the hypothetical post-suspension activities are not anticipated to create any substantial effects resulting from the spillage of oil, gas, or other hazardous substances.*
>
> *The potential for an oil spill occurring from development of the Cavern Point Unit represents a small but measurable incremental increase to the cumulative oil spill risk for threatened and endangered plants, marine mammals, and amphibians. In the event that an oil spill occurs, it would be anticipated to result in low to moderate effects on sea otters; fish resources; and marine, coastal, and threatened and endangered birds during the hypothetical post-suspension period. Effects on the sea turtle are assumed to be negligible.*
>
> *The effects of hypothetical post-suspension activities (i.e., routine operations for exploration, development and production) on marine resources such as kelp beds, wetlands, the sea floor, fish resources, marine mammals, and marine and coastal birds, would result in low level effects. A potential oil spill may result in moderate level effects to threatened and endangered marine mammals, coastal and marine birds; with low to high level effects on rocky and sandy beaches, estuarine and wetland habitats; and moderate to high level effects on threatened and endangered plants in the affected area. Effects on sea turtles and threatened and endangered fish and marine invertebrates resulting from hypothetical post-suspension activities were determined to be negligible.*
>
> *As stated above, Venoco must submit a new plan for exploration and new or revised plans for development for approval to the MMS and, when appropriate, must certify that activities described in their plans are consistent with the enforceable policies of the California Coastal Management Program (CCMP) under section 307(c)(3) of the CZMA. If appropriate under Federal regulations, the State will review the plans and the consistency certifications and either concur or object. No activities will be permitted by MMS without State concurrence or a decision by the Secretary of Commerce to override the State's objections. Therefore, no foreseeable impacts can occur as a result of the proposed action except for those caused by activities that are fully consistent with the enforceable policies of the CCMP. However, given the scenarios and attendant activities hypothesized in the EID, it is anticipated that any conflicts with the enforceable policies can be avoided.*

MMS concludes:

> *Based upon the above, granting an SOO to Venoco for the Cavern Point Unit will be consistent to the maximum extent practicable with sections 30230 and 30231.*

**Commission Response**

MMS' conclusions are predicated on the assumptions that "… any conflicts with the enforceable policies can be avoided" and that existing infrastructure would be used to develop the unit. In order to evaluate these assumptions, the Coastal Commission staff's April 22, 2005, letter to MMS requested additional information concerning the design life of existing facilities and their

structural integrity. MMS responded to the Commission staff's information request with statements that it regularly tests the platforms and pipelines to ensure that they are safe and being properly maintained, that future case-by-case reviews can address any concerns over their integrity, and that:

> *Platforms Gail and Grace and the associated pipelines are structurally sound according to our records and the results of the inspections. We believe that if they are properly maintained, they have many more years of remaining life.*

This response ignores the fundamental question of the continuing impact of use of the existing infrastructure on the marine environment, including additional operation (drilling, crew and supply boat, and helicopter) noise, and extended and increased oil spill risks. Based on the discussions in the following two sections of this report (marine discharges and oil spills), the Commission finds that the proposed activity and its reasonably foreseeable effects would be inconsistent with the marine resources, water quality, and oil spill policies (Sections 30230, 30231, and 30323) of the Coastal Act.

Because Platform Gail and associated pipelines are "coastal-dependent industrial facilities," the proposed project is presumptively subject to analysis under section 30260 of the Coastal Act. See Section 3.9: Coastal Dependent Industrial Facility "Override" Provision of this staff report, below. As will be discussed in that analysis, the Commission needs additional information to enable it to determine the project's impacts in several issue areas (including oil spill risks, and, therefore, marine resources and water quality) in order to adequately analyze it under Section 30260 of the Coastal Act.

### 3.1.1 Oil Spills

#### *Introduction*

*Summary*

Since the first federal lease sale offshore Santa Barbara in 1966, the potential for oil spills from offshore oil and gas development has been a major environmental concern. Oil spills resulting from such events as well blowouts, pipeline ruptures, operational errors, or vessel-platform collisions can lead to significant adverse effects on the marine and coastal resources of the Santa Barbara Channel, Santa Maria Basin, and southern California region. These resources include endangered or threatened species of seabirds and shorebirds (e.g., California brown pelicans, western snowy plovers), marine mammals (e.g., sea otters, stellar sea lions, humpback whales), and fishes and invertebrates (e.g., steelhead trout, tidewater goby, white abalone).

Since the time of the Commission's review of the existing platforms and support facilities, the national and even international significance of the value of the coastal and marine resources in the region — including the environmentally sensitive habitats of sandy beaches, rocky intertidal areas, and estuaries — has continued to grow. In addition to the Channel Islands National Park and Marine Sanctuary, the Santa Barbara Oil and Gas Sanctuary, the Santa Barbara Channel Federal Ecological Preserve and the Monterey Bay National Marine Sanctuary, the region now includes the San Luis Obispo State Seashore, Santa Barbara Coast Seashore, Marine Protected

Areas, Areas of Special Biological Significance, Marine Preserves, State Reserves, State Refuges, State Wildlife Areas, and numerous state parks and beaches.

