Even small spills can cause significant impacts to sensitive resources. On June 15, 2005, twelve to fifteen barrels of light crude oil washed ashore onto Breton Island, Louisiana, from an offshore platform during a storm. The incident occurred during nesting season for thousands of birds at the Breton National Wildlife Refuge. Hundreds of endangered brown pelicans were killed. Approximately 1,000 oiled pelicans were recovered, including 268 live chicks.[23] Although this incident did not occur in California, it demonstrates that a very small spill from an OCS pipeline could have devastating effects on the coastal resources of the region, depending on the season and location of the pipeline.

***Coastal Resources at Risk from an Oil Spill***

The coastal resources at risk from a marine oil spill from OCS oil and gas development include marine biota, water quality, environmentally sensitive habitat areas (e.g., rocky intertidal areas, sandy beaches, wetlands, and estuaries), commercial fishing, access and recreation, and cultural resources. The sections that follow provide a summary of potential impacts from an oil spill to each of these resources.

***Marine Biota***[24]

A complete description of marine resources found in the area is included in this staff report as Exhibit 4. Subsections below focus on the potential effects of an oil spill on marine biota.

*Sea Otters*

The southern sea otter is extremely sensitive to oil spills. Lacking a layer of fat, these animals are dependent on maintaining an intact layer of air next to their skin. Oil on just a portion of the fur can cause hypothermia and death. Oil can also be ingested by otters when they attempt to groom their oiled fur, or when they consume filter-feeding prey that has also consumed oil.

The US Fish and Wildlife Service ("USFWS") and the Southern Sea Otter Recovery Team have specifically identified: "Managing petroleum exploration, extraction, and tankering to reduce the likelihood of a spill along the California coast to insignificant levels," as critical to southern sea otter population recovery.[25] The USFWS does not believe it is possible to avoid a catastrophic loss to the sea otter population in the event of a major spill in or near the sea otter's current range. The Southern Sea Otter Recovery Plan[26] concludes that, 1) an oil spill is likely to occur over the next 30 years (the period during which the 36 leases would be developed), 2) the probability of death in sea otters as a result of contact with oil following an oil spill is likely to be no less than 50 percent, and 3) rehabilitation of oiled sea otters following a major spill is

---

[23] International Bird Rescue Research Center, http://www.ibrrc.org/louisiana-05.html, accessed July 7, 2005.

[24] EID, Biological Resources, Chapter 4.7 pp. 4.7-1 to 69 and Chapter 5.7, pp. 5.7-1 to 104

[25] U.S. Fish and Wildlife Service. 2003. Final Revised Recovery Plan for the Southern Sea Otter (*Enhydra lutris nereis*). Portland, Oregon. xi + 165 pp.

[26] *Ibid.*

expensive, may be detrimental to some individuals and is of questionable benefit to the population.

*Other Marine Mammals*

Oil may affect marine mammals through various pathways: surface contact, inhalation, ingestion, and baleen fouling. Since whales and most adult pinnipeds rely on layers of body fat and vascular control rather than a coat of fur to retain body heat, they are generally resistant to the thermal stresses associated with oil contact. However, exposure to oil can cause damage to skin, mucous, and eye tissues. The membranes of the eyes, mouth, and respiratory tract can be irritated and damaged by light oil and the resulting vapors. If oil compounds are absorbed into the circulatory system, they attack the liver, nervous system, and blood-forming tissues. Oil can collect in baleen plates, temporarily obstructing the flow of water between the plates and thereby reducing feeding efficiency. Reduction of food sources from acute or chronic hydrocarbon pollution can be an indirect effect of oil and gas activities.

Since oil can destroy the insulating qualities of hair or fur, resulting in hypothermia, marine mammals that depend on hair or fur for insulation are most likely to suffer mortality from exposure. Most vulnerable to the direct effects of oiling among the pinnipeds are fur seals and newborn pups, which lack a thick insulating layer of fat. More than 300 harbor seals are estimated to have died in Prince William Sound as a result of the *Exxon Valdez* oil spill, and pup production and survival were also affected. The majority of the dead harbor seals recovered were pups. Seasonally, the most vulnerable marine mammal resources along the California coast between Point Conception and Ragged Point would be harbor seal haul-out areas and pupping beaches, during early spring.

*Marine Birds*

Direct contact of birds with oil can cause matting of plumage, resulting in reduced flying or swimming ability; loss of buoyancy, which can lead to exhaustion and death from drowning; loss of insulation, which can lead to death from hypothermia; and increased physiological stresses and reproductive failure due to ingestion of oil. The 1997 163 bbl. Torch pipeline spill killed or injured between 635-815 birds. Oil-related mortality is highly dependent on the life histories of the bird species involved. Birds that spend much of their time feeding or resting on the surface of the water are more vulnerable to oil spills. Cleanup efforts to remove spilled oil may also cause impacts to coastal birds. The presence of human beings during clean-up activities, and attempts to capture oiled wildlife for rehabilitation, may have the effect of flushing birds into oiled water.

If oil spill contact with the shore occurs, California least terns, western snowy plovers, and light-footed clapper rails could also be affected. Brown pelicans occur throughout the project area and are especially widespread during the late summer and fall; therefore, at least a few pelicans would probably be oiled regardless of the location of a spill. The greatest threat to pelicans would be from a spill from one of the platforms (Grace, Gilda, Gail, or Gina) or associated pipelines at the eastern end of the Santa Barbara Channel. An oil spill from these platforms could contact Anacapa Island, which is the location of the largest pelican colony along the Pacific coast. A spill in close proximity to, or contacting, Anacapa Island during the breeding season

could result in the loss of adult birds and disrupt nesting activities; cleanup efforts could exacerbate the impact of a spill on nesting pelicans, which are especially sensitive to disturbance.

*Sea Turtles*

Oil spills can adversely affect sea turtles by toxic external contact, toxic ingestion or blockage of the digestive tract, disruption of salt glad function, asphyxiation, and displacement of preferred habitats. Sea turtles are known to ingest oil; this may occur during feeding (tar balls may be confused with food) or while attempting to clean oil from flippers. Oil ingestion frequently results in blockage of the respiratory system or digestive tract. Some fractions of ingested oil may also be retained in the animal's tissues, as was detected in turtles collected after the Ixtoc spill in the Gulf of Mexico. Breathing toxic fumes from floating oil can also cause harm to sea turtles.

*Red-legged frog*

Oil may affect amphibians through various pathways including direct contact, ingestion of contaminated prey, and lingering sublethal impacts from oil sequestered in sediments that may linger for years. Adult red-legged frogs move down to the brackish coastal lagoons formed seasonally behind sand berms that close the mouths of rivers and streams along the south central coast. Though no direct oil contact with frogs is expected, some red-legged frogs could return to lagoons in which oil has become sequestered in sediments, before contaminated sediments are flushed into the ocean. In addition, habitat destruction could result from clean-up efforts.

*Fish*

Fish can be affected directly by oil, either by ingestion of oil or oiled prey. They can also be affected by uptake of dissolved petroleum compounds through the gills, by effects on fish eggs and larval survival, and by changes in the ecosystem that supports fish. Many effects can be sub-lethal, transient, or slightly debilitating, however any stress requires energy for recovery, which can ultimately lead to increased vulnerability to disease or to decreased growth or reproductive success.

The egg, early embryonic, and larval-to-juvenile stages of fish seem to be the most sensitive to oil. The *Exxon Valdez* oil spill occurred within weeks of Pacific herring spawning along the shores of Prince William Sound, resulting in increased egg mortality and larval deformations, and site-specific occurrences of instantaneous mortality. Studies estimate that over 40 percent of the 1989 year-class was affected by *Exxon* Valdez at toxic levels. Also, fry from pink salmon emerged from their gravel spawning redds and entered the nearshore environment during the spill. Salmon and trout exposed to oil from the *Exxon Valdez* spill all showed reduced growth rates the season following the oil spill. Studies estimate that 1.9 million adult pink salmon failed to return to Prince William Sound in 1990, primarily because of a lack of growth in the critical nearshore life stage. Returns in 1991 and 1992 were most likely reduced by a total of 11 percent.

*Abalone*

A spill that resulted in substantial coating of subtidal rocky habitats or significant loss of attached algae within an area that supports white abalone poses the greatest risk. White abalone in water depths of less than 33 feet could also be affected by oil treated with chemical

dispersants, as the oil disperses through the water column. Recovery of the black abalone could exceed seven to ten years if a significant portion of the local population was directly contacted and heavily oiled by a spill.

*Plants*

Plant mortality from oil spills can be caused by smothering and toxic reactions to hydrocarbon exposure. Generally, oiled marsh vegetation dies above the soil interface, but roots and rhizomes survive when oiling is not too severe. The cleanup process could exacerbate the effects of an oil spill on threatened and endangered plants.

***Environmentally Sensitive Habitat Areas***

*Rocky Intertidal and Sandy Beach Habitat*

Primary oil spill impacts to rocky intertidal and sandy beach areas include smothering, uptake in tissues, and contamination of animals using rocky habitat and beaches, such as invertebrates, seabirds, and marine mammals. Oil tends to strand high in the intertidal in the barnacle zone. Tarballs in this zone are persistent, lasting several seasons. Oil can also persist in individual tidepools.

*Estuaries and Wetlands*

If oil from and offshore spill enters a wetland or estuary, impacts to the resource could include irreversible alteration of the habitat, mortality of endangered birds, plants and fish, and loss of plants and animals that may be unable to populate from adjacent areas. In addition to the potential for offshore spills, several hundreds of miles of pipelines onshore carry oil products that, if spilled, could affect estuarine and wetland habitat. A spill originating from an onshore pipeline (supporting offshore OCS oil production), especially from a pipeline break crossing a river or streambed, could send oil directly into a wetland. The cleanup process, which is another source of impacts, would consist of removal and replacement of contaminated soil and revegetation with native species. Although limited in extent, recovery could take several years, depending on the type of vegetation and wildlife affected by the spill.

