IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMBER RESOURCES COMPANY., et al.,<br><br>Plaintiffs,<br><br>THE UNITED STATES,<br><br>Defendant. | |
| ANADARKO E&P COMPANY, L.P., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Nos. 02-30C<br>04-1822C<br>05-249C (Consolidated)<br>(Senior Judge Eric G. Bruggink) |
| NYCAL OFFSHORE DEVELOPMENT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | |

**DEFENDANT'S MOTION FOR LEAVE TO FILE**
**SUPPLEMENTAL BRIEF PURSUANT TO RCFC 15(d)**

Pursuant to RCFC 15(d), defendant, the United States, respectfully requests leave to file this supplemental brief setting forth two separate occurrences that have happened since the completion of briefing upon the pending dispositive cross-motions. *See* RCFC 15(d) ("Upon

motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented.”).

“Rule 15(d) . . . plainly permits supplemental amendments to cover events happening after suit.” *Griffin v. County Sch. Bd. Of Prince Edward County*, 377 U.S. 218, 277 (1964).

## I. <u>Plaintiffs’ Subsequent Admissions Confirm The Absence Of Material Breach</u>

As noted in our status report filed on June 13, 2005, two plaintiffs in this litigation, Aera Energy LLC (“Aera”) and Samedan Oil Corp. (“Samedan”), are challenging the exclusion of four leases (OCS-P-0420, 0424, 0429, and 0462 (the “IBLA leases”) from the units of which the leases previously were a part in administrative proceedings before the Department of the Interior Board of Land Appeals (“IBLA”). *Samedan Oil Corp. v. Minerals Mgmt. Serv.*, IBLA 2000-142, and *Aera Energy LLC v. Minerals Mgmt. Serv.*, IBLA 2000-144. Plaintiffs’ principal declarant in this action, Ronald G. Heck, made material admissions against plaintiffs’ interest under oath at the IBLA evidentiary hearing. The administrative law judge has since released the pertinent testimony, which was previously subject to a confidentiality order entered by the same administrative law judge. We submit the pertinent excepts of this testimony with this motion.

In the transcript portions attached as Exhibit 1, Mr. Heck conceded that in-office activities are not prohibited under the directed suspensions issued pursuant to judicial decree in *California v. Norton*. See Ex. 1 at transcript pages 1195-96.[1] This testimony directly

---

[1] Mr. Heck further conceded that Samedan would not conduct activities regarding Lease 0462 until a production platform was built on Lease 0460, Ex. 1 at transcript page 1196, and that it would “need a way to work something out with Exxon, either to share drilling costs or to, you know, some kind of understanding . . . .” *Id.* at 1197.

undermines plaintiffs' repeated and unsupported contention in this litigation that the so-called "four year delay" in the development in *all* of their leases has been caused by the directed suspensions issued pursuant to judicial decree in *California v. Norton*.

This same situation exists with regard to the majority of the other suspension applications at issue in this litigation. As demonstrated in our previous supplemental brief, of the ten suspension applications submitted by plaintiffs, those for the Lion Rock, Santa Maria , Bonito, Rocky Point, Sword, and Cavern Point units, and for the stand-alone lease OCP -0409, did not propose any on-the-water activities during the suspension period. Rather, those suspension requests proposed only in-office activities such as plan amendments, re-interpretation of seismic data, and other similar activities. Mr. Heck correctly acknowledges that a directed suspension does not preclude these types of activities. Therefore, it did not matter that the district court in *California v. Norton* order the Minerals Management Service to rescind the granted suspensions and replace them with directed suspensions because the activities proposed in the above activities could be conducted under either scenario. In effect, the "delay" continuously cited by plaintiffs as the basis for breach as the leases comprising these units is illusory. Any "delay" in moving forward with the activities planned for the periods of the requested suspensions is a result of plaintiffs' own recalcitrance and not due to the litigation or to any action upon the part of the Government.

