**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

| | |
|---|---|
| AMBER RESOURCES COMPANY, *et al.*, | |
| *Plaintiffs,* v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ****************************************** | |
| ANADARKO E & P COMPANY L.P., *et. al.*, | |
| *Plaintiffs,* v. | |
| | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ****************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| ****************************************** | |

**RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF**

On September 2, 2005, this Court granted Defendant's motion for leave to file a supplemental brief, which advances two contentions:

That "A New Non-Final Ruling Of The District Court Would Defeat Plaintiffs' Breach Claim In This Case" (Supp. Br. 4) and that the testimony of one of the Plaintiffs' witnesses at a hearing before the administrative law judge "Confirm[s] The Absence Of Material Breach" (Supp. Br. 2). As Plaintiffs show below, neither argument has the slightest merit.

**NEPA.** The Government's attempt to describe as "new" the U.S. district court decision that recently found the Mineral Management Service (MMS) has failed to comply with that court's June 20, 2001, order is a transparent attempt to inject an issue that the Government not only failed to raise in its opposition to Plaintiffs' summary judgment motion, but also that it conceded by failing to challenge Plaintiffs' demonstration in that motion that any NEPA-induced delays in approving the lease suspensions were irrelevant.

The Government's own brief provides the necessary background that exposes the Government's tactics here:

> [O]n June 20, 2001, the district court ruled in California's favor upon ***both*** the CZMA claims and the NEPA claims.
>
> The court ordered the Government to set aside its November 12, 1999 approvals of plaintiffs' most recent suspension requests, and to direct suspensions of the leases for a time sufficient for the Government to comply with the district court's order regarding the CZMA. **The court also held that "before again granting these lease suspensions" the Government should provide the required NEPA explanations. *Norton*, 150 F. Supp.2d at 1057-58**."

Supp. Br. 5 (first emphasis in original; second emphasis added).

Aware that the Government in *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000), had argued -- first successfully in the Federal Circuit, but unsuccessfully in the Supreme Court -- that the existence of an independent obstacle to

Mobil's exploration of its leases should excuse the material breach that resulted from the imposition of new legal requirements upon Mobil, Plaintiffs devoted three pages of their August 31, 2004, memorandum in support of their motion for summary judgment (hereinafter "Memorandum") to an argument that "Other Potential Barriers Do Not Excuse The Government's Breach." *Id.* at 28. Plaintiffs first discussed *Mobil Oil*'s holding that "the fact that the Mobil Oil lessees might not have been permitted to explore for oil and gas for reasons wholly apart from the OBPA [Outer Banks Protection Act, the statute that was enacted after the leases were issued] was irrelevant to the claim for restitution," *id.* at 29, 30. As the Court had explained, "Because the Government repudiated the lease contracts [through the enactment of the OBPA], the law entitles the companies to [their] restitution whether the contracts would, or would not, ultimately have produced a financial gain or led them to obtain a definite right to explore." 530 U.S. at 623-24.

Plaintiffs then addressed the NEPA issue in this case:

> **Again, *Mobil Oil* Is On Point and Controlling.**
>
> Here, the Government has suggested that the 1990 CZMA amendments cannot constitute a material breach because the *Norton I* and *II* courts also found that the Secretary had failed to prepare the requisite NEPA documentation (*see* p. 17, *supra*). This argument is even less persuasive than in *Mobil Oil*. In that case, the Government unsuccessfully tried to excuse its material breach of contract by pointing to a concurrent event that was outside its control – the state of North Carolina's assertion of a CZMA § 307(c)(3) objection.
>
> The Government here relies on a much thinner reed, attempting to excuse its material breach of contract by pointing to its own failure to satisfy its NEPA obligations. *Mobil Oil* thus applies here *a fortiori*.

Memorandum at 30-31. Although the Government advanced a host of arguments in its opposition brief and at oral argument in seeking to persuade this Court to deny Plaintiffs' summary judgment motion, it never contested Plaintiffs' NEPA argument.

There is nothing "new" about the NEPA issue in this case; the only "new" thing is that the Government, after four years of attempting to comply with NEPA, has yet to satisfy that statute's requirements.[1] Thus, NEPA (due to the federal government's own failings) continues to be a cause of delay in connection with the lessees' activities, just like the CZMA until such time as MMS makes its final consistency determinations. Given the State's detailed objections to MMS's earlier consistency determinations, *see* August 29, 2005 Joint Status Report, Attachments A-E, and the State's unquestioned right to challenge in court any final consistency determinations, it is completely unsettled whether the federal government will ever be able to surmount the CZMA requirements established by the 1990 CZMA amendments to § 1456(c)(1).

Moreover, even assuming *arguendo* that such determinations were issued and survived judicial review, the fact that NEPA might at that point impose still additional delays would provide no excuse for the years of CZMA -induced delay that has already transpired.

Again, *Mobil Oil* is dispositive because by the time the Supreme Court reached its decision in that case, the OBPA had been repealed, although the independent CZMA §1456(c)(3) delay that underlay North Carolina's objection to Mobil's exploration plan was still in effect. 530 U.S. at 613.

---

[1] Judge Wilken has now issued her formal decision and judgment (Attachment 1 hereto), which are consistent with her Minute Order that was Attachment F to the parties' August 29, 2005 Joint Status Report.

Patently, the Government's attempt to inject NEPA into this case six months after this Court's summary judgment hearing is not only untimely but is also completely without merit.

**Heck's Testimony.** Even less needs to be said about the Government's reliance in its supplemental brief upon the now-available testimony of Mr. Ron Heck, a witness in the IBLA proceedings regarding the four leases that were not suspended by MMS in 1999. The Government filed a status report on June 13, 2005 with respect to that matter, referring to Mr. Heck's alleged "material admissions" that purportedly undermined the position taken by the Lessees in this case, *id.* at 6, and representing that "[w]hen and if the administrative law judge grants the agency's request [for relief from the protective order in that case] and we obtain access to this testimony, we intend to file a motion for leave to file a supplemental brief pursuant to RCFC 15(d) *as soon as practicable*." *Id.* (emphasis added). Although the administrative law judge granted the requested relief from the protective order on July 1, 2005 (Attachment 2 hereto), the Government waited two full months to file its Rule 15(d) brief.

