ATTACHMENT 3





UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
-----------------------------------------------------
SAMEDAN OIL CORPORATION,
Petitioner (Appellant),
v.
MINERALS MANAGEMENT SERVICE,
Respondent.
IBLA 2000-142
APPEAL Re: Lease OCS-P-0462
-----------------------------------------------------
AERA ENERGY LLC,
Petitioner (Appellant),
v.
MINERALS MANAGEMENT SERVICE,
Respondent.
IBLA 2000-142
APPEAL Re: Lease OCS-P-420, 424, 429
-----------------------------------------------------
HEARING DAY 5
May 20, 2005
Arlington, Virginia
Before: Honorable Harvey Sweitzer

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING 1-800-825-3341

Page 1177

HECK - CROSS - HEATH

Thank you.

Q The title being "Why Samedan did not plan to drill a well on lease 462 during the suspension period." To make sure I understand correctly, the suspension period referred to here is the three-year suspension period that Samedan requested in 1999; is that correct?

A That's correct.

Q Okay. Thank you. What did Samedan plan to do during the three-year suspension period that it requested?

A We planned to perform a geohazard survey, a new one, to update and do some additional geohazard work that had not been done before. We planned to do a year-long reinterpretation of our 3D seismic, and I couldn't put it in the SOP but I planned to make a data exchange with Exxon to try to complete our mapping.

We planned to either amend or update our exploration plan or submit a new one. That was still my understanding, question of how we would proceed, that we would work out with MMS, and of course that

Page 1178

HECK - CROSS - HEATH

geohazard information would have been included in that.

We planned to drill one more well on lease 460, the No. 3 well, up near the eastern boundary of lease 460 with a sole intent of one final test of the producibility of the Monterey and to try to be sure that, to give us another, let me say, another data point in our mapping in order to be able to make a recommendation to management whether or not we should set a platform.

Q Do I understand correctly that the anticipated drilling of 460 No. 3, the delineation well would have been from a mobile offshore drilling unit?

A Yes.

Q Could you take me back a little bit, Mr. Heck, and explain to me what is involved in the geohazard survey and how that's done?

A Yes. We, in this instance, because we did it, I can tell you quite a bit about it. I can't remember -- I still can't remember a few things, that was six years ago, too. I believe we put out an RFP or else we discussed it with several contractors about who

Page 1179

HECK - CROSS - HEATH

we would use as a contractor.

The company we chose was headquartered in San Diego and they had done the original geohazard work here back when; the company was called Pelagos at the time. They subsequently were acquired by a French company.

And we first determined with them -- and we have an NTL, as you know, you know, that MMS has guidelines for us -- what their needs are, what type of instrumentation is needed, what levels. They don't tell us what instruments to use, just what needs to be done.

Then working with the MMS we had many meetings, many meetings. It took quite a while to get that plan developed and approved, and the tools are high resolution, we call them, geophysical tools where they explore from the sea bottom and then just below the sea bottom, and then a little more below the sea bottom, trying to look for --

We also had to run a magnetometer survey, so those are things that are looking for objects on the

Page 1180

HECK - CROSS - HEATH

sea floor, looking for anything, and also we had to run a rather sophisticated side scan survey, which actually looks at images of sea floor.

Q And the side scan survey is a sonar-type survey?

A Yes.

Q When you say high resolution tools, you're referring there to a high resolution visual tool, or are you actually taking pictures of the sea bottom?

A No, you said that, the sonar tool is not a photograph. With the technology that exists today we get an image that is quite revealing and what that is looking for is marine, you know, outcrops, the data actually can't see marine life but, if there's an outcrop, there's probably marine life. It's looking for slumps, that sort of thing.

Q Slumps of the sea bottom, you mean?

A Yes.

Q Because that creates a hazard for platform placement?

A Could be, yes. So as we go down through

HECK - CROSS - HEATH

those levels there's also the tools that are trying to see if there's any gas in the sediments that could be a hazard, and then finally you -- in this case, we're going to run an air gun for a little deeper penetration.

Q Is that similar to the type of air gun that's used in the seismic survey?

A It is a seismic survey, just that it's -- we're using an air gun not quite as powerful as, say, the 3D air guns.

Q Because the only thing you were looking at was kind of a --

A We didn't have to penetrate as deep in the subsurface as you would for regular geological, for regular exploration.

So to create that plan or get that plan developed, I think you said earlier I was on the HESS committee and out of that committee came a lot of recommendations for mediating the effects of the air gun and other, to protect marine mammals.

We got that program developed in conjunction



HECK - CROSS - HEATH

with the contractor, MMS and ourselves. We submitted the plan; it was approved, and during, is that 2001 we got shut down? Let me think a minute.

