# In the United States Court of Federal Claims

Nos. 02-30C, 04-1822C, & 05-249C (consolidated)

(Filed: November 15, 2005)

(Reissued: November 17, 2005)[1]

* * * * * * * * * * * * * * * * * * * *

AMBER RESOURCES CO.,
*et al.*,

              *Plaintiffs*,

v.

THE UNITED STATES,

              *Defendant.*

* * * * * * * * * * * * * * * * * * * *

ANADARKO E&P CO. LP,
*et al.*,

              *Plaintiffs*,

v.

THE UNITED STATES,

              *Defendant.*

* * * * * * * * * * * * * * * * * * * *

NYCAL OFFSHORE DEVELOPMENT CORP.,

              *Plaintiff*,

v.

THE UNITED STATES,

              *Defendant.*

* * * * * * * * * * * * * * * * * * * *

Summary Judgment; Outer Continental Shelf Oil and Gas Leasing; Anticipatory Repudiation; Restitution; Outer Continental Shelf Lands Act; 1990 Amendment to the Coastal Zone Management Act, 16 U.S.C. § 1456(c)(1); Sovereign Acts Doctrine; Unmistakability Doctrine; Waiver; Assignability of Claims

---

[1]This opinion was originally issued under seal to allow the parties an opportunity to offer redactions. Both parties agree that no redactions are necessary, and therefore, this opinion is reissued in its original form.

*E. Edward Bruce*, Washington, D.C., with whom were *Steven J. Rosenbaum* and *Jeremy D. Kernodle*, Washington, D.C., for plaintiffs.

*Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United Stated Department of Justice, Washington, D.C., with whom were Trial Attorney *Stephen C. Rosini*, Director *David M. Cohen*, and Assistant Attorney General *Peter D. Keisler*, for defendant.

_____

*OPINION*

_____

BRUGGINK, *Judge*.

For more than twenty years, the government has been holding over $1.2[2] billion in up-front bonuses paid by plaintiffs and their predecessors in exchange for forty undeveloped oil and gas leases off the California coast. The leases give plaintiffs the right to extract oil and gas provided that their exploration, development, and production activities receive agency approval pursuant to the applicable statutory and regulatory scheme. Because Congress' 1990 amendment of the Coastal Zone Management Act breached the thirty-six leases subject to this motion, we hold that plaintiffs are entitled to treat the breach as an anticipatory repudiation and obtain restitution of the bonus payments made for these leases. Our reasons for so holding follow.

FACTUAL BACKGROUND

*Outer Continental Shelf Leases*

The continental shelf is the shallow sea floor lying at a continent's edge. The United States exercises exclusive control and the power of disposition over those portions of the outer continental shelf ("OCS") that extend beyond the areas owned by coastal states. Pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-1356a (2000), the Secretary of the

_____

[2]This amount represents the up-front bonuses paid for all forty leases. Plaintiffs seek $1.104 billion for the thirty-six leases presently in question in the pending motions. *See infra*, note 42.

Interior may enter into lease contracts that grant lessees the right to "explore, develop, and produce the oil and gas" contained within the OCS. *Id.* § 1337(b)(4). Most of the Secretary's authority for the sale and oversight of OCS oil and gas leases has been delegated to the Minerals Management Service ("MMS") of the Department of the Interior ("DOI").

Potential lessees publicly compete for OCS leases, which typically consist of three square miles of sea floor. Successful bidders pay the government an up-front bonus and annual rent and royalties in exchange for their lease rights. The primary term of an OCS lease varies in length from five to ten years. A lease runs beyond its primary term so long as "oil or gas is produced . . . in paying quantities, or drilling or well reworking operations . . . are conducted." *Id.* § 1337(b)(2)(B).

OCSLA mandates that the Secretary prescribe regulations allowing for the suspension of operation or activity on a lease, thereby allowing MMS to preserve a lease by freezing an operator's obligation to perform certain activities.[3] A lease may be suspended either, in specified situations, at a lessee's request[4] ("requested suspension") or upon the agency's initiative ("directed suspension"). *Id.* § 1334(a)(1); 30 C.F.R. § 250.168(a) (2005).[5] Typically, a suspended lease's term is extended the length of the suspension.

---

[3]Code of Federal Regulations Title 30, Part 250, which governs OCS oil and gas operations, was revised December 28, 1999. 64 Fed. Reg. 72,756, 72,780, 72,785 (Dec. 28, 1999). Lease suspensions, which had been controlled by 30 C.F.R. § 250.110 (1999), are now controlled by 30 C.F.R. §§ 250.168-.177 (2005). This revision, with respect to the suspension regulations relevant to the issues before us, was structural in nature. The alteration of suspension procedures, which will be discussed at length *infra*, was not a product of the reorganization of Part 250.

[4]Section 1334(a) allows an agency to grant a suspension at the lessee's request if such a suspension is in the national interest, will facilitate proper development of a lease, or allows for the construction or negotiation for use of transportation facilities; or if a suspension is necessary due to a threat of serious harm to life, property, mineral deposits, or to the marine, coastal, or human environment. 43 U.S.C. § 1334(a)(1).

[5]We employ the terms "requested suspension" and "directed suspension" throughout this opinion to distinguish between the types of suspension at issue here, although MMS has not adopted the former and did not employ the latter until after the commencement of related litigation in district court. *See* 30 C.F.R. § 250.168(a).

30 C.F.R. § 250.169(a).  During a requested suspension, a lessee may pursue "reasonable . . . work leading to the commencement or restoration of the suspended activity."  *Id.* § 250.171(b).

Lessees frequently request suspensions to prevent lease expiration in the face of ongoing exploration or development activities that have not yet resulted in the production of oil in paying quantities.  In order to tender such a request, a lessee must submit to MMS its justification for the suspension and a schedule for the work to be pursued while the lease is suspended.  *Id.* § 250.171.  At the time of contracting, the suspension statutes and regulations did not provide states a role in the evaluation of suspensions requested for leases off their coast.  However, as we discuss at length below, the amendment to the Coastal Zone Management Act of 1972 ("CZMA") subsequently provided states such a role under federal law.

A lessee's right to explore, develop, and produce oil and gas resources is subject to an extensive regulatory approval process, which OCS leases explicitly incorporate by reference.  In light of these regulatory constraints, OCS lease rights amount to an exclusive opportunity to pursue the regulatory approvals necessary to produce oil and gas in a particular lease area.  Securing such approvals is not guaranteed.

Virtually all of the leases subject to this litigation were created on either standard form 3300-1 or standard form MMS-2005.[6]  According to Section 1 of these forms, the leases were:

> issued subject to the [OCSLA]; Sections 302 and 303 of the Department of Energy Organization Act . . . ; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation of the natural resources of the [OCS], and the protection of correlative rights therein; and all other applicable statutes and regulations.

---

[6]The only exception was Lease OCS-P 0210, which was issued in 1968 on standard form 3380-1 "subject to the terms and provisions of the [OCSLA], and to all lawful and reasonable regulations of the Secretary of the Interior . . . when not inconsistent with any express and specific provisions herein, which are made a part hereof . . . ."

With MMS's approval, lessees may organize their leases into geographic units for joint exploration and development. *Id.* § 250.1301. Each unit is controlled by a single "operator" company. Before an operator may begin the exploration of a particular unit, a number of procedures must be satisfied. First, the operator must submit an Exploration Plan ("EP") for agency approval. Pursuant to the OCSLA, the EP must be approved by the agency within thirty days unless some reason for the cancellation or suspension of the lease exists. *See* 43 U.S.C. § 1334(a). Once an EP is approved, the operator must obtain drilling permits before exploration may begin.[7] If EP approval is not granted and the lease is canceled, the United States must pay each lessee in the unit either the fair value of its lease or the lessee's costs from the day its lease was acquired, whichever is less. *Id.* § 1334(a)(2)(C).

If exploration is successful, the operator must submit a Development and Production Plan ("DPP") for MMS approval. MMS's evaluation employs a standard similar to the one used to evaluate an EP. An operator has five years to reapply or modify a disapproved DPP. Otherwise, the lease will be canceled and the unit's lessees will be afforded the same compensation as when an EP is disapproved. *Id.* § 1351(h)(2)(c).

At each step of the planning and permitting process described above, the operator must also meet the requirements of the CZMA, 16 U.S.C. §§ 1451-1465 (2000).[8] The CZMA gives coastal states a voice in the regulatory approval of OCS lease activity occurring off of their coast. Pursuant to the act, a coastal state may develop its own federally approved coastal management program ("CMP"). *Id.* § 1454. CZMA § 307(c)(3)[9] requires an operator to certify that each plan and permit sought from the agency will comply with the CMP of the nearest coastal state.[10] The agency may not approve an operator's

---

[7]Operators must obtain an exploratory well-drilling permit from DOI and a National Pollution Discharge Elimination System permit from the Environmental Protection Agency.

[8]Lease OCS-P 0210, the oldest lease before us, was executed prior to the adoption of the CZMA and is not subject to its requirements. The act is incorporated into the remaining leases via the catchall provision of Section 1. *See infra* Part II.B.

[9]CZMA § 307 corresponds with 16 U.S.C. § 1456.

[10]

[A]ny person who submits to the Secretary of the Interior any plan for

submission unless the state concurs with the operator's compliance certification.   Only the Secretary of Commerce may override a state's objection.[11]

*The Leases at Issue*

The forty leases at the heart of this litigation dot California's continental shelf from the shores of Ventura County in the south to the San Luis Obispo County coast in the north.  None have yet produced oil or gas in paying quantities.  Virtually every lease is jointly held by two or more lessees. In total, fifteen lessees have an ownership interest in the leases.  Only twelve lessees are presently party to this suit.[12]

The government terminated four of the leases in 1999.[13]  Plaintiffs' challenge to those terminations is currently before the Interior Board of Land Appeals.  Thus, only thirty-six of plaintiffs' leases are presently at issue.  Of

---

the exploration or development of, or production from, any area which has been leased under the [OCSLA] shall, with respect to any exploration, development, or production described in such plan and affecting any land or water use or natural resource of the coastal zone of such state, attach to such plan a certification that each activity which is described in detail in such plan complies with the enforceable policies of such state's approved management program and will be carried out in a manner consistent with such program.

43 U.S.C. § 1456(c)(3)(B).

[11]The Secretary may override if he "finds, pursuant to subparagraph (A), that each activity which is described in detail in such plan is consistent with the objectives of [the CZMA] or is otherwise necessary in the interest of national security."  § 307(c)(3)(B)(iii).

