IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMBER RESOURCES COMPANY., et al.,<br><br>Plaintiffs,<br><br>THE UNITED STATES,<br><br>Defendant. | |
| ANADARKO E&P COMPANY, L.P., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Nos. 02-30C<br>04-1822C<br>05-249C (Consolidated)<br>(Senior Judge Eric G. Bruggink) |
| NYCAL OFFSHORE DEVELOPMENT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | |

**DEFENDANT'S MOTION FOR RECONSIDERATION**
**OF THE COURT'S RESCISSION OF LEASE OCS P-0452**

Pursuant to RCFC 59(a)(1), defendant, the United States, respectfully requests reconsideration of the Court's order of November 15, 2005, reissued on November 17, 2005, to the extent that the Court rescinded Lease OCS P-452 owned by plaintiff, Delta Petroleum

Corporation ("Delta"). As we demonstrate below, newly-discovered evidence establishes that Delta cannot return Lease OCS-P 0452 to the Government in the condition in which it received it due to the drainage of Lease OCS-P 0452 by adjacent leaseholders, including Delta. Unlike other impairments of the 36 leases' value that the Court considered and rejected as a bar to rescission in its re-issued November 17, 2005 decision, the past, present, and future drainage of Lease OCS-P 0452, which plaintiffs did not disclose in their motion for partial summary judgment as to damages, has not occurred, and will not occur, in a manner contemplated by Lease OCS-P 0452. Rather, the drainage has occurred by virtue of Delta's acquiescence to the drainage by adjacent leaseholders, including Delta itself. Accordingly, the basis upon which the Court rejected our arguments against rescission as a remedy in this litigation – that the drilling and exploration activities that have destroyed the speculative values of the leases were contemplated by the allegedly breached leases – does not apply to Lease OCS-P 0452.

Delta has enjoyed a financial stake in the drainage of Lease OCS-P 0452 because it currently owns approximately 11 percent of the lease that has been drilling into Lease OCS-P 0452. We have not yet been able to learn through discovery other possible ways in which Delta was compensated for the depletion of Lease OCS-P 0452.

Therefore, if this Court's rescission of Lease OCS-P 0452 stands, Delta and other adjacent leaseholders will essentially receive oil for free unless the Government obtains from this Court recoupment in the form of, among other things, all past, present, and ***future*** revenues received by Plains Exploration & Production Co. ("Plains"), Delta, and others from the continuing drainage of Lease OCS-P 0452. Because such an expansive form of recoupment could be impractical, we respectfully request that the Court reconsider its rescission of Lease

OCS-P 0452 and order that the remedy of rescission and restitution is not available as to this lease. We rely upon the attached Declaration of Drew Mayerson, dated January 19, 2006, in support of this motion for reconsideration.

## I. Legal Standard

A party is entitled to file a motion for reconsideration of the Court's ruling upon a partial summary judgment motion pursuant to Rule 59(a)(1). *Klamath Irrig. Dist. v. United States*, 68 Fed. Cl. 119, 120 (2005). Rule 59(a)(1) applies "even where no judgment has been entered. . . ." *Id.* at 121.

To prevail upon a motion for reconsideration, "the movant must point to a manifest error of law or mistake of fact" and must do more than "merely reassert[] argument were previously made and were carefully considered by the court." *Henderson County Drainage Dist. No. 3 v. United States*, 55 Fed. Cl. 334, 337 (2003) (internal citations omitted); *accord Bannum, Inc. v. United States*, 59 Fed. Cl. 241, 243 (2003). Although we respectfully disagree with the whole of the Court's opinion, and expressly reserve our right to appeal the totality of that opinion, we do not seek to argue again matters presented to the Court in prior briefing.

## II. Newly-Discovered Evidence Demonstrates That Delta Cannot Return Lease OCS-P 0452 To The Government In The Condition In Which It Received It Due To Drainage By Adjacent Leaseholders, Including Delta

In their recent motion to strike filed on January 4, 2006, the plaintiffs in Nos. 02-30C and 04-1822C, including Delta and Plains, reminded the Court that Ronald Heck swore, under pain and penalty of perjury, that "no oil or gas has ever been produced from any of the lawsuit leases." Nos. 02-30C & 04-1822C Pl. Mot. to Strike (Jan. 4, 2006), at 2 (citing Declaration of Ronald Heck ¶ 22). Lease OCS-P 0452 is among the "lawsuit leases," and the Court rescinded

this lease, and 35 others, in its re-issued November 17, 2005 decision. However, newly-discovered evidence demonstrates that Mr. Heck's statement was untrue regarding Lease OCS-P 0452. *See* Ex. 1 (Declaration of Drew Mayerson).

Neither Delta nor Plains, nor any of the other plaintiffs in No. 02-30C and 04-1822C, made specific mention of Lease OCS-P 0452 in their recent motion to strike. However, both Delta and Plains were well aware of the fact that, since 2003, this lease has been, and continues to be, susceptible to significant drainage due to the drilling of the eastern half of Lease OCS-P 0451. We, however, were unaware of these facts, described in the attached declaration of Mr. Mayerson, until December 2005. *See* Mayerson Decl. (Ex. 1).

