# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

| | |
|---|---|
| AMBER RESOURCES COMPANY,<br>*et al.*, | |
| *Plaintiffs,*<br><br>v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| **************************************** | |
| ANADARKO E & P COMPANY L.P.,<br>*et. al.*, | |
| *Plaintiffs,*<br><br>v. | |
| | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| **************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| **************************************** | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR RECONSIDERATION**

The Court's November 15, 2005 decision, reissued November 17, 2005, held that the Government had materially breached thirty-six lawsuit leases, and that the Plaintiff Lessees are entitled to full restitution of the lease bonuses. The Government's January 19, 2006 Motion ("Gov't Motion") seeks reconsideration of the restitution award with respect to only Lease OCS-P 0452, predicated on the assertion that some of the oil underlying Lease OCS-P 0452 is being drained by one or more wells drilled on adjacent non-lawsuit Lease OCS-P 0451.

The motion should be denied for several reasons:

*First*, no oil had been drained from Lease OCS-P 0452 as of the time of the Court's November 15, 2005 decision. That fact is established by the attached declaration of Dr. Robert W. Mannon, and is consistent with the Government's motion and the Mayerson Declaration submitted in support thereof by the Government, neither of which asserts that any drainage had occurred as of that date. The fact that no drainage had occurred is fatal to the Government's motion for reconsideration under its view of the case. The Government predicates its motion on the proposition that a party seeking restitution must return the property to the breaching party in substantially its original condition.[1] But MMS has repeatedly taken the position that the Court's November 15, 2005 decision effectuated an automatic rescission of the thirty-six leases. If so, then Lease OCS-P 0452 was returned to the Government on November 15, 2005, in its original condition. The entire predicate for the Government's motion thus disappears.

*Second*, were the Court to deem relevant the potential for future drainage from the area covered by Lease OCS-P 0452, the Government's motion does not provide the information

---

[1] As discussed in Section III, *infra*, the Federal Circuit has significantly relaxed that requirement.

necessary for the Court to evaluate the legal significance of that drainage. The Government's motion acknowledges that the relief it seeks (reversal of the restitution award for Lease OCS-P 0452) would require at a minimum proof that drainage makes it impossible for the Lessees to return Lease OCS-P 0452 to the Government "in substantially as good condition." Gov't Motion 7. But while the Government's filing purports to estimate the amount of drainage that will occur from that Lease (300,000 to 400,000 barrels by its estimate), the Government never introduces any evidence regarding the total oil reserves on Lease OCS-P 0452, or the percentage of those reserves that this estimated drainage would represent. Without such information, it is impossible to evaluate whether the Lease will remain in "substantially" its original condition. Thus, the Government motion fails for want of essential proof.

In fact, as established by the Mannon Declaration, over 28 million barrels of oil reserves underlie Lease OCS-P 0452. By his expert calculation, the total potential drainage from Lease OCS-P 0452 is only 85,000 barrels, or 0.3% of the total oil reserves on the Lease. Even assuming the Government's higher estimated drainage of 300,000 to 400,000 barrels, less than 1.5% of the oil reserves on Lease OCS-P 0452 will be drained. This insignificant portion of potential oil drainage also warrants denial of the Government's motion for reconsideration of the order granting restitution of the lease bonus, particularly given the Federal Circuit's significant relaxation of the "substantially as good condition" requirement, *see* Section III *infra.*

*Third*, the Government's alternative request, for an offset against the restitution award with respect to the value of any drained oil, should also be denied. That claimed offset is predicated on the supposition that the owner of Lease OCS-P 0452 has received a benefit from that ownership in the form of any drained oil. But as recognized by the Supreme Court as early

as 1895, where an oil and gas pool spans a property line, a landowner has the right to capture for itself any oil that migrated across property lines toward a producing well.

Any oil drained from Lease OCS-P 0452 by the wells on the east half of Lease OCS-P 0451 will represent a tiny fraction of the oil produced by those wells. And, under the rule of capture, any drainage that will occur is incident to the prerogatives of the owners of non-lawsuit Lease OCS-P 0451. Any "benefits" are theirs, not the owner of Lease OCS-P 0452.

## I. FACTUAL BACKGROUND

The facts relevant to the Government's motion are reasonably straightforward. As depicted in the following map (*see* Mannon Decl. ¶ 6), the producing Point Arguello Unit consists of Leases OCS-P 0315, 0316, 0450, and the western half of Lease OCS-P 0451. None of these leases are involved in this litigation. The Point Arguello Unit produces oil and gas from three platforms: Hidalgo (located on Lease OCS-P 0450), Harvest (located on Lease OCS-P 0315), and Hermosa (located on Lease OCS-P 316).




