IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBER RESOURCES COMPANY., *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

ANADARKO E&P COMPANY, L.P., *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

NYCAL OFFSHORE DEVELOPMENT CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Nos. 02-30C
04-1822C
05-249C (Consolidated)
(Sr. Judge Eric G. Bruggink)

**DECLARATION OF RICHARD F. STRICKLAND**

RICHARD F. STRICKLAND makes the following declaration:

1. My name is Richard F. Strickland. I have been retained by the U.S. Department of Justice to offer expert opinions related to matters of petroleum reservoir engineering in

the above-styled case. The following statements are true and correct to the best of my knowledge and are based upon my personal knowledge.

## I. Professional Background

2. I am the President of The Strickland Group, Inc. TSG provides petroleum consulting services in the area of reservoir and geological engineering to oil and gas producers, pipeline companies, and other parties in the oil and gas industry. I have performed studies on fields throughout the United States, Eastern and Western Europe, the North Sea, the Middle East, North Africa, CIS countries, India, Indonesia, Central America, and South America. Specifically, I have performed a number of studies of the Monterey formation onshore and offshore California in the last 20 years.

3. I graduated from Texas A&M University with a B.S. degree in Petroleum Engineering in 1970. I received my M.Sc. and Ph.D. in Petroleum Engineering from Texas A&M in 1974 and 1976, respectively. After that time, I was an Associate Professor of Petroleum Engineering at Texas A&M for six years, teaching courses in petroleum and reservoir engineering and the numerical simulation of oil and gas reservoirs. I have also taught these same subjects in over 75 company-run or industry sponsored courses attended by reservoir engineers and geoscientists from practically every major oil company in the world. I also held the position of President of the petroleum consulting firm Reservoir Simulation Technologies, Inc., where I developed and marketed numerical models and performed reservoir and simulation studies in fields throughout the United States, the North Sea, and the Middle East. From 1982 to 2001, I consulted to the petroleum industry with Cawley, Gillespie and Associates and served as President of the firm for more than 11 years of that time.

4. I am a registered professional engineer in the state of Texas and a member of the National Society of Professional Engineers. I am a member of the Society of Petroleum Engineers and have held several positions at the national and local level. I have served as an officer and director of the Accrediting Board of Engineering and Technology, which accredits graduate and undergraduate engineering programs in the United States and have served on this board's Engineering Accreditation Commission, which is the only body that accredits such programs in the United States.

5. Over the past 20 years I have performed and supervised reservoir engineering and geological projects including field studies, economic evaluations, audits, and field unitizations. I have testified as a petroleum engineering expert before state regulatory commissions in Texas, Oklahoma, Arkansas, Alaska and Mississippi representing over 20 state and federal court proceedings in the United States and in similar proceedings in the United Kingdom, including international arbitration matters.

6. I have become personally familiar with Leases OCS-P 0451, 0452, and 0453 based upon review of materials by the MMS and Dr. Robert Mannon disclosed in the context of this lawsuit. I have also reviewed the declarations made by Dr. Mannon and Mr. Drew Mayerson in February and January respectively.

7. I make this declaration based on my personal knowledge and expert analysis.

## II. Summary and Conclusions

8. In his declaration of February 17, 2006, Dr. Mannon made four primary conclusions of a technical nature. For three of the conclusions, Dr. Mannon offers neither the raw data nor a description of his methodology. For the fourth conclusion, Dr.

Mannon does not provide the raw data and provides only a vague description of his methodology. Consequently, it is not possible for me evaluate effectively the technical assertions of Dr. Mannon.

9. The four technical conclusions offered by Dr. Mannon pertain to following:

- the presence of a geologic fault trending northwest and southeast located in the northwestern quadrant of OCS-P 0452, and the idea that the fault is sealing,[1]
- the amount of recoverable oil in OCS-P 0452 and 0453,
- the ultimate recovery of oil from the four wells drilled to OCS-P 0451, and
- the drainage from OCS-P 0452 as a result of this production.

