# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

| | |
|---|---|
| AMBER RESOURCES COMPANY, *et al.*, | |
| *Plaintiffs,* v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| **************************************** | |
| ANADARKO E & P COMPANY L.P., *et. al.*, | |
| *Plaintiffs,* v. | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| **************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| **************************************** | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to RCFC 56(h)(2), Plaintiffs hereby submit their Response to Defendant's Proposed Findings Of Uncontroverted Fact In Support Of Its Cross-Motion For Summary Judgment, and Plaintiffs' Proposed Findings of Uncontroverted Fact.

## I. PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS.

1. In February 1968, the Government awarded Lease OCS-P 0210, one of the Outer Continental Shelf leases at issue in this case. Am. Compl. (No. 02-30C) (May 13, 2003), ¶ 34.

Plaintiffs' Response: AGREE.

2. Between June 1979 and October 1984, the Government awarded the 39 additional Outer Continental Shelf leases at issue. *Id.* ¶¶ 35-39.

Plaintiffs' Response: AGREE.

3. With the exception of Lease OCS-P 0210, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*, was in effect at the time the leases that are the subject of this lawsuit were issued by the Minerals Management Service ("MMS").

Plaintiffs' Response: AGREE.

4. Each of the leases is located on the Outer Continental Shelf offshore California. *Id.* 3.

Plaintiffs' Response: AGREE.

5. Outer Continental Shelf leases are valid only for a finite initial time period. The initial time period, called the "primary term," for each of the leases is five years. *See* Am. Compl. Attachment B, § 3; *id.* ¶ 40.

Plaintiffs' Response: DISAGREE that this represents an accurate or complete statement of fact. OCS leases are valid for their primary term and as long thereafter as oil or gas is being produced, or approved drilling or well reworking operations are being conducted, either on the lease itself or on any unit into which the lease has been joined. In addition, OCS leases are valid for any period of suspension, unless the suspension was directed due to gross negligence or willful violation of a provision of the lease or governing statues and regulations. *See* 30 C.F.R. § 250.105 (2002). *See also* 43 U.S.C. § 1334(a); 30 C.F.R. § 250.110(f); 30 C.F.R. § 256.73(a).[1]

6. The lease can extend beyond the primary term if oil or gas is being produced from the lease, or approved drilling or well reworking operations are being conducted (the "secondary term"). 30

[1] Unless otherwise indicated, the regulations referenced herein are to the regulations in effect in 1999, at the time MMS granted the November 1999 requested suspensions.

C.F.R. § 250.113(a) (1999) (re-codified at 30 C.F.R. § 250.180 (2000); Am. Compl. Attachment B, § 3.

<u>Plaintiffs' Response</u>: AGREE IN PART AND DISAGREE IN PART. Plaintiffs agree that the production of oil or gas or the conducting of approved drilling or well reworking operations extends the primary term of the leases, but note that such activities necessarily extend the lease term, and plaintiffs therefore disagree with the Government's use of the term "can." In addition, the regulations and leases do not use the term "secondary term," nor are plaintiffs familiar with this as a term of art. *See* 43 U.S.C. § 1337(b)(5) (OCS leases "[must] provide for suspension . . . of the lease during the initial lease term or thereafter pursuant to section 1334."); 30 C.F.R. § 250.113(a).

7. The term of the lease can also be extended beyond the primary term by "suspensions" (the "extended term"). See 43 U.S.C. § 1334(a)(1); *see also* 30 C.F.R. § 250.110 (1999) (re-codified at 30 C.F.R. § 250.168-177 (2000)).

<u>Plaintiffs' Response</u>: AGREE IN PART AND DISAGREE IN PART. Plaintiffs agree that suspensions extend the primary term of the lease, but note that, unless the suspension was directed due to gross negligence or willful violation of a provision of the lease or governing statues and regulations, such suspensions necessarily extend the lease term, and plaintiffs therefore object to the Government's use of the term "can." In addition, the regulations and lease do not use the term "extended term," nor are plaintiffs familiar with this as a term of art. *See* 43 U.S.C. § 1337(b)(5) (OCS leases "[must] provide for suspension . . . of the lease during the initial lease term or thereafter pursuant to section 1334."); 43 U.S.C. § 1334(a)(1); 30 C.F.R. § 250.110.

