IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBER RESOURCES COMPANY., et al.,

Plaintiffs,

THE UNITED STATES,

Defendant.

ANADARKO E&P COMPANY, L.P., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

NYCAL OFFSHORE DEVELOPMENT CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Nos. 02-30C
04-1822C
05-249C (Consolidated)
(Senior Judge Eric G. Bruggink)

**DEFENDANT'S RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(h)(2) of the Court's rules, defendant, the United States, respectfully responds as follows to the additional proposed findings submitted by plaintiffs with regard to its cross-motion for summary judgment:

**1. NEPA, 42 U.S.C. § 4331, was signed into law on January 1, 1970, and among other things established procedures to ensure that federal agency decision makers take into account environmental factors. (Poulter Decl. ¶ 6).**

Government's Response: Other than the date of enactment of the National Environmental Policy Act ("NEPA"), paragraph 1 constitutes a proposed finding of law that is inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. United Technologies Corp.* ("*UTC*"), 315 F.3d 1361, 1369 (Fed. Cir. 2003). Mr. Poulter's views as to what NEPA provides are irrelevant, and his declaration is not necessary to establish the enactment date of NEPA. The provisions of NEPA are the best evidence of their contents.

**2. NEPA does not establish substantive standards for decision making, but instead sets forth the process whereby federal agencies will examine a proposed action and its alternatives to ensure that environmental consequences have been fully analyzed and taken into account. NEPA review is conducted under regulations issued by the Council on Environmental Quality ("CEQ") (40 C.F.R. § 1500). (Poulter Decl. ¶ 6).**

Government's Response: Paragraph 2 contains proposed findings of law that are inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what NEPA and regulations provide are irrelevant. The provisions of NEPA and 40 C.F.R. § 1500 are the best evidence of their contents.

**3. The CEQ regulations set forth a three level system for environmental review. First, an agency can establish a "categorical exclusion" ("CE") for categories of actions which do not individually or cumulatively have a significant effect on the human environment, and for which neither an environmental assessment nor an environmental**

**impact statement is required. But the agency must provide for "extraordinary circumstances" under which a normally excluded action may have a significant environmental effect, in which case an environmental analysis will be required. (Sections 1507.3 and 1508.4) (Poulter Decl. ¶ 7).**

Government's Response: Paragraph 3 contains proposed findings of law that are inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what regulations provide are irrelevant. The provisions of 40 C.F.R. §§ 1507.3, 1508.4 are the best evidence of their contents.

**4. Second, if an agency is uncertain whether proposed action will have a significant environmental impact, i[t] may conduct an Environmental Assessment ("EA"), which will lead either to a Finding of No Significant Impact ("FONSI"), in which case no additional environmental analysis is needed (Sections 1501.3, 1508.9 and 1508.13), or a determination that there is in fact a significant environmental impact, in which case the agency must proceed to prepare an Environmental Impact Statement ("EIS"). (Poulter Decl. ¶ 8).**

Government's Response: Paragraph 4 contains proposed findings of law that are inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what regulations provide are irrelevant. The provisions of 40 C.F.R. §§ 1501.3, 1508.9, and 1508.13 are the best evidence of their contents.

**5. An agency can skip the EA stage and go directly to the preparation of an EIS. (Section 1501.3). (Poulter Decl. ¶ 8).**

Government's Response: Paragraph 5 is a proposed finding of law that is inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what the regulation provides are irrelevant. The provisions of 40 C.F.R. § 1501.3 are the best evidence of their contents.

**6. In determining whether proposed action will significantly affect the environment, thereby requiring the preparation of an EIS, a federal agency must examine the degree to which the proposed action affects public health or safety, the degree to which the effects are likely to be highly controversial, whether the action establishes a precedent for further actions with significant effects, and whether the action is related to other actions with individually insignificant, but cumulatively significant, impacts. (Section 1508.27) (Poulter Decl. ¶ 9).**

Government's Response: Paragraph 6 contains proposed findings of law that are inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what the regulation provides are irrelevant. The provisions of 40 C.F.R. § 1508.27 are the best evidence of their contents.

