IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBER RESOURCES COMPANY., et al., Plaintiffs, THE UNITED STATES, Defendant. | ) | |
| ANADARKO E&P COMPANY, L.P., et al., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | Nos. 02-30C<br>04-1822C<br>05-249C (Consolidated)<br>(Senior Judge Eric G. Bruggink) |
| NYCAL OFFSHORE DEVELOPMENT CORPORATION, Plaintiff, v. THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL BRIEF REGARDING EFFECT OF *OLD STONE CORPORATION V. UNITED STATES* UPON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

PATRICIA M. McCARTHY
Assistant Director
GREGG M. SCHWIND
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530
Tel. (202) 307-0164
Fax (202) 514-7969

July 3, 2006

Attorneys for Defendant

**TABLE OF CONTENTS**

DEFENDANT'S SUPPLEMENTAL BRIEF REGARDING EFFECT OF OLD STONE CORPORATION V. UNITED STATES UPON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. *OLD STONE* PROVIDES THE CONTROLLING STANDARD FOR THE ELECTION DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. THE ELECTION DOCTRINE IS CLEARLY APPLICABLE HERE BASED UPON THE REASONING IN *OLD STONE* . . . . . . . . . . . . . . . . . . . . . 6

A. THE GOVERNMENT RELIED TO ITS DETRIMENT UPON THE LESSEES' ELECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B. THE LESSEES CONTINUED TO RECEIVE BENEFITS UNDER THE LEASES AFTER ENACTMENT OF THE 1990 CZMA AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C. THE COURT'S NOVEMBER 2005 DECISION REJECTING APPLICATION OF THE CLOSELY-RELATED DOCTRINE OF WAIVER DOES NOT FORECLOSE APPLICATION OF THE ELECTION DOCTRINE AS REQUIRED BY *OLD STONE* . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## TABLE OF AUTHORIES

**CASES:** **PAGES:**

*Amber Resources Co. v. United States*,
68 Fed. C1. 535, 556 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Old Stone Corp. v. United States*,
__ F.3d __, 2006 WL 1420817
(Fed.Cir. May 25, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Mobil Oil Exploration & Producing Southeast, Inc v. United States*,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Westfed Holdings, Inc. v. United States*,
407 F.3d 1352 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12

**REGULATIONS:**

30 C.F.R. § 218.154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBER RESOURCES COMPANY., et al.,

Plaintiffs,

THE UNITED STATES,

Defendant.

ANADARKO E&P COMPANY, L.P., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

NYCAL OFFSHORE DEVELOPMENT CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Nos. 02-30C
04-1822C
05-249C (Consolidated)
(Senior Judge Eric G. Bruggink)

**DEFENDANT'S SUPPLEMENTAL BRIEF REGARDING EFFECT OF *OLD STONE CORPORATION V. UNITED STATES* UPON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, the United States, respectfully submits this supplemental brief regarding the potentially direct and important effect of the recent authority of the United States Court of Appeals for the Federal Circuit upon plaintiffs' pending motion for partial summary judgment.

*See Old Stone Corp. v. United States*, ___ F.3d ___, 2006 WL 1420817 (Fed. Cir. May 25, 2006). In *Old Stone*, the Federal Circuit considered, for the first time, "the effect of the election doctrine on damages arising from the enactment of [the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA")]." *Id.*, 2006 WL 1420817 at *8. Like the *Winstar* cases, this case also involves an alleged material breach arising from a change in law – here, the passage of the 1990 amendments to the Coastal Zone Management Act ("CZMA"). *See, e.g.*, *Amber Resources Co. v. United States*, 68 Fed. Cl. 535, 556 (2005) ("We must ascertain the nature of the breaching action, the 1990 CZMA amendments.").

