# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

| | |
|---|---|
| AMBER RESOURCES COMPANY,<br>*et al*., | |
| *Plaintiffs,*<br><br>v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| **************************************** | |
| ANADARKO E & P COMPANY L.P.,<br>*et. al*., | |
| *Plaintiffs,*<br>v. | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| **************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| **************************************** | |

**MEMORANDUM IN RESPONSE TO THE GOVERNMENT'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF REGARDING EFFECT OF *OLD STONE CORPORATION V. UNITED STATES* UPON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Government's motion for leave to file a supplemental brief is untimely. In any event, the arguments advanced in the brief are substantively unsound and do not affect the Lessees' entitlement to partial summary judgment.

**A. The Government's Motion is Untimely.**

The supplemental brief purports to be triggered by the Federal Circuit's decision in *Old Stone Corp. v. United States*, _ F.3d _, 2006 WL 1420817 (Fed. Cir. May 25, 2006). But that decision was rendered 39 days before the Government's filing, and the Government nowhere explains why it waited until the day before the July 4 holiday, and four business days before oral argument, to file its motion. The Government's conduct is particularly troubling given that it cited the Federal Circuit's *Old Stone* ruling more than a month ago in its June 1, 2006 reply brief on the summary judgment motions. The Government's delay in asserting new arguments based on *Old Stone* smacks of gamesmanship.

**B. The Government's Brief Is Entirely Based on a False Premise as to When the Breach Occurred.**

The Government's contention that the doctrine of election of remedies bars the Lessees' restitution claim is, if anything, even weaker than the related waiver claim that this Court has already rejected, *Amber Resources Co. v. United States*, 68 Fed. Cl. 535, 558-59 (2005). The Government's assertion that the Lessees purportedly elected to receive benefits under the contract for more than eleven years after the breach occurred is based entirely on a false premise as to the date of breach.

The Government argues that the breach here occurred when Section 307(c)(1) of the CZMA was amended in 1990 (although neither they nor the Lessees were aware of the impact of those amendments on lease suspensions). *See* Gov't Br. at 6 - 7. But as the Lessees already demonstrated in their May 15, 2006 reply brief in support of their pending motion for

partial summary judgment at pp. 7 - 8, the Supreme Court's decision in *Franconia Associates v. United States*, 536 U.S. 129 (2002), conclusively establishes that the Government's breach here did not occur until July 2001, when the *Norton I* decision required the Government for the first time to apply the new Section 307(c)(1) procedures to the Lessees' suspension requests.

Indeed, as we noted in the May 15, 2006 reply brief, the Government initially moved to dismiss this case on the ground that the 1990 CZMA amendments constituted the breach and the Lessees' lawsuit (filed in January 2002) was therefore time-barred. *See* Def.'s Mot. to Stay Proceedings, or in the Alternative, to Dismiss, at 14 - 24 (April 5, 2002). However, after *Franconia,* the Government abandoned that motion at the oral argument on the Lessees' original summary judgment motion. *See* 68 Fed. Cl. at 544 n. 22; *see also id.* at 554. Consistent with that abandonment decision, the Government did not assert the statute of limitations as an affirmative defense when it later filed its Answers to the complaints in these consolidated actions on November 30, 2005. The Government never explains how its current arguments can be reconciled with its past positions and actions.

The *Franconia* Court unanimously rejected the precise argument advanced by the Government here — that the enactment of a statute that alters the government's future contractual obligations effects an immediate breach.[1] As *Franconia* makes clear, the enactment

---

[1] The *Franconia* plaintiffs were multiple dwelling housing owners whose obligation to rent to low- and middle-income occupants could, under the terms of their promissory notes, be terminated by pre-payment of their low-interest FmHA mortgage loans. 536 U.S. at 133. In 1987, Congress passed a law (ELIHPA) that placed restraints on the owners' preexisting contractual rights to prepay the loans, but the owners did not bring their breach of contract lawsuit until 1997. *Id*. at 137. The Government argued, and the Federal Circuit held, that the owners' lawsuit was untimely because the Government had breached its obligation "to keep its promise to allow borrowers an unfettered prepayment right" "immediately upon enactment of ELIHPA." *Id*. at 138-39 (citations omitted).

(continued…)

of a statute announcing that the Government will not comply with its future obligations only constitutes an anticipatory repudiation. "[R]enunciation of a 'contractual duty *before* the time fixed in the contract for . . . performance' is a repudiation . . . a repudiation ripens into a breach prior to the time for performance only if the promisee 'elects to treat it as such.'" 536 U.S. at 143 (citation omitted, emphasis added by the Court). The promisee is entitled instead to await the time of performance and file a lawsuit for breach after performance is not forthcoming. *Id.*

*Franconia* is directly on point. In *Franconia*, the governmental promise was to process a prepayment of the mortgage, in the manner specified in the contract, when the promisee made such a repayment request in the future. *See* n. 1 *supra*. Here, it was a promise to process the Lessees' request for lease suspensions in the manner specified in the statutes and regulations as they existed when the Leases were issued. The Government did not breach that obligation in 1990 when it amended the CZMA to change the procedures relating to lease suspensions — as in *Franconia*, that amendment was an anticipatory repudiation. The Government only breached the leases in July 2001 when its contractual obligation to the Lessees came due and the Government instead applied to the Lessees' suspension requests the new procedures required by the 1990 CZMA amendments.

