IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMBER RESOURCES COMPANY., et al., Plaintiffs, THE UNITED STATES, Defendant. | |
| ANADARKO E&P COMPANY, L.P., et al., Plaintiffs, v. THE UNITED STATES, Defendant. | Nos. 02-30C<br>04-1822C<br>05-249C (Consolidated)<br>(Senior Judge Eric G. Bruggink) |
| NYCAL OFFSHORE DEVELOPMENT CORPORATION, Plaintiff, v. THE UNITED STATES, Defendant. | |

**DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF REGARDING EFFECT OF *OLD STONE CORPORATION V. UNITED STATES* UPON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, the United States, respectfully submits this reply to plaintiffs' response to our motion for leave to file our supplemental brief regarding the potentially direct and important

effect of *Old Stone Corp. v. United States*, ___ F.3d ___, 2006 WL 1420817 (Fed. Cir. May 25, 2006), upon plaintiffs' pending motion for partial summary judgment.

## I. <u>Our Motion For Leave Is Not Untimely</u>

Plaintiffs contend that our motion for leave was untimely and "smacks of gamesmanship." Pl. Opp. at 1. As an initial matter, our motion was not "untimely," as there was no deadline by which we were required to apprise the Court of a non-final decision of the United States Court of Appeals for the Federal Circuit. As we noted in our motion for leave, we filed the motion regarding this non-final decision only because oral argument is scheduled for July 10, and the *Old Stone* decision, if it becomes final, would have a potentially dispositive effect upon plaintiffs' pending motion for partial summary judgment.

Further, there is no "gamesmanship" here. In our motion for leave, we explicitly stated our regret in filing the motion on the eve of the July 4 holiday, on a day which the Court was closed. That was not our preference, and we immediately provided courtesy copies of our filing to plaintiffs' counsel. To the extent that we did not "explai[n]" why we did not file the motion sooner, Pl. Opp. at 1, we will say only that we attached to our supplemental brief a declaration from the agency's regional director, Ellen Aronson, which contains detailed information, some of which is more than 10 years old. This critical information regarding the agency's detrimental reliance was not readily available to the agency without a fair amount of investigation. Moreover, since the issuance of *Old Stone*, Ms. Aronson's office has been forced to respond to plaintiffs' continuing and increasingly burdensome demands for documents that are outside the scope of discovery authorized by the Court's scheduling orders. To date, we have decided not to burden the Court by seeking a protective order with regard to these discovery matters, but, to the

extent that plaintiffs seek to use their onerous discovery demands as a means to persuade the Court to deny our motion for leave regarding a potentially dispositive decision of the Federal Circuit, we would be prepared to provide the Court with a brief cataloguing the myriad demands recently placed upon the agency's regional office in this case.

## II. ***Franconia* Has Nothing To Do With The Election Doctrine Applied In *Old Stone***

Plaintiffs contend that our brief is "entirely" based upon a "false premise" as to when the breach occurred. Pl. Opp. at 2. By "false premise," they mean our position that the alleged breach occurred, for purposes of the election doctrine, when the CZMA was amended in 1990, rather than in July 2001, when plaintiffs claim the alleged breach occurred. However, plaintiffs later contradict their own use of the word "entirely" to address, in three of the seven pages of their brief, their post-July 2001 actions. *See id.* at 5-7.

Rather than respond to the arguments raised by *Old Stone*, plaintiffs discuss at length the Supreme Court's decision in *Franconia Associates v. United States*, 536 U.S. 129 (2002), and contend that this Court possesses jurisdiction to entertain their claims. Pl. Opp. at 2-5. *Franconia* is strictly a statute of limitations case. It addresses the election of a non-breaching party to bring suit either at the time of an anticipatory repudiation or at the time when performance is due. *See id.*, 536 U.S. at 143. *Franconia* does not address the election doctrine at issue in *Old Stone*, which concerns the election of a non-breaching party to treat a breach as a material breach or a partial breach. Although plaintiffs contend that "*Franconia* is directly on point," *id.* at 3, and chide us for not citing *Franconia* or *Karsarsky v. Merit Systems Protection Board*, 296 F.3d 1331 (Fed. Cir. 2002), Pl. Opp. at 4, those cases have no bearing upon any issue raised in our supplemental brief. For purposes of the election doctrine, the 1990 CZMA

amendments, according to the Court's November 2005 decision, announced to plaintiffs an anticipatory repudiation of the leases. From that time forward, according to plaintiffs' theory of repudiation, plaintiffs were on notice that the Minerals Management Service ("MMS") was going to perform consistency review in connection with a request for a lease suspension. Under plaintiffs' reading of *Franconia*, plaintiffs could have treated the repudiation as a total breach in 1990, or they could have waited and declared the breach at the time performance was allegedly due in 1999, when plaintiffs requested and received lease suspensions.

