# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

| | |
|---|---|
| AMBER RESOURCES COMPANY,<br>*et al.*, | |
| *Plaintiffs,*<br><br>v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| **************************************** | |
| ANADARKO E & P COMPANY L.P.,<br>*et. al.*, | |
| *Plaintiffs,*<br>v. | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| **************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| **************************************** | |

**PLAINTIFFS' OPPOSITION TO THE GOVERNMENT'S MOTION TO MODIFY THE DISCOVERY SCHEDULING ORDER**

The Government has failed to show good cause to extend the August 31, 2006 discovery cutoff that has been in place since January 20, 2006. This is true for three reasons:

*First*, despite the vague references to further discovery that it purportedly still needs to take on sunk costs, *all* of the document discovery that the Government has actually sought will be complete by August 31 and *all* of the depositions that the Government is seeking will be finished, with one exception. That exception, addressed in a concurrently filed motion to quash, involves the Government's attempt to depose 87 year-old Burdette Ogle, despite written warnings from his doctor that doing so would be deleterious to his health and well being.

*Second*, the only specific issues that the Government identifies as requiring further discovery, regarding the Rocky Point Unit and Cavern Point Unit leases, are absolute red herrings that warrant no extension whatsoever.

*Third*, as the Court has already noted, "[f]or over two decades, the government has enjoyed the interest-free use of more than $1 billion in bonus payments for leases that it has now repudiated." *Amber Resources Co. v. United States*, 68 Fed.Cl. 535, 560 n. 47 (2005). Where, as here, the Lessees have diligently responded to the Government's discovery, there is no legitimate basis for extending the discovery period and thus extending the Lessees' involuntary interest-free loan to the Government.

## I. The Lessees Have Fully Responded to the Government's Legitimate Discovery.

### A. The Government's Document Requests.

While the Government wields strong words about alleged discovery misconduct, the simple facts tell an entirely different story. With respect to document discovery, on February 10, 2006, the Government served its first document requests following the January 20, 2006 status conference. As the Lessees were collecting documents, the Government served another

document request on March 17, 2006, causing several of the ongoing document searches to begin anew. After the Lessees timely served their objections and responses, over 33,000 pages of responsive documents were made available to the Government on April 25, 2006, a mere 39 days after the Government's March 17, 2006 document requests.

Since then, as reflected in the Government's timeline on pages 3 and 4 of its motion, the Lessees have produced a trickle of additional pages as further documents have become available.[1] The Government's claim that "belated (and continuing)" document productions have "created a situation where the Government cannot possibly conclude or obtain reasonable discovery before the current discovery deadline" (Gov't Br. 6) is a complete exaggeration.

Perhaps the most egregious example is the June 26, 2006 timeline entry regarding the production of "Unit Operating Agreements," which as the names suggests, are agreements that govern the operation of OCS units.[2] Even though these documents had never been requested by a formal Government document request,[3] the Lessees produced them in response to a letter request, in order to avoid further unnecessary dispute. But that is not to say that these documents were new to the Government in June 2006. The Government has possessed these agreements in its *own files* for twenty years, ever since the units themselves were created in the mid to late

---

1 The Government fails to mention that some of these pages, such as the 65 pages produced on June 13, 2006, were replacement computer records that were being reproduced to correct clerical errors during their original preparation.

2 The Government's brief mistakenly calls these "Unit Agreements," which are related but different documents.

3 The Government served a document request seeking "any and all documents . . . that pertain to any cost or expense for which [Lessees] seek recovery." In the spirit of cooperation and to alleviate further dispute, the Lessees agreed to produce the unit operating agreements despite their view that these agreements were not conceivably responsive to that request or any other.

1980s. (Heck Decl. ¶¶ 2 - 4).[4] MMS regulations *require* OCS lessees to enter into unit operating agreements when a unit is formed and to *provide copies of those agreements to MMS*. *See* 30 C.F.R. § 250.1301(e).[5] Thus, the only thing new about the unit operating agreements produced by the Lessees on June 26, 2006, were the Bates stamps the Lessees placed thereon. If the Government failed to consult its own files for these documents and thus never knew "how expenditures are to be approved and paid for the units, how costs are to be allocated among owners, and what accounting/auditing procedures are to be used by the unit operators" (Gov't Br. 4), the Lessees should not be made to suffer for it.[6]

The Lessees' productions in response to the Government's January and March document requests are finished, although any newly discovered documents will naturally be turned over. The only ongoing search is for documents responsive to the Government's latest document requests served on July 7, 2006, responses and objections to which are not due until August 9, 2006. These documents too will be produced well in advance of the discovery cutoff.

