# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

******************************************

| | |
|---|---|
| AMBER RESOURCES COMPANY, *et al.*, | |
| *Plaintiffs,* v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ****************************************** | |
| ANADARKO E & P COMPANY L.P., *et. al.*, | |
| *Plaintiffs,* v. | |
| | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ****************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| ****************************************** | |

**FIFTH SUPPLEMENTAL DECLARATION OF RONALD G. HECK**

Ronald G. Heck declares and states as follows:

1. I provide this fifth supplemental declaration, in support of Plaintiffs' July 20, 2006 Opposition to the Government's Motion to Modify the Scheduling Order. My background was set forth in the August 27, 2004 declaration I previously submitted in support of Plaintiffs' first motion for partial summary judgment.

2. I am personally familiar with the process by which individual OCS leases are joined together into units. Federal regulations require that lessees forming a unit enter into both a "unit agreement" and a "unit operating agreement." Unit operating agreements are agreements between working interest owners of unitized leases that typically address, among other things, the apportionment of costs incurred by the unit operator and the determination of production participating areas.

3. OCS lessees are required by MMS regulation to provide copies of their unit operating agreements to the Minerals Management Service. It is accordingly standard operating procedure for Pacific OCS lessees to deliver complete executed copies of unit operating agreements to the Minerals Management Service.

4. I have personally been involved with forming or maintaining six Pacific OCS units, and am familiar with the operating agreements for each such unit. In each and every case, to the best of my knowledge and in compliance with the regulations, a complete copy of the executed unit operating agreement, with attachments, was in fact delivered to the Minerals Management Service.

5. The Rocky Point Unit was formed in February, 1985. The Rocky Point Unit Operating Agreement ("RPUOA") was entered into by the owners of the Rocky Point Unit leases that same month. While the RPUOA contains certain cost-sharing provisions that

allocate certain *future* costs among the Rocky Point Unit leases, costs incurred before the RPUOA was entered into are not subject to the terms of the RPUOA.

6. The Rocky Point Unit as formed contained all or part of seven leases: the SE/4 of Lease OCS-P 0447; Lease OCS-P 0448; the E/2 of Lease OCS-P 0451; Lease OCS-P 0452; Lease OCS-P 0453; Lease OCS-P 0317; and Lease OCS-P 0318. Leases OCS-P 0317, 0318, 0447, and 0448 were later relinquished to the Government. The E/2 of Lease OCS-P 0451 was later removed from the Rocky Point Unit but not relinquished.

7. Five exploratory wells were drilled on Lease OCS-P 0452. All of these wells were drilled in 1983. Because these wells were drilled prior to the formation of the Rocky Point Unit in 1985, their costs were not subject to the RPUOA.

8. Three exploratory wells (317 #1, 318 #1, and 318 #2) were drilled prior to 1985 on the Rocky Point leases that were later relinquished. Because these three wells were drilled prior to formation of the Rocky Point Unit, their costs were not subject to the RPUOA. None of the costs of these wells are being claimed in this litigation.

9. I have reviewed the Government's Motion to Modify Discovery Scheduling Order, and am familiar with the Government's representation that "a modest amount of oil and gas was produced from the Rocky Point Unit in the early 1990s via a neighboring platform in the Point Arguello Unit." Based on personal knowledge of the drilling activities in that area, the Government is referring to the B-7 exploratory well drilled from Platform Hermosa in 1988. This well was drilled into and completed entirely on Lease OCS-P 0451, tested during the early 1990s, but never put into full production. Lease 0451 is a non lawsuit lease, and the Lessees in this case have asserted no claims with respect to the bonuses paid for this lease or the wells drilled thereon, including the B-7 well.

10. The Cavern Point Unit is comprised of Leases OCS-P 0210 and 0527. These two leases were originally contained within the larger, producing Santa Clara Unit. No oil or gas was ever produced from Leases OCS-P 0210 or 0527, and those leases were never part of a "participating area" within the Santa Clara Unit. A participating area in a unit is determined by the unit owners in accordance with the unit operating agreement and submitted to MMS for approval. It is generally defined as an area that will produce hydrocarbons in paying quantities. If a lease is not part of a participating area within a unit, the owners of that lease are not entitled to share in revenues from production on the unit.

