IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMBER RESOURCES COMPANY., et al., Plaintiffs, v. THE UNITED STATES, Defendant. | |
| ANADARKO E&P COMPANY, L.P., et al., Plaintiffs, v. THE UNITED STATES, Defendant. | Nos. 02-30C<br>04-1822C<br>05-249C (Consolidated)<br>(Senior Judge Bruggink) |
| NYCAL OFFSHORE DEVELOPMENT CORPORATION, Plaintiff, v. THE UNITED STATES, Defendant. | |

**DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26(b)(1) and 37(a)(2) of the Rules of the Court, defendant, the United States, respectfully requests that the Court overrule plaintiffs' objections and enter an order compelling plaintiffs to produce documents responsive to Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents. The documents requested are

important to our ability to challenge plaintiffs' claims for hundreds of millions of dollars in "sunk costs" allegedly invested in the California offshore leases at issue. Moreover, two of the document requests are pinpoint requests for known documents that will shed light upon drainage of oil from under Lease OCS-P 0452 by two plaintiffs (Plains Exploration & Production Company and Delta Petroleum Corporation), an issue at the center of our Motion for Partial Reconsideration of the Court's Rescission of Lease OCS-P 0452.

In accordance with Rule 37(a)(2)(B), we have conferred with plaintiffs' counsel in an attempt to narrow the issues in dispute and to obtain the documents without filing a motion to compel. Plaintiffs stand by their objections and refusals to produce the requested documents.

As a general matter, the United States is entitled to "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." See RCFC 26(b)(1). Plaintiffs do not dispute the relevance of any of the requested documents and do not contend that any of the documents are protected by privilege. Instead, plaintiffs object to the document requests with the repeated mantra that the requests are "overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence." Plaintiffs do not further describe or justify their claims of burden.

This Court has held that "[t]he proper standard for discovery requests is to "balance the burden on the interrogated party against the benefit to the discovering party of having the information." Pac. Gas & Elec. Co. v. United States, 69 Fed. Cl. 323, 325 (2005) ((quoting Hoffman v. United Telecomm., Inc., 117 F.R.D. 436, 438 (D. Kan.1987)), and citing United States ex rel. Fisher v. Network Software Assocs., 217 F.R.D. 240, 246 (D.D.C. 2003) ("To determine the level of burden a document places on the responding party, the court should

balance the need for discovery against the burden imposed on the person ordered to produce the documents.”).

The Court in Pacific Gas & Electric added: “To prevail on its objection, however, the objecting party must do more than “simply intone the familiar litany that the discovery sought is burdensome, oppressive, or overly broad.” See 69 Fed. Cl. at 325. Indeed, plaintiffs “bear[] the burden of demonstrating “specifically how, despite the broad and liberal construction of afforded the federal discovery rules, each [request] is not relevant or how each question is overly broad, burdensome, or oppressive.” Id. at 325-26. Against this standard, plaintiffs’ refusal to produce the requested documents is not justified.

With respect to the documents requested by the United States, plaintiffs fail to offer any explanation as why the requested production would be burdensome or how the requested documents would be inadmissible at trial. Our Third Consolidated Set of Interrogatories and Request for Production of Documents is attached to this motion as Exhibit A. Plaintiffs’ complete response is attached as Exhibit B. Each of the disputed discovery requests and the plaintiffs’ objections are reproduced below. We have then summarized the relevance and importance of the requests as a basis for the Court to overrule plaintiffs’ objections.

**REQUEST NO. 8:** The complete, unredacted accounting records of Poseidon Petroleum relating in any way to any lease at issue in this lawsuit. This request includes, but is not limited to, clean, unredacted copies the documents marked POSEIDON-00284 - 00307.

**OBJECTION:** Subject to the foregoing General Objections, Plaintiffs also object to this request on the ground that, because none of the redacted information pertains to expenditures on

the 40 lawsuit leases or expenditures being claimed in this lawsuit, it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**IMPORTANCE OF DOCUMENTS SOUGHT:** This document request pertains to Poseidon's accounting records related to the lawsuit leases generally, not only the redacted records identified in the request. Poseidon, a plaintiff in this lawsuit, claims millions of dollars for its and its predecessors' "sunk costs" related to its 60 percent ownership interest in five of the six leases in the Bonito Unit (Leases OCS-P 443, 445, 446, 499, and 500) as well its 100 percent ownership interest in the two Cavern Point Unit leases (Leases OCS-P 210 and 527). Obviously, Poseidon's accounting records are relevant to a complete examination of the costs claimed. The need of the United States for these accounting documents is all the more significant given that plaintiffs intend to prove their "sunk costs" exclusively though an outside accountant, as opposed to calling representatives of Poseidon and the other plaintiffs to testify to their first-hand knowledge of Poseidon's costs.[1]

With respect to the pages marked POSEIDON-00284 through 00307, Poseidon's president Flint Ogle testified at his deposition that he redacted certain entries that he believes are not relevant. See Ex. C. These redactions were not made upon the basis of privilege. Thus, there is no basis under the Rules of the Court of Federal Claims for the redactions (particularly in light of the protective order in place). Moreover, there is little or no burden in producing unredacted copies of Poseidon's records already produced in this litigation.

**REQUEST NO. 13:** All documents related to meetings and presentations with respect to the exploration and development of the eastern half of Lease OCS-P 0451. This request includes,

[1] As we will demonstrate at another time when appropriate, plaintiffs may not establish their sunk costs based upon hearsay. See generally, Defendant's Opposition to Plaintiffs' Motions to Quash Subpoena of Douglas Tymkiw and for Protective Order.

but is not limited to, the meeting and PowerPoint presentation referenced by Kent Lina during his August 4, 2006 deposition in this case. (See Tr. at 22-23.)

**OBJECTION:** The appropriate scope of discovery relating to these issues was set forth in the Court's April 20, 2006 Scheduling Order regarding this issue, as modified on August 17, 2006, the terms of which were negotiated among and agreed to by the parties and submitted to the Court in the form of an unopposed motion. Plaintiffs provided discovery responses regarding these issues in conformity with that Order. Subject to the foregoing General Objections, to the extent this request goes beyond that Order, Plaintiffs also object to this request on the ground that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence with respect to any of the issues still pending in this litigation, and inconsistent with the Court's Order.

**IMPORTANCE OF DOCUMENTS SOUGHT:** The United States' Motion for Partial Reconsideration of the Court's Rescission of Lease OCS-P 0452 raises the issue of drainage from under Lease OCS-P 0452 via drilling on the eastern half of adjacent Lease OCS-P 0451 by plaintiff Plains Exploration & Production Company's (Plains). Plaintiff Delta Petroleum Corporation (Delta) is the 100 percent owner of Lease 0452 and a part owner of Lease 0451. Delta's chief engineer, Kent Lina, testified at his deposition in this case that Plains made at lease one presentation to Delta and the other owners of Lease 0451 describing the development of the eastern half of Lease 0451. Mr. Lina testified that he recalled a PowerPoint presentation and possibly even meeting minutes, but that he did not recall whether the topic of drainage from Lease 0452 was discussed in those materials. See Ex. D. The United States seeks these materials and any other presentation materials/minutes related to the development of the eastern half of Lease 0451.

With respect to the scheduling orders referenced by plaintiffs in their objection, those orders provide a schedule for certain major events but do not restrict the United States' discovery of documentary materials. This Court has already held as much in its June 6, 2006 Order granting in part the United States May 31, 2006 Motion to Compel. In its order, the Court overruled plaintiffs' identical objections and ordered the production of materials not specified in the scheduling order. Here, plaintiffs do not dispute the relevance or existence of the requested documents, and plaintiffs do not claim that the materials are discoverable from any other source. Moreover, plaintiffs have not explained how a search of Delta's files (to include Mr. Lina's files) would be burdensome.

**REQUEST NO. 14:** All Authorizations for Expenditures (AFEs) related to the drilling of wells on the eastern half of Lease OCS-P 0451, along with all documents relating to whether any plaintiff or subsidiary would/did approve or disapprove the AFE. This request includes, but is not limited to, any notes or recommendations on any of the wells prepared by Kent Lina as referenced during his August 4, 2006 deposition in this case.

**OBJECTION:** Same as that for Request No. 13.

**IMPORTANCE OF DOCUMENTS SOUGHT:** As stated above, the United States' Motion for Reconsideration raises the degree of drainage from Lease 0452 via drilling on Lease 0451. Both sides agree that some drainage will occur. Plaintiff Plains proposed six wells (four wells plus two sidetracks) to be drilled into the main oil-bearing structure that underlies the lease boundary separating Leases 0451 and 0452. It is these wells (four of which eventually went into production) that have and will continue to drain oil from under Lease 0452. Thus, drilling on the eastern half of Lease 0451 not only changes the physical condition of Lease 0452 (a reduction in

the oil in place under the lease) but significantly erodes the commercial viability of the lease should the lease be returned to the United States.

Mr. Lina testified that the drilling of each of the six wells on the eastern half of Lease 0451 was preceded by a proposal, called an Authorization for Expenditure, from Plains to the lease owners/partners (including Delta) for their approval. Mr. Lina also testified that he performed an analysis of the AFEs and made a recommendation to his company to approve each one. The issue of drainage from Delta's lease (Lease 0452) likely factored into Mr. Lina's analysis. Mr. Lina testified that he did not recall whether he made notes or not, or whether he retained his notes or not. See Ex. E. Plaintiffs' objection does not deny the existence of the AFEs or Mr. Lina's notes. Accordingly, this pinpoint request seeks the Plains AFEs and any documents related to Delta's approvals, including Mr. Lina's notes and/or recommendations.

**REQUEST NO. 17:** All agendas and meeting minutes for meetings of unit owners and/or working interest owners for all nine units at issue in this lawsuit, that occurred at any time in the past. This request includes, but is not limited to, agendas and meeting minutes as described by Roger Parker during his August 3, 2006 deposition in this case.

**OBJECTION:** Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that it is overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**IMPORTANCE OF DOCUMENTS SOUGHT:** A portion of the "sunk costs" claimed in this lawsuit were approved by multiple working interest owners in the nine units and by owners of working interests in neighboring leases (i.e., leases not at issue in this lawsuit). Moreover, costs were split among partners in a manner different from the owners' working interest

(ownership interest) in the lease or leases participating in a particular project. The unit agreements (via non-consent provisions) gave owners the right not to participate in projects; a non-participating owner was not required to fund the non-consented project. Within the industry, meetings of unit operators/owners/partners in a lease or a unit are ordinarily held to discuss project proposals, the costs of proposed projects, the sharing of those costs, and the agreement (or non-agreement) of owners to participate in projects. Plaintiffs' witness Ron Heck confirmed at his October 26, 2006 deposition in this case that operators historically held such meetings with respect to the leases at issue in this lawsuit.

