# EXHIBIT D

32519AJH

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C
04-1822C
05-249C (Consolidated)

---

AMBER RESOURCES COMPANY, et al.,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

---

ANADARKO E&P COMPANY, L.P., et al.,
Plaintiffs,
v.
THE UNITED STATES,
Defendant.

CONFIDENTIAL

---

NYCAL OFFSHORE DEVELOPMENT CORPORATION,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

ORIGINAL

---

DEPOSITION OF KENT B. LINA

August 4, 2006
JOB NO. 175864

Pursuant to Notice taken on behalf of the Defendant at 1225 17t Street, 7th Floor, Denver, Colorado 80202, at 9 a.m., before Jennifer Hayden, Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES:

STEVEN J. ROSENBAUM, Attorney at Law, from the Law Firm of Covington & Burling, LLP, 1201 Pennsylvania Avenue, N.W., Washington, D.C. 20004-2401, appearing on behalf of the Plaintiff.

GREGG M. SCHWIND, Attorney at Law, from the U.S. Department of Justice, Civil Division, 1100 L Street, N.W., Washington, D.C. 20004, appearing on behalf of the Defendant.

Also present: Ted Freedman, Esq.

Incorporated, operator of both Point Arguello Unit and the eastern half of OCS-P 0451, is proposing to drill development wells from Platforms Hermosa and Hidalgo. The proposal is to drill a maximum of 8 wells for development of the eastern half of Lease OCSP 0451 reserves."

My question is this, prior to receiving the AFEs from Arguello or Plains, do you recall any type of written proposal to your company, Delta, to revise the development plan to drill wells into the eastern half of Lease 451?

A. Could you repeat that, please.

Q. No, I can't.

MR. SCHWIND: Can you read it back, please.

(The question was read back.)

A. The only documents that I recall receiving regarding their proposal was the typical minutes from a working interest owner meeting in the year 2002 and associated PowerPoint presentation.

Q. (BY MR. SCHWIND) Do you retain copies of those minutes and that PowerPoint

presentation?
A. Yes, I do. Yes, I did.
Q. And where do you maintain those documents?
A. In my office.
Q. Have you reviewed them in preparation for your testimony today?
A. No, I did not.
Q. What documents did you review in preparation for your testimony today?
A. No documents.
Q. If we go back to this revision that's marked Exhibit 1, did you attend the meeting that you referred to as far as the meeting minutes and the PowerPoint presentation?
A. I've never attended a meeting with Plains.
Q. Do you know from whatever recollection you may have of the minutes and the PowerPoint presentation whether or not the issue of drainage was discussed at that meeting? And by drainage, I mean drainage out from under Lease 451 from drilling on Lease 451.
A. I should correct myself. I don't believe I received minutes. I just received

this PowerPoint that has information that was shown. So it kind of acts like minutes, but it's not minutes of the meeting. I did not receive minutes.

Q. Okay. Do you know if the company received minutes?

A. They don't always prepare them and send them out, so I don't know that.

Q. But you're confident that whatever occurred occurred back in -- did you say near the latter half of the end of 2002?

A. I say 2002 because that was the date on the presentation materials that I received.

Q. Do you recall if those presentation materials discussed in any way the possibility of drainage from neighboring Lease 452?

A. I don't think they did.

Q. But you don't recall sitting here today?

A. I don't recall sitting here today.

Q. Who attended that meeting on behalf of Delta, if you know?

A. I don't believe anybody did.

Q. Did someone attend from Whiting on behalf of Delta?

A. I wouldn't know that.
Q. Who sent you this presentation?
A. As a working interest owner, it's customary to send out the presentation materials after each working interest owner meeting.
Q. Right, but who sent you your copy?
A. Plains.
Q. It came from Plains?
A. Um-hum.
Q. After this meeting in 2002, were you part of any discussions of the proposal to drill the eastern half of 451 here at Delta?
A. Yes.
Q. What do you recall of those discussions?
A. The discussions I recall were regarding my analysis of the AFE and my recommendation to participate.
Q. Was there an AFE on the table at that time in 2002?
A. If there wasn't an actual AFE, I would have still been able to perform an analysis with assumed costs.
Q. Okay. And do you recall what you were analyzing at that time, what specifically?