MMS has submitted information to the Commission on oil spill risk in the consistency determinations and the EID. A document previously released by MMS, the Draft EIS for Delineation Drilling ("DEIS")[17] also contains pertinent information on the risk of oil spills from the granting of the lease suspensions. As discussed in more detail below, the EID and DEIS do not provide enough information for the Commission to analyze the potential impacts to marine and coastal resources in appropriate detail.

In a letter dated April 22, 2005, Commission staff requested additional information from MMS regarding oil spill risks. MMS's response reiterated the agency's position that the appropriate time for a detailed analysis is when operators have submitted specific Exploration Plans and Development and Production Plans, not at the lease suspension stage. MMS stated:

> *Drilling activities, if and when they occur, can only occur after the suspension period ends and must be detailed in EP's and DPP's that are approved by the MMS and certified consistent with the CCMP by the State. Pursuant to Federal regulations at 30 CFR 250.203 and 204, and reviewable pursuant to §307(c)(3) of the CZMA, EP's and DPP's will provide details regarding oil spill risk, volumes, oil quality, etc. No EP or DPP will be approved by MMS without State concurrence with an operator-provided consistency certification or a determination by the Secretary of Commerce to override the State's objections.*

As discussed in Section 2.2.2: Scope of Coastal Commission Review, above, the Commission disagrees with MMS's position that the more appropriate time to review details of oil spill risks, environmental consequences, and prevention and response capabilities for each of the hypothetical development scenarios is at the Development and Production Plan and Exploration Plan stage. Granting the lease suspensions could significantly increase the risk of oil spills, and consequent environmental impacts. The Commission must conduct a detailed oil spill risk analysis at the lease suspension stage in order to determine whether it is appropriate to facilitate through approval of the proposed suspensions future development of the undeveloped lease areas.

The Commission requested detailed information specifically regarding: 1) worst-case discharge volumes, 2) oil spill probabilities, and 3) oil spill trajectories. As discussed in relevant sections below, MMS has failed to provide this information to the Commission, and as a result the Commission finds it does not have sufficient information to analyze in appropriate detail potential impacts to coastal resources from a reasonably foreseeable oil spill. The Commission's lack of information in this regard is relevant to its analyses of the consistency of the granting of the lease suspensions with Coastal Act policies related to: marine resources and water quality

---

[17] See Section 2.5: Related Environmental Documents, above. Minerals Management Service, Pacific OCS Region. *Delineation Drilling Activities in Federal Waters Offshore Santa Barbara County, California.* Draft Environmental Impact Statement. Published by the US Department of the Interior, MMS, Pacific OCS Region. Document 2001-046. June 2001.

(§§30230 and 30231), environmentally sensitive habitat areas (§30240), commercial fishing (§30234.5), access and recreation (§§ 30210, 30211, 30212, and 30220), and cultural resources (§30244).

Section 30232 of the Coastal Act requires the applicant to provide "protection against the spillage of crude oil, gas, petroleum products, or hazardous substances…" and to provide "effective containment and cleanup facilities and procedures" for accidental spills that do occur. As discussed in more detail below, the Commission finds that current prevention regulations and programs provide measures for maximum feasible protection against the spillage of crude oil and other petroleum hydrocarbons, and therefore granting the lease suspensions is consistent with the prevention standard of Section 30232. The Commission also finds that current state-of-the-art response measures cannot effectively protect California's shoreline and coastal resources from significant oil spill impacts, and therefore granting the lease suspensions is inconsistent with the response standard of Section 30232.

The following discussion is organized into the following topics: 1) background information, 2) oil spill risk analysis, and 3) prevention and response.

*Relevant Coastal Act Sections*

Section 30232 of the Coastal Act requires protection of coastal and marine resources from oil spills, and requires effective spill containment and clean-up, as follows:

> *Protection against the spillage of crude oil, gas, petroleum products, or hazardous substances shall be provided in relation to any development or transportation of such materials. Effective containment and cleanup facilities and procedures shall be provided for accidental spills that do occur.*

Potential impacts from an oil spill are relevant to the Commission's analyses under Coastal Act policies related to: marine resources and water quality (§§30230 and 30231), environmentally sensitive habitat areas (§30240), commercial fishing (§30234.5), access and recreation (§§ 30210, 30211, 30212, and 30220), and cultural resources (§30244).