***Commercial Fishing***[27]

Impacts to commercial fishing from an oil spill could include fouling of commercial fishing gear and vessels, closure of harbors, and preclusion of access to fishing areas. For example, as a result of the 1997 Torch oil spill, several fishermen filed claims for damages related to the spill and cleanup operations. Steve Dunn, representing the Santa Barbara Trappers, asserts that response, cleanup and repair vessels violated Vessel Traffic Corridor restrictions, resulting in lost or destroyed gear. Other fishermen similarly sought damages from loss of nets resulting from the spill and cleanup activities.[28]

---

[27] EID, p. 5.13-3

[28] County of Santa Barbara Planning and Development Memorandum re: Update on Torch Oil Spill for January 20, 1998 Hearing, from John Patton, Director, to Board of Supervisors, dated January 13, 1998.

### *Access and Recreation*[29]

The mainland coast in the project region includes a number of recreational beaches and parks that attract visitors throughout the year. Oil spills have the potential to affect access and recreation at the coast by causing beach and harbor closures. Cleanup of a smaller spill (200 barrels or less) can take up to two weeks, whereas a larger spill may take 30 days or more. The wider the area that is oiled, the more locations that could be affected, and as the area of effect increases, the more difficult it becomes to substitute near-by locations in order to enjoy recreational activities. Closing a beach or recreation area would have impacts on the people who enjoy overnight camping, swimming, surfing, walking, jogging, and tidepool-watching at these parks. In addition, the Channel Islands are restricted with regard to the maximum number of visitors at any given time, and the hauling capacity of park concessionaires is limited by boat occupancy restrictions. Anacapa and Santa Cruz Islands are the most vulnerable to losing visitor days due to an oil spill. Region-wide, deployment of containment booms could result in the closure of small craft harbors.

### *Cultural Resources*[30]

Oil-spill related impacts are not expected to affect offshore cultural resources because of the nature of clean-up operations. Onshore, oil spills could alter the chemical composition of archeological materials and render them useless for carbon-14 dating. Oil spill containment and cleanup activities could result in extensive impacts to site deposits from the excavation of containment barriers (e.g., dams, berms, and trenches), and the mechanized removal of oil-soaked earth.

### *Oil Spill Risk Analysis*

#### *Spill Volumes*

The EID states that the "most likely maximum size of a major oil spill" for all 36 undeveloped leases is 2,000 barrels,[31] and uses this quantity to characterize the worst-case spill scenario for all anticipated post-suspension hypothetical development scenarios. The Commission finds this characterization is overly simple, because expected worst-case spills may vary greatly from scenario to scenario due to large differences in anticipated production and other factors. (Volumes of oil transported by offshore pipelines range from a current 6,000 barrels per day from Platform Irene to a projected 92,000 barrels per day from hypothetical SMB "B" platform. See the staff report analyzing the consistency determinations for the Northern Santa Marina Basin leases for details.)

---

[29] EID, p. 5.10-3

[30] EID, p. 5.8-3

[31] "The most likely maximum size of a major oil spill from potential future development — the maximum most probable discharge — 2,000 bbl, is based on the volumes of oil in various pipelines and vessels (i.e., tanks and other containers on platforms) as described in the U.S. Coast Guard Area Contingency Plans for oil spill response (e.g., USCG, 1999) (see MMS, 2001). This is the maximum volume of oil calculated to be spilled from a break in the longest Point Arguello Unit pipeline, the Hermosa to shore pipeline (A. D. Little, 2001 as cited in MMS, 2001)." EID, p. 5.3-14.

The Commission requested that MMS characterize the worst-case spill scenario using the "worst-case discharge volume," rather than the most likely maximum spill size. MMS replied to the Commission's request as follows:[32]

> *The maximum spill volumes described in the EID and previously in the [DEIS] are conservative in that they were applied to the largest observed or possible spills that MMS has observed in the Pacific Region subsequent to the 1969 spill in the Santa Barbara Channel. Thus, the hypothetical 2000 barrel spill from the Arguello pipeline described in the EID is based on the size and length of that pipeline, which is anticipated to be the largest of any in the region. Analyses of project specific development and associated pipelines would indicate hypothetical spills of smaller volume...*

MMS states in the EID that: "the most likely maximum size of a major oil spill from potential future development — the maximum most probable discharge — [is] 2,000 barrels." According to MMS, this number is based on the volumes of oil in various pipelines and vessels (i.e. tanks and other containers on platforms), and is applicable to all post-suspension hypothetical development scenarios given the spill record for the Pacific Region since 1970.[33]

The Commission disagrees with MMS's position that 2,000 barrels represents the maximum reasonably foreseeable spill size. The term "maximum most probable discharge" is ill defined in the EID,[34] and appears to be an arbitrary volume without substantive basis. The "worst-case discharge volume" is a well-defined quantity that is systematically calculated in each operator's oil spill response plan, following procedures given in 30 CFR 254.47, for offshore facilities, and in 49 CFR 194.105 for onshore pipelines. The estimated worst-case discharge volume varies among existing OCS facilities and can greatly exceed 2,000 barrels. For example, the estimated worst-case discharge volumes for Platforms Gail and Grace are 3,971 and 1,283 barrels, respectively, assuming prompt leak detection and pipeline shutdown.[35] The current federal worst-case response planning volume for Santa Clara Unit is 3,971 bbl.[36] Worst-case spill volumes could potentially be larger, if the Cavern Point Unit is developed as anticipated in the EID and the produced oil is processed offshore and transported through the pipelines to shore from Platform Gail. The 2,000-barrel maximum spill volume is also an inadequate measure of possible worst case spills from onshore pipelines,[37] or vessel-platform collisions.

---

[32] June 23, 2005, MMS letter, page 47.

[33] EID, p.5.3 -14

[34] *Ibid*

[35] July 2004, Oil Spill Response Plan for Platforms Grace and Gail, Venoco Inc., pp. 3-3-2 and 3-3-4.

[36] *Ibid*

[37] For example, the worst case spill planning volume for the Platform Irene onshore pipeline (beginning at the beach) is 4,424 barrels. (California Office of Spill Prevention and Response Supplement for the Oil Spill Response Plan for the Point Pedernales 20-inch Wet Oil Pipeline, April, 2003, p. 4-2)

The worst-case discharge volume is the accepted standard for evaluating the maximum potential volume of oil spills. Information on the worst-case discharge volume is necessary for an assessment of the full range and extent of potential oil spill impacts to marine and coastal resources.

***Spill Probabilities***

The oil spill risk discussion in the EID focuses on the probability of "one or more spills," and offers no information on multiple spills.[38] This is an oversight that minimizes the apparent risk of spills. In its information request letter of April 22, 2005, the Commission requested that MMS provide an analysis of oil spill risk probabilities for multiple oil spills. MMS responded as follows:[39]

> *Because the EID tables indicate the probability of one* or more *(emphasis added), it does not minimize the risk of multiple spills. As indicated in the table in the comments provided to MMS (without verifying the accuracy of the calculations), the risk of two or more spills, etc. keeps decreasing as the number of spills increases. You are correct in that there is a relatively high probability of multiple spills from existing operations combined with the hypothetical development in the spill size range 50 – 999 barrels. Unfortunately, such statistics contribute very little to assessing hypothetical environmental impacts because the statistics do not give any insight into the risk of coincident spills either in time or space.*

This response does not address the Commission's request that MMS analyze the probability of multiple oil spills individually – that is, analyze the probability of two independent spills, three independent spills, four independent spills, etc., rather than merely analyzing the probability of "one or more spills." A preliminary analysis by the Commission staff, using MMS data and methodology,[40] shows that the estimated risk of multiple spills is significant, and that post-suspension development could substantially increase the probability of multiple spills over the life of the project. Anticipated post-suspension development of the 36 leases will increase the estimated probability of *one or more spills* in the 50-999 barrel size range only slightly (from 96.8 percent to 99.9 percent). However, the estimated probability of six independent spills would rise from a current 13.6 percent to 82.5 percent, and the probability of ten independent spills would rise from 0.3 percent to 30.6 percent. Similarly, for spills of 1,000 barrels or more, the estimated probability of one or more spills would rise from 46 percent to 76.8 percent, whereas the probability of two or more spills would rise from 12.8 percent to 42.9 percent.

---

[38] EID p. 5.3-13 to 5.3-14

[39] June 23, 2005 MMS letter, page 47 and 48.

[40] Spill probability is estimated from historic oil spill data, specifically, the number of spills that have occurred for each billion barrels of crude oil handled. Once the historic spill rate is determined, an estimate of the expected mean number of spills over the expected life of a proposed project can be obtained by multiplying the estimated volume of recoverable reserves (in billions of barrels) times the spill rate (in spills per billion barrels). The probability that *N* spills will occur for the estimated mean number of spills is given by the Poisson distribution. The same model produces estimates of the probability of one or more spills, or multiple spills.

The Commission staff provides this information to indicate the importance of a multiple-spill probability analysis. It is accurate to the degree that Commission staff uses available MMS data and methodology. MMS has data relating to recoverable reserves and other characteristics of the hypothetical post suspension development scenarios that will allow a full analysis of the probability of multiple oil spills from development of these leases. A multiple-spill probability analysis is information that should be provided by MMS in the consistency determination. Without this information, the Commission cannot assess the full range, extent, and likelihood of oil spill impacts that may be caused by granting the lease suspensions.