## II. Absent Reversal Upon Appeal, A New Nonfinal Ruling Of The District Court Would Defeat Plaintiffs' Breach Claim In This Case

### A. The District Court Has Erroneously Interpreted NEPA To Require An Analysis Of Effects Extending Beyond The Proposed Suspension Period

As indicated in the parties' Joint Status Report filed on August 29, 2005, on August 12, 2005, the district court in *League for Coastal Protection v. Norton*, No. C 05-00991 CW (N.D. Cal.), heard oral argument on pending motions for summary judgment. The district court subsequently issued a minute order that could have a potentially significant effect upon this matter. *See* Ex. 2.

The leases at issue in this litigation have always been subject to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*[2] *See Gulf Oil Corp. v. Morton*, 493 F.2d 141 (9th Cir. 1973). This statute requires Federal agencies to consider the environmental effects of their decisions, and, among other things, provides for the preparation of an environmental assessment or an environmental impact statement in certain circumstances.

On November 15, 1999, the state of California filed suit against the Secretary of the Interior in the United States District Court for the Northern District of California. Am. Compl. ¶ 51; *California v. Norton*, 150 F. Supp.2d 1046 (N.D. Cal. 2001). As we demonstrated previously, among other things, California contended that the Government lacked authority to grant the November 12, 1999 suspensions because the Government had not complied with 16 U.S.C. § 1456(c)(1), the provision of the Coastal Zone Management Act ("CZMA") requiring a Government certification for its own activities affecting the coastal zone. 150 F. Supp.2d at 1051-55. However, California ***additionally*** contended that the Government had failed to comply

[2] The 1968 lease pre-dates NEPA.

with NEPA because it had not adequately explained why the extraordinary circumstances exceptions do not apply to the use of the categorical exclusion cited with respect to the lease suspensions granted. *Id.* at 1055-57.

Plaintiffs, through the unit operators, intervened as defendants in *Norton*, denying California's contention that CZMA section 1456(c)(1) applies to the mere suspension of leases, and opposing California's NEPA contentions as well. *California v. Norton*, 150 F. Supp.2d at 1047-53; Am. Compl. ¶ 51. Nevertheless, on June 20, 2001, the district court ruled in California's favor upon ***both*** the CZMA claims and the NEPA claims.

The court ordered the Government to set aside its November 12, 1999 approvals of plaintiffs' most recent suspension requests, and to direct suspension of the leases for a time sufficient for the Government to comply with the district court's order regarding the CZMA. The court also held that "before again granting these lease suspensions" the Government should provide the required NEPA explanations. *Norton*, 150 F. Supp.2d at 1057-58.

The Ninth Circuit affirmed the district court's decision in December 2002. *California v. Norton*, 311 F.3d 1162 (9th Cir. 2002). Upon remand, on June 28, 2004, the district court entered an order adopting the Government's proposed timetable for completion of the analyses required by its judgment. Ex. 94 to Heck Decl. (Order Adopting Federal Defendants' Proposed Timetable, *California v. Norton*, No. C 99-4694 CW, (N.D. Cal. Jun. 28, 2004)). According to this timetable, the ordered NEPA analyses were to be completed by February 16, 2005, while the ordered CZMA analyses were to be completed by April 7, 2005. *See* Ex. 93 to Heck Decl.

The Government issued the NEPA analysis required by the district court in *California v. Norton* on February 11, 2005. In March 2005, several environmental groups brought suit

challenging the adequacy of the Government's environmental assessments. *League for Coastal Protection v. Norton*, No. 05-00991 (N.D. Cal.).

On August 23, 2005, the district court in *League for Coastal Protection* issued a minute order remanding the NEPA analysis to the Minerals Management Service "to conduct adequate NEPA analysis on lease suspension." Ex. 2. At the oral argument held on August 12, we understand that the district court indicated that, pursuant to NEPA, the Minerals Management Service is required by law to address the potential effects of future (and as yet unplanned) exploration and production at the lease suspension stage, an analysis that extends beyond the scope of NEPA review ever applied to granting mere suspensions.

The Department of the Interior disagrees with the district court's apparent reading of NEPA and potentially the Government might appeal an appealable judgment reflecting this reading. However, if permitted to stand, the district court's reading of NEPA would render the alleged breach in this case immaterial.