Perhaps the Government's delay is explained by the fact that Plaintiffs had responded to the Government's June 13, 2005 Status Report on June 17, 2005, where they correctly anticipated (at p. 3) that--

> the Government is almost certainly relying upon Mr. Heck's testimony regarding Samedan's plans under the November 1999 'green light suspensions' to conduct certain non-mandatory office analyses,

and went on to refute any arguments based on that testimony. In any event, the Government's August 31 supplemental brief makes precisely the argument that Plaintiffs have already answered. Accordingly, it largely suffices to refer the Court to Plaintiffs' June 17, 2005 Submission. *Id.* at 2-4. Plaintiffs do add, however, that the Government's supplemental brief

failed to include all of Mr. Heck's relevant testimony (Attachment 3 hereto), which explained why it made no sense for plaintiff Samedan to proceed with its office analyses (*i.e.*, seismic reprocessing) until after it had conducted the mandatory geohazard surveys that were precluded by MMS's issuance of the July 2, 2001 "red light" suspensions following Judge Wilken's June 20, 2001 order. Attachment 3, page 1177 line 10 - page 1185 line 15; *see also* Plaintiffs' June 17, 2005 Submission at 2-4.

One additional comment on the Government's argument is appropriate: It tried first at the March 8 oral argument on the summary judgment motions, again in the supplemental brief which this Court requested after oral argument, next in its first uninvited status report, and now in its uninvited supplemental brief to advance the wholly untenable position that the four plus years' delay in proceeding with activities on the leases "is a result of plaintiffs' own recalcitrance and not due to the litigation or any action upon the part of the Government." Supp. Br. 3. The Government's position continues to defy belief.

The district court's holding on June 20, 2001, that the November 1999 "green light" lease suspensions were invalid because of the failure to comply with the CZMA, necessarily brought all activities on the leases to an end, thus forbidding the geohazard surveying and exploratory drilling that would have occurred years ago under the schedules established by the November 1999 suspensions. The holding also raised serious doubt whether CZMA compliance could ever be achieved, thus jeopardizing the leases' very existence. It is absurd to contend that the lessees were free to proceed with plans and commitments to conduct any activities leading to development in these circumstances. Plaintiffs are pleased that this Court, having received the Government's fourth iteration of this argument, has made it clear that "no further briefing will be allowed absent order of the Court."

**CONCLUSION**

For the reasons stated in all of the memoranda that have been filed by Plaintiffs in support of their motion for summary judgment, we urge this Court to order the summary judgment that they have requested.

Respectfully submitted,

s/ Steven J. Rosenbaum
by s/ Thomas J. Cosgrove
E. Edward Bruce
Steven J. Rosenbaum
*Counsel of Record*
Thomas J. Cosgrove
COVINGTON & BURLING
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2401
Tel. (202) 662-5568
Fax. (202) 778-5568

Counsel for All Plaintiffs in
No. 02-30C and No. 04-1822C

September 7, 2005

**ATTACHMENT 1**

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LEAGUE FOR COASTAL PROTECTION, et al.,

Plaintiffs,

v.

GALE NORTON, Secretary of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; and MINERALS MANAGEMENT SERVICE and PETER TWEEDT, Regional Manager;

Defendants.

______________________________________/

No. C 05-0991 CW

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION

Plaintiffs League for Coastal Protection, The Otter Project, Sierra Club, Citizens Planning Association of Santa Barbara County, Defenders of Wildlife, Environment California, Get Oil Out, Natural Resources Defense Council, Santa Barbara Channel Keeper, and Surfrider Foundation move for summary adjudication of their complaint against Defendants Gale Norton, the United States Department of the Interior, Minerals Management Service (MMS) and Peter Tweedt. Defendants oppose the motion and cross-move for summary judgment. The matter was heard on August 12, 2005. Having considered the parties' papers, the evidence cited therein and oral argument on the motions, the Court GRANTS Plaintiffs' motion for

United States District Court
For the Northern District of California

summary judgment and DENIES Defendants' cross-motion.

BACKGROUND

Oil and gas leases on the Outer Continental Shelf (OSC) are governed by the Outer Continental Shelf Lands Act (OCSLA). Under OCSLA, the Department of the Interior may issue and administer leases for exploration for and production of oil and gas on the OCS. These leases may have a primary term of five to ten years, and may continue after the primary term for as long as there is production of oil or gas in paying quantities, approved drilling or well-reworking operations. The MMS has the authority to grant suspensions of the primary lease term upon request of the lessee for reasons such as facilitating the development of the lease or making arrangements for transportation facilities. A suspension of a lease suspends the running of its term; thus, a lease suspension functions as an extension of the primary lease term.

In November, 1999, MMS granted suspensions for thirty-six oil and gas leases located off of the central California coast. These leases were originally sold between 1968 and 1984. In granting the lease suspensions, MMS did not conduct environmental analyses or engage in consistency review processes with the California Coastal Commission. This Court deemed those suspensions invalid because MMS had failed to comply with the Coastal Zone Management Act and the National Environmental Policy Act (NEPA). California ex rel. California Coastal Comm'n v. Norton, 150 F. Supp. 2d 1046 (N.D. Cal. 2001), aff'd, 311 F.3d 1162 (9th Cir. 2002).