Yes. I think it was in 2001 we performed that survey except for the air gun. Just as we were about to get that done, Judge Wilken shut us down on the California versus Secretary Norton case. So we terminated that survey at that point.

Q So you were conducting the survey -- let me make sure I've got this straight. You were conducting the survey under the suspension that MMS granted in 1999 in response to Samedan's request?

A That's right.

Q You did that survey in the 1999 to 2001 timeframe or 2000 to 2001 timeframe, about where were we?

A We went through that process as I just mentioned. We got the boat in the water in 2001.

Q Just to make sure that the record is clear, when you say the HESS Committee, that stands for High Energy Seismic Survey?



HECK - CROSS - HEATH

A Yes.

Q Is that correct?

A Yes.

Q And when they're referring to Judge Wilken "shutting us down," you're referring to the Initial District Court order in the California versus Norton litigation?

A That's correct.

Q During the suspension period, that is the period of suspension granted in 1999, did you also do the reinterpretation of the 3D seismic data?

A We had not begun that yet.

Q Could you explain why?

A Why we hadn't started on that?

Q Yes.

A Up until we shot the geophysics, since we're a pretty small staff in Santa Barbara, we hadn't had time.

Q Then I'm a little confused. When we talk about a reinterpretation of 3D seismic data, that also involved shooting new seismic data?



HECK - CROSS - HEATH

A No. We were not -- we would not have planned nor do I think we could have permitted to shoot a full bore 3D seismic survey here.

Q Okay, and I had understood the reinterpretation to be a reinterpretation of preexisting 3D seismic data; is that correct?

A Yes.

Q And that's why I'm confused about your answer just a minute ago about the staff to do the shoot?

A No, to do the interpretation.

Q To do the interpretation?

A Yes. We had a dual purpose in reinterpretation. When we did the original interpretation it was simply just to see what improvements we could get from well data that we required. Now that we're going to drill this well, we were going to really hone in on the location of the well to really fine tune that interpretation. That would have been our primary goal.

We also -- since we did the

Page 1185

HECK - CROSS - HEATH

reinterpretation, you know, essentially way more than ten years before, there have been vast improvements in the software, which we now have in the Santa Barbara office we didn't have before, so that was our intent was to use -- implement that software to improve our interpretation. We just hadn't begun that yet.
Q Fundamentally, if I understand you correctly, the basic reason it hadn't begun was just lack of available staff?
A Yes. And there was -- we still, you know, the time -- between the time we finished up the geohazard survey and then updating our exploration plan, we still had time prior to spudding the well to do that work.
Q I believe you said just a minute ago that the software for your seismic reinterpretation had become available when in 2000? When was the software --
A Well, it's -- we subscribe to a, you know, licensed software and it gets improved every year.
Q Oh, I see; you get actually updated software

Page 1186

HECK - CROSS - HEATH

for it every year?
A Annually.
Q You would receive annual updates in 1999, 2000 and 2001?
A Yes.
Q If I can back up again a step to the anticipated delineation Well No. 3, and then taking a quantum leap back in time, the exploration plan that had been approved and that had passed -- well, I'll have to ask this in several questions to make sense.
At the time the COOGER directed suspensions were entered, there was an approved EP, exploration plan --
A Yes.
Q -- for lease 460 for the Gato Canyon Unit; is that correct?
A Yes.
Q And that exploration plan had passed consistency review under the Coastal Zone Management Act with the State of California; is that correct?
A Yes.

Page 1187

HECK - CROSS - HEATH

Q And that exploration plan, if my understanding is correct, was still in place at the end of the directed COOGER suspension in 1999, that is you were still dealing with the same EP when you requested the new suspensions in '99?
A Yes.
Q Okay. Now, was the anticipated delineation Well 460 No. 3 part of that approved EP?
A Was the location for it? Is that what you said?
Q I should make it several questions. Yes, there may be a difference -- was the drilling of such a well approved as part of that exploration plan?
A Yes.
Q Was the location that you anticipated, and I appreciate your clarification on that, was the location that you had anticipated for that well, also approved as part of that EP?
A We had planned to use what's called location C on that plan, yes.
Q Okay. I believe you mentioned a second ago

Page 1188

HECK - CROSS - HEATH

that you had planned or at least tentatively planned during the three-year suspension and granted suspension period to amend or update or even possibly submit a new EP.
What revisions did you anticipate to the existing exploration plan?
A Well, it was our intent to create a unit plan if we could, so we would have updated that. As I say, there was still, you know, if we could drill our 460 well and say we were going to set a platform, we would go to a development plan. So there was some unknowns as far as exactly what was going to happen.
But we would still have to do the -- in that course of that plan, you know, each one of these leases has to go through some kind of environmental review, whether you're going to physically sit on it or not, at least with the Coastal Commission. So we would have had a unit plan.
Q But it was not necessary, if I understand you correctly, there was no amendment to the approved exploration plan that was required in order to drill