[12]The following lessees are plaintiffs to this suit: Amber Resources Co.; Aera Energy LLC; Anadarko E&P Co. LP; Delta Petroleum Corp.; Devon Energy Production Co., L.P.; Plains Exploration and Production Co.; Ogle Petroleum, Inc.; OLAC Resources, LLC; Nycal Offshore Development Corp.; Poseidon Petroleum LLC; RME Petroleum Co.; and Noble Energy Inc.; and Total E&P USA, Inc.  Plaintiffs successfully moved to change the name of several parties when companies merged or changed their names during the pendency of these dispositive motions.

[13]Leases OCS-P 0420, 0424, 0429, and 0462.

6

the leases before us, one was formed in 1968; all others were executed between 1979 and 1984.  These leases are organized into ten units: Bonito, Cavern Point, Gato Canyon, Lion Rock, Point Sal, Purisima Point, Rocky Point, Santa Maria, Sword, and Stand-Alone Lease 0409.[14]

Plaintiffs have submitted an EP to MMS and received approval for their plans with respect to all but one unit.[15]  Under CZMA § 307(c)(3), each unit must submit a consistency determination to the affected coastal state for approval before MMS may allow the unit to pursue its EP.  California initially approved plaintiffs' EPs under this review, but now challenges the adequacy of the consistency determinations provided by MMS under § 307(c)(1) for the current requested lease suspensions.

Plaintiffs allege that the unit operators subjected the leases to extensive seismic and exploratory operations.  They claim that thirty-nine exploratory wells have been drilled among the leases, costing hundreds of millions of dollars.  The discovery of vast quantities of oil and gas is the alleged fruit of these efforts.  According to a statement on the MMS website, "1 billion barrels of unproved recoverable oil reserves and 500 billion cubic feet of gas reserves are estimated to underlie" the leases.  Despite this potential reserve, none of the leases has produced oil or gas in paying quantities to date.

Each lease is past its five-year primary term.  Their existence has been prolonged by numerous suspensions, both those requested by unit operators and those directed by MMS.  On January 1, 1993, MMS subjected each lease unit to a directed suspension that brought all activity on the leases to a halt.  These directed suspensions enabled MMS to conduct the California Offshore Oil and Gas Energy Resources ("COOGER") study, which was meant to aid MMS's consideration of EP[16] and DPP submissions, as well as provide local

---

[14]Lease OCS-P 0409 is not unitized with other leases.  Its operation is indistinguishable from the operation of plaintiffs' nine lease units.  Thus, we refer to it as Stand-Alone Lease 0409 and treat it as plaintiffs' tenth unit.

[15]The Cavern Point Unit does not have an MMS-approved EP.  California has never approved an EP for this unit pursuant to § 307(c)(3).

[16]Although MMS has approved EPs for all units, except Cavern Point, the operators are permitted to resubmit amended and new EPs.  At the time of the directed suspension, none of the units were prepared to produce oil or gas and

California governments with information concerning the leases.  Although the original directed suspensions were scheduled to end in December 1995, the agency extended them through June 30, 1999.  MMS did not issue the final COOGER study until January 26, 2000.

Before the extended COOGER-related directed suspensions were to end in 1999, MMS instructed the lessees to submit suspension requests for each unit, along with a schedule of future exploration- and development-related activities, by May 15, 1999.  In compliance with these instructions, unit operators submitted ten suspension requests.  In order to afford itself additional time to consider the requests, MMS directed the short-term suspension of each unit through November 15, 1999.  It also petitioned for additional information to support the requests.

On November 12, 1999, MMS granted ten suspensions ranging in length from nineteen to forty-five months.  Each suspension incorporated a set of "milestone" activities that was gleaned from the schedule of exploration- and development-related activities submitted along with the requests. According to MMS in a letter sent to each of the unit operators, "[m]eeting these milestones is a critical factor in [the] determination of whether the suspension continues, or whether potential future requests for suspension are granted."

*The* Norton *Litigation*

Three days after MMS granted the ten requested suspensions, the State of California sued MMS in district court on the grounds that the granted suspensions failed to meet the requirements of CZMA § 307(c)(1) (as opposed to the requirements of CZMA § 307(c)(3)).[17]  The operators of the suspended leases intervened as defendants.

When the leases before us were issued, CZMA § 307(c)(1) was neither applicable to the execution of OCS leases nor to the grant of lease suspensions. At that time, § 307(c)(1) prohibited federal agencies from "conducting or supporting activities directly affecting [a state's] coastal zone" if the activities

---

therefore the operators had not prepared or submitted DPPs.

[17]As discussed *infra*, nine of the ten units had already undergone and passed the requirements of CZMA § 307(c)(3).

were not consistent with the state's CMP to the greatest practicable degree. 16 U.S.C. § 1456(c)(1)(A) (1976) (amended 1990). According to the Supreme Court in *Secretary of the Interior v. California*, the DOI's issuance of OCS leases was not subject to § 307(c)(1) because the sale of a lease did not "directly affect" a state's coastal zone. 464 U.S. 312, 315 (1984). In 1990, Congress amended § 307(c)(1) to reverse *Secretary of the Interior*. The amendment broadened the description of federal activity subject to the requirements of § 307(c)(1), no longer requiring agency action to "*directly* affect[] the coastal zone," thereby subjecting future OCS lease sales to its requirements.[18]

Pursuant to the amendment of § 307(c)(1), MMS must now provide a coastal state with a "consistency determination" before it may execute a new OCS lease located off that state's shore. *Id.* § 1456(c)(1)(A), (C) (2000). MMS can issue a consistency determination only if it concludes that the proposed lease sale will comply with the state's CMP "to the maximum extent practicable." CZMA § 307(c)(1)(A).[19] The consistency determination must describe the agency's evaluation of the state's CMP, contain a detailed description of the agency's proposed activity, associated facilities, and their coastal effects, and provide "comprehensive data and information sufficient to support" the agency's conclusions. 15 C.F.R. § 930.39(a) (2005). Any exemption from entire consistency provided by the regulations must also be described and supported in the agency's consistency determination. *Id.* § 930.39(a).

_____

[18]Additions to § 307(c)(1) are italicized; deletions are bracketed:

Each Federal agency [conducting or supporting activities directly affecting] *activity within or outside the coastal zone that affects any land or water use or natural resource of* the coastal zone shall [conduct or support those activities] *be carried out* in a manner which is consistent to the maximum extent practicable with *the enforceable policies* of approved State management programs. *A Federal agency activity shall be subject to this paragraph unless it is subject to paragraph (2) or (3).*

CZMA § 307(c)(1)(A) (2000).

[19]The sale of an OCS lease can be exempted from full consistency only by order of the President, *id.* § 307(c)(1)(B), to the extent prohibited by federal law, 15 C.F.R. § 930.32(a)(1) (2005), or because of an emergency, *id.* § 930.32(b).

Upon receipt of a consistency determination, a coastal state has sixty days in which to concur or object. *Id.* § 930.41(a). During this time, the state must provide the public with notice and an opportunity to comment upon its pending evaluation. *Id.* § 930.42(b). The lease cannot be executed until either the state concurs with the consistency determination or ninety days have elapsed after the determination was issued. *Id.* § 930.41(c). If the state objects, the parties may attempt to mediate the disagreement. *Id.* § 930.43(d). In any event, the state retains the right to challenge MMS's consistency determination and the sale of a lease in district court pursuant to the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 702 (2000); 15 C.F.R. § 930.116(c); *Cal. Coastal Comm'n v. United States*, 5 F. Supp. 2d 1106, 1110 (1998).

In *California v. Norton* ("*Norton I*"), the state argued that the 1990 amendment of § 307(c)(1) applied to the grant of OCS lease suspensions as well as to the sale of such a lease in the first instance. 150 F. Supp. 2d 1046, 1053 (N.D. Cal. 2001). Thus, California claimed that the ten requested suspensions granted to plaintiffs here were impermissible because MMS had failed to conduct § 307(c)(1) consistency determination procedures prior to granting the unit operators' requests. Both the government and the operators contested this broad interpretation of the scope of § 307(c)(1).

In *Norton I*, California also claimed that the suspension grants did not comply with the reporting provisions of the National Environmental Policy Act of 1969 ("NEPA"). NEPA requires government agencies performing activities possibly affecting the quality of the human environment to make a statement concerning the environmental impact of the action, alternatives to the action, and any "irreversible and irretrievable commitments of resources which would be involved in the proposed action." 42 U.S.C. §§ 4321 et seq. (2000). NEPA's implementing regulations allow a federal agency to adopt categorical exclusions from the mandatory reporting requirements for a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4 (2001). The agency must still, however, provide for any extraordinary circumstances in which a categorically excluded action might possibly have a significant environmental effect. *Id.* MMS has adopted such an exclusion for the grant of lease suspensions. However, California challenged MMS's decision to treat these lease suspensions as categorical exclusions. California presented evidence alleging that these suspensions require environmental impact statements because the

extraordinary circumstances exceptions drafted by MMS applied to these specific leases. California argued that, at the very least, MMS should have supplied explanatory findings in support of its exclusion determination.

On June 20, 2001, the district court endorsed the state's interpretation of § 307(c)(1) and the NEPA requirements. It was uncontested that Congress subjected the agency's sale of OCS leases to the CZMA's consistency determination procedures by broadening the types of federal activity subject to § 307(c)(1). *Id.* at 1052. The court thought it significant that, but for numerous suspensions, each of the leases at issue would have exhausted its initial five-year term long before Congress amended § 307(c)(1). *Id.* at 1053. It further noted that the suspensions required the lessees to undertake physical milestone activities that would impact California's coastal zone. *Id.* The court concluded that, although the agency's grant of requested suspensions did not involve the sale of new leases, such a grant was nevertheless a federal activity affecting "land or water use or [a] natural resource of the coastal zone" and therefore is subject to the amendment of § 307(c)(1). *Id.* As a result, the court ordered MMS to set aside the ten requested suspensions and to direct the suspension of each lease unit, "including all milestone activities," until MMS could present the state with a consistency determination for each of the initial requests. *Id.* at 1057.

With regard to NEPA, the court held that MMS was also required to provide some explanation as to its reliance on its self-proclaimed categorical exclusion to the reporting requirements. *Id.* In *Jones v. Gordon*, the Ninth Circuit held that the National Marine Fisheries Service, which claimed its activity was within a categorical exclusion, did not necessarily have to provide an environmental impact statement ("EIS") but must "provide a reasoned explanation of whatever course it elects to pursue." *Jones v. Gordon*, 792 F.2d 821, 829 (9th Cir. 1986). Relying on *Jones*, the court in *Norton I* held that plaintiffs demonstrated that the suspensions may meet an extraordinary circumstance exception which would "justify requiring . . . the MMS [to] provide a reasoned explanation for its reliance on the categorical exclusion and explain the inapplicability of the extraordinary circumstances exceptions." *Id.*

Following *Norton I*, the lease operators have conducted no further physical activities on the leases.[20] Pursuant to the district court's order, on July

---

[20]Plaintiffs claim that the unit operators had completed every required step of the suspension's milestone activities at the time *Norton I* brought all activity to a halt.