In late 2005, PXP Arguello Inc., a wholly-owned subsidiary of Plains, approached the Pacific OCS Region of the Minerals Management Service ("MMS"), seeking permission to drill into a portion of the Bonito Unit from a platform located in the Point Arguello Unit. In response to this request, the Pacific Region of MMS researched its files to determine how it had responded to similar requests in the past.

In December 2005, the Pacific OCS Region of MMS brought to our attention, for the first time, that in February 2003, PXP Arguello Inc., a wholly-owned subsidiary of Plains, had requested concurrence from the Regional Supervisor to contract the Rocky Point Unit, thereby separating the eastern half of Lease OCS-P 0451 from the Rocky Point Unit. *See* Mayerson Decl. ¶ 4. MMS determined that Lease OCS-P 0451 was a developed lease by virtue of existing production from its western half, which was part of the producing Point Arguello Unit. *Id.* In accordance with 30 C.F.R. § 250.1301(g)(1), production on a lease within a unit keeps each lease within that unit active. Because the eastern half of Lease OCS-P 0451 was part of a unit

containing two other non-producing leases subject to litigation (Leases OCS-P 0452 and OCS-P 0453), MMS concluded that the inclusion of the eastern half of Lease OCS-P 0451 in the Rocky Point Unit was an impediment to its timely development, and ordered the contraction of the Rocky Point Unit in March 2003. *Id.* Although the eastern half of Lease OCS-P 0451 is not part of this lawsuit, the Court rescinded Lease OCS P-0452 and Lease OCS P-0453 in its re-issued November 17, 2005 decision. These three leases were originally unitized based upon common geologic structure. *See id.* Mayerson Decl. ¶ 3.

On February 20, 2003, the same day on which PXP Arguello Inc. submitted its concurrence request to MMS, the President and Chief Executive Officer of Delta, which owns Lease OCS-P 0452, Lease OCS P-0453, and approximately 11 percent of the eastern half of Lease OCS P-0451, Mayerson Decl. ¶ 7, acquiesced to the request of PXP Arguello Inc. to contract the Rocky Point Unit by removing the eastern half of Lease OCS-P 0451, and made assurances to MMS, among others, that it would not assert that it was entitled to explore or develop Lease OCS-P 0452 or Lease OCS-P 0453 as a result of the development of the eastern half of Lease OCS-P 0451. Mayerson Decl. ¶¶ 4-5 (citing February 20, 2003 letter from Roger A. Parker to J. Lisle Reed (Regional Director of MMS), the Director of the Santa Barbara County Energy Division, and the Executive Director of the California Coastal Commission).

PXP Arguello Inc. subsequently submitted a revision to the Point Arguello Unit Development and Production Plan ("DPP") proposing to develop the eastern half of Lease OCS-P 0451 through the use of extended reach drilling. Mayerson Decl. ¶ 6. MMS approved revisions to the DPP in August 2003. *Id.*

Further, on October 18, 2005, ***less than one month*** before the Court ordered the rescission of Lease OCS-P 0452, Delta wrote to the Pacific Region of MMS that it did not object to the plan of Arguello, Inc. to drill a sidetrack of a "well so that its bottom-hole location will be within 500 feet of the boundary between OCS-P 0451 and 0452." Mayerson Decl. ¶ 7 (citing October 18, 2005 letter from Kent B. Lina to Allen Shareghi).

At the time of PXP Arguello Inc.'s February 2003 request to drill into the Rocky Point field, MMS estimated that approximately 24 million barrels of oil and nine billion cubic feet of gas could be recovered from the eastern half of Lease OCS-P 0451, including approximately 4.7 million barrels of oil and two billion cubic feet of gas that would be drained from the now-rescinded Lease OCS-P 0452. Mayerson Decl. ¶ 8. Although Arguello Inc. recently suggested that there is a sealing fault between Lease OCS-P 0451 and Lease OCS-P 0452, MMS does not have sufficient well data to confirm this new interpretation. *Id.* In any event, the most recent data submitted by Arguello, Inc., including its recent geologic interpretation, indicates that the estimated drainage of Lease OCS-P 0452 will be between 300,000 and 400,000 barrels of oil. *Id.*

In every filing in this Court since February 2003, plaintiffs did not disclose ***even the possibility of drainage*** of Lease OCS-P 0452 by adjacent leaseholders. We have not yet possessed the ability to conduct extensive discovery to ascertain, with more certainty, the amount of drainage that has already occurred and will occur with regard to Lease OCS-P 0452. We also have not yet possessed the opportunity to obtain discovery as to any possible financial arrangements involving Delta as to its compensation for the drainage of Lease OCS-P 0452, over and above its approximately 11 percent interest in the eastern half of Lease OCS-P 0451. Mr.

Mayerson's declaration establishes, however, that, at a minimum, adjacent leaseholders have, in fact, drained Lease OCS-P 0452 to some degree. *Compare* Mayerson Decl. ¶ 8 *with* Nos. 02-30C & 04-1822C Pl. Mot. to Strike (Jan. 4, 2006), at 2 ("no oil or gas has ever been produced from any of the lawsuit leases") (citing Declaration of Ronald Heck ¶ 22)).