As depicted on this map, the non-producing Rocky Point Unit is located to the east of the Point Arguello Unit. As recounted in the Mayerson Declaration at ¶¶ 4-5 and the

attachments thereto, the Rocky Point Unit until 2003 consisted of lawsuit leases OCS-P 0452, 0453 and the east half of non-lawsuit Lease 0451.[2] However, because development of the Rocky Point Unit was blocked by the suspension of operations imposed on Leases OCS-P 0452 and 0-453, in July 2001 following Judge Wilken's decision in *California v. Norton,* permission was sought by the Rocky Point Unit operator, and granted by MMS, to remove the eastern half of Lease OCS-P 451 from the Rocky Point Unit, so as to allow the development of the oil and gas on it. (*Id.*)

No new platform was or will be installed in order to enable production from the eastern half of Lease OCS-P 451. Rather, four extended reach wells are to be drilled in a diagonal, high angled fashion from Platform Hidalgo, traversing nearly the entire width of Lease OCS-P 0451 for roughly three miles. (Mannon Decl. ¶ 19). Three of the wells have already been drilled, and the drilling of the fourth well is planned for the near future. (*Id.* ¶ 16). None of the wells has or will penetrate onto lawsuit Lease OCS-P 0452, *see id.* ¶ 19 (nor would they be permitted to do so under the suspension of operations that applies to all of the lawsuit leases).[3] With respect to each well, the operator was required to submit and obtain MMS approval of an Application for Permit to Drill (APD), *see* 30 C.F.R. § 250.410 (2005).

---

2 Because the western half of Lease OCS-P 0451 is part of the producing Point Arguello Unit, the entire lease is deemed to be in production, and therefore unlike the lawsuit leases did not need a suspension to maintain its existence. *See* 30 C.F.R. § 250.1301(g) (2005).

3 Such penetration of Lease OCS-P 0452 would be considered operations on that Lease, *see* 30 C.F.R. § 256.71 (2005), which are precluded by the July 2001 suspension of operations that applies to that Lease and the other lawsuit leases.

## II. THE GOVERNMENT MOTION SHOULD BE DENIED BECAUSE NO OIL HAD BEEN DRAINED FROM LEASE OCS-P 0452 AS OF THE TIME OF THE COURT'S NOVEMBER 15, 2005 DECISION.

Although the Government's motion is rife with innuendo that the wells drilled onto Lease OCS-P 0451 have drained oil from Lease OCS-P 0452, a careful review of the language employed makes clear that the Government does not actually claim that this has happened. *See, e.g.,* Gov't Mot. at 4 ("this lease has been, and continues to be, *susceptible* to significant drainage due to the drilling of the eastern half of Lease OCS-P 0451") (emphasis added). The Mayerson Declaration accompanying the Government's motion likewise never asserts that any drainage has occurred, but merely purports to estimate what the drainage "*will* be." (Mayerson Decl. ¶ 8) (emphasis added).

In fact, no oil had been drained from Lease OCS-P 0452 as of the time of the Court's November 15, 2005 decision. That fact is established in the accompanying declaration of Dr. Robert Mannon. Dr. Mannon is a petroleum engineer with approximately fifty-five years of oil industry experience.[4] Dr. Mannon establishes that of the four wells, one well will never drain oil from Lease OCS-P 0452; two wells may do so to a limited extent but had not done so as of November 15, 2005; and one well has not yet been drilled. (Mannon Decl. ¶¶ 23 - 27).

---

[4] Dr. Mannon received his Bachelor of Science degree from Stanford, and his Masters and Ph.D. in petroleum engineering from the University of Southern California in 1971. Now a consultant, Dr. Mannon previously taught at the University of Southern California, was an Associate Professor at the Montana College of Mineral Science and Technology, and headed the Department of Petroleum Engineering at the University of Louisiana, Lafayette. Dr. Mannon is a Registered Engineer, and a member of the Society of Petroleum Engineers, the American Association of Petroleum Geologists, and the Society of Petroleum Evaluation Engineers. Dr. Mannon has previously conducted analyses of numerous oil and gas reservoirs in the California OCS, including the Rocky Point Unit of which Lease OCS-P 0452 is a part, and is an expert in the fields of reservoir engineering, economic analysis, the evaluation of oil and gas properties, drilling and production engineering, the analysis of petroleum fluids, and the estimation of oil and gas reserves. (Mannon Decl. ¶¶ 1, 3).