10. Dr. Mannon states in paragraph 4 that his current statement is based upon additional work completed since the time I received the limited discovery from his files. More importantly, he explains that "[t]his additional review included well data from wells recently drilled on Lease OCS-P 0451, and resulting geological reinterpretations." These additional data are likely to bear on several of his conclusions. More to the point, they have not been made available to me.

11. It is not possible for me to evaluate effectively the conclusions of Dr. Mannon or to develop fully informed opinions about the quantity of drainage from OCS-P 0452 without access to data possessed by the operator of OCS-P 0451 which is more extensive and recent than that currently available through the discovery process and regulatory reporting. Fully informed response to these questions requires access to all the data collected in the area as well as the plans and interpretations of the operator.

[1] That is, that fluids may not flow through the fault plane from one side to the other.

## III. Presence of a Sealing Fault

12. In paragraph 10, Dr. Mannon asserts the existence of the fault and the conclusion that fluids cannot flow across the plane of a "sealing fault" in the area. This assertion is significant since it limits the area which Dr. Mannon believes could be drained by the four wells. Specifically, Dr. Mannon writes "Any fluid flow from Lease OCS-P 0452 to any of the four wells is restricted to movement in a northeast to southwest direction along the line of the fractures, and is cut off by the sealing fault. Consequently, only a very limited area of Lease OCS-P 0452 is susceptible to drainage by the OCS-P 0451 wells, as depicted by the following diagram." (paragraph 21) The significance of the fault is reiterated in paragraphs 23 to 26 as Dr. Mannon concludes, for example: "Given the distance of the well from the lease boundary, the fracture orientation, the location of the sealing fault, and the perforated zones, I would anticipate 85,000 barrels will be drained from Lease OCS-P 0452 by Wells 13, 14 and 15 combined."

13. In regards to this point, there are two relevant assertions: first that the fault exists, and second that it is sealing. Dr. Mannon offers neither the data on which the two conclusions are based nor any insight into how that data was analyzed to arrive at the conclusions.

14. Previous interpretations of the Monterey structure indicate the presence of *two* faults in the vicinity of the *one* described by Dr. Mannon. I have no basis to judge the validity of Dr. Mannon's interpretation. There is no description of the source or basis of the current structure map. In addition I do not have the results of recent drilling which play an important part in the construction of a structure map.

15. Moreover, the data available to me about this area does not provide reliable evidence as to whether or not the interpreted fault(s) do, in fact, provide a barrier to flow. Given that the interpreted displacement on the faults is small by comparison to the thickness of the reservoir interval, I would not expect from first principles that the interpreted faults would seal. Mr. Drew Mayerson of the MMS stated in his declaration of January 19, 2006 that a "recent" interpretation by the operator "indicates a sealing fault. . .though MMS does not have sufficient well test data to confirm [the operator's] interpretation. (paragraph 8)

16. In order to evaluate fully this technical point, I need the raw data on which the structural interpretation and sealing fault conclusion is based, including but not limited to seismic data and all data collected and analyzed from all wells in the area such as well logs, daily drilling and completion reports, comprehensive DST flow test records, all pressure data, core analyses and fluid analyses. Though some of this data will eventually be reported to the MMS, not all of it has been to date nor is it likely that all of it will ever will be reported.

## IV. Total Recoverable Oil in OCS-P 0452

17. In paragraphs 11 to 15 of his declaration, Dr. Mannon describes his calculation of recoverable oil in OCS-P 0452. His conclusion about total recoverable oil is used to argue the significance of the level of drainage. This calculation is the only one of the four technical assertions about which he offers a description of his methodology, but the explanation lacks the essential rigor to evaluate the accuracy of the calculation.