8. By statute and regulation, the Government may "suspend" a lease, either at its own direction or at the request of a lessee. 43 U.S.C. § 1334(a)(1); *see also* 30 C.F.R. § 250.110 (1999) (re-codified at 30 C.F.R. § 250.168-177 (2000)). *Id.*

<u>Plaintiffs' Response</u>: DISAGREE. Plaintiffs disagree that this truncated summary accurately describes the regime under which suspensions can be granted or directed. That regime is set forth in 30 C.F.R. § 250.110. While suspensions may be granted upon the "initiative [of the MMS] or at the request of the lessee" (30 C.F.R. § 250.110(a)), those suspensions are governed by the terms the applicable regulatory provisions and are not relegated to mere agency discretion.

9. A suspension extends the lease's term by a period equal to the period of the suspension. Am. Compl. ¶¶ 24-25.

<u>Plaintiffs' Response</u>: AGREE, unless the suspension was directed due to gross negligence or willful violation of a provision of the lease or governing statues and regulations. *See* 43 U.S.C. § 1334(a); 30 C.F.R. § 250.110(f); 30 C.F.R. 256.73(a).

10. The lessees (some of whom later sold their interests to certain plaintiffs for fair market value) explored the leases, but have not yet commenced activities that would put the leases into the secondary term. Am. Compl. ¶¶ 44-45.

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. Plaintiffs agree that some of the current owners of the leases are not the original owners, sometimes as a result of corporate mergers, and sometimes as a result of acquisitions. As noted above, the phrase "secondary term" is neither set forth in statutory or regulatory language, nor is it a term of art. Plaintiffs agree that there has been no production of oil or gas from any of the lawsuit leases.

11. Plaintiffs' leases can exist only by reason of suspensions, the issuance of which is at the discretion of the Government, in accordance with its regulations. *See id.* ¶ 45; *see also* 30 C.F.R. § 250.110 (1998).

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. Plaintiffs agree that their leases currently exist by reason of suspensions. However, the Government's statement that the issuance of suspensions is at the "discretion" of the Government is a legal argument and is not accurate. The grant of a suspension is not based on unbridled "discretion," but is rather based upon an agency decision whether there is sufficient resource potential and whether the lessee has proposed sufficient actions to exploit those resources. *See* 30 C.F.R. §§ 250.110(a)(1); 250.110(d)(1); 250.110(i) (1999). Applying these factors pursuant to the applicable regulations, the agency granted suspensions for the 36 leases on November 12, 1999.

12. The leases have been under suspension for much of the past 20 to 30 years, both as a result of suspensions requested by the lessees and as a result of suspensions directed by the Government.

Plaintiffs' Response: DISAGREE. All but one of the lawsuit leases was issued in or subsequent to 1981, and each had a primary term of five years. Accordingly, the reference to "20 to 30 years" of suspensions is factually inaccurate. Furthermore, the suspensions sought by the lessees were for the specific purpose of conducting activities leading to production, including the drilling of 40 wells on the 40 lawsuit properties. (Declaration of Ronald G. Heck ("Heck Decl.") ¶ 26; Exhs. 15-24.)[2] Moreover, since the *Norton I* decision, the leases have been under a suspension imposed by the United States District Court for Northern District of California.

13. On November 12, 1999, the Government granted suspensions requested by unit operators for 36 of the 40 leases. Am. Compl. ¶ 49.

Plaintiffs' Response: AGREE.

14. The suspensions ranged in length from 19 to 45 months. *Id.*

Plaintiffs' Response: AGREE.

---

[2] The Declaration of Ronald Heck, dated August 27, 2004, was submitted together with Plaintiffs August 2004 Motion for Summary Judgment as to Liability and for Partial Summary Judgment with Respect to Plaintiffs' Claim for Damages.

15. The Government severed the remaining four leases from the units of which they previously had been part based upon geological information submitted by the lessees. *Id.* ¶ 48.

Plaintiffs' Response: DISAGREE. The Government's treatment of the four referenced leases is the subject of a separate challenge before the Interior Board of Land Appeals ("IBLA"). The Government purported to find that the geological and geophysical data and interpretation no longer support inclusion of the four leases in the units in which they belonged. It refused to grant a suspension for those four leases. (Heck Decl. ¶ 29; Exhs. 35-36). On September 7, 2004, the IBLA issued a decision finding that MMS's arguments and "conclusory findings" were "fundamental[ly] flaw[ed]": "the record before us does not establish the basis for MMS's . . . decisions that the 'geophysical data and interpretation no longer support inclusion' of the excluded leases within their respective units." *In re Samedan Oil Corp.*, 163 IBLA 63, 69 (Sept. 7, 2004). The IBLA found further that MMS's reasons for terminating the four leases to be "dubious" and referred the matter for a hearing before an administrative law judge, the outcome of which is still pending. 163 IBLA at 69 - 70.