**7. NEPA requires federal agencies to consider both the direct effects and the indirect effects of the proposed action, with indirect effects defined as effects which are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." (Section 1508.8). (Poulter Decl. ¶ 10).**

Government's Response: Paragraph 7 is a proposed finding of law that is inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter

declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what the regulation provides are irrelevant. The provisions of 40 C.F.R. § 1508.8 are the best evidence of their contents.

**8. If an EIS is prepared, then it is prepared first in draft format, and then in final format. A draft EIS "must fulfill and satisfy to the fullest extent possible the requirements" for a final EIS. (Section 1502.9). (Poulter Decl. ¶ 11).**

<u>Government's Response</u>: Paragraph 8 is a proposed finding of law that is inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what the regulation provides are irrelevant. The provisions of 40 C.F.R. § 1502.9 are the best evidence of their contents.

**9. After preparing the draft EIS, an agency must then obtain the comments of relevant federal and state agencies, interested or affected organizations, the applicant[,] and the public. (Section 1503.1). (Poulter Decl. ¶ 11).**

<u>Government's Response</u>: Paragraph 9 is a proposed finding of law that is inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what the regulation provides are irrelevant. The provisions of 40 C.F.R. § 1503.1 are the best evidence of their contents.

**10. A public hearing or meeting on the draft EIS must be held if the criteria set forth in the regulations are met or a hearing or meeting is required by law. (Section**

**1506(c)). The final EIS must include, and respond to, the comments that are received. (Section 1503.4). (Poulter Decl. ¶ 11).**

Government's Response: Paragraph 10 is a proposed finding of law that is inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what regulations provide are irrelevant. The provisions of 40 C.F.R. §§ 1506(c), 1503.4 are the best evidence of their contents.

**11. The operators of the undeveloped California OCS leases in May 1999 submitted to MMS suspension requests covering each of the units as well as the one non-unitized lease. Those requests were granted by MMS on November 12, 1999. MMS relied upon its categorical exclusion for lease suspensions and therefore did not prepare either an EA or EIS prior to granting those suspensions. (Poulter Decl. ¶ 12).**

Government's Response: Controverted. Agrees that on November 12, 1999, the Government granted suspensions requested by unit operators for 36 of the 40 undeveloped leases. Am. Compl. ¶ 49. The suspensions ranged in length from 19 to 45 months. *Id.* The Government severed the remaining four leases from the units of which they previously had been part based upon geological information submitted by the lessees. *Id.* ¶ 48. Because there was no pending suspension request for the severed leases, the four severed leases expired by their terms. Peter Tweedt Decl. (No. 02-30C) ¶ 6. Plaintiffs have challenged the severing and consequent expiration of these leases "by administrative appeal to the Interior Board of Land Appeals." Am. Compl. ¶ 48. Exhibits 1 and 2 to the Poulter Declaration are the best evidence of their contents.

We further note that Mr. Poulter's declaration is of no probative value as a matter of law. Mr. Poulter does not allege that he was employed by the Minerals Management Service;

therefore, he has no personal knowledge as to how and why the Minerals Management Service performed its administrative duties. His speculation is irrelevant. Finally, it is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369.

**12. The same day that MMS approved the suspension requests, Secretary of the Interior Babbitt announced he had "ordered an environmental analysis of the impact of oil drilling off the central California coast." (Poulter Decl. ¶ 12; Exhs. 1 and 2).**

Government's Response: Exhibits 1 and 2 to the Poulter Declaration are the best evidence of their contents, although we note that Mr. Poulter's declaration is of no probative value as a matter of law. Mr. Poulter does not allege that he was employed by the Minerals Management Service; therefore, he has no personal knowledge as to how and why the Minerals Management Service performed its administrative duties. His speculation is irrelevant.

Secretary Babbitt stated that NEPA compliance is necessary because the lessees were going to submit revised exploration plans or development and production plans. The Minerals Management Service routinely performs NEPA compliance before such revisions are approved.

**13. In order to facilitate the preparation of that environmental analysis, MMS in its November 12, 1999 letters approving the suspension requests directed that the operators by the end of February 2000 submit "a detailed project description of your proposed exploration operations" and "general development plans." (Poulter Decl. ¶ 13; Exh. 3).**

Government's Response: Exhibits 3 to the Poulter Declaration is the best evidence of its contents, although we note that Mr. Poulter's declaration is of no probative value as a matter of law. Mr. Poulter does not allege that he was employed by the Minerals Management Service; thus, he has no personal knowledge as to how and why the Minerals Management Service performed its administrative duties. His speculation is irrelevant.