Applying the new authority of *Old Stone* to this case, plaintiffs would not be entitled to recover their out-of-pocket expenses as restitution, even if the Court were to agree with the arguments that plaintiffs advance in their motion for partial summary judgment. As we demonstrate below, the relevant facts of *Old Stone* are not materially distinguishable from those presented here. Accordingly, although the Court previously rejected our demonstration that plaintiffs waived any material breach of contract, *see Amber Resources*, 68 Fed. Cl. at 558-59, the Federal Circuit expressly distinguished the doctrine of election and the "related doctrine of waiver[.]" *Old Stone*, 2006 WL 1420817 at *8 n.6.[1]

---

[1] Although, in our view, *Old Stone* requires reconsideration of the Court's November 2005 award of restitution in its entirety, we do not formally seek reconsideration of that decision at this time because the mandate has not yet issued in *Old Stone*, and, accordingly, the Federal Circuit's decision in *Old Stone* is not final. We raise the application of *Old Stone* to plaintiffs' motion for partial summary judgment now only because the Court has scheduled oral argument upon the pending cross-motions for summary judgment on July 10, 2006, and we wish to immediately apprise the Court of the potentially dispositive effect of *Old Stone* upon the relief sought by plaintiffs in their pending motion.

In their current motion for partial summary judgment, plaintiffs contend, among other things, that their remaining claims for recovery of out-of-pocket expenses may be treated as costs of performance that are recoverable in restitution. In our opposition to plaintiffs' motion and pending cross-motion for summary judgment upon plaintiffs' remaining claims, we have demonstrated that these expenses are not required costs of performance pursuant to controlling precedent, and, accordingly, are not recoverable in restitution. To the extent, if any, that plaintiffs may seek recovery of these expenses, plaintiffs must establish each of the elements of a reliance damages claim.

However, even assuming, for argument's sake, that plaintiffs' out-of-pocket expenses were properly classifiable as required costs of performance recoverable in restitution, plaintiffs still would not be entitled to recover these costs as restitution because, just like the plaintiff bank, OSC, in *Old Stone*, plaintiffs here "plainly continued to treat the [leases] as in place by deciding not to terminate the contracts or file suit for restitution after the enactment of [the 1990 CZMA amendments]." *Id.*, 2006 WL 1420817 at *9. As in *Old Stone*, here, "[t]he government detrimentally relied on [the lessees'] conduct" in continuing performance. *See id.*, 2006 WL 1420817 at *10. Given this, plaintiffs' out-of-pocket expenditures "are not recoverable under a restitution theory." *See id.*, 2006 WL 1420817 at *11.

## ARGUMENT

### I. *Old Stone* Provides The Controlling Standard For The Election Doctrine

In *Old Stone*, the Federal Circuit addressed, for the first time, the effect of the election doctrine upon a plaintiff's claim for damages arising from the enactment of FIRREA. *Old Stone,* 2006 WL 1420817 at *8. Although the court of appeals had previously addressed the "related

doctrine of waiver" in *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1360-61 (Fed. Cir. 2005), the court expressly distinguished the waiver doctrine from the election doctrine. *Id.*, 2006 WL 1420817 at *8 n.6. Quoting Williston, the court cautioned, "'[t]he doctrine of election and that of waiver should not be confused; an election is not a waiver of any rights under the contract but rather a choice between two inconsistent rights following a breach of contract.'" *Id.* (quoting 13 Williston § 39:32 (4th ed. 2000); *see also id.* at n.56 (citing case precluding waiver of breach but applying election doctrine)) (other citation omitted).

The court in *Old Stone* further explained that the election doctrine is invoked when a material breach is committed. At that time, "'the other party has a choice between two inconsistent rights – he or she can either elect to allege a total breach, terminate the contract and bring an action [for restitution], or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach . . . .'" *Id.*, 2006 WL 1420817 at *9 (quoting 13 Williston § 39:32 (4th ed. 2000). The court noted that the Supreme Court in *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000), "recognized that the election doctrine applies ***when the breach is the enactment of a statute***." *Old Stone*, 2006 WL 1420817 at *9 (emphasis supplied).