The Federal Circuit has itself recognized and applied the Supreme Court's *Franconia* holding: "the passing of the statute in *Franconia* did not amount to a breach of

---

The Supreme Court unanimously reversed, concluding that "ELIHPA effected a repudiation of the FmHA loan contracts, not an immediate breach. The Act conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages." *Id.* at 142-43. "Unless [the property owners] treated ELIHPA as a present breach by filing suit prior to the date indicated for performance, breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due." *Id.* at 143 (footnote omitted).

contract without further action by the government," which would occur "when the property owners attempted to prepay [their loans] but were refused." *Kasarsky v. Merit Systems Protection Board*, 296 F.3d 1331, 1338 (Fed. Cir. 2002).

The Government never mentions *Franconia* or *Kasarsky* in its brief. It instead cites *Old Stone* for the proposition that the specific statute at issue there — FIRREA — itself constituted the breach. But this was so because the enactment of FIRREA (and/or the implementing regulations adopted and applied immediately thereafter by statutory mandate) vitiated the savings and loans associations' *current and ongoing right* to count regulatory goodwill and capital credits toward their mandatory capital requirements, *which they were already doing*. *United States v. Winstar Corp.,* 518 U.S. 839, 856-57 (1996). Unlike the situation here, the effect of FIRREA and/or its implementing regulations was immediate:

> Once the OTS regulations took effect, thrifts were legally subject to new capital standards that were in direct contradiction to the terms of their forebearance agreements….[T]hrifts with forbearance agreements were no longer allowed to rely on those agreements in the wake of FIRREA. Plaintiffs were left to operate under capital standards governed explicitly and exclusively by FIRREA. They were prohibited from including millions of dollars worth of supervisory goodwill-as their agreements expressly allowed them to do-in their efforts to meet the legally mandated capital standards.

*Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174, 185 (1997) (citations omitted) (addressing the statute of limitations as applied to *Winstar* cases);[2] *see also Old Stone*, 2006 WL 1420817, at * 2 ("FIRREA prevented OSB [Old Stone Bank] from recognizing [supervisory goodwill and capital credits] as regulatory capital. As a result, OSB failed one of

[2] The Federal Circuit has not itself resolved whether the breach occurred upon FIRREA's enactment or the subsequent adoption of implementing regulations. *See Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 880 (Fed. Cir. 1998). Resolution of that issue is not relevant to this case.

the government's regulatory capital requirements--the so-called 'risk-based' capital requirement --by $36 million. OSB was thus 'undercapitalized' and subject to seizure.")[3]

The obligation at issue here is indistinguishable from that at issue in *Franconia*, and the breach did not occur until July 2001.

**C. The Lessees Received Nothing Between the Time of Breach and the Filing of Their Lawsuit.**

Once the date of breach has properly been established as July 2001, the Government's reliance on *Old Stone* falls apart. In *Old Stone*, the plaintiffs had received numerous benefits during the more than three year period after the breach occurred and before they filed their breach lawsuit, *see* 2006 WL 1420817, at * 9. These benefits included the entry into a new capital plan with the government agency; the making of additional capital contributions giving rise to the government's liability for $74.5 million in mitigation payments; the avoidance of bank seizure, causing additional losses to the insurance fund; and continued federal deposit insurance, *id.* at * 10.[4]

---

[3] While the Government purports to cite *Mobil Oil* as relevant to the question when the breach occurred, Def. Supp. Br. 4, the date of breach was not at issue in that decision. Indeed, the statute at issue there (the Outer Banks Protection Act), which established new procedures for the approval of OCS exploration plans offshore North Carolina, was enacted nearly simultaneously with Mobil's submittal of its exploration plan. *See Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 611-12 (2000). Thus, the anticipatory repudiation (the enactment of the OBPA) and the breach (the subjection of the lessees' exploration plan to the new procedures required by the OBPA) were nearly simultaneous. The precise date of breach was of no moment to the lawsuit, and the *Mobil Oil* Court had no reason to consider the issues it later resolved in *Franconia*.