Nothing in *Franconia*, however, permitted plaintiffs to indulge in the "moral hazard" of "postpon[ing] repudiation of the contract for several years," betting that they could yield a favorable result from performance of the leases, and then seeking restitution if their gamble failed. *See Old Stone*, 2006 WL 1420817, at *10. The Court in *Old Stone* quoted the Court of Claims, in the context of waiver: "'As a general proposition, one side cannot continue after a material breach by the other . . . act as if the contract remains fully in force . . . , run up damages, and then go suddenly into court.'" *Id.* (quoting *Northern Helex Co. v. United States*, 455 F.2d 546, 551 (Ct. Cl. 1972)). By demanding and receiving performance over a 14 year period, three years of which post-dated even plaintiffs' own view as to the date of breach, plaintiffs made an election to treat any alleged breach as a partial breach. Given this election, plaintiffs' out-of-pocket expenditures are not recoverable as restitution. *See Old Stone*, 2006 WL 1420817, at *11.

Thus, *Franconia* is not "directly on point," Pl. Opp. at 3, because we do not contend that plaintiffs' remaining claim of partial breach is barred by the statute of limitations. In response to our original motion to dismiss filed in 2002, plaintiffs filed an amended complaint to add

repudiation claims, thus curing the jurisdictional defect of their original complaint. *Franconia* has no bearing upon any issue currently before the Court.

## III. Plaintiffs Repeatedly Confirmed Their Election After July 2001

Plaintiffs do not deny that the Government relied to its detriment by performing the leases after plaintiffs commenced this action, and that plaintiffs received a benefit from the Government's continuing performances of the leases. Rather, plaintiffs contend that "they received nothing between July 2001 and January 2002," when plaintiffs commenced this action. Pl. Opp. at 6. They concede that the Government continued to perform the leases after they commenced this action, but claim, incorrectly, that it was at the Government's "behest." *Id.* at 7.

As an initial matter, for purposes of the election doctrine applied in *Old Stone*, plaintiffs are wrong to say that they "received nothing" between July 2001 and January 2002. Pl. Opp. at 6. They received court-ordered directed suspensions in July 2001 that prevented the expiration of their leases and relieved them of the requirement to make rental payments. *See* Aronson Decl.; *see also* 30 C.F.R. § 218.154. Although the Court held that this was not a benefit for purposes of the waiver doctrine because the directed suspensions were issued to permit the allegedly breaching consistency review, *Amber Resources Co. v. United States*, 68 Fed. Cl. 535, 559 (2005), the Federal Circuit in *Old Stone* distinguished the election doctrine from the waiver doctrine and made plain that an election occurs when the non-breaching party continues to demand and receive performance ***in the face of a breach***. In that case, even though the new requirements imposed by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") were viewed as a breach of the contract, the plaintiff bank nonetheless made an election to comply with them. *See Old Stone*, 2006 WL 1420817, at *9.

Second, and more importantly, plaintiffs are flatly wrong when they contend that they submitted their updated suspension requests "*at the behest of MMS in April 2004*, . . . ." Pl. Opp. at 7 (emphasis in original). As plaintiffs' own brief filed in February 2004 in the district court in *California v. Norton*, No. C 99-4964 CW, makes plain, plaintiffs aggressively urged the district court to require MMS, ***under pain of contempt***, to perform their leases at considerable expense to the Government – even years after plaintiffs had initiated this action. *See* Ex. A (Operator Intervenors' Response To Federal Government Defendants' Supplemental Brief) (Feb. 5, 2004)). Plaintiffs succeeded. As plaintiffs' principal declarant, Ronald G. Heck, has already volunteered, the district court in June 2004 entered an order adopting the Government's proposed timetable for completion of the analyses required by that court's judgment. Ex. 94 to Heck Decl. (Order Adopting Federal Defendants' Proposed Timetable, *California v. Norton*, No. C 99-4694 CW, (N.D. Cal. Jun. 28, 2004)).

Plaintiffs readily concede that they demanded that MMS perform the allegedly breaching consistency determination on August 31, 2001. Am. Compl. (No. 02-30C) ¶¶ 57-58. As plaintiffs themselves allege in their amended complaint, they did not declare the leases to be terminated in August 2001, one month after the supposed "breach." To the contrary they "'urg[ed] MMS to issue the [Section 307](c)(1) determination expeditiously." *Id.* ¶ 58. Indeed, plaintiffs continue to allege in this Court that "[t]he Government has caused additional, significant, continuing and material delay to the Lessees' operations by refusing to issue a Section 307(c)(1) determination pending the resolution of its appeal of the *California v. Norton* decision." *Id.* ¶ 65.