---

4 *See* Fifth Supplemental Declaration of Ronald G. Heck, dated August 4, 2006 ("Heck Decl.").

5 Correspondence from the MMS during the 1980's demonstrates this point. *See e.g.* July 17, 1987 letter from MMS Regional Direct William E. Grant regarding the Proposed Gato Canyon Unit (Cosgrove Decl. Exh. 6) (conditioning approval of the Gato Canyon Unit upon receipt of fully executed copies of, *inter alia*, the unit operating agreement); June 11, 1986 letter from MMS Regional Direct William E. Grant regarding the approval of the Santa Maria Unit (Cosgrove Decl. Exh. 7) (noting prior submission of the unit operating agreement).

6 This is not to suggest that the cost sharing provisions of the unit operating agreements are of any relevance to the case, *see* pp. 8 - 9 *infra*.

**B. The Government's Depositions.**

Like the document discovery discussed above, all but one of the depositions that the Government has requested will be completed by the end of August; the only exception being the deposition of Burdette Ogle, whose subpoena Dr. Ogle is moving to quash.[7]

More than four years after the beginning of this case, 5 months after the January 20, 2006 status conference at which the August 31, 2006 discovery cutoff was set, and two months after the Lessees had made their document production, the Government in a June 23, 2006 letter first gave notice that it intended to depose seven individual witnesses and also serve Rule 30(b)(6) notices on three lessees "on cost matters related to operatorship" of the lawsuit units. The Government stated an intent to complete all of these depositions by the first week of August. *See* June 23, 2006 letter from Mr. Schwind to Mr. Rosenbaum (Cosgrove Decl., Exh. 1) at 2.[8]

Taking the Government at its word that the depositions must be concluded by the end of the first week of August and recognizing that such a feat would require some double tracking, the Lessees on July 6, 2006 responded to the Government's letter with a proposed schedule. *See* July 6, 2006 email from Mr. Cosgrove to Mr. Schwind (Cosgrove Decl., Exh. 2).

---

7 With respect to the deposition of Mr. Ronald Heck, by Government misleads the Court by failing to provide any context whatsoever to its statement that the Lessees "refused" to make Mr. Heck available for deposition. (Gov't Br. 5). To the contrary, the Lessees made clear to the Government that they intend to offer an expert report from Mr. Heck, and that he would be made available for deposition at that time as to both fact and expert-related issues. When the Government asserted the need to depose Mr. Heck during the period for fact discovery, the Lessees asked the Government why it should be permitted to take Mr. Heck's deposition twice (once during fact discovery and later during expert discovery), and why Mr. Heck should be subjected to such a burden. *See e.g.* July 7, 2006 letter from Mr. Cosgrove to Mr. Schwind (Cosgrove Decl., Exh. 4) at 2. The Government never responded to these inquires. Nevertheless, to eliminate any possible source of dispute, Mr. Heck has agreed to be deposed on August 25, 2006.

8 *See* Declaration of Thomas J. Cosgrove, dated August 7, 2006 ("Cosgrove Decl.").

The next day, accusing the Lessees of attempting double tracking as a "tactic to hinder the taking of testimony and obstruct discovery," the Government rejected this proposal and submitted a counterproposal that included four depositions scheduled for the week of July 24 and two during the *last* week of August (a week previously not identified by the Government as being available for scheduling). *See* July 7, 2006 letter from Mr. Schwind to Mr. Rosenbaum (Cosgrove Decl., Exh. 3) at 2. Building on the Government's own new schedule and considering witness availability, the Lessees submitted a counterproposal on July 11, which proposed, *inter alia*, four depositions during the week of August 1. *See* July 11, 2006 letter from Mr. Cosgrove to Mr. Schwind (Cosgrove Decl., Exh. 4) at 2. But this proposal was rejected by the Government in part because deposing four witnesses during a single week had, for reasons unknown, suddenly become unworkable for the Government. (Govt. Br. 5).

The Lessees nonetheless persevered, but with a full schedule nearly agreed upon, their receipt on July 11, 2006, of the Government's first 30(b)(6) deposition notice sent the Lessees back to the drawing board. Instead of the one subject that the Government in its June 23, 2006 letter had indicated would be covered by the Rule 30(b)(6) notices -- "cost matters related to operatorship" of the units -- the notice covered multiple subjects, including "the origin of all documents" produced in discovery; "the circumstances under which [the lessee] became the operator" of various units; the "contents and terms of all unit agreements and understandings related to the operatorship" of the units; and the "contents and terms of all agreements and understandings among two or more owners of lease interests" of the units. *See* July 11, 2006 Notice of Rule 30(b)(6) Deposition served by the Government on Aera Energy (Cosgrove Decl., Exh. 5) at 2.