11. Because Leases OCS-P 0210 and 0527 were not included in a participating area of the Santa Clara Unit, they did not share in the revenues from production on that Unit. Because a geological prospect had been mapped on Leases 0210 and 0527, separate from the prospect underlying the participating areas in the Santa Clara Unit, Leases 0210 and 0527 were to be contracted out of the Santa Clara Unit in 1990, and formed into the smaller adjoining unit, the Cavern Point Unit.

12. Attached hereto as Exhibit 129 is a true and correct copy of a May 22, 1990 letter from J.W. Seymour of Chevron to Dr. J. Lisle Reed of the Minerals Management Service. This letter states that Leases OCS-P 0210 and 0527 were being contracted out of the Santa Clara Unit because they had not been included in a participating area of that unit. The letter proposes that Leases 0210 and 0527 be formed into a new unit, the new Cavern Point Unit, a request the Minerals Management Service subsequently approved.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 4, 2006

Ronald G. Heck

# EXHIBIT 129

Chevron

**Chevron** U.S.A. Inc.
6001 Bollinger Canyon Road, San Ramon, California
Mail Address: P.O. Box 5050, San Ramon, CA 94583 0905

Land Department
Western Region

May 22, 1990

OVERNIGHT EXPRESS MAIL

Proposed Santa Clara Unit Contraction and
Request for Approval of Proposed
Cavern Point Unit
Leases OCS-P 0210 and P 0527
Offshore California

Dr. J. Lisle Reed
Regional Director
U.S. Department of the Interior
Minerals Management Service
1340 West Sixth Street
Los Angeles, CA 90017

Dear Dr. Reed:

Santa Clara Unit Leases OCS-P 0210 and 0527 are not included in a Participating Area and so both will be subject to Santa Clara Unit Agreement Article XV which calls for their automatic removal from the Unit Area on July 25, 1990. As you know, Chevron explorationists have mapped a geological prospect covering P 0527 and P 0210 and are moving forward with the necessary documentation to form the new unit, the Cavern Point Unit, composed of the two mentioned leases, P 0527 and P 0210. Several months ago Chevron submitted to the MMS supporting geological/geophysical data and maps which put in motion the concept of combining the two leases to form a logical exploration project.

The draft Cavern Point Unit Agreement was transmitted to you on May 15, 1990 and discussions are proceeding with Exxon (our Lease P 0210 partner) on both Unit and Unit Operating Agreements. Additionally Chevron is finalizing the preliminary Cavern Point Unit Plan of Exploration (POE) packet which will be forwarded to you under seperate mailing.

In accordance with Santa Clara Unit Agreement Article IV, Chevron hereby gives notice of the proposed Santa Clara Unit Contraction changing the boundaries of the Unit Area to remove Leases OCS-P 0210 and 0527. The reason for the Unit Contraction is to

allow us to form the new Cavern Point Unit. The proposed effective date of the Unit Contraction is July 1, 1990. By copy hereof Chevron is also notifying Exxon (the only Working Interest Owner whose interest is affected) that it has 30 days to submit objections to Chevron.

The Cavern Point unitization would allow us to prevent waste, help conserve valuable natural resources and protect our mutual interest. Chevron hereby requests your approval consistent with 30 CFR 250.10 of a four and one-half year (or until December 31, 1994) Suspension of Operation (SOO) for Leases OCS-P 0210 and 0527 to allow us time to complete the formation of the new unit, to reprocess and reinterpret seismic data, to proceed with the POE and spud a well in the Unit area by the third quarter of 1992.

Concurrent with this request, Chevron requests your approval of the attached initial Plan of Operation which forecasts Chevron spudding a well in the proposed Cavern Point Unit area by the third quarter of 1992.

Chevron asks that you support our efforts by approving these requests. If you have any questions please call me at (415) 842-3254.

Very truly yours,

J. W. Seymour

JWS:jjn
Enclosure

cc: Mr. Eldon Means
Exxon Company U.S.A. Inc.
440 Benmar
Houston, TX 77060

bcc: Mr. R. J. Harris
Mr. E. K. Espenschied
Mr. R. T. Hughes
Mr. C. C. Rubins
Ms. L. C. Thurn
Mr. R. W. Butler