We also know from documents already produced in this case and from depositions of certain witnesses that certain large-scale projects (e.g., the drilling of certain wells) were shared among less than all unit working interest owners (e.g., one or more owners elected not to participate), and even shared by non-owners (e.g., one or more neighboring lease owners or outside companies paid a portion of the well costs). Under these circumstances, the records of unit owner/partner meetings is important to determining which owners/plaintiffs actually paid for which wells, and which projects were paid for by entities other than the lease owners. This, in turn, is relevant to plaintiffs' claim for reimbursement of these costs in this litigation.

**REQUEST NO. 18:** All agendas and meeting minutes for meetings of lease owners and/or working interest owners for 40 leases at issue in this lawsuit, that occurred at any time in the past prior to unitization of the particular lease in question. This request includes, <u>but is not limited to</u>, agendas and meeting minutes with respect to Lease OCS-P 0409.

**OBJECTION:** Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that it is overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**IMPORTANCE OF DOCUMENTS SOUGHT:** The majority of the "sunk costs" claimed in this lawsuit were approved by multiple working interest owners of the free-standing leases prior to unitization, sometimes including leases/units not at issue in this lawsuit. Within the industry, meetings of lease owners/partners are ordinarily held by the lease operators to discuss project proposals, the costs of proposed projects, and the sharing of those costs. Plaintiffs' witness Ron Heck confirmed at his October 26, 2006 deposition in this case that operators historically held such meetings with respect to the leases at issue in this lawsuit.

We also know from documents already produced in this case and from depositions of plaintiffs' witnesses that certain large-scale projects (e.g., the drilling of certain wells) were shared among less than all lease owners (e.g., one or more owners elected not to participate), and even shared by non-owners (e.g., one or more neighboring lease owners or outside companies paid a portion of the well costs). Under these circumstances, the records of unit owner/partner meetings is important to determining which owners actually paid for which wells, and which projects were paid for by entities other than the lease owners. As stated above, this is relevant to plaintiffs' claim for reimbursement of these costs in this litigation.

**CONCLUSION**

For these reasons, we respectfully request that the Court overrule plaintiffs' objections and order plaintiffs to produce the requested documents.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director

s/ Gregg M. Schwind
GREGG M. SCHWIND
ALLISON KIDD-MILLER
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 353-2345

Attorneys for Respondent

October 30, 2006

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBER RESOURCES COMPANY., et al., Plaintiffs, THE UNITED STATES, Defendant. | ) | |
| ANADARKO E&P COMPANY, L.P., et al., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | Nos. 02-30C<br>04-1822C<br>05-249C (Consolidated)<br>(Senior Judge Eric G. Bruggink) |
| NYCAL OFFSHORE DEVELOPMENT CORPORATION, Plaintiff, v. THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S THIRD CONSOLIDATED SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**

Defendant, United States, hereby requests that plaintiffs answer the following interrogatories under oath and produce to defendant the documents requested below in

accordance with Rules 33 and 34 of the Rules of the United States Court of Federal Claims, respectively.

These interrogatories and production requests shall be deemed continuing, so as to require supplemental response(s) if plaintiff obtains additional information or discovers additional documents after service of its original response. Such supplemental responses shall be served from time to time, but not later than 10 days after such additional information has been obtained.

## DEFINITIONS AND INSTRUCTIONS

A. The terms "plaintiffs," "you," "yourself," and "your" refer to plaintiffs and their present or former officers, employees, agents, attorneys or representatives and every person connected with plaintiffs in connection with the matter at issue in this action.

B. "Person" and "individual" means and includes natural persons, partnerships, corporations, associations, or any other kind of entity recognized by law and its employees or independent contractors.

C. "Documents" refers to all writings, tapes, recordings, graphic representations, drawings or printed materials of any kind whatsoever, specifically including electronic media of any kind, however produced, or reproduced that are now or have ever been in your possession or whose existence is or was ever known to you, including but not limited to: correspondence, letters, notes, memoranda, electronic messages or mail, invoices, bills, written estimates, contracts, agreements of any kind, shipping or receiving documents, diagrams, drawings, designs, books, articles, or extracts from any of the foregoing, any drafts of the above, or any other tangible things containing information. If a document responsive to any interrogatory or

production request was, but no longer is, in your possession, custody, or control, describe in detail the contents of the documents, its date of creation and disposition, and its present location and custodian. "Documents" does not include any materials previously provided to counsel for the United States in this litigation.

D. "Complaint" refers to the First Amended Complaint filed by order of the Court in No. 02-30 dated June 14, 2002, the Complaint filed in No. 04-1822 dated December 27, 2004, and the Original Complaint filed in No. 05-249 dated February 24, 2004.

E. "Identify" or "identity" shall have the following meanings:

(1) When used in reference to an organization, the response shall state the full name and present or last known address of the corporation, partnership, firm or other entity.

(2) When used in reference to an individual, the response shall state his or her full name, present or last known address, present or last known business affiliation and job description, and any past or present affiliation with plaintiff or defendant.

(3) When used in reference to a document, the response shall state the type of document (e.g., memorandum, letter, note, contract), its date, author(s), addressee(s) (if any), synopsis of content, and present location. In lieu of providing this information, plaintiff may attach a copy of the document to its answers.

(4) When used in reference to a source of information, the response shall identify each individual providing information. The response shall also state whether the information has been reduced to writing or other tangible form. If so, this writing or other record shall be identified in the manner described in subparagraph (3) above.

F. "Describe in detail" or "state in detail" as used herein, means the following:

(1) Describe fully by reference to underlying facts rather than ultimate facts or conclusions of law or facts.

(2) Particularize as to:

(a) the identity of each person involved in each such event, including, but not limited to persons employed by plaintiff and those persons purporting to act for plaintiff;

(b) the specific acts of each person participating in each such event;

(c) the date and time of each such event;

(d) the address and location of each such event; and

(e) the identity of each person present during each such event.

G. "Leases" means the 40 undeveloped outer continental shelf leases to which paragraph 3 of the First Amended Complaint filed in No. 02-30 refers.

H. "Prior Owner" means a prior owner of a Lease, or a lessee, who is not a plaintiff.

I. The word "explain" means to state with specificity each and every fact, ultimate fact, particular circumstances, incident, act, omission, detail and event which relates to the reference, contention or response.

J. The word "substantiate" means to identify each document and/or communication, including each and every provision of the contract, upon which you rely in making the reference, contention or response, and to state any other facts relating to the reference, contention or response.

K. "Relating to" means containing, constituting, discussing, describing, identifying, referring to, supporting, explaining, contradicting, or in any way pertaining to the subject specified.

L. Should you claim privilege for any documents about which information is requested for any of the following interrogatories or production requests, describe in detail those documents, in the manner described in paragraph F above, and indicate your claim of privilege and give the grounds upon which your claim of privilege rests.

M. If you object to or otherwise decline to answer any portion of an interrogatory, please provide all information called for by that portion of the interrogatory to which you do not object or to which you do not decline to answer. If you object to an interrogatory on the ground that it is too broad (i.e., that it calls both for information which is relevant to the subject matter of the action and information which is not), please provide the information that is relevant. If you object to an interrogatory on the ground that to provide an answer would constitute undue burden, please provide all requested information that can be supplied without undertaking an undue burden. For those portions of an interrogatory to which you object or otherwise decline to answer, state the reason for such objection or declination.

**INTERROGATORIES**

Interrogatory No. 15: Please identify each person who provided any information used in answering any of these interrogatories, or who located and/or provided documents to be produced. For each person identified, state for which answers/requests that person provided information and/or documents.

Interrogatory No. 16: Identify and describe in detail any court, administrative, or other proceeding for which one or more plaintiffs seek reimbursement of any costs in this lawsuit. By way of example only, the United States is aware that plaintiffs may have incurred costs with respect to proceedings before the California federal district court (California v. Norton) and the Interior Board of Land Appeals (IBLA, challenging the termination of four offshore leases) with respect to leases at issue in this litigation.

## REQUESTS FOR PRODUCTION

1. All documents reflecting or related to Samedan's acquisition of Conoco's interests in the Sword Unit leases, to the extent not previously produced to the United States in this litigation. This request includes, but is not limited to, all documents listed at Exhibit A-1 to the May 30, 2000 "Purchase and Sale Agreement" at NOBLE-08411 et seq.

2. All documents reflecting or related to the "Samedan-Ogle Joint Venture" referenced in NOBLE-06522 and NOBLE-03330. This request includes, but is not limited to, documents related to the (1) formation of the Joint Venture; (2) costs, revenues, and expenditures of the Joint Venture; and (3) termination of the Joint Venture.

3. All documents related to or reflecting any agreement between Ogle Petroleum and Samedan Oil Corporation with respect to any interest in one or more California off-shore leases. This request includes, but is not limited to, the 1982 agreement and subsequent assignments as described in E&Y 2000280.

4. All documents related to or reflecting any agreement or transaction between Ogle Petroleum, Samedan Oil Corporation, and/or New England Energy, Inc. (NEEI), with respect to any interest in one or more of the leases at issue in this lawsuit. This request includes, but is not limited to, any documents related to the transaction or transactions by which NEEI acquired any interest or right in one or more of the leases at issue in this lawsuit.

5. All documents related to the acquisition, ownership, any extension, any use, and any assignment of the "Lease Purchase Option" from Conoco, as referenced in NOBLE-08623 and NOBLE-08497 et seq. This request includes, but is not limited to, the complete "Lease Purchase Option Agreement," with all amendments/modifications, described in NOBLE-08623.

6. All documents related to any analysis or investigation (whether internal or external) of costs billed to owners of working interests in one or more leases at issue in this litigation. This request includes, but is not limited to, all documents related to the analysis of Nuevo's 2001 and 2002 billings as described in E&Y 2001437 - 2001438.

7. All documents reflecting or related to any consultancy, management, or similar agreement between any unit operator or lease working interest owner, and any of the following persons or firms: Ronald Heck; any firm in which Mr. Heck has ever had an ownership interest, including, but not limited to R.G. Heck & Associates; Burdette A. Ogle; Flint B. Ogle; or any firm in which either (or both) Dr. Ogle and Mr. Ogle has ever had a direct or indirect interest, including, but not limited to, Ogle Enterprises, Ogle Petroleum, PetroGreen, OLAC, Ogle Resources, Marine Oil, Poseidon Petroleum, and Ogle Properties. This request includes, but is not limited to, the consultancy/management agreement(s) between Mr. Heck (or R.G. Heck & Associates) and Samedan (and later Noble) described by Mr. Heck at his August 25 deposition in this case. This request also includes, but is not limited to, the arrangement between Ogle Enterprises (to include Burdette Ogle, Ron Heck, and Flint Ogle) and Samedan (and later Noble) as described by Flint B. Ogle at his August 29, 2006 deposition in this case.