A. I recall utilizing the PowerPoint materials that I received to make a conclusion as to the expected performance of the proposed wells, and I made a conclusion as to the costs, and I evaluated that in an economic analysis.

Q. All right. What conclusion did you draw at that time as far as performance of the -- well, let me back up. How many wells were being -- were to be drilled in the proposal that you were evaluating?

A. At the time of originally looking at this, there may not have been a firm proposal, but I do recall anticipating as many as ten wells to be drilled.

Q. What was your analysis of the production from those wells at that time?

A. Can you repeat the question, please.

Q. What was your -- let me put it this way. What conclusion did you draw from your analysis with respect to production from those wells?

A. I made a recommendation to participate.

Q. I understand that, but I assume that recommendation was based, as you stated,

on your analysis of production, correct?
A. Correct.
Q. So what conclusions did you draw with respect to production?
A. That the production would be profitable.
Q. Well, at that time did you estimate -- did you generate an estimate of production?
A. I utilized the materials that were provided to me in the form of the PowerPoint and assumed that the production indicated was appropriate.
Q. So you agreed with the production numbers that were in the PowerPoint presentation that Plains had provided you?
A. Yes. Please repeat the question.
MR. SCHWIND: Can you read it back, please.
(The question was read back.)
A. No, I did not. I reduced the volumes.
Q. (BY MR. SCHWIND) How so?
A. There was numerous expectations presented as to the production expected, and

after looking at all of them, I -- for Delta, I chose one of the lower scenarios.
Q. And you said you also as part of your analysis looked at profitability, correct?
A. Correct.
Q. And you ultimately made the recommendation or you ultimately came to the conclusion that Arguello's or Plains' proposal to develop the eastern half of 451 would be profitable, correct?
A. Correct.
Q. As part of your analysis, did it occur to you that there was -- that some of the production numbers would originate from oil under Lease 452?
A. Could you please repeat.
(The question was read back.)
A. No.
Q. At that time, again, back in 2002 when you had this PowerPoint presentation before you, what was the, if you recall, closest bottom-hole location to Lease 452?
A. I don't recall at all.
Q. Do you recall generally that the bottom-hole locations were within several

thousand feet of the lease boundary?
A. I did not look at the location of the wells.
Q. Why not?
A. I was performing an analysis on a generic single well out of the ten.
Q. What were the parameters of that well?
A. I don't recall specifically.
Q. Do you recall making any notes during that analysis?
A. No, I do not recall.
Q. If you had made notes as part of that analysis and recommendation, where would those notes be now?
MR. ROSENBAUM: Object as calling for speculation.
A. I have no idea where they might be.
Q. (BY MR. SCHWIND) Do you normally retain copies of your notes that you make as part of an analysis and recommendation to your company?
A. Can you repeat that question, please.
Q. Do you normally retain notes from

analyses and recommendations that you perform for your company?
A. On most occasions, I do.
Q. Where do you retain those notes?
A. In personal files or in the company's files.
Q. Do you have any type of policy that you follow as far as how long you or your company maintains those type of notes?
A. No.
Q. If I understand your testimony correctly, in 2002 you made a recommendation to your company that the drilling of a generic well on the eastern half of 451 would be profitable, correct?
A. Not correct. I cannot agree with the 2002. The 2002 is the date of the information. I do not know when I performed the analysis.
Q. So it may have been in 2003?
A. Correct.
Q. So with that qualification, would you then agree that you made a recommendation to your company either in 2002 or 2003 --
A. Or 2004 at some point.

Q. -- that the drilling of one generic well on Lease 451 would be profitable?
A. Yes.
Q. Now, at some point there were -- well, going forward from this first PowerPoint presentation, when do you recall considering a more specific proposal from Plains or Arguello with respect to drilling on the eastern half of 451?
A. Approximately three years ago.
Q. Approximately three years ago would be on or around August 4, 2003; is that right?
MR. ROSENBAUM: Object as mischaracterizing the testimony.
A. Repeat.
Q. (BY MR. SCHWIND) Actually, let me rephrase. Turn to the page of this document, page 5 at the bottom -- we'll go about it that way -- the second paragraph from the bottom, "Based on current data, Arguello, Incorporated has estimated that 8 wells will be needed to develop the eastern half of Lease 451."
Do you recall ever considering a proposal from Arguello to drill eight wells into the eastern half of 451?