The public access and recreation policies of the CCMP include:

§ 30210:

> *In carrying out the requirement of Section4 of Article X of the California Constitution, maximum access, which shall be conspicuously posted, and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse.*

§ 30211:

> *Development shall not interfere with the public's right of access to the sea where acquired through use or legislative authorization, including, but not limited to, the use of dry sand and rocky coastal beaches to the first line of terrestrial vegetation.*

§ 30212(a):

> *Public access from the nearest public roadway to the shoreline and along the coast shall be provided in new development projects except where: (1) It is inconsistent with public safety, military security needs, or the protection of fragile coastal resources, (2) Adequate access exists nearby, or, (3) Agriculture would be adversely affected. Dedicated accessway shall not be required to be opened to public use until a public agency or private association agrees to accept responsibility for maintenance and liability of the accessway.*

§ 30220:

> *Coastal areas suited for water-oriented recreational activities that cannot readily be provided at inland water areas shall be protected for such uses.*

The environmentally sensitive habitat areas policy of the CCMP (Coastal Act Section 30240) states:

> *(a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas.*
>
> *(b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas.*

The cultural resources policy of the CCMP (Coastal Act Section 30244) states:

> *Where development would adversely impact archaeological or paleontological resources as identified by the State Historic Preservation Officer, reasonable mitigation measures shall be required.*

Coastal Act/CCMP policies related to marine resources, water quality, and commercial fishing are cited in the relevant sections of this staff report.

***Regional Oil Spill History***

Oil spills may occur from such events as well blowouts, pipeline breaks, operational errors, or vessel-platform collisions. The largest spill in the Pacific OCS region occurred in 1969, when a well blowout on Platform A in federal waters offshore Santa Barbara spilled an estimated 80,000 barrels of crude oil into the Santa Barbara Channel. Since 1969, the have been no further spills of this magnitude. Between 1970 and 1999, a total of 843 spills occurred that ranged from 1 barrel to 163 barrels. Most of these were less than 1 barrel. The largest was a 163-barrel spill from the

Platform Irene pipeline in State waters in September 1997.[18] This spill had significant adverse impacts on the marine and coastal resources of Santa Barbara County, and the operator was required to pay $3.25 million in damages and penalties to county, State, and federal agencies.[19]

The spill was caused by a failed flange on the subsea wet oil pipeline, exacerbated by the operator's decision to manually restart pipeline flow following an automatic shutdown caused by a pressure drop. Despite favorable weather conditions and rapid response and recovery efforts, which included use of state-of-the-art response equipment, the Platform Irene pipeline oil spill resulted in the oiling of approximately 17 miles of the Santa Barbara coastline. The oil came ashore on sandy beaches and on rocky intertidal areas. Some stretches of the beaches had oil coverage exceeding 50 percent, and the estuaries of San Antonio Creek, Honda Creek, and the Santa Ynez River were also affected. Clean-up actions, which required heavy equipment, many personnel, and removal of marine plants and other biota at the wrack line, resulted in physical disturbances to habitat.[20]

The spill most heavily affected the sandy beach nearest the origin of the spill, with light sheen, tarballs and tar patties found at several other beaches. A 2004 report[21] indicates that Pismo clams and spiny sand crabs, "likely suffered significant mortality from the spill." This report also states that rocky intertidal species including black abalone and mussels were "injured" by the spill, and reported observations of black abalone and mussel beds coated with oil along or near the shores of Vandenberg Air Force Base. An estimated 635 to 815 seabirds were oiled as a result of the spill. Animal species in the rocky intertidal zone were injured, as were beach-dwelling invertebrates. Shorebird numbers also decreased, including the endangered western snowy plover. The physical oiling of the beaches and subsequent clean-up activities affected beach-related recreational activities including walking, jogging, swimming, surfing, tidal pool viewing, fishing, and picnicking.

A loss of well control or "blowout" incident occurred on Platform Gail in November 2004, which did not result in a serious oil spill but necessitated platform shutdown and evacuation.[22] The cause was operator error: a contract employee had removed a lockdown pin, circumventing the blow-out preventer system, so that it failed to function as intended when an unbalanced condition developed in the well. The result was an uncontrolled flow of oil, gas, and seawater from the well.

---

[18] EID, pp. 5.3 -11 to 5.3 -12

[19] Consent Decree. *United States and People of the State of California v Torch Energy Services.* 2002. (Settlement for Natural Resources Damage Assessment.)

[20] *Torch/Platform Irene Oil Spill, Scoping Document for Restoration Planning*, Prepared by Platform Irene Trustee Council, US Fish and Wildlife Service, Cal. Department of Fish and Game, US Air Force: Vandenberg Air Force Base, Cal. State Lands Commission, with assistance from Santa Barbara County Planning Development Department, Energy Division, October 20, 2004.

[21] *Ibid.* pp. 3-7

[22] http://www.mms.gov/omm/pacific/lease/Gail_Incident_Final_Draft_Report.pdf, accessed July 7, 2005.