Additionally, the EID does not include information on the spill risk probabilities for individual units — for example, there is no risk probability information specific to the cumulative risk of the proposed Cavern Pt. Unit development plus the risk of the existing Santa Clara Unit In its letter of April 22, 2005, the Commission staff requested that MMS provide estimates of spill probabilities for each existing operation and hypothetical development scenario. MMS did not address this request in its response letter. As a result, the Commission is unable to analyze how granting the lease suspensions may individually increase the probability of an oil spill, or the contribution that granting the lease suspensions would make to a cumulatively increased oil spill risk probability.

***Spill Trajectories***

Three separate oil spill trajectories analyses are presented in the DEIS and EID: 1) MMS's Oil Spill Risk Assessment ("OSRA") model, 2) the National Oceanic and Atmospheric Administration's "General NOAA Oil Modeling Environment" ("GNOME") oil spill model, and 3) an analysis of Scripps Institution of Oceanography ("Scripps") free-floating drifter trajectories. The results of the analyses are summarized in the EID as a composite analysis, which covers the general geographic region of anticipated post-suspension development. Upon initial review of the EID, Commission staff determined that the analyses are overly general, and do not provide enough detailed information for the Commission to analyze the risk of oil spill impacts to specific coastal resources. Commission staff requested more specific trajectory information, which would include:

1. Detailed trajectory analyses for each existing development project and hypothetical post-suspension scenario, using scenario-specific, maximum reasonably foreseeable spill sizes (i.e., worst-case discharge volumes); and

2. A summary of the analyses that clearly communicates the risk exposure borne by different coastal areas due to potential spills from each hypothetical development scenario, including discussions of variability and uncertainty in the estimates.

MMS responded to the Commission's request as follows:[41]

> *MMS believes it is appropriate to present generalized spill risk at this stage in the possible hypothetical future development of these undeveloped leases. MMS includes*

[41] June 23, 2005 MMS letter, page 46-47.

> *overall risk from a spill from possible future development because a spill could potentially affect geographically diverse resources in the overall area no matter the origin of the spill given the complex and varying circulation in the region...*
>
> *Project specific modeling would not add substantial resolution to the modeling of spill trajectories performed in the DEIS (1999) because the launch points for those trajectories cover the geographic domain of the projects described in the EID. Appendix Figure 5.2-1 in the DEIS indicates the launch points used in modeling. These are very near or within the units for which projects are described.*

The Commission does not agree that the generalized information provided in these analyses is appropriate at this stage of development. As discussed in Section 2.2.2: Scope of Coastal Commission Review, above, unlike a lease sale, the location and anticipated character of the post-suspension development scenarios are fairly well defined, and the available information would support a more specific analysis. Nor does the Commission agree that scenario-specific spill trajectory analyses would not "add substantial resolution." Rather, the modeling studies are overly generalized by design, and overlook factors important for evaluating oil movement and shoreline contact locations. Some major inadequacies in the analyses are summarized below.

*Small scale current features*

Neither the OSRA nor GNOME modeling studies appear to account for relatively fine-scale current features or changes in current patterns.[42] The importance of small scale variations is stressed in a National Research Council report,[43] which states: "In the absence of most of the temporally and spatially varying part of the spectrum, the predicted trajectories may miss many aspects contributing to drift, especially at the shorter time scales. This problem plagues all modeling efforts to some extent, but is of particular concern for southern California where the variable flows are so strong."

A recent study demonstrates the importance of fine-scale current dynamics. The study, which involved intensive deployment of drifters offshore Santa Barbara's southern coast between Ellwood and Naples, indicates that cross-shelf currents intermittently dominate the pattern of circulation within a few kilometers of the shore. Cross-shelf currents could drive spilled oil directly toward shore in some areas.[44] These currents have major importance for understanding the risk of potential spills from Santa Ynez Unit and Gato Canyon Unit, particularly if the spill were from a pipeline rupture within State waters.

---

[42] Although the model physics seem to incorporate some fine scale processes (OCS Report MMS 2000-057, p. 3-4), there is no indication that the model was empirically verified at such scales in southern California waters. In any case, much of the fine scale information would be lost in the seasonal averaging.

[43] National Research Council. 1989. *The Adequacy of Environmental Information For Outer Continental Shelf Oil and Gas Decisions: Florida and California*. p. 23; (see also, Assessment of the U.S. Outer Continental Shelf Environmental Studies Program – I. Physical Oceanography, 1990, NRC.)

[44] Ohlmann, Carter, *Transport over the Inner-Shelf of the Santa Barbara Channel, Draft final report to MMS*, March 28, 2005.

*Temporal variability in current patterns*

Both the OSRA and GNOME modeling studies appear to oversimplify the current patterns. The OSRA studies are based on seasonally averaged, modeled ocean current fields, combined with averaged surface drifter data. As a result of the averaging, the range of variability of current patterns is greatly reduced. This is a serious error, because different current "regimes" occur during each season, and the dominant current pattern may change on time scales of days to weeks.[45]

Additionally, the GNOME studies are based on the three major characteristic flow regimes that have been identified in Scripps-MMS collaborative studies (i.e., upwelling, convergent, and relaxation regimes). These three flow patterns can clearly be identified about 60% of the time.[46] With this approach, only the conceptually idealized flow patterns are modeled. Trajectories associated with hybrid flow patterns, changing patterns, and less common patterns are not modeled. Neither the OSRA nor the GNOME study analyses storms or other conditions that could produce unusual trajectories.

*Pipeline spills*

Although subsea pipeline ruptures are the most likely type of oil spill from the anticipated post-suspension activities, GNOME and OSRA model only surface spills from platforms.[47] Because pipelines are closer to shore than platforms, a higher proportion of the spilled oil is likely to affect shoreline and near-shore resources. Also, subsea releases behave differently than surface spills, and require a very different modeling approach.[48] In addition, the modeling fails to consider onshore pipeline spills, which may enter marine waters and affect coastal resources.

*Other weaknesses of the analysis*

- **Effect of spill volume on modeled shoreline contact locations.** Because the maximum spill volume modeled was only 2,000 barrels, the GNOME model results don't provide complete information concerning the volume of oil that would contact the shore in the event of a maximum worst-case discharge.

- **Oil characteristics.** The OSRA modeling and drifter studies do not consider properties of the spilled oil, which varies considerably among reservoirs. Oil properties affect subsea plume

[45] DEIS, Table 5.1.3.2-2, p. 5-24.

[46] DEIS, p. 4-48.

[47] See DEIS, p. 5-20. OSRA modeling of spills from several currently existing pipelines is included in the *Oil-Spill Risk Analysis* [MMS 2000-057] cited above. However, the surface spill model is used, and the modeling is not tied into the spill analysis in the DEIS or EID. The modeled spill locations are approximately 2.5 to 6.3 miles offshore, and fail to consider possible spills closer to shore, where environmental impacts would be greater.

[48] Subsea spill models are under development by MMS, and other models may be available. See: Technical Documentation for the Pipeline Oil Spill Volume Computer Model, SINTEF Report to MMS, 1/20/03. http://www.mms.gov/tarprojects/390/WCD%20Technical%20Description_Final-170203.pdf (accessed 7/8/05)

formation and the behavior of oil on the surface, such as spreading, sinking, and expansion of volume due to mousse formation.[49] It is unclear how realistically the GNOME modeling studies account for such characteristics, if they are considered at all.

- **Shoreline contact**. The OSRA model generates estimates of conditional probabilities of shoreline contact. However, these estimates are of dubious value, given that the model uses seasonal current averages, fails to include important small-scale currents, and does not account for oil characteristics or volume. The spill trajectory analysis does not adequately connect probable shoreline contact locations with presence of sensitive resources, as necessary for evaluation of impacts.

- **Uncertainty.** The trajectory modeling does not include an error analysis or discussion of model sensitivity analysis, as recommended in the National Resource Council assessments.[50]

The oil spill modeling in the EID and DEIS is over-generalized and lacks crucial information. Hence, it does not provide the information needed for a realistic appraisal of potential impacts to specific resources in the Santa Barbara Channel and Santa Maria Basin. Nor does it provide information on potential spill scenarios detailed enough to assess the effectiveness of spill response. The modeling lacks an appraisal of what resources are likely to be affected by an oil spill incident. Without this information, the Commission cannot evaluate the full range and extent of potential oil spill impacts to marine and shoreline resources.

***Conclusion***

The oil spill risk analysis in the EID is overly general, and lacks specific information crucial to the Commission's analysis of potential oil spill impacts on coastal resources. The Commission requested additional information from MMS regarding: 1) the worst-case discharge volumes specific to each hypothetical post-suspension development scenario, cumulative volumes for all 36 leases, and cumulative volumes for all 36 leases plus existing development; 2) spill probability analyses for each hypothetical post-suspension development scenario and a cumulative analysis for multiple spills; and 3) detailed spill trajectory analyses for each hypothetical post-suspension development scenario and cumulative for all 36 leases. Without this information, the Commission cannot evaluate the full range and extent of potential oil spill impacts to marine and shoreline resources. The Commission therefore finds it does not have sufficient information to determine whether granting the lease suspensions is consistent with CCMP policies related to: marine resources and water quality (§§30230 and 30231), environmentally sensitive habitat areas (§30240), commercial fishing (§30234.5), access and recreation (§§ 30210, 30211, 30212, and 30220), and cultural resources (§30244).

---

[49] Mousse formation is the tendency of some oils to form emulsion, which can expand the spill volume by a factor of two to three, as apparently was the case for the 1997 Irene pipeline spill. Sinking may be a very important consideration for the heavier local oils.

[50] *Ibid.*, NRC, 1989, p. 24.

***Prevention and Response Capability***

Section 30232 of the Coastal Act requires the applicant to provide "protection against the spillage of crude oil, gas, petroleum products, or hazardous substances..." and to provide "effective containment and cleanup facilities and procedures" for accidental spills that do occur.