**B. The Logical Implication Of The New District Court Ruling Is That The 1990 CZMA Amendments Did Not Substantially Change The "Procedures And Standards" In Place At The Time The Lessees Entered Their Leases**

It is settled that a "total breach" is a breach that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Mobil Oil Expl. & Prod. S.E., Inc. v. United States*, 530 U.S. 604, 608 (2000) (quoting Restatement (Second) of Contracts § 243(4)); *accord Admiral Fin. Corp. v. United States*, 378 F.3d 1336, 1334-45 (Fed. Cir. 2004); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1311 (Fed. Cir. 2004).

In *Admiral*, a savings and loan case, the court also upheld the trial court's finding that the change in law at issue in that case (the passage of the Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA")) "had no practical effect on Admiral's ability to find the necessary additional funding for the thrift." 378 F.3d at 1345. Based upon this absence of a practical effect by the passage of FIRREA, the Federal Circuit held that the Government's action did not "'substantially impair [] the value of the contract to the injured party at the time of breach'" so as to make rescission an appropriate remedy." *Id.* (quoting *Mobil*, 530 U.S. at 608). The court quoted the trial court: "[t]he fact that FIRREA was passed in the middle of Admiral's cure period is sheer happenstance." *Id.* (citation omitted).

Here, plaintiffs contend that "the Government breaches an existing OCS lease if it establishes new requirements that 'deviate []significantly' from the 'procedures and standards' in effect when the lease was issued." Pl. Mot. at 23-24 (quoting *Mobil*, 530 U.S. at 620-21). Plaintiffs conclude that the 1990 CZMA amendments breached Section 1 of the leases by requiring "a new type of Interior Department environmental review that had not previously existed." *Id.* at 24 (quoting *Mobil*, 530 U.S. at 619).

If allowed to stand, the recent district court ruling would provide yet another independent reason why plaintiffs cannot state a claim that 1990 CZMA amendments "deviate significantly" from the "procedures and standards" in effect for leases suspensions when the leases were issued. Given the recent district court ruling, the requirements for NEPA "previously existed," and the time requirements to satisfy the CZMA would not "deviate significantly" from the time required to comply with NEPA. (Indeed, plaintiffs concede "The Existence Of A Concurrent Cause Of

Delay, . . . ." Pl. Mot. at 30). Plaintiffs' response to the NEPA requirements has been to assert, without basis or explanation, that the Supreme Court somehow held pre-existing NEPA requirements to be irrelevant in ascertaining whether the alleged change in law constituted a significant deviation from the procedures in place at the time of the leases were issued. *See* Pl. Mot. at 30. As we demonstrate below, the Supreme Court held no such thing.

Further, the 1990 CZMA amendments, which allegedly impose requirements upon the Minerals Management Service and not upon plaintiffs, would be immaterial as a matter of law if the district court’s reading of NEPA were correct. Thus, had Congress never amended the CZMA in 1990, the agency must still comply with the alleged NEPA requirements, which are not new. The 1990 CZMA amendments deprived plaintiffs of no benefit that they reasonably expected.

Because plaintiffs concede that the leases are subject to NEPA, if the district court’s interpretation of NEPA stands, plaintiffs could not demonstrate that the "procedures and standards" in place for lease suspension requests significantly changed after the enactment of the 1990 CZMA amendments. *Compare* Pl. Mot. at 24 (conceding that plaintiffs must establish, at a minimum, that "new requirements that 'deviate[] significantly' from the 'procedures and standards' in effect when the lease was issued.") *with id.* at 30 (contending that concurrent delay from NEPA review is "legally irrelevant"). According to the district court ruling, the NEPA requirements are not an independent cause for delay; rather, they go to the heart of the "procedures and standards" that were in place for lease suspension requests at the time the plaintiffs entered into their leases. By avoiding the issue, *see* Pl. Mot. at 30-31 (implying that NEPA requirements are unrelated to lease suspension requests), plaintiffs have conceded, by

omission, their inability to establish that the 1990 CZMA amendments caused a substantial deviation in the rules that were in place for lease suspension requests.