On February 11, 2005, MMS issued six final Environmental Assessments (EAs) on new proposed suspensions for the thirty-six

leases involved in the prior litigation and an adjacent lease. None of the EAs considered the potential environmental impact of post-suspension exploration and development activities. Also on February 11, MMS issued a finding of no significant impact (FONSI) on these thirty-seven proposed suspensions. MMS did not prepare an environmental impact statement (EIS) for any of the proposed lease suspensions.

The stated purpose of the suspensions is to prevent the leases from expiring and "to facilitate proper development" of the leases. Future exploration and development activities under the thirty-seven leases could not occur absent the granting of the proposed suspensions.

MMS plans to allow acoustic surveys under several of the leases during the suspension period, including several in the Santa Barbara Channel. The surveys are designed to produce information to assist in planning and implementing future exploratory drilling under the leases. The surveys would involve the regular underwater firing of an air gun producing sound at 218 decibels. Sound levels exceeding 160 decibels may be harmful to some marine life, including marine mammals and sea turtles. The EAs prepared by MMS concluded that decibel levels would exceed 160 only within a one-half mile radius of the air gun, known as the "impact zone." MMS declared in its EAs that it would institute as a mitigation measure shipboard human observers who would visually scan the impact zone for, among other things, marine mammals and sea turtles. If such a creature was seen entering the impact zone, the observer could direct MMS to turn the air gun off. MMS used a "spherical



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

spreading model" to calculate the size of the impact zone. However, the EAs did not disclose that research from several MMS scientists suggested that the model was not accurate for the Santa Barbara Channel because the water there is too shallow, and that the impact zone in the channel is potentially much larger than disclosed in the EAs. Nevertheless, MMS also relied upon field data, including a report from Exxon, to conclude that the model had accurately calculated the size of the impact zone in the Channel.

On March 9, 2005, Plaintiffs filed their complaint, which alleges that Defendants violated NEPA and the Administrative Procedures Act (APA) by failing to conduct adequate environmental analyses on the thirty-seven proposed lease suspensions at issue. Plaintiffs seek declaratory judgment that Defendants violated NEPA, and request that the Court remand the EAs and FONSIs to MMS with instructions to complete adequate NEPA environmental analyses of the proposed suspensions.

LEGAL STANDARD

I. Summary Judgment

Summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. See Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Insurance Co. of North America, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

A motion for summary judgment may properly be brought in litigation challenging decisions and actions of federal agencies

under the APA. See Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800 (9th Cir. 1999); see also 5 U.S.C. §§ 702-706. In deciding such a motion for summary judgment, the Court reviews the record of the federal agency and determines whether the agency's decision was based on a consideration of the relevant factors or whether its actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. See Blue Mountain Biodiversity Project v. Blackwood, 161 F.3d 1208 (9th Cir. 1998). However, questions of law are reviewed de novo by the Court. See Wagner v. National Transp. Safety Bd., 86 F.3d 928, 930 (9th Cir. 1996).

II. Administrative Procedures Act

Challenges to final agency actions taken pursuant to NEPA are subject to the review provisions of the APA. Southwest Center for Biological Diversity v. Bureau of Reclamation, 143 F.3d 515, 522 (9th Cir. 1998). MMS's decision not to prepare an EIS is a final agency action subject to review pursuant to the APA. Under the APA, agency decisions may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001).

To determine whether an agency action was arbitrary and capricious, the court must "determine whether the agency articulated a rational connection between the facts found and the choice made." Ariz. Cattle Growers' Ass'n, 273 F.3d at 1236. As long as the agency decision was based on a consideration of relevant factors and there is no clear error of judgment, the



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

reviewing court may not overturn the agency's action. Id. (citing Am. Hosp. Ass'n v. NLRB, 499 U.S. 606 (1991)). In particular, the reviewing court must defer to the agency's decision when the resolution of the dispute involves issues of fact or requires a high level of technical expertise. Marsh v. Or. Natural Res. Council, 490 U.S. 360, 377 (1989); Cen. Ariz. Water Conservation Dist. v. EPA, 990 F.2d 1531, 1539-40 (9th Cir. 1993). Accordingly, the court may set aside only those conclusions that do not have a basis in fact, not those with which it merely disagrees. Ariz. Cattle Growers' Ass'n, 273 F.3d at 1236.

DISCUSSION

I. Future Exploration and Production Activities

Plaintiffs argue that Defendants violated NEPA by failing to prepare environmental analyses of future exploration and development activities under the leases. NEPA, Title 42 U.S.C. section 4331, et seq., requires federal agencies to consider the environmental consequences of their actions. Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989)). NEPA provides that federal agencies are to identify and develop methods for implementing NEPA in consultation with the Council on Environmental Quality. See 42 U.S.C. § 4332(B); see also, 40 C.F.R. § 1500 et seq. Title 40 C.F.R. section 1500 et seq., enacted pursuant to NEPA, are the "action-forcing provisions to make sure that the federal agencies act according to the Act." 40 C.F.R. § 1500.1(a).

NEPA requires federal agencies to prepare an EIS for any action that will significantly affect the environment. See 42

Case 4:05-cv-00991-CW Document 35 Filed 08/31/2005 Page 7 of 13

U.S.C. § 4332(C). In determining whether an action will significantly affect the environment, some factors that should be considered are "(1) the degree to which the proposed action affects public health or safety, (2) the degree to which the effects will be highly controversial, (3) whether the action establishes a precedent for further action with significant effects, and (4) whether the action is related to other action which has individually insignificant, but cumulatively significant impacts." Alaska Ctr for the Env't v. U.S. Forest Service, 189 F.3d 851, 859 (9th Cir. 1999); see also 40 C.F.R. § 1508.27(b).

Under Title 40 C.F.R. section 1508.9, when determining whether to prepare an EIS, a federal agency may prepare an EA in order to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement (EIS) or finding of no significant impact." Pursuant to Title 40 C.F.R. section 1508.13, if the agency finds that the proposed action would have no significant impact on the environment, the agency may issue a FONSI, which eliminates the agency's requirement to prepare an EIS.