HECK - CROSS - HEATH

Well No. 3; is that right?
A We were asked by the MMS to do the geohazard survey, to update the geohazard survey, and exactly whether the MMS would have turned that over to the Coastal Commission, I have no idea.
All we were doing it under the NTL for the MMS in order to drill our well.
Q Yes, surely.
A So I'm not sure what your question is exactly.
Q But the well, as I understand it, the Well No. 3 that you planned to drill was the well envisioned in the approved exploration plan?
A The ARCO, as you know, developed exploration plan. They put four locations down. In doing a plan like that, the locations are shown as vertical wells, and in the course of time what we had learned about the lease was there are some outcroppings on that lease, so why we were doing the geohazard study and updating it and improving it, was to be sure we didn't put an anchor on any of that outcrop.



HECK - CROSS - HEATH

So meaning that location C we might have had to request or be told that it needed to be slid a little bit in order to accommodate that geohazard information, and in some ways that had already been done in that we -- geohazards or not -- we had a pretty good idea where it was from the original geohazard survey, and so we did pick a location.
Because of that necessity of anchoring up a certain way we were going to have to deviate the well to our target, so we were going to have to drill a directional well.
Q Would that have required an amendment to the exploration plan to do that?
A No, not as long as we stayed on lease 460.
Q As long as you were on lease 460. So there wasn't anything that you would have had to amend to potentially would have had to go back through consistency review with the Coastal Commission in order to drill 460 No. 3?
A That's my understanding and that what we -- working hard to do.



HECK - CROSS - HEATH

Q And I take it that your geohazard survey that was done during the suspension period didn't yield information that indicated that there was a potential problem with the site that you planned for Well No. 3; is that right?
A Well, it did not with respect to the surveys that were run. We hadn't run the air gun yet. Based on all the wells that had been drilled nobody had run into, no well, no one of the wells, and we obviously done that work prior to drilling 460 No. 2, we looked at all of those wells for any potential shallow gas hazards and there had never been any problem.
Q Since Judge Wilken, Claudia Wilken in the Northern District of California, since Judge Wilken had entered her judgment ordering the MMS to replace the granted suspension, the directed suspension, that is now still in force, has Samedan done the reinterpretation of the 3D seismic data?
A No; we have not.
Q You don't believe that the directed suspension prohibits the reinterpretation of the



HECK - CROSS - HEATH

seismic data, do you?
A No; there is no prohibition.
Q Is there a reason you haven't done the reinterpretation at this point?
A Yes. We intend to do it when we begin our new SOP. In other words, the program has been stopped and we're going to start it again when we're allowed to.
Q I see.
A I mean, if that doesn't make sense to you, I'm sorry.
Q But it's not your understanding, is it, that "activities" for lack of a better word, that take place in the office and not out on the sea floor are prohibited by the directed suspension?
MR. ROSENBAUM: Your Honor, I'm going to object at this point. We are involved in wholly separate litigation with the United States where conceivably these questions might be relevant, but I'm sure they're not relevant here.
The question here relates to the information

available in 1999 and whether the MMS decision was supported or not. What it is these companies or free or not free to do today I cannot imagine the relevance of that, and this makes me very nervous that the government is trying to use an opportunity to ask witnesses in this case questions they -- the answer to which thus far has been of no assistance to the MMS. I don't know where we're going here. This makes me very nervous.

MR. CROWELL: Let me tell you where we're going.

JUDGE SWEITZER: Tell me where we're going and then explain why either of you, why you think this is relevant to the question.

MR. CROWELL: He has testified. He has a slide there that says why Samedan did not or do certain things during suspension periods, and suspension periods -- they showed on other slides, a whole series of suspensions, claiming they were not able to do things because of the COOGER study, claiming they were not able to do other things under other suspensions and



we're simply attempting to show that given the nature of the activities they plan to do, which he has already testified on and is on the record, were not prohibited by some of these suspensions and there's no reason for the last four years during Judge Wilken's orders they couldn't have been doing these activities. And it all goes to whether or not they do intend, as they testified, to develop these leases.

MR. ROSENBAUM: Your Honor, with all due respect, that strikes me as incoherent. These leases were taken away from us in 1999. What in the world are they talking about, whether we're engaged in activities now to drill these leases?

MR. CROWELL: That's the period of litigation.

JUDGE SWEITZER: One at a time.