2, 2001, MMS formally set aside its grant of the ten requested suspensions and directed the suspension of all operations on the leases. In letters dated July 16, 2001, MMS assured the unit operators that it would review the suspension requests for consistency with California's CMP "over the next several weeks." MMS stated that it would then forward its consistency determinations to the state but that it expected to act on the requests no sooner than December 2001. In a response letter, the unit operators accused the agency of fostering needless delay by withholding its consistency determinations until the conclusion of the agency's appeal of *Norton I*. In a September 17, 2001 letter, MMS simply informed the lessees that its attorneys were "working to determine the course of action which will best serve all constituents, including the lessees, the States, and the public."

Applying a rationale similar to that of the district court in *Norton I*, the Ninth Circuit affirmed the lower court's interpretation of § 307(c)(1) and NEPA on December 2, 2002. *California v. Norton*, 311 F.3d 1162, 1173 (9th Cir. 2002) ("*Norton II*"). The case was remanded to the district court to determine what, if any, further NEPA reporting was necessary to fulfill the statutory requirements and achieve compliance.[21] *Id.* at 1178.

On February 26, 2004, over three-and-a-half years after MMS set aside the initial requested suspensions, the district court denied an agency motion to dismiss. The court ordered the agency to solicit updated suspension requests from the lessees and to provide the court with a "detailed timetable for MMS to complete [the required] analyses and to provide California the consistency determinations required by [the district court's] June 2001 judgment." Pursuant to an MMS solicitation, the lease operators updated the suspension requests on April 20, 2004. In an order dated June 28, 2004, the district court adopted MMS's proposed timetable for conducting the consistency determination procedures.

--------

[21]The district court had previously left open the possibility of requiring MMS to file an EIS if the agency could not provide an adequate explanation as to why none of the extraordinary circumstances exceptions applied for these leases, regardless of their usual status as a categorical exclusion. Therefore, the circuit court decided that the district court should determine if MMS had met that standard. *Norton II*, 311 F.3d at 1178.

On April 7, 2005, MMS determined that the grant of each updated suspension request would be consistent with California's CMP.  On April 22, 2005, in a letter addressed to MMS, California enumerated forty-six alleged deficiencies in the data and information supporting the agency's consistency determinations.  The district court granted California's unopposed motion to extend through August 12, 2005, the deadline for the state response to the consistency determinations.  On the last day of the deadline, California informed MMS by letter that it objected to the consistency determinations on the grounds that they were not supported with "sufficient information to enable [California] to determine whether the granting of the lease suspensions is consistent with the enforceable policies of [California's CMP]."  The court-approved timetable does not provide a date by which MMS must now act on the updated suspension requests.

Plaintiffs filed the present complaint on June 14, 2002.  As amended, the complaint alleges that the procedures and standards governing the grant of requested suspensions when the leases were issued were materially altered by the 1990 amendment of § 307(c)(1).  This change in terms, according to plaintiffs, was an anticipatory breach.  Plaintiffs made clear during oral argument that they are tendering the leases back to the United States as part of a rescission of the leases.

DISCUSSION

Plaintiffs move for summary judgment as to liability and partial summary judgment as to damages in the form of restitution of up-front bonuses.  Plaintiffs preserve their claims for restitution of the rental payments and expenditures made with respect to each lease, as well as their claims for expectancy damages.  In response, defendant moves to dismiss or, in the alternative, for summary judgment.

Defendant's motion to dismiss is premised on the grounds that this court lacks jurisdiction and that plaintiffs have failed to state a claim of anticipatory repudiation.[22]  Its motion for summary judgment, premised on a competing interpretation of the leases, is urged in the alternative, should we

_____

[22]In its initial brief, the government also argued that particular claims were not repudiative in nature and therefore barred by the six-year statute of limitations for breach of contract claims.  At oral argument, the government acknowledged that it had abandoned this ground for dismissal.

deny the motion to dismiss.

I.    Jurisdiction

We begin with defendant's motion to dismiss for lack of jurisdiction. According to the government, the plaintiffs' repudiation claims are premised on a breach of the implied covenant of good faith and fair dealing.  Based on this characterization, the government assumes that plaintiffs are asking this court to review the exercise of MMS's discretion with regard to the timing of the agency's April 2005 consistency determinations, which were issued more than four years after the suspensions were initially requested.  In the absence of a contrary statute, a challenge to administrative discretion can only be reviewed in district court pursuant to the APA.  5 U.S.C. § 703.  The government's characterization of plaintiffs' claims as asserting an abuse of agency discretion, however, is mistaken.

Plaintiffs do not question the exercise of MMS's discretion in the timing of the application of CZMA § 307(c)(1).  Instead, they argue that *any* application of § 307(c)(1) to suspension requests is inconsistent with and constitutes a repudiation of the leases.  Plaintiffs know that § 307(c)(1) now applies to their suspension requests, pursuant to the *Norton* decisions.  They, therefore, are asserting breach of the leases and seek money damages.  The Federal Circuit has held that a party in contractual privity with the government asserts a breach of contract claim when it seeks retroactive monetary relief under that contract.  *Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1059-60 (Fed. Cir. 1995).  Plaintiffs present such a claim.  This action therefore falls within our jurisdiction.  *See* 28 U.S.C. § 1491(a)(1) (2000).

II.   Repudiation

The law of contracts between private parties generally controls the government's contractual rights and duties.  *Mobil Oil Exploration & Producing S.E., Inc. v. United States*, 530 U.S. 604, 607 (2000).  A few basic principles apply to the case at bar.  Repudiation of a contract entitles the non-repudiating party "to restitution for any benefit that he has conferred on" the repudiating party "by way of part performance or reliance."  Restatement (Second) of Contracts § 373 (1981).  The Restatement defines "repudiation" as a "statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach."  *Id.* § 250.  A "total breach," in turn, is one that "so substantially

impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Id.* § 243.

A.      *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*

The Supreme Court's decision in *Mobil Oil* involves issues so similar to those raised here that a complete understanding of its implications is essential to the resolution of the present case. In *Mobil Oil*, the Court examined the effect of the Outer Banks Protection Act ("OBPA"), 33 U.S.C. § 2753 (1994) (repealed 1996), on OCS oil and gas leases in North Carolina's Outer Banks. The lessees had sought approval for a joint EP. MMS concluded in the summer of 1990 that a draft version of the EP satisfied the applicable OCSLA standard. *See* 43 U.S.C. §§ 1340(c)(1), 1334(a)(2)(A)(i). On August 20, 1990, the lessees submitted the EP's final draft to MMS for approval. The OCSLA required approval of the EP within thirty days. *See* 43 U.S.C. § 1340(c)(1).

On August 18, 1990, two days before the final EP was submitted and the thirty-day deadline would have begun to run, Congress enacted the OBPA. The legislation prohibited approval of the EP until "the later of October 1, 1991, or after forty-five days of continuous congressional session following DOI's receipt of an [OBPA-created review panel's] report and submission of a certificate by the Secretary [of the Interior] reporting that he had sufficient information to carry out his responsibilities under the OCSLA." *Marathon Oil Co. v. United States*, 177 F.3d 1331, 1335 (Fed. Cir. 1999), *rev'd sub nom. Mobil Oil*, 530 U.S. at 624. The OBPA required the Secretary, in his certification, to explain and justify any differences between his certified conclusions and the review panel's recommendations. *Mobil Oil*, 530 U.S. at 612.

In light of the new OBPA-imposed procedures, MMS directed suspension of the leases. Three months later, North Carolina objected to the lessees' certification, mandated by CZMA § 307(c)(3), that their EP would comply with the state's CMP. The Secretary of Commerce eventually declined the lessees' request that he override this objection. In the Spring of 1992 and pursuant to the OBPA, the Secretary of the Interior certified that he had sufficient information upon which to consider the EP. Subsequently, however, he requested and received the results of two studies recommended by the

OBPA-created review panel.  Despite these studies and the Secretary's earlier certification, DOI never formally approved the EP.  In 1996, Congress repealed the OBPA.

Section 1 of the leases in *Mobil Oil*, which is identical to Section 1 of the leases at hand, only incorporated two statutes explicitly: the OCSLA and two provisions of the Department of Energy Organization Act ("DEOA").  *See Marathon Oil*, 177 F.3d at 1337.  With respect to regulations issued pursuant to either statute, Section 1 incorporated both those that were "'in existence upon the [leases'] effective date'" and those, promulgated in the future, that provided for resource conservation.  *Mobil Oil*, 530 U.S. at 615.  Other statutes and regulations were incorporated by the "catchall provision"of Section 1: "'issued subject to . . . all other applicable statutes and regulations.'"  *Id.* at 616.  The Court compared Section 1's temporal treatment of OCSLA- and DEOA-authorized regulations with the regulations referenced in the catchall provision.  Because Section 1 explicitly incorporated the former into the leases even when created in the future, the Court held that the latter were implicitly excluded from similar treatment.  The Court also held that this temporal limitation also applied to the statutes subject to the catchall provision.  The Court reasoned that, had the catchall provision subjected the leases to the requirements of any statute or regulation created in the future, "the companies would have spent $158 million to buy next to nothing."  *Id.*

In light of its reading of Section 1, the Court held that the leases were written in such a way that the lessees were assured exemption from subsequent legislation such as the OBPA.  The inclusion of the leases within the reach of the OBPA thus was a breach of contract.  The Court enumerated the specific ways in which the OBPA's alteration of pre-existing regulatory procedures and standards violated the leases: it mandated a minimum thirteen-month waiting period that, under the facts, delayed agency approval of the lessees' EPs, drilling permits, and DPPs for at least four years; it created a panel for the purpose of conducting an additional environmental review pursuant to a new standard; and it created a presumption in favor of the panel's review by requiring the Secretary of the Interior to justify any point of disagreement he may have had with it.

The Court went on to hold that the breach of lease terms was substantial, thereby constituting a material breach that amounted to a repudiation.  It reasoned that the lessees bargained for a promise, implicit in the leases and supported by the Court's reading of Section 1, that the

16

government would not significantly deviate from the procedures and standards enumerated at the time of lease execution—otherwise, "what did they buy?" *Id.* at 620-21.  The Court stated that legislation passed by Congress, signed by the President, and adhered to by the government was a clear "statement by the obligor," the United States, of its intent to repudiate the contract.  *Id.* at 619.  The Court concluded that the repudiation of the current terms of the contract and alteration of contract processes were neither technical nor insubstantial.  It held that the OBPA-induced delay "of thirteen-months minimum, and likely longer," was a delay that mattered, particularly in the context of an extensive regulatory regime.  *Id.* at 621.  It also held that the imposition of many new procedures was significant.