**III. The Basis Upon Which The Court Rejected Our Arguments As To A Bar Against Rescission As A Remedy Does Not Apply To Lease OCS-P 0452**

On pages 62 through 64 of our re-stated motion to dismiss, or, in the alternative, cross-motion for summary judgment, and opposition to plaintiff's motion for summary judgment as to liability and motion for partial summary judgment as to damages, we noted that restitution would not be available as a remedy here based upon plaintiffs' inability to return the leases to the Government in the condition in which they received them. We quoted the decision of the United States Court of Appeals for the Federal Circuit in *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed. Cir. 2004), observing that "section 384 of the Restatement precludes restitution when the non-breaching party cannot return 'any interest in property that he has received in exchange in substantially as good condition as when it was received by him . . . .'" 367 F.3d at 1315.

We specifically contrasted this case with *Mobil Oil Exploration & Producing, S.E., Inc. v. United States*, 530 U.S. 604 (2000), noting plaintiffs' concession that "[i]n *Mobil Oil*, no substantial operating expenses had been incurred and were thus not sought." Pl. Partial SJ Mot. at 34 n.8. Here, plaintiffs conceded that they have spent hundreds of millions of dollars conducting substantial exploration activities and that their activities have "resulted in the discovery of significant quantities of oil and gas." Pl. Proposed Findings of Uncontroverted Fact Nos. 20-21. We noted that plaintiffs necessarily conceded that they have irreparably destroyed

the speculative value of the leases, which was an asset to the Government at the time the leases were issued. *See* Def. Re-Stated MTD at 63.

Further, we expressly noted that "[t]he benefit plaintiffs received in this case is the exercise of exploration rights upon the leases over a number of decades. In the course of this exploration, plaintiffs and their predecessors used up much of the value of the leases' exploration rights." *Id.* (citing Pl. Proposed Findings of Uncontroverted Fact Nos. 20-21). We noted that "[t]he right to go onto the property at issue and conduct geophysical exploration is a valuable property right, with an ascertainable market value," *Mustang Prod. Co. v. Texaco, Inc.*, 754 F.2d 872, 873 (10th Cir. 1975), and this value was diminished by the activities of plaintiffs and their predecessors. *See id.* We contended that, due to acknowledged differences between this case and *Mobil Oil*, Pl. Partial SJ Mot. at 34 n.8, it may not be feasible here to simply "unwind" the leases. Def. Re-Stated MTD at 63-64 (citing Pl. Proposed Findings of Uncontroverted Fact Nos. 20-21).

However, in its re-issued November 17, 2005 decision, the Court rejected our argument that the nature of the benefits admittedly received by plaintiffs acted as a bar to the threshold availability of rescission as a remedy. Slip op. at 37 n.43. The Court quoted the Restatement (Second) of Contracts: "Mere depreciation in market value . . . is not such a change as will preclude restitution." *Id.* (quoting Restatement (Second) of Contracts, § 384(1)(a) cmt. a). The Court specifically held that "plaintiffs' restitution claims should not be barred by the alleged impact of their exploratory activities when such activities were part of 'the inherent nature of the[ir] transaction[s]' with the government." *Id.* at 38 n.43 (citing *Hansen*, 367 F.3d at 1319). The Court added: "The exploration of these leases has come to no surprise to the government – it

should not be shielded from restitution liability simply because its breach coincided with the contractually-provided activities that may have reduced the leases' market value." *Id.*

We respectfully seek reconsideration because the drainage of Lease OCS P-0452 was not a "contractually-provided activit[y]," nor is it part of the "inherent nature" of Delta's transactions with the Government. *See id.* The drainage of Lease OCS-P 0452 has not occurred pursuant to that lease. Rather, it has occurred because Delta acquiesced to the drainage of Lease OCS-P 0452 by adjacent leaseholders, including Delta itself. Further, the drainage of Lease OCS-P 0452 has not merely produced a "depreciation in market value;" it has irreparably changed the character of the resource. With regard to Lease OCS-P 0452, there can be no question that section 384(1)(a) of the Restatement (Second) of Contracts (as adopted by the Federal Circuit in *Hansen*) bars the rescission of this lease because Delta cannot possibly return it in "substantially as good condition" as Delta received it.

**CONCLUSION**

For these reasons, we respectfully request that this Court reconsider its rescission of Lease OCS-P 0452 and award of restitution to Delta for bonus payments received for that lease, and hold instead that rescission and restitution are not available as remedies for the Government's alleged breach of that lease.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director

STEPHEN C. TOSINI
ALLISON KIDD-MILLER
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530
Tel. (202) 307-0164
Fax (202) 514-8640

January 19, 2006

Attorneys for Defendant

**EXHIBIT 1**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMBER RESOURCES COMPANY., et al.,<br><br>Plaintiffs,<br><br>THE UNITED STATES,<br><br>Defendant. | |
| ANADARKO E&P COMPANY, L.P., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Nos. 02-30C<br>04-1822C<br>05-249C (Consolidated)<br>(Senior Judge Eric G. Bruggink) |
| NYCAL OFFSHORE DEVELOPMENT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | |

**DECLARATION OF DREW MAYERSON**

Drew Mayerson declares and states as follows:

1. I am the Chief of the Office of Reservoir Evaluation and Production of the Pacific Outer Continental Shelf Region, Minerals Management Service ("MMS"), United States

Department of the Interior. At all relevant times regarding the matters addressed in this declaration, I was a staff member of the Office of Reservoir Evaluation and Production of the Pacific Outer Continental Shelf Region of MMS. I make this declaration based upon my personal knowledge and understanding of the referenced laws and events.