The fact that no drainage had occurred is dispositive, in light of the Government's dual positions that: (a) its motion for reconsideration turns on the purported requirement that the Lessees return Lease OCS-P 0452 to the Government in "substantially as good condition" as it was received (Gov't Motion 7); and (b) the leases were rescinded on November 15, 2005, as a result of this Court's decision granting the Lessees' motion for summary judgment as to liability and partial summary judgment as to damages. *See, e.g.,* January 18, 2006 Joint Preliminary Status Report, Docket no. 115, at 5 (Defendant's Position: "On November 15, 2005, the Court held that plaintiffs had demonstrated a material breach of 36 leases and ordered the rescission of the leases."); see *also id.* ("the Court's current task, having ordered rescission of the leases at issue . . ."); January 18, 2006 Defendant's Opposition to Plaintiffs' Motion to Strike, Docket No. 116, at 3 ("The Court held that the consolidated plaintiffs had demonstrated a material breach of 36 leases and ordered the rescission of the leases."); Gov't Motion at 2 - 3 ("[W]e respectfully request that the Court reconsider its rescission of Lease OCS-P 0452 . . . .").[5]

Because no drainage had occurred as of November 15, 2005, Lease OCS-P 0452 was, under the Government's theory of the case, returned in exactly its original condition. Accordingly, no basis exists for reconsideration or alteration of the Court's November 17, 2005 Order.

---

[5] The Lessees have disagreed with the Government's position, contending: "[T]he Court's November 17, 2005 decision did not 'order[] the rescission of the leases.' The Court found that the leases are subject to rescission, based on its finding of material breach, a finding that the Government continues to dispute and presumably intends to do on appeal. The plaintiffs will tender the leases back to the Government, in conjunction with plaintiffs' receipt of their damages." (January 18, 2006 Joint Preliminary Status Report, Docket no. 115, at 4). Nonetheless, the Government cannot have it both ways, arguing that rescission has already occurred and then seeking in the instant motion relief that is wholly unavailable if rescission has already occurred.

## III. THE GOVERNMENT'S MOTION SHOULD BE DENIED EVEN IF THERE IS THE POTENTIAL FOR FUTURE DRAINAGE FROM LEASE OCS-P 0452.

By the Government's own formulation, reconsideration of the Court's decision is predicated solely on a determination that the Lessees could not return Lease OCS-P 0452 in substantially its original condition. Gov't Motion 7, *citing Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1315 (Fed. Cir. 2004). But the "substantiality" determination turns on: (a) the size of the oil reserves on Lease OCS-P 0452, and (b) the percentage of those reserves that may be subject to drainage from the wells drilled or to be drilled onto Lease OCS-P 0451. *See* Webster's Third New International Dictionary (defining "substantial" as "of or relating to the main part of something"; "an important or material matter, thing or part").

The Government has not provided the information necessary to allow one to make that substantiality determination, because it never sets forth in its motion or supporting materials an evaluation of the size of the oil reserves on Lease OCS-P 0452. The Government does aver that its original estimate of reserves on the entire Rocky Point Field (spanning both Leases OCS-P 0451 and 0452) was 88 million barrels of oil and 42 billion cubic feet of gas, and also avers that there is another field (the Jamala Field) on Leases OCS-P 0452 and 0453. (Mayerson Decl. ¶ 8). But the Government does not quantify the reserves on the Jamala Field, or quantify how much of the reserves of either the Rocky Point Field or the Jamala Field are found on Lease OCS-P 0452.

Thus, the Government fails to adduce any evidence allowing one to assess the factual predicate for its motion -- the substantiality of the alleged drainage from Lease OCS-P

0452.[6] And, the numbers that the Government has provided -- up to 400,000 barrels of potentially drained oil in a Rocky Point Field of 88,000,000 barrels -- indicates that only 0.5% of the oil would be drained, leaving 99.5% in place, a "substantial" amount of the oil by any meaning of that word.

Moreover, Dr. Mannon has performed the necessary resource evaluation of Lease OCS-P 0452 itself, which reveals that there are approximately 28 million barrels of oil reserves on that Lease. (Mannon Decl. ¶¶ 7 - 15). Those reserves are contained in three separate pools, only one of which spans the boundary between Leases OCS-P 0451 and 0452. (*Id.* at ¶ 9). Dr. Mannon estimates that approximately 85,000 barrels of oil now located under Lease OCS-P 0452 are susceptible to drainage by the four wells that have been or will be drilled on the eastern half of Lease OCS-P 0451. (*Id.* at ¶¶ 16 - 25).