18. Dr. Mannon's conclusion is based in part upon information from newly drilled wells in OCS-P 0451 not available to me at this time: "The depth of the oil-water contact is critical in estimating the size of reserves because, given that oil floats on top of water, the oil in a formation will sit above the oil-water contact. Data on the oil-water contact for each pool was obtained from exploratory wells drilled on Lease OCS-P 0452 and both exploratory and producing wells on Lease OCS-P 0451." (paragraph 11)

19. The current recovery analysis of Dr. Mannon differs from his previous analysis, but neither analysis is adequately described in the documents disclosed to date. The conclusion reached here differs from his previous work in that he describes a different range of possible recoveries and a different average recovery factor. I also observe that Dr. Mannon's current estimate of recovery for the Northeastern pool is greater than that he prepared three years ago. No explanation of the deviation is offered. Lastly, Dr. Mannon's estimates are also much greater than those made by the previous operator of the Rocky Point Unit in 2000.

20. To evaluate Dr. Mannon's assertion concerning total recoverable oil, I require raw data collected on the block from the operator described above as well as explanation of how his qualitative considerations were reduced to quantitative figures. It would also be enlightening to understand the analyses made by the operator or other owners of the block in order to evaluate the insights, to understand uncertainty in the recovery estimates, and to understand their perspectives on value and future development.

## V. Ultimate Recovery from Four Wells

21. In the process of determining how much oil may be drained from OCS-P 0452, Dr. Mannon first draws conclusions about how much oil will be produced from four wells drilled or to be drilled in the immediate vicinity of the block boundary.

22. Mannon's method of estimating ultimate recovery is not described at all nor is the data on which the determination was made.

23. Dr. Mannon's analysis is also silent on how many other wells may be drilled after the four described. The development plan submitted by the operator to the MMS called for a total of 8 wells to be drilled to the eastern half of OCS-P 0451. (Declaration of Drew Mayerson, January 19, 2006, paragraph 8) Mr. Mannon's analysis does not address the possibility or implications of another four wells being drilled.

24. Besides needing the data described above, analysis of future recovery from these wells requires detailed and up-to-date, i.e. daily, pressure and production data collected in OCS-P 0451 and 0452 plus documents about perspectives on future development plans. Both of these kinds of data are available from the operator or owners of the block. To the extent that Dr. Mannon has relied on methodologies and assumptions different than I've surmised, I also need documents related to his methodologies and assumptions.

## VI. Drainage from OCS-P 0452

25. From the four wells assumed to be drilled into the Northeastern pool of the Rocky Point unit, Dr. Mannon projects 12.6 million barrels of ultimate recovery. Of this total, Dr. Mannon concludes that only 85,000 barrels will be drained from the adjacent OCS-P

0452.[2] Though the text lists some qualitative considerations, it does not describe his methodology or specific assumptions in coming to his conclusions.

26. As shown in the figure to Dr. Mannon's paragraph 21 and described in later paragraphs, the four drilled or to-be-drilled wells are clustered on the eastern side of the block with substantial perforated intervals within a thousand feet of the block boundary, including one well as close as 55 feet from the boundary. Including consideration for the fault sealing issue described above, the idea that 12.6 million barrels could be withdrawn from these wellbores and only "drain" 85,000 barrels (0.7%) from the adjacent block doesn't seem sensible. But I cannot draw final conclusions about Dr. Mannon's assertions without having the same set of data available to him. For example, Dr. Mannon's conclusion may be based on an assumptions about reservoir drive mechanism, reservoir character or reservoir structure which are based on data not currently available for my analysis.

27. To evaluate Dr. Mannon's calculation I require first a description of his methodology, then disclosure of the intrinsic assumptions, and finally the raw data or analyses on which the assumptions are based. Given the lack of description of his calculation, I cannot describe my data needs more specifically.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Richard F. Strickland

Richard F. Strickland, PhD, P.E.
March 2, 2006

[2] It may also be noted that Dr. Mannon draws a related conclusion about the timing of the "drainage" about which I have no comment at this time.