16. Because there was no pending suspension request for the severed leases, the four severed leases expired by their terms. Peter Tweedt Decl. (No. 02-30C) ¶ 6.

Plaintiffs' Response: DISAGREE. The pending suspension requests for the units to which the four leases belonged encompassed the four leases. (Heck Decl., Exhs. 16, 22). To the extent that the IBLA reverses the agency decision with respect to the four leases, those leases will be reattached to their units and covered by the red light suspensions now in place.

17. Plaintiffs have challenged the severing and consequent expiration of these leases "by administrative appeal to the Interior Board of Land Appeals." Am. Compl. ¶ 48.

Plaintiffs' Response: AGREE.

18. On November 15, 1999, the state of California filed suit against the Secretary of the Interior in the United States District Court for the Northern District of California. Am. Compl. ¶ 51; *California v. Norton*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001).

Plaintiffs' Response: AGREE.

19. Among other things, California contended that the Government lacked authority to grant the November 12 suspensions because the Government had not complied with 16 U.S.C. § 1456(c)(1), the provision of the Coastal Zone Management Act ("CZMA") requiring a Government consistency certification for its own activities affecting the coastal zone. 150 F. Supp. 2d at 1051-55.

Plaintiffs' Response: AGREE.

20. California also contended that the Government had failed to comply with NEPA because it had not provided necessary explanations or support to avoid NEPA's requirement for the

preparation of an environmental assessment or environmental impact statement prior to granting suspensions. *Id.* at 1055-57.

Plaintiffs' Response: AGREE.

21. Plaintiffs, through the unit operators, intervened as defendants in *Norton*, denied California's contention that CZMA section 1456(c)(1) applies to the mere suspension of leases, and opposed California's NEPA contentions as well. *Id.* at 1047-53; Am. Compl. ¶ 51.

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. The unit operators were not granted intervention as to the merits of California's NEPA claim.

22. On June 20, 2001, the district court ruled in California's favor upon both California's CZMA claims and its NEPA claims.

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. While California prevailed on both its CZMA and NEPA claims, this statement does not provide a complete description of the district court's decision. The *Norton I* court specifically "set aside its approval of the requested suspensions, and [directed] suspensions of the thirty-six leases, including all milestone activities, for a time sufficient for it to provide the State of California with a consistency determination in compliance with CZMA § 1456(c)(1) and its implementing regulations." 150 F. Supp. 2d at 1057-58. With respect to NEPA, the district court ruled that "before again granting these lease suspensions, the MMS shall provide a reasoned explanation for its reliance on the categorical exclusion and the inapplicability of the extraordinary circumstances exception." *Id.*

23. The district court ruled that NEPA required the Government to provide a reasoned explanation for not performing an environmental assessment or environmental impact statement before suspending the leases. *Id.* at 1057.

Plaintiffs' Response: DISAGREE. The district court specifically ruled that "the MMS shall provide a reasoned explanation for its reliance on the categorical exclusion and the inapplicability of the extraordinary circumstances exception." *Id.* at 1058. After the district court's ruling, MMS concluded that it should not or could not sustain the position that none of the foregoing circumstances applied to the lease suspensions, thus abandoning its effort to rely on the categorical exclusion for the lease suspensions. (Poulter Decl. ¶ 22.)[3]

24. The district court ordered the Government to set aside its November 12, 1999 approvals of plaintiffs' most recent suspension requests, and to direct suspension of the leases for a time

---

[3] *See* Declaration of Simon A. Poulter Regarding National Environmental Policy Act (NEPA) and Implications on the Procedural Actions Associated with the Undeveloped Outer Continental Shelf (OCS) Leases, submitted herewith.

sufficient for the Government to provide California with a consistency determination. *Norton*, 150 F. Supp. 2d at 1057-58.

Plaintiffs' Response: AGREE.

25. The court also held that "before again granting these lease suspensions" the Government should provide the required NEPA explanations. *Norton*, 150 F. Supp. 2d at 1057-58.