**14. In response to that MMS requirement, the operators submitted preliminary project descriptions and associated informational responses in February 2000, and in response to follow-up requests from MMS, submitted supplemental responses in November 2000. These responses outlined potential short term and long term activities envisioned by these lease operators which would allow for delineation and potential development of the subject leases. Short term activities included but were not limited to, expanded geophysical and geotechnical surveys, delineation drilling, and unit consolidation. Long term activities included, but were not limited to the Development and Production Plan (DPP) development and submission and ultimate implementation of development of production activities on these leases (units). (Poulter Decl. ¶ 14).**

Government's Response: Based upon the face of his declaration, Mr. Poulter lacks sufficient personal knowledge that would permit him to attest to the breadth of matters set forth in paragraph 14. Further, he does not even claim to have reviewed documents that would support his assertions. In the absence of any probative evidence to support his conclusory contentions, the assertions in paragraph 14 consist of uncorroborated, unsubstantiated, and uninformed speculation as to which no response is necessary.

**15. Consistent with Secretary Babbitt's pledge, MMS proceeded to publish and publicly circulate a 784-page draft EIS in June 2001. A notice of availability of the draft EIS was filed with the Federal Register on June 20, 2001, and published in the Federal Register on June 2001, at page 33268 (Poulter Decl. ¶ 17).**

Government's Response: Because the Federal Register notice is the best evidence of its contents, Mr. Poulter's declaration is of no probative value as a matter of law. Mr. Poulter does not allege that he was employed by the Minerals Management Service; thus, he has no personal knowledge as to how and why the Minerals Management Service performed its administrative duties. His speculation as to whether the Federal Register notice is consistent with Secretary Babbitt's so-called "pledge" is irrelevant.

**16. In the June 21, 2001 draft EIS, MMS analyzed both the impact of the planned additional exploratory drilling on the undeveloped leases and "the cumulative effects . . . associated with the full development of the currently undeveloped Federal leases in the Pacific OCS." Chapter 6 of the draft EIS was devoted to a "Cumulative Impact**

**Analysis" through the year 2030, including a "hypothetical development scenario" for the undeveloped leases. (Poulter Decl. ¶ 18).**

Government's Response: Because the June 21, 2001 draft Environmental Impact Statement is the best evidence of its contents, Mr. Poulter's declaration is of no probative value as a matter of law. Mr. Poulter does not allege that he was employed by the Minerals Management Service; he thus has no personal knowledge as to how and why the Minerals Management Service performed its administrative duties. His interpretation of this document and selective quotations from this document are irrelevant.

In any event, the "draft EIS" was a regional analysis and not specific to each unit or lessee. The information analyzed was more conducive to a more general, regional analysis. In order to conduct the analysis upon a unit-by-unit basis, plaintiffs would have been required to actually submit the revised plans as to their proposed activities during the suspension period. This was not possible, however, because plaintiffs abandoned all work during the directed suspensions, even though the directed suspensions did not prevent them from performing work. In short, the Minerals Management Service never received from plaintiffs the detailed information that the revised plans would have provided.

**17. By regulation, a draft EIS such as the one published in June 2001 with respect to the undeveloped California OCS leases must fulfill and satisfy "to the fullest extent possible" the requirements for a final EIS. All that is left is to solicit comments on the draft EIS[,] hold a public hearing or meeting as required[,] and prepare and publish a final EIS that incorporates these comments and the agency's responses thereto. (Poulter Decl. ¶ 19).**

Government's Response: Paragraph 17 is a proposed finding of law that is inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less

consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what regulations provide or require are irrelevant. *See id.*

In any event, paragraph 17 is plainly incorrect. If the public comments are critical and raise legitimate issues with regard to the completeness or the adequacy of the environmental impact statement, then it could take months or years of additional work to be responsive to the comments received. In short, "incorporating these comments and the agency's responses thereto" may be a substantial task.