The court then discussed the two differing standards "on what conduct is required to establish an election." *Id.* It described the first standard as the "Williston view," in which "mere continued performance can result in an election." *Id.* (citing 13 Williston § 39.32). The court then observed a second, "stricter position" grounded in Corbin, the Restatement (Second) of Contracts, and *Mobil Oil*:

> [T]he mere failure to elect restitution at the time of breach and the continuation of performance is not sufficient to result in an election. Rather, there must be either (1) detrimental reliance by the breaching party (here an injury to the government as a result of the delay), . . . or (2) a benefit to the nonbreaching party as a result of the delay (here a benefit to OSC).

*Id.* (citing 12 Corbin § 1220 (1993 ed.); Restatement (Second) of Contracts § 378; *Mobil Oil*, 530 U.S. at 621-23).

The Federal Circuit in *Old Stone* expressly found the Supreme Court's decision in *Mobil Oil* to be "ambiguous" as to which standard applies. *Id.*, 2006 WL 1420817 at *9. In its view, the *Mobil Oil* decision "is clear that receipt of partial performance by the plaintiff will bar restitution (and the authorities cited make equally clear that detrimental reliance by the government would also be a bar),[] it is unclear as to whether a plaintiff's continued performance without receipt of benefits or detrimental reliance would be sufficient to bar restitution." *Id.* (footnote omitted).

The Federal Circuit ultimately concluded that it need not decide which standard applies because, given the facts presented in *Old Stone*, "even the stricter election rule is satisfied." *Id.* The court explained that "OSC plainly continued to treat the assistance agreements as in place by deciding not to terminate the contracts or to file suit for restitution ***after the enactment of FIRREA.***" *Id.* (emphasis supplied). It noted that OSC did not present its claim for restitution until three years after the legislative change:

> Instead of electing to terminate the agreement after the enactment of FIRREA, OSC on March 13, 1990, some seven months after FIRREA, agreed to a new Capital Plan with the Office of Thrift Supervision ("OTS"), under which it once again agreed to comply with the Net Worth Maintenance Stipulations of the original

> contracts and to make payments to the thrift to bring it into compliance with the requirements of FIRREA.

*Id.*

Given this, the Federal Circuit concluded that the Government had relied to its detriment upon OSC's conduct. *Id.*, 2006 WL 1420817 at *10. It noted that, had OSC elected to terminate the contract at the time of the enactment of FIRREA, the government would not have, and could not have, demanded that OSC make subsequent contributions to the thrift, which resulted in the Government's liability for $74.5 million in mitigation payments. *Id.* (footnote omitted). In addition, the court stated that it is "almost certain" that the Government would have seized the bank earlier, likely avoiding additional losses to the insurance fund. *Id.* (footnote omitted).

The Federal Circuit also noted that there were "continued benefits to OSC received under earlier agreements with the government," such as OSC's ability to continue to operate the thrift, the Government's willingness to defer enforcement of OSC's obligation to contribute additional capital, the non-seizure of the thrift in 1993 despite its non-compliance with FIRREA standards, and continued Federal deposit insurance. *Id.* Concluding that the election doctrine was "clearly applicab[le]," the Federal Circuit held that "OSC's initial contributions are not recoverable under a restitution theory." *Id.*, 2006 WL 1420817 at *11. The court went on to hold that the same payments were not recoverable as reliance damages for different reasons. *See id.*, 2006 WL 1420817 at *11-*14.

## II. The Election Doctrine Is Clearly Applicable Here Based Upon The Reasoning In *Old Stone*

Applying the law of election as clarified by the Federal Circuit in *Old Stone*, there can be no question but that plaintiffs elected to treat the passage of the 1990 amendments to the CZMA

as a partial breach in this case, and, therefore, are not entitled to recover the claimed out-of-pocket expenses as restitution as a matter of law. Contrary to plaintiffs' current position that an alleged material breach based upon a legislative change does ***not*** occur at the time of enactment, *see* Pl. Reply (May 15, 2006), at 7-8, *Old Stone* makes plain that, for purposes of the election doctrine, the time of enactment is the critical point for ascertaining whether the non-breaching party has elected to treat the breach as a total breach or a partial breach. *See Old Stone*, 2006 WL 1420817 at *9 (referring expressly to the enactment of FIRREA).