[4] The *Old Stone* court contrasted the facts before it to those in *First Nationwide Bank v. United States*, 431 F.3d 1342 (Fed. Cir. 2005), where the plaintiff had "promptly protested the [breach], filing suit first against the FDIC and then against the United States." 2006 WL 1420817, at * 10 n. 13 (quoting *First Nationwide*, 431 F.3d at 1352) (brackets in original). The *First Nationwide* plaintiff had filed suit against the FDIC and then the United States 27 months and 39 months after the offending Guarini legislation was enacted, respectively, *see* Pub. L. No. 103-66, 107 Stat. 312, 485 (1993) (enactment in August 1993); *First Nationwide Bank v. United* (continued…)

By contrast, the Lessees received nothing between the breach and the filing of their lawsuit. After the *Norton I* decision, MMS on July 2, 2001, set aside its approval of the November 1999 suspensions and directed a suspension of operations for the leases until MMS "has acted on" the Lessees' suspension requests by, *inter alia*, conducting the newly required CZMA analysis. *See* 68 Fed. Cl. at 543. After initially informing the Lessees by letters dated July 16, 2001, that it intended immediately to perform the CZMA analyses, MMS changed course and indicated that it no longer intended to do so but instead would do nothing while it appealed Judge Wilken's decision. *Id.* The Lessees filed their material breach of contract lawsuit in this Court on January 9, 2002.

In short, the Lessees here did not elect to continue with the contracts in lieu of declaring material breach and suing, and they received nothing from the Government between July 2001 and January 2002. This Court has already so indicated in the context of rejecting the Government's related assertion that the Lessees waived their claims. 68 Fed. Cl. at 559.

The Government's supplemental brief never contends otherwise. The Government's COOGER study costs comprise a full 90% of the total expenditures relied upon by the Government, *see* Aronson Decl. ¶¶ 3-6, yet by the Government's own description, COOGER was completed in January 2000, before the breach occurred. (*Id.*¶ 4). The Draft EIS and the High Energy Seismic Survey (HESS) study were likewise published before the July 2001 breach. (Decl. of Simon A. Poulter ¶¶ 15, 17 - 19, submitted in support of Pls.' Reply Mem. in Support of Mot. for Partial Summ. J. (May 15, 2006)).[5]

---

*States*, 48 Fed. Cl. 248, 252, 254 (2000) (lawsuits against FDIC and the United States filed in November 1995 and September 1996, respectively).

5 The Government also cites its supervision of the Lessees' "milestone activities," *see* Aronson Decl. ¶ 7, but these were the very activities halted by issuance of the "red light" (continued…)

Furthermore, the consistency determinations, supporting environmental information document, and Environmental Assessments cited by the Government (Aronson Decl. ¶¶ 2, 6) all relate to the updated suspension requests that the Lessees submitted *at the behest of MMS in April 2004*, years after the Lessees had already elected to declare material breach and filed the instant lawsuit. *See* 68 Fed. Cl. at 543, 552. Moreover, as this Court has already held in denying the Government's related waiver arguments, the Lessees in submitting these updated suspension requests "expressly preserved the right to challenge the application of § 307(c)(1) as a breach of contact." 68 Fed. Cl. at 558.

Finally, the *Old Stone* court relied heavily upon *Mobil Oil* for guidance on the application of election of remedies issue, *see* 2006 WL 1420817, at * 9, and *Mobil Oil* rejected the argument the Government now makes. The Government in *Mobil Oil* had also argued that Mobil could not pursue a restitution claim, because it had submitted an exploration plan to MMS after the OBPA became law. *See Mobil Oil*, 530 U.S. at 622. In addition, Mobil had asked the Secretary of Commerce to overturn North Carolina's objection to the companies' CZMA consistency certification, and had waited over two years after enactment of the OBPA to file its breach lawsuit. *Id.* at 613. According to the Government, "[s]uch actions seeking contractual performance after the asserted material breach has occurred are 'tantamount to an election to affirm the contract.'" Br. for United States in *Mobil Oil*, 99-244, 2000 WL 126193, at * 40 (Jan. 28, 2000) (citations omitted). But the *Mobil Oil* Court rejected the Government's argument and ordered that restitution be awarded. *Mobil Oil*, 530 U.S. at 622.

---

suspensions, *see* 68 Fed. Cl. at 542-53, and thus by definition predated the breach. The same is of course true with respect to MMS's efforts (*see* Aronson Decl. ¶ 7) regarding the Lessees' exploration plans, development plans, and "green light" suspension requests, *see* 68 Fed. Cl. at 551.

**CONCLUSION**

The election of remedies doctrine is inapplicable here.

Respectfully submitted,

s/ Steven J. Rosenbaum
by s/ Thomas J. Cosgrove
E. Edward Bruce
Steven J. Rosenbaum
*Counsel of Record*
Thomas J. Cosgrove
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-5568
Facsimile: (202) 778-5568
Attorneys for All Plaintiffs in Nos. 02-30C and 04-1822C

July 6, 2006