In their supplemental brief filed in February 2004 in the district court, plaintiffs provided even more detail as to their continuing treatment of the leases as not terminated, several years after the date they claim to be the alleged date of breach (July 2001). On September 21, 2001, plaintiffs' counsel wrote to MMS that the district court's "decision leaves [the Department of the Interior] no choice but to promptly file a CZMA determination." Ex. A at 3-4 (quoting Ex. 2 to Bruce Feb. 5, 2004 Decl.).

Plaintiffs further scolded the Government for filing a May 15, 2003 motion to dismiss in *California v. Norton* "without complying with the Court's order to prepare consistency determinations." *Id.* at 4. Noting that the district court had denied the motion to dismiss, plaintiffs complained that "[i]n its January 22, 2004 filing, the Government once again seeks to postpone the consistency obligation to an indefinite point in the future[,]" noting the Government's then pending request that the district court stay proceedings pending resolution of the case before this Court. *Id.* Plaintiffs pointedly did ***not*** join in the Government's request for the stay, as would a plaintiff who has made an election to treat the asserted breach as material and seek restitution. *See id.* at 6. Rather, unambiguously confirming their longstanding election to treat the leases as continuing, plaintiffs heatedly opposed the request for a stay and insisted that the district court order the Government to perform the leases:

> Showing the lengths to which the Government will go to avoid preparing the consistency determinations ordered by this Court, it attempts to justify its stay request by misrepresenting that the Lessees in *Amber Resources* claim in that action that the "leases no longer exist." . . . ***The Lessees assert no such thing.*** They allege that the United States is in material breach, and seek relief that the Leases be rescinded, and that the United States provide restitution to the Lessees.

*Id.* at 6-7 (emphasis supplied). Indeed, in a footnote further preserving their election to treat the

leases as continuing, plaintiffs chastised the Government for "mischaracteriz[ing]" their claims in this Court that they "have alleged material breach and an alternative theory of partial breach based on the Government's delay." *Id.* at 7 n.2. Calling that description "not correct," plaintiffs clarified that they "allege that the Government materially breached the Leases and seek alternative remedies for such a breach." *Id.* Their actions in district court alone, however, are tantamount to an election for the "alternative remedies for such a breach."

Although plaintiffs contend that the mere filing of this action is sufficient to prevent application of the election doctrine, *Old Stone* demonstrates that their contention is wrong. Plaintiffs' undisguised strategy to keep all of their options open by simultaneously urging performance of the leases in one court and seeking restitution in another squarely presents the "moral hazard" decried by the Federal Circuit in *Old Stone*. *See Old Stone*, 2006 WL 1420817, at *10. Simply put, plaintiffs have cited no authority that entitles them to opt out of the election doctrine by purporting to reserve their right to assert a total breach while simultaneously electing to demand and receive performance by the Government.

Indeed, plaintiffs vociferously urged that the Government's lease performance be required. The Government thus relied, to its detriment, upon plaintiffs' election to treat the leases as continuing even after plaintiffs had commenced this action. Plaintiffs may not plausibly contend that MMS was unreasonable to conduct the consistency review and NEPA analyses when MMS was under a court order to do so. Plaintiffs made a calculated – and successful – decision to ***force*** MMS to perform the leases, years after they filed this action. As Ms. Aronson's declaration establishes, MMS incurred considerable expense to perform the

leases, performance as to which it had no choice. Plaintiffs had a choice, and they chose to treat the alleged breach as a partial breach, as a matter of law.

Finally, given plaintiffs' demand and receipt of lease performance as recently as 2004 and 2005, plaintiffs' reliance upon *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000), is misplaced. Pl. Opp. at 7. In that case, the lessees submitted an exploration plan and asked the Government to perform. Here, plaintiffs successfully forced the district court to order that the Government perform, under pain of contempt. The Government did perform, and plaintiffs accepted that performance having demanded it. Because plaintiffs did far more than merely urge performance, *Mobil Oil* does not rescue them from application of the election doctrine.

**CONCLUSION**

For these reasons, and the reasons set forth in our motion for leave, we respectfully request that the Court grant leave for filing of our supplemental brief regarding the effect of the recent *Old Stone* decision upon plaintiffs' pending motion for partial summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530
Tel. (202) 307-0164
Fax (202) 514-7969

July 7, 2006

Attorneys for Defendant

# EXHIBIT A

Sonya D. Winner, SBN 200348
David M. Jolley, SBN 191164
COVINGTON & BURLING
601 California Street, 19th Floor
San Francisco, CA 94108
Telephone: (415) 591-6000
Fax: (415) 591-6091

E. Edward Bruce
Steven J. Rosenbaum
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, D.C. 20004-2401
Telephone: (202) 662-6000
Fax: (202) 662-6291