These subjects went far beyond that identified in the Government's June 23, 2006 letter. Moreover, with no single witness able to address these subjects for a given lessee, the Lessees have been required to proffer multiple Rule 30(b)(6) witnesses during the few remaining weeks of discovery. Yet this considerable effort to comply with the Government's Rule 30(b)(6) notices has somehow been derided by the Government as an effort to obstruct discovery. (Gov't Br. 6).

Despite the complications imposed by the Government's own delay and the shifting sands of its Rule 30(b)(6) notices, all of the depositions the Government has sought, except for Dr. Ogle's, have now been scheduled, and the Government's wish list of witnesses will be crossed off by the current discovery cutoff.[9] While the Government appears to be holding out the possibility of identifying further witness for deposition, it does not identify any specific need for such depositions.

---

9 Several of the subjects contained in the Government's 30(b)(6) notices relate to the calculation of the Lessees' damages. Because the damages of all eleven Lessees have been jointly calculated by the Lessees' experts, Ernst and Young, based on accounting records of both the lessees and their predecessors, the Lessees have designated Mr. Doug Tymkiw of Ernst and Young as their 30(b)(6) witness with respect to these topics, and he will be available for deposition during the expert phase of discovery. See, e.g., Nat'l Fire Prot. Ass'n, Inc. v. Int'l. Code Council, Inc., No. Civ. A.03-10848 DPW, 2006 WL 839501, at *27 (D. Mass. Mar. 29, 2006) (accepting plaintiff's assertion that it could designate an expert to testify to 30(b)(6) issue involving calculation of damages); Omegaflex, Inc. v. Parker Hannifin Corp., 425 F. Supp.2d 171, 185 (D. Mass. 2006) (defendant allowed to respond to plaintiff's Rule 30(b)(6) deposition notice by directing plaintiff to its expert witness); Cummings v. General Motors Corp., No. Civ. 00-1562-W, 2002 WL 32713320, at *2 (W.D. Okla. June 18, 2002) (defendant designated as Rule 30(b)(6) witness an expert who was also scheduled to testify at trial); Baxter Int'l., Inc. v. McGaw, Inc., No. 95 C 2723, 1998 WL 102668, at *8 (N.D. Ill. Mar. 3, 1998) (plaintiff allowed to designate expert as 30(b)(6) witness).

### C. The Ongoing Discovery into the OCS-P 0452 Drainage Issues Has Not Prevented the Completion of the Government's Sunk Costs Discovery.

The Government devotes considerable attention to the Lease OCS-P 0452 drainage issue, asserting that separate discovery as to this issue (which the Government triggered by its motion for reconsideration as to that lease) has interfered with its discovery into the quantification of the Lessees' sunk costs. But in allowing the drainage-related discovery to proceed at the Government's behest, the Court explicitly noted that such discovery should not be allowed to "slow down the rest of the lawsuit." (March 30, 2006 Hearing Tr., page 29 lines 10 - 11). Furthermore, the Lessees have taken only three depositions on the drainage issue,[10] all of which were completed on two back-to-back days in a single location. The Government's complaints about that discovery are baseless.[11] Furthermore, regardless of the Government's characterizations of the drainage-related discovery, as discussed above, the Government's pending sunk cost discovery will be completed prior to the discovery cutoff.

[10] The Lessees will also be deposing the Government's expert on the drainage issue.

[11] The Lessees strongly dispute the Government's characterization of their Lease 0452 drainage discovery. (Gov't Br. 6 - 8). The Lessees deposed: (a) Drew Mayerson, the declarant in support of the Government's motion for reconsideration; (b) Armen Voskanian, the MMS employee who actually performed the drainage estimates that were incorporated into Mr. Mayerson's sworn declaration (who testified at deposition that the drainage estimate upon which the Government relied in its reconsideration motion was an entirely undocumented "rough guesstimate," performed on a handheld calculator and based on inputs none of which he could recall); and (c) Dr. Lisle Reed, the former Regional Director of the Minerals Management Service for the Pacific OCS Region (who testified that the development of the eastern half of Lease 0451 that has purportedly resulted in drainage from Lawsuit Lease 0452 was a "very positive . . . very good thing" for all parties involved, including the U.S. Government). While the Government (somewhat curiously) complains that these depositions were too short in duration (*id.*), the Lessees were satisfied that their questioning had thoroughly plumbed the relevant knowledge of all three witnesses.