8. The complete, unredacted accounting records of Poseidon Petroleum relating in any way to any lease at issue in this lawsuit. This request includes, but is not limited to, clean, unredacted copies the documents marked POSEIDON-00284 - 00307.

9. Any letters of understanding or other similar written arrangement between Ogle Petroleum, Samedan, and/or Celeron Oil and Gas Company. This request includes, but is not limited to, any documents related to the transaction or transactions by which Celeron acquired any interest or right in one or more of the leases at issue in this lawsuit.

10. All documents reflecting and/or related to the acquisition, possession, sale, assignment, transfer, or termination of any overriding royalty interest or similar property interest held by any person or entity at any time with respect to any of the leases at issue in this lawsuit. This request includes, but is not limited to, documents related to the overriding royalty interest described on pages E&Y 2001578 - 2001587. This request also includes, but is not limited to, documents related to the "override" referenced by Terry Enders during his July 25, 2006 deposition in this case. (See Tr. at 85-86.) This request also includes, but is not limited to, the overriding royalty interest or interests described by Ron Heck and Flint Ogle at their August 25 and August 29 depositions, respectively, in production from the Point Pedernales Unit and/or the Lompoc field. Finally, this request also includes, but is not limited to, the overriding royalty interest described in paragraph (6) in E&Y 2001578 - 2001579.

11. All documents reflecting and/or related to the acquisition, possession, sale,

assignment, transfer, or termination of any net profits interest or similar property interest held by any person or entity at any time with respect to any of the 40 leases at issue in this lawsuit. This request includes, but is not limited to, documents related to the net profits interest referenced in E&Y 2000260 and the net profits interest described by Flint B. Ogle during his August 29, 2006 deposition. This request also includes, but is not limited to, documents related to the "net profits" arrangement referenced by Terry Enders during his July 25, 2006 deposition in this case. (See Tr. at 90.)

12. All documents reflecting and/or related to the acquisition, possession, sale, assignment, transfer, or termination of any farmout agreement or similar agreement by any person(s) or entity(ies) at any time with respect to any of the 40 leases at issue in this lawsuit. This request includes, but is not limited to, the farmout agreements referenced at E&Y 2000228.

13. All documents related to meetings and presentations with respect to the exploration and development of the eastern half of Lease OCS-P 0451. This request includes, but is not limited to, the meeting and PowerPoint presentation referenced by Kent Lina during his August 4, 2006 deposition in this case. (See Tr. at 22-23.)

14. All Authorizations for Expenditures (AFEs) related to the drilling of wells on the eastern half of Lease OCS-P 0451, along with all documents relating to whether any plaintiff or subsidiary would/did approve or disapprove the AFE. This request includes, but is not limited

to, any notes or recommendations on any of the wells prepared by Kent Lina as referenced during his August 4, 2006 deposition in this case.

15. A complete copy of the Amber Resources Company Form 10-K partially produced at E&Y 2000256 - 2000278.

16. All documents reflecting and/or relating to the "agreements" and transactions referenced in the Amber Resources Company 1988 and 1989 Forms 10-K at page E&Y 2000274 and E&Y 2000228, to the extent those "agreements" and transactions relate to any of the leases at issue in this lawsuit. This request includes, but is not limited to, the farmout agreements with Heafitz Energy Management, Inc. (HEMI) referenced in E&Y 2000228.

17. All agendas and meeting minutes for meetings of unit owners and/or working interest owners for all nine units at issue in this lawsuit, that occurred at any time in the past. This request includes, but is not limited to, agendas and meeting minutes as described by Roger Parker during his August 3, 2006 deposition in this case.

18. All agendas and meeting minutes for meetings of lease owners and/or working interest owners for 40 leases at issue in this lawsuit, that occurred at any time in the past prior to unitization of the particular lease in question. This request includes, but is not limited to, agendas and meeting minutes with respect to Lease OCS-P 0409.

19. All documents reflecting or related to any contracts, agreements, or understandings between Poseidon Petroleum and Chevron related to Chevron's operatorship of the Cavern Point Unit.

20. All documents reflecting or related to any contracts, agreements, or understandings between Poseidon Petroleum and Venoco related to Venoco's operatorship of the Cavern Point Unit. This request includes, but is not limited to, the letter agreement between Poseidon Petroleum and Venoco described by Flint B. Ogle during his August 29, 2006 deposition in this case.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

PATRICIA M. McCARTHY
Assistant Director

GREGG M. SCHWIND
ALLISON KIDD-MILLER
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530

Tel. (202) 307-0164
Fax (202) 514-8640

August 31, 2006

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 31, 2006, I caused to be sent by e-mail and by first class mail, postage prepaid, copies of Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents addressed as follows:

Steven J. Rosenbaum, Esq.
Covington & Burling
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2401
srosenbaum@cov.com

Jeffrey D. Antonson, Esq.
Jackson Waller LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
jantonson@jw.com

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBER RESOURCES COMPANY., et al.,

Plaintiffs,

THE UNITED STATES,

Defendant.

ANADARKO E&P COMPANY, L.P., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

NYCAL OFFSHORE DEVELOPMENT CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Nos. 02-30C
04-1822C
05-249C (Consolidated)
(Senior Judge Eric G. Bruggink)

**PLAINTIFFS' RESPONSE TO DEFENDANT'S THIRD CONSOLIDATED SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26, 33 and 34 of the Rules of the United States Court of Federal Claims, Plaintiffs respond and object to Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents ("Third Consolidated Set") as follows:

## GENERAL OBJECTIONS

The following general objections are applicable to each interrogatory and/or each document request, notwithstanding the fact that they are not repeated in full in response to each individual interrogatory or request. Neither the failure to assert any general objection or portion thereof in response to an individual interrogatory or request, nor the statement of portions of the general objections, or of similar objections, or additional objections, in response to specific requests, waives any of Plaintiffs' general objections to each request.

1. Plaintiffs object to Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents to the extent that they seek information that is protected from discovery by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or doctrine, and nothing in Plaintiffs' response is intended as, constitutes, or may be deemed as a waiver of any applicable privilege or doctrine. Accordingly, Plaintiffs do not provide privileged or otherwise protected information in its responses.

2. Plaintiffs object to Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents to the extent that they seek information that is not in the possession, custody or control of Plaintiffs, or which is at least as readily available to Defendant as it is to Plaintiffs. Requiring Plaintiffs to provide such information would be unnecessary and overly burdensome, and would not advance the objectives of legitimate

discovery. Subject to and without waiving the foregoing objection, Plaintiffs state that copies of some of the documents that Plaintiffs will produce may also be in the possession or control of Defendant.

3. Plaintiffs object to Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents to the extent that they seek information or documents not already prepared by Plaintiffs or in Plaintiffs' possession, custody or control.

4. Plaintiffs object to Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents, including the definitions and instructions, to the extent that they are vague, ambiguous, overbroad and unduly burdensome.

5. Plaintiffs object to Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents, including the definitions and instructions, to the extent that they seek to impose requirements or obligations on Plaintiffs in addition to or different from those imposed by the Rules of the United States Court of Federal Claims. In its responses, Plaintiffs will provide information as appropriate under those Rules.

6. Plaintiffs object to Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents to the extent that they seek information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence.

7. Plaintiffs object to Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents to the extent that they seek disclosure of confidential information and communications protected by Rule 408 of the Federal Rules of Evidence.

8. Plaintiffs' agreement to produce or objection to producing any particular information or document(s) is not a representation that such information or document(s) in fact exists.

9. Plaintiffs object to Defendant's definition of the terms "plaintiffs," "you," "yourself," and "your" to the extent that they may call for information beyond the possession, knowledge or control of Plaintiffs.

10. Plaintiffs object to Defendant's definition of the terms "identify," "documents," "describe in detail," and "state in detail" on the grounds that they are overbroad and unduly burdensome.

Without waiving or restricting any of its general objections set forth above, and expressly reserving and incorporating each such general response and objection, Plaintiffs respond as follows to Defendant's Third Consolidated Set of Interrogatories and Request for Production of Documents:

**INTERROGATORIES**

Interrogatory No. 15: Please identify each person who provided any information used in answering any of these interrogatories, or who located and/or provided documents to be produced. For each person identified, state for which answers/requests that person provided information and/or documents.

Response: Subject to the foregoing General Objections, and to the specific objection against the identification of participation by attorneys on grounds of the attorney client and work product privileges, Plaintiffs respond that the following persons assisted in locating and/or providing documents to be produced (names of companies on behalf of which the searches were

performed are identified in parentheses): Pat Williams (Plains); Tom Batsche (Plains); Jim Rumsey (Plains); Flint Ogle (OLAC, Ogle Petroleum, and Poseidon); Ron Heck (OLAC, Ogle Petroleum, and Poseidon); Stanley F. Freedman (Delta Petroleum and Amber Resources); Kevin K. Nanke (Amber Resources); Kent B. Lina (Delta Petroleum and Amber Resources); Jill M. Woodeshick (Delta Petroleum and Amber Resources); Sherry Abplanalp (Total), Ursula Cooper (Total); Marvinette Ponder (Devon); George Dowdy (Devon); Perry McAlister (Devon); Susan Starns (Devon); Steven K. Dodds (Anadarko); R.C. Barton (Aera); J.C. Boyd (Aera); Joseph Anderson (Aera); Jerry Williams (Noble); Alicia Caldwell (Noble); and Mike Brown (Noble).

Interrogatory No. 16: Identify and describe in detail any court, administrative, or other proceeding for which one or more plaintiffs seek reimbursement of any costs in this lawsuit. By way of example only, the United States is aware that plaintiffs may have incurred costs with respect to proceedings before the California federal district court (California v. Norton) and the Interior Board of Land Appeals (IBLA, challenging the termination of four offshore leases) with respect to leases at issue in this litigation.

Response: Reimbursement is not being sought in this lawsuit for the costs of any other court, administrative, or other proceeding.

## REQUESTS FOR PRODUCTION

1. All documents reflecting or related to Samedan's acquisition of Conoco's interests in the Sword Unit leases, to the extent not previously produced to the United States in this litigation. This request includes, but is not limited to, all documents listed at Exhibit A-1 to the May 30, 2000 "Purchase and Sale Agreement" at NOBLE-08411 et seq.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this

request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): copies of the documents listed in Exhibit A-1 to the May 30, 2000 "Purchase and Sale Agreement" at NOBLE-08411 et seq.; any other agreements between Samedan and Conoco relating to Samedan's acquisition of Conoco's interests in the Sword Unit leases; and any documents by which the May 30, 2000 "Purchase and Sale Agreement," or any other agreements between Samedan and Conoco relating to Samedan's acquisition of Conoco's interests in the Sword Unit leases, were modified, amended, or terminated.