MR. ROSENBAUM: Object as lacking foundation for this document.
A. Can you repeat the question, please.
(The question was read back.)
MR. ROSENBAUM: Same objection.
A. A specific proposal, no.
Q. (BY MR. SCHWIND) A general proposal?
A. Yes, as portrayed in the PowerPoint presentation.
Q. Did the PowerPoint presentation talk about a generic well or eight wells?
A. I believe it talks -- I don't know. I think -- I don't know.
Q. Well, you testified earlier that you performed an analysis on one generic well in the eastern half of 451. Where did that idea come from?
A. It would have come from the materials in the PowerPoint presentation.
Q. There were other AFEs that Arguello or Plains submitted to Delta for its consideration, correct?
A. Correct.
Q. And by other AFEs, I mean other

# EXHIBIT E

32519AJH

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C
04-1822C
05-249C (Consolidated)

---

AMBER RESOURCES COMPANY, et al.,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

---

ANADARKO E&P COMPANY, L.P., et al.,
Plaintiffs,
v.
THE UNITED STATES,
Defendant.

CONFIDENTIAL

---

NYCAL OFFSHORE DEVELOPMENT CORPORATION,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

ORIGINAL

---

DEPOSITION OF KENT B. LINA

August 4, 2006
JOB NO. 175864

Pursuant to Notice taken on behalf of the Defendant at 1225 17t Street, 7th Floor, Denver, Colorado 80202, at 9 a.m., before Jennifer Hayden, Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES:

STEVEN J. ROSENBAUM, Attorney at Law, from the Law Firm of Covington & Burling, LLP, 1201 Pennsylvania Avenue, N.W., Washington, D.C. 20004-2401, appearing on behalf of the Plaintiff.

GREGG M. SCHWIND, Attorney at Law, from the U.S. Department of Justice, Civil Division, 1100 L Street, N.W., Washington, D.C. 20004, appearing on behalf of the Defendant.

Also present: Ted Freedman, Esq.

MR. ROSENBAUM: Object as lacking foundation for this document.
A. Can you repeat the question, please.
(The question was read back.)
MR. ROSENBAUM: Same objection.
A. A specific proposal, no.
Q. (BY MR. SCHWIND) A general proposal?
A. Yes, as portrayed in the PowerPoint presentation.
Q. Did the PowerPoint presentation talk about a generic well or eight wells?
A. I believe it talks -- I don't know. I think -- I don't know.
Q. Well, you testified earlier that you performed an analysis on one generic well in the eastern half of 451. Where did that idea come from?
A. It would have come from the materials in the PowerPoint presentation.
Q. There were other AFEs that Arguello or Plains submitted to Delta for its consideration, correct?
A. Correct.
Q. And by other AFEs, I mean other

AFEs related to drilling on the eastern half of 451, correct?

A. Yes.

MR. ROSENBAUM: I'm belatedly objecting to the use of the word "other." It lacks foundation.

Q. (BY MR. SCHWIND) What were the terms of the first AFE that you recall performing an analysis on that related to drilling on the eastern half of 451?

A. I believe the first AFE was for the mobilization and building of a drilling rig.

Q. And this would have been a rig to be set on one of Arguello's platforms in the Point Arguello Unit?

A. Correct.

Q. Do you recall when that AFE was provided to Delta?

A. No, I don't.

Q. Was it before or after the PowerPoint presentation that you spoke of earlier today?

A. I'm sure it would have been after.

Q. Do you recall approximately how long after that?

A. No, I don't.
Q. As part of -- well, let me ask you this. What analysis did you perform in considering that first AFE?
A. The analysis was fairly limited, in that it was pretty straightforward that that AFE needed to be approved if you were going to drill any wells.
Q. But at that time, in considering that first AFE for the rig, did you perform any analysis as to production and profitability?
A. Not at the time of receiving that AFE.
Q. Did you provide a recommendation to your company as far as whether or not your company should approve that AFE?
A. Yes, I did.
Q. What was that recommendation?
A. To approve the AFE.
Q. As part of that recommendation, did you consider or perform any analysis of production?
A. No, I did not.
Q. Then what did go into your recommendation to go ahead and approve that AFE?