After the 1989 *Exxon Valdez* oil spill, the federal and California State governments imposed tough new statutory and regulatory standards for oil spill prevention and response. Under the Oil Pollution Act of 1990, the federal government agency with the primary regulatory authority over marine waters is the U.S. Coast Guard ("USCG"). The USCG also serves as the Federal On-Scene Coordinator ("FOSC") during an oil spill response. Under California's Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (Cal. Gov't Code § 8670 *et seq.*), the California State government agency with the primary regulatory authority over oil spills in state marine waters is the California Department of Fish and Game's Office of Spill Prevention and Response ("OSPR"). OSPR is the State On-Scene Coordinator ("SOSC") during an oil spill response.

A Regional Response Team ("RRT") composed of representatives from the USCG, the US EPA, MMS, the California Office of Emergency Services, and OSPR oversees the development and implementation of three Area Contingency Plans for all waters offshore California. The Plans present procedures for joint response efforts, including appropriate procedures for mechanical recovery, dispersal, shoreline cleanup, protection of sensitive environmental areas, and protection, rescue, and rehabilitation of fisheries and wildlife.[51]

Oil spill prevention and response for the hypothetical post-suspension development scenarios are discussed in detail below.

***Prevention***

To reduce the likelihood of spills, OCS operators must comply with a multitude of oil spill prevention, environmental management, and worker safety regulations from federal, State, and local agencies. These include MMS, U.S. Office of Pipeline Safety regulations; U.S. Coast Guard Facility Response Plan regulations (33 CFR Part 154 and 155); the California Office of Spill Prevention and Response regulations (14 CCR §§ 790 –886) for oil spill contingency plans, inspections, and drills (for pipelines in state waters and onshore facilities); State Lands Commission regulations (14 CCR §§ 2000 – 2017, §§ 2300–2407) for onshore marine terminals; Coastal Commission consistency certification and permit requirements; and Santa Barbara County permit conditions for onshore facilities.

According to the EID and DEIS Appendix 5,[52] MMS prevention strategy includes regulations that require the use of best available technologies, training standards for operator personnel, and a rigorous inspection program. This strategy encourages industry to operate well-engineered facilities with good housekeeping practices, adequate equipment maintenance, and proper and safe operational procedures to reduce the likelihood of an oil spill. MMS has established

---

[51] US Coast Guard, California Office of Oil Spill Prevention and Response. *2000 Area Contingency Plan, Los Angeles and Long Beach.* 2000. available at http://www.uscg.mil/d11/m/rrt9web/

[52] EID p. 5.3-7, DEIS Appendix 5 p. A5-69

inspection protocols and reporting requirements designed to effect timely detection of any spills, notification of proper authorities, and initiation of cleanup. Operators are required to conduct frequent periodic inspections to determine if pollution is occurring and to report sources of pollution to MMS.

To ensure that a facility is prepared in the event that oil is spilled, MMS has a comprehensive oil spill response program.[53] In addition, MMS tests a facility operator's response, as well as its knowledge and understanding of the individual Oil Spill Response Plan through oil spill exercise programs with announced and unannounced drills each quarter. For planning purposes, MMS adheres to the requirements of the USCG's National Preparedness for Response Exercises Program.[54] Facility operators must exercise their entire response plan at least once every three years. To satisfy this triennial exercise requirement, an owner or operator must conduct the following elements of the response plan: annual spill management tabletop exercise; annual deployment exercise of spill response equipment staged at an onshore location; annual notification exercise; and semiannual deployment exercise of any response equipment which the owner or operator must maintain at the facility.[55]

The Commission notes that even with these regulations and programs in place, oil spills do still occur due to human error. MMS and other federal, State, and local regulations provide feedback mechanisms for the continual improvement of operator training programs and leak detection systems.

Hypothetical post-suspension development of the Cavern Point Unit would employ existing infrastructure, including Platform Gail and its associated pipelines. Venoco, Inc. currently operates the Cavern Point Unit infrastructure in accordance with the requirements discussed above. The Commission finds that MMS's and other applicable prevention regulations and programs provide measures for maximum feasible "protection against the spillage of crude oil, gas, petroleum products, and hazardous substance." The Commission therefore finds that granting the lease suspensions is consistent with the prevention requirements of CCMP Section 30232.

***Response Technologies and Capability***

Oil spill prevention measures, such as blowout protection devices and regular platform inspections, have reduced the frequency of oil spills from OCS platforms since the 1980's. However, offshore oil development in the Pacific OCS continues to pose a significant risk to the environment from oil spills.[56] Oil spill response strategies generally include: mechanical

---

[53] In accordance with MMS regulations 30 CFR §250.204 (b)(3) and Part 254, each of the OCS operators must have an approved oil spill response plan.

[54] USCG, National Preparedness for Response Exercise Program (PREP), August 1994. http;//www.uscg.mil/hq/g-m/nmc/response/msprep.pdf

[55] See EID page 5.3-7; DEIS Appendix 5, page A5-69.

[56] The term "risk" encompasses both the likelihood and environmental impacts of oil spills.

containment and recovery equipment, chemical dispersants, and in-situ burning. Each is discussed in more detail below.

*Mechanical Containment and Recovery Equipment*

According to the EID and DEIS Appendix 5,[57] operators in the Pacific OCS are required to keep sufficient equipment on or near the platforms to enable the immediate initiation of containment activities. Primary response equipment at the platforms is supplemented by onshore equipment operated by oil spill cooperatives formed by the lessees and operators.

Hypothetical post-suspension development of the Cavern Point Unit would employ existing Santa Clara Unit infrastructure, including Platform Gail and associated facilities. Venoco, Inc. currently operates Santa Clara Unit infrastructure in accordance with an existing MMS-approved Oil Spill Response Plan ("OSRP"), which incorporates the response elements discussed above, and which is updated biannually to reflect improvements in response equipment and procedures. The Commission staff reviews updated OSRPs.

At the time of the Commission's review of the consistency certifications for the installation of the Santa Clara Unit Platform Gail and its associated subsea pipelines (CC-2-86 and CC-36-86), the operator (Chevron) committed to providing 1500 feet of oil spill boom, skimmers, storage capacity to handle skimmer throughput, as well as a boom deployment boat at (or within 15-60 minutes travel time from) the platforms, for primary response within the first three hours of an oil spill. This configuration of oil spill response equipment remains on the platforms today.

For secondary response capability, Platform Gail has access to the Clean Seas inventory of vessels and equipment which includes: Mr. Clean I (stationed at Santa Barbara harbor) and Mr. Clean III (stationed at Platform Harvest), fast response vessels, and pre-staged equipment located at Morro Bay, Avila Bay, Santa Barbara Harbor, the Carpinteria Yard in the Ventura/Port Hueneme area, and at Point Mugu Navy Base.

In the 20 years since the installation of the platforms, Clean Seas has continued to upgrade and improve the containment and recovery capability of its state-of-the art response equipment to best match the characteristics of the oil produced in the offshore fields. As MMS notes,[58] the additional resources of the Marine Services Response Corporation, National Response Corporation and the USCG Oil Spill Response Team are also available to assist Clean Seas in the event of catastrophic spill.

The Commission interprets "effective containment and clean up" in CCMP Section 30232 as the ability to keep an offshore oil spill from adversely affecting the shoreline resources of California. In the consistency certifications pertaining to OCS oil and gas development projects the

---

[57] EID, page 5.3-7. DEIS, page A5-70.

[58] EID, page 5.3-7

Commission reviewed in the 1980's,[59] the Commission found that although the on-water oil spill containment and clean-up equipment available for response to offshore oil spills was state-of-the art, research and oil spill experience showed that its effectiveness in keeping a marine oil spill from causing significant impacts to sensitive shoreline resources was severely limited by weather, currents, and wave conditions.

Although oil spill response equipment and cleanup methods have significantly improved in the past 20 years, research and experience shows that the response capability of current state-of-the art containment and clean-up equipment continue to be very limited during conditions of rough weather and sea conditions. EPA tests have demonstrated that oil skimmers can generally only recover about 50 percent of spilled oil in calm water conditions, with decreasing effectiveness if sea conditions are rougher.[60] Booms and skimmers are also limited in their effectiveness by wave height and wind speed. According to the National Oceanic and Oceanographic Administration's ("NOAA") Office of Response and Restoration, historical data indicates that only 10-30 percent of spilled oil can be recovered by mechanical means.[61]

The lack of real-time current information can also affect the accuracy of on-water response operations. A system of buoys was deployed during the 1990s in the Santa Barbara Channel and Santa Maria Basin by Scripps Institution of Oceanography, to provide wind and current data for circulation studies. Through a cooperative agreement between MMS and Scripps, and an interagency agreement with NOAA, a monitoring array was deployed in 1999, providing real-time wind and current data. The data was made available on the internet for use in trajectory analysis during oil spill response.[62, 63] The buoys were removed in October/November, 2004, and real-time current data is no longer available. Some up-to-date oil spill response plans cite the Scripps website for access to real-time current data;[64] however no plans to resume the real-time current monitoring have been announced.

Recent ocean oil spills, even those as small as the 163-barrel Torch Platform Irene pipeline spill in 1997, have demonstrated that state-of-the-art response equipment, even under the best weather and calm-sea conditions, are not effective in keeping oil off the shoreline. Current state-of-the-art mechanical response equipment cannot effectively protect California's shoreline and marine resources from significant oil spill impacts. The Commission therefore finds that the CCMP

---

[59] CC-7-83 (Platforms Harmony and Heritage), CC-12-83 (Platform Hermosa), CC-27-83 (Platform Harvest), CC-24-84 (Platform Hidalgo), and CC-36-86 (Platform Gail)

[60] Environmental Protection Agency, Summary of U.S. EPA OHMSETT Testing 1974-1979.