Assuming the correctness of the district court's recent reading of NEPA, there would be nothing new about the NEPA requirements, for which plaintiffs have always assumed the risk. By dismissing the NEPA requirements "legally irrelevant," plaintiffs have not demonstrated specifically how the 1990 CZMA amendments caused a significant deviation in the rules for lease suspension requests that were already in place due to NEPA (according to the recent district court ruling). Thus, unlike in *Mobil*, where a change in the law directly caused the Government's breach in that case, here, Congress has done nothing to "change the rules" with regard to NEPA's requirements.

Thus, as in *Admiral*, given the alleged NEPA requirements in this case, the passage of the 1990 CZMA amendments here was "sheer happenstance" and did not "substantially impair" the value of plaintiffs' leases. *See* 378 F.3d at 1345. This is not a matter of speculating that plaintiffs might have lost money but for the breach, as the Supreme Court suggested in *Mobil*. *See* 530 U.S. at 623-24. Rather, the NEPA reporting requirements affirmatively prevent plaintiffs from establishing that the 1990 CZMA amendments alone destroyed the value of their leases, or, more precisely, that a "change in the law" is directly responsible for plaintiffs' current situation. *See, e.g., Hansen Bancorp, Inc. v. United States*, ___ Fed. Cl. ___, 2005 WL 2036253 at *1 (Fed. Cl. Aug. 24, 2005) (no material breach because "Hansen Savings Bank would have been subject to the regulations that limited its options to survive" notwithstanding the enactment of FIRREA). Plaintiffs always assumed the risk of NEPA's reporting requirements, and the 1990 CZMA amendments do not materially increase that risk.

## CONCLUSION

For these reasons, we respectfully request that this Court grant our motion for leave to file a supplemental brief pursuant to RCFC 15(d).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director

STEPHEN C. TOSINI
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530
Tel. (202) 307-0164
Fax (202) 514-8640

August 31, 2005

Attorneys for Defendant

# EXHIBIT 1

Page 1064

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS

---

SAMEDAN OIL CORPORATION,
Petitioner (Appellant),
v.
MINERALS MANAGEMENT SERVICE,
Respondent.
IBLA 2000-142
APPEAL Re: Lease OCS-P-0462

---

AERA ENERGY LLC,
Petitioner (Appellant),
v.
MINERALS MANAGEMENT SERVICE,
Respondent.
IBLA 2000-142
APPEAL Re: Lease OCS-P-420, 424, 429

---

HEARING DAY 5
May 20, 2005.
Arlington, Virginia
Before: Honorable Harvey Sweitzer

FINAL COPY - [redacted]
JANE ROSE REPORTING 1-800-825-3341

Page 1185

HECK - CROSS - HEATH

reinterpretation, you know, essentially way more than ten years before, there have been vast improvements in the software, which we now have in the Santa Barbara office we didn't have before, so that was our intent was to use -- implement that software to improve our interpretation. We just hadn't begun that yet.

Q Fundamentally, if I understand you correctly, the basic reason it hadn't begun was just lack of available staff?

A Yes. And there was -- we still, you know, the time -- between the time we finished up the geohazard survey and then updating our exploration plan, we still had time prior to spudding the well to do that work.

Q I believe you said just a minute ago that the software for your seismic reinterpretation had become available when in 2000? When was the software --

A Well, it's -- we subscribe to a, you know, licensed software and it gets improved every year.

Q Oh, I see; you get actually updated software

Page 1186

HECK - CROSS - HEATH

for it every year?

A Annually.

Q You would receive annual updates in 1999, 2000 and 2001?

A Yes.

Q If I can back up again a step to the anticipated delineation Well No. 3, and then taking a quantum leap back in time, the exploration plan that had been approved and that had passed -- well, I'll have to ask this in several questions to make sense.

At the time the COOGER directed suspensions were entered, there was an approved EP, exploration plan --

A Yes.