Here, it is not disputed that the EAs prepared for the lease suspensions addressed only the potential environmental impact of activities planned during the lease suspensions, and did not address the environmental impact of future exploration and development activities under the leases. NEPA requires federal agencies to consider not just the "direct effects" of an action, but also the "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8. The Supreme Court

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

has ruled that this test is analogous to a "reasonably close causal relationship" test. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 767 (2004).

Plaintiffs argue that future exploration and development activities are reasonably foreseeable as a result of MMS's proposed lease suspensions, and that there is a reasonably close causal relationship between the suspensions and future oil and gas production. Plaintiffs note that the stated purpose of the suspensions is to facilitate future development of the leases, and that activities undertaken during the suspension are aimed at providing information for exploratory drilling. Plaintiffs cite one operations plan pursuant to which the lessee intends to "spud a delineation well" on the very date that the suspension for that lease expires. Pl.'s Mot., Ex. C.

In further support of their argument, Plaintiffs cite Village of False Pass v. Clark, 733 F.2d 605 (9th Cir. 1984), and Thomas v. Peterson, 753 F.2d 754 (9th Cir. 1985). In False Pass, the Ninth Circuit ruled that the Secretary of the Interior had not abused his discretion when he decided to consider a less serious oil-spill scenario instead of a much worse hypothetical scenario in conducting environmental analysis for an oil exploration and production lease. 733 F.2d at 616-17. However, the court held as follows: "The lease sale itself does not directly mandate further activity that would raise an oil spill problem, but it does require an overview of those future possibilities." Id. at 616 (internal citations omitted). The Ninth Circuit has analogized the lease suspensions in this case to a lease sale. California v. Norton,

Case 4:05-cv-00091-CW Document 35 Filed 08/31/2005 Page 9 of 13

United States District Court
For the Northern District of California

311 F.3d at 1174.

In Thomas, the plaintiffs challenged an EA and FONSI prepared by the United States Forest Service for its approval of a timber road that was planned in a national forest. 753 F.2d at 756-57. The Ninth Circuit ruled that the EA was insufficient because it considered only the potential environmental impact of the road, and did not consider the impact of potential timber sales that would result; the court held that the building of the road and the sale of the timber were "inextricably intertwined," and thus connected actions, and would likely have cumulative environmental effects. Id. at 758-59.

Defendants argue that MMS was not required to consider the environmental impact of future exploration and development in issuing the EAs on the proposed lease suspensions. First, Defendants contend that the lease suspensions themselves cause only further planning and review of already-established development plans, rather than future development. Defendants note that MMS prepared an EIS in connection with the original lease sales and that further EISs would be required for future exploration and development plans. They argue that the suspensions do not necessarily implicate further activity that would have any environmental impact, and that the lease suspensions merely maintain the status quo. Second, Defendants argue that Plaintiffs' reliance upon Thomas is misplaced because, in that case, the timber road and timber sales proposals were finalized, whereas in this case Plaintiffs are arguing that the lease suspensions are connected to and have cumulative effect with potential exploration

United States District Court
For the Northern District of California

and development activity for which there is no proposal or plan.

However, even if Thomas is distinguishable, Defendants have not disputed that future exploration and development activity under the leases at issue here is reasonably foreseeable as a result of the proposed suspensions. And, as Plaintiffs note, the lease suspensions do not preserve the status quo because, without them, the leases would expire. Plaintiffs cite California v. Norton, in which the Ninth Circuit not only analogized the lease suspensions at issue here with lease sales, but also held that the suspensions "represent a significant decision to extend the life of oil exploration and production off of California's coast, with all of the far reaching effect and perils that go along with offshore oil production." 311 F.3d at 1173. Defendants' argument that EISs are not required because they would be required in the future for exploration and development plans is similarly unavailing. The Ninth Circuit has ruled that "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done." Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1072 (9th Cir. 2002).

Future exploration and development activity on the thirty-seven leases at issue here is not only reasonably foreseeable, it is, as Defendants acknowledge, itself the object of the lease suspensions. A lessee has already made explicit plans to drill under at least one lease the very day that the corresponding proposed suspension expires. MMS may not restrict its NEPA analysis to activity during the lease suspensions; the agency must

Case 4:05-cv-00991-CW Document 35 Filed 08/31/2005 Page 11 of 13

consider the environmental impact of future exploration and development activity in preparing environmental analyses in conjunction with the thirty-seven suspensions in this case. Such analyses must be prepared even if MMS does not currently have detailed proposals for such activity on all leases: "The purpose of an EIS is to evaluate the possibilities in light of current and contemplated plans and to produce an informed estimate of the environmental consequences. . . . Drafting an EIS necessarily involves some degree of forecasting." Id. at 1072 (internal citations omitted) (emphasis in original).

II. Activities During Lease Suspensions

Plaintiffs argue that, even in its NEPA analysis of activity during the lease suspensions, MMS violated NEPA by issuing flawed and incomplete EAs.

Plaintiffs contend that MMS used an inaccurate underwater noise model in calculating the impact zone for the acoustic surveys on several of the leases and, as a result, drastically under-estimated the zone's size. Plaintiffs argue that the spherical spreading noise model implemented by MMS was inaccurate for the Santa Barbara Channel because the water in the channel is too shallow for that model. Plaintiffs cite internal MMS documents indicating that MMS administrators knew that the agency was using a faulty model and that the impact zone was actually much larger than it represented in the EAs. Pl.'s Mot., Ex. J. Plaintiffs cite The Lands Council v. Powell, 395 F.3d 1019, 1032 (9th Cir. 2005), in which the Ninth Circuit ruled that the United States Forest Service had violated NEPA by failing to disclose in an EIS the limitations



United States District Court
For the Northern District of California

Case 1:02-cv-06030-EGB Document 101-2 Filed 09/07/2005 Page 12 of 15



of the model it had used to determine the environmental impact of a timber sale.