MR. ROSENBAUM: The leases are gone as of 1999. That's why we're here to get them back again. It's unfathomable to me there could be questioning as to what we've been doing as of 2003, 2004 and 2005 is relevant to that question, Your Honor.



JUDGE SWEITZER: It appears that it might be relevant. The objection is overruled.

MR. HEATH: Just a second, Judge.

JUDGE SWEITZER: Okay.

(Pause.)

Q The final question is this:

JUDGE SWEITZER: Is this going to be a restatement of the question you asked that was objected to?

MR. HEATH: I think so.

JUDGE SWEITZER: Okay.

MR. HEATH: I think so, and I think this will make it simpler.

MR. CROWELL: Could he read the question back, please?

(The following question was read:

"QUESTION: But it's not your understanding, is it, that "activities" for lack of a better word, that take place in the office and not out on the sea floor are prohibited by the directed suspension?")

MR. HEATH: The restatement of the question



would be --

Q Is it your testimony that in-office activities are prohibited by Judge Wilken's directed suspension?

A That's not my testimony.

Q That's all I need.

I believe you testified yesterday that Samedan basically wouldn't be doing anything on lease 462 until the production platform was built on lease 460; is that right?

A Yes. I said that we would explore 462 from the platform.

Q And building a platform would enable you to avoid the rather expensive costs associated with mobile offshore drilling unit or save the costs would be a better way to put it?

A Yes, because if we drill the 462 lease from a mobile drilling unit after having gone through the permitting process to do that, we would have abandoned that well; whereas, if we drilled it from the platform, there's risk involved in all wells, particularly if

HECK - CROSS - HEATH

drilling a prospective well which is what we've never said this is anything else, would be, if it was successful, we'd put it on production.

Q Okay. And I believe you also testified that even on the plan to put a platform in, and then drill later into lease 462 from the platform, that you would still need Exxon to contribute to the cost of an exploratory well in lease 462?

A No; I didn't say that. I said we would need to settle, however we were going to -- we need to work something out is a better way to say it. We just need a way to work something out with Exxon, either to share drilling costs or to, you know, some kind of understanding, because we're right on the lease line; if you're going to drill a well right near a lease line, you'll always make some kind of agreement with your neighbor.

Q Okay, but the well --

A Let me say, it's good business practice to make an agreement with your neighbor.

Q (Laughter.) Surely. But do I understand you



HECK - CROSS - HEATH

to be saying then a well into lease 462, you would anticipate would be quite close to the border of 461?

A Probably. See, you know, we haven't reached that -- we don't have a location. We have a prospective area, an area of interest, that's why we kept the lease, wanted to keep the lease, that we intended to try to explore from the platform.

Obviously, since it does appear to, from the mapping we today, to extend on to the Exxon lease as well, we would have to work out a business arrangement with Exxon.

Q I understand. Is it correct to infer -- and if it's not, tell me so -- but is it correct to infer that Samedan would not be willing to proceed with drilling a well into the prospect on 462 without Exxon agreeing to share in the cost of the well?

A I can't say that for sure. I mean, that's an issue we'd have to decide between Samedan and its partners if we got to that; in other words, if we could not work out something with Exxon, you know, that's another step away. I can't really be sure.



HECK - CROSS - HEATH

Q That's a little too far down the road?

A Right.

Q Was that the import -- I believe, you said yesterday that we "can't assess where we would have gone with that" and that's part of that; that is, we don't really know?

A I'm not sure where that "I can't assess where we would have gone" came from. What did I say before that?

Q That was in connection with the discussion of the possibility of drilling a well on the 462?

A You know, as to whether we would do it as a standalone project or with no business arrangement, yeah, I can't be -- that's too -- that's an unknown to me at this time.

Q Okay. At the July 15, 1999 meeting with MMS, didn't one of the MMS employees ask you if Samedan was committed to ultimately drilling the prospect on 462 that you identified?

A I was -- my memory is that I was asked if we had drilled it or we planned to drill it from a mobile



HECK - CROSS - HEATH

drilling unit, and I said, no.

Q Specifically with respect to a mobile drilling unit?

A That was my understanding. That's what I thought we were talking about.

Q All right. Just one second.

JUDGE SWEITZER: Ten-minute recess.

(Recess taken at 1:52 p.m. and reconvened at 2:03 p.m.)

In order, Mr. Heath?

MR. HEATH: Thank you, Judge.

Q If we could go to page 58?

A (Witness complied.)

Q I believe, Mr. Heck, this was the seismic line index map that you had testified about yesterday, and do I understand correctly that That line 500 on the 3D survey essentially follows the boundary between the Gato Canyon Unit on the east and the Santa Ynez Unit and north of that lease 187 on the west; is that right?

A Yes.

Q If we can turn to page 59. Again, I'm just