According to the Court, the regulatory procedures and standards to which an OCS lease is subject stand as the "gateway" through which a lessee must pass in order to exercise its contractual right to the oil and gas contained within its lease.  *Id.* at 621.  The Court concluded that the OBPA's modification of lease procedures and standards substantially narrowed this gateway, thereby materially breaching the leases.  MMS's communication of its intent to apply the OBPA, and thereby breach the leases, amounted to a repudiation.

B.    The 1990 Amendment of CZMA § 307(c)(1) Repudiated the Leases

In the present case, plaintiffs argue that CZMA § 307(c)(1) similarly violated the leases at hand because the amendment to it in 1990 was not incorporated by Section 1 of the leases.  They claim that the broadened applicability of the CZMA changed the procedures and standards governing the grant of lease suspensions and delayed the award of requested suspensions by at least four years—a delay that persists to this day.  In response, defendant argues that plaintiffs have misread the *Mobil Oil* Court's reliance on Section 1 of the standard lease form.  The government claims that the breach there was attributed to the violation of the lessees' regulatory right to have their EP approved within thirty days.  The government urges us to differentiate the current case because here plaintiffs lack a comparable "firm right" to have their suspension requests granted within a specific period of time.

First, we must determine whether the amendment to § 307(c)(1) is incorporated into the leases at hand.  Unlike the OCSLA, which is explicitly incorporated into the leases by name, no mention of the CZMA is made in the

leases' terms.  The catchall provision of Section 1, however, subjects the leases to "all other applicable statutes and regulations."  Pursuant to this provision, the leases incorporate the CZMA because it existed at the time the leases were executed.  Although the leases are generally subject to the terms of § 307(c)(1) because it was on the books at the time of execution, its provisions were not applicable to the grant of lease suspensions until its amendment in 1990, years after the leases were executed.  Therefore, we must examine whether the catchall provision incorporates the subsequent amendment of an act that was incorporated at the time of lease formation.

The temporal restriction of the catchall provision, which was identified in *Mobil Oil* and is discussed in the previous section, limits incorporation to those statutes and regulations in existence at the time of lease creation.  Because the catchall provision does not incorporate future legislation, it stands to reason that it also does not incorporate the future amendment of incorporated statutes.  Otherwise, lessees would be subject to the alteration of any statute after lease execution.

Although lessees have bargained for oil and gas rights subject to the mandates of a stable statutory regime, a lease may be modified by *regulations* promulgated long after lease execution and issued pursuant to statutes enumerated in Section 1, such as the OCSLA.  A regulation's scope and effect, however, are subject to the enabling statute.  Therefore, subjecting a lease to any future regulation issued pursuant to the OCSLA limits the lease's modification to the contours of that act.  Subjecting a lease to all future changes of an incorporated *statute*, on the other hand, would not similarly limit the impact on a lease.  Amending a statute, no matter the breadth of the statute or the focus of the amendment, subjects the lease to the mandate of the new statute.  Section 1 is subject to temporal limitations on the breadth of its incorporation—according to the *Mobil Oil* Court, to hold otherwise would render a lessee's bargain illusory.  Thus, we hold that the catchall provision is limited to legislation in existence at the time of execution.  Therefore, the 1990 amendment of § 307(c)(1) is not incorporated into the leases at hand.[23]

---

[23]Lease OCS-P 0210, the only lease issued on Form 3380-1, is subject to the OCSLA and "all lawful and reasonable regulations of the Secretary of the Interior" when they are not inconsistent with other terms of the lease.  None of the leases examined in *Mobil Oil* contained this term.  The rationale applied to those leases by the Court, however, is applicable here.  Lease 0210 was issued subject only to the terms of the OSCLA.  No other statutes were incorporated directly, and none were

The procedural impact of § 307(c)(1) on suspensions is easily identified. Before *Norton*, a lessee's suspension request was governed solely by the requirements of the OCSLA and its implementing regulations. A lessee only had to submit to MMS its reasons for the request and a schedule of the work planned during the suspension. *See* 43 U.S.C. § 1334(a)(1) (1994); 30 C.F.R. § 250.110(i) (1999). With this information in hand, MMS was free to grant or deny the request. Currently, however, the requirements of § 307(c)(1) must be met before MMS may grant the updated suspension requests pursuant to OCSLA regulation. *See* 43 U.S.C. § 1334(a)(1); 30 C.F.R. § 250.168(a).

Before MMS may grant a lease suspension, it now must also comply with the procedures and standards that are applicable to its issuance of a new OCS lease. To summarize, MMS must issue a consistency determination indicating that a proposed suspension will comply with a coastal state's CMP to the "maximum extent practicable." CZMA § 307(c)(1)(A). This determination must be supported by "comprehensive data and information." 15 C.F.R. § 930.39(a). If the relevant coastal state concurs with the consistency determination, MMS may grant the suspension. If the state objects, it may challenge the agency's action in district court pursuant to the APA.

Although the new procedures imposed by the CZMA are performed by MMS, they nevertheless exact a procedural toll on lessees by increasing the period of time between when a suspension request is made and when it is granted, if granted at all. Moreover, these procedures have altered the standards by which suspension requests are judged. Whereas requests were once evaluated by MMS pursuant to OSCLA standards, now MMS must also determine whether a suspension will comply with a state CMP. Furthermore, MMS must be prepared to defend its determination to an interested coastal state in the event of a challenge. This further increases the burden imposed by the amendment.

We recognize that, even before the *Norton* decisions, the lessees were

---

incorporated indirectly because the lease lacks any provision similar to the catchall provision found in Section 1 of the other leases before us. To imply the incorporation of future statutes would render Lease 0210 illusory because it would subject the lessee to any statutory change imposed subsequent to the lease's execution. Thus, Lease 0210 incorporates no provision of the CZMA, let alone the 1990 amendment to § 307(c)(1).

not guaranteed every suspension they requested.  At that time, however, the lessees were entitled to have such requests acted upon by MMS pursuant to the OCSLA and its implementing regulations.  The lessees bargained for these procedures and standards by incorporating them into the leases via Section 1. *See Mobil Oil*, 530 U.S. at 616, 620-21.  Section 1 erects the gateway through which the lessees must pass to in order to suspend their leases and preserve their rights.  The applicability of the amendment to § 307(c)(1) to suspension requests has narrowed this gateway.  The best proof, of course, is that, prior to the *Norton* litigation, MMS had approved the suspension requests in question. As in *Mobil Oil*, the lessees here did not bargain for these additional procedures and standards when they signed their contracts with the government.  Therefore, the amendment to § 307(c)(1) violates the leases.

We disagree with the government's contention that the violation of the thirty-day EP-approval deadline was the crux of the holding in *Mobil Oil* and is a basis for differentiating the current case.  Rather than cite the deadline as the basis for its holding, the Court held that "the timely and fair consideration of a submitted [EP] was a 'necessary reciprocal obligation'" of the government. *Id.* at 620 (quoting *Conoco Inc. v. United States*, 35 Fed. Cl. 309, 327 (1996), *upheld sub nom Mobil Oil*, 530 U.S. at 604).  The Court reasoned that the lessees were entitled to a degree of stability in the procedures and standards standing as a gateway to their oil and gas rights.  Any change that amounted to more than a "technical" alteration of lease procedures and standards constituted a breach. *Id.* at 621.  As such, the delay imposed by the OBPA, which was a minimum of thirteen months and had stretched to four years, substantially breached lease procedures.  The violation of the thirty-day deadline, in short, was incidental.[24]   The OBPA's alteration of other procedures and standards, discussed above, were additional grounds for breach.  The Court held that these changes constituted a breach because, in the aggregate, they narrowed the gateway to the lessees' rights, these changes constituted a breach. *Id.* at 620.

---

[24]In fact, no mention of the deadline is made in Part II.A of *Mobil Oil*, the portion of the opinion that establishes the government's breach. 530 U.S. at 615-20. According to the Court, "lengthy delays matter" because they can negatively impact a lessee's effort to secure successive agency approvals. *Id.* at 621.  For example, the Court noted that the Secretary of Commerce would have been more likely to overturn the objection to the lessees' § 307(c)(3) compliance certifications if the lessees had an MMS approval of their EP in hand at the time of their appeal.  The OBPA-fostered delay, however, prevented MMS from issuing such an approval.

C.      Materiality of the Government's Breach

1.      Total Breach

Plaintiffs may claim restitution if the amendment of § 307(c)(1) amounts to a total breach. To constitute a total breach, the government must have substantially impaired the value of the leases. The new procedures and standards imposed on the grant of lease suspensions by § 307(c)(1) did just that by increasing the lessees' procedural burden, halting what had been ongoing exploration and development, and increasing the risk of lease termination.

First, the broadened applicability of CZMA consistency determination procedures has imposed a procedural cost that was not bargained for under the leases. Prior to the holding in *Norton I*, MMS was free to act upon the operators' initial suspension requests as it deemed fit. On that basis, the agency granted all 10 requests in 1999. Once the applicability of § 307(c)(1) was recognized, however, the agency set aside the 1999 suspensions and subjected the initial requests to the consistency determination process. As a consequence, the approval of the initial requests has been delayed more than four years and may not be granted at all. Over the course of this delay, the operators complied with an MMS request to update their suspension requests, and the agency conducted its consistency review, which required it to evaluate, document, and defend the consistency of each request with California's CMP. MMS eventually determined that the grant of each suspension would be consistent. California has since objected to the consistency determinations on the grounds that they lack adequate support. MMS must now decide whether it will deny the suspension requests, enter mediation with California concerning the state's objections, or grant the suspensions despite those objections. If the agency then decides to grant the requests, California may challenge that decision in court. Thus, even if the lease units eventually receive the requested suspensions, those suspensions will come at the end of a battery of time-consuming procedures that were not contemplated by the parties at the time the leases were executed.

Second, the breach immediately deprived the lessees of the previously granted suspensions. In *Mobil Oil*, the enactment of the OBPA prompted MMS to defer the approval of an EP that the agency openly acknowledged warranted approval, absent the OBPA. The agency, however, had not actually approved the EP before the OBPA came into effect. The impact of the

government's breach here is more apparent.  The initial suspension requests had been granted before the holding in *Norton I* broadened the scope of § 307(c)(1) and prompted the agency to set aside the requested suspensions.