2. The Submerged Lands Act of 1953, 43 U.S.C. §§ 1301 et. seq., preserved Federal ownership and control of the subsoil and seabed of the submerged lands lying seaward of the belt granted to the coastal states (generally, three nautical miles, except in the case of Texas and the gulf coast of Florida, which have State waters out to three marine leagues). That same year the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 et. seq., authorized the Secretary of the Interior to conduct leasing of the mineral resources underlying the outer Continental Shelf. The first Federal leasing occurred in 1954. Whole OCS lease blocks are approximately three miles on each side and are laid out in a systematic grid to cover the entire Federal OCS; block maps generated on this grid are called Official Protraction Diagrams wherein each block carries a discrete block number. These blocks are issued for lease during OCS lease sales. The block configuration is unrelated to the underlying geology.

3. Unitization is the practice of cooperatively exploring or developing a prospective or producing oil and gas field, or part of a field, that underlies more than one lease, through an agreement which provides for development and operation of the property as a unit by a single operator. Unitization can be used to promote and expedite development, to maximize oil and gas recovery from competitively operated pools, to eliminate the drilling of unnecessary wells, to reduce development and production costs, and to protect the correlative rights of operators,

lessees, and royalty interest owners. Allocation of production is in proportion to the percentage interest in the unit reservoirs ascribed to each overlying lease in the unit agreement, and each lessee shares in production and expenses of the unit. Units are approved only after geologic and engineering studies determine that a common geologic structure would be encompassed by the unit and that the criteria listed in applicable regulations are satisfied. In many cases, this means that the unit is comprised of a single field stretching over two or more leased tracts, but units can be comprised of multiple fields with common geologic characteristics.

4. In February 2003, Arguello Inc., operator of the Rocky Point Unit, wrote to the Regional Director requesting contraction of the eastern ½ of Lease OCS-P 0451 from the Rocky Point Unit stating that, "the Rocky Point owners have determined that it would be beneficial...," to do so. The attached copy of the letter from Robert Huguenard to the Regional Director, dated February 20, 2003 is a true copy of the original letter. The following month, the Regional Director responded by demanding contraction of the eastern ½ of Lease OCS-P 0451 from the Rocky Point Unit because, "federal regulations at 30 CFR 250.1301(g)(1), guiding unitized development, require that drilling on a lease within a unit keeps each lease in that unit active in accordance with the unit agreement, and because of the ongoing litigation surrounding the other two leases in the Rocky Point Unit, continued inclusion of the E ½ of Lease OCS-P 0451 in the Rocky Point Unit is an impediment to timely development." In closing his letter, the Regional Director stated, "...in order to promote and expedite development of the E ½ of Lease OCS-P 0451, we are contracting the E ½ of Lease OCS-P 0451 out of the Rocky Point Unit." The attached copy of the letter from the Regional Director to Mr. Robert Huguenard of Arguello Inc.,

dated March 4, 2003 is a true copy of the original letter. The western ½ of Lease OCS-P 0451 had been developed as part of the Point Arguello Unit.

5. The contraction of the Rocky Point Unit was intended to allay some of the main concerns that Santa Barbara County had with the prospect of drilling into the eastern ½ of Lease OCS-P 0451, a developed lease that was unitized with two of the undeveloped leases involved in the California v. Norton lawsuit. The attached copy of an e-mail from Joan Barminski, dated March 12, 2003, is a true copy of the original email. The email memorializes a telephone conversation with Santa Barbara County expressing their concern that regulations at 30 CFR 250.1301(g)(1) state, "If you drill, produce or perform well-workover operations on a lease within a unit, each lease, or part of a lease, in the unit will remain active in accordance with the unit agreement." The County also expressed concern that Delta Petroleum, lessee of Leases OCS-P 0452 and 0453, would assert that they should be allowed to drill on Lease OCS-P 0452 under the rule of capture, since development of the eastern ½ of Lease OCS-P 0451 would involve drainage of adjacent Lease OCS-P 0452, which overlies the same reservoir that underlies the eastern ½ of Lease OCS-P 0451. This concern was addressed earlier in a February 20, 2003 letter from Delta Petroleum to the MMS Regional Director (J. Lisle Reed), the Director of the Santa Barbara County Energy Division (Steve Chase), and the Executive Director of the California Coastal Commission (Peter Douglas). The attached letter is a true copy of the original. Delta went on to state in its letter that they "will not contend, before any county, state, or federal government entity, that it is or should be entitled to explore or develop the OCS-P 0452 or 0453 Leases as a result of the fact that such county, state or federal entity permitted the

E/2 of OCS-P 0451 Lease to be developed, or as a result of the actual development of the E/2 of the OCS-P 0451 Lease."