In short, based on Dr. Mannon's analysis, the four wells on the eastern half of Leases OCS-P 0451 will likely result in an insubstantial amount of future drainage from Lease OCS-P 0452 -- approximately 0.3% of the total reserves on that Lease. If one instead accepts Mr. Mayerson's estimate of 300,000 to 400,000 barrels of total drainage from Lease OCS-P 0452, the percent of reserves drained still represents a mere 1.5% of the total reserves under the Lease.

By any formulation, with at least 98.5%, and more likely 99.7%, of its total reserves remaining, Lease OCS-P 0452 will be left in substantially its original condition. Even if such a small percentage of the fungible oil and gas originally in place were extracted, the Lessees will not have "used, destroyed, or substantially altered in character" Lease OCS-P 0452. *Old*

---

[6] Mr. Mayerson concedes that no drainage will occur from the Jamala Field, or from the other lease in the Rocky Point Unit, Lawsuit Lease OCS-P 0453. (*See* Mayerson Decl. ¶ 8).

*Stone Corp. v. United States*, 63 Fed. Cl. 65, 78 (2004); *quoting* Restatement (Second) of Contracts § 384 cmt. a (1981). Thus, restitution remains an available remedy, and the Government's motion to reconsider should be denied.

Lessees further note that, even if Lease OCS-P 0452 had been substantially altered, that would erect no bar to restitution. In *Hansen Bancorp,* the government claimed that the plaintiffs had shifted an acquired bank to a "more high-risk loan portfolio" which "'substantially altered' the character of the bank" and made restitution inappropriate. 367 F.3d *at* 1318-19. But the Federal Circuit permitted the plaintiffs' restitution claim to proceed:

> We agree that the commingling of assets as a result of the Raritan-Hammonton merger and the subsequent activities of Hansen Savings [i.e., plaintiffs] may make it difficult to "unwind" the transaction between the Hansens and the government for purposes of determining the appropriate amount, if any, that can be restored through restitution. We do not agree with the government, however, that this difficulty, on its own, prevents the Hansens from recovering any restitution. It is the inherent nature of the merger transaction, more than any alleged mismanagement after the merger, that makes it impossible for the Hansens to return "any interest in property that [they] ha[ve] received in exchange in substantially as good condition as when it was received by [them]. . . ." Restatement (Second) of Contracts § 384. If mismanagement on their part is established, the Hansens may be accountable for any diminishment of the character or value of property that can be directly traced to their mismanagement. However, we do not think that the Hansens' restitution claim may not proceed based solely on the consequences of the merger transaction. *Id.* at 1318-19.

**IV. THERE IS NO BASIS FOR AN OFFSET.**

Somewhat obliquely, the Government alternatively seeks an offset against the restitution award for Lease OCS-P 0452 with respect to the value of any oil drained from Lease OCS-P 0452 (presumably net of all costs of production, royalties to the United States, etc.). *See* Gov't Motion at 2 ("recoupment in the form of . . . all . . . revenues received . . . from the

continuing drainage"). While restitution awards may under appropriate circumstances be subject to offset for benefits received under the breached contract, this case is not one of them.

The critical issue is whether any future drainage is properly considered a benefit received under the breached contract for which restitution has been awarded -- Lease OCS-P 0452 -- or rather a benefit received under a different lease that was not breached and as for which restitution has not been sought or awarded -- Lease OCS-P 0451. The Lessees submit that it is the latter; indeed, the Government appears to concede the point, *see* Gov't Motion at 9: "The drainage of Lease OCS-P 0452 has not occurred pursuant to that lease."

"Under the common law rule of capture, which [applies] to the OCS, the owner of land has the right to capture oil and gas underlying his property, including that which migrates to his property from another's land." *Louisiana ex rel. Guste v. United States*, 832 F.2d 935, 938 (5th Cir. 1987) (footnote omitted); *see also Alabama v. United States Dept. of the Interior*, 84 F.3d 410, 413 (11th Cir. 1996) (same); Preamble to the OCS Unitization Regulations, 45 Fed. Reg. 29,280 - 81 (May 2, 1980) ("A lease does not grant lessees the ownership of minerals in place, and the Law of Capture applies to the development and production of OCS minerals.")