Plaintiffs' Response: AGREE. Furthermore, as discussed above, after the district court's ruling, MMS concluded that it should not or could not sustain the position that none of the foregoing circumstances applied to the lease suspensions, abandoning its effort to rely on the categorical exclusion for the lease suspensions. (Poulter Decl. ¶ 22). At that point, the only logical, prudent and reasonable step would have been for MMS to perform an Environmental Impact Statement ("EIS"), a draft of which had already been completed in June 2001. (*Id.* ¶ 23). That draft EIS should have been finalized no later than December 2001. (*Id.* ¶ 25). The draft EIS, however, was never finalized. (*Id.*)

26. On July 2, 2001, pursuant to the district court's order, the Government set aside its previous approval of plaintiffs' requested suspensions, and directed suspensions of the leases in accordance with its regulations until further compliance with the district court's order. Am. Compl. ¶ 53.

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. Pursuant to the district court's order, the Government directed suspensions of the leases, but the Lessees clarify that such suspensions were as a result of the district court's order, and not as a result of MMS's pre-existing requirements.

27. In August 2001, the Government appealed the district court's ruling to the Ninth Circuit.

Plaintiffs' Response: AGREE.

28. While the appeal was pending, the Government did not provide California with the consistency determination, nor did it issue the NEPA explanations found to be necessary by the district court.

Plaintiffs' Response: AGREE. Indeed, the Government totally failed to comply with its NEPA obligations. MMS should reasonably have completed a final Environmental Impact Statement no later than December 2001. (Poulter Decl. ¶ 25).

29. In 2002, the United States Court of Appeals for the Ninth Circuit held, among other things, that the Government had failed to comply with NEPA because it had not adequately explained why the extraordinary circumstances exceptions do not apply to the use of the categorical exclusion cited with respect to the lease suspensions granted. *California v. Norton*, 311 F.3d 1162 (9th Cir. 2002).

Plaintiffs' Response: DISAGREE. In affirming the district court, the Ninth Circuit held that the Government must provide a reasoned explanation for its reliance on the categorical exclusion (*id.* at 1177-78).

30. Plaintiffs submitted updated lease suspension applications to the Department of the Interior following issuance of a February 26, 2004 order of the district court in *California v. Norton*. Ex. 93 to Heck Decl. (No. 02-30C) at 2.

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. Even after the Ninth Circuit affirmed the district court ruling in December 2002, and issued its mandate in January 2003, MMS continued to delay conducting the newly required consistency determination. The district court on February 5, 2003, ordered the parties to file a joint case management statement regarding the status of the lawsuit. (Findings ¶ 45).[4] While the plaintiffs sought a timetable for MMS's performance of its consistency determination obligations, MMS took the position that *no* timetable should be imposed and that the lawsuit should be dismissed. (Findings ¶ 46). MMS then formally moved to dismiss the lawsuit on May 15, 2003, again opposing the setting of any timetables. (Findings ¶ 46).

The district court rejected MMS's arguments, and on February 26, 2004, issued an order directing MMS to obtain updated lease suspension applications from the Lessees, to review those applications, and to provide the court with a "detailed timetable for MMS to complete [the required] analyses and to provide California the consistency determinations required by this Court's June 2001 judgment." (Findings ¶ 47). MMS then instructed the Lessees to file updated information regarding their suspension requests, which the Lessees did on April 20, 2004. (Findings ¶ 48).

On June 4, 2004 – nearly three years after *Norton I* – MMS finally released a timetable for conducting the consistency determinations. MMS issued its consistency determinations on April 7, 2005 – a date nearly four years after the *Norton I* court required MMS to set aside the 1999 suspensions, order a suspension of all activities on the Leases, and perform a Section 307(c)(1) determination pursuant to the 1990 Amendments to the CZMA. The California Coastal Commission objected to these determinations on August 12, 2005, and the consistency process was never completed. (*See* Plaintiffs' and Defendants' Joint Status Report, Exh. A (August 29, 2005)).

31. In the spring of 2004, the Minerals Management Service ("MMS") received from plaintiffs a total of ten applications for suspensions entailing nine units and one stand-alone lease. *Id.*

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. Plaintiffs submitted applications that expressly preserved their position in this litigation that the application of the

---

[4] References herein to "Findings" are to the August 31, 2004 "Proposed Findings of Uncontroverted Fact in Support of Plaintiffs' Motion for Summary Judgment as to Liability and For Partial Summary Judgment with Respect to Plaintiffs' Claim for Damages," and the materials submitted in support thereof.