**18. The same day (June 20, 2001) that the notice of availability of the draft EIS was filed with the Federal Register, Judge Claudia Wilken issued her decision finding that MMS had not satisfied its NEPA requirements with respect to its November 12, 1999 decision [sic] approving the suspension requests. She found that MMS had improperly relied on the categorical exclusion for lease suspensions, without explaining why "extraordinary circumstances" did not apply. *California v. Norton,* 150 F. Supp. 2d 1046, 1057 (N.D. Cal. 2001).**

Government's Response: Controverted. The Minerals Management Service did not make a single decision to approve all suspension requests on November 12, 1999. The Minerals Management Service approved the suspension requests upon a case-by-case basis. *See, e.g.*, Am. Compl. ¶ 49 (suspensions ranged in length from 19 to 45 months).

Further, agrees only that on November 15, 1999, the state of California filed suit against the Secretary of the Interior in the United States District Court for the Northern District of California. Am. Compl. ¶ 51; *California v. Norton,* 150 F. Supp. 2d 1046 (N.D. Cal. 2001). Among other things, California contended that the Government lacked authority to grant the November 12 suspensions because the Government had not complied with 16 U.S.C. § 1456(c)(1), the provision of the Coastal Zone Management Act ("CZMA") requiring a

Government consistency certification for its own activities affecting the coastal zone. 150 F. Supp. 2d at 1051-55. California also contended that the Government had failed to comply with NEPA because it had not provided necessary explanations or support to avoid NEPA's requirement for the preparation of an environmental assessment or environmental impact statement prior to granting suspensions. *Id.* at 1055-57.

On June 20, 2001, the district court ruled in California's favor upon both California's CZMA claims and its NEPA claims. The district court ruled that NEPA required the Government to provide a reasoned explanation for not performing an environmental assessment or environmental impact statement before suspending the leases. *Id.* at 1057. The district court ordered the Government to set aside its November 12, 1999 approvals of plaintiffs' most recent suspension requests, and to direct suspension of the leases for a time sufficient for the Government to provide California with a consistency determination. *Norton*, 150 F. Supp. 2d at 1057-58. The court also held that "before again granting these lease suspensions" the Government should provide the required NEPA explanations. *Norton*, 150 F. Supp. 2d at 1057-58.

In short, the district court did ***not*** rule that the Minerals Management Service had “improperly relied” upon the categorical exclusion; rather, it ruled only that more explanation was necessary in order for the agency could rely upon that exclusion.

**19. After Judge Wilken’s decision, MMS concluded that it should not or could not sustain the position that categorical exclusions could be applied to the lease suspensions. (Poulter Decl. ¶ 19).**

Government’s Response: Controverted. The Minerals Management Service never concluded that “it should not or could not sustain the position that categorical exclusions could

be applied to the lease suspensions." In fact, the Minerals Management Service continues to use the categorical exclusion for lease suspensions throughout the country.

Further, the only ostensible "support" cited by plaintiffs is Mr. Poulter's declaration, which is of no probative value as a matter of law given that Mr. Poulter does not allege that he was employed or otherwise engaged by the Minerals Management Service. Accordingly, Mr. Poulter fails to allege that he has any personal knowledge that would support his allegations in paragraph 19. His speculation is irrelevant.

In fact, given the amount of additional explanation required by the district court, the Minerals Management Service merely decided that it would be more practical to perform an environmental assessment. The agency never concluded that it "should not or could not sustain the position that categorical exclusions could be applied to the lease suspensions," nor is there any evidence to suggest that the agency reached such a conclusion.

**20. Having abandoned its position that a categorical exclusion could apply to lease suspensions, MMS could have then proceeded to complete the June 2001 draft EIS, which included in its environmental analysis both the planned exploratory drilling that was the focal point of the suspension requests and the development that would follow. (Poulter Decl. ¶ 20).**

Government's Response: Controverted. The Minerals Management Service never "abandoned its position that a categorical exclusion could apply to lease suspensions," and the United States Court of Appeals for the Ninth Circuit in *California v. Norton* did not exclude the possibility that categorical exclusions were appropriate. In fact, the Minerals Management Service continues to use the categorical exclusion for lease suspensions throughout the country. The only ostensible "support" for this statement cited by plaintiffs is Mr. Poulter's declaration, which is of no probative value as a matter of law given that Mr. Poulter does not allege that he

was employed or otherwise engaged by the Minerals Management Service. Accordingly, Mr. Poulter fails to allege that he has any personal knowledge that would support his allegations in paragraph 20. His speculation is irrelevant.