In *Old Stone*, OSC waited three years before asserting that the legislative change was a material breach. *See id.*, 2006 WL 1420817 at *9. Here, in contrast, plaintiffs waited nearly four times longer than OSC – ***11 years*** – before claiming that the 1990 CZMA amendments constituted a breach of contract. During that 11 year period in which plaintiffs did not treat the leases as terminated, plaintiffs and their predecessors-in-interest repeatedly demanded, and received, substantial performance of the leases by the Government. *See* Declaration of Ellen Aronson, ¶ 2-8. As we demonstrate below, not only did the Minerals Management Service ("MMS") rely to its detriment upon plaintiffs' election to treat the leases as continuing, but also plaintiffs received substantial benefits from continued lease performance during that 11-year period, as well as during the ensuing three years after the issuance of the 2001 district court decision in *California v. Norton*. Thus, as in *Old Stone*, even the stricter standard for application of the election doctrine is satisfied here.

**A. <u>The Government Relied To Its Detriment Upon The Lessees' Election</u>**

Following enactment of the 1990 CZMA amendments, the lessees did not treat their leases as terminated. As a result, over the course of 14 years, MMS invested a substantial

amount of time, effort, and funding into the development of the 36 leases at issue in this litigation. Aronson Decl. ¶ 2. It dedicated staff time and funds to conduct the California Offshore Oil and Gas Energy Resources ("COOGER") study, as well as the High Energy Seismic Survey ("HESS") study. *Id.* In addition, MMS prepared or contracted for the preparation of 10 consistency determinations, a supporting environmental information document, and six environmental assessments regarding the 36 leases, as well as a draft environmental impact statement on delineation drilling activities in Federal waters offshore Santa Barbara County, California. *Id.* When MMS invested this substantial time and resources, it believed that the lease agreements were continuing in full force, and it expected that the leases would be properly developed. *Id.* MMS did not know until 2001 – 11 years after enactment of the 1990 CZMA amendments – that plaintiffs believed the leases to be terminated.

Both MMS and plaintiffs invested in the COOGER study from 1993 to 1999 because they believed that the study would benefit the industry and the local governments and enhance oil and gas development from the 36 leases at issue. *See id.* ¶ 4. The MMS Regional Director wrote the lessees on July 31, 1992: "We deem this study to be an important step toward realization of future development potential in the Santa Maria Basin and Santa Barbara Channel." *See* Letter from MMS to Shell Western (predecessor to plaintiff Aera) (Jun. 31, 1992) (Ex. 1.).[2] Plaintiffs agreed to participate in the study provided that MMS pay for one-third of the costs of the study. *See* Letters from operators to MMS (Sept. 1992) (Ex. 2). In this October 15,

---

[2] All four exhibits attached to illustrate the factual background to the COOGER study were either previously submitted by plaintiffs in support of various declarations from their employees, or were written by plaintiffs (or their predecessors). *See* Pl. Supp. Br. Pursuant to the Court's Re-Issued Scheduling Order for Briefing, R. 36.

1992 letter to the operators of the 36 leases, the Regional Director wrote that the COOGER study "is a key step leading to the future development of discovered oil and gas resources offshore California," and that MMS was prepared "to take a leadership role" in managing the study. *See* Letter from MMS to operators (Oct. 15, 1992) (Ex. 3). In each of the MMS-directed suspensions during the COOGER study period, MMS emphasized that the goal of the study was to "alleviate certain issues and concerns held by several State, local, and Federal entities." *See, e.g.*, Letter from MMS to operators (Nov. 5, 1996) (Ex. 4).