Attorneys for Aera Energy LLC, Conoco Inc., Nuevo Energy Company, Poseidon Petroleum LLC and Samedan Oil Corporation

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et. al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GALE NORTON, Secretary of Interior, *et al.*,<br><br>Defendants. | Case No.: No. C 99-4964 CW<br><br>**OPERATOR INTERVENORS' RESPONSE TO FEDERAL GOVERNMENT DEFENDANTS' SUPPLEMENTAL BRIEF** |

Intervenors Aera Energy LLC, Nuevo Energy Company, Poseidon Petroleum LLC, and Samedan Oil Corporation (hereinafter "Lessees") hereby respond to the Government's January 22, 2004 supplemental brief submitted pursuant to the Court's December 9, 2003 order.

## I. Introduction.

The Government's January 22, 2004, supplemental brief is simply the most recent example of its studied efforts to avoid complying with this Court's June 20, 2001 order.

On July 27, 1999, California put the Department of the Interior ("DOI") on notice that it would invoke the Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq.*, to review the "consistency" of any future Outer Continental Shelf ("OCS") lease suspensions with the State's CZMA program. (4 AR Doc. 96). In November 1999, DOI granted the Lessees and others such suspensions for 36 OCS leases, without providing the CZMA consistency review demanded by the State, thus leading to the State's challenge in this Court to the suspensions.

In its June 20, 2001 order, this Court held that DOI's grant of the November 1999 suspensions was "subject to a consistency determination as a federal activity affecting the coastal zone" under CZMA § 307(c)(1), 16 U.S.C. § 1456(c)(1). *California v. Norton*, 150 F. Supp.2d 1046, 1053 (N.D. Cal. 2001), *aff'd*, 311 F.3d 1162 (9th Cir. 2002). Accordingly, the Court ordered DOI to "provide the State of California with a determination that its grant of the lease suspensions at issue here is consistent with California's coastal management program." *Id.* at 1057. The Court also ordered DOI to direct suspensions of the Leases "for a time sufficient for it to provide the State of California with a consistency determination in compliance with CZMA § 1456(c)(1) and its implementing regulations." *Id.* at 1057-58. During the next 30 months, the Government never even began the process of preparing a consistency determination.

It was not always this way. In its immediate response to this Court's June 20, 2001 order, DOI on July 2, 2001, set aside its approval of the November 1999 suspensions and directed suspensions until DOI "has acted on" the Lessees' suspension requests. In July 16, 2001 letters, DOI informed the Lessees that it would be reviewing the November 1999

suspension requests "over the next several weeks" to determine whether their approval would have coastal effects within the meaning of the CZMA. Noting that under 15 C.F.R. § 930.41, DOI could not take final agency action until 90 days after the State's receipt of DOI's CZMA determination, DOI informed the Lessees that it might be able to act on the suspension requests as early as December 2001. The December 2001 date, coupled with the 90-day requirement, indicated that DOI believed it could provide California with a section 307(c)(1) CZMA determination as early as September 2001, *i.e.*, within two months. (*See* Exh. 1 to Readinger Decl.).

Although the July 16, 2001 letter was transmitted approximately two years after the Lessees' original suspension requests, DOI did not order them to provide any additional information in support of those requests. Rather, the July 16, 2001 letters stated that the Lessees could "update" their requests "if necessary." In response, the Lessees reported that "the timetables originally included in the grants of suspensions will have to be tolled during the consistency review process" and that any new deadline would have to reflect the time required for any necessary permitting and operational planning. (*See* Exh. 1 to Bruce Feb. 5, 2004 Decl.). Until its January 22, 2004, filing, DOI never suggested that it needed more information from the Lessees.

However, the Lessees subsequently learned that DOI would not promptly issue a CZMA determination, but instead would await a decision by the Ninth Circuit on its appeal of the Court's June 20, 2001 decision. On August 31, 2001, the Lessees sent a letter to DOI protesting such a course of action as inconsistent with this Court's order and DOI's own prior representations. (*See* Exh. 2 to Bruce July 3, 2003 Decl.). On September 17, 2001 DOI responded that it was "working to determine the course of action which will best serve all constituents, including the lessees, the States and the public." (*See* Exh. 3 to Bruce July 3, 2003 Decl.). DOI did not suggest then or at any time later until its January 22, 2004, filing in this Court that it would be unable to issue a consistency determination because of lack of information. The Lessees again objected, emphasizing that the Court's "decision leaves DOI no

choice but to promptly file a CZMA determination." (*See* Exh. 2 to Bruce Feb. 5, 2004 Decl.). DOI never responded to the Lessees' letter.