## II. There is No Need for Further Discovery Into the Issues Identified by the Government Relating to the Rocky Point and Cavern Point Units.

The only specific additional discovery that the Government identifies cannot withstand scrutiny.

1. The Government claims that it "recently discovered" (despite the fact that the information was contained in MMS files) that in 1995 and 1996, four of the original Rocky Point Unit leases were relinquished and extinguished, and that based on its "preliminary examination of the [1985] Rocky Point Unit Operating Agreement" ("RPUOA") (which was also irrefutably in MMS's files since 1985), it believes that some of the costs relating to the five exploratory wells drilled on Lawsuit Lease OCS-P 452 (which is part of the Rocky Point Unit) would have been allocated to the relinquished leases under the terms of the RPUOA and are therefore not appropriately recoverable by the Lessees. (Gov't Br. 8 - 9).

But as the Government well knows, all five Lease OCS-P 452 exploratory wells were drilled in 1983, years before the Rocky Point Unit was created and the RPUOA entered. (Heck Decl. ¶¶ 5 - 8). Thus, none of the costs of those five wells could have been allocated to other leases (including the four relinquished leases) under the RPUOA, because it did not yet exist. (*Id.*) No discovery is required on this issue, much less discovery that would vitiate the existing discovery cutoff date.

2. Lawsuit Leases OCS-P 0210 and 0527 were originally part of the producing Santa Clara Unit, but were contracted out in 1990 and formed into the Cavern Point Unit. According to the Government, "[a]lthough no production wells were drilled on Leases OCS-P 0210 and 0527, the Santa Clara Unit has been producing oil and gas since July 1980 via three platforms. Additional discovery is necessary to determine whether the prior owners of Leases

OCS-P 0210 and 0527 received payment for oil and gas prior to 1990 when the leases were part of the Santa Clara Unit." (Gov't Br. 9).

But Leases OCS-P 0210 and 0527 were contracted out of the Santa Clara Unit and formed into the Cavern Point Unit for the very reason that they were never part of a "Participating Area" in the Santa Clara Unit, meaning that the owners of those two leases were not entitled to share in any of the revenues from the Santa Clara Unit production. (Heck Decl. ¶¶ 10 - 11). The irrefutable proof comes from a document that would be found in MMS's own files, a May 22, 1990 letter from Chevron to the MMS indicating that Leases 0210 and 0527 had never been "included in a Participating Area." (*Id.* ¶ 12).

3. Finally, the Government claims that it "recently determined that oil and gas were in fact produced from units which contained lawsuit leases, creating the very real possibility that plaintiffs or their predecessors received payment for oil and gas as a result of their lease ownership." (Gov't Br. 9). The Government references "a *modest* amount of oil and gas was produced from the Rocky Point Unit in the early 1990's via a neighboring platform in the Point Arguello Unit." (*Id.*) The Government is in fact referencing "modest" production from an exploratory well drilled from Platform Hermosa in 1988 onto Lease OCS-P 0451, *a non lawsuit lease as to which the Lessees have asserted no claims, including the costs of this exploratory well*. (Heck Decl. ¶¶ 10 - 11).

Thus, none of these "newly discovered" issues into which the Government now seeks discovery raise colorable issues in this case, much less could justify any expansion of the discovery period.

## III. The Lessees Would be Substantially Prejudiced by an Extension.

The Lessees' claims are not interest bearing, and they incur a substantial loss every day that passes. The Court in its November 2005 decision noted the interest-free loan of

over one billion dollars that the Government has been enjoying for over 20 years. 68 Fed.Cl. at 560 n. 47. Considering only the amount already awarded for lease bonuses and assuming an interest rate of 8%, the Lessees would lose $14.7 million during the Government's proposed two month extension. Including the Lessees' sunk costs claim raises the loss significantly. And while the Government blithely suggests that its proposed extension would have but a "minimal effect" on the trial date (Gov't Br. 8), it is hard to imagine how "minimal" could mean anything less than two months.

**CONCLUSION**

The Government's motion to extend the discovery cutoff should be denied.

Respectfully submitted,

s/ Steven J. Rosenbaum
by s/ Thomas J. Cosgrove
E. Edward Bruce
Steven J. Rosenbaum
*Counsel of Record*
Thomas J. Cosgrove
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-5568
Facsimile: (202) 778-5568
Attorneys for All Plaintiffs in Nos. 02-30C and 04-1822C

August 7, 2006