2. All documents reflecting or related to the "Samedan-Ogle Joint Venture" referenced in NOBLE-06522 and NOBLE-03330. This request includes, <u>but is not limited to</u>, documents related to the (1) formation of the Joint Venture; (2) costs, revenues, and expenditures of the Joint Venture; and (3) termination of the Joint Venture.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of

admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): copies of agreements or other documents through which the "Samedan-Ogle Joint Venture" was formed, modified, amended, or terminated; and any documents relating to the "Samedan-Ogle Joint Venture" that set forth expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs).

3. All documents related to or reflecting any agreement between Ogle Petroleum and Samedan Oil Corporation with respect to any interest in one or more California off-shore leases. This request includes, <u>but is not limited to</u>, the 1982 agreement and subsequent assignments as described in E&Y 2000280.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these

specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): a copy of the September 24, 1982 agreement; copies of subsequent assignments from Ogle to Samedan; copies of any other agreements between Ogle and Samedan relating to the lawsuit leases or the wells drilled on those leases; and copies of documents or agreements by which the 1982 Agreement, or any other agreements between Ogle and Samedan relating in whole or in part to any of the lawsuit leases, were modified, amended, or terminated.

4. All documents related to or reflecting any agreement or transaction between Ogle Petroleum, Samedan Oil Corporation, and/or New England Energy, Inc. (NEEI), with respect to any interest in one or more of the leases at issue in this lawsuit. This request includes, <u>but is not limited to</u>, any documents related to the transaction or transactions by which NEEI acquired any interest or right in one or more of the leases at issue in this lawsuit.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): all agreements between Ogle Petroleum,

Samedan Oil Corp. and/or NEEI that relate in whole or in part to any of the lawsuit leases; all agreements or documents modifying, amending, or terminating any such agreements between Ogle Petroleum, Samedan Oil Corp. and/or NEEI; and all assignments of any interests in the lawsuit leases among Ogle Petroleum, Samedan Oil Corp. and/or NEEI.

5. All documents related to the acquisition, ownership, any extension, any use, and any assignment of the "Lease Purchase Option" from Conoco, as referenced in NOBLE-08623 and NOBLE-08497 et seq. This request includes, but is not limited to, the complete "Lease Purchase Option Agreement," with all amendments/modifications, described in NOBLE-08623.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, all responsive documents have previously been produced.

6. All documents related to any analysis or investigation (whether internal or external) of costs billed to owners of working interests in one or more leases at issue in this litigation. This request includes, but is not limited to, all documents related to the analysis of Nuevo's 2001 and 2002 billings as described in E&Y 2001437 - 2001438.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this

request on the grounds that, through use of the term "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): documents related to any analysis or investigation (whether internal or external) of costs billed to owners of working interests in one or more leases at issue in this litigation.

7. All documents reflecting or related to any consultancy, management, or similar agreement between any unit operator or lease working interest owner, and any of the following persons or firms: Ronald Heck; any firm in which Mr. Heck has ever had an ownership interest, including, but not limited to R.G. Heck & Associates; Burdette A. Ogle; Flint B. Ogle; or any firm in which either (or both) Dr. Ogle and Mr. Ogle has ever had a direct or indirect interest, including, but not limited to, Ogle Enterprises, Ogle Petroleum, PetroGreen, OLAC, Ogle Resources, Marine Oil, Poseidon Petroleum, and Ogle Properties. This request includes, but is not limited to, the consultancy/management agreement(s) between Mr. Heck (or R.G. Heck & Associates) and Samedan (and later Noble) described by Mr. Heck at his August 25 deposition in this case. This request also includes, but is not limited to, the arrangement between Ogle Enterprises (to include Burdette Ogle, Ron Heck, and Flint Ogle) and Samedan (and later Noble) as described by Flint B. Ogle at his August 29, 2006 deposition in this case.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in

whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): consultancy, management, or similar agreement between any unit operator or lease working interest owner, and any of the following persons or firms: Ronald Heck; any firm in which Mr. Heck has ever had an ownership interest, including, but not limited to R.G. Heck & Associates; Burdette A. Ogle; Flint B. Ogle; or any firm in which either (or both) Dr. Ogle and Mr. Ogle has ever had a direct or indirect interest, including, but not limited to, Ogle Enterprises, Ogle Petroleum, PetroGreen, OLAC, Ogle Resources, Marine Oil, Poseidon Petroleum, and Ogle Properties.

8. The complete, unredacted accounting records of Poseidon Petroleum relating in any way to any lease at issue in this lawsuit. This request includes, but is not limited to, clean, unredacted copies the documents marked POSEIDON-00284 - 00307.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the ground that, because none of the redacted information pertains to expenditures on the 40 lawsuit leases or expenditures being claimed in this lawsuit, it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

9. Any letters of understanding or other similar written arrangement between Ogle Petroleum, Samedan, and/or Celeron Oil and Gas Company. This request includes, but is not limited to, any documents related to the transaction or transactions by which Celeron acquired

any interest or right in one or more of the leases at issue in this lawsuit.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): copies of any agreements between Ogle Petroleum, Samedan Oil Corp and/or Celeron Oil and Gas Company that relate in whole or in part to the lawsuit leases.

10. All documents reflecting and/or related to the acquisition, possession, sale, assignment, transfer, or termination of any overriding royalty interest or similar property interest held by any person or entity at any time with respect to any of the leases at issue in this lawsuit. This request includes, <u>but is not limited to</u>, documents related to the overriding royalty interest described on pages E&Y 2001578 - 2001587. This request also includes, <u>but is not limited to</u>, documents related to the "override" referenced by Terry Enders during his July 25, 2006 deposition in this case. (<u>See</u> Tr. at 85-86.) This request also includes, <u>but is not limited to</u>, the overriding royalty interest or interests described by Ron Heck and Flint Ogle at their August 25 and August 29 depositions, respectively, in production from the Point Pedernales Unit and/or the

Lompoc field. Finally, this request also includes, but is not limited to, the overriding royalty interest described in paragraph (6) in E&Y 2001578 - 2001579.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): documents through which overriding royalty interests in the lawsuit leases were acquired, purchased, sold, assigned, transferred, or terminated in connection with any agreement or understanding regarding the payment of any expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs).

11. All documents reflecting and/or related to the acquisition, possession, sale, assignment, transfer, or termination of any net profits interest or similar property interest held by any person or entity at any time with respect to any of the 40 leases at issue in this lawsuit. This request includes, but is not limited to, documents related to the net profits interest referenced in E&Y 2000260 and the net profits interest described by Flint B. Ogle during his August 29, 2006 deposition. This request also includes, but is not limited to, documents related to the "net

profits" arrangement referenced by Terry Enders during his July 25, 2006 deposition in this case. (See Tr. at 90.)

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): documents through which net profits interests in the lawsuit leases were acquired, purchased, sold, assigned, transferred, or terminated in connection with any agreement or understanding regarding the payment of any expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs).

12. All documents reflecting and/or related to the acquisition, possession, sale, assignment, transfer, or termination of any farmout agreement or similar agreement by any person(s) or entity(ies) at any time with respect to any of the 40 leases at issue in this lawsuit. This request includes, but is not limited to, the farmout agreements referenced at E&Y 2000228.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is

overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): farmout agreements entered into in connection with any agreement or understanding regarding to the payment of any expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), and any documents through which such farmout agreement were acquired, purchased, sold, assigned, transferred, or terminated.

13. All documents related to meetings and presentations with respect to the exploration and development of the eastern half of Lease OCS-P 0451. This request includes, but is not limited to, the meeting and PowerPoint presentation referenced by Kent Lina during his August 4, 2006 deposition in this case. (See Tr. at 22-23.)

Response: The appropriate scope of discovery relating to these issues was set forth in the Court's April 20, 2006 Scheduling Order regarding this issue, as modified on August 17, 2006, the terms of which were negotiated among and agreed to by the parties and submitted to the Court in the form of an unopposed motion. Plaintiffs provided discovery responses regarding these issues in conformity with that Order. Subject to the foregoing General Objections, to the extent this request goes beyond that Order, Plaintiffs also object to this request on the ground

that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence with respect to any of the issues still pending in this litigation, and inconsistent with the Court's Order.

14. All Authorizations for Expenditures (AFEs) related to the drilling of wells on the eastern half of Lease OCS-P 0451, along with all documents relating to whether any plaintiff or subsidiary would/did approve or disapprove the AFE. This request includes, but is not limited to, any notes or recommendations on any of the wells prepared by Kent Lina as referenced during his August 4, 2006 deposition in this case.

Response: The appropriate scope of discovery relating to these issues was set forth in the Court's April 20, 2006 Scheduling Order regarding this issue, as modified on August 17, 2006, the terms of which were negotiated among and agreed to by the parties and submitted to the Court in the form of an unopposed motion. Plaintiffs provided discovery responses regarding these issues in conformity with that Order. Subject to the foregoing General Objections, to the extent this request goes beyond that Order, Plaintiffs also object to this request on the ground that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence with respect to any of the issues still pending in this litigation, and inconsistent with the Court's Order.

15. A complete copy of the Amber Resources Company Form 10-K partially produced at E&Y 2000256 - 2000278.

Response: Plaintiffs have searched for and are producing the requested document.

16. All documents reflecting and/or relating to the "agreements" and transactions referenced in the Amber Resources Company 1988 and 1989 Forms 10-K at page E&Y 2000274

and E&Y 2000228, to the extent those "agreements" and transactions relate to any of the leases at issue in this lawsuit. This request includes, but is not limited to, the farmout agreements with Heafitz Energy Management, Inc. (HEMI) referenced in E&Y 2000228.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): the agreements referenced at page E&Y 2000274 and E&Y 2000228, insofar as they relate to any of the lawsuit leases.

17. All agendas and meeting minutes for meetings of unit owners and/or working interest owners for all nine units at issue in this lawsuit, that occurred at any time in the past. This request includes, but is not limited to, agendas and meeting minutes as described by Roger Parker during his August 3, 2006 deposition in this case.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that it is overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

18. All agendas and meeting minutes for meetings of lease owners and/or working

interest owners for 40 leases at issue in this lawsuit, that occurred at any time in the past prior to unitization of the particular lease in question. This request includes, <u>but is not limited to</u>, agendas and meeting minutes with respect to Lease OCS-P 0409.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that it is overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

19. All documents reflecting or related to any contracts, agreements, or understandings between Poseidon Petroleum and Chevron related to Chevron's operatorship of the Cavern Point Unit.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): any contracts or agreements between Poseidon Petroleum and Chevron related to Chevron's operatorship of the Cavern Point Unit.

20. All documents reflecting or related to any contracts, agreements, or understandings between Poseidon Petroleum and Venoco related to Venoco's operatorship of the

Cavern Point Unit. This request includes, but is not limited to, the letter agreement between Poseidon Petroleum and Venoco described by Flint B. Ogle during his August 29, 2006 deposition in this case.