MR. ROSENBAUM: Object as vague.
A. Previous analysis that I had performed.
Q. (BY MR. SCHWIND) Previous analysis of what?
A. The generic single well.
Q. So at that time that you were considering the AFE for the rig, is it fair to assume from your testimony that you still had not performed an analysis of the eight wells that we see proposed in Exhibit 1?
A. I did not analyze each and every one of the eight wells.
Q. After your recommendation on the rig AFE, what AFE do you recall receiving after that?
A. I believe the first AFE was Well 12.
Q. And do you recall that that well is sometimes referred to as C-12?
A. Correct.
Q. When do you recall receiving that AFE?
A. I do not know.
Q. At that point, I assume -- is it fair to assume that Arguello already had the

rig installed on the platform?
A. It was either installed or very close to being installed.
Q. Did you perform -- well, let me ask you this. The AFE from Arguello with respect to Well C-12, what information did it contain?
A. It probably had a page or two cover letter, and then the associated actual AFE would have been one or two pages.
Q. Did that AFE propose a well bottom location for C-12?
A. I can only assume it did because they always do.
Q. Do you recall what the well bottom location was, sitting here today?
A. No, I do not.
Q. But you do recall performing some type of analyses in making a recommendation to your company as far as the profitability of Well C-12, correct?
MR. ROSENBAUM: Object as compound, lack of foundation.
A. Can you repeat that, please.
(The question was read back.)
MR. ROSENBAUM: Same objection.

A. Extremely limited analysis or maybe no analysis, just pushing paper. I had already performed a generic run.

Q. (BY MR. SCHWIND) And you're saying that because you performed this generic run, no or little additional analysis was required?

A. Correct.

Q. Do you consider yourself a geologist?

A. No.

Q. A petroleum engineer?

A. Yes.

Q. Would you agree that the profitability of a particular well depends fairly heavily on where that well is drilled?

A. Can you repeat that, please.

Q. Would you agree, as a petroleum engineer, that the profitability of a given well is going to depend very heavily on where that well is drilled?

A. Yes.

Q. Would you also agree that there are many places on the eastern half of 451 where it would be entirely unprofitable to drill a well?

A. I can't specifically comment on

that. I don't have enough knowledge.
Q. How many oil-producing structures do you understand to exist on the eastern half of 451?
A. I have very limited knowledge.
Q. Well, with that very limited knowledge in mind, how many oil-producing structures do you understand to exist on the eastern half of that lease?
A. I can't really comment.
Q. Is your answer -- are you refusing to answer my question or --
A. I don't recall. I can't --
Q. I'm asking you today. Do you know how many oil-producing structures are known to exist on the eastern half of Lease 451?
A. No, I do not.
Q. When you were performing the limited analysis on the profitability of Well C-12, did you consider the possibility of drainage of oil from Lease 452 via the drilling of Well C-12?
A. No, I did not.
Q. Why not?
A. I didn't think it was an issue.
Q. Why not?

A. Because the way that the formation is fractured prevents it from draining.
Q. What formation is that?
A. The Monterey.
Q. Are you saying that oil does not move within the Monteray?
A. Oil will move in the Monteray, correct. Repeat the question, please. Did I misunderstand it?
Q. I don't know if you misunderstood it.
MR. ROSENBAUM: Why don't you read back the question and answer.
(The record was read back.)
Q. (BY MR. SCHWIND) Would you like to change any of those answers?
A. I'm good with those.
Q. You talked about your belief that there would be no drainage based upon fracturing within the structure?
A. Based on the reservoir characteristics of the formation.
Q. And what characteristics were those? And again, I'm going back to your analysis at the time when you received the AFE to drill

C-12.

A. Would you please repeat that.

Q. Sure. What characteristics are you talking about?

A. The fracturing of the Monteray, as with other -- which -- the fracturing of the Monteray would prevent oil flow in a lateral direction from the drain hole. It would be -- excuse me. It would come from a lateral and not the length of the drain hole.