[61] Michel, Christopherson, Whipple, Mechanical Protection Guidelines, NOAA, USCG, Research Planning, Inc., 1994.

[62] http://ccs.ucsd.edu/research/sbcsmb/; http://ccs.ucsd.edu/research/sbcsmb/moorings/ (accessed 7/15/05)

[63] DEIS, 2001, p. 4-46 to 4-48; EID, 2005, pp. 4.5-14 and -15.

[64] e.g., Core Oil Spill Response Plan, PXP Arguello, Inc., February, 2004, Vol. 1, p. E-1.

Section 30232 standard of "effective containment and clean up" cannot be met using the on-water containment and clean-up equipment currently available to respond to marine oil spills from oil and gas exploration development offshore California.

*Chemical Dispersants*

The effectiveness of chemical dispersants can be limited by the characteristics of the oil found in the Pacific OCS oil reserves, as well as rough weather and sea conditions.

The Regional Response Team recently updated its policy for the use of chemical dispersants in federal offshore waters through an updated California Dispersant Plan.[65] This Plan will become part of the three California Area Contingency Plans. The California Dispersant Plan includes the results of a net environmental benefit analysis conducted for all habitats and species from the California shoreline to 200 miles offshore, and lists the oils commonly tankered into California or produced from its offshore fields. An evaluation of the "dispersibility" of these oils was included. Most oils transported into California by tanker ship have a chemical composition that might, under favorable conditions, make them candidates for chemical dispersion. However, most oils produced from California offshore fields are too heavy, persistent, and non-volatile to be suitable candidates for effective chemical dispersion with the products and resources currently available. Clean Seas has 18,000 gallons of Corexit 9527 – which is marginally effective for some of the lighter OCS crude oil – stored at its Carpinteria yard. However, Corexit 9500, which is the dispersant most appropriate for use on the heavy-grade oil that is produced from the OCS leases, is not stored in California. The closest available supply is in Texas, which could arrive in about six hours by plane. As noted in the EID, the effectiveness of dispersants decreases the longer the oil is weathered due to emulsification. To be most effective, dispersants must be applied in the first 24 hours of a spill.[66]

The California Dispersant Plan also includes: 1) a description of federal offshore waters "pre-approved" by the RRT for dispersant use, with an accompanying decision-making flowchart and resources to be used by the FOSC to assist her decision, and 2) a description of federal offshore waters for which case-by-case RRT approval must be received before the FOSC can deploy dispersants. Areas pre-approved for dispersant use include all federal waters (more than 3 miles from shore) except those areas within National Marine Sanctuaries (e.g., Channel Islands and Monterey Bay National Marine Sanctuaries). RRT approval on a case- by-case basis is required for State waters, sanctuary waters, and within 3 miles of California-Oregon or California-Mexico borders. Even in areas where the use of dispersants is approved, dispersants cannot be applied directly over marine mammals. The presence of marine mammals may therefore further limit the potential use of dispersants.

In conclusion, factors such as the heavy viscosity of the oil in the OCS reserves, weather and sea conditions at the time of the spill, proximity of marine mammals, and the RRT approval process may severely limit the effectiveness of dispersants as a spill response measure.

---

[65] Region IX Regional Response Team. 2005. *Draft Final California Dispersant Plan and Federal On-Scene Coordinator (FOSC) Checklist for California Federal Offshore Waters.* 49 pp. + Appendix.

[66] EID, p. 5.3 -8

In Situ *Burning*[67]

The three California Area Contingency Plans include policies for the *in situ* burning of oil on the water's surface. RRT "pre-approval" for *in situ* burns exists for waters 35 nautical miles and further from shore. An FOSC decision to do an *in situ* burn in waters 0-35 miles from shore requires case-by-case approval from the RRT, in consultation with the regional air board and health department.

The heavy oils produced by California offshore oil fields may, if contained properly, be burnable. The physical and chemical characteristics of this oil may require the addition of accelerants to facilitate combustion, and de-emulsifiers. There is no fire boom stored in California; however a regular boom could be used sacrificially for *in situ* burning. The presence of marine mammals in the area would preclude *in situ* burning.

As is the case with the use of chemical dispersants, factors such as the heavy viscosity of the oil in Pacific OCS reserves, weather and sea conditions at the time of the spill, proximity to sensitive marine resources, and the RRT approval process may severely limit the effectiveness of *in situ* burning as a spill response measure.

*Conclusion*

Current state-of-the-art mechanical response equipment, chemical dispersants, and *in situ* burning cannot effectively protect California's shoreline and coastal resources from significant oil spill impacts. The Commission therefore finds that the CCMP Section 30232 standard of "effective containment and clean up" cannot be met using the oil spill response strategies currently available. The Commission finds that granting the lease suspensions is inconsistent with the oil spill response requirement of Section 30232 of the CCMP. Because Platform Gail and its associated pipelines are "coastal-dependent industrial facilities," the proposed project would presumptively be subject to analysis under Section 30260 of the Coastal Act. See Section 3.9: Coastal Dependent Industrial Facility "Override" Provision of this staff report, below.

### 3.1.2 Ocean Discharges

The proposed project involves development and productsion of oil and gas using only existing Santa Clara Unit infrastructure, specifically, Platform Gail and associated pipelines and facilities. No new structures would be constructed and placed either onshore or offshore. Potential impacts to marine resources and water quality could result from discharges into the marine environment associated with the drilling of production and service wells, and the operation of the platforms.

Discharges associated with future exploration, development, and production of the Cavern Point Unit could adversely affect water quality and marine resources. A variety of discharges are associated with offshore oil and gas activities, including muds and cuttings, produced water, well treatment, completion and workover fluids, deck drainage, and sanitary/domestic wastes. Drilling muds and cuttings and produced water contain heavy metals and several toxic chemicals, including arsenic, PCBs, benzene, mercury, and hexavalent chromium.

---

[67] Pers. Comm., Addassi, Y.N. (CDFG-OSPR) and Faurot-Daniels, E.R. (Coastal Commission staff), July 11, 2005.

MMS estimates that over the life of the Cavern Point project, Venoco would discharge 198,000 barrels of muds, 30,000 barrels of cuttings, and 33 million barrels of produced water. Cumulatively, if all undeveloped leases are fully developed, MMS estimates 199 total wells drilled over a period of 13 years, discharging up to 2.8 million barrels of drilling muds, 627,000 barrels of cuttings, and 896 million barrels of produced water. These figures do not take into account discharges from existing platforms.

The Environmental Protection Agency ("EPA") regulates OCS oil and gas-related effluents through issuance of a National Pollutant Discharge Elimination System ("NPDES") permit. EPA NPDES permits, including those for OCS oil and gas platform discharges, are "listed" federal permits in the CCMP and subject to the federal consistency review requirements of the Coastal Zone Management Act.

Discharges associated with exploration and production wells at the Cavern Point Unit would fall under the effluent requirements of new General NPDES Permit CAG280000, which EPA submitted and the Commission concurred with on January 9, 2001, and which has been in effect since December 2004.[68] This new 5-year General NPDES permit covers discharges from *existing* OCS oil and gas platforms and any exploration activities. It imposes more stringent discharge requirements than the former NPDES permits that were in effect for platforms.

Platform Gail is currently discharging under the new General NPDES Permit CAG280000.

The new General Permit prescribes maximum annual discharge volumes for the Point Arguello Unit platforms, as described in Table 5 below:

**Table 5: Maximum Annual Allowable Discharges (bbls)**

| Platform | Cuttings | Drilling Fluids | Excess Cement | Produced Water |
|---|---|---|---|---|
| Gail | 28,700 | 49,500 | 2,000 | 4,380,000 |

These requirements apply to discharges from the Platform Gail, regardless of the source of the oil and gas produced by the platforms. MMS has not indicated if development of the Cavern Point Unit would cause the operator to exceed the limits set by the permit. If production of the undeveloped leases would cause Venoco to exceed the maximum allowable discharges set by EPA, Venoco would be required to apply for either an amendment to the general NPDES permit or a new individual NPDES permit from EPA covering the excess discharges. Any new individual NPDES permit for these platforms would require separate review and concurrence by the Coastal Commission under the federal consistency requirements of the CZMA.

Notwithstanding stricter effluent discharge requirements contained in the new General NPDES permit, platform operators continue to discharge toxic pollutants into the ocean from muds and

---

[68] Although platform operators are currently discharging under the requirements of General NPDES Permit CAG280000, the Western States Petroleum Association has challenged this permit in court. (*Western States Petroleum Association v. Nastri*, No. 04-75605 (9th Cir.))

cuttings, produced water and other wastes. In its concurrence with the new General NPDES permit (Consistency Certification CC-126-00), the Commission made clear its concern that scientific research on the effects of oil and gas wastes on marine resources and water quality is inconclusive, and that the mass of, and toxic concentrations in, projected discharges, both individually and cumulatively, may still damage the biological productivity of coastal waters. The Commission found that the discharges may, 1) reduce the long-term productivity of certain marine species to a level below that necessary to sustain healthy populations; 2) potentially contaminate or cause changes in fish species that dwell near the platforms; and 3) cause cumulatively significant adverse impacts, such as chronic sublethal effects.

The Commission therefore found in consistency certification CC-126-00 that the discharges that occur under the new NPDES permit are inconsistent with the marine resource, water quality, and cumulative impact policies of the CCMP. The Commission nevertheless applied the "override" provision of the CCMP (Coastal Act Section 30260) for coastal-dependent industrial development activities and concurred with the new General NPDES permit, finding that it met the tests of Section 30260, because: 1) alternative locations were infeasible or more environmentally damaging; 2) to do otherwise would adversely affect the public welfare; and 3) adverse environmental effects would be mitigated to the maximum extent feasible.