Q -- for lease 460 for the Gato Canyon Unit; is that correct?

A Yes.

Q And that exploration plan had passed consistency review under the Coastal Zone Management Act with the State of California; is that correct?

A Yes.

Page 1187

HECK - CROSS - HEATH

Q And that exploration plan, if my understanding is correct, was still in place at the end of the directed COOGER suspension in 1999, that is you were still dealing with the same EP when you requested the new suspensions in '99?

A Yes.

Q Okay. Now, was the anticipated delineation Well 460 No. 3 part of that approved EP?

A Was the location for it? Is that what you said?

Q I should make it several questions. Yes, there may be a difference -- was the drilling of such a well approved as part of that exploration plan?

A Yes.

Q Was the location that you anticipated, and I appreciate your clarification on that, was the location that you had anticipated for that well, also approved as part of that EP?

A We had planned to use what's called location C on that plan, yes.

Q Okay. I believe you mentioned a second ago

Page 1188

HECK - CROSS - HEATH

that you had planned or at least tentatively planned during the three-year suspension and granted suspension period to amend or update or even possibly submit a new EP.

What revisions did you anticipate to the existing exploration plan?

A Well, it was our intent to create a unit plan if we could, so we would have updated that. As I say, there was still, you know, if we could drill our 460 well and say we were going to set a platform, we would go to a development plan. So there was some unknowns as far as exactly what was going to happen.

But we would still have to do the -- in that course of that plan, you know, each one of these leases has to go through some kind of environmental review, whether you're going to physically sit on it or not, at least with the Coastal Commission. So we would have had a unit plan.

Q But it was not necessary, if I understand you correctly, there was no amendment to the approved exploration plan that was required in order to drill

Page 1189

HECK - CROSS - HEATH

Well No. 3; is that right?

A We were asked by the MMS to do the geohazard survey, to update the geohazard survey, and exactly whether the MMS would have turned that over to the Coastal Commission, I have no idea.

All we were doing it under the NTL for the MMS in order to drill our well.

Q Yes, surely.

A So I'm not sure what your question is exactly.

Q But the well, as I understanc it, the Well No. 3 that you planned to drill was the well envisioned in the approved exploration plan?

A The ARCO, as you know, developed exploration plan. They put four locations down. In doing a plan like that, the locations are shown as vertical wells, and in the course of time what we had learned about the lease was there are some outcroppings on that lease, so why we were doing the geohazard study and updating it and improving it, was to be sure we didn't put an anchor on any of that outcrop.

Page 1190

HECK - CROSS - HEATH

So meaning that location C we might have had to request or be told that it needed to be slid a little bit in order to accommodate that geohazard information, and in some ways that had already been done in that we -- geohazards or not -- we had a pretty good idea where it was from the original geohazard survey, and so we did pick a location.

Because of that necessity of anchoring up a certain way we were going to have to deviate the well to our target, so we were going to have to drill a directional well.

Q Would that have required an amendment to the exploration plan to do that?

A No, not as long as we stayed on lease 460.

Q As long as you were on lease 460. So there wasn't anything that you would have had to amend to potentially would have had to go back through consistency review with the Coastal Commission in order to drill 460 No. 3?

A That's my understanding and that what we -- working hard to do.

Page 1191

HECK - CROSS - HEATH

Q And I take it that your geohazard survey that was done during the suspension period didn't yield information that indicated that there was a potential problem with the site that you planned for Well No. 3; is that right?

A Well, it did not with respect to the surveys that were run. We hadn't run the air gun yet. Based on all the wells that had been drilled nobody had run into, no well, no one of the wells, and we obviously done that work prior to drilling 460 No. 2, we looked at all of those wells for any potential shallow gas hazards and there had never been any problem.

Q Since Judge Wilken, Claudia Wilken in the Northern District of California, since Judge Wilken had entered her judgment ordering the MMS to replace the granted suspension, the directed suspension, that is now still in force, has Samedan done the reinterpretation of the 3D seismic data?

A No; we have not.