Defendants argue that the methods implemented by MMS were adequate to support the agency's FONSI, and that its field data indicated that the spherical spreading model had accurately calculated the impact zone. Notably, however, Defendants do not dispute that MMS's own research indicated that the spherical spreading model has limitations when applied to shallow water, or that its mitigation measures would be inadequate if the impact zone was much larger than described in the EAs. Defendants argue that the EAs stated that field data supported the conclusions reached by MMS's use of the model. However, the sentence in the EAs upon which they rely for this argument is conclusory and insufficient. Thus, MMS violated NEPA by failing to disclose in the EAs the limitations of the spherical spreading model relied upon for the FONSI, see Lands Council, 395 F.3d at 1032, and failing to describe fully the field data supporting its conclusions irrespective of the accuracy of the model.

United States District Court
For the Northern District of California

CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (Docket No. 9) is GRANTED and Defendants' cross-motion (Docket No. 20) is DENIED. Defendants' motion for leave to file a reply brief (Docket No. 28) is GRANTED. The EAs and FONSIs relating to the lease suspensions at issue in this case are remanded to MMS; the agency shall complete adequate NEPA analyses on these suspensions in conformance with this order. The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: 8/31/05

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LEAGUE FOR COASTAL PROTECTION, et al.,

Plaintiffs,

v.

GALE NORTON, Secretary of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; and MINERALS MANAGEMENT SERVICE and PETER TWEEDT, Regional Manager;

Defendants.
_______________________________________/

No. C 05-0991 CW

JUDGMENT

This action came on August 12, 2005 before the Court, the Honorable Claudia Wilken, United States District Judge, presiding, and the issues having been duly heard and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED

That the environmental assessments and findings of no significant impact relating to the lease suspensions at issue in this case be remanded to Defendant Minerals Management Service, that the agency complete adequate environmental analyses on these suspensions in conformance with the Court's orders, and that Plaintiffs recover from Defendants their costs of action.

Dated at Oakland, California, this 31st day of August, 2005.

RICHARD W. WIEKING
Clerk of Court

By: /s/ SHEILAH CAHILL

United States District Court
For the Northern District of California

SHEILAH CAHILL
Deputy Clerk

**ATTACHMENT 2**

United States Department of the Interior
OFFICE OF HEARINGS AND APPEALS
Hearings Division
139 East South Temple, Suite 600
Salt Lake City, Utah 84111
TELEPHONE (801) 524-5344
FAX: (801) 524-5539

July 1, 2005

# ORDER

| | | |
|---|---|---|
| SAMEDAN OIL CORPORATION, Appellant | : | IBLA 2000-142 |
| v. | : | Appeal from an August 13, 1999, decision of the Minerals Management Service terminating Lease OCS-P-0462. |
| MINERALS MANAGEMENT SERVICE, Respondent | : | |
| AERA ENERGY LLC, Appellant | : | IBLA 2000-144 |
| v. | : | Appeal from an August 13, 1999, decision of the Minerals Management Service terminating Lease OCS-P 420, 424 and 429. |
| MINERALS MANAGEMENT SERVICE, Respondent | : | |

## Ruling Regarding Confidentiality Order

By Order dated May 10, 2005, I granted Appellants' motion that the hearing and hearing transcript and exhibits be deemed and kept confidential. On June 20, 2005, Respondent filed a document entitled "Motion to Clarify Scope of Confidentiality Order or in the Alternative for Relief from Order" in which it seeks a ruling that the May 10, 2005 Order does not apply to pages 1185-2000 of the transcript of the hearing. On June 27, 2005, Appellants filed a response in which it agrees that those pages need not be kept confidential and proposes that pages 1177-84 need not be kept confidential as well. Based upon the foregoing, I find that the May 10, 2005 Order does not apply to pages 1177-2000 of the transcript and therefore that those pages are not deemed, and need not be kept, confidential.

Harvey C. Sweitzer
Administrative Law Judge

See page 2 for distribution.

IBLA 2000-142, 2000-144

Distributed
By Facsimile and First Class Mail:

Steven J. Rosenbaum, Esq.
Thomas J. Cosgrove, Esq.
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Fax: (202) 778-5568

Barry Crowell, Esq.
Rodney J. Vieira, Esq.
Geoffrey Heath, Esq.
Office of the Solicitor
Division of Mineral Resources
1849 C Street, NW, MS 6312
Washington, D.C. 20240
Fax: (202) 219-1789

ATTACHMENT 3



UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
--------------------------------------------------
SAMEDAN OIL CORPORATION,
Petitioner (Appellant),
v.
MINERALS MANAGEMENT SERVICE,
Respondent.
IBLA 2000-142
APPEAL Re: Lease OCS-P-0462
--------------------------------------------------
AERA ENERGY LLC,
Petitioner (Appellant),
v.
MINERALS MANAGEMENT SERVICE,
Respondent.
IBLA 2000-142
APPEAL Re: Lease OCS-P-420, 424, 429
--------------------------------------------------
HEARING DAY 5
May 20, 2005
Arlington, Virginia
Before: Honorable Harvey Sweitzer

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING 1-800-825-3341

HECK - CROSS - HEATH

Thank you.

Q The title being "Why Samedan did not plan to drill a well on lease 462 during the suspension period." To make sure I understand correctly, the suspension period referred to here is the three-year suspension period that Samedan requested in 1999; is that correct?

A That's correct.

Q Okay. Thank you. What did Samedan plan to do during the three-year suspension period that it requested?

A We planned to perform a geohazard survey, a new one, to update and do some additional geohazard work that had not been done before. We planned to do a year-long reinterpretation of our 3D seismic, and I couldn't put it in the SOP but I planned to make a data exchange with Exxon to try to complete our mapping.