Third, the loss of the suspensions has exacted a financial toll on the lessees.  The set aside and replacement of the original suspensions with directed suspensions[25] brought the exploratory and development activities of each unit to a halt.  As in *Mobil Oil*, this breach delayed the commencement of potential oil production, thereby postponing the lessees' ability to recoup their investment and attempt to turn a profit.  In *Mobil Oil*, however, the lessees had not expended money on physical operations prior to the implementation of the OBPA.  Here, in contrast, the unit operators have extensively explored most of the leases at a substantial cost.[26]  Therefore, the lessees' inability to either profit from these additional investments or recoup their actual value and opportunity cost over the past four years, and possibly into the future, has exacerbated the impact of § 307(c)(1).  The possibility exists, of course, that they will never recoup them, solely due to the imposition of new requirements.

Finally, § 307(c)(1) gives California the opportunity to influence the termination of the leases at issue.  In *Mobil Oil*, the Secretary of the Interior retained the power of decision when evaluating an EP, despite the implementation of OBPA-mandated procedures and standards.  Here, by contrast, § 307(c)(1) gives California the ability to challenge the grant of a suspension request in court as an abuse of agency discretion.  Furthermore, under the OBPA, in the event of a denial, a lessee would be compensated either its own costs for maintaining and exploring the lease or the lease's fair market value.  *See* 43 U.S.C. § 1334(a)(2)(C).  Here, in the event California demonstrated a violation of § 307(c)(1) in court, or the agency agreed with potential California opposition, the agency would have no reason to maintain the current directed suspensions.  Without a suspension, the leases would

---

[25]In *Mobil Oil*, the government was faulted for directing suspensions in order to facilitate lease-violating compliance with the OBPA.  *See id.* at 617.  Similarly, here, the directed suspensions were granted so that MMS could apply the lease-violating procedures of § 307(c)(1).

[26]Defendant disputes the accuracy of plaintiffs' claimed exploration and development expenses.  It admits, however, that exploration has occurred.  The exact amount expended by the lessees is not crucial to our analysis.

terminate.[27]  In such an event, the lessee will not be compensated for the loss of its lease rights.

### 2.     The Government's Arguments Against Materiality

Defendant argues that, just as in *Mobil Oil*, any violation of lease terms found here did not constitute total breach because its impact was not substantial.  First, the government contends that seven of the ten lease units at issue were not affected by the switch from requested to directed suspensions because the directed suspensions do not prohibit activities that lease operators would have pursued under a requested suspension.  Second, defendant argues that nine out of ten lease units were not materially affected by CZMA § 307(c)(1) because they had already survived the allegedly more stringent standard of CZMA § 307(c)(3).  Third, the government claims that, in the four years since MMS set aside the initial requested suspensions, the CZMA amendment has not harmed the lessees because NEPA requirements mandated a concurrent delay in operations of equal length.  The government raised the first and second arguments initially at oral argument.  At our request, the government filed a post-argument brief in support.  The government raised the third argument in a supplemental brief filed pursuant to RCFC 15(b).

As to the government's first argument—that the requested suspension milestone activities for seven lease units did not include any on-the-water activities[28]—it reasons that, because the current directed suspensions bar on-the-water activities only, the switch from requested to directed suspensions had no impact on these units.  Once again, however, the government's argument fails to account for *Mobil Oil*.  Although a lease is materially impacted when planned on-the-water activities are barred, a substantial government breach need not have a physical impact.  Because the procedures incorporated into

---

[27]Termination would have a greater impact on the lessees before us than the lessees in *Mobil Oil*.  In that case, even if the Court had failed to find a breach, agency disapproval of the lessees' EP would have entitled them to compensation from the government.  43 U.S.C. § 1334(a)(2)(C).  Here, by contrast, the lessees would not be entitled to compensation if California's potential objection led to the termination of the leases.

[28]On-the-water activities are those physical actions performed by an operator on the leases within its unit.  They are distinct from in-the-office activities, which pertain to the administrative maintenance of a unit's leases.

OCS leases are the gateway through which a lessee may exercise its exploration and development rights, the narrowing of that gateway constitutes a substantial breach. *Mobil Oil*, 530 U.S. at 620-21. For example, in *Mobil Oil* the Court held that the modification of EP-approval procedures constituted a substantial breach despite the fact that, had there been no breach, other procedural requirements may have barred the lessees from conducting physical operations on their leases.[29] The Court reasoned that the breach was significant because it independently impinged on the lessees' contractually-mandated "*opportunity* to obtain . . . rights in accordance with the [leases'] procedures and . . . standards." *Id.* at 620.

With respect to the seven units subject to the government's present argument, the impact of the government's breach is no less substantial than it was in *Mobil Oil*, regardless of whether on-the-water milestone activities were planned during the units' requested suspensions. The amendment added to the lease suspension procedures was a new set of procedures and created new grounds for objection and delay. The amendment violated the government's implicit promise to maintain statutory procedures as they stood at the time of contracting. *See id.* at 620-621.

Even if we accept, *arguendo*, defendant's premise that a substantial breach can only be demonstrated if on-the-water activities are thwarted, the government's characterization of the requested suspension milestones for some units is inaccurate. According to the government, no on-the-water activities were included in the milestones for seven units.[30] We accept this characterization with respect to three units.[31] Operators of the four other

---

[29]The government argued in *Mobil Oil* that the lessees' EP could not have met the CZMA § 307(c)(3) compliance certification requirement and therefore would not have been approved, regardless of the enactment of the OBPA. The Court found the correctness of that assertion immaterial in a claim of contract repudiation and drew the following comparison: "If a lottery operator fails to deliver a purchased ticket, the purchaser can get his money back—whether or not he eventually would have won the lottery." 530 U.S. at 624.

[30]These units encompass twenty-seven leases.

[31]These units, as well as their constituent leases, are as follows: Santa Maria, which contains Leases OCS-P 0425, 0430, 0431, 0433, and 0434; Lion Rock, which contains Leases OCS-P 0396, 0397, 0402, 0403, 0408, and 0414; and Stand-Alone Lease 0409.

units,[32] however, had planned, during the requested suspensions, at least one on-the-water milestone.  Three units had other necessary preparation activities planned that were on-the-water, such as shallow hazard and biological surveys, but simply were not designated as milestones. All five units had scheduled a

------

As to these units, defendant correctly asserts that on-the-water activities were not part of their requested suspension milestones.  Plaintiffs argue that these units were nevertheless impacted by the government's breach.  These three units form a contiguous block with the Purisima Point and Point Sal Units, two units that had on-the-water milestones planned during the 1999 requested suspensions (defendant concedes material impact if a breach is found with regard to the latter two units). Plaintiff Aera Energy LLC operates all five as a single unit and has demonstrated its intent to develop the units jointly and re-propose unitization of these units during the requested suspension period.  According to plaintiffs, joint development would have commenced only upon the conclusion of exploration of Purisima Point and Point Sal. Consequently, they argue that Purisima Point and Point Sal's barred on-the-water activities materially impact the Santa Maria, Lion Rock, and Stand-Alone Lease 0409 units because the latter units' development was contingent on the now banned exploration of the former units.

Despite their joint operation, Aera's five units were never formally unitized by MMS.  Thus, defendant argues that the breach of one unit's leases cannot constitute the breach of jointly operated leases in the absence of a contractual relationship between the units.  *See Dale Constr. Co. v. United States*, 168 Ct. Cl. 692, 841 (1946).  Though there was no current contractual relationship between the units, MMS was aware of and encouraged Aera's plan to develop and re-unitize these units.  MMS sent a letter to "Interested Stakeholders" on June 2, 1999, stating that these units (the five discussed *supra*) "are all covered by a co-development strategy, which will likely result in re-unitization of the properties."  (Heck Second Supp. Decl., Exh. 114, p. 0685).  MMS went on to specify the numerous on-the-water activities Aera had planned for the other two units, Point Sal and Purisima Point, including the drilling of "up to two delineation wells."  *Id.*  We do not offer an opinion on the parties' arguments and note only that this issue is foreclosed by our determination that materiality does not hinge on whether the current suspensions bar once-planned on-the-water activities.

[32]These units, as well as their constituent leases, are as follows: Rocky Point, which contains Leases OCS-P 0451, 0452, and 0453; Sword, which contains Leases OCS-P 0319, 0320, 0322, and 0323A; Cavern Point, which contains Leases OCS-P 0210 and 0527; and Bonito, which contains Leases OCS-P 0443, 0445, 0446, 0449, 0499, and 0500.

date to begin the spudding (i.e. the drilling) of a well.[33]  Well spudding is clearly an on-the-water activity.  And it is significant.  Well spudding impacts a suspended lease in two ways: it brings a requested lease suspension to a close while at the same time ensuring the lease's existence beyond the expiration of its initial term.  *See* 43 U.S.C. § 1337(b); 30 C.F.R. § 256.37(b).

The government perceives an impermissible irony, however, if the spudding milestones are characterized as on-the-water activity because the satisfaction of the units' spudding milestone would bring to a close the very suspensions that plaintiffs now claim were wrongly set aside in the first place. This irony gives us no pause.  Well spudding brings a suspension to a close only because the suspension is no longer needed—spudding signals the commencement of production.  Leases that produce oil have no need for suspensions because, as discussed *supra*, leases do not terminate if oil or gas are produced in paying quantities.  When the 1999 requested suspensions were in effect, well spudding was a permissible activity.  Indeed, well spudding is a necessary step in the successful development of all oil and gas leases.  Once the original suspensions were replaced with suspensions directed by the agency, well spudding and the on-the-water preparations for well spudding were prohibited.  Regardless of whether plaintiffs continued to conduct in-the-office activities,[34] they were no longer permitted to reach the spudding stage, therefore delaying the development of these units for more than four years. That delay continues today.

In its second argument concerning materiality, the government contends that nine of ten units are unharmed by the application of § 307(c)(1) because they have already survived the allegedly more stringent consistency review of

---

[33]An activity performed on one lease is ascribed to all of the leases within the same unit. 30 C.F.R. § 250.1301(g).  Therefore, the spudding of a single exploratory well on one lease would have satisfied the associated milestone for every lease within the same unit.

[34]Defendant makes the argument that plaintiffs created their own delay by not continuing with in-the-office activities during the directed suspension.  However, even if plaintiffs had completed all in-the-office activities that they had scheduled to perform during their requested suspensions, plaintiffs would still, to this day, be estopped from going forth with any type of production to pursue the fruits of all their efforts.