6. After MMS ordered the contraction of the Rocky Point Unit in March 2003, Arguello Inc. submitted revisions to the Point Arguello field Development and Production Plans proposing to develop the eastern ½ of Lease OCS-P 0451 through the use of extended reach drilling. MMS approved the revisions in a letter dated August 19, 2003. The attached copy of this letter is a true and correct copy.

7. MMS regulations (30 CFR 250.1101(b)) prohibit drilling to within 500 feet of the lease line without permission of the offset lessee, in this case Delta Petroleum. It is MMS's interpretation that the Delta letter grants that permission. This position is reaffirmed in a separate letter from Delta, (October 18, 2005) to MMS (Allan Shareghi) stating that they do not have an objection to Arguello Inc.'s planned drilling of Lease OCS-P 0451 well C-13 BP1 to within 500 feet of the boundary between Leases OCS-P 0451 and 0452. Delta does not mention its position on the drainage of resources from Lease OCS-P 0452 by development of the eastern ½ of Lease OCS-P 0451, nor is MMS privy to any agreements between the lessees on this subject. Delta currently owns approximately 11% of the eastern ½ of Lease OCS-P 0451.

8. MMS's original estimate of reserves on the Rocky Point Field was approximately 88 million barrels (MMbbl) of oil and 42 billion cubic feet (Bcf) of gas. When Arguello Inc. proposed that the field be developed via extended reach drilling from the Point Arguello platforms instead of a platform over the Rocky Point field, MMS estimated that only 39 MMbbl of oil and 12 Bcf of gas could be recovered based upon Arguello Inc's. development scenario.

Later, Arguello Inc. proposed developing the eastern ½ of Lease OCS-P 0451 with 8 wells. Based on that scenario, MMS estimated that approximately 24 MMbbl of oil and 9 Bcf of gas could be recovered from the eastern ½ of Lease OCS-P 0451, including approximately 4.7 MMbbl of oil and 2 Bcf of gas that would be drained from Lease OCS-P 0452. However, recent geological interpretation by Arguello Inc. indicates a sealing fault in Lease OCS-P 0451 between Lease OCS-P 0451 and Lease OCS-P 0452, though MMS does not have sufficient well test data to confirm Arguello Inc's interpretation. Three Rocky Point field wells have been drilled thus far and only one well crossed the above-mentioned fault. There are no additional wells planned to cross that fault. Therefore, according to the most recent production data, MMS estimates drainage of Lease OCS-P 0452 will be 300,000-400,000 bbl. This estimate was calculated using available production data, wells drilled, recent geological interpretation by the operator, and future development plans presented to MMS by the operator in December 2005. Based upon information currently available, I do not foresee any drainage of Lease OCS-P 0453 because the Rocky Point field does not extend to that lease. There is a separate field, the Jalama field, that underlies parts of OCS-P 0452 and 0453 Leases, and which is also part of the Rocky Point Unit.

9. Attached are tables summarizing the ownership interests before and after the contraction of the eastern ½ of Lease OCS-P 0451 from the unit. These pages are true copies from the Rocky Point Unit Agreements. Also attached are maps that represent the Unit boundary before and after the contraction of Lease OCS-P 0451, though not necessarily drawn to scale.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 19, 2006.

Drew Mayerson

PXP

# ARGUELLO INC.

from the desk of:
Robert E. Huguenard
Project Manager
Arguello Inc.

February 20, 2003

Mr. Lisle Reed, Regional Supervisor
Minerals Management Service
770 Paseo Camarillo
Camarillo, CA 93010

Re: Contraction of the Unit For OCS Exploration, Development and Production Operations, Rocky Point Unit, Santa Maria Basin Area, Offshore California
Effective February 15, 1985 (Rocky Point Unit Agreement)

Dear Mr. Reed:

This letter is to request concurrence of the Regional Supervisor of the MMS to contract the Rocky Point Unit as set forth herein. This request is being made by Arguello Inc. on its own behalf and on behalf of the working owners of the Rocky Point Unit, all pursuant to Article X – Revision of Unit Area, of the Rocky Point Unit Agreement.

The Rocky Point owners have determined that it would be beneficial to contract the Rocky Point Unit by removing Block 465, being the E/2 of OCS-P 0451, subject to receipt of all necessary permits/approvals for development of such lands.

Please advise if this conditional contraction of the Rocky Point Unit is acceptable to the MMS. If so, Arguello Inc. will submit the appropriate revised exhibits.

Thank you for your attention to this matter. Should you have any questions or comments, please advise.