As articulated long ago by the Supreme Court, "[i]f an adjoining owner drills his own land, and taps a doposit [*sic*] of oil or gas, extending under his neighbors field, so that it comes into his well, it becomes his property." *Brown v. Spilman*, 155 U.S. 665, 670 (1895). This rule applies even when "it may be *proved* that . . . oil or gas migrated from adjoining lands." 1 Williams & Meyers, *Oil and Gas Law*, § 204.4 (2005 LEXIS) (emphasis added).

The law of capture is thus part of the "inherent nature" of the OCS leasing scheme, and the production of migrating oil is one of the "contractually-provided activities"

contemplated in the leases. The owners of Lease OCS-P 0451 are entitled to produce oil and gas that migrates from Lease OCS-P 0452.

Over 12.6 million barrels of oil are expected to be produced from the four wells that have been or will be drilled on the eastern half of Lease OCS-P 0451. (Mannon Decl. ¶¶ 23 - 26). Less than one percent of that oil (85,000 barrels) is expected to be oil drained from Lease OCS-P 0452. (*Id.* ¶ 25). In capturing any such "drained" oil, the OCS-P 0451 lessees would have been exercising their right to produce any and all oil obtained from wells drilled on Lease OCS-P 0451, and any "benefits" derived from the drained oil would have accrued under Lease OCS-P 0451, *not* Lease 0452. Indeed, the rights of the Lease OCS-P 0451 lessees to this oil would be the same even if Lease OCS-P 0452 had never been issued.

The Government's suggestion that any future drainage of Lease OCS-P 0452 would be untoward is also dispelled by the fact that the Government itself approves the locations of all wells drilled on the Pacific OCS, *see* 30 C.F.R. § 250.410 through 412, and must specifically approve a well that comes within 500 feet of the lease boundary, *see* 30 C.F.R. § 250.1101(b) (2005).[7] Moreover, the United States is entitled to the same 16.67% royalty on the oil produced regardless of whether it migrated,[8] and no one will receive "free oil" as the Government asserts (*see* Gov't Motion 2).

---

[7] MMS incorrectly describes 30 C.F.R. § 250.1101(b) as "prohibit[ing] drilling to within 500 feet of the lease line without "permission of the offset [*i.e.*, adjoining] lessee." (Mayerson Decl. ¶ 7). Although the regulation does require the operator of the well to submit the acceptance or objection of the operator of the adjoining lease, it does not condition MMS approval of the well upon the adjoining lessee's acquiescence. MMS retains decision-making authority whether to permit the well, *see id.*

[8] The 16.67% lease royalty for both Lease OCS-P 0451 and Lease OCS-P 0452 is set forth in Exhibit B to the Rocky Point Unit Agreement, an Attachment to the Mayerson declaration.

Under these facts and the rules governing restitution awards as set forth by the Federal Circuit in the *Landmark Land* and *Hansen Bancorp* cases, the Government is not entitled to an offset from the restitution award for Lease OCS-P 0452. Although benefits conferred on a plaintiff should be "netted out" in calculating the amount of restitution, only benefits conferred *under the contract* can be considered. *Hansen Bancorp Inc. v. United States*, 367 F.3d 1297, 1316 (Fed. Cir. 2004); *citing Landmark Land Co. v. F.D.I.C.*, 256 F.3d 1365, 1372-73 (Fed. Cir. 2001). "Because the purpose of restitution is to restore the plaintiff to its status quo ante, the award to the plaintiff must be reduced by the value of any benefits that it received from the defendant *under the contract*, so that only the actual, or net, loss is compensated." *Landmark Land*, 256 F.3d at 1373 (emphasis added).

But *no* benefit has been conferred by the Government under Lease OCS-P 0452. As in *Landmark Land*, where the Federal Circuit affirmed the denial of an offset because benefits received by the plaintiff were "not relevant" to the Government's performance under the contract, the drainage here is "not relevant" to the OCS-P 0452 Lease, but is instead perfectly permissible pursuant to the contractual rights of the OCS-P 0451 Lessees.

**CONCLUSION**

The Motion for reconsideration should be denied.

Respectfully submitted,

s/ Steven J. Rosenbaum
by s/ Thomas J. Cosgrove
E. Edward Bruce
Steven J. Rosenbaum
*Counsel of Record*
Thomas J. Cosgrove
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-5568
Facsimile: (202) 778-5568

February 21, 2006

Attorneys for All Plaintiffs in Nos. 02-30C and 04-1822C