1990 CZMA Amendments to their suspension requests constituted a material breach of contract. (Heck Supp. Decl. ¶ 4; Exhs. 100-109).

32. Upon remand, on June 28, 2004, the district court entered an order adopting the Government's proposed timetable for completion of the analyses required by that court's judgment. Ex. 94 to Heck Decl. (Order Adopting Federal Defendants' Proposed Timetable, *California v. Norton*, No. C 99-4694 CW, (N.D. Cal. Jun. 28, 2004)).

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. *See* Plaintiffs' response to paragraph 30 *supra*.

33. According to this timetable, the ordered NEPA analyses were to be completed by February 16, 2005, while the ordered CZMA analyses were to be completed by April 7, 2005, and California had until July 7, 2005 to object. Ex. 93 to Heck Decl. (Timeline for NEPA Analyses, CZMA Consistency Determinations, and Environmental Information Document (EID) in the *California v. Norton* Decision.

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. Notwithstanding the district court's scheduling order, the Government has still never completed its NEPA analyses. The Government should have been able to complete its NEPA-related analyses by December 2001, over three years *prior* to the deadline established by the district court. (Poulter Decl. ¶ 25).

34. In August 2005, the United States District Court for the District of California ruled that MMS was required under NEPA to "consider the environmental impact of future exploration and development activity in preparing environmental analyses in conjunction with the thirty-seven suspensions in this case." *League for Coastal Protection v. Norton*, No. C 05- 00991 CW, 2005 WL 2176910, at *5 (N.D. Cal. Aug. 31, 2005).

Plaintiffs' Response: AGREE AND DISAGREE. The MMS should have completed a final EIS by December 2001. (Poulter Decl. ¶ 25). An EIS would have included an analyses of the environmental impact of the exploratory drilling planned for the undeveloped leases and the development and oil production that would follow. (*Id.* ¶ 26). It was the absence of such analyses that lead to the *League for Coastal Protection vs. Norton* litigation, which successfully challenged before Judge Wilken the limited nature of the EAs. (*Id.* ¶ 27). The *League for Coastal Protection* litigation could and should have been avoided by the finalization of the June 2001 draft EIS, which did not suffer from these shortcomings. (*Id.*) MMS could have, within the same timeframe as that needed to complete the final EIS, also provide the more detailed explanation of the effect of the use of air guns that Judge Wilken also found was needed. (*Id.*)

35. In its August 2005 decision, the district court in *League for Coastal Protection* remanded the NEPA analysis MMS to conduct further analysis. *League for Coastal Protection*, 2005 WL 2176910, at *5.

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. *See* Plaintiffs' response to paragraph 34 *supra*.

36. The Government's appeal to the Ninth Circuit in *League of Coastal Protection* is currently stayed pending resolution of this litigation. Ex. B (Order dated Feb. 9, 2006, *League for Coastal Protection v. Norton*, No. 05-17098 (9th Cir.).

Plaintiffs' Response: AGREE IN PART AND DISAGREE IN PART. The *League for Coastal Protection* stay was granted on the Government's own motion, evidencing the Government's intent to further delay completion of the NEPA analyses. (*See* Defs.' Opp. to Pls.' Mot. for Part. Summ. J. as to Certain Defs. and Cross Mot. for Summ. J. upon Pls.' Remaining Claims, Appx. Tab B.)

## II. PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS.

1. NEPA, 42 U.S.C. § 4331, was signed into law on January 1, 1970, and among other things established procedures to ensure that federal agency decision makers take into account environmental factors. (Poulter Decl. ¶ 6).

2. NEPA does not establish substantive standards for decision making, but instead sets forth the process whereby federal agencies will examine a proposed action and its alternatives to ensure that environmental consequences have been fully analyzed and taken into account. NEPA review is conducted under regulations issued by the Council on Environmental Quality ("CEQ") (40 C.F.R. § 1500). (Poulter Decl. ¶ 6).