In fact, given the amount of additional explanation required by the district court, the Minerals Management Service merely decided that it would be more practical to perform an environmental assessment. Because there was a risk that any justification of the use of categorical exclusions would be challenged, and the work required to support the justification would be the same as the work required for an environmental assessment, the agency elected to perform the environmental assessment to avoid unnecessary litigation. The agency never "abandoned its position that a categorical exclusion could apply to lease suspensions," nor is there any reason for the agency to reach that position. Further, there is no nexus between the holding of *California v. Norton* addressing 10 separate suspension applications, and the draft EIS to which paragraph 20 refers.

**21. MMS did in fact proceed to conduct public hearings on the draft EIS, which were held in the cities of Santa Barbara and Santa Maria, California on July 10 and July 12, 2001. The June 21, 2001 Federal Register notice of availability of the draft EIS had set an August 13, 2001 deadline for the receipt of public comments. (Poulter Decl. ¶ 24).**

Government's Response: Uncontroverted.

**22. A final EIS is typically published three to four months after the deadline for public comments on the draft EIS. Such an EIS could have been finalized no later than December 2001. (Poulter Decl. ¶ 25).**

Government's Response: Based upon the face of his declaration, Mr. Poulter lacks sufficient personal knowledge that would permit him to attest to the breadth of matters set forth in paragraph 22. Further, he does not even claim to have reviewed documents that would

support his assertions. In the absence of any probative evidence to support his conclusory contentions, the assertions in paragraph 22 consist of uncorroborated, unsubstantiated, and uninformed speculation as to which no response is necessary.

In any event, the length of time necessary to publish a final environmental impact statement after public comments are received depends upon: (1) the quantity of comments; (2) the substance of the comments; and (3) the amount of work necessary to satisfy those legitimate criticisms before a final environmental impact statement may be issued. If the comments identify substantial problems in the draft, then the agency may decide to issue a revised draft and provide another comment period.

**23. The June 2001 draft EIS was never finalized. (*Id.*)**

Government's Response: Uncontroverted.

**24. Instead of finalizing the draft EIS, MMS proceeded to prepare and publish draft, and then final EAs for the (updated) lease suspensions. (Poulter Decl. ¶ 26).**

Government's Response: Based upon the face of his declaration, Mr. Poulter lacks sufficient personal knowledge that would permit him to assert that there was any nexus between the single "draft EIS" to which paragraph 24 refers and the individualized environmental assessments that the Minerals Management Service performed pursuant to the district court's order in *California v. Norton*. Indeed, neither he nor plaintiffs attempt to articulate any reason why he or they believe, as they apparently do, that such a nexus ever existed, or why the "draft EIS" has any relevance to the NEPA holdings in *California v. Norton*. Further, Mr. Poulter does not even claim to have reviewed documents that would support his assertions in paragraph 24. In the absence of any probative evidence to support his assertions, the assertions in paragraph 24

consist of uncorroborated, unsubstantiated, and uninformed speculation as to which no response is necessary.

In fact, the single draft environmental impact statement and multiple individualized environmental assessments were fundamentally different activities undertaken for fundamentally different purposes. The former was analyzing the general development of the region, while the latter were for a proposed action whether to grant or deny lease suspensions. They are different activities, with different degrees of specificity. Until the district court issued its decision in *League for Coastal Protection*, the agency had no way of knowing that multiple, individualized environment impact statements were allegedly required by NEPA.

**25. None of these EAs examined any environmental effects other than those which would occur during the suspension periods themselves. Therefore, the EAs did not examine the environmental impact of either the exploratory drilling planned for the undeveloped leases (which would commence simultaneously with the expiration of the suspensions), or the development and oil production that would follow. (Poulter Decl. ¶ 26).**

Government's Response: The multiple individualized environmental assessments to which paragraph 25 refers are the best evidence of their contents, although we note that Mr. Poulter's declaration is of no probative value as a matter of law.