As a result, MMS invested over five years and in excess of $3.3 million to perform the COOGER study, a study that resulted in the publication of an in-depth assessment of various options for bringing oil and gas onshore in the tri-county area of California (Ventura, Santa Barbara, and San Luis Obispo Counties). Aronson Decl. ¶ 4 and attached COOGER Executive Summary. MMS expended more than $2.2 million alone upon the COOGER study contract, and an additional $237,000 in connection with associated cooperative agreements. *Id.* The Government paid salaries in the order of $924,000 for MMS employees working on the study. *Id.* The COOGER study involved a considerable investment of Government resources, an investment that never would have been made had the lessees stated their intent to declare the leases terminated following the enactment of the 1990 CZMA amendments. These amendments were enacted more than two years prior to undertaking the study.

In addition to the COOGER study, consistent with plaintiffs' demands, MMS prepared, or contracted for the preparation of, 10 consistency determinations with supporting environmental information documents. *Id.* ¶ 5. MMS spent $135,000 with regard to these determinations, plus an additional $1,400 in related costs. *Id.*

Indeed, over the course of 14 years until lease activity was stayed late last year following this Court's decision and the stay of litigation pending in the United States Court of Appeals in the Ninth Circuit, MMS employees, particularly in the Pacific Region office, had expended considerable amounts of time organizing unit teams for the 36 leases at issue in this case. *Id.* ¶ 7. They expended time and effort reviewing one revision to a development and production plan and one exploration plan involving the subject leases. *Id.* They also spent time and effort developing environmental analyses in compliance with the National Environmental Policy Act ("NEPA") for each plan, reviewing or approving various suspension requests, and reviewing the lessees' progress toward achieving milestones to which lessees voluntarily committed themselves in their suspension requests. *Id.* Moreover, between 1990 and 2005, MMS employees continuously performed activities every day in furtherance of the 36 leases to ensure proper stewardship and conservation of resources located on the outer continental shelf offshore California. *Id.* ¶ 8. They had frequent communication with the lessees through periodic telephone calls, occasional meetings in person (which were sometimes at the lessees' request), and regular written correspondence. *Id.* ¶ 7. MMS engaged in this activity with the understanding that the leases were not terminated. Had the leases been terminated, MMS would have had no reason to expend considerable resources in performing its duties under the leases.

### B. The Lessees Continued To Receive Benefits Under The Leases After Enactment Of The 1990 CZMA Amendments

Not only did the Government plainly rely to its detriment upon the lessees' decision to treat the leases as continuing for 11 years following enactment of the 1990 CZMA amendments, the lessees continued to receive benefits following that legislative change.

For example, in 1993, three years after enactment of the 1990 CZMA amendments, MMS issued directed suspensions for the 36 leases. Aronson Decl. ¶ 3. Pursuant to 30 C.F.R. § 218.154, the lease owners did not have to make rental payments while under the directed suspensions. The lessees accepted this benefit. MMS extended the directed suspensions several times to accommodate delays in the COOGER study, which was ultimately completed in July 2000. *Id.* ¶ 4. The lessees accepted the benefits of these directed suspensions, which relieved them of the obligation to make rental payments while they enjoyed the benefits of the COOGER study.

Indeed, the lessees voluntarily entered into a partnership with the Government by participating in the COOGER study. *Id.* ¶ 3. This study benefitted the lessees because it provided information regarding the current and future level of offshore oil and gas activity in the area, including the role of oil and gas activity in the local socioeconomic setting. *Id.* One of the purposes of the study was to provide a common understanding of existing and prospective issues that should be addressed by the parties in planning and developing offshore oil and gas activities. *Id.* The lessees accepted the benefits of this study.

The lessees also accepted the benefits of MMS's regulatory activity. They accepted the review of a development and production plan and exploration plan. *Id.* ¶ 7. They allowed MMS to perform the NEPA analyses upon their behalf. *Id.* They accepted the benefits of MMS's every day handling of the leases. *Id.* They accepted the benefits of their phone calls and meetings with MMS. In short, plaintiffs accepted MMS's performance of the leases for 14 years after the enactment of the 1990 CZMA amendments.