More than a year later (and almost exactly a year before this Court's December 9, 2003 order), the Ninth Circuit on December 2, 2002, affirmed and remanded the case for further proceedings consistent with its opinion, which of course included preparation of the CZMA consistency determinations. However, after the 45 days to file a petition for rehearing in the Ninth Circuit which was predictably denied, and another 90 days for an even more predictable refusal of the Solicitor General to file a petition for certiorari in the Supreme Court, DOI on May 15, 2003, filed a motion to dismiss the case without complying with the Court's order to prepare consistency determinations. On December 9, 2003, the Court rejected the Government's assertion that it had already "fully complied" with the Court's June 20, 2001 order as "incorrect," because DOI "has not provided a consistency determination." December 9, 2003 Order at 6-7. The Court thus ordered the Government defendants to "file a brief addressing the issue of how much time they believe is sufficient for them to comply with this Court's order." *Id.* at 12.

In its January 22, 2004 filing, the Government once again seeks to postpone the consistency obligation to an indefinite point in the future. Specifically, the Government seeks a stay pending resolution of the *Amber Resources* litigation in the United States Court of Federal Claims or, in the alternative, seeks to initiate a three-month administrative process that would eventually lead to a proposed timeline for completion of CZMA consistency process required by the Court.

## II. The Government Is Responsible For The "Abrupt Termination" Of The Settlement Process.

In its May 15, 2003 filing, DOI informed the Court that obtaining "'a negotiated settlement with the [Lessees] in the *Amber Resources* case is of a higher priority' than obtaining a consistency determination." December 9, 2003 order at p.10 (quoting Fed. Def. Memo p. 14). Accordingly, in addition to ordering DOI to provide the time necessary for a consistency

determination, this Court invited DOI to provide information about the "settlement discussions" to which it had referred. DOI has responded by accusing the Lessees of "abruptly terminating" those discussions. In fact, the Government has shown that its "priority" regarding settlement is no higher than its compliance with this Court's orders.

By March 2003, the Lessees had provided the Government, through discovery in the *Amber Resources* case, most of the information DOI had requested so that it could make a settlement offer.[1] None had been forthcoming as of the Court's December 9, 2003 order, even though the Government had indicated to the Lessees that its analysis of their data would be completed by September 2003. On December 15, 2003, six days after the December 9 order, the Department of Justice ("DOJ") "invited" the Lessees to submit a settlement proposal. On December 17, the Lessees responded by documenting the clear understanding that the Government would present a settlement position to the Lessees after an analysis of their data. Finally, on December 22, DOJ presented the Lessees with "guidance" as to the amount of the "offer" by the Lessees that it "would be willing to entertain." (*See* Bruce Feb. 5, 2004 Decl. ¶¶ 3-4).

The Lessees replied to DOJ on January 8, 2004. Their four-page, single-spaced letter demonstrated that the "guidance" was "so far below any reasonable evaluation of the value of the Lessees' claims that it marks the end, not the beginning, of settlement negotiations at this time" and that "Judge Wilken should promptly be so advised." This conclusion was based on a detailed comparison of the amounts (in relationship to the bonus monies paid for the disputed leases) that the Government had paid to settle similar claims by OCS lessees in regions other than California – Florida (Pully Ridge in 1995; Destin Dome in 2002); Alaska (1995); and North Carolina (1996). This compelled the Lessees to conclude that "the Government is not prepared at this time to engage in good-faith discussions." (*See* Bruce Feb. 5, 2004 Decl. ¶ 5).

---

[1] The Lessees provided the Government with limited supplemental information in June 2003 and September 2003.

The Government's approach to settlement has been just like its approach to compliance with this Court's June 20, 2001 decision – delay, and then, when confronted with the need to make a filing in this Court, dissemble.

## III. The Government's Stay Request Is A Further Example Of Its Delay Strategy.

As the Government knows, the stay it requests could last many years. For example, the breach of contract suit concerning OCS leases offshore North Carolina was filed in May 1992 and was not finally resolved until February 2001. *See Marathon Oil Co. v. United States*, 236 F.3d 1313 (Fed. Cir. 2000), *rehearing denied* (Feb. 16, 2001). And even as to the claims that were settled in 1996, there was a four-year delay. The *Amber Resources* litigation could well take even longer. For example, the Government promptly answered the complaints in the North Carolina case. By contrast, in *Amber*, although the Lessees filed suit more than two years ago, the United States has not yet filed an answer.

The Government's stay request in this Court is by now a familiar tactic in this litigation. First, it obtained a stay in the *Amber Resources* case based on the pendency of the appeal of *this case*, which was decided by the Ninth Circuit. Now, confronted with this Court's December 9, 2003 order, the Government argues that this action should be stayed pending the outcome of the *Amber Resources* case.