Response: Subject to the foregoing General Objections, Plaintiffs also object to this request on the grounds that: (a) through use of the terms "reflecting" and "related to," it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and (b) to the extent it seeks documents other than those that relate in whole or in part to expenditures relating to the lawsuit leases and/or units (excluding those relating solely to lease acquisition costs), it seeks discovery that is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, and beyond that which has been permitted by the Court. Subject to the General Objections and these specific objections, Plaintiffs have searched for and are producing if found (and if not already produced to the Government in this litigation): any contracts or agreements between Poseidon Petroleum and Venoco related to Venoco's operatorship of the Cavern Point Unit.

E. Edward Bruce
Steven J. Rosenbaum
*Counsel of Record*
Thomas J. Cosgrove
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-5568
Facsimile: (202) 778-5568

October 3, 2006

Attorneys for All Plaintiffs in Nos. 02-30C and 04-1822C

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on October 3, 2006, I caused to be sent by email, and by first class mail, postage prepaid on the following day, copies of:

**PLAINTIFFS' RESPONSE TO DEFENDANT'S THIRD CONSOLIDATED SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

addressed as follows:

Patricia M. McCarthy
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

Jeffrey D. Antonson
Jackson Walker, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202

Thomas J. Cosgrove

# EXHIBIT C

# Poseidon Petroleum, LLC

## Accounting Records

## Cavern Point Unit

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

PLEASE TURN TO THE BACK COVER FOR AN EXPLANATION
OF HOW THIS REGISTER MAY BE USED.

X-108 (IFC) 2-94

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | ✓ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| 1995 | [redacted] | | | | | | | |
| 1002 | 11/3 | Burdette A. Ogle (OR) | Cooper Study | 23579.90 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1008 | 5/13 | Dept. of Int. - MMS (OR) | Cooper Study | 2456.11 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1014 | 12/19 | MMS | Filing Fee Cavern Point | 50.00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1018 | 1/8 | Dept. of Interior - MMS (OR) | Cooper Study | 12456.00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE IF ANY (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | $ [redacted] |
| [redacted] | | | | | | | | |
| 1022 | 4/15 | Oil Data | Cavern Point | 2377 54 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1023 | 5/2 | MMS (ok) | Cooper Study | 11326 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1026 | 7/22 | Minerals Management | Fishermans Contingency Fund | 357 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1101 | 8/26 | Oil Data | Cavern Point | 2323 50 | ✓ | | | [redacted] |
| (1998) [redacted] | | | | | | | | |
| 1102 | 2/12 | MMS (ok) | Cooper Study | 10314 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1105 (1999) | 11/9 | R.G. Heck & Associates (ok) | Consulting-Edward | 7550 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1106 | 1/4 | MMS | Cooper Study | 14189 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1108 | 1/5 | R.G. Heck + Associates | Professional Ser | 15110 61 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | (ok) | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| [redacted] | | | | | | | | |
| 1117 | 7/12 | Mannon Associates | Consulting Fees | 9157 50 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1119 | 7/23 | R.G. Heck & Ass. (ok) | Consulting Fees | 2760 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1128 | 12/13 | MMS | Lease Rentals | 6494 49 | ✓ | | | [redacted] |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | $ [redacted] |
| [redacted] | | | | | | | | |
| 1131 | (2006) 1/27 | Minerals Management | Lease Rentals | 29.53 | √ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1401 | 3/7 | Minerals Management Sec | Rentals OCS P0210 | 17580.00 | √ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1407 | 4/23 | Padre Associates, Inc | Consulting | 8088.68 | √ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1412 | 6/12 | Padre Associates | Consulting | 2513.71 | √ | | | [redacted] |
| [redacted] | | | | | | | | |

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | ✓ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| [redacted] | | | | | | | | |
| 1417 | 7/19 | Padre Associates Inc. | Consulting Fees | 4579.33 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1418 | 7/23 | Padre Associates | Consulting Fees | 3196.16 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1422 | 8/16 | Padre Associates | Consulting Fees | 4932.89 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1424 | 9/19 | Padre Associates | Consulting Fees | 1564.24 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1430 | 10/24 | Padre Associates | Consulting Fees | 2715.00 | ✓ | | | [redacted] |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| [redacted] | | | | | | | | |
| 1433 | 11/9 | Minerals Revenue Mgmt. | 1999 Rent3 Sego OCS-P-0533 | 1736 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1435 | 11/22 | Padre Associates, Inc. | Consulting Fees | 9636 60 | ✓ | | | [redacted] |
| 1436 | 11/22 | Minerals Management Service | Fishermans Fund | 591 25 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1441 | 12/27 | Padre Associates, Inc. | Consulting Fees | 15292 98 | ✓ | | | [redacted] |
| 1442 | 12/27 | R.G. Heck + Ass | Consulting Fees | 2955 80 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 2001 | [redacted] | | | | | | | |
| [redacted] | | | | | | | | |
| 1447 | 2/1 | Padre Associates, Inc | Consulting Fees | 3238 95 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1449 | 2/15 | MMS | Rentals OCS-P-0210 | 1728 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| [redacted] | | | | | | | | |
| 1461 | 3/1 | Padre Associates, Inc. | Consulting Fees | 3330.00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1457 | 4/27 | Padre Associates, Inc. | Consulting Fees | 1976.92 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1465 | 6/25 | Padre Ass. (6k) | Consulting Fees | 4653.41 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1467 | 7/12 | Ogle Enterprises, LLC | Supplies | 648.33 | ✓ | | | [redacted] |
| 1468 | 7/12 | R.C. Heck + Ass. | Consulting Fees | 1724.25 | ✓ | | | [redacted] |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

POSEIDON-00290

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | ✓ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| [redacted] | | | | | | | | |
| 1471 | 7/31 | R.G. Hecht + Ass. | Consulting Fee | 2343 22 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 2003 | [redacted] | | | | | | | |
| [redacted] | | | | | | | | |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

POSEIDON-00291

1008

DATE 5-14-04

TO Padre Associates Inc.

DEPOSITS [redacted]

FOR Consulting Fee

| | |
|---|---|
| TOTAL | [redacted] |
| THIS CHECK | 1435 00 |
| OTHER | |
| BALANCE | [redacted] |

ok

TAX DEDUCTIBLE

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

1026

DATE 7-8-05

TO Padre Associates Inc

FOR Consulting Fees

DEPOSITS [redacted]

TOTAL

THIS CHECK 870 00

OTHER

BALANCE [redacted]

OK

TAX DEDUCTIBLE

1027

DATE 8-3-05

TO Padre Associates Inc

FOR Consulting Fees

DEPOSITS [redacted]

TOTAL

THIS CHECK 3319 56

OTHER [redacted]

BALANCE

TAX DEDUCTIBLE

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

1031 K4194 A1 36

BAL. BRO'T FOR'D 84 43

DATE 9-15-05

TO Padre Associates

DEPOSITS [redacted]

FOR Consulting Fees

TOTAL [redacted]

THIS CHECK 2260 00

OTHER

TAX DEDUCTIBLE

BALANCE [redacted]

1033

DATE 10-3-05

TO Padre Associates Inc.

DEPOSITS [redacted]

FOR Consulting

TOTAL [redacted]

THIS CHECK 2582 14

OTHER

TAX DEDUCTIBLE

BALANCE [redacted]

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

# Poseidon Petroleum, LLC

## Accounting Records

## Bonito Unit

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

PLEASE TURN TO THE BACK COVER FOR AN EXPLANATION
OF HOW THIS REGISTER MAY BE USED.

X-10B (IFC) 2-94

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| 1999 | | | | | | | | |
| [redacted] | | | | | | | | |
| 1152 | 8/14 | Burdette A. Ogle | Copying & seismic Storage | 2319 39 | ✓ | | | [redacted] |
| 1001 | 8/16 | Burdette A. Ogle (OR) | Travel Expenses | 246 44 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1002 | 11/3 | Burdette A. Ogle (OR) | Cooper study | 3357 90 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1006 | 4/29 | Torch | Copy 3-D seismic | 360 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1008 | 5/13 | Dept. of Int. - MMS (OR) | Cooper Study | 2456 11 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1018 | 1/8 | Dept. of Interior - MMS (OR) | Cooper Study | 2456 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| [redacted] | | | | | | | | |
| 1023 | 5/7 | MMS (ok) | Cooper Study | 1326 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1025 | 6/5 | Mannon Ass. | Consulting | 1446 17 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1027 | 7/22 | Mannon Associates (ok) | Consulting | 3300 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| (1998) 1102 | 2/12 | MMS (ok) | Cooper Study | 10314 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1104 | 6/25 | Mannion Associates | Consulting | 1760 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| (1999) | | | | | | | | |
| 1106 | 1/4 | MMS | Cooper Study | 14189 00 | ✓ | | ~~[illegible]~~ | [redacted] |
| [redacted] | | | | | | | | |
| 1108 | 1/7 | R.G. Heck + Associates | Professional Ser | 15110 61 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | (ok) | | | | | BALANCE BROUGHT FORWARD → | $ [redacted] |
| [redacted] | | | | | | | | |
| 1111 | 5/3 | WSPA (ok) | ORA | 1000 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1112 | 6/16 | R.G. Heck & Associates | Consulting Fees | 2100 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1114 | 6/16 | Nuevo Energy (ok) | Minimum Royalty | 33177 60 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1116 | 7/12 | WSPA | ORA Contribution | 1000 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1118 | 7/12 | R.G. Heck & Ass. | Consulting Fees | 1800 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1119 | 7/23 | R.G. Heck & Ass. (ok) | Consulting Fees | 2760 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1122 | 9/13 | R.G. Heck & Ass. | Consulting Fees | 2225 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1123 | 10/4 | WSPA | ORA Contribution | 2500 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1121 | 8/31 | R.G. Heck & Ass. (ok) | Consulting Fees | 2880 00 | ✓ | | | |
| [redacted] | | | | | | | | |
| 1125 | 10/29 | R.G. Heck & Ass. (ok) | Consulting Fees | 2935 06 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1126 | 11/23 | WSPA (ok) | ORA Contribution | 1100 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1127 | 12/18 | R.G. Heck & Ass. | Consulting Fees | 1800 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | BALANCE BROUGHT FORWARD → | | [redacted] |
| [redacted] | | | | | | | | |
| 1129 | 12/30 | Nuevo Energy | Consulting Fees | 9686 14 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1132 | 2/5 | R.G. Heck + Ass | Consulting Fee | 1920 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1403 | 3/17 | R. G. Heck & Ass. | Consulting Fees | 1680 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1405 | 4/23 | R.G. Heck + Ass. | Consulting | 1920 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1409 | 5/8 | R.G. Heck & Ass. | Consulting | 960 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1411 | 6/12 | System Technology Ass | Geophysical | 504 61 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | BALANCE BROUGHT FORWARD → | | [redacted] |
| [redacted] | | | | | | | | |
| 1414 | 6/15 | R.G. Heck & Associates | Consulting | 1688 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1416 | 7/17 | Nuevo Energy Co. | Legal Fees | 1425 26 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1419 | 8/1 | Nuevo Energy Co. | Lease Rentals | 33,177 60 | ✓ | | | [redacted] |
| 1420 | 8/1 | R.G. Heck & Ass. (ok) | Consulting Fees | 2779 26 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1423 | 8/31 | Nuevo Energy | Legal Fees | 912 22 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1426 | 9/14 | R.G. Heck & Associates (ok) | Consulting Fees | 840 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1427 | 9/28 | Nuevo Energy | Legal Fees | 3444 18 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1429 | 10/2 | Nuevo Energy | Legal & Consulting | 3451 77 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| 431 | 10/24 | R.G. Heck & Ass. | Consulting Fees | $1680 00 | ✓ | $ | $ | [redacted] |
| [redacted] | | | | | | | | |
| 432 | 11/2 | Nuevo Energy Co. | Consulting & Legal Fees | 5171 10 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1442 | 12/[illegible] | R.G. Heck & ASS | Consulting Fees | 3955 80 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1444 | 12/27 | Nuevo Energy (ok) | Legal Fees & Consulting | 8852 69 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1446 | 2/1 | Nuevo Energy Company | Legal Fees Consulting Fees | 3003 40 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1448 | 2/6 | Heck & Associates ok | Consulting Fees | 1930 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| [redacted] | | | | | | | | |
| 1452 | 3/1 | Nuevo Energy (OK) | Legal Fees | 1064.17 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1454 | 4/2 | R.G. Heck + Associates (OK) | Consulting Fees | 2880.00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1455 | 4/17 | Nuevo Energy | Consulting Fees | 851.20 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1456 | 4/23 | R.G. Heck + Associates | Consulting Fees | 960.00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1458 | 5/7 | Nuevo Energy Company | Lease Rentals | 33177.60 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1461 | 6/8 | R.G. Heck & Associates | Consulting Fees | 2395.00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | BALANCE BROUGHT FORWARD → | | $ [redacted] |
| [redacted] | | | | | | | | |
| 1469 | 7/31 | MANNON Associates | Consulting Fee | 63210 00 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1471 | 7/31 | R.G. Hedr + Ass | Consulting Fee | 3343 22 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 1472 | 8/6 | Nuevo Energy Co. (8K) | Consulting Fees | 9858 83 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |
| 2002 | | | | | | | | |
| [redacted] | | | | | | | | |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| [redacted] | | | | | | | | |
| 1497 | 11/4 | Nuevo Energy Co. (VR) | | 31698.41 | √ | | | [redacted] |
| [redacted] | | | | | | | | |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | IN PAYMENT OF | PAYMENT/DEBIT (-) | √ T | FEE (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | BALANCE BROUGHT FORWARD → | [redacted] |
| [redacted] | | | | | | | | |
| 1523 | 10/15 | Nuevo Energy Co. (OK) | Op. Expense | 5616 74 | ✓ | | | [redacted] |
| [redacted] | | | | | | | | |