Q. At that time, do you recall the general trajectory of Well C-12 as it was proposed?

A. I don't today.

Q. Do you recall the well was going to be drilled from Platform Hidalgo?

A. I don't even recall that. It was either that or the other one.

Q. The other platform?

A. Platform.

Q. You do remember providing a recommendation to your company with respect to Well C-12, correct?

A. Correct.

Q. Do you recall whether that

recommendation was in writing?
A. Most likely not.
Q. And once again, as I asked previously, do you recall whether you made any notes as part of that analysis?
A. No.
Q. Would you expect just from the general way that you operate that you did make notes as part of that analysis?
MR. ROSENBAUM: Object as calling for speculation.
A. I couldn't state that.
Q. (BY MR. SCHWIND) You talked about two AFEs, an AFE to install the rig on a platform and then the AFE for Well C-12. What AFE do you recall receiving next with respect to drilling on the eastern half of 451?
A. I don't recall receiving -- I don't know. It may have been for a sidetrack. They came at me quite often.
Q. How many AFEs do you recall in total receiving, again, with respect to drilling on the eastern half of 451?
A. I can only approximate.
Q. Okay. Approximately how many?

A. There would have been four originals and then a couple of sidetracks and the drilling rig, so that would have been six, seven.
Q. So we have four original wells, correct?
A. I believe that's correct.
Q. Two sidetracks, correct?
A. One to three. I'm not sure. That's what I assume, two.
Q. Plus the AFE for the rig, correct?
A. Correct.
Q. So, again, your recollection is approximately seven AFEs were submitted by Arguello to Delta for its approval, correct?
A. There may have been a lot others. There's supplementals if the well goes over. They come at you quite often.
Q. Sure, but a supplement -- does a supplement utilize the same AFE number as --
A. Yes, it does, but it's confusing as to the number of AFEs that you receive from Plains.
Q. With respect to the four original wells -- or the AFEs for the four original wells, do you recall performing any

additional -- any additional analyses?
A. I really don't.
Q. Do you recall making recommendations to your company as to the profitability of those four original wells?
A. I remember making recommendations as to the profitability of the generic well that I simulated.
Q. I understand that, but do you recall making recommendations as to profitability of the four original wells?
A. No, I don't.
Q. So what recommendation or recommendations did you make with respect to the four original wells?
A. I made recommendations to sign the AFEs.
Q. And what were those recommendations based on?
A. The analysis that I had done previously.
Q. So essentially you -- did you carry forward your conclusion that these wells would be profitable as the generic well itself was profitable?

A. Correct.
Q. Do you recall when the C-12 well was drilled?
A. No, I do not.
Q. Did you -- were you provided from any source production numbers from the C-12 well when it was drilled?
A. Subsequent to drilling --
Q. Yes.
A. -- after it was drilled?
Q. Yes.
A. Yes.
Q. That's when it was in production, right?
A. Correct.
Q. And do you recall generally whether those production numbers exceeded expectations, met expectations or were below expectations?
A. It was various, based on the time of analysis.
Q. What do you recall as far as the variety of production?
A. I really don't recall, but initially I think the well produced okay, and then later on it became apparent that maybe it was not

producing up to expectations.
Q. Prior to production from Well C-12, did you have any experience in drilling into the Monteray offshore California?
A. No.
Q. Does anyone at your -- did anyone at your company have such experience?
A. Not specifically in the Monteray.
Q. I'm wondering why your company even asked you to perform this analysis if you had no such experience. Do you know why?
A. We had great success in other fractured formations.
Q. Not the Monteray?
A. Correct.
Q. What type of other -- what other fractured formations are you referring to?
A. Austin Chalk trend.
Q. Austin what?
A. Austin Chalk.
Q. And how did those -- what is your understanding of how those fractures compare to the Monteray fracture?
A. Very similarly.
Q. When you're evaluating, you're

estimating production from a proposed well in the Austin Chalk, what drainage radius do you assume?
A. I don't. I've never done a calculation.
Q. Have you ever calculated drainage radius as part of your --
A. Not on a fractured formation.
Q. What type of formation have you calculated --
A. Conventional formations.
Q. If you could, just wait until I finish the question before you answer it. I know you probably know the rest of my question, but just for the court reporter's sake. Did you make any assumptions as to drainage radius with respect to the C-12 well?
A. No, I did not.
Q. Why not?
A. That was not part of my analysis.
Q. Whose idea was it to omit that from your analysis?
MR. ROSENBAUM: Object as lack of foundation.
A. I didn't consider it to be