The Commission finds the proposed project to be inconsistent with Sections 30230 and 30231 of the Coastal Act, because the proposed project would discharge under the new NPDES permit, and such discharges are inconsistent with the marine resource, water quality and cumulative impacts policies of the CCMP. Because Platform Gail is a "coastal-dependent industrial facilities," the proposed project would presumptively be subject to analysis under Section 30260 of the Coastal Act. See Section 3.9: Coastal Dependent Industrial Facility "Override" Provision of this staff report, below.

### 3.2 Commercial Fishing

Section 30230 of the Coastal Act, quoted on page 23, provides for the protection of species of special economic significance. In addition, Coastal Act § 30234.5 provides:

> *The economic, commercial, and recreational importance of fishing activities shall be recognized and protected.*

Potential impacts to the commercial fishing industry from the proposed project include impacts caused by space conflicts and fishing preclusion zones from the retention of structures in the water. When the Commission originally reviewed Platform Gail, it determined that the platform and pipelines, and associated discharges, would impose a preclusion zone causing extensive impacts to commercial and recreational fishing. Platform Gail and the pipeline to Platform Grace are located within Dept. of Fish and Game Fish Blocks 684 and 685, respectively. Principal fisheries at the time of the Commission's review (i.e., 1986) included fishing for mackerel, anchovies, bonito, sole, rockfish, halibut, shark, lobster, shrimp, and sea urchins. The predominant commercial fishing gear types the Commission noted consisted of: 1) purse seine for anchovies; 2) trawl for English and petrale sole; and 3) gill net fishing for shark. Depending on weather and current conditions, the Commission determined the platform could preclude

fishing for two miles (for trawling and gill netting) to four miles (for purse seining). Among the mitigation measures Chevron agreed to address these impacts were committing to creating a fisherman's contingency fund ($250,000), an insurance trust fund ($250,000), and partial financing ($100,000) for a study to assess the cumulative impacts of OCS development on commercial fishing in the Santa Barbara Channel.

MMS notes in the EID that the area continues to be fished, and that these Fish Blocks have been fished using several gear types including: 1) purse seine for coastal pelagics such as northern anchovy and market squid; 2) trawl for spot prawns, and halibut; 3) hook and line/longline for rockfish and other rocky outcrop fish; 4) trap for crab and lobster; and 5) drift/set gillnet for halibut and white seabass. The EID further notes, based on the Dept. of Fish and Game 1999-2003 data cited, that while diving for urchins and sea cucumbers occurs within the Fish Blocks, the platform and pipelines are probably in waters too deep to affect diving.

Analyzing the project's impacts, MMS states:

> *During the suspension phase, Venoco will conduct certain in-office activities that will result in the submission of a new Exploration Plan (EP). No "on the water" activities are proposed to take place during the suspension.*
>
> *During the hypothetical post-suspension phase, production activities are anticipated to continue on the existing Platform Gail. Potential effects on commercial and recreational fishermen from hypothetical post-suspension activities are anticipated to be restricted to short-term preclusion and space-use conflicts due to vessel traffic and routine maintenance and repairs of platforms and pipeline facilities, and would be anticipated to be low. These effects would not likely increase over present levels.*
>
> *Given the anticipated use of existing Platform Gail, no additional offshore area would be precluded from fishing and no new offshore construction would occur. Also, it is unlikely that additional supply boats will be used to service the Platform Gail facilities if and when post-suspension activities occur for the Cavern Point Unit. Therefore, the development of the Cavern Point Unit would not reduce commercial or recreational boating harbor space.*
>
> *Sections 30234 and 30234.5: Findings*
>
> *Based on the above analysis, granting an SOO to Venoco for the Cavern Point Unit will be consistent to the maximum extent practicable with sections 30234 and 30234.5.*

Similar to the Commission's concerns expressed in the Marine Resources section of this staff report above, the Commission believes this response ignores the fundamental question of the continuing impact of use of the existing infrastructure on the marine environment, including continued preclusion impacts from the platform and pipelines, operational activities (drilling, crew and supply boat, and helicopter) noise, marine discharges, and extended and increased oil spill risks. Compounding these concerns for the commercial fishing industry are relatively recent efforts to develop Marine Protected Areas, including two near Platform Gail. MMS' EID notes:

> *The creation of the marine reserves establishes "safe zones" to reverse the drop over the past decade in the populations of several marine species, such as red snapper, angel sharks, and abalone that were once plentiful off the California coast. The marine reserves extend around portions of State waters surrounding the five islands that form the Channel Islands National Marine Sanctuary: Anacapa, Santa Cruz, San Miguel, Santa Rosa and Santa Barbara Islands. The new system of MPAs consists of the following (CDFG, 2002a and 2004b):*
>
> - *Ten State Marine Reserves... ([including two near Platform Gail – Scorpion (Santa Cruz Island) and Anacapa Island State Marine Reserves]... where it is unlawful to damage, take, or possess any living, geological, or cultural marine resource, except under a permit or specific authorization by the Commission for research, restoration, or monitoring purposes;*
>
> - *Painted Cave State Marine Conservation Area ([on the western and northern side of Santa Cruz Island] where only the recreational take of spiny lobster (Panulirus interruptus) and pelagic finfish is allowed; and*
>
> - *Anacapa State Marine Conservation Area [north side of Anacapa Island, adjacent to western boundary of Anacapa Island State Marine Reserve] where only the recreational take of spiny lobster (Panulirus interruptus) and pelagic finfish is allowed and commercial take of lobster is allowed on the north side of West Anacapa Island....*
>
> *The no-take areas represent approximately 132 square nautical miles, or approximately 19 percent of the State waters within the Sanctuary. The limited-take areas represent an addition 10 square nautical miles of area (CDFG, 2004c). The next phase of this project would expand the network of reserves into Federal waters lying beyond the three-mile boundary of State water that encircle each island. The full system of marine reserves would cover 322 nautical miles (426 square miles) and once adopted by the Federal government would make the largest network of marine reserves in the continental United States (CDFG, 2002b).*

Given the proximity of Platform Gail to the Scorpion and Anacapa Island MPAs, currently under consideration discussion for expansion to the six mile Sanctuary Boundary (from their current 3-mile State water boundary), and which already set aside over 20 sq. nautical miles to fishing activities, the cumulative impacts to fishing activities combined with extending the life of Platform Gail has the potential to significantly impose a preclusion zone affecting a number of fishing methods from an even larger area than the original platform. As noted above, when the Commission originally reviewed Platform Gail, it determined the platform and pipelines would impose a preclusion zone causing extensive impacts to commercial and recreational fishing and required extensive mitigation measures (some of which are listed above on page 50). The Commission determined the original Platform Gail to be inconsistent with a large number of coastal resource protection policies, including the commercial and recreational fishing policies of the Coastal Act. Retention of the platform in this location for an additional time period of time would exacerbate these conflicts by extending their duration.

If development of the Cavern Point Unit does not occur, Santa Clara Unit infrastructure is scheduled to be decommissioned in 2020-2025. As discussed in Section 1.2.1: Necessary Information above, and in Appendix B, the Commission requested information from MMS regarding the potential for the lease suspensions to extend the life of the infrastructure the Cavern Point Unit would rely on. If the proposed development would not extend the life of the platform and pipelines, then the proposed project would cause no new effects to commercial fishing different from those already analyzed by the Commission when the platforms were installed. On the other hand, extending the life of the infrastructure would cause new impacts to commercial fishing for the period that the infrastructure's life would be extended. The Commission therefore cannot determine what impacts, if any, the proposed project would have on commercial fishing without the requested information regarding a potential extension of life. MMS has not provided the Commission with this information. Without the information it has requested regarding the possible extension of life of existing platforms and other infrastructure, the Commission cannot determine whether the project under consideration would cause any impacts to the commercial fishing industry, and, if it would, the magnitude of such impacts. Thus, without an analysis of the reasonably foreseeable length of time the platform would be extended if the Cavern Point Unit is to be developed, along with updated information about the current importance of the area to the fishing industry, the Commission finds that it lacks sufficient information to determine whether the project is consistent with the commercial and recreational fishing policies (Sections 30230 and 30234.5) of the Coastal Act.

### 3.3 Scenic, Visual, and Recreational Impacts

Coastal Act § 30251 provides:

> *The scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas, to minimize the alteration of natural land forms, to be visually compatible with the character of the surrounding areas, and where feasible, to restore and enhance visual quality in visually degraded areas. New development in highly scenic areas such as those designated in the California Coastline Preservation and Recreation Plan prepared by the Department of Parks and Recreation and by local government shall be subordinate to the character of the setting.*

Coastal Act § 30213 provides:

> *Lower cost visitor and recreational facilities shall be protected, encouraged, and, where feasible, provided. Developments providing public recreational opportunities are preferred.*

MMS states:

> *During the suspension phase, Venoco will conduct certain in-office activities that will result in the submission of a new Exploration Plan (EP). No "on the water" activities are proposed to take place during the suspension.*
>
> *Hypothetical post-suspension activities would not include any new pipelines or platforms. Existing regulatory requirements and mitigation measures for operation of the facilities*

*associated with Platform Gail would remain in effect. Since the Cavern Point Unit would utilize these existing offshore and onshore OCS related facilities, no new effects on public access ...and recreation... would occur.*

*Based upon the above, granting an SOO to Venoco for the Cavern Point Unit will be consistent to the maximum extent practicable with policies related to public access...and recreation....*

In its original review of Platform Gail, the Commission found the platform posed extensive visual and recreational degradation in a highly scenic area, most particularly on views from the Channel Islands National Park. The Commission also noted the platform needed to be more conspicuous than other platforms due to its close proximity to the vessel traffic lanes. The Commission determined the original Platform Gail to be inconsistent with the visual and recreational policies (including Section 30251, 30210 and 30221) of the Coastal Act. As a coastal-dependent industrial facility, Platform Gail was eligible under an applicable provision of the CCMP (Coastal Act Section 30260) to be considered for an "override" (i.e., an overall finding of consistency with the CCMP) of the inconsistencies with policies 30251, 30210, and 30221 of the Coastal Act that the Commission found that facility to be subject. Application of the "override" provisions of Section 30260 to resolve these inconsistencies is implicit in the Commission's entry into the litigation settlement agreement.