Q You don't believe that the directed suspension prohibits the reinterpretation of the

Page 1192

HECK - CROSS - HEATH

seismic data, do you?

A No; there is no prohibition.

Q Is there a reason you haven't done the reinterpretation at this point?

A Yes. We intend to do it when we begin our new SOP. In other words, the program has been stopped and we're going to start it again when we're allowed to.

Q I see.

A I mean, if that doesn't make sense to you, I'm sorry.

Q But it's not your understanding, is it, that "activities" for lack of a better word, that take place in the office and not out on the sea floor are prohibited by the directed suspension?

MR. ROSENBAUM: Your Honor, I'm going to object at this point. We are involved in wholly separate litigation with the United States where conceivably these questions might be relevant, but I'm sure they're not relevant here.

The question here relates to the information

Page 1193

HECK - CROSS - HEATH

available in 1999 and whether the MMS decision was supported or not. What it is these companies or free or not free to do today I cannot imagine the relevance of that, and this makes me very nervous that the government is trying to use an opportunity to ask witnesses in this case questions they -- the answer to which thus far has been of no assistance to the MMS. I don't know where we're going here. This makes me very nervous.

MR. CROWELL: Let me tell you where we're going.

JUDGE SWEITZER: Tell me where we're going and then explain why either of you, why you think this is relevant to the question.

MR. CROWELL: He has testified. He has a slide there that says why Samedan did not or do certain things during suspension periods, and suspension periods -- they showed on other slides, a whole series of suspensions, claiming they were not able to do things because of the COOGER study, claiming they were not able to do other things under other suspensions and

Page 1194

HECK - CROSS - HEATH

we're simply attempting to show that given the nature of the activities they plan to do, which he has already testified on and is on the record, were not prohibited by some of these suspensions and there's no reason for the last four years during Judge Wilken's orders they couldn't have been doing these activities. And it all goes to whether or not they do intend, as they testified, to develop these leases.

MR. ROSENBAUM: Your Honor, with all due respect, that strikes me as incoherent. These leases were taken away from us in 1999. What in the world are they talking about, whether we're engaged in activities now to drill these leases?

MR. CROWELL: That's the period of litigation.

JUDGE SWEITZER: One at a time.

MR. ROSENBAUM: The leases are gone as of 1999. That's why we're here to get them back again. It's unfathomable to me there could be questioning as to what we've been doing as of 2003, 2004 and 2005 is relevant to that question, Your Honor.

Page 1195

HECK - CROSS - HEATH

JUDGE SWEITZER: It appears that it might be relevant. The objection is overruled.

MR. HEATH: Just a second, Judge.

JUDGE SWEITZER: Okay.

(Pause.)

Q The final question is this:

JUDGE SWEITZER: Is this going to be a restatement of the question you asked that was objected to?

MR. HEATH: I think so.

JUDGE SWEITZER: Okay.

MR. HEATH: I think so, and I think this will make it simpler.

MR. CROWELL: Could he read the question back, please?

(The following question was read:

"QUESTION: But it's not your understanding, is it, that "activities" for lack of a better word, that take place in the office and not out on the sea floor are prohibited by the directed suspension?")

MR. HEATH: The restatement of the question

Page 1196

HECK - CROSS - HEATH

would be --

Q Is it your testimony that in-office activities are prohibited by Judge Wilken's directed suspension?

A That's not my testimony.

Q That's all I need.

I believe you testified yesterday that Samedan basically wouldn't be doing anything on lease 462 until the production platform was built on lease 460; is that right?

A Yes. I said that we would explore 462 from the platform.

Q And building a platform would enable you to avoid the rather expensive costs associated with mobile offshore drilling unit or save the costs would be a better way to put it?

A Yes, because if we drill the 462 lease from a mobile drilling unit after having gone through the permitting process to do that, we would have abandoned that well; whereas, if we drilled it from the platform, there's risk involved in all wells, particularly if

Page 1197

HECK - CROSS - HEATH

drilling a prospective well which is what we've never said this is anything else, would be, if it was successful, we'd put it on production.