We planned to either amend or update our exploration plan or submit a new one. That was still my understanding, question of how we would proceed, that we would work out with MMS, and of course that



HECK - CROSS - HEATH

geohazard information would have been included in that.

We planned to drill one more well on lease 460, the No. 3 well, up near the eastern boundary of lease 460 with a sole intent of one final test of the producibility of the Monterey and to try to be sure that, to give us another, let me say, another data point in our mapping in order to be able to make a recommendation to management whether or not we should set a platform.

Q Do I understand correctly that the anticipated drilling of 460 No. 3, the delineation well would have been from a mobile offshore drilling unit?

A Yes.

Q Could you take me back a little bit, Mr. Heck, and explain to me what is involved in the geohazard survey and how that's done?

A Yes. We, in this instance, because we did it, I can tell you quite a bit about it. I can't remember -- I still can't remember a few things, that was six years ago, too. I believe we put out an RFP or else we discussed it with several contractors about who



HECK - CROSS - HEATH

we would use as a contractor.

The company we chose was headquartered in San Diego and they had done the original geohazard work here back when; the company was called Pelagos at the time. They subsequently were acquired by a French company.

And we first determined with them -- and we have an NTL, as you know, you know, that MMS has guidelines for us -- what their needs are, what type of instrumentation is needed, what levels. They don't tell us what instruments to use, just what needs to be done.

Then working with the MMS we had many meetings, many meetings. It took quite a while to get that plan developed and approved, and the tools are high resolution, we call them, geophysical tools where they explore from the sea bottom and then just below the sea bottom, and then a little more below the sea bottom, trying to look for --

We also had to run a magnetometer survey, so those are things that are looking for objects on the



HECK - CROSS - HEATH

sea floor, looking for anything, and also we had to run a rather sophisticated side scan survey, which actually looks at images of sea floor.

Q And the side scan survey is a sonar-type survey?

A Yes.

Q When you say high resolution tools, you're referring there to a high resolution visual tool, or are you actually taking pictures of the sea bottom?

A No, you said that, the sonar tool is not a photograph. With the technology that exists today we get an image that is quite revealing and what that is looking for is marine, you know, outcrops, the data actually can't see marine life but, if there's an outcrop, there's probably marine life. It's looking for slumps, that sort of thing.

Q Slumps of the sea bottom, you mean?

A Yes.

Q Because that creates a hazard for platform placement?

A Could be, yes. So as we go down through

Page 1181

HECK - CROSS - HEATH

those levels there's also the tools that are trying to see if there's any gas in the sediments that could be a hazard, and then finally you -- in this case, we're going to run an air gun for a little deeper penetration.

Q Is that similar to the type of air gun that's used in the seismic survey?

A It is a seismic survey, just that it's -- we're using an air gun not quite as powerful as, say, the 3D air guns.

Q Because the only thing you were looking at was kind of a --

A We didn't have to penetrate as deep in the subsurface as you would for regular geological, for regular exploration.

So to create that plan or get that plan developed, I think you said earlier I was on the HESS committee and out of that committee came a lot of recommendations for mediating the effects of the air gun and other, to protect marine mammals.

We got that program developed in conjunction

Page 1182

HECK - CROSS - HEATH

with the contractor, MMS and ourselves. We submitted the plan; it was approved, and during, is that 2001 we got shut down? Let me think a minute.

Yes. I think it was in 2001 we performed that survey except for the air gun. Just as we were about to get that done, Judge Wilken shut us down on the California versus Secretary Norton case. So we terminated that survey at that point.

Q So you were conducting the survey -- let me make sure I've got this straight. You were conducting the survey under the suspension that MMS granted in 1999 in response to Samedan's request?

A That's right.

Q You did that survey in the 1999 to 2001 timeframe or 2000 to 2001 timeframe, about where were we?

A We went through that process as I just mentioned. We got the boat in the water in 2001.

Q Just to make sure that the record is clear, when you say the HESS Committee, that stands for High Energy Seismic Survey?

Page 1183

HECK - CROSS - HEATH

A Yes.

Q Is that correct?

A Yes.

Q And when they're referring to Judge Wilken "shutting us down," you're referring to the Initial District Court order in the California versus Norton litigation?

A That's correct.

Q During the suspension period, that is the period of suspension granted in 1999, did you also do the reinterpretation of the 3D seismic data?

A We had not begun that yet.

Q Could you explain why?

A Why we hadn't started on that?

Q Yes.

A Up until we shot the geophysics, since we're a pretty small staff in Santa Barbara, we hadn't had time.

Q Then I'm a little confused. When we talk about a reinterpretation of 3D seismic data, that also involved shooting new seismic data?

Page 1184

HECK - CROSS - HEATH

A No. We were not -- we would not have planned nor do I think we could have permitted to shoot a full bore 3D seismic survey here.

Q Okay, and I had understood the reinterpretation to be a reinterpretation of preexisting 3D seismic data; is that correct?

A Yes.

Q And that's why I'm confused about your answer just a minute ago about the staff to do the shoot?

A No, to do the interpretation.

Q To do the interpretation?

A Yes. We had a dual purpose in reinterpretation. When we did the original interpretation it was simply just to see what improvements we could get from well data that we required. Now that we're going to drill this well, we were going to really hone in on the location of the well to really fine tune that interpretation. That would have been our primary goal.

We also -- since we did the

Page 1185

HECK - CROSS - HEATH

reinterpretation, you know, essentially way more than ten years before, there have been vast improvements in the software, which we now have in the Santa Barbara office we didn't have before, so that was our intent was to use -- implement that software to improve our interpretation. We just hadn't begun that yet.

Q Fundamentally, if I understand you correctly, the basic reason it hadn't begun was just lack of available staff?

A Yes. And there was -- we still, you know, the time -- between the time we finished up the geohazard survey and then updating our exploration plan, we still had time prior to spudding the well to do that work.