§ 307(c)(3) under the EP compliance certification procedures.[35]  We fail to see the relevance of this argument.  The two tests are independent.  Regardless of which standard proves more burdensome,[36] it is undisputed that the application of § 307(c)(1) to the evaluation of suspension requests imposes additional procedures and introduces additional delay and risks.  At the time plaintiffs and defendant executed the leases, a lessee seeking a suspension only had to submit its request for agency consideration.  No other governmental authority played a role and no other procedures were required.   In the wake of the *Norton* decisions, a suspension request must meet with both MMS and state approval.   Even if we assume, *arguendo*, that § 307(c)(3) imposes a higher level of scrutiny, the application of § 307(c)(1) imposes a new procedural step along with attendant possibilities that lease development will be thwarted.  In addition, the government's argument also fails on a surface level.  Though nine of the ten units have already undergone a consistency determination and their EPs were initially approved by California, California now challenges the adequacy of the consistency determinations provided by MMS under § 307(c)(1) for the current requested lease suspensions.[37]

The government's third argument is premised on the application of NEPA.  Pursuant to the Ninth Circuit remand, the district court required MMS to perform a NEPA analysis of the requested suspensions.  The analysis had

---

[35]The Cavern Point Unit does not have an MMS-approved EP.  California has never approved an EP for this unit pursuant to § 307(c)(3).

[36]In any event, the government's argument that § 307(c)(1) presents the lesser burden is implausible in light of the practical concerns surrounding this case.  Circumstances have changed since the units' EPs were approved under § 307(c)(3) during the 1980s.  Since that time, California filed the suit in *Norton* in an effort to terminate the very leases it once approved.

[37]On August 12, 2005, the California Coastal Commission ("CCC") sent a letter to MMS stating:

> The Commission found that the [MMS] consistency determinations and other submittals did not contain sufficient information to enable [CCC] to determine whether granting of the lease suspensions is consistent with the enforceable policies of the [CCMP]. . . .   A set of final, adopted findings that reflect certain technical changes [CCC] made to the recommended findings in the staff report will be provided to the MMS in due course.

to include explanations of its reliance on the categorical exclusions and its determination that none of the exceptions applied. MMS prepared environmental assessments ("EAs") which were issued on February 11, 2005. However, MMS did not provide helpful additional information and the EAs simply found that the requested suspensions had no significant impact on the environment. Several environmental groups challenged the adequacy of MMS's NEPA analysis in the Northern District of California. In an August 23, 2005 minute order, the district court remanded the initial MMS analysis to the agency, requiring MMS to "conduct [an] adequate NEPA analysis on lease suspension." *League for Coastal Prot. v. Norton*, C-05-00991 CW, minute order (N.D. Cal. Aug. 12, 2005). As requested by the environmental groups, MMS must now prepare an EIS. The implication following the court's rejection of MMS's previous NEPA analysis is that NEPA requires the preparation of an EIS, even for activities listed as categorical exclusions, so long as there is any possibility that the activity may fall within an exception.

The government argues that any breach caused by the amendment of § 307(c)(1) does not substantially impair the value of the leases before us because the amendment's new procedures do not differ materially from the procedures to which all of the leases (save one) were subject under NEPA. The government uses the standard set forth in *Mobil* in an attempt to demonstrate its point: "the Government breaches an existing OCS lease if it establishes new requirements that 'deviate . . . significantly' from the 'procedures and standards' in effect when the lease was issued," 530 U.S. at 620-21, implying there is no breach if new requirements do not deviate from those already existing requirements. The government then argues that the 1990 amendment to the CZMA does not "deviate significantly" from "procedures and standards" already in place because NEPA "previously existed" and the time requirements necessary to fulfill the new CZMA procedure do not "deviate significantly" from the time required to achieve NEPA compliance. Here, the government fails to demonstrate what similar time requirements have to do with similar "procedures and standards."

The government has failed to demonstrate any meaningful redundancy between the procedures of consistency determinations and NEPA analysis for lease suspension requests. As discussed *supra*, § 307(c)(1) now requires MMS to determine if granting a lease suspension would be consistent with the interested state's CMP. NEPA requires the agency to determine what, if any, impact the planned activity will have on the environment. Though both procedures require some type of environmental assessment, NEPA does not

require compliance with state CMPs.  The application of § 307(c)(1) to lease suspension requests certainly creates new "procedures and standards" that "deviate significantly" from those already in existence.

Unable to demonstrate any similarity between the procedures of § 307(c)(1) and NEPA, the government focuses on the fact that the delay imposed by the § 307 procedure is no longer than the four years of delay imposed by NEPA and therefore does not deprive plaintiffs of a benefit that they reasonably expected.  Even if we assume that the leases would always be subject to a NEPA-induced four-year delay when suspensions are requested, such a delay does not lessen the material impact of § 307(c)(1) on lease suspension procedures.  As we discussed above, the four years that have passed since the 1999 requested suspensions were set aside is not the sole basis for finding a breach.  The imposition of § 307(c)(1) changed the procedures and standards that govern the grant of suspension requests.  As a result, MMS must now comply with new consistency determination procedures.  Furthermore, the agency's decision to grant a suspension request is subject to a stricter standard—whereas the decision to suspend was once solely the agency's, now such a decision is subject to the scrutiny of the relevant coastal state.  Finally, the CZMA-induced change in procedures has created a new risk for lease cancellation.

The government also cites *Admiral Financial Corp. v. United States* in support of its immateriality argument.  378 F.3d 1336 (Fed. Cir. 2004).  The *Admiral* court stated that a government breach does not repudiate a contract if the breach does not place the private party in a worse position than it was in prior to the breach.  *Id.* at 1343.  Admiral, a failing thrift, was unable to comply with financial regulations.  *Id.* at 1337.  Admiral entered into an agreement with the government that improved its chance for regulatory compliance.  *Id.* at 1338.  The government subsequently breached this agreement with the enactment of new legislation.  *Id.* at 1338-39.  The court concluded that the government's violation of the agreement was not a repudiation because it did not leave the thrift in a worse a position and was therefore immaterial.  *Id.* at 1343.  The thrift was not harmed by the violation merely because the thrift was already traveling down a self-induced road to failure and seizure, independent of the government's breach.  *Id.*  Admiral did not have the capital to revive its investment, irrespective of the legislation that happened to be enacted briefly before its failure.  *Id.*

In this case, on the other hand, the application of § 307(c)(1) placed the

lessees in a worse position.  Although the new-found applicability of NEPA has made it more difficult for the lessees to receive a requested suspension, it has not independently prohibited such suspensions.  As evidenced by the district court order, requested suspensions are permitted under NEPA so long as the agency complies with the requisite steps of analysis.  Regardless of whether the suspension requests withstand such an analysis in the future, the applicability of § 307(c)(1) has created an additional impediment to the grant of a requested suspension.

> D.     Plaintiffs Preserved a Claim of Anticipatory Repudiation

The government asserts that plaintiffs' suit is procedurally barred because they failed to demand adequate assurance of performance.  *See Danzig v. AEC Corp.*, 224 F.3d 1333, 1337-38 (Fed. Cir. 2000); *United States v. DeKonty*, 922 F.2d 826, 828 (Fed. Cir. 1991).  According to the government, the amendment of § 307(c)(1) did not clearly communicate the government's intent to refuse to perform the original contract, prompting an obligation in plaintiffs to seek assurance of the government's real intent.  Indeed, the government argues, the lessees have continued to perform as if the leases remain in force.  (*See* waiver discussion *infra*, Part III.A.)

The lessees did not claim repudiation until after the *Norton* courts held that the amendment of § 307(c)(1) applied to the grant of suspensions.  That is understandable.  The courts' construction of § 307(c)(1), however, relieved plaintiffs of any obligation to demand adequate assurances of the government's intent.  Their interpretation conclusively established the government's breach.  The *Norton* decisions leave no room for ambiguity—MMS must apply the procedures of § 307(c)(1) to every suspension it grants.  MMS was not at liberty to ignore the rulings.  Notwithstanding the fact that the parties failed to understand the import of § 307(c)(1) until *Norton I* was issued, the government has been bound by its terms since the day it was amended.  Thus, obligating the lessees to demand assurance of performance would have been futile.[38]

--------

[38]In *Mobil Oil*, the Court noted that an MMS letter informing a lessee of its intent to apply the OBPA "amounted to a repudiation of the contracts."  *Mobil Oil*, 530 U.S. at 621.  When the government breaches one of its contractual obligations with the implementation of new legislation, however, an affirmative communication is not necessary to establish repudiation.  As noted in the letter, the OBPA prohibited MMS from approving any EP at that time.  This would have been true even if the

E.      The Sovereign Acts Defense and the Unmistakability Doctrine

Defendant argues that, even if we find that the leases were repudiated, concerns of federal sovereignty shield the government from liability. Thus, the government turns to the twin doctrines of unmistakability and sovereign acts.

The inherent opposition of two "fundamental constitutional concepts" has catalyzed the unmistakability doctrine's development. *United States v. Winstar Corp.*, 518 U.S. 839, 872-74 (1996) (Souter, J., plurality). On the one hand, historic common law principles posit that the sovereign power of the legislature is supreme and cannot be abrogated by acts of prior legislatures; on the other hand, American legislative bodies are "'subject to the overriding dictates of the Constitution and the obligations that it authorizes.'" *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569 (Fed. Cir. 1997) (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 872-74 (1996) (Souter, J., plurality)). A claim against the federal government for contract damages arising from legislative enactment embodies the tension between these two concepts. The unmistakability doctrine is a rule of construction that alleviates a portion of this tension. Pursuant to the doctrine, a contract to which the government is a party will not be read to exempt the parties from subsequent sovereign acts that frustrate the contract unless it is so stated in unmistakable terms. *Centex Corp. v. United States*, 395 F.3d 1283, 1306-07 (Fed. Cir. 2005).

The sovereign acts doctrine appeared in the precedent of this court's predecessor near the mid-point of the 19th century and has developed in tandem with the unmistakability doctrine during the course of subsequent years. Whereas the unmistakability doctrine is responsive to questions concerning sovereign power, the sovereign acts doctrine stands as a means to distinguish the government's role as sovereign from its role as contractor. *Winstar*, 518 U.S. at 892 (Souter, J., plurality). Accordingly, when sued as a

---

letter were not sent.

In a contract between private parties, the non-breaching party must demonstrate it had notice of the other party's intent to breach—otherwise, harm will not be inflicted until a breach actually occurs. When the government breaches its own contract with legislation, however, there is no need to communicate an intent to breach—the legislation that binds the government's action conclusively establishes the government's intent to breach.

31

contractor, the government cannot be held liable for a breach attributable to "its public and general acts as a sovereign." *Id.* (citation omitted).[39]  Sovereign acts that lack a public and general nature do not preclude liability.  As stated by the Federal Circuit, "the Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties.  Such action would give the Government-as-contractor powers that private contracting parties lack." *Yankee Atomic*, 112 F.3d at 1575.

In *Winstar*, a group of plaintiff thrifts that had been promised favorable regulatory treatment by the government in exchange for certain concessions brought a breach of contract claim after Congress changed the laws affecting that treatment.  518 U.S. at 872-74.  In its *Winstar* opinion, the Supreme Court provided an extensive exegesis of the unmistakability doctrine.  Unfortunately, majority support could not be gained for a singular conception.  Nevertheless, seven justices supported a judgment against the government.  The Federal Circuit's subsequent analysis of the unmistakability doctrine is responsive to two conceptions of the unmistakability doctrine represented in the *Winstar* opinions.  *See Centex Corp.*, 395 F.3d at 1306-07; *Yankee Atomic*, 112 F.3d at 1579.