Sincerely,

Robert E. Huguenard

Robert E. Huguenard
Project Manager

DELTA
PETROLEUM CORPORATION

475 SEVENTEENTH ST
SUITE 1400
DENVER, CO 80202
(303)293-9133/TEL
(303)298-8251/FAX

February 20, 2003

Mr. Lisle Reed, Regional Supervisor
Minerals Management Service
770 Paseo Camarillo
Camarillo, CA 93010

Mr. Steve Chase, Director
Energy Division
30 East Figueroa Street, 2nd Floor
Santa Barbara, CA 93101-2709

Mr. Peter Douglas, Executive Director
California Coastal Commission
45 Fremont Street, Suite 2000
San Francisco, CA 94105

Re: E/2 OCS-P 0451 Development

Gentlemen:

Delta Petroleum Corporation understands that Arguello, Inc. has proposed to develop the E/2 of the OCS-P 0451 Lease from an existing platform on the Point Arguello Unit. Delta owns a 100% record title interest in leases OCS-P 0452 and 0453 , which are adjacent to the OCS-P 0451 Lease. Delta understands that a concern has been raised thatDelta might take the position that it is entitled to explore or develop lease OCS-P 0452 or lease OCS-P 0453 as a result of the fact that a county, state or federal governmental entity permitted the E/2 of OCS-P 0451 Lease to be developed, or as a result of the actual development of the E/2 of the OCS-P 0451 Lease. Delta has no intent to rely on those facts in contending that lease OCS-P 0452 or lease OCS-P 0453 should be explored or developed.

Accordingly, Delta Petroleum Corporation hereby represents, intending to be bound thereby, that it will not contend, before any county, state or federal governmental entity, that it is or should be entitled to explore or develop the OCS-P 0452 or 0453 Leases as a result of the fact that such county, state or federal entity permitted the E/2 of OCS-P 0451 Lease to be developed, or as a result of the actual development of the E/2 of the OCS-P 0451 Lease.

Sincerely,

DELTA PETROLEUM CORPORATION

Roger A. Parker
President & CEO

c: Tom Gladney
Bob Huguenard

DC: 757017-1

**United States Department of the Interior**

MINERALS MANAGEMENT SERVICE
Pacific OCS Region
770 Paseo Camarillo
Camarillo, California 93010-6064

IN REPLY REFER TO: MS 7000

March 4, 2003

CERTIFIED MAIL-
RETURN RECEIPT REQUESTED

Mr. Robert Huguenard
Arguello, Inc.
17100 Calle Mariposa Reina
Goleta, CA 93117-9737

Dear Mr. Huguenard,

We have received your letter dated February 20, 2003, requesting our concurrence for contraction of the Rocky Point Unit by removing the E ½ of Lease OCS-P 0451 from the Unit. For the reasons below, and in accordance with Article X of the Unit Agreement for the Rocky Point Unit, we hereby demand the contraction of the E ½ of Lease OCS-P 0451 out of the Rocky Point Unit. Per Article X of the aforementioned agreement, the effective date of this contraction is April 1, 2003, unless the Unit operator, Arguello Inc., can justify a different effective date.

Lease OCS-P 0451 is considered a developed lease by virtue of the existing production on the W ½ of Lease OCS-P 0451 in the Point Arguello Unit. However, E ½ of Lease OCS-P 0451 is currently included in a unit with two of the 36 undeveloped leases, currently subject to litigation (California v. Norton and Amber Resources v. United States). Because the federal regulations at 30 CFR 250.1301(g)(1), guiding unitized development, require that drilling on a lease within a unit keeps each lease in that unit active in accordance with the unit agreement, and because of the ongoing litigation surrounding the other two leases in the Rocky Point Unit, continued inclusion of the E ½ of Lease OCS-P 0451 in the Rocky Point Unit is an impediment to timely development.

Arguello Inc.'s recent proposal to develop the reserves in E ½ of Lease OCS-P 0451 with directionally drilled wells from Platforms Hidalgo and Hermosa in the Point Arguello Unit illustrates the opportunity for expeditious development of these reserves. Therefore, in order to promote and expedite development of the E ½ of Lease OCS-P 0451, we are contracting the E ½ of Lease OCS-P 0451 out of the Rocky Point Unit. Arguello Inc. shall submit revised Exhibits A

and B for the Rocky Point Unit Agreement to reflect this contraction as soon as possible. If development of the E ½ of Lease OCS-P 0451 is not feasible because the requisite permits and/or approvals are not attainable, then the Rocky Point Unit will revert to its configuration immediately prior to the contraction demand of this letter and will again include the E ½ of Lease OCS-P 0451.

Please contact me if you have questions. I can be reached at (805) 389-7502.

Sincerely,

J. Lisle Reed

J. Lisle Reed
Regional Director

**Shareghi, Allan**

**From:** Barminski, Joan
**Sent:** Wednesday, March 12, 2003 4:16 PM
**To:** Mayerson, Drew; Shareghi, Allan
**Subject:** FW: Communication with Santa Barbara County Energy

I talked with Luis today.

Joan Barminski
389-7707
-----Original Message-----
**From:** Barminski, Joan
**Sent:** Wednesday, March 12, 2003 4:15 PM
**To:** OMM PAC Supvrs/Mangrs
**Cc:** Romero, John
**Subject:** Communication with Santa Barbara County Energy Division

Luis Perez, Santa Barbara County Energy Division, called today inquiring about the status of Lease OCS-P 0451 E/2 and the potential for its removal from the Rocky Point Unit. I informed him that MMS received a request from Arguello Inc. to contract the unit, and that we had in turn issued a demand letter for the contraction of Lease OCS-P 0451 E/2 from the RPU, effective April 1, 2003. He also was interested in whether the contraction was revocable; I let him know that our letter provides for the Unit to revert to its configuration prior to contraction if the requisite permits are not attainable. I faxed him a copy of our 3/4/03 letter.