3. The CEQ regulations set forth a three level system for environmental review. First, an agency can establish a "categorical exclusion" ("CE") for categories of actions which do not individually or cumulatively have a significant effect on the human environment, and for which neither an environmental assessment nor an environmental impact statement is required. But the agency must provide for "extraordinary circumstances" under which a normally excluded action may have a significant environmental effect, in which case an environmental analysis will be required. (Sections 1507.3 and 1508.4). (Poulter Decl. ¶ 7).

4. Second, if an agency is uncertain whether proposed action will have a significant environmental impact, if may conduct an Environmental Assessment ("EA"), which will lead either to a Finding of No Significant Impact ("FONSI"), in which case no additional environmental analysis is needed (Sections 1501.3, 1508.9 and 1508.13), or a determination that there is in fact a significant environmental impact, in which case the agency must proceed to prepare an Environmental Impact Statement ("EIS"). (Poulter Decl. ¶ 8).

5. An agency can skip the EA stage and go directly to the preparation of an EIS. (Section 1501.3). (Poulter Decl. ¶ 8).

6. In determining whether proposed action will significantly affect the environment, thereby requiring the preparation of an EIS, a federal agency must examine the degree to which the proposed action affects public health or safety, the degree to which the effects are likely to be highly controversial, whether the action establishes a precedent for further actions with significant effects, and whether the action is related to other actions with individually insignificant, but cumulatively significant, impacts. (Section 1508.27). (Poulter Decl. ¶ 9).

7. NEPA requires federal agencies to consider both the direct effects and the indirect effects of the proposed action, with indirect effects defined as effects which are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." (Section 1508.8). (Poulter Decl. ¶ 10).

8. If an EIS is prepared, then it is prepared first in draft format, and then in final format. A draft EIS "must fulfill and satisfy to the fullest extent possible the requirements" for a final EIS. (Section 1502.9). (Poulter Decl. ¶ 11).

9. After preparing the draft EIS, an agency must then obtain the comments of relevant federal and state agencies, interested or affected organizations, the applicant and the public. (Section 1503.1). (Poulter Decl. ¶ 11).

10. A public hearing or meeting on the draft EIS must be held if the criteria set forth in the regulations are met or a hearing or meeting is required by law. (Section 1506(c)). The final EIS must include, and respond to, the comments that are received. (Section 1503.4). (Poulter Decl. ¶ 11).

11. The operators of the undeveloped California OCS leases in May 1999 submitted to MMS suspension requests covering each of the units as well as the one non-unitized lease. Those requests were granted by MMS on November 12, 1999. MMS relied upon its categorical exclusion for lease suspensions and therefore did not prepare either an EA or EIS prior to granting those suspensions. (Poulter Decl. ¶ 12).

12. The same day that MMS approved the suspension requests, Secretary of the Interior Babbitt announced that he had "ordered an environmental analysis of the impact of oil drilling off the central California coast." (Poulter Decl. ¶ 12; Exhs. 1 and 2).

13. In order to facilitate the preparation of that environmental analysis, MMS in its November 12, 1999 letters approving the suspension requests directed that the operators by the end of February 2000 submit "a detailed project description of your proposed exploration operations" and "general development plans." (Poulter Decl. ¶ 13; Exh. 3).

14. In response to that MMS requirement, the operators submitted preliminary project descriptions and associated informational responses in February 2000, and in response to follow-up requests from MMS, submitted supplemental responses in November 2000. These responses outlined potential short term and long term activities envisioned by these operators which would allow for the delineation and potential development of the subject leases. Short term activities included but were not limited to, expanded geophysical and geotechnical surveys, delineation drilling, and unit consolidation. Long term activities included, but were not limited to the Development and Production Plan (DPP) development and submission and ultimate implementation of development and production activities on these leases (units). (Poulter Decl. ¶ 14).

15. Consistent with Secretary Babbitt's pledge, MMS proceeded to publish and publicly circulate a 784-page draft EIS in June 2001. A notice of availability of the draft EIS was filed with the Federal Register on June 20, 2001, and published in the Federal Register on June 21, 2001, at page 33268. (Poulter Decl. ¶ 17).

16. In the June 21, 2001 draft EIS, MMS analyzed both the impact of the planned additional exploratory drilling on the undeveloped leases and "the cumulative effects…associated with the full development of the currently undeveloped Federal leases in the Pacific OCS." Chapter 6 of the draft EIS was devoted to a "Cumulative Impact Analysis" through the year 2030, including a "hypothetical development scenario" for the undeveloped leases. (Poulter Decl. ¶ 18).