**26. The absence of analyses of the environmental impact of exploratory drilling planned for the undeveloped leases and the development and oil production that would follow led to the *League for Coastal Protection vs. Norton* litigation, which successfully challenged before Judge Wilken the limited nature of the EAs. (Poulter Decl. ¶ 27).**

Government's Response: Paragraph 26 contains proposed findings of law that are inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation.

*See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what NEPA and regulations provide are irrelevant. Further, Mr. Poulter has no personal knowledge as to "what led" to the *League for Coastal Protection* litigation, so his views upon this matter are unfounded, even if they were not irrelevant as a matter of law. The district court's decision in *League for Coastal Protection* is the best evidence of its contents. We note that the case is pending upon appeal to the Ninth Circuit, so the challenge may not ultimately be "successful."

**27. That result would have been avoided by the finalization of the June 2001 draft EIS, which did not suffer from these shortcomings. MMS could within the same timeframe as that needed to complete the final EIS also provide the more detailed explanation of the effect of the use of air guns that Judge Wilken also found was needed. (Poulter Decl. ¶ 27).**

Government's Response: Paragraph 27 contains proposed findings of law that are inappropriate in a submission pursuant to RCFC 56(h)(2). Further, plaintiffs' reliance upon the Poulter declaration is erroneous as a matter of law. It is settled that the Court may not receive, much less consider, proffered expert evidence concerning the meaning of a statute or regulation. *See Rumsfeld v. UTC*, 315 F.3d at 1369. Mr. Poulter's views as to what NEPA and regulations provide are irrelevant. Further, as is clear from the face of his declaration, Mr. Poulter has neither personal knowledge nor a basis upon which to speculate as to how long finalization of the "draft EIS" would have taken. More importantly, Mr. Poulter lacks any basis upon which to speculate that the district court would not have rejected a single environmental impact statement, undertaken for a wholly different purpose, rather than multiple, individualized environmental impact statements that would examine the 10 suspension applications. Mr. Poulter's speculation upon this matter is, therefore, both unfounded and illogical, even assuming, for argument's sake,

that it were not irrelevant as a matter of law. The district court's decision in *League for Coastal Protection* is the best evidence of its contents.

For example, on exhibit 4, the cover page of the "draft EIS" is entitled "Delineation drilling activities . . . ." It is pure speculation, if not dubious speculation, to suggest that an environmental impact statement that focuses upon delineation drilling would sufficiently address the "cradle to grave" approach mandated by the district court in *League for Coastal Protection.* In addition, the fourth paragraph of the introduction page of Exhibit 4 to Mr. Poulter's declaration states that the "draft EIS" contemplates that certain other development activities will be addressed at a later date, separate and apart from the analyses in the "draft EIS." There is no reason to think that leaving analyses for another day would satisfy the requirements of the district court in *League for Coastal Protection*.

**28. For the period 1954 through 2004, the Federal Government received approximately $64 billion in bonuses, $3 billion in rentals, and $89 billion in royalties from oil and natural gas activities on the Outer Continental Shelf. Additionally, since 2000, some of the royalty on OCS oil, valued at about $3.2 billion, has been taken in-kind for delivery to the Strategic Petroleum Reserve. (*See* Minerals Management Service, Leasing Oil And Natural Gas Resources, Outer Continental Shelf, 37-38, *available at*** http://www.mms.gov/Id/PDFs/GreenBook-LeasingDocument.pdf).

Government's Response: The cited website and authority do not support this proposed finding. We currently are not in a position to confirm or deny plaintiffs' assertion.

**29. Exhibit 126 to the Fourth Supplemental Declaration Heck Declaration is a Statement by MMS Director Rejane Burton before the Committee on Senate Energy and Natural Resources. (Fourth Supp. Heck Decl. 5, Exh. 126).**

Government's Response: Uncontroverted.

**30. All necessary permits were obtained with respect to each of the forty exploratory wells that have been drilled on the lawsuit leases. (Fourth Supp. Heck Decl., para. 4, Exh. 125).**

Government's Response: Paragraph 30 contains proposed findings of law that are inappropriate in a submission pursuant to RCFC 56(h)(2). Otherwise, uncontroverted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530
Tel. (202) 307-0164
Fax (202) 514-7969

June 1, 2006

Attorneys for Defendant