### C. The Court's November 2005 Decision Rejecting Application Of The Closely-Related Doctrine Of Waiver Does Not Foreclose Application Of The Election Doctrine As Required By *Old Stone*

In its November 2005 opinion, the Court addressed the closely-related doctrine of waiver and held that plaintiffs had not waived their claim of material breach. *See Amber*, 68 Fed. Cl. at 558-59. In its decision, the Court expressly relied upon *Westfed*, which the Federal Circuit expressly distinguished in *Old Stone* as a waiver decision. *Compare Old Stone*, 2006 WL 1420817 at *8 n.6 (discussing *Westfeld* and distinguishing doctrines of waiver and election) *with Amber*, 68 Fed. Cl. at 558 ("The pursuit of requested suspensions is no different than the payments accepted by the non-breaching party in *Westfed*-both constitute performance under the contract.").

Indeed, as the Court's decision makes plain, it was not until 2001 when the lessees first notified the Government that they were treating the 1990 amendments to the CZMA as even a partial breach of contract. *See Amber*, 68 Fed. Cl. at 558 ("When the lessees submitted their updated suspension requests to MMS, they expressly preserved the right to challenge the application of § 307(c)(1) as a breach of contract."). The Court held that "the lessees' submission of updated suspension requests was met with MMS consistency review pursuant to § 307(c)(1). Such performance was not bargained for at the time of lease formation and therefore cannot constitute a waiver." *Id.* at 559. The Court further rejected our argument that acceptance of directed suspensions, which prevented the termination of the leases, constituted a benefit to plaintiffs. *See id.*

Indeed, the *Old Stone* decision highlights the critical distinction between the waiver and election doctrines. In *Old Stone*, the Federal Circuit specifically held that OSC made an election

because, among other things, "it once again agreed to comply with the Net Worth Maintenance Stipulations of the original contracts and to make payments to the thrift to bring it into compliance with the requirements of FIRREA." *Old Stone*, 2006 WL 1420817 at *9. Thus, even though the new requirements imposed by FIRREA were viewed as a breach of the contract, OSC nonetheless made an election to comply with them.

Here, the Court ***rejected*** the application of the waiver doctrine to plaintiffs' receipt of the benefit of a directed suspension "so that a contract-violating procedure may be applied" because that "is not a type of performance bargained for by the lessees." *Amber*, 68 Fed. Cl. at 559. However, applying the reasoning of *Old Stone* regarding the election doctrine, it is simultaneously clear that plaintiffs' demands that MMS perform new consistency reviews and NEPA analyses under the auspices of the *California v. Norton* litigation, and plaintiffs' acceptance of directed suspensions, constitute an ***election*** to treat the alleged breach in this case as a partial breach. That plaintiffs purported to reserve their rights, *see Amber*, 68 Fed. Cl. at 558, is of no moment – there is no precedent that permits a non-breaching party to use a reservation of rights to avoid the application of the election doctrine once it decides to treat an alleged material breach as a partial breach by continuing with the contract.

Accordingly, assuming the correctness of the Court's 2005 decision (we respectfully disagree with both the factual assertions and legal conclusions set forth in the waiver section of that opinion, *see id.* at 558-59), the Court is not foreclosed from holding that the lessees elected to continue with their leases following the enactment of the 1990 CZMA amendments, and, therefore, may treat the legislative change as only a partial breach of contract. *See Old Stone*, 2006 WL 1420817 at *9 (quoting 13 *Williston* § 39.32 (4th ed. 2000)). Plainly, MMS relied to its

detriment upon the lessees' treatment of the leases as continuing for 14 years; in addition, the lessees received significant benefits from MMS's performance of the leases during those 14 years. *See, generally,* Aronson Decl. Given this, plaintiffs may recover the claimed out-of-pocket expenditures only as reliance damages, if at all.

**CONCLUSION**

For these reasons, we respectfully request that, in the alternative, this Court hold that, based upon the reasoning of *Old Stone*, plaintiffs may not recover the claimed out-of-pocket expenditures as restitution due to the application of the election doctrine.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director
GREGG M. SCHWIND
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530
Tel. (202) 307-0164
Fax (202) 514-7969

July 3, 2006

Attorneys for Defendant