Showing the lengths to which the Government will go to avoid preparing the consistency determinations ordered by this Court, it attempts to justify its stay request by misrepresenting that the Lessees in *Amber Resources* claim in that action that the "leases no longer exist." Gov't Supp. Mem. at 6. The Lessees assert no such thing. They allege that the United States is in material breach, and seek relief that the Leases be rescinded, and the United States provide

restitution to the Lessees.[2] The United States, as the DOI concedes, takes the position that the Leases do exist and has moved to dismiss the Lessees' suit. *See* Gov't Supp. Mem. at 6.

**IV. The Government's Proposal to "Restart" The Suspension Request Process Is Yet Another Example Of Its Delay Strategy.**

Based on its own delay in complying with the Court's June 20, 2001 order, the Government claims, it must re-"adjudicate" whether the Lessees are entitled to suspensions before engaging in the CZMA § 307(c)(1) process ordered by the Court. Gov't Supp. Mem. at 9. The Government's argument is untenable.

As an initial matter, the Government's decision to appeal this Court's decision cannot excuse its failure to comply immediately with the this Court's June 20, 2001 decision. As the Lessees explained in their July 3, 2003 response to the Government's motion to dismiss (p. 3), the DOI in virtually identical circumstances prepared a conditional consistency determination for OCS leases while *it successfully* appealed the application of the CZMA to the issuance of those leases. *See Clark v. California*, 464 U.S. 1065 (1983) (Rehnquist, J. in chambers); *Secretary of the Interior v. California*, 464 U.S. 312 (1984). Thus, just as DOI first planned in July 2001, it should have prepared the consistency determinations for the Leases as ordered by this Court, while simultaneously appealing its obligation to do so.

Moreover, the Government's alleged reason for a restart is contrived. DOI previously determined, based on the resource potential of the leased tracts[3] – the only basis for "adjudicating" the suspensions, in addition to the Lessees' proposed activities – that the Lessees were entitled to the November 1999 suspensions. Neither has changed since the Lessees' original suspension requests.

---

[2] The Government also mischaracterizes the Lessees' claims, asserting the Lessees have alleged material breach and an alternative theory of partial breach based on the Government's delay. *See* Gov't Supp. Mem. at 6. That is not correct. The Lessees allege that the Government materially breached the Leases and seek alternative remedies for such breach.

[3] Suspensions were denied for four tracts on this basis. *See* Gov't Supp. Mem., p. 4.

The Court ordered DOI to issue a CZMA § 307(c)(1) determinations for those previously issued suspensions. *See California v. Norton*, 150 F. Supp.2d at 1057 (ordering the Government to "provide the State of California with a determination that its grant of the *lease suspensions at issue here* [i.e., the November 1999 suspensions] is consistent with California's coastal management program.") (emphasis added). The Lessees believed that it was the intent of the Court for DOI to conduct immediately the consistency determinations. If the November 1999 suspensions were consistent with the California CZMA coastal program and the State of California did not successfully challenge that determination, the November 1999 suspensions would be reinstated *nunc pro tunc*, restoring to the Lessees the time remaining on the November 1999 leases suspensions.[4]

The Government's own conduct immediately after the Court's June 20, 2001 decision shows that it held the same view. At that time, approximately two years after the Lessees had submitted their original suspension requests, DOI clearly intended to issue consistency determinations in a few months. *See* p. 2, *supra*, discussing DOI's July 16, 2001 letter contemplating a consistency determination. DOI also informed the California Coastal Commission on July 5, 2001 that, "in compliance with the court order," it was "in the process of preparing consistency determinations ('CDs') to be submitted to the Coastal Commission." (Exh. 2 to Readinger Decl.). However, over the Lessees' objections, DOI abruptly reversed course, informing the Lessees that it was "working to determine the course of action which will best serve all constituents, including the lessees, the States and the public." (*See* Exh. 3 to Bruce July 3, 2003 Decl.). Although DOI provided the Lessees with the opportunity to "update" their previous requests "if necessary," it never suggested that such an "update" was

---

[4] The Government misleadingly implies that one or more of the November 1999 suspensions may have lapsed before the Court's June 20, 2001 order. Gov't Supp. Mem. at 11. That is not the case. The initial suspension for the Rocky Point Unit was until June 1, 2001. However, DOI subsequently extended that suspension until June 30, 2002. Thus, the suspension had nine months remaining at the time it was set aside pursuant to this Court's order. There were between seven and 22 months remaining on the suspensions for the other units.

required nor that DOI could not act without further information. (*See* Exh. 1 to Readinger Decl.). Now, for the first time since this Court's June 2001 decision, DOI has announced such a requirement when faced with the need to finally prepare consistency determinations.