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

1012

DATE 8-4-04

TO Nuevo Energy 8/3

FOR Operating Costs Bonito

| | |
|---|---|
| DEPOSITS | [redacted] |
| TOTAL | [redacted] |
| THIS CHECK | ✓ 368 50 |
| OTHER | |
| BALANCE | [redacted] |

TAX DEDUCTIBLE

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

1029

DATE 8-23-05

TO Plains Exploration + Production Co.

FOR Op. Expenses

| | |
|---|---|
| DEPOSITS | [redacted] |
| TOTAL | [redacted] |
| THIS CHECK | 745 99 |
| OTHER | |
| BALANCE | [redacted] |

TAX DEDUCTIBLE

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

# EXHIBIT D

32519AJH

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C
04-1822C
05-249C (Consolidated)

---

AMBER RESOURCES COMPANY, et al.,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

---

ANADARKO E&P COMPANY, L.P., et al.,
Plaintiffs,
v.
THE UNITED STATES,
Defendant.

CONFIDENTIAL

---

NYCAL OFFSHORE DEVELOPMENT CORPORATION,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

ORIGINAL

---

DEPOSITION OF KENT B. LINA

August 4, 2006
JOB NO. 175864

Pursuant to Notice taken on behalf of the Defendant at 1225 17t Street, 7th Floor, Denver, Colorado 80202, at 9 a.m., before Jennifer Hayden, Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES:

STEVEN J. ROSENBAUM, Attorney at Law, from the Law Firm of Covington & Burling, LLP, 1201 Pennsylvania Avenue, N.W., Washington, D.C. 20004-2401, appearing on behalf of the Plaintiff.

GREGG M. SCHWIND, Attorney at Law, from the U.S. Department of Justice, Civil Division, 1100 L Street, N.W., Washington, D.C. 20004, appearing on behalf of the Defendant.

Also present: Ted Freedman, Esq.

Incorporated, operator of both Point Arguello Unit and the eastern half of OCS-P 0451, is proposing to drill development wells from Platforms Hermosa and Hidalgo. The proposal is to drill a maximum of 8 wells for development of the eastern half of Lease OCSP 0451 reserves."

My question is this, prior to receiving the AFEs from Arguello or Plains, do you recall any type of written proposal to your company, Delta, to revise the development plan to drill wells into the eastern half of Lease 451?

A. Could you repeat that, please.

Q. No, I can't.

MR. SCHWIND: Can you read it back, please.

(The question was read back.)

A. The only documents that I recall receiving regarding their proposal was the typical minutes from a working interest owner meeting in the year 2002 and associated PowerPoint presentation.

Q. (BY MR. SCHWIND) Do you retain copies of those minutes and that PowerPoint

presentation?

A. Yes, I do. Yes, I did.

Q. And where do you maintain those documents?

A. In my office.

Q. Have you reviewed them in preparation for your testimony today?

A. No, I did not.

Q. What documents did you review in preparation for your testimony today?

A. No documents.

Q. If we go back to this revision that's marked Exhibit 1, did you attend the meeting that you referred to as far as the meeting minutes and the PowerPoint presentation?

A. I've never attended a meeting with Plains.

Q. Do you know from whatever recollection you may have of the minutes and the PowerPoint presentation whether or not the issue of drainage was discussed at that meeting? And by drainage, I mean drainage out from under Lease 451 from drilling on Lease 451.

A. I should correct myself. I don't believe I received minutes. I just received

this PowerPoint that has information that was shown. So it kind of acts like minutes, but it's not minutes of the meeting. I did not receive minutes.

Q. Okay. Do you know if the company received minutes?

A. They don't always prepare them and send them out, so I don't know that.

Q. But you're confident that whatever occurred occurred back in -- did you say near the latter half of the end of 2002?

A. I say 2002 because that was the date on the presentation materials that I received.

Q. Do you recall if those presentation materials discussed in any way the possibility of drainage from neighboring Lease 452?

A. I don't think they did.

Q. But you don't recall sitting here today?

A. I don't recall sitting here today.

Q. Who attended that meeting on behalf of Delta, if you know?

A. I don't believe anybody did.

Q. Did someone attend from Whiting on behalf of Delta?

A. I wouldn't know that.
Q. Who sent you this presentation?
A. As a working interest owner, it's customary to send out the presentation materials after each working interest owner meeting.
Q. Right, but who sent you your copy?
A. Plains.
Q. It came from Plains?
A. Um-hum.
Q. After this meeting in 2002, were you part of any discussions of the proposal to drill the eastern half of 451 here at Delta?
A. Yes.
Q. What do you recall of those discussions?
A. The discussions I recall were regarding my analysis of the AFE and my recommendation to participate.
Q. Was there an AFE on the table at that time in 2002?
A. If there wasn't an actual AFE, I would have still been able to perform an analysis with assumed costs.
Q. Okay. And do you recall what you were analyzing at that time, what specifically?

A. I recall utilizing the PowerPoint materials that I received to make a conclusion as to the expected performance of the proposed wells, and I made a conclusion as to the costs, and I evaluated that in an economic analysis.
Q. All right. What conclusion did you draw at that time as far as performance of the -- well, let me back up. How many wells were being -- were to be drilled in the proposal that you were evaluating?
A. At the time of originally looking at this, there may not have been a firm proposal, but I do recall anticipating as many as ten wells to be drilled.
Q. What was your analysis of the production from those wells at that time?
A. Can you repeat the question, please.
Q. What was your -- let me put it this way. What conclusion did you draw from your analysis with respect to production from those wells?
A. I made a recommendation to participate.
Q. I understand that, but I assume that recommendation was based, as you stated,

on your analysis of production, correct?
A. Correct.
Q. So what conclusions did you draw with respect to production?
A. That the production would be profitable.
Q. Well, at that time did you estimate -- did you generate an estimate of production?
A. I utilized the materials that were provided to me in the form of the PowerPoint and assumed that the production indicated was appropriate.
Q. So you agreed with the production numbers that were in the PowerPoint presentation that Plains had provided you?
A. Yes. Please repeat the question.
MR. SCHWIND: Can you read it back, please.
(The question was read back.)
A. No, I did not. I reduced the volumes.
Q. (BY MR. SCHWIND) How so?
A. There was numerous expectations presented as to the production expected, and

after looking at all of them, I -- for Delta, I chose one of the lower scenarios.
Q. And you said you also as part of your analysis looked at profitability, correct?
A. Correct.
Q. And you ultimately made the recommendation or you ultimately came to the conclusion that Arguello's or Plains' proposal to develop the eastern half of 451 would be profitable, correct?
A. Correct.
Q. As part of your analysis, did it occur to you that there was -- that some of the production numbers would originate from oil under Lease 452?
A. Could you please repeat.
(The question was read back.)
A. No.
Q. At that time, again, back in 2002 when you had this PowerPoint presentation before you, what was the, if you recall, closest bottom-hole location to Lease 452?
A. I don't recall at all.
Q. Do you recall generally that the bottom-hole locations were within several

thousand feet of the lease boundary?
A. I did not look at the location of the wells.
Q. Why not?
A. I was performing an analysis on a generic single well out of the ten.
Q. What were the parameters of that well?
A. I don't recall specifically.
Q. Do you recall making any notes during that analysis?
A. No, I do not recall.
Q. If you had made notes as part of that analysis and recommendation, where would those notes be now?
MR. ROSENBAUM: Object as calling for speculation.
A. I have no idea where they might be.
Q. (BY MR. SCHWIND) Do you normally retain copies of your notes that you make as part of an analysis and recommendation to your company?
A. Can you repeat that question, please.
Q. Do you normally retain notes from

analyses and recommendations that you perform for your company?

A. On most occasions, I do.

Q. Where do you retain those notes?

A. In personal files or in the company's files.

Q. Do you have any type of policy that you follow as far as how long you or your company maintains those type of notes?

A. No.

Q. If I understand your testimony correctly, in 2002 you made a recommendation to your company that the drilling of a generic well on the eastern half of 451 would be profitable, correct?