applicable.
Q. (BY MR. SCHWIND) According to a declaration from Dr. Mannon, the C-12 well at its closest point is 700 feet from the lease boundary between Lease 451 and 452. Were you aware of that fact?
A. I can't say that I was.
Q. Well, you stated previously that the well-bottom location is stated on an AFE to drill a well, correct?
A. Usually it is.
Q. So is it fair to assume that you were aware of the distance from the Lease 452 boundary at the time you made your recommendation with respect to the C-12 well?
A. No.
Q. If that -- if the bottom-hole location was specified on the AFE, you would have seen it, right?
A. I may have glanced over it.
Q. Are you aware -- there's also evidence in this case that a second well, Well C-13, was eventually drilled. Do you recall that?
A. I recall a C-13 well being drilled.

Q. And do you recall receiving an AFE for that well?
A. I'm sure I did.
Q. And do you recall the proposed bottom-hole location of that well?
A. No, I do not.
Q. What do you recall as far as the production from Well C-13 as it was originally drilled?
A. I don't recall, but I believe that well was sidetracked.
Q. And do you recall that it was sidetracked because it produced an excessive amount of water?
A. I don't know why it was sidetracked.
Q. From your experience as a petroleum engineer, why do companies ordinarily sidetrack a well?
A. Any number of reasons. Usually it's due to mechanical failure.
Q. But it's some type of well failure, whether it's mechanical or otherwise, correct?
A. Correct.
Q. From your earlier testimony, can you confirm that Arguello sent Delta an AFE for the

C-13 sidetrack?
A. If the well was sidetracked, we received an AFE.
Q. Do you recall, sitting here today, performing any analysis in relation to the C-13 sidetrack?
A. No.
Q. Are you aware, sitting here today, of the proposed bottom=hole location of the C-13 sidetrack?
A. No, I am not.
Q. Were you aware that according to Dr. Mannon, the bottom of that well is 55 feet from the lease boundary? And the lease boundary I'm referring to is that between 451 and 452.
A. No, I was not aware of that.
Q. Is it your testimony that you are hearing that for the first time this morning?
A. Yes.
Q. Have you seen any production numbers from the C-13 well?
A. In the course of my job, I would have seen production numbers on the C-13 well.
Q. Well, the C-13 is still producing today, correct?

A. I assume it is.
Q. What are the last production numbers you've seen for the C-13 sidetrack?
A. I don't recall.
Q. Do you recall receiving an AFE for the C-14 well?
A. I assume we did.
Q. And from your answer, I take it you do not recall that, sitting here this morning?
A. I would have handled it, and I'm sure we received it.
Q. Do you recall, sitting here this morning, whether you performed any additional analysis with respect to the C-14 well?
A. I don't recall.
Q. And do you recall the bottom-hole location of the C-14 well as it was originally proposed?
A. No, I do not.
Q. What do you recall as far as the initial production from the C-14 well?
A. I can't distinguish between the wells. I don't know which is which as far as the production. I can't recall.
Q. Do you generally recall that the

C-14 well as originally drilled was also a failure and had to be sidetracked?
A. I'm not aware of that. I don't recall.
Q. Do you recall receiving an AFE for the C-14 sidetrack?
A. If the well was sidetracked, I received it and would have handled it.
Q. Do you recall, sitting here this morning, whether you performed any additional analysis related to the C-14 sidetrack?
A. I don't recall.
Q. Now, your current position is vice president of engineering; is that correct?
A. Correct.
MR. ROSENBAUM: Senior vice president.
A. Senior vice president.
Q. (BY MR. SCHWIND) Senior vice president. I apologize. As a senior vice president of engineering, do you recall tasking out the analysis to any persons under you?
MR. ROSENBAUM: Object as vague.
A. At that time there would have been no one under me.