Nevertheless, at this time the Commission finds that retention of Platform Gail in this location for a period of time in excess of that originally contemplated for that facility would exacerbate the conflicts with the above-referenced policies of the CCMP/Coastal Act, by extending their duration. If the proposed development would not extend the life of the platform, then the proposed project would cause no new effects on views and recreation different from those already analyzed by the Commission when the platform was installed. On the other hand, extending the life of the infrastructure would cause new impacts on views and recreation for the period that the Platform's life would be extended. While MMS maintains that developing the Cavern Point Unit would occur using existing infrastructure, without a clear analysis of the extent to which the platform would be extended, as discussed on pages 52-53 (Commercial Fishing Section above), the Commission is also unable to assess the reasonably foreseeable visual and recreational impacts of extending the platform life. The Commission therefore finds that it lacks sufficient information to determine the project's consistency with the visual and recreational resource protection policies (Section 30251 and 30213) of the Coastal Act.

### 3.4 Hazards

Coastal Act §30253(2) provides that:

*New development shall:*

*(2) Assure stability and structural integrity, and neither create nor contribute significantly to erosion, geologic instability, or destruction of the site or surrounding area or in any way require the construction of protective devices that would substantially alter natural landforms along bluffs and cliffs.*

Coastal Act §30262(a)(1) provides, in part:

> *a) Oil and gas development shall be permitted in accordance with Section 30260, if the following conditions are met:*
>
> *(1) The development is performed safely and consistent with the geologic conditions of the well site.*

When the Commission was originally considering Platform Gail, it noted several geologic hazards that needed to be addressed. The platform itself was proposed above a buried ancient slide, and the pipelines to Platform Grace crossed submarine landslide areas to the north and west of the platform. To address the platform slide, Chevron installed deep piles well below the unstable area. In addition, the Commission requested, and Chevron agreed, to address platform integrity, which could be compromised by transoceanic transportation of the platform (from Asia), through the placement and testing of additional platform features that could be disassembled and tested to determine the platform's strength at the time of installation. To address concerns over the pipeline crossing of unstable areas (Exhibit 6), the Commission noted:

> *Approximately 18,000 feet northwest of Gail, the [pipeline] corridor turns north and crosses the northern slope area to connect with Platform Grace. Crossing the northern slope area at this location was necessary to avoid the numerous submarine slumps located on the eastern portion of the northern slope area. Approximately 3,000 feet of the corridor overlies a buried ancient slide deposit at the Platform Gail site vicinity. A pre-installation site specific geophysical survey of the pipeline routes within the 1,000 foot corridor will identify site specific areas of potential seafloor instability to be avoided, if any. Placing the pipelines directly on the seafloor reduces potential soil loading caused by slumps and enables the line to deform without rupturing. In addition, earthquake loads are less on exposed pipelines because forces are proportional to the amount of soil restraint around the pipeline. Surface sediments on the seafloor within the pipeline corridor consist of silty sand to sandy silt and should adequately support the pipelines.*

While the Commission determined at the time that Chevron had adequately addressed the geologic hazards for the foreseeable life of the platform, given these geologic hazards, extending the life of the platform raises the need for information concerning the platform's continued structural integrity. Moreover, since MMS regularly tests the facilities, it should have readily available information about whether the pipeline remains on the seafloor as expected, and/or whether any changes to the above-noted geologic concerns have appreciably changed over the past two decades. Accordingly, the Commission staff requested that MMS provide a reassessment of the hazards, including information about whether any additional studies/mapping have occurred since 1986 further defining the landslide, whether the landslide poses any geologic risks to the pipeline between Platforms Gail and Grace, whether production from the Sockeye Field from which Platform Gail is producing has had any effect on the landslide, whether the pipeline has been buried under or suspended over seafloor sediments, and, in general, whether any new information has been developed since 1986 that could shed new light on the size and potential effects of the landslide. MMS responded:

> *The proposed activity subject to this consistency determination is the granting, by the Minerals Management Service, of a Suspension of Operations (SOO) for the Cavern Point Unit in response to a request filed by the operator of the Cavern Point Unit under the provisions of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. 1334(a)(1). The detailed information requested here is appropriately addressed in EP's and DPP's. If and when the operator of the Cavern Point Unit submits a new EP, specific details regarding the exploration of the Cavern Point Unit will be provided to the State by the operator in the operator's consistency certification.*

MMS' response also included the statement that it regularly tests the platforms and pipelines pursuant to applicable federal regulations (MMS cited 30 CFR 102 250.900 through 914, and API RP 2A-WSD, for platforms, and 30 CFR 250.1000-1019, for pipelines), and that:

> *(1) These platforms have been frequently inspected by MMS personnel to ensure that they are safe and being properly maintained.*
>
> *(2) Any future projects (such as Cavern Point) or platform modifications, including significant structural load changes, involving these platforms would be reviewed on a case-by-case basis by MMS to ensure that they can meet the demands of any future proposed operations per MMS regulations.*
>
> *(3) Platforms Gail and Grace have complied with the... [above] requirements. They have had annual topsides inspections and underwater jacket inspections every 5 years per MMS requirements. The platforms have been maintained and will continue be required to be maintained per MMS requirements. If significant problems are identified as a result of future inspections, then the operator would be required to be correct those problems per MMS regulations. The underwater jacket inspections for Platforms Gail and Grace were last conducted in 2001 and the platforms were found to be structurally sound. The topsides for these platforms have been structurally inspected annually per MMS requirements and are structurally sound.*
>
> *(4) 'The Platform Gail to Platform Grace Pipelines are internally inspected every 3 years. The Platform Grace to shore pipelines are inspected every 2 years. All the pipelines meet MMS requirements. The near shore portion of the Platform Grace to shore oil pipeline was remediated in 2001 to stabilize the pipeline. In addition, the Platform Grace to shore oil pipeline was repaired in 2004 in the near shore area and we do not foresee any additional remediation needed at this time. All the Platform Gail to Platform Grace and Platform Grace to shore pipelines are externally inspected (including cathodic protection) every other year. All the pipelines are regularly reviewed.*
>
> *(5) Platforms Gail and Grace and the associated pipelines are structurally sound according to our records and the results of the inspections. We believe that if they are properly maintained, they have many more years of remaining life.*

Upon receipt of these responses, on June 29, 2005, the Commission staff contacted MMS by telephone (pers. conversation, Maurice Hill) and requested a copy of the most recent tests MMS has conducted on Platform Gail, and on the pipelines from Platform Gail to Grace and from Grace to shore. MMS informed the Commission staff that it was unwilling to provide this information, and that the information was not relevant to the question of whether an OCS lease suspension is consistent with the applicable enforceable policies of the CCMP. The Commission disagrees, and finds that, given the geologic hazards described above, the results from the tests MMS has conducted on pipeline and platform integrity are necessary to enable the Commission to determine the adequacy of existing infrastructure to handle the longer oil and gas development scenarios inherent in developing new units such as Cavern Point, and to determine whether the reasonably foreseeable effects from extending the life of the platform and pipelines would be consistent with the geologic hazards policies (Sections 30253 and 30262) of the CCMP.

With respect to potential onshore hazards, MMS maintains that no new infrastructure modifications would be needed, or if they are, existing regulatory processes can adequately address any issue raised. Given the age of the Carpinteria facility, the Commission believes further analysis is needed at this stage in the process. Accordingly, in addition to the above questions about offshore infrastructure, the Commission staff also requested information on the ability of onshore facilities to process Cavern Point petroleum hydrocarbons within the City of Carpinteria, to enable a determination of, among other things, whether that onshore facility remains suitable, or if an increased risk to public safety makes other locations more appropriate. The Commission notes that gas processing was originally proposed to occur at Platform Grace, in order to avoid the need for the Carpinteria onshore facility to exceed permitted throughput limits. Part of this concern was based on public safety issues, and the size of the safety hazard zone, as the onshore facility is surrounded by residential and commercial development and other public facilities. With Platform Grace now no longer operating, it is unclear whether offshore processing occurs at Platform Gail, and what, if any, additional oil and gas development demands would be on the onshore facility. Without an assessment of the ability of the existing onshore facilities to process Cavern Point petroleum hydrocarbons, the Commission cannot evaluate whether the project would increase public safety concerns and geologic risks, and thus whether the reasonably foreseeable onshore effects from developing the Cavern Point Unit would be consistent with Sections 30253(2) and 30262(a)(1) of the Coastal Act.