Q Okay. And I believe you also testified that even on the plan to put a platform in, and then drill later into lease 462 from the platform, that you would still need Exxon to contribute to the cost of an exploratory well in lease 462?

A No; I didn't say that. I said we would need to settle, however we were going to -- we need to work something out is a better way to say it. We just need a way to work something out with Exxon, either to share drilling costs or to, you know, some kind of understanding, because we're right on the lease line; if you're going to drill a well right near a lease line, you'll always make some kind of agreement with your neighbor.

Q Okay, but the well --

A Let me say, it's good business practice to make an agreement with your neighbor.

Q (Laughter.) Surely. But do I understand you

Page 1198

HECK - CROSS - HEATH

to be saying then a well into lease 462, you would anticipate would be quite close to the border of 461?

A Probably. See, you know, we haven't reached that -- we don't have a location. We have a prospective area, an area of interest, that's why we kept the lease, wanted to keep the lease, that we intended to try to explore from the platform.

Obviously, since it does appear to, from the mapping we today, to extend on to the Exxon lease as well, we would have to work out a business arrangement with Exxon.

Q I understand. Is it correct to infer -- and if it's not, tell me so -- but is it correct to infer that Samedan would not be willing to proceed with drilling a well into the prospect on 462 without Exxon agreeing to share in the cost of the well?

A I can't say that for sure. I mean, that's an issue we'd have to decide between Samedan and its partners if we got to that; in other words, if we could not work out something with Exxon, you know, that's another step away. I can't really be sure.

Page 1199

HECK - CROSS - HEATH

Q That's a little too far down the road?

A Right.

Q Was that the import -- I believe, you said yesterday that we "can't assess where we would have gone with that" and that's part of that: that is, we don't really know?

A I'm not sure where that "I can't assess where we would have gone" came from. What did I say before that?

Q That was in connection with the discussion of the possibility of drilling a well on the 462?

A You know, as to whether we would do it as a standalone project or with no business arrangement, yeah, I can't be -- that's too -- that's an unknown to me at this time.

Q Okay. At the July 15, 1999 meeting with MMS, didn't one of the MMS employees ask you if Samedan was committed to ultimately drilling the prospect on 462 that you identified?

A I was -- my memory is that I was asked if we had drilled it or we planned to drill it from a mobile

Page 1200

HECK - CROSS - HEATH

drilling unit, and I said, no.

Q Specifically with respect to a mobile drilling unit?

A That was my understanding. That's what I thought we were talking about.

Q All right. Just one second.

JUDGE SWEITZER: Ten-minute recess.

(Recess taken at 1:52 p.m. and reconvened at 2:03 p.m.)

In order, Mr. Heath?

MR. HEATH: Thank you, Judge.

Q If we could go to page 58?

A (Witness complied.)

Q I believe, Mr. Heck, this was the seismic line index map that you had testified about yesterday, and do I understand correctly that That line 500 on the 3D survey essentially follows the boundary between the Gato Canyon Unit on the east and the Santa Ynez Unit and north of that lease 187 on the west; is that right?

A Yes.

Q If we can turn to page 59. Again, I'm just

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

LEAGUE FOR COASTAL PROTECTION,

Plaintiff,

v.

GALE NORTON,

Defendant.

NO. C 05-00991 CW

**MINUTE ORDER**
Date: 8/12/05

**The Honorable Claudia Wilken, Presiding**
**Clerk: Sheilah Cahill** **Court Reporter:** Diane Skillman

**Appearances for Plaintiff:**
Drew Caputo, David Newman, Linda Krop

**Appearances for Defendant:**
David Glazer

**Motions:**

| | | |
|---|---|---|
| Plaintiffs | Mo. for summary judgment | Under Submission |
| Defendant USA | Cross-mo. for summary judgment | Under Submission |

Further briefing due:
Order to be prepared by: Court

**Case Management Conference Held?:** Moot

Notes: Motions taken under submission. EA will be remanded to DOI/MMS to conduct adequate NEPA analysis on lease suspension. Ruling will on motions will be dispositive; CMC moot.

Copies to: Chambers