Q I believe you said just a minute ago that the software for your seismic reinterpretation had become available when in 2000? When was the software --

A Well, it's -- we subscribe to a, you know, licensed software and it gets improved every year.

Q Oh, I see; you get actually updated software

Page 1186

HECK - CROSS - HEATH

for it every year?

A Annually.

Q You would receive annual updates in 1999, 2000 and 2001?

A Yes.

Q If I can back up again a step to the anticipated delineation Well No. 3, and then taking a quantum leap back in time, the exploration plan that had been approved and that had passed -- well, I'll have to ask this in several questions to make sense.

At the time the COOGER directed suspensions were entered, there was an approved EP, exploration plan --

A Yes.

Q -- for lease 460 for the Gato Canyon Unit; is that correct?

A Yes.

Q And that exploration plan had passed consistency review under the Coastal Zone Management Act with the State of California; is that correct?

A Yes.

Page 1187

HECK - CROSS - HEATH

Q And that exploration plan, if my understanding is correct, was still in place at the end of the directed COOGER suspension in 1999, that is you were still dealing with the same EP when you requested the new suspensions in '99?

A Yes.

Q Okay. Now, was the anticipated delineation Well 460 No. 3 part of that approved EP?

A Was the location for it? Is that what you said?

Q I should make it several questions. Yes, there may be a difference -- was the drilling of such a well approved as part of that exploration plan?

A Yes.

Q Was the location that you anticipated, and I appreciate your clarification on that, was the location that you had anticipated for that well, also approved as part of that EP?

A We had planned to use what's called location C on that plan, yes.

Q Okay. I believe you mentioned a second ago

Page 1188

HECK - CROSS - HEATH

that you had planned or at least tentatively planned during the three-year suspension and granted suspension period to amend or update or even possibly submit a new EP.

What revisions did you anticipate to the existing exploration plan?

A Well, it was our intent to create a unit plan if we could, so we would have updated that. As I say, there was still, you know, if we could drill our 460 well and say we were going to set a platform, we would go to a development plan. So there was some unknowns as far as exactly what was going to happen.

But we would still have to do the -- in that course of that plan, you know, each one of these leases has to go through some kind of environmental review, whether you're going to physically sit on it or not, at least with the Coastal Commission. So we would have had a unit plan.

Q But it was not necessary, if I understand you correctly, there was no amendment to the approved exploration plan that was required in order to drill

Page 1189

HECK - CROSS - HEATH

Well No. 3; is that right?

A We were asked by the MMS to do the geohazard survey, to update the geohazard survey, and exactly whether the MMS would have turned that over to the Coastal Commission, I have no idea.

All we were doing it under the NTL for the MMS in order to drill our well.

Q Yes, surely.

A So I'm not sure what your question is exactly.

Q But the well, as I understand it, the Well No. 3 that you planned to drill was the well envisioned in the approved exploration plan?

A The ARCO, as you know, developed exploration plan. They put four locations down. In doing a plan like that, the locations are shown as vertical wells, and in the course of time what we had learned about the lease was there are some outcroppings on that lease, so why we were doing the geohazard study and updating it and improving it, was to be sure we didn't put an anchor on any of that outcrop.

Page 1190

HECK - CROSS - HEATH

So meaning that location C we might have had to request or be told that it needed to be slid a little bit in order to accommodate that geohazard information, and in some ways that had already been done in that we -- geohazards or not -- we had a pretty good idea where it was from the original geohazard survey, and so we did pick a location.

Because of that necessity of anchoring up a certain way we were going to have to deviate the well to our target, so we were going to have to drill a directional well.

Q Would that have required an amendment to the exploration plan to do that?

A No, not as long as we stayed on lease 460.

Q As long as you were on lease 460. So there wasn't anything that you would have had to amend to potentially would have had to go back through consistency review with the Coastal Commission in order to drill 460 No. 3?

A That's my understanding and that what we -- working hard to do.

Page 1191

HECK - CROSS - HEATH

Q And I take it that your geohazard survey that was done during the suspension period didn't yield information that indicated that there was a potential problem with the site that you planned for Well No. 3; is that right?

A Well, it did not with respect to the surveys that were run. We hadn't run the air gun yet. Based on all the wells that had been drilled nobody had run into, no well, no one of the wells, and we obviously done that work prior to drilling 460 No. 2, we looked at all of those wells for any potential shallow gas hazards and there had never been any problem.

Q Since Judge Wilken, Claudia Wilken in the Northern District of California, since Judge Wilken had entered her judgment ordering the MMS to replace the granted suspension, the directed suspension, that is now still in force, has Samedan done the reinterpretation of the 3D seismic data?

A No; we have not.

Q You don't believe that the directed suspension prohibits the reinterpretation of the

Page 1192

HECK - CROSS - HEATH

seismic data, do you?

A No; there is no prohibition.

Q Is there a reason you haven't done the reinterpretation at this point?

A Yes. We intend to do it when we begin our new SOP. In other words, the program has been stopped and we're going to start it again when we're allowed to.

Q I see.

A I mean, if that doesn't make sense to you, I'm sorry.

Q But it's not your understanding, is it, that "activities" for lack of a better word, that take place in the office and not out on the sea floor are prohibited by the directed suspension?

MR. ROSENBAUM: Your Honor, I'm going to object at this point. We are involved in wholly separate litigation with the United States where conceivably these questions might be relevant, but I'm sure they're not relevant here.

The question here relates to the information

HECK - CROSS - HEATH

available in 1999 and whether the MMS decision was supported or not. What it is these companies or free or not free to do today I cannot imagine the relevance of that, and this makes me very nervous that the government is trying to use an opportunity to ask witnesses in this case questions they -- the answer to which thus far has been of no assistance to the MMS. I don't know where we're going here. This makes me very nervous.