The four justices who signed on to *Winstar*'s plurality opinion felt that the unmistakability doctrine is a bar to claims against the government only when enforcement of a disputed contract "would block the exercise of a sovereign power[40] of the Government." *Id.* at 1307 (quoting *Winstar*, 518 U.S.

_____

[39]As stated earlier in this opinion, it is a general premise that contracts with the government are controlled by the law governing contractual relations between private parties.  *See Mobil Oil*, 530 U.S. at 607.  Rather than shield the government from the implications of this principle, the sovereign acts doctrine ensures its effectiveness by preserving for the government an impossibility defense that would be available to a private defendant under the same circumstances.  *Winstar*, 518 U.S. at 894 (Souter, J., plurality).

[40]The plurality limits the scope of "sovereign power" to those instances when the government can affect its obligations under contract.  *Id.* at 879 n.22.  All exercises of governmental power that, "for example, abrogate one of its contracts by a statute abrogating the legal enforceability of that contract, Government contracts of a class including that one, or simply all Government contracts," do not constitute sovereign acts warranting the application of the unmistakability doctrine.  *Id.* The

at 879 (Souter, J., plurality)).  In the view of the plurality, there is no need to apply the doctrine if a contract can be "reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of that power." *Winstar*, 518 U.S. at 880.  With respect to the facts in *Winstar*, the plurality read the contracts as shifting to the government the risk that Congress would change those laws favorable to the plaintiffs, not as a bar to Congress actually changing those laws in the future.  *Id.* at 881.  Furthermore, the plurality reasoned that the award of money damages for the breach caused by the new law would not amount to the plaintiffs' exemption from that law.  *Id.*; *cf. Yankee Atomic*, 112 F.3d at 1789 (holding that the damages sought for the alleged breach, the imposition of a new tax assessment, would effectively bar the sovereign power to tax).  Because the plurality concluded that the government's sovereign power to enforce the new banking laws was not threatened by the terms of the contract or the damages sought, it did not apply the doctrine.

Five justices disagreed with the plurality's conception of the doctrine's applicability.  *Winstar*, 518 at 919, 926.  This majority felt that the doctrine applies as a bar to claims against the government whenever a sovereign act deprives a party of the benefits of an earlier contract with the government.  *Id.* at 920, 925-26.  These justices reasoned that Congress' sovereign decision to alter relevant banking laws deprived plaintiffs of the benefit of their bargain.  *Id.*  The three justices that concurred in the judgment alone concluded, however, that plaintiffs could rely on the exception to the doctrine.  The concurring justices read the contracts as containing an unmistakable promise to the plaintiffs that the government would preserve favorable banking regulations throughout the term of the contracts.

Much as was the case in *Winstar*, the instant facts yield the same result, irrespective of how the unmistakability doctrine is applied.  According to Section 1, the leases incorporate only those statutes "in existence upon the Effective Date of [each] lease."  This provision embodies the government's promise to the lessees that it would bear the risk of changes made to the governing law after the leases were formed.  As the Supreme Court held in *Mobil Oil* with regard to this provision, a contrary reading would enable the government to alter lease terms at any time, thereby rendering plaintiffs'

---

bifurcation of government actions into those of a public, general nature and those of a private, contractual nature is a function of the sovereign acts doctrine, which will be discussed below.

bargain valueless.  530 U.S. at 620-21.

The unmistakability doctrine has no applicability here because the enforcement of Section 1 will not block the exercise of federal sovereignty.[41] All OCS leases and suspensions, including those at bar, remain subject to § 307(c)(1) procedural requirements.  Section 1 simply shifts the financial risk of regulatory change to the government.  Furthermore, the imposition of this cost does not amount to a *de facto* exemption from the amendment of § 307(c)(1).  The remedy plaintiffs seek—cancellation of the leases and restitution of the bonus payments—would not thwart the achievement of Congress' goals.

Although we construe Section 1 as a risk-shifting provision, we are mindful of the fact that five justices in *Winstar* considered such a reading to be an inappropriate justification for not applying the unmistakability doctrine. With that in mind, we assume, *arguendo*, that Congress' sovereign amendment of the CZMA deprived the lessees of their bargain.  Section 1, as we stated above, embodies the government's commitment to preserve the law governing OCS leases beyond the date of lease formation.  This provision is every bit as unmistakable a promise as the provision at issue in *Winstar*.  Much as in *Winstar*, Section 1 must be treated as an unmistakable promise in order to avoid rendering illusory the lessees' contracts with the government.  *See Winstar*, 518 U.S. at 921.  Furthermore, the *Winstar* concurrence characterized the provision at issue there as a risk-shifting provision as well as an unmistakable promise.  *Id.* at 924 (Scalia, J., concurring in judgment only). Section 1 effectively exposes the government to liability for the breach of the leases at issue.

We must ascertain the nature of the breaching action, the 1990 CZMA amendments.  According to the Federal Circuit, such a determination is not governed by "a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." *Yankee Atomic*, 112 F.3d at 1575.  We must determine whether the CZMA

---

[41]The Federal Circuit has acknowledged the primacy of the *Winstar* plurality's threshold inquiry.  *Centex Corp.*, 395 F.3d at 1308 ("'[A]pplication of the unmistakability doctrine turns on whether [enforcement] of the contractual obligation would effectively block the exercise of a sovereign power.'" (quoting *Yankee Atomic*, 112 F.3d at 1579)).

amendments were passed for the benefit of the government-as-contractor or for the benefit of the public.

On its face, the impact of the amendment reaches beyond the leases off of California's central coast. The provision, which had been limited to those agency activities "directly affecting the coastal zone," CZMA, Pub. L. No. 92-583, 86 Stat. 1280, 1285 (1972), was broadened to apply to any "agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone . . ." CZMA § 307(c)(1)(A). The CZMA's main purpose is the "encouragement and assistance of States in preparing and implementing management programs to preserve, protect, develop and whenever possible restore the resources of the coastal zone of the United States." By amending § 307(c)(1), Congress extended the CZMA's reach to a group of federal activities that had theretofore been exempt.

Looking beyond the text of the amendment, the legislative history confirms Congress' intent to bring a number of federal activities within the ambit of the CZMA. Congress amended § 307(c)(1) in direct response to *Secretary of the Interior*, 464 U.S. 312, which held that the provision's mandated state consistency review did not apply to the sale of OCS leases. H.R. Rep. No. 101-964, at 970 (1990) (Conf. Rep.), *as reprinted in* 1990 U.S.C.C.A.N. 2374, 2675 ("The conferees' principle objective . . . [is] to make clear that [OCS] lease sales are subject to the requirements of section 307(c)(1)."). Congress also had a wider purpose in mind. In *Secretary of the Interior*'s wake, "federal agencies . . . construed the . . . decision broadly to exempt a variety of agency activities from [§ 307(c)(1)'s] requirements." 136 Cong. Rec. 26,038 (1990). According to the legislative history, the amendment to § 307(c)(1) was meant "to dispel any doubt as to the applicability of [the consistency-review] requirement to all federal agency activities that meet the standard of review." *Id.* In fact, Congress specifically considered extending the reach of § 307(c)(1) to OCS leases alone, but opted instead for reestablishing "a general rule of law that is equally applicable to all federal agency activities." *Id.*

It is apparent, then, that Congress had more than the fate of the subject leases in mind when it broadened the scope of the CZMA. The amendment of § 307(c)(1) furthered Congress' effort to "enhance state authority by encouraging and assisting the states to assume planning and regulatory powers over their coastal zone" by widening the array of federal activities subject to consistency review. *See Norton I*, 150 F. Supp. 2d at 1050 (quoting S. Rep.

No. 92-753 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 4776, 4776).  Plaintiffs counter by pointing out that only the leases at issue have had suspension requests subjected to the requirements of § 307(c)(1).  As both the text and legislative history of the amendment of § 307(c)(1) make clear, however, the activities of all federal agencies impacting the nation's coastal zone have been made subject to this provision.  Without data concerning the provision's application to either OCS leases not subject to this suit or to other federal activities, we are left to examine the breadth of the provision's amendment and the apparent reasoning behind it.  Both pieces of evidence strongly support our conclusion that the § 307(c)(1) amendment was a general and public exercise of Congress' sovereign power.

Although we find that the general and public nature of § 307(c)(1) implicates the sovereign acts doctrine, the government must surmount a final hurdle before it is shielded from liability.  According to the *Winstar* plurality, the government can be held liable for a contract breached by even a public and general law if the contract, by its very terms, shifts the risk of such a change to the government.  518 U.S. at 904 (Souter, J., plurality).  The logic of this requirement is easily discerned in light of typical principles of private contract law.  A party is excused from impractical performance only if it was a basic assumption that the impracticable event would not occur and the party did not accept the risk of such occurrence.  *Id.* (citing Restatement (Second) of Contracts § 261).

Neither element necessary for such a defense is present here.  The event currently rendering the government's performance impracticable—the alteration of the laws and regulations governing OCS leases—could not have been a surprise to the parties.  The body of law regulating the rights to offshore oil and gas deposits is not subject to prolonged periods of stasis.  Moreover, the foreseeability of this risk is reflected in Section 1 of the leases, which shifts the risk of future statutory change to the government.  To read this provision otherwise would render the lessees' bargain illusory.  Because the government contracted for this risk when it entered into the subject leases, it is not entitled to raise the defense of impossibility now.

III.    Restitution

Plaintiffs seek restitution of $1.104 billion[42] in bonus payments paid by them or their predecessors in exchange for the leases. According to the *Mobil Oil* Court, "relevant contract law entitles a contracting party to restitution if the other party 'substantially' breached a contract or communicated its intent to do so." 530 U.S. at 614 (quoting Restatement (Second) of Contracts § 373(1)). Defendant argues that, even if the government is liable for breach, plaintiffs waived their restitution claims by accepting significant performance following the breach. Furthermore, defendant argues that the law of restitution bars recovery for those lessees who acquired their lease interest via assignment.[43]

---

[42]The government has received bonus payments totaling $1,248,246,491 in exchange for the forty leases at issue in the underlying case. Because plaintiffs do not own the entire interest in these leases, only $1,105,552,307 of the bonus payments are attributable to them (or their predecessors, *see infra* Part III.B). The parties stipulate to these totals. In three complementary charts that itemize the ownership of all forty leases, plaintiffs detail each lessee's proportionate interest in the bonus payments. While defendant quibbles with the legal implications of these charts, it fails to "set forth specific facts showing that there is a genuine issue for trial." *See* RCFC 56(e). The charts' accuracy is confirmed by the totals, discussed above, to which the government stipulates.