I asked how the County viewed this action. He said that the contraction would resolve one of the main concerns of the county - that the potential development of 0451 E/2 could create or lead to access to the other two leases in the RPU (0452 and 0453) which are encumbered by the CA v. Norton case. The other primary concern the County had was whether the offset lessee, Delta, would object to the drilling on 0451 and claim that they should be allowed to drill offset wells on 0452 under the rule of capture. This concern was addressed by Delta's letter, sent to SBC Energy Division, CCC and MMS, wherein Delta waived its interest in developing 0452 regardless of the drainage that might occur.

An unresolved County concern is the potential for the State and other plaintiffs in the CA v. Norton case to argue that drainage from 0452 is circumventing the Court's ruling, effectively allowing "production" of one of the leases subject to the suit. Counter arguments can be made that it's hard to tell how much oil is coming from the reservoir that's attributable to 0452, that the oil cannot be fingerprinted and traced to that lease, and that the lease boundary is the legal boundary. A corollary issue is whether allowing drilling adjacent to an undeveloped lease is precedent setting; as an example, could the Cavern Point Unit be drained by drilling from Grace or Gail up to the lease line.

The County is meeting with the CCC staff and other tomorrow, so work is going forward on their end with the FDP application. It does appear that our action is a positive one for the process.

Joan Barminski
389-7707

7400

August 19, 2003

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. Robert E. Huguenard
Project Manager
Arguello Inc.
17100 Calle Mariposa Reina
Goleta, CA 93117-9737

Re: Revisions to the Point Arguello Field DPP's to include Development of the Eastern Half of Lease OCS-P 0451

Dear Mr. Huguenard:

In June 2003, the Minerals Management Service (MMS) completed its review of the proposed revisions to the Point Arguello Field DPP's and concluded that the project, with the mitigation measures from the Environmental Assessment, is technically and environmentally sound and complies with Federal OCS oil and gas operating regulations and the National Environmental Policy Act. However, since the project had not yet received concurrence from the California Coastal Commission (CCC), the MMS disapproved the proposed revisions to the DPP's by letter dated July 17, 2003, per the MMS regulations at 250.204(l)(3).

On August 13, 2003, the MMS received notification from the CCC that the proposed revisions will not cause effects on California's coastal uses and resources substantially different than those originally reviewed by the Commission, and that no additional federal consistency review is needed. Because the Point Arguello Field DPP's have all previously received CCC concurrence with their certifications of coastal zone consistency, the August 13, 2003, notification from the CCC means that the original concurrence now also applies to the subject revisions. With this CCC concurrence, and since there have been no changes made to the project or significant changes identified in the available information or impacts following the July 17, 2003, disapproval, the MMS hereby approves, pursuant to 30 CFR 250.204(o)(1), the revisions to the Point Arguello Field DPP's (as received by the MMS on April 1, 2003, deemed submitted by the MMS on April 16, 2003, and modified by Arguello Inc. in a June 12, 2003, letter to the MMS and the CCC). Our approval is subject to the following requirements:

1. Within 30 days of receipt of this approval letter, Arguello Inc. shall submit to the MMS, for approval, documentation that describes how and when Arguello Inc. will comply with the Fish and Wildlife Biological Opinion Terms and Conditions that apply to the proposed project, as described below:

    a. Annual training for platform operators covering appropriate aspects of the biology of the Brown Pelican, California Least Tern, Western Snowy Plover, and the southern sea otter;
    b. A pamphlet describing the measures to be taken by platform personnel if oiled wildlife (including listed species) is encountered.

2. At least 30 days prior to commencement of activities under the approved revisions to the plans, Arguello Inc. shall submit to the MMS, for approval, an environmental compliance monitoring plan to monitor and track compliance with all environmental protection mitigation measures to be carried out under this project. This includes all measures described in the approved revisions to the plans or supporting information, all applicable lease sale stipulations, and all applicable measures from the initial Point Arguello Field DPPs, as amended. The monitoring plan shall include submittal dates to report progress to the MMS and note any deviations from the approved plans or supporting information.

3. Arguello Inc. must submit for approval any changes to the approved Measurement and Allocation Plan prior to commencing production from the eastern half of Lease OCS-P 0451.

This approval covers only the revisions to the Point Arguello Field DPP's to include development of the eastern half of Lease OCS-P 0451. Arguello Inc. must obtain approval for an Application for Permit to Drill from the Santa Maria District Supervisor prior to commencing drilling operations.

Please keep our office advised of any changes to the project, including the schedule, prior to making such changes. If you have any questions regarding this matter, please contact Cathy Hoffman at (805) 389-7575.