17. By regulation, a draft EIS such as the one published in June 2001 with respect to the undeveloped California OCS leases must fulfill and satisfy "to the fullest extent possible" the requirements for a final EIS. All that is left is to solicit comments on the draft EIS; hold a public hearing or meeting as required; and prepare and publish a final EIS that incorporates these comments and the agency's responses thereto. (Poulter Decl. ¶ 19).

18. The same day (June 20, 2001) that the notice of availability of the draft EIS was filed with the Federal Register, Judge Claudia Wilken issued her decision finding that MMS had not satisfied its NEPA requirements with respect to its November 12, 1999 decision approving the suspension requests. She found that MMS had improperly relied on the categorical exclusion for lease suspensions, without explaining why "extraordinary circumstances" did not apply. *California v. Norton*, 150 F. Supp. 2d 1046, 1057 (N.D. Cal. 2001).

19. After Judge Wilken's decision, MMS concluded that it should not or could not sustain the position that categorical exclusions could be applied to the lease suspensions. (Poulter Decl. ¶ 22).

20. Having abandoned its position that a categorical exclusion could apply to lease suspensions, MMS could have then proceeded to complete the June 2001 draft EIS, which included in its environmental analysis both the planned exploratory drilling that was the focal point of the suspension requests and the development that would follow. (Poulter Decl. ¶ 23).

21. MMS did in fact proceed to conduct public hearings on the draft EIS, which were held in the cities of Santa Barbara and Santa Maria, California on July 10 and July 12, 2001. The June 21, 2001, Federal Register notice of availability of the draft EIS had set an August 13, 2001 deadline for the receipt of public comments. (Poulter Decl. ¶ 24).

22. A final EIS is typically published three to four months after the deadline for public comments on the draft EIS. Such an EIS could have been finalized no later than December 2001. (Poulter Decl. ¶ 25).

23. The June 2001 draft EIS was never finalized. (*Id.*)

24. Instead of finalizing the draft EIS, MMS proceeded to prepare and publish draft, and then final, EAs for the (updated) lease suspensions. (Poulter Decl. ¶ 26).

25. None of these EAs examined any environmental effects other than those which would occur during the suspension periods themselves. Therefore, the EAs did not examine the environmental impact of either the exploratory drilling planned for the undeveloped leases (which would commence simultaneously with the expiration of the suspensions), or the development and oil production that would follow. (Poulter Decl. ¶ 26).

26. The absence of analyses of the environmental impact of exploratory drilling planned for the undeveloped leases and the development and oil production that would follow led to the *League for Coastal Protection vs. Norton* litigation, which successfully challenged before Judge Wilken the limited nature of the EAs. (Poulter Decl. ¶ 27).

27. That result would have been avoided by the finalization of the June 2001 draft EIS, which did not suffer from these shortcomings. MMS could within the same timeframe as that needed to complete the final EIS also provide the more detailed explanation of the effect of the use of air guns that Judge Wilken also found was needed. (Poulter Decl. ¶ 27).

28. For the period 1954 through 2004, the Federal Government received approximately $64 billion in bonuses, $3 billion in rentals, and $89 billion in royalties from oil and natural gas activities on the Outer Continental Shelf. Additionally, since 2000, some of the royalty on OCS oil, valued at about $3.2 billion, has been taken in-kind for delivery to the Strategic Petroleum Reserve. (*See* Minerals Management Service, Leasing Oil And Natural Gas Resources, Outer Continental Shelf, 37-38, *available at* http://www.mms.gov/ld/PDFs/GreenBook-LeasingDocument.pdf).

29. Exhibit 126 to the Fourth Supplemental Heck Declaration is a Statement by MMS Director Rejane Burton before the Committee on Senate Energy and Natural Resources. (Fourth Supp. Heck Decl., ¶ 5, Exh. 126).

30. All necessary permits were obtained with respect to each of the forty exploratory wells that have been drilled on the lawsuit leases. (Fourth Supp. Heck Decl., ¶ 4, Exh. 125).

Respectfully submitted,

s/ Steven J. Rosenbaum
by s/ Thomas J. Cosgrove

E. Edward Bruce
Steven J. Rosenbaum
*Counsel of Record*
Thomas J. Cosgrove
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-5568
Facsimile: (202) 778-5568
Attorneys for All Plaintiffs in Nos. 02-30C and 04-1822C

May 15, 2006