DOI's suggestion that it must re-start the suspension approval process because it is not aware of what activities the Lessees have conducted on the Leases is nonsense. As DOI concedes, the Lessees provided DOI with quarterly reports detailing precisely what activities they were undertaking prior to the Court-ordered directed suspension.. (Readinger Decl. ¶ 3). Of course, the Lessees have been prevented from conducting any additional operations since the imposition of the directed suspension. DOI therefore knows which milestone activities have been completed and which were not, as well as the timeframe for the suspensions that remained after this Court's June 20, 2001 decision.

## IV. Conclusion

The Lessees' position recited to DOI since July 2001 and to this Court thereafter has always been the same: DOI should have expeditiously issued its Section 307(c)(1) determination upon the Court's June 2001 decision.

DATED: February 5, 2004

COVINGTON & BURLING

By: [signature]
DAVID M. JOLLEY
Attorneys for Aera Energy LLC,
Nuevo Energy Company,
Poseidon Petroleum LLC and
Samedan Oil Corporation

**CASE NAME: STATE OF CALIFORNIA, et al. v. GALE NORTON, et al**
**CASE NUMBER: C 99-4964 CW**

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA, CITY AND COUNTY OF SAN FRANCISCO

I am a citizen of the United States. My business address is One Front Street, San Francisco, California 94111. I am employed in the City and County of San Francisco where this service takes place. I am over the age of 18 years, and not a party to the within cause. I am readily familiar with my employer's normal business practice for collection and processing of correspondence for mailing with the U.S. Postal Service. On the date set forth below, I served the foregoing document(s) described as:

- **OPERATOR INTERVENORS' RESPONSE TO FEDERAL GOVERNMENT DEFENDANTS' SUPPLEMENTAL BRIEF;**
- **DECLARATION OF E. EDWARD BRUCE**

on the following person(s) in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Jamee Jordan Patterson, Esq.
Attorney General's Office
110 West A Street
Suite 1100
San Diego, CA 92101

James A. Coda
Assistant United States Attorney
450 Golden Gate Avenue
Box 36055
San Francisco, CA 94102

Andrew P. Caputo
Natural Resources Defense Council
71 Stevenson Street
Suite 1825
San Francisco, CA 94105

Edward S. Gelderman
U.S. Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663

Linda Krop
Environmental Defense Center
906 Garden Street
Suite 2
Santa Barbara, CA 93101

William M. Dillon
County Counsel's Office
105 E. Anapamu St.
Suite 201
Santa Barbara, CA 93101

Timothy McNulty
County Counsel's Office
County Government Center
Room 386
San Luis Obispo, CA 93408

[X] (BY MAIL) I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at San Francisco, California

[ ] (BY FACSIMILE) the documents listed above to the fax numbers set forth above on this date before 5 p.m.

[ ] (BY PERSONAL SERVICE) I caused such envelope(s) to be delivered by hand this date to the offices of the addressee(s).

[X] (FEDERAL) I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 5, 2004, at San Francisco, California.

Devine General

DEVINE GENERAL

Sonya D. Winner, SBN 200348
David M. Jolley, SBN 191164
COVINGTON & BURLING
601 California Street, 19th Floor
San Francisco, CA 94108
Telephone: (415) 591-6000
Fax: (415) 591-6091

E. Edward Bruce
Steven J. Rosenbaum
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, D.C. 20004-2401
Telephone: (202) 662-6000
Fax: (202) 662-6291

Attorneys for Aera Energy LLC, Conoco Inc., Nuevo Energy Company, Poseidon Petroleum LLC and Samedan Oil Corporation

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

STATE OF CALIFORNIA, *et. al.*,

Plaintiffs,

v.

GALE NORTON, Secretary of Interior, *et al.*,

Defendants.

Case No.: No. C 99-4964 CW

**DECLARATION OF E. EDWARD BRUCE**

I, E. Edward Bruce, do hereby declare and say:

1. I serve as counsel to Operator Intervenors Aera Energy LLC, Nuevo Energy Company, Poseidon Petroleum LLC, and Samedan Oil Corporation in the instant lawsuit. I make this declaration in support of Operator Intervenors' Response to Defendants' Supplemental Brief of January 22, 2004.

2. In January 2002, the above-listed Operator Intervenors and others (collectively, the "Lessees") filed suit against the United States alleging material breach of forty Outer Continental Shelf leases (the "Leases") located offshore California. *Amber Resources v. United States*, No. 02-30C (Ct. Fed. Cl. 2002).

3. By March 2003, the Lessees had provided the government, through discovery in the *Amber Resources* case, most of the information DOI had initially requested so that it could make a settlement offer. The Lessees provided the government with supplemental information in June 2003 and September 2003.