A. Not correct. I cannot agree with the 2002. The 2002 is the date of the information. I do not know when I performed the analysis.

Q. So it may have been in 2003?

A. Correct.

Q. So with that qualification, would you then agree that you made a recommendation to your company either in 2002 or 2003 --

A. Or 2004 at some point.

Q. -- that the drilling of one generic well on Lease 451 would be profitable?

A. Yes.

Q. Now, at some point there were -- well, going forward from this first PowerPoint presentation, when do you recall considering a more specific proposal from Plains or Arguello with respect to drilling on the eastern half of 451?

A. Approximately three years ago.

Q. Approximately three years ago would be on or around August 4, 2003; is that right?

MR. ROSENBAUM: Object as mischaracterizing the testimony.

A. Repeat.

Q. (BY MR. SCHWIND) Actually, let me rephrase. Turn to the page of this document, page 5 at the bottom -- we'll go about it that way -- the second paragraph from the bottom, "Based on current data, Arguello, Incorporated has estimated that 8 wells will be needed to develop the eastern half of Lease 451."

Do you recall ever considering a proposal from Arguello to drill eight wells into the eastern half of 451?

MR. ROSENBAUM: Object as lacking foundation for this document.
A. Can you repeat the question, please.
(The question was read back.)
MR. ROSENBAUM: Same objection.
A. A specific proposal, no.
Q. (BY MR. SCHWIND) A general proposal?
A. Yes, as portrayed in the PowerPoint presentation.
Q. Did the PowerPoint presentation talk about a generic well or eight wells?
A. I believe it talks -- I don't know. I think -- I don't know.
Q. Well, you testified earlier that you performed an analysis on one generic well in the eastern half of 451. Where did that idea come from?
A. It would have come from the materials in the PowerPoint presentation.
Q. There were other AFEs that Arguello or Plains submitted to Delta for its consideration, correct?
A. Correct.
Q. And by other AFEs, I mean other

# EXHIBIT E

32519AJH

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C
04-1822C
05-249C (Consolidated)

---

AMBER RESOURCES COMPANY, et al.,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

---

ANADARKO E&P COMPANY, L.P., et al.,
Plaintiffs,
v.
THE UNITED STATES,
Defendant.

CONFIDENTIAL

---

NYCAL OFFSHORE DEVELOPMENT CORPORATION,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

ORIGINAL

---

DEPOSITION OF KENT B. LINA

August 4, 2006
JOB NO. 175864

Pursuant to Notice taken on behalf of the Defendant at 1225 17t Street, 7th Floor, Denver, Colorado 80202, at 9 a.m., before Jennifer Hayden, Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES:

STEVEN J. ROSENBAUM, Attorney at Law, from the Law Firm of Covington & Burling, LLP, 1201 Pennsylvania Avenue, N.W., Washington, D.C. 20004-2401, appearing on behalf of the Plaintiff.

GREGG M. SCHWIND, Attorney at Law, from the U.S. Department of Justice, Civil Division, 1100 L Street, N.W., Washington, D.C. 20004, appearing on behalf of the Defendant.

Also present: Ted Freedman, Esq.

MR. ROSENBAUM: Object as lacking foundation for this document.
A. Can you repeat the question, please.
(The question was read back.)
MR. ROSENBAUM: Same objection.
A. A specific proposal, no.
Q. (BY MR. SCHWIND) A general proposal?
A. Yes, as portrayed in the PowerPoint presentation.
Q. Did the PowerPoint presentation talk about a generic well or eight wells?
A. I believe it talks -- I don't know. I think -- I don't know.
Q. Well, you testified earlier that you performed an analysis on one generic well in the eastern half of 451. Where did that idea come from?
A. It would have come from the materials in the PowerPoint presentation.
Q. There were other AFEs that Arguello or Plains submitted to Delta for its consideration, correct?
A. Correct.
Q. And by other AFEs, I mean other

AFEs related to drilling on the eastern half
of 451, correct?
A. Yes.
MR. ROSENBAUM: I'm belatedly
objecting to the use of the word "other."
It lacks foundation.
Q. (BY MR. SCHWIND) What were
the terms of the first AFE that you recall
performing an analysis on that related
to drilling on the eastern half of 451?
A. I believe the first AFE was for
the mobilization and building of a drilling rig.
Q. And this would have been a rig to
be set on one of Arguello's platforms in the
Point Arguello Unit?
A. Correct.
Q. Do you recall when that AFE was
provided to Delta?
A. No, I don't.
Q. Was it before or after the
PowerPoint presentation that you spoke
of earlier today?
A. I'm sure it would have been after.
Q. Do you recall approximately how long
after that?

A. No, I don't.
Q. As part of -- well, let me ask you this. What analysis did you perform in considering that first AFE?
A. The analysis was fairly limited, in that it was pretty straightforward that that AFE needed to be approved if you were going to drill any wells.
Q. But at that time, in considering that first AFE for the rig, did you perform any analysis as to production and profitability?
A. Not at the time of receiving that AFE.
Q. Did you provide a recommendation to your company as far as whether or not your company should approve that AFE?
A. Yes, I did.
Q. What was that recommendation?
A. To approve the AFE.
Q. As part of that recommendation, did you consider or perform any analysis of production?
A. No, I did not.
Q. Then what did go into your recommendation to go ahead and approve that AFE?

MR. ROSENBAUM: Object as vague.
A. Previous analysis that I had performed.
Q. (BY MR. SCHWIND) Previous analysis of what?
A. The generic single well.
Q. So at that time that you were considering the AFE for the rig, is it fair to assume from your testimony that you still had not performed an analysis of the eight wells that we see proposed in Exhibit 1?
A. I did not analyze each and every one of the eight wells.
Q. After your recommendation on the rig AFE, what AFE do you recall receiving after that?
A. I believe the first AFE was Well 12.
Q. And do you recall that that well is sometimes referred to as C-12?
A. Correct.
Q. When do you recall receiving that AFE?
A. I do not know.
Q. At that point, I assume -- is it fair to assume that Arguello already had the

rig installed on the platform?
A. It was either installed or very close to being installed.
Q. Did you perform -- well, let me ask you this. The AFE from Arguello with respect to Well C-12, what information did it contain?
A. It probably had a page or two cover letter, and then the associated actual AFE would have been one or two pages.
Q. Did that AFE propose a well bottom location for C-12?
A. I can only assume it did because they always do.
Q. Do you recall what the well bottom location was, sitting here today?
A. No, I do not.
Q. But you do recall performing some type of analyses in making a recommendation to your company as far as the profitability of Well C-12, correct?
MR. ROSENBAUM: Object as compound, lack of foundation.
A. Can you repeat that, please.
(The question was read back.)
MR. ROSENBAUM: Same objection.

A. Extremely limited analysis or maybe no analysis, just pushing paper. I had already performed a generic run.

Q. (BY MR. SCHWIND) And you're saying that because you performed this generic run, no or little additional analysis was required?

A. Correct.

Q. Do you consider yourself a geologist?

A. No.

Q. A petroleum engineer?

A. Yes.

Q. Would you agree that the profitability of a particular well depends fairly heavily on where that well is drilled?

A. Can you repeat that, please.

Q. Would you agree, as a petroleum engineer, that the profitability of a given well is going to depend very heavily on where that well is drilled?

A. Yes.

Q. Would you also agree that there are many places on the eastern half of 451 where it would be entirely unprofitable to drill a well?

A. I can't specifically comment on

that. I don't have enough knowledge.
Q. How many oil-producing structures do you understand to exist on the eastern half of 451?
A. I have very limited knowledge.
Q. Well, with that very limited knowledge in mind, how many oil-producing structures do you understand to exist on the eastern half of that lease?
A. I can't really comment.
Q. Is your answer -- are you refusing to answer my question or --
A. I don't recall. I can't --
Q. I'm asking you today. Do you know how many oil-producing structures are known to exist on the eastern half of Lease 451?
A. No, I do not.
Q. When you were performing the limited analysis on the profitability of Well C-12, did you consider the possibility of drainage of oil from Lease 452 via the drilling of Well C-12?
A. No, I did not.
Q. Why not?
A. I didn't think it was an issue.
Q. Why not?

A. Because the way that the formation is fractured prevents it from draining.

Q. What formation is that?

A. The Monterey.

Q. Are you saying that oil does not move within the Monteray?

A. Oil will move in the Monteray, correct. Repeat the question, please. Did I misunderstand it?

Q. I don't know if you misunderstood it.

MR. ROSENBAUM: Why don't you read back the question and answer.

(The record was read back.)

Q. (BY MR. SCHWIND) Would you like to change any of those answers?

A. I'm good with those.

Q. You talked about your belief that there would be no drainage based upon fracturing within the structure?

A. Based on the reservoir characteristics of the formation.

Q. And what characteristics were those? And again, I'm going back to your analysis at the time when you received the AFE to drill

C-12.
A. Would you please repeat that.
Q. Sure. What characteristics are you talking about?
A. The fracturing of the Monteray, as with other -- which -- the fracturing of the Monteray would prevent oil flow in a lateral direction from the drain hole. It would be -- excuse me. It would come from a lateral and not the length of the drain hole.
Q. At that time, do you recall the general trajectory of Well C-12 as it was proposed?
A. I don't today.
Q. Do you recall the well was going to be drilled from Platform Hidalgo?
A. I don't even recall that. It was either that or the other one.
Q. The other platform?
A. Platform.
Q. You do remember providing a recommendation to your company with respect to Well C-12, correct?
A. Correct.
Q. Do you recall whether that

recommendation was in writing?
A. Most likely not.
Q. And once again, as I asked previously, do you recall whether you made any notes as part of that analysis?
A. No.
Q. Would you expect just from the general way that you operate that you did make notes as part of that analysis?
MR. ROSENBAUM: Object as calling for speculation.
A. I couldn't state that.
Q. (BY MR. SCHWIND) You talked about two AFEs, an AFE to install the rig on a platform and then the AFE for Well C-12. What AFE do you recall receiving next with respect to drilling on the eastern half of 451?
A. I don't recall receiving -- I don't know. It may have been for a sidetrack. They came at me quite often.
Q. How many AFEs do you recall in total receiving, again, with respect to drilling on the eastern half of 451?
A. I can only approximate.
Q. Okay. Approximately how many?