Q. (BY MR. SCHWIND) So it was either you or no one?
A. Correct.
Q. With respect to these wells -- well, let me finish the wells first. Are you aware that there's also a C-15 well on the eastern half of 451?
A. That's the fourth well.
Q. So you are aware of that well?
A. Yes.
Q. All right. Do you recall -- well, let me back up. That would have been the most recent AFE that you received with respect to the drilling on the eastern half of 451?
A. I don't recall receiving that AFE. We have a new department that might have handled it.
Q. A new what? I'm sorry.
A. A new -- more people, and so someone else may have handled it.
Q. Can you give me the names of other persons who would have handled it if you did not?
A. It would have been in the land department, nontechnical.

Q. The land department, nontechnical?
A. They would have moved the paperwork. We established new procedures.
Q. What were those procedures?
A. That the land department would involve itself in the routing and approving process of AFEs.
Q. With respect to the C-15 well -- I'll ask the same series of questions -- do you recall the bottom-hole locations proposed in that AFE?
A. No, I do not.
Q. Do you recall, sitting here today, performing any analysis with respect to the C-15 well?
A. No, I do not.
Q. Do you recall seeing any analysis from someone else with respect to the C-15 well?
A. I'm not sure.
Q. Have you seen any production numbers from the -- well, let me back up. The C-15 well came onto production several months ago, correct?
A. Recently.
Q. Have you seen the production numbers

from the C-15 well?
A. No, I have not.
Q. Do you know generally whether it exceeded, met or failed to meet expectations?
A. I believe that well is an extremely poor well.
Q. I'll ask the same question with respect to the C-14 sidetrack. Are you aware whether that sidetrack well has exceeded, met or failed to meet expectations?
A. Is that the final completion for the well, the final sidetrack, the current?
Q. Yes.
A. I believe the 15 is a poor producer.
Q. I'm talking about the 14 sidetrack.
A. Oh, the 14 sidetrack. I'm sorry. Can you repeat the question.
Q. Sure. Are you aware of whether the production from the C-14 sidetrack -- and you're correct, the final sidetrack, exceeded, met or failed to meet expectations?
A. I would state it most likely failed to meet expectations.
Q. And the C-13 sidetrack, the same question. Are you aware of whether it exceeded,

met or failed to meet expectations?
A. I believe all of the wells failed to meet expectations.
Q. Are you aware that at some point one of the owners objected to the -- to one -- at least one of Arguello's AFEs to continue drilling wells in the eastern half of 451?
A. I was not aware of that.
Q. Did your recommendations -- or were your recommendations with respect to all these wells, including their sidetracks, all positive recommendations? And by positive recommendation, I mean, did you recommend that your company approve all of these AFEs?
A. Yes, I did.
Q. Maybe you can help me out here, because you have no well that's meeting expectations, correct, on the eastern half of 451?
A. You know, there's some good ones and there's some bad ones, and I'm not sure the best well, if I could characterize it as totally not meeting expectations.
Q. Can you name one well on the eastern half of 451 that, in your opinion, even met

expectations?
A. None of the wells met the original expectations.
Q. Well, what is the -- what is Delta's cost share of these wells when they're drilled into the eastern half of 451?
A. I believe it's 6 percent.
Q. And what's the -- let's talk about the four original wells, not the sidetracks. What was the approximate proposed cost for those original wells?
A. I can give a range.
Q. Please do.
A. I think they were 15 to 20 million dollars.
Q. So in round numbers, your company's cost share would be in the range of a million dollars per well, correct?
A. I believe that's correct.
Q. And I don't know everything your company does or how big it is, but is that considered a significant amount of money at Delta Petroleum?
A. Yes, it is.
Q. I'm wondering this. If all of these

wells continue to be drilled and continue to fail to meet expectations, why do you continue to recommend approval of the AFEs, obligating your company to a cost of approximately $1 million per well?

A. The lack of performance of a well in this formation does not necessarily dictate that another well will not perform.

Q. It's a fairly good indication, though, isn't it?

A. It is an indication.

Q. Sitting here today, do you know the bottom-hole location of any of the four wells that are currently in production on the eastern half of 451?

A. No, I do not, not specifically.

Q. Well, do you know the approximate bottom-hole location of any of the wells?

A. I'm not sure when you say bottom-hole location. Do you mean distance from the lease line, coordinates? What are you asking for?

Q. Let's put it in terms of distance from the lease line. Do you know the approximate bottom-hole location as far