### 3.5 Air Quality

The air quality policy of the CCMP (Coastal Act § 30253(3)) states:

> *New development shall:*
>
> *(3) Be consistent with the requirements imposed by an air pollution control district or the State Air Resources Control Board as to each particular development.*

Section 30414 provides:

> *(a) The State Air Resources Board and air pollution control districts established pursuant to state law and consistent with requirements of federal law are the principal public agencies responsible for the establishment of ambient air quality and emission standards and air pollution control programs. The provisions of this division do not authorize the commission or any local government to establish any ambient air quality standard or emission standard, air pollution control program or facility, or to modify any ambient air quality standard, emission standard, or air pollution control program or facility which has been established by the state board or by an air pollution control district.*
>
> *(b) Any provision of any certified local coastal program which establishes or modifies any ambient air quality standard, any emission standard, any air pollution control program or facility shall be inoperative.*
>
> *(c) The State Air Resources Board and any air pollution control district may recommend ways in which actions of the commission or any local government can complement or assist in the implementation of established air quality programs.*

In addition, Section 307(f) of the federal CZMA specifically incorporates the Clean Air Act into the California Coastal Management Program (CCMP). Under the Clean Air Act, the federal government has established ambient air quality standards to protect public health (primary standards) and secondary standards to protect public welfare. The State of California has established separate, more stringent ambient air quality standards to protect human health and welfare. National and California standards have been established for ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, suspended particulate matter 10 microns ($PM_{10}$), suspended particulate matter ($PM_{2.5}$) and lead. In addition, California has adopted standards for sulfates, hydrogen sulfide, vinyl chloride, and visibility reducing particles.

Under federal standards, Ventura County is in "Severe Nonattainment"[69] of the 1-hour ozone standard, and in "Moderate Nonattainment"[70] of the 1-hour ozone standard. Under federal standards, Ventura County is in Severe Non-attainment area for the 1-hour ozone standard, and in Nonattainment for both the $PM_{10}$ and $PM_{2.5}$ standards.

The 1990 Clean Air Act Amendments (Section 328) transferred to the Environmental Protection Agency ("EPA") authority for air quality on the OCS. Federal (EPA) regulations enacted in 1992 require OCS sources to comply with applicable onshore air quality rules in the corresponding onshore area. In 1993, the EPA delegated authority to the Ventura County Air Pollution Control District ("VCAPCD") to implement and enforce the federal air requirements of 40 CFR Part 55.

---

[69] "Severe" means that the area has 15 years from original designation date 1990 (i.e. until 2005) to meet attainment status.
[70] "Moderate" means that the area has until Year 2010 to meet attainment status.

Federal regulations contained in 30 CFR 250.204(b)(14), 250.303, and 250.304 specifically apply to air emissions from OCS oil and gas facilities. Regulations at 30 CFR 250.204(b)(14) require an operator to supply detailed information to MMS when the operator applies for a new or amended Development and Production Plan, including:

- Projected emissions for each proposed or modified facility for each year of operation;
- The model(s) used to determine the effect on the onshore air quality of emissions from each facility and the result obtained through the use of the model(s);
- The air quality status of any onshore area where the air quality is significantly affected by projected emissions from each facility proposed in the plan;
- The emission-reduction controls available to reduce emissions, including the source, emission-reduction control technology, reductions to be achieved, and monitoring system.

Federal regulations at 30 CFR 250.303 set significance standards for carbon monoxide, total suspended particles, sulfur dioxide, nitrogen oxides and volatile organic compounds for OCS facilities. Facilities that significantly affect air quality in a nonattainment area are required to fully reduce emissions (through Best Available Control Technology ("BACT"), additional emissions controls, or offsets), while facilities causing significant impacts in attainment or unclassifiable areas are required to reduce emissions through BACT. These regulations also prohibit any air pollutant to exceed the concentration permitted under the national secondary ambient air quality standard or the national primary air quality standard, whichever is lowest.

Regulations at 30 CFR 250.304 allow the State Air Board to review existing facilities, such as Platform Gail, to determine if those facilities are contributing significantly to onshore ambient air pollutant concentrations. If a facility is significantly affecting the air quality of the onshore area, emissions must be reduced through the application of BACT.

Platform Gail operates under an existing VCAPCD permit. Additional air emissions from Platform Gail expected from any additional exploration and production development of the Cavern Point Unit would need to be consistent with the rules and requirements of VCAPCD. MMS' EID and its consistency determination for the Cavern Point Unit do not analyze the consistency of any future development with the standards of the VCAPCD. Nor do they reflect in their analyses of future conditions the fact that Ventura County's nonattainment problems are more severe than Santa Barbara County's. Despite these omissions, all exploration and production drilling will be subject to the VCAPCD's permit process, including requiring Permits Construct and Operate, application of Best Available Control Technology ("BACT"), and, where applicable, emission offset requirements. Thus, because Sections 30253 and 30414 of the Coastal Act require the Commission to rely on the applicable rules of the VCAPCD for air quality measures, and because any future development will require permits from the VCAPCD, the Commission therefore that any reasonably foreseeable activities at the Cavern Point Unit would be carried out in a manner consistent with the rules and requirements of the VCAPCD and, therefore, also in a manner consistent with the air quality policy of the CCMP (Coastal Act Section 30253(3)).

### 3.6 Consolidation of Oil and Gas Development

The CCMP requires that oil and gas development facilities be consolidated to the maximum extent feasible.

Section 30250, provides, in relevant part:

> *(a) New residential, commercial, or industrial development, except as otherwise provided in this division, shall be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it...*

More specifically, Section 30262(a)(2) requires the consolidation of oil and gas development, as provided in the following relevant part:

> *a) Oil and gas development shall be permitted... if the following conditions are met:...*
>
> *(2) New or expanded facilities related to that development are consolidated, to the maximum extent feasible and legally permissible, unless consolidation will have adverse environmental consequences and will not significantly reduce the number of producing wells, support facilities, or sites required to produce the reservoir economically and with minimal environmental impacts...*

The post-suspension development scenario for the Cavern Point Unit provides that the operator would produce the oil and gas resources of the these units using existing Santa Clara Unit Platform Gail and associated subsea pipelines, and the onshore Carpinteria processing facility. According to MMS, no new platforms, subsea pipelines, or onshore facilities or pipelines are proposed for construction.

The Commission finds that the proposed post-suspension development scenario for the Cavern Point Unit provides for the consolidation of new oil and gas development, and would, therefore, be consistent with the consolidation requirements contained in Sections 30250 and 30262 of the CCMP.

### 3.7 Coastal-Dependent Industrial Facility "Override" Provision

Coastal Act §30101 defines a coastal-dependent development or use as that which "requires a site on or adjacent to the sea to be able to function at all." Ports, commercial fishing facilities, and offshore oil and gas platforms are coastal-dependent development types that the Coastal Act gives priority over types of development on or near the shoreline. Coastal Act §30001.2 finds that notwithstanding the environmental effects of offshore petroleum and gas development, the location of such developments in the coastal zone may be necessary. Consequently, Coastal Act §30260 provides for special consideration of coastal-dependent industrial facilities that may otherwise be found inconsistent with the Coastal Act's Chapter 3 policies. Section 30260 is relevant to the Commission's review of suspensions of OCS oil and gas leases because such suspensions, if granted, would lead to or result in the construction of new, or new use of existing industrial facilities that are coastal-dependent as discussed in Section 2.3: Project Description above. The hypothetical

post-suspension development scenario reviewed in this report involves the use of "coastal-dependent industrial facilities," including Platform Gail and associated pipelines (i.e., from Platform Gail to Platform Grace, and from Platform Grace to shore).

Coastal-dependent industrial facilities must be evaluated under all applicable policies and standards contained in Chapter 3. If the proposed project is inconsistent with any Chapter 3 policy, section 30260 provides for approval of the coastal-dependent industrial development, notwithstanding such inconsistencies of the development. Coastal Act §30260 specifically states:

> *Coastal-dependent industrial facilities shall be encouraged to locate or expand within existing sites and shall be permitted reasonable long-term growth where consistent with this division. However, where new or expanded coastal-dependent industrial facilities cannot feasibly be accommodated consistent other policies of this division, they may nonetheless be permitted in accordance with this section and Sections 30261 and 30262 if (1) alternative locations are infeasible or more environmentally damaging; (2) to do otherwise would adversely affect the public welfare; and (3) adverse environmental effects are mitigated to the maximum extent feasible.*

As described in Section 3.1: Marine Resources and Water Quality of this report, the proposed project does not meet the standards of Coastal Act §30230 and 30231, due to the potential for significant adverse individual and cumulative marine resource and water quality impacts caused by platform discharges. The proposed project also does not meet the oil spill response requirement of §30232 of the Coastal Act, because current state-of-the-art mechanical response equipment, chemical dispersants, and *in situ* burning cannot effectively protect California's shoreline and marine resources from significant oil spill impacts. Since the project qualifies as a "coastal-dependent industrial facility" the Commission may nevertheless approve the project if the three requirements of §30260 can be met: 1) alternative locations are infeasible or more environmentally damaging; 2) to do otherwise would adversely affect the public welfare; and 3) adverse environmental effects are mitigated to the maximum extent feasible.

The second test of 30260 states that coastal-dependent industrial development may be permitted if to do otherwise would adversely affect the public welfare. In previous sections of this report, the Commission has found that it is unable to determine whether or not the proposed project is consistent with the resource protection policies of the Coastal Act/CCMP, because it lacks the information necessary to make that determination. Specifically, the Commission cannot determine what environmental impacts the proposed project may cause, as follows:

- Impacts to marine resources, water quality, environmentally sensitive habitat areas, recreation, public access, visual resources, and commercial fishing due to potential oil spills;
- Safety impacts due to potentially unstable platforms and pipelines;
- Impacts to commercial fishing, visual resources, and safety impacts due to the possibility that the life of the platforms and other facilities will be extended.

Without a detailed assessment of the project's potential environmental impacts, the Commission cannot make a determination about whether or not the public welfare would be adversely affected if the project is not permitted. The Commission is therefore unable to determine

whether the proposed project should be permitted because to do otherwise would adversely affect the public welfare. Because the Commission is unable to determine whether the proposed project meets, at least, the second test of §30260, it is unable to analyze the proposed project for consistency with §30260 of the Coastal Act.