MR. CROWELL: Let me tell you where we're going.

JUDGE SWEITZER: Tell me where we're going and then explain why either of you, why you think this is relevant to the question.

MR. CROWELL: He has testified. He has a slide there that says why Samedan did not or do certain things during suspension periods, and suspension periods -- they showed on other slides, a whole series of suspensions, claiming they were not able to do things because of the COOGER study, claiming they were not able to do other things under other suspensions and



HECK - CROSS - HEATH

we're simply attempting to show that given the nature of the activities they plan to do, which he has already testified on and is on the record, were not prohibited by some of these suspensions and there's no reason for the last four years during Judge Wilken's orders they couldn't have been doing these activities. And it all goes to whether or not they do intend, as they testified, to develop these leases.

MR. ROSENBAUM: Your Honor, with all due respect, that strikes me as incoherent. These leases were taken away from us in 1999. What in the world are they talking about, whether we're engaged in activities now to drill these leases?

MR. CROWELL: That's the period of litigation.

JUDGE SWEITZER: One at a time.

MR. ROSENBAUM: The leases are gone as of 1999. That's why we're here to get them back again. It's unfathomable to me there could be questioning as to what we've been doing as of 2003, 2004 and 2005 is relevant to that question, Your Honor.



HECK - CROSS - HEATH

JUDGE SWEITZER: It appears that it might be relevant. The objection is overruled.

MR. HEATH: Just a second, Judge.

JUDGE SWEITZER: Okay.

(Pause.)

Q The final question is this:

JUDGE SWEITZER: Is this going to be a restatement of the question you asked that was objected to?

MR. HEATH: I think so.

JUDGE SWEITZER: Okay.

MR. HEATH: I think so, and I think this will make it simpler.

MR. CROWELL: Could he read the question back, please?

(The following question was read:

"QUESTION: But it's not your understanding, is it, that "activities" for lack of a better word, that take place in the office and not out on the sea floor are prohibited by the directed suspension?")

MR. HEATH: The restatement of the question



HECK - CROSS - HEATH

would be --

Q Is it your testimony that in-office activities are prohibited by Judge Wilken's directed suspension?

A That's not my testimony.

Q That's all I need.

I believe you testified yesterday that Samedan basically wouldn't be doing anything on lease 462 until the production platform was built on lease 460; is that right?

A Yes. I said that we would explore 462 from the platform.

Q And building a platform would enable you to avoid the rather expensive costs associated with mobile offshore drilling unit or save the costs would be a better way to put it?

A Yes, because if we drill the 462 lease from a mobile drilling unit after having gone through the permitting process to do that, we would have abandoned that well; whereas, if we drilled it from the platform, there's risk involved in all wells, particularly if

HECK - CROSS - HEATH

drilling a prospective well which is what we've never said this is anything else, would be, if it was successful, we'd put it on production.

Q Okay. And I believe you also testified that even on the plan to put a platform in, and then drill later into lease 462 from the platform, that you would still need Exxon to contribute to the cost of an exploratory well in lease 462?

A No; I didn't say that. I said we would need to settle, however we were going to -- we need to work something out is a better way to say it. We just need a way to work something out with Exxon, either to share drilling costs or to, you know, some kind of understanding, because we're right on the lease line; if you're going to drill a well right near a lease line, you'll always make some kind of agreement with your neighbor.

Q Okay, but the well --

A Let me say, it's good business practice to make an agreement with your neighbor.

Q (Laughter.) Surely. But do I understand you



HECK - CROSS - HEATH

to be saying then a well into lease 462, you would anticipate would be quite close to the border of 461?

A Probably. See, you know, we haven't reached that -- we don't have a location. We have a prospective area, an area of interest, that's why we kept the lease, wanted to keep the lease, that we intended to try to explore from the platform.

Obviously, since it does appear to, from the mapping we today, to extend on to the Exxon lease as well, we would have to work out a business arrangement with Exxon.

Q I understand. Is it correct to infer -- and if it's not, tell me so -- but is it correct to infer that Samedan would not be willing to proceed with drilling a well into the prospect on 462 without Exxon agreeing to share in the cost of the well?

A I can't say that for sure. I mean, that's an issue we'd have to decide between Samedan and its partners if we got to that; in other words, if we could not work out something with Exxon, you know, that's another step away. I can't really be sure.



HECK - CROSS - HEATH

Q That's a little too far down the road?

A Right.

Q Was that the import -- I believe, you said yesterday that we "can't assess where we would have gone with that" and that's part of that; that is, we don't really know?

A I'm not sure where that "I can't assess where we would have gone" came from. What did I say before that?

Q That was in connection with the discussion of the possibility of drilling a well on the 462?

A You know, as to whether we would do it as a standalone project or with no business arrangement, yeah, I can't be -- that's too -- that's an unknown to me at this time.

Q Okay. At the July 15, 1999 meeting with MMS, didn't one of the MMS employees ask you if Samedan was committed to ultimately drilling the prospect on 462 that you identified?

A I was -- my memory is that I was asked if we had drilled it or we planned to drill it from a mobile



HECK - CROSS - HEATH

drilling unit, and I said, no.

Q Specifically with respect to a mobile drilling unit?

A That was my understanding. That's what I thought we were talking about.

Q All right. Just one second.

JUDGE SWEITZER: Ten-minute recess.

(Recess taken at 1:52 p.m. and reconvened at 2:03 p.m.)

In order, Mr. Heath?

MR. HEATH: Thank you, Judge.

Q If we could go to page 58?

A (Witness complied.)

Q I believe, Mr. Heck, this was the seismic line index map that you had testified about yesterday, and do I understand correctly that That line 500 on the 3D survey essentially follows the boundary between the Gato Canyon Unit on the east and the Santa Ynez Unit and north of that lease 187 on the west; is that right?

A Yes.

Q If we can turn to page 59. Again, I'm just