Plaintiffs' charts were submitted in support of their August 31, 2004, Proposed Findings of Uncontroverted Fact. For the purposes of that filing, only eleven of the current plaintiffs were treated as plaintiffs. The twelfth plaintiff, Nycal Offshore Development Corp., was, at the time, facing government opposition to its pending motion to intervene. Therefore, the third chart, which compiles the amount of bonus payments attributable to each plaintiff for only the thirty-six leases subject to the current motions, does not address Nycal's share. Thus, plaintiffs only sought restitution for $1,103,346,738 in bonus payments at the time.

Nycal has since successfully intervened as plaintiff. Plaintiffs' first chart, which breaks down every lessees' proportionate interest in the leases, indicates that $880,600 in bonus payments are attributable to Nycal. This amount brings plaintiffs' total restitution claim to $1,104,227,348.

[43]In a third line of defense, defendant claims that the leases' speculative value has been destroyed by the exploratory activities of the lessees and their predecessors. *See Mustang Prod. Co. v. Texaco, Inc.*, 754 F.2d 892, 893 (10th Cir. 1985) ("[The right to] conduct geophysical exploration is a valuable property right, with an ascertainable market value."). Thus, defendant argues that plaintiffs are barred from

A.    Waiver

A party can waive its repudiation claim by accepting "significant performance" from the breaching party. *Mobil Oil*, 530 U.S. at 623. The breaching party bears the burden of proving that they significantly performed the contract and that the other party accepted the performance. *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1360 (Fed. Cir. 2005). As it did in *Mobil Oil*, the government argues here that, even if a total breach occurred, the lessees waived their repudiation claims by accepting post-breach performance. First, the government argues that the lessees' ongoing pursuit of requested suspensions is tantamount to seeking performance from MMS. We disagree.

So long as the government has notice of a non-breaching party's "timely reservation of rights in protest to the breach," the non-breaching party's acceptance of contract payments will not constitute a waiver. *Id.* When the lessees submitted their updated suspension requests to MMS, they expressly preserved the right to challenge the application of § 307(c)(1) as a breach of contract. The pursuit of requested suspensions is no different than the payments accepted by the non-breaching party in *Westfed*—both constitute performance under the contract.

Even if the lessees' express reservation of rights was insufficient, the government's waiver argument does not withstand the holding in *Mobil Oil*. There, the Court stated that the waiver analysis "is not just about what the oil companies did or requested, but also about what they actually received from the Government." 530 U.S. at 622. In that instance, the lessees' request that

---

recovering restitution damages because they cannot return the leases in "substantially as good condition" as they were at the time of their execution. *See* Restatement (Second) of Contracts § 384(1)(a). Even if we assume the leases' value has been impaired by exploration, a "[m]ere depreciation in market value . . . is not such a change as will preclude restitution." *Id.* § 384(1)(a) cmt. a. Furthermore, plaintiffs' restitution claims should not be barred by the alleged impact of their exploratory activities when such activities were part of "the inherent nature of the[ir] transaction[s]" with the government. *See Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1319 (Fed. Cir. 2004). The exploration of these leases has come as no surprise to the government—it should not be shielded from restitution liability simply because its breach coincided with contractually-provided activities that may have reduced the leases' market value.

the Secretary of Commerce overturn North Carolina's objection to their § 307(c)(3) consistency certification did not amount to waiver by performance. Even though the lessees petitioned the Secretary pursuant to a procedure prescribed by the leases, his reply was based mostly on the findings of the new OBPA-created review panel, not the standards incorporated by the leases. Because the Secretary's reliance on the panel's findings was not "the kind of consideration for which [the] contracts called," the Court held that the lessees' request did not waive their claims of breach. *Id.* at 622-23. Here, the lessees' submission of updated suspension requests was met with MMS consistency review pursuant to § 307(c)(1). Such performance was not bargained for at the time of lease formation and therefore cannot constitute a waiver.

Second, the government argues that the directed suspension of the lease units has benefitted the lessees by preventing the termination of their leases. The government claims that this alleged benefit constitutes the acceptance of performance and thereby waives any claim for breach.[44]

Although the directed suspensions have preserved the leases, their imposition has not benefitted the lessees with the benefit sought through the requested suspensions. The effect of the requested suspensions was to prevent lease termination while permitting unit operators to engage in the activities

---

[44]The *Mobil Oil* Court examined three of the government's waiver arguments. In an argument similar to the one at issue here, the government relied on the fact that MMS directed lease suspensions once it had determined that the OBPA barred the approval of the EP. The Court concluded that these suspensions were not a type of performance that waived the lessees' claim for breach because they were granted pursuant a separate contract, not the leases under consideration. Given the second contract, the Court held that there was "no convincing reason why [it] should consider the suspensions to amount to significant performance of the lease contracts in question." *Id.* at 623.

The parties here dispute whether the above quotation should control the government's argument concerning the directed suspensions. The government attempts to differentiate the present facts by pointing out the similarity between the performance the lessees had sought, requested suspensions, and the performance they received, directed suspensions. Both the government and the lessees, however, ignore the Court's reliance on the second contract. Because the directed suspensions at issue here were granted pursuant to the leases, and not pursuant to an external agreement, the Court's reasoning and conclusion with regard to directed suspensions is inapplicable to the wavier argument at issue here.

necessary to prepare each lease for oil production.  The directed suspensions, by contrast, only prevent lease termination.  As a consequence, the preparation for oil production has been delayed for more than four years.  Thus, the directed suspensions have not provided the benefit sought by the lessees when the suspension requests were granted in 1999.

Even if we assume that the directed suspensions provide a benefit, as in *Mobil Oil*, this benefit does not constitute bargained-for performance.  MMS directed each unit's suspension in order to prevent lease termination while the agency applies the § 307(c)(1) procedure to the unit operators' updated suspension requests.  Although MMS may direct the suspension of the lease units pursuant to the terms in each lease, directing suspensions so that a contract-violating procedure may be applied is not a type of performance bargained for by the lessees.  Therefore, the directed suspensions do not waive the lessees' claims for breach.

B.    Assignment

Those plaintiffs which have held their leases since execution are clearly entitled to restitution for the monies they paid the government to preserve their leases over the years.  *See id.* at 607 (citing Restatement (Second) of Contracts § 373).  Defendant argues, however, that assignees of original leaseholders[45] are not entitled to full restitution.  There is no question that the assignments were proper.[46]  Instead, defendant contends that restitution in full would net assignees a windfall because their leases were acquired at a discount from the assignors.

_____

[45]Although it is not a matter of dispute that a number of plaintiffs gained their leasehold interest via assignment, the record fails to clearly differentiate original lessees from successor lessees.  In view of our ruling, this gap in the record does not preclude summary judgment.

[46]The government also claims that the Anti-Assignment Act, 31 U.S.C. § 3727 (2000), would bar the successor lessees' full recovery.  It is well established, however, that the act's prohibition is waived if the contracting officer gives clear assent to the assignment.  *See, e.g.*, *D & H Distrib. Co. v. United States*, 102 F.3d 542, 546 (Fed. Cir. 1996).  Here, the government concedes that the "[DOI] did not object to the lease transactions and has treated the purchasers as successor lessees." Def.'s Re-Stated Mot. Dismiss at 59.  Plainly, the government cannot now rely upon the act.

We disagree.  In *Insurance Co. of the West v. United States* ("*ICW*"), the government argued that the Tucker Act waiver of sovereign immunity did not extend to a breach of contract suit brought by a surety as subrogee in light of a Supreme Court decision that questioned some of the precedent upon which earlier waivers had been premised.  243 F.3d 1367, 1372 (Fed. Cir. 2001) (citing *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999)). Without relying on such precedent, the court pointed out that the waiver of sovereign immunity relates to particular claims, not to particular claimants. *Id.* at 1373-74.  Thus it reasoned that the rights of Tucker Act claimants are subject to the common law principle that an assignment transfers an assignor's rights to its assignee, including the right to pursue the rights of its insured against the government.  *Id.* at 1374.

The government's effort to differentiate *ICW* from the current facts on the ground that the *ICW* plaintiff received its rights via the subrogation of an insurance contract is not persuasive.  The rationale undergirding the Federal Circuit's opinion is clear—Congress intended common law principles, at least insofar as assignments are concerned, to govern the rights of claimants suing the government under the Tucker Act.  The successor lessees before us thus stand in the shoes of their predecessors in interest.  At common law, an assignee is entitled to restitution for both its own expenditures and the expenditures made by its assignor.  *See, e.g., Capitol Res. Funding v. Am. Way, Inc.*, 860 F. Supp. 486 (N.D. Ill. 1994); *Eli's, Inc. v. Lemen*, 591 N.W.2d 543, 536 (Neb. 1999).  Consequently, assignees are entitled to recover in restitution the expenditures of their predecessors.

The government argues that this outcome will net the successor lessees an unwarranted windfall.  For support, the government looks to *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed. Cir. 2004).  *Hansen* addressed whether a restitution award against the government should be discounted by the amount the complaining party benefitted under the contract. The case simply reiterates the unremarkable proposition that a restitution recovery should not "compensat[e a plaintiff] above and beyond the losses suffered under the breached agreement."  *Id.* at 1315.  The government would have us read this statement as a bar to the successor lessees' recovery for any of the bonus payments made by their predecessors.  Such a reading runs counter to the basic principle that an assignee stands in its assignor's shoes. So long as an assignor's recovery would not have constituted an impermissible windfall, its assignee will be entitled to the same recovery.  The government does not allege that the lessees' predecessors would have reaped a windfall had

they retained their interests in the subject leases.  Absent such a showing, the principle discussed in *Hansen* has no bearing here.[47]

CONCLUSION

For the foregoing reasons, we grant both plaintiffs' motion for summary judgment as to liability and their motion for partial summary judgment as to damages.  Defendant's motion to dismiss and alternative motion for summary judgment are denied.  Plaintiffs are entitled to the return of $1,104,227,348 in damages as restitution for the bonus payments made for the breached leases. The parties are directed to consult and file by December 20, 2005, a joint status report that stipulates to each plaintiff's share of damages on the assumption that this opinion is correct.   Judgment is deferred pending resolution of remaining claims.


s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge

---

[47]The alternative would ignore the windfall attendant to an avoidance of restitution liability by the government.  For over two decades, the government has enjoyed the interest-free use of more than $1 billion in bonus payments for leases that it has now repudiated.  The non-breaching party has the better of any equitable arguments.  *See Nashville Lodging Co. v. FDIC*, 934 F. Supp. 449 (D.D.C. 1996).