Sincerely,

Nabil F. Masri

Nabil F. Masri
Chief
Office of Facilities, Safety and Enforcement

cc: Ms. Alison Detmer, California Coastal Commission
Mr. Luis Perez, County of Santa Barbara Energy Division
Mr. Terry Oda, U.S. EPA Region 9

bcc: File: 1703-02(1) Point Arguello Unit DPP Correspondence
1703-02(1) Rocky Point Unit DPP Correspondence
Chron
RM
C/OFSE (electronic copy)
C/OEE (electronic copy)
C/ODOS (electronic copy)
C/OREP (electronic copy)
DS/SM (electronic copy)
C/EAS (electronic copy)
M. Hill (electronic copy)
D. Mayerson (electronic copy)
C. Hoffman (electronic copy)
OFSE:CMHoffman/pfr:mydocs:msoffice:word:hoffman'sfiles:2003:approval.doc/08-18-03

DELTA
PETROLEUM CORPORATION

370 SEVENTEENTH ST.
SUITE 4300
DENVER, CO 80202
(303)293-9133/TEL
(303)298-8251/FAX

October 18, 2005

Mr. Allan Shareghi
Minerals Management Service
770 Paseo Camarillo
Camarillo, CA 93010

Re: E/2 OCS-P 0451 Development

Dear Mr. Shareghi,

Delta Petroleum Corporation (Delta) understands that Arguello Inc. is planning to drill a sidetrack of the C-13 BP1 well so that its bottom-hole location will be within 500 feet of the boundary between OCS-P 0451 and 0452. Delta hereby agrees with these plans and has no objection to the proximity of the proposed location in relation to the lease boundary line.

If you have any questions, please contact me at (303) 293-9133.

Sincerely,

Kent B. Lina, P.E.
Vice President of Engineering
Delta Petroleum Corporation

# EXHIBIT "A"
# ROCKY POINT UNIT




LEGEND

UNIT BOUNDARY

EXHIBIT "A" TO
ROCKY POINT UNIT
AGREEMENT
OFFSHORE CALIFORNIA

| SCALE | DATE | |
|---|---|---|
| NTS | April 1, 2002 | Contract No. 14-08-0001-18484 |

# EXHIBIT "A"
# ROCKY POINT UNIT

RECEIVED
MAR 11 2003




LEGEND

UNIT BOUNDARY

**EXHIBIT "A" TO**
**ROCKY POINT UNIT**
**AGREEMENT**
**OFFSHORE CALIFORNIA**

CONTRACT NO 14-08-0001-18484

DATE: APRIL 1, 2003 | SCALE: NTS

# EXHIBIT "B"
# TO
# ROCKY POINT UNIT AGREEMENT
# SANTA MARIA BASIN AREA
# OUTER CONTINENTAL SHELF, OFFSHORE CALIFORNIA

## OIL AND GAS LEASES AND LEASE OWNERSHIP INTERESTS

| Tract No. | Description of Lands in the Unit Area | Number of Acres or Hectares | U.S.A. Lease Serial Number | Lease Royalty | Lessees of Record | Lessee Interests | ORR & Net Profits |
|---|---|---|---|---|---|---|---|
| 1 | E/2 Block 465 All that portion seaward of the three geographic mile, OCS Official Protraction Diagram NI 10-6 (Santa Maria) | 2,385.18<br>965.25 | OCS-P 0451 | 16 2/3% | Arguello Inc.<br>Delta Petroleum Corporation | 88.888%<br>11.112% | None<br>0.3241% |
| 2 | Block 466, All that portion seaward of the three geographic mile, OCS Official Protraction Diagram NI 10-6, (Santa Maria) | 4,016.11<br>1,625.27 | OCS-P 0452 | 16 2/3% | Delta Petroleum Corporation | 100% | 0.3241% |
| 3 | All of Block 467 All that portion seaward of the three geographic mile, OCS Official Protraction Diagram NI 10-6 (Santa Maria) | 2,184.03<br>883.85 | OCS-P 0453 | 16 2/3% | Delta Petroleum Corporation | 100% | 0.3241% |
| | Total number of acres in unit<br>Total number of hectares in unit | 8,585.32<br>3,474.37 | | | | | |

Rocky Point Unit Agreement
Revised Effective April 1, 2002
Contract No. 14-08-0001-18484

017.1451a.1834.EXUARocky

**EXHIBIT "B"**
**TO**
**ROCKY POINT UNIT AGREEMENT**
**SANTA MARIA BASIN AREA**
**OUTER CONTINENTAL SHELF, OFFSHORE CALIFORNIA**

**OIL AND GAS LEASES AND LEASE OWNERSHIP INTERESTS**

| Tract No. | Description of Lands in the Unit Area | Number of Acres or Hectares | U.S.A. Lease Serial Number | Lease Royalty | Lessees of Record | Lessee Interests | ORR & Net Profits |
|---|---|---|---|---|---|---|---|
| 1 | Block 466, All that portion seaward of the three geographic mile, OCS Official Protraction Diagram NI 10-6, (Santa Maria) | 4,016.11<br>1,625.27 | OCS-P 0452 | 16 2/3% | Delta Petroleum Corporation | 100% | 0.3241% |
| 2 | All of Block 467 All that portion seaward of the three geographic mile, OCS Official Protraction Diagram NI 10-6 (Santa Maria) | 2,184.03<br>883.85 | OCS-P 0453 | 16 2/3% | Delta Petroleum Corporation | 100% | 0.3241% |
| | Total number of acres in unit<br>Total number of hectares in unit | 6200.14<br>2509.12 | | | | | |

Rocky Point Unit Agreement
Revised Effective April 1, 2003
Contract No. 14-08-0001-18484

017.1641A.1834.exArockypt