4. On December 15, 2003, DOJ "invited" the Lessees to submit a settlement proposal. On December 17, the Lessees responded by documenting the understanding that the government would present a settlement position to the Lessees after an analysis of their data. On December 22, 2003, DOJ presented the Lessees with "guidance" as to the amount of the "offer" by the Lessees that it "would be willing to entertain."

5. On January 8, 2004, the Lessees replied in a four-page, single-spaced letter demonstrating that DOJ's "guidance" was "so far below any reasonable evaluation of the value of the Lessees' claims that it marks the end, not the beginning, of settlement negotiations at this time" and that "Judge Wilken should promptly be so advised." This conclusion was based on a comparison of the amounts (in relationship to the bonus monies paid for the disputed leases) that the government had paid to settle similar claims by OCS lessees in regions other than California – Florida (Pully Ridge in 1995; Destin Dome in 2002); Alaska (1995); and North Carolina (1996). The Lessees accordingly informed DOJ that they had concluded that "the government is not prepared at this time to engage in good-faith discussions."

6. Exhibit 1 hereto is a true and correct copy of the August 1, 2001 letter from Ronald G. Heck, Samedan Oil Corporation, to Maher Ibrahim, Minerals Management Service.

7. Exhibit 2 hereto is a true and correct copy of the September 21, 2001 letter from E. Edward Bruce to Thomas R. Kitsos, Acting Director, Minerals Management Service.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of February, 2004.

E. Edward Bruce

# EXHIBIT 1

SAMEDAN OIL CORPORATION
1224 Coast Village Circle, Suite 36
Santa Barbara, California 93108-3788
(805) 565-2234 FAX (805) 565-2236

August 1, 2001

VIA FACSIMILE AND MAIL

Mr. Maher Ibrahim
Regional Supervisor
Office of Production, Development
and Resource Evaluation
Minerals Management Service
Pacific OCS Region
770 Paseo Camarillo
Camarillo, CA 93010-6064

Re: MMS July 16, 2001 Letter Request to Update the Suspension Request for the Sword Unit

Dear Mr. Ibrahim:

This letter responds to your letter of July 16, 2001 offering Samedan the opportunity to update its May 1999 suspension request for the Sword Unit leases, in light of the district court's order in California v. Norton (No. C 99-4964 CW). Without waiving any rights entailed in the further delay on the schedule of work included in our suspension requests caused by the Court's order and MMS' response thereto, Samedan notes that the timetables originally included in the grants of suspensions will have to be tolled during the consistency review process. In addition, Samedan has previously described the scope and timing of activities prerequisite to planned delineation drilling from Platform Hermosa in correspondence to MMS and in the quarterly reports filed since January 2000, including without limitation our April 13, 2001 quarterly report and your letter to Ronald G. Heck of the same date. Those documents may provide information useful to your work. Finally, MMS is aware that the any new deadline must also reflect the time necessary for permitting and final operational and logistical planning for delineation drilling, including securing a platform rig and coordination with other planned uses of required platform facilities.

Sincerely,

SAMEDAN OIL CORPORATION

By: Ronald G. Heck
Ronald G. Heck
Attorney-in-Fact

cc: Mr. J. M. Ables, Houston
Sword Unit Partners

# EXHIBIT 2

COVINGTON & BURLING

1201 PENNSYLVANIA AVENUE NW
WASHINGTON, DC [illegible]
TEL [illegible]
FAX [illegible]
WWW.COV.COM

WASHINGTON
NEW YORK
SAN FRANCISCO
LONDON
BRUSSELS

E. EDWARD BRUCE
TEL [illegible]
FAX [illegible]
EBRUCE@COV.COM

September 21, 2001

Mr. Thomas R. Kitsos
Acting Director
United States Department of the Interior
Minerals Management Service
Washington, D.C. 20240

Re: Suspension Requests for Undeveloped Pacific OCS Leases

Dear Mr. Kitsos:

This responds to your letter of September 17, 2001, reporting that MMS has "not made a final decision" regarding its submission of a CZMA determination in the aftermath of Judge Wilken's decision in CCC v. Babbitt.

As indicated in our August 31 letter, to which you were responding, the clients we represent are "very concerned about, and adamantly opposed to, the considerable additional delay that would result if MMS postpones the issuance of the c(1) determination." Your statement that no final decision has yet been made and that "[o]ur attorneys are working to determine the course of action which will best serve all constituents ... and the public," does nothing to lessen our concern and opposition. It is our view that Judge Wilken's decision leaves MMS no choice but to *promptly* file a CZMA determination. The issue, therefore, is not what course "will best serve all constituents," but is instead what course of action MMS must take.

We would appreciate a prompt response to this letter with an indication whether MMS is going to file a CZMA determination and, if so, when it intends to do so.

Sincerely yours,

E. Edward Bruce
Steven J. Rosenbaum