A. There would have been four originals and then a couple of sidetracks and the drilling rig, so that would have been six, seven.
Q. So we have four original wells, correct?
A. I believe that's correct.
Q. Two sidetracks, correct?
A. One to three. I'm not sure. That's what I assume, two.
Q. Plus the AFE for the rig, correct?
A. Correct.
Q. So, again, your recollection is approximately seven AFEs were submitted by Arguello to Delta for its approval, correct?
A. There may have been a lot others. There's supplementals if the well goes over. They come at you quite often.
Q. Sure, but a supplement -- does a supplement utilize the same AFE number as --
A. Yes, it does, but it's confusing as to the number of AFEs that you receive from Plains.
Q. With respect to the four original wells -- or the AFEs for the four original wells, do you recall performing any

additional -- any additional analyses?
A. I really don't.
Q. Do you recall making recommendations to your company as to the profitability of those four original wells?
A. I remember making recommendations as to the profitability of the generic well that I simulated.
Q. I understand that, but do you recall making recommendations as to profitability of the four original wells?
A. No, I don't.
Q. So what recommendation or recommendations did you make with respect to the four original wells?
A. I made recommendations to sign the AFEs.
Q. And what were those recommendations based on?
A. The analysis that I had done previously.
Q. So essentially you -- did you carry forward your conclusion that these wells would be profitable as the generic well itself was profitable?

A. Correct.
Q. Do you recall when the C-12 well was drilled?
A. No, I do not.
Q. Did you -- were you provided from any source production numbers from the C-12 well when it was drilled?
A. Subsequent to drilling --
Q. Yes.
A. -- after it was drilled?
Q. Yes.
A. Yes.
Q. That's when it was in production, right?
A. Correct.
Q. And do you recall generally whether those production numbers exceeded expectations, met expectations or were below expectations?
A. It was various, based on the time of analysis.
Q. What do you recall as far as the variety of production?
A. I really don't recall, but initially I think the well produced okay, and then later on it became apparent that maybe it was not

producing up to expectations.
Q. Prior to production from Well C-12, did you have any experience in drilling into the Monteray offshore California?
A. No.
Q. Does anyone at your -- did anyone at your company have such experience?
A. Not specifically in the Monteray.
Q. I'm wondering why your company even asked you to perform this analysis if you had no such experience. Do you know why?
A. We had great success in other fractured formations.
Q. Not the Monteray?
A. Correct.
Q. What type of other -- what other fractured formations are you referring to?
A. Austin Chalk trend.
Q. Austin what?
A. Austin Chalk.
Q. And how did those -- what is your understanding of how those fractures compare to the Monteray fracture?
A. Very similarly.
Q. When you're evaluating, you're

estimating production from a proposed well in the Austin Chalk, what drainage radius do you assume?

A. I don't. I've never done a calculation.

Q. Have you ever calculated drainage radius as part of your --

A. Not on a fractured formation.

Q. What type of formation have you calculated --

A. Conventional formations.

Q. If you could, just wait until I finish the question before you answer it. I know you probably know the rest of my question, but just for the court reporter's sake. Did you make any assumptions as to drainage radius with respect to the C-12 well?

A. No, I did not.

Q. Why not?

A. That was not part of my analysis.

Q. Whose idea was it to omit that from your analysis?

MR. ROSENBAUM: Object as lack of foundation.

A. I didn't consider it to be

applicable.

Q. (BY MR. SCHWIND) According to a declaration from Dr. Mannon, the C-12 well at its closest point is 700 feet from the lease boundary between Lease 451 and 452. Were you aware of that fact?

A. I can't say that I was.

Q. Well, you stated previously that the well-bottom location is stated on an AFE to drill a well, correct?

A. Usually it is.

Q. So is it fair to assume that you were aware of the distance from the Lease 452 boundary at the time you made your recommendation with respect to the C-12 well?

A. No.

Q. If that -- if the bottom-hole location was specified on the AFE, you would have seen it, right?

A. I may have glanced over it.

Q. Are you aware -- there's also evidence in this case that a second well, Well C-13, was eventually drilled. Do you recall that?

A. I recall a C-13 well being drilled.

Q. And do you recall receiving an AFE for that well?

A. I'm sure I did.

Q. And do you recall the proposed bottom-hole location of that well?

A. No, I do not.

Q. What do you recall as far as the production from Well C-13 as it was originally drilled?

A. I don't recall, but I believe that well was sidetracked.

Q. And do you recall that it was sidetracked because it produced an excessive amount of water?

A. I don't know why it was sidetracked.

Q. From your experience as a petroleum engineer, why do companies ordinarily sidetrack a well?

A. Any number of reasons. Usually it's due to mechanical failure.

Q. But it's some type of well failure, whether it's mechanical or otherwise, correct?

A. Correct.

Q. From your earlier testimony, can you confirm that Arguello sent Delta an AFE for the

C-13 sidetrack?
A. If the well was sidetracked, we received an AFE.
Q. Do you recall, sitting here today, performing any analysis in relation to the C-13 sidetrack?
A. No.
Q. Are you aware, sitting here today, of the proposed bottom=hole location of the C-13 sidetrack?
A. No, I am not.
Q. Were you aware that according to Dr. Mannon, the bottom of that well is 55 feet from the lease boundary? And the lease boundary I'm referring to is that between 451 and 452.
A. No, I was not aware of that.
Q. Is it your testimony that you are hearing that for the first time this morning?
A. Yes.
Q. Have you seen any production numbers from the C-13 well?
A. In the course of my job, I would have seen production numbers on the C-13 well.
Q. Well, the C-13 is still producing today, correct?

A. I assume it is.
Q. What are the last production numbers you've seen for the C-13 sidetrack?
A. I don't recall.
Q. Do you recall receiving an AFE for the C-14 well?
A. I assume we did.
Q. And from your answer, I take it you do not recall that, sitting here this morning?
A. I would have handled it, and I'm sure we received it.
Q. Do you recall, sitting here this morning, whether you performed any additional analysis with respect to the C-14 well?
A. I don't recall.
Q. And do you recall the bottom-hole location of the C-14 well as it was originally proposed?
A. No, I do not.
Q. What do you recall as far as the initial production from the C-14 well?
A. I can't distinguish between the wells. I don't know which is which as far as the production. I can't recall.
Q. Do you generally recall that the

C-14 well as originally drilled was also a failure and had to be sidetracked?

A. I'm not aware of that. I don't recall.

Q. Do you recall receiving an AFE for the C-14 sidetrack?

A. If the well was sidetracked, I received it and would have handled it.

Q. Do you recall, sitting here this morning, whether you performed any additional analysis related to the C-14 sidetrack?

A. I don't recall.

Q. Now, your current position is vice president of engineering; is that correct?

A. Correct.

MR. ROSENBAUM: Senior vice president.

A. Senior vice president.

Q. (BY MR. SCHWIND) Senior vice president. I apologize. As a senior vice president of engineering, do you recall tasking out the analysis to any persons under you?

MR. ROSENBAUM: Object as vague.

A. At that time there would have been no one under me.

Q. (BY MR. SCHWIND) So it was either you or no one?
A. Correct.
Q. With respect to these wells -- well, let me finish the wells first. Are you aware that there's also a C-15 well on the eastern half of 451?
A. That's the fourth well.
Q. So you are aware of that well?
A. Yes.
Q. All right. Do you recall -- well, let me back up. That would have been the most recent AFE that you received with respect to the drilling on the eastern half of 451?
A. I don't recall receiving that AFE. We have a new department that might have handled it.
Q. A new what? I'm sorry.
A. A new -- more people, and so someone else may have handled it.
Q. Can you give me the names of other persons who would have handled it if you did not?
A. It would have been in the land department, nontechnical.

Q. The land department, nontechnical?
A. They would have moved the paperwork. We established new procedures.
Q. What were those procedures?
A. That the land department would involve itself in the routing and approving process of AFEs.
Q. With respect to the C-15 well -- I'll ask the same series of questions -- do you recall the bottom-hole locations proposed in that AFE?
A. No, I do not.
Q. Do you recall, sitting here today, performing any analysis with respect to the C-15 well?
A. No, I do not.
Q. Do you recall seeing any analysis from someone else with respect to the C-15 well?
A. I'm not sure.
Q. Have you seen any production numbers from the -- well, let me back up. The C-15 well came onto production several months ago, correct?
A. Recently.
Q. Have you seen the production numbers

from the C-15 well?
A. No, I have not.
Q. Do you know generally whether it exceeded, met or failed to meet expectations?
A. I believe that well is an extremely poor well.
Q. I'll ask the same question with respect to the C-14 sidetrack. Are you aware whether that sidetrack well has exceeded, met or failed to meet expectations?
A. Is that the final completion for the well, the final sidetrack, the current?
Q. Yes.
A. I believe the 15 is a poor producer.
Q. I'm talking about the 14 sidetrack.
A. Oh, the 14 sidetrack. I'm sorry. Can you repeat the question.
Q. Sure. Are you aware of whether the production from the C-14 sidetrack -- and you're correct, the final sidetrack, exceeded, met or failed to meet expectations?
A. I would state it most likely failed to meet expectations.
Q. And the C-13 sidetrack, the same question. Are you aware of whether it exceeded,

met or failed to meet expectations?
A. I believe all of the wells failed to meet expectations.
Q. Are you aware that at some point one of the owners objected to the -- to one -- at least one of Arguello's AFEs to continue drilling wells in the eastern half of 451?
A. I was not aware of that.
Q. Did your recommendations -- or were your recommendations with respect to all these wells, including their sidetracks, all positive recommendations? And by positive recommendation, I mean, did you recommend that your company approve all of these AFEs?
A. Yes, I did.
Q. Maybe you can help me out here, because you have no well that's meeting expectations, correct, on the eastern half of 451?
A. You know, there's some good ones and there's some bad ones, and I'm not sure the best well, if I could characterize it as totally not meeting expectations.
Q. Can you name one well on the eastern half of 451 that, in your opinion, even met

expectations?
A. None of the wells met the original expectations.
Q. Well, what is the -- what is Delta's cost share of these wells when they're drilled into the eastern half of 451?
A. I believe it's 6 percent.
Q. And what's the -- let's talk about the four original wells, not the sidetracks. What was the approximate proposed cost for those original wells?
A. I can give a range.
Q. Please do.
A. I think they were 15 to 20 million dollars.
Q. So in round numbers, your company's cost share would be in the range of a million dollars per well, correct?
A. I believe that's correct.
Q. And I don't know everything your company does or how big it is, but is that considered a significant amount of money at Delta Petroleum?
A. Yes, it is.
Q. I'm wondering this. If all of these

wells continue to be drilled and continue to fail to meet expectations, why do you continue to recommend approval of the AFEs, obligating your company to a cost of approximately $1 million per well?

A. The lack of performance of a well in this formation does not necessarily dictate that another well will not perform.

Q. It's a fairly good indication, though, isn't it?

A. It is an indication.

Q. Sitting here today, do you know the bottom-hole location of any of the four wells that are currently in production on the eastern half of 451?

A. No, I do not, not specifically.

Q. Well, do you know the approximate bottom-hole location of any of the wells?

A. I'm not sure when you say bottom-hole location. Do you mean distance from the lease line, coordinates? What are you asking for?

Q. Let's put it in terms of distance from the lease line. Do you know the approximate bottom-hole location as far