# In the United States Court of Federal Claims

Nos. 02-30C, 04-1822C, & 05-249C (consolidated)
(Filed: October 31, 2006)

* * * * * * * * * * * * * * * * * * * * * * *
AMBER RESOURCES CO.,
*et al.*,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.
* * * * * * * * * * * * * * * * * * * * * * *
ANADARKO E&P CO. LP,
*et al.*,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.
* * * * * * * * * * * * * * * * * * * * * * * *
NYCAL OFFSHORE DEVELOPMENT CORP.,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*.
* * * * * * * * * * * * * * * * * * * * * * * *

Motion for Partial Summary Judgment; Outer Continental Shelf Oil and Gas Leasing; Outer Continental Shelf Lands Act; Rescission and Restitution; Offset of Restitution Award; Recovery of Sunk Costs as Restitutionary Damages; Reliance Damages Distinguished.

*Steven J. Rosenbaum*, Covington & Burling, Washington, D.C., with whom were *E. Edward Bruce* and *Thomas J. Cosgrove*, also of Washington, D.C., for plaintiffs.

*Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United Stated Department of Justice, Washington, D.C., with whom were Trial Attorneys *Stephen C. Tosini* and *Allison Kidd-Miller*, Director *David M. Cohen*, and Assistant Attorney General *Peter D. Keisler*, for defendant.

————

*OPINION*

————

BRUGGINK, *Judge*.

This is an action for breach of contract brought by several holders of leases to explore and exploit submerged federal lands for oil and gas. We previously held that a 1990 amendment to the Coastal Zone Management Act ("CZMA")[1] constituted an anticipatory repudiation of those leases. *See Amber Resources Co. v. United States,* 68 Fed. Cl. 535 (2005). We held that plaintiffs were entitled to treat the government's 2001 cancellation of the lease suspensions as a total breach of contract, giving them the right of rescission and restitution. We also held that plaintiffs were entitled to a return of approximately $1.1 billion in up-front bonus payments that they, or their predecessors in interest, had paid for the leasehold rights.

Now pending is Plaintiffs' Motion for Partial Summary Judgment (1) Establishing the Absence of Any Legally Cognizable 'Benefits' to Be Offset Against Plaintiffs' Restitution Award; (2) Establishing Their Entitlement to Recover Sunk Costs as Restitutionary Damages; and (3) Dismissing All of Defendant's Affirmative Defenses. The import of the motion is that plaintiffs are entitled to approximately $727 million in additional damages. Proof of quantum is left for a later day. Defendant has responded by filing its Opposition to Plaintiffs' Motion for Partial Summary Judgment as to Certain Defenses and Cross-Motion for Summary Judgment Upon Plaintiffs'

[1] 16 U.S.C. §§ 1451-65

Remaining Claims. The matter is fully briefed,[2] and oral argument was held on July 10, 2006. For the reasons set out below, we deny in part and grant in part both parties' motions.

BACKGROUND

We assume the reader's familiarity with our prior decision. Plaintiffs now seek a ruling clarifying their entitlement to additional damages, namely, recovery of exploration and other costs to develop the leaseholds incurred by them and their leasehold predecessors. In addition, they ask the court to reject certain affirmative defenses the government has indicated it will pursue, including the assertion that any award should be offset by benefits received by plaintiffs or their predecessors in interest and for the depreciation in value of the leases. Defendant's affirmative cross-motion is based on the assumption that plaintiffs, to recover anything further, must proceed on a reliance theory of damages. On that assumption, defendant contends that plaintiffs cannot recover additional damages because they cannot establish a causal link between the breach and any loss.

The case presents a difficult series of choices as to how to measure damages for the breach of contract. Plaintiffs, with the exception of NYCAL, have elected not to pursue expectancy damages; presumably because proof to a reasonable degree of certainty would be difficult, given the speculative nature of the enterprise of drilling for oil and gas. Nevertheless, plaintiffs are entitled to pursue their reliance or restitutionary interests. Plaintiffs have characterized their theory of recovery as one in restitution, consisting of a recovery of the value of the benefits provided to the defendant and plaintiffs' other costs. They have heretofore avoided resort to reliance damages.

We have previously endorsed plaintiffs' entitlement to approximately $1.1 billion as a return of the up front payments received by the government. We viewed this amount as a ready measure of the benefit defendant has received, although it does not account for the time value of the money

[2]Defendant was permitted subsequently to initiate additional briefing to address the Federal Circuit's recent decision in *Old Stone Corp. v. United States,* 450 F.3d 1360 (Fed. Cir. 2006).

defendant had for over two decades.[3] The Supreme Court's decision in *Mobil Oil v. United States*, 530 U.S. 604, 608 (2000), which involved very similar facts, furnished a logical model. Plaintiffs contend, however, that they are also entitled, as part of a restitution recovery, to be reimbursed for "other costs," citing *Landmark Land Co., Inc. v. United States*, 256 F.3d 1365, 1372-73 (Fed. Cir. 2001). We discuss below the legal basis for this claim. For the present it is sufficient to reflect that, in this case, plaintiffs or their predecessors in interest invested not just the $1.1 billion in up front bonus payments, but also an additional $727 million in "sunk costs," (i.e., amounts spent on developing the leases). Plaintiffs, therefore, seek a total recovery of approximately $1.83 billion. Solely for the purpose of ruling on the present cross-motions, we will use plaintiffs' numbers as to sunk costs.[4]

---

[3]The Restatement (First) of Restitution provides for damages for "lost use:"

> Restitution Of Direct Product And Compensation For Use
>
> (1) A person under a duty to another to make restitution of property received by him or of its value is under a duty(a) to account for the direct product of the subject matter received while in his possession, and (b) *to pay such additional amount as compensation for the use of the subject matter as will be just* to both parties in view of the fault, if any, of either or both of them. (2) The rule stated in Subsection (1) is applicable to an action brought solely to recover the income or value of the use of the subject matter, or interest upon the amount of its value.

Restatement (First) of Restitution § 157 (1937) (emphasis supplied). The Federal Circuit cites comment (a) of this section in *Landmark Land Co., Inc. v. United States,* 256 F. 3d 1365 (Fed. Cir. 2001): "The remedy of restitution may include compensation for lost use value where necessary to restore the plaintiff to its status quo ante by providing compensation 'for the use of the subject matter for the period during which [it] was deprived.'" *Landmark*, 256 F.3d at 1374. Plaintiffs have not sought use damages here, presumably because they would be questioned as interest.

[4]Unlike the figures for up front payments, they are disputed and are the subject of ongoing discovery.

Defendant's response is based, in part, on the undisputed fact that most of the current plaintiffs obtained their interests in the leaseholds by assignment, and that most of the money was spent by those predecessors in interest. Defendant contends that, even assuming liability, the most that plaintiffs can recover under a restitution theory is $508 million, consisting of the $334 million plaintiffs spent to acquire the leases (either from the government or their predecessors in interest) and the $174 million they actually spent on lease development. As we explained above, the first component of this defense (with respect to up front bonus payments) has been rejected in the context of a rescission remedy, although it is revisited below in connection with defendant's argument that plaintiffs are now, in reality, seeking reliance damages. The second component of this defense–plaintiffs' entitlement *vel non* to development costs of their predecessors in interest–is before us for the first time in these motions.

The government presents us with a string of other defenses, some of which we have dealt with earlier. The first is that the plaintiffs are, in effect, pursuing a claim in *quantum meruit* and not a claim for damages for breach of an express contract. According to the government, such a claim sounds in equity and is beyond the court's jurisdiction. A second argument, recycled from the earlier round of motions, is that plaintiffs are barred from proceeding because of an asserted election to continue performance of the contracts.

The third argument is that plaintiffs' expenditures did not benefit the United States. A related defense is that, because the law of restitution (or reliance) contemplates an accounting by the injured party for any benefit received, any recovery by the plaintiffs must be offset by the benefit flowing to plaintiffs from the government. The benefit the government identifies consists of two elements: amounts received by predecessor plaintiffs from successor plaintiffs at the time of lease assignments, and the value to the oil companies of the opportunity they had to explore for oil and gas.

A fourth defense is that plaintiffs must also account for the fact that the leases are being returned to the government in a "damaged" condition. To the extent that plaintiffs' prior exploration on some tracts was unsuccessful, the government wants a credit for the loss of the "speculative" value of the leases.

The government does not offer, however, to do a reciprocal accounting for successful exploratory drilling.[5]

Finally, the most telling argument the government now offers is that, properly construed, plaintiffs' claim sounds in reliance rather than restitution, and thus they should recover no sunk costs without demonstrating a causal connection between the breach and a net loss on the leases.

DISCUSSION

*Applicable Legal Principles*

Plaintiffs characterize their recovery as one for restitution and rescission. Defendant suggests that some of the damages are more correctly characterized as reliance damages. Because the outcome here may turn on distinctions between restitution and reliance damages, it is useful to attempt to summarize the two remedies, although we do so with great trepidation. Restitution, in particular, is a protean concept. This is reflected in the fact that the Restatement (First) of Restitution (1937), now actively being reworked, embraces legal principles well beyond contract law. Even its contract applications, however, are not fully consistent with the treatment of restitution in the Restatement (Second) of Contracts (1981). In addition, while restitution and reliance are typically treated as alternate remedies, as we see below, reliance is a broader concept and, arguably, restitution in the context of express contracts is merely a subset of reliance damages.

We begin with restitution, which is the plaintiffs' preferred choice of remedy. Restitution as a theory of recovery embraces much more than one type of remedy for breach of contract. Instead, restitution is an elastic concept which may have its origins in equity, but which has expanded to embrace both implied-in-law and implied-in-fact contracts. *See* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* 599-600 (4th ed. 1998). The common thread perceived by the drafters of the Restatement (First) of Restitution § 1 is that "one person is accountable to another on the ground that otherwise he would unjustly benefit or the other would suffer loss."

---

[5]Plaintiffs have alleged the discovery of significant quantities of oil and gas on some of the tracts.

As is apparent from the Restatement, a potential dual focus–the breaching party and the injured party–has been imbedded in the remedy, with resulting confusion. We note, for example, the following two descriptions of the remedy from noteworthy hornbooks, which attempt to focus on only one of those parties. Farnsworth, for example, is adamant that the focus of restitution is on the breaching party:

> In contrast to cases in which the court grants specific performance or awards damages as a remedy for breach, the effort is not to enforce the promise by protecting the injured party's expectation or reliance interest, but to prevent unjust enrichment of the party in breach by protecting the injured party's restitution interest. The object is not to put the *injured* party in as good a position as the party would have been in had the contract been performed, nor even to put the *injured* party back in the position that party would have been in if the contract had not been made; it is rather to put the party *in breach* back in the position that party would have been in had the contract not been made.

E. Allen Farnsworth, *Contracts* 947 (2d ed. 1990) (emphasis in original).

Corbin, on the other hand, characterizes restitution this way:

> The purpose of the remedy is the restoration of the *injured* party to as good a position as was occupied by him before the contract was made, without attempting to compensate him for consequential harms; the means to this end is a judgment for the equivalent in money of any performance rendered by the plaintiff and received by the defendant . . . .

Arthur L. Corbin, *Corbin on Contracts* § 1102 (Interim ed. 2002) (emphasis supplied). It is worth noting, however, that the measurement of restitution even under Corbin's approach permits, as an alternative, a focus on what the breaching party received.

The Restatement (Second) of Contracts § 373 recites that, " on a breach by non-performance that gives rise to a claim for damages for total breach . . . the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance." "A party is

entitled to restitution . . . , only to the extent that he has conferred a benefit on the other party by way of that part performance or reliance." *Id.* § 370.

The Federal Circuit's recent occasions to address restitution reflect some of this inconsistency in approach. In *Old Stone Corp. v. United States,* 450 F.3d 1360 (Fed. Cir. 2006), for example, the court writes that, "when one party to a contract commits a total breach, the other party 'is entitled to restitution for any benefit that he has conferred on' the breaching party 'by way of part performance or reliance.'" *Id.* at 1370-71. (quoting *Mobil,* 530 U.S. at 608).

In *Glendale Federal Bank, F.S.B. v. United States,* 239 F.3d 1374 (Fed. Cir. 2001), on the other hand, the court emphasized that the idea behind restitution is "to restore–that is, to restore the non-breaching party to the position he would have been in had there never been a contract to breach." *Id.* at 1380. *See also Acme Process Equip. Co. v. United States*, 347 F.2d 509, 528 (Ct. Cl. 1965) ("The purpose is to restore the injured party to the pre-contract *status quo*, not to put him in a post-contract position.").

Reflective of this dual focus, the Federal Circuit has held that there are two alternative measures of relief.

> The first is the value of the benefits received by the defendant due to the plaintiffs' performance. The second is the cost of the plaintiffs' performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract.

*Landmark*, 256 F.3d at 1372-73. The *Landmark* court pointed to the decision of the Court of Claims in *Acme*. There, the court permitted a recovery that it characterized as restitution despite the fact that plaintiff did not deliver any of the equipment called for by the contract. The court held that plaintiff's recovery was "not limited to the value of the goods received by the Government . . . rather, it [could] be based on the reasonable value of the entire performance," which the court measured by plaintiff's actual costs. *Acme*, 347 F.2d at 530. *See also LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1375-76 (Fed. Cir. 2003) (these "classical views [are not] incompatible, for applicability of restitution damages varies with the particular case.").

It is worth noting, however, that even in *Acme*, the court took pains to characterize the plaintiff's preparation costs as part of the benefits the government had contracted to receive: "One of the contemplated benefits of awarding the contract to Acme was that 'placing this procurement [in] subject contractor's plant will not only broaden the manufacturing base but create a salutory effect, pricewise, on all other procurements of this type.'" 347 F.2d at 530 (quoting from internal government document). Calamari and Perillo recognize this approach, but suggest that the "losses sustained by the plaintiff are artificially labeled as benefits conferred upon the defendant." Calamari & Perillo, *supra*, at 600.

These excerpts from the cases and commentary demonstrate what Joseph Perillo observed in his article critiquing the Restatement (Second) of Contracts with respect to its treatment of restitution: there have been three separate, but related rationales offered for contract restitution–unjust enrichment, return of a benefit, and returning the parties to the status quo ante. Joseph M. Perillo, *Restitution in the Second Restatement of Contracts*, 81 Colum. L. Rev. 37, 38-39 (1981). As the citations above show, the question of whether the breaching party has been benefitted can be nuanced. Moreover, as Perillo points out, the third rationale–returning parties to the status quo ante–can conflict with the other two on occasion. The present case provides an example. The status quo ante here would involve: the return of the leases, uninjured, to the government; the return of the deposits to the plaintiffs or their predecessors; and the reimbursement to plaintiffs or their predecessors of all expenditures. The reimbursement of expenses, however, would come from the government, which simultaneously would leave it somewhere other than the status quo ante.

A contracting party's restitution interest is normally viewed as distinct from the reliance interest. The former is not a damages remedy; the latter is. The Restatement characterizes a party's reliance interest as "his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made . . . ." Restatement (Second) of Contracts § 344 (1981). "Reliance' damages cover the amount a non-breaching party expends in performing the contract in reliance on the other party's anticipated performance." *Granite Management Corp. v. United States,* 416 F.3d 1373, 1380 (Fed. Cir. 2005). As explained by the Federal Circuit:

> Reliance damages provide another way for a non-breaching party to recover losses suffered as the result of a breach of contract. Restatement (Second) of Contracts § 344(b). As reliance damages, the non-breaching party "may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract."

*Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297, 1308-09 (Fed. Cir. 2004) (citing Calamari & Perillo, *supra*, at 556).

As Fuller and Perdue remind in their seminal article, *The Reliance Interest in Contract Damages* (pt. 1), 46 Yale L. J. 52 (1937), "it is impossible to separate the law of contract damages from the larger body of motives and policies which constitutes the general law of contracts." *Id.* at 53. In summarizing these purposes with respect to the three categories of contract damages, they suggest the close kinship between restitution and reliance damages:

> *First*, the plaintiff has in reliance on the promise of the defendant conferred some value on the defendant. The defendant fails to perform his promise. The court may force the defendant to disgorge the value he received from plaintiff. The object here may be termed the prevention of gain by the defaulting promisor at the expense of the promissee; more briefly, the prevention of unjust enrichment. The interest protected may be called the *restitution interest*. . . .
>
> *Secondly*, the plaintiff has in reliance on the promise of the defendant changed his position. . . . We may award damages to the plaintiff for the purpose of undoing the harm which his reliance on the defendant's promise has caused him. Our object is to put him in as good a position as he was in before the promise was made. The interest protected in this case may be called the *reliance interest*.
>
> *Thirdly*, . . . we may seek to give the promissee the value of the expectancy which the promise created. . . . Here our object is to put the plaintiff in as good a position as he would have occupied had the defendant performed his promise. The interest protected in this case is the *expectation interest*.

> . . . .
> If . . . the gain involved in the restitution interest results from and is identical with the plaintiff's loss through reliance, then the restitution interest is merely a special case of the reliance interest; all of the cases coming under the restitution interest will be covered by the reliance interest, and the reliance interest will be broader than the restitution interest only to the extent that it includes cases where the plaintiff has relied on the defendant's promise without enriching the defendant.

*Id*. at 53-55.

What becomes problematic, however, is when reliance (broadly including restitution interests) and expectation interests are combined in one suit. As Fuller and Purdue suggest:

> [A] man cannot claim the benefits of a bargaining without incurring its detriments. Since "essential reliance" consists of those acts which must occur before the plaintiff is entitled to the benefits of the contract and is therefore in a sense the "price" of those benefits, it is improper for the plaintiff to recover those benefits and at the same time shift the cost of them to the defendant . . . .

*Id*. at 81.

This proliferation of rationales and defenses provides the present parties with an abundance of arguments. Trying to resolve them in some principled way matters. As defendant emphasizes, if plaintiffs' recovery is really one in reliance damages, it is subject to the defense that individual leases would have been unprofitable, and the concept of benefit conferred is arguably different. For assistance in properly categorizing plaintiffs' current claim for sunk costs, we turn to the recent efforts to complete the draft Restatement (Third) of Restitution.

The tensions in the Restatement (First) of Restitution, the Restatement (Second) of Contracts, and the draft Restatement (Third) of Restitution, reflected in case law, has been well-chronicled by Professor Andrew Kull. *See* Andrew Kull, *Rescission and Restitution*, 61 Bus. Law. 569 (2006); Andrew Kull, *Private law, Punishment and Disgorgement: Restitution's*

*Outlaws*, 78 Chi.-Kent L. Rev. 17 (2003). The result is an imprecision in maintaining the difference between restitution limited to the remedy of rescission and restitution when expanded to include reliance damages. Although the two remedies share many common inquiries, as we see below, the difference between them matters on occasion.

Professor Kull has explained the distinction:

> [T]he category of "restitution as a remedy for breach" has been employed to comprise two remedies that need to be distinguished. One of these remedies is rescission, meaning the injured party's option to unwind the contractual exchange as an alternative to enforcing it; the other is a substitute measure of damages, for cases in which full expectation damages are incapable of proof.

Kull, *Rescission and Restitution*, *supra*, at 570.

Rescission is thus not a true "damage" remedy, unlike reliance, which is a substitute for enforcement of the contract. For example, as Professor Kull explains, rescission is not concerned with inquiries into the profitability of the now-cancelled contract. *See Id*. at 577-78. The possibility that the injured party may benefit from the breach by being spared performance of a losing contract is accepted and immaterial. For that reason, as defendant here concedes, it is unnecessary–in the context of rescission–for plaintiffs to establish a causal connection between the breach and any damage. Reliance damages, on the other hand, leave room for the argument that the contract would not have been profitable, and hence, monies plaintiffs invested would have been lost even in the absence of a breach.

The Federal Circuit has recognized this distinction:

> [T]he applicability of restitution damages varies with the particular case. *See* Restatement of Restitution § 1 cmt. e ("The amount of recovery, however, is not invariably determined by the value of what is received. In some cases the value of what is given is determinative . . . .")
>
> *When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the*

> *contract, the award can be viewed as a form of reliance damages,* wherein the non-breaching party is restored to its pre-contract position by returning as damages the costs incurred in reliance on the contract. Acme, 347 F.2d at 530.
>
> . . . .
>
> The principle of restitution damages is to return the costs incurred in performing the contract, costs sometimes conveniently measured by the benefits conferred on the breaching party . . . .

*LaSalle Talman Bank,* 317 F.3d at 1376 -1377 (emphasis supplied). *See also Hansen Bancorp,* 367 F.3d at 1315 n.13 ("While these two approaches to restitution are not necessarily incompatible, we have observed that the 'costs' measurement may sometimes be more properly viewed as a form of reliance damages.").

The draft of the Restatement (Third) of Restitution (hereafter, "Restitution Draft") attempts to clarify the law in the area by identifying two distinct remedies, although, confusingly, both are characterized as "restitution." Section 37 deals with "Rescission as a Remedy for Breach of Contract." These damages are retrospective in approach, seeking to put the parties in a pre-performance position by having them "make specific restitution of *property* transferred under the contract . . . ." Restitution Draft § 37 (Tentative Draft No. 3, 2004) (emphasis supplied). Critically, it leaves room for the possibility of a windfall to the injured party. Section 53 of the current working draft, entitled "Rescission," permits the claimant "who has transferred *money or other property*" to avoid "the legal effect of the transfer and recover the property transferred, but only if the claimant can make the reciprocal restitutions required by this section." Restitution Draft § 53(3) (Tentative Draft No. 8, 2006) (emphasis supplied). The draft goes on to clarify:

> (6) Rescission involves a mutual restitution and accounting in which each party
>
> > (a) restores property received from the other or its value,
> >
> > (b) accounts for additional benefits obtained at the expense of the other as a result of the transaction . . .,
> >
> > (c) compensates the other for incidental loss as justice may require.

*Id*. § 53(6). We view it as significant that the draft assumes that rescission involves a restoration of "property received." Here, the sunk expenditures do not, we believe, constitute property received from plaintiffs by the government. While we agree with plaintiffs, as discussed below, that such costs were foreseeable and incurred pursuant to the contract, they did not directly benefit the government in the same way as the up-front payments. They were simply expenses incurred in reliance on the leases.

Section 38, "Restitutionary Measure of Contract Damages," on the other hand, as the notes to the draft make clear, is closely analogous to (and in some cases indistinguishable from) the rule that allows contract damages measured by the plaintiff's reliance expenditures. Restitution Draft § 38 cmts. a-b (Tentative Draft No. 3, 2004). Section 38, in other words, even though still characterized as restitution, will function equivalently to section 349 of the Restatement (Second) of Contracts, "Damages Based on Reliance Interest." The recovery under draft section 38 will thus include "expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." Restatement (Second) of Contracts § 349 (1981). The latter limitation ("less any loss") makes it clear that this is a damage remedy; a proxy for the expectation interest.

Although no attempt is made to calculate lost profits under section 38, the remedy is forward looking, i.e., as if the contract had been performed. The assumption is that the injured party would at least have recovered his expenses; although that assumption may be rebutted. But the net result is that damages by a "proxy measure cannot be more advantageous than provable expectation damages: there is no 'unfair windfall.'" Kull, *Rescission and Restitution*, *supra*, at 580.[6] As Prof. Kull points out, this is simply reliance damages by any

---

[6]The Federal Circuit has held that restitution may be inappropriate if "relief would result in an 'unfair windfall' to the non-breaching party. While an award of restitution should seek to return the non-breaching party to as good of a position as it would have been in if the contract had never been entered into, 'the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach.'" *Hansen Bancorp,* 367 F.3d at 1315 (quoting *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed.Cir.2003)). *See also LaSalle Talman Bank*, (continued...)

other name and is fully consistent with what the Federal Circuit has written recently. *Id*. at 578.

Reliance, in short, attempts to make the injured party whole by reimbursing it for amounts expended, even if they do not benefit the breaching party. In effect, it is a substitute for expectancy damages when it is impossible to determine accurately whether performance would have been profitable. The assumption is made that the injured party would have at least covered his expenses.[7] If a claim is advanced on a reliance theory, in other words, the defendant should be able to argue that the injured party would have lost money on the contract. Restitution, on the other hand, is concerned with returning to the injured party any net benefit conferred on the breaching party, although sometimes measured by performance costs. The focus, or paradigm circumstance in restitution/rescission, however, *involves the return of specific money or property*.

To return to the case at bar: Heretofore, plaintiffs have assiduously avoided characterizing their claim as one for reliance damages. The reason is apparent. By doing so, they would open themselves up to the defense that any one leasehold would have lost money, and hence plaintiffs' recovery would be capped at the point that there was no longer a return on investment. Moreover, they face the argument that expenditures for down payments or sunk costs by their predecessors are not costs *they* incurred in reliance on the contract.

In the context of rescission, it is worth recapping what the court has held previously. At the time we ruled in favor of plaintiffs with respect to

---

[6](...continued)
317 F.3d at 1371 ("the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred"). In light of *Mobil*, we view these cautions as inapplicable in the case of restitution/rescission.

[7]"When the aggrieved party cannot establish a loss of profits with sufficient certainty, the party may recover expenditures of preparation and part performance, as well as other foreseeable expenditures incurred in reliance on the contract. The relief is awarded 'on the assumption that the value of the contract would at least have covered the outlay.'" Calamari & Perillo, *supra*, at 556 (quoting Charles T. McCormick, *Handbook on the Law of Damages* 586 (1935)).

recovery of up front payments, we rejected the government's arguments premised on the facts that some of the current plaintiffs are successors in interest to the original leaseholders, and that most of the successor plaintiffs paid less to take over the leases than their predecessors had paid the United States.[8] At that time, the government argued that plaintiffs should only recover what they individually paid, irrespective of what the government received. We disagreed, holding that successor plaintiffs took over all contract rights from the original lessees, including the right to assert an anticipatory total breach, with its concomitant right to seek rescission and restitution. As the citiations above make clear, the focus is on money or property held by the breaching party. Those plaintiffs who are successors in interest to original lessees are entitled to seek full restitution of the amounts paid up front because they "stand in the shoes of their predecessors." 68 Fed. Cl. at 560. It is our view that in a rescission context, the government has no standing to make a "windfall" argument. Unlike the reliance remedy, rescission leaves room for the possibility that the injured party will benefit from the breach. In this case, one of the two parties will be left with the windfall. In our view there is no reason it should be the party in breach.

We reaffirm that result here. Money being fungible, the amount paid up front for the leases is an easy measure of benefit to the government. Indeed, the government's actual benefit is not even fully reflected in the return of the down payments, as it does not account for the government's interest-free use of the funds for over twenty years. As the Court in *Mobil* made clear, "if a lottery operator fails to deliver a purchased ticket, the purchaser can get his money back–whether or not he eventually would have won the lottery." 530 U.S. at 624. *Mobil* thus represents a classic case of rescission. The possibility that the oil companies might have lost money if they had been able to develop the leases is immaterial.[9]

---

[8]At least one assignee, Devon Energy Production Co., paid a premium to acquire its current interest.

[9]Because the government repudiated the leases, "the law entitles the companies to that restitution whether the contracts would, or would not, ultimately have produced a financial gain or led them to obtain a definite right to explore. . . . And if one party to a contract, whether oil company or ordinary citizen, advances the other party money, principles of restitution normally require the latter, upon repudiation, to refund that money." *Mobil*,
(continued...)

This case is, however, distinct from *Mobil* in two respects: lessees have invested hundreds of millions of dollars in developing the leases; and most of the leases have been transferred to new owners, who, in sum, paid less to the assignors than the assignors paid to the government. Most of those "sunk costs" were incurred by those prior owners. As defendant points out, in *Mobil*, exploration had not yet occurred, and there were apparently no assignments of interest to complicate matters. Return of the deposits was a tidy remedy. Here, on the other hand, matters are complicated by those same two factors: plaintiffs wish to be reimbursed for costs that did not result in immediate benefit to the government; many of those costs were borne by others.

The question posed by the current cross-motions, in other words, is whether plaintiffs can continue with the rescission model and still recover their sunk costs, or whether, in order to proceed, they must shift to a reliance-based remedy. We believe defendant is fundamentally correct in attempting to flag any effort by plaintiffs to mix the remedies in such a way as to avoid defenses unique to the reliance measure of damages by improperly characterizing them as part of rescission. While the two approaches are not incompatible, and they share certain defensive inquiries, we believe they are alternative remedies.[10] That is to say, the remedy of rescission should not be combined with the remedy of reliance.

What gives "legs" to plaintiffs' attempt to blur the lines between the remedies is that both the case law and the Restitution Draft contain somewhat imprecise language with respect to the more peripheral elements of both types of restitution remedies. For example, as we cite above, plaintiffs are able to point to language in *Landmark* to the effect that restitution permits them to recover "both the value of the benefits provided to the defendant and the plaintiff's *other costs incurred* as a result of its performance under the

---

[9](...continued)
530 U.S. at 623-24 (internal citations omitted). The outcome thus does not turn on "whether the contracts would, or would not, ultimately have proved financially beneficial to the companies." *Id.* at 608.

[10]"As a general rule, a plaintiff may not recover both restitution and reliance damages for breach of contract. At some stage the plaintiff must elect remedies . . . ." L. L. Fuller & William R. Perdue, *The Reliance Interest* (pt. 2), 46 Yale L. J. 373, 608-09 (1937).

contract." 256 F.3d at 1372-73 (emphasis supplied). Similarly, in the Restitution Draft, both rescission and reliance-type recoveries leave room, in addition to other measures of recovery, for "incidental" damages. Restitution Draft § 38 (Tentative Draft No. 3, 2004).

In view of the discussion above, we believe these references to additional incurred costs are not an invitation to the types of damages plaintiffs now seek. We begin with the fact that exploration is not "incidental" to the leaseholds–it is the heart of the contracts. Exploration costs, in other words, are plaintiffs' essential risk investment in the leaseholds. They cannot make money without investing large amounts of money in exploration, and later, production. As we discuss below, moreover, these expenditures are fundamentally different in kind than up-front payments to purchase the leaseholds. The latter are monies actually held in hand by the government. The benefit to the government is immediate. Sunk costs, on the other hand, may or may not directly benefit the government, depending on whether production leads to royalty payments. These are expenditures made by plaintiffs in reliance on the contract, but for which neither they nor the government expected any return in the absence of successful drilling.

The Restitution Draft does not explain what is meant by "incidental loss." Whatever it does mean, we hold that it does not, in this case, include the principal anticipated reliance expenditures, namely, the costs of exploration and development. We conclude that such costs are not properly recoverable under a restitution theory. If plaintiffs wish to collect these expenditures, they must do so under a reliance theory. The government has advanced a number of defenses, however, which are also relevant to a recovery under a reliance theory.

*Jurisdiction*

We begin with the jurisdictional defense. Defendant argues that plaintiffs are attempting to create a remedy based on an implied-in-law contract by asking for disgorgement of unjust enrichment by the government. Defendant argues that such a cause of action is unavailable against the United States because it has not waived sovereign immunity for such equitable claims. *See Hercules, Inc. v. United States*, 516 U.S. 417, 423 (1996); *Dolmatch Group, Ltd. v. United States*, 40 Fed. Cl. 431, 438 (1998).

Plaintiffs are not seeking an equitable remedy, however. We begin by noting that the claim for sunk costs can only proceed under a reliance theory, which no one suggests is an equitably-grounded remedy. As to restitution, however, it is also well established that it can be a contract remedy, which embraces as one possible means of measuring recovery the benefit bestowed on the breaching party. *See Glendale*, 239 F.3d at 1380-81 ("Restitution is sometimes described in terms of taking from the breaching party any benefits he received from the contract and returning them to the non-breaching party.").

While the concept of unjust enrichment has been criticized as a device for shaping remedies for breach of contract, *see, e.g.,* Andrew Kull, *Restitution as a Remedy for Breach of Contract*, 67 S. Cal. L. Rev. 1465 (1994), the criticism is not based on jurisdictional shortcomings in jurisprudence involving suits against the United States. Instead, the assumption behind the criticism is that the theory of unjust enrichment is indeed applied as a contract remedy, but that it can lead to anomalous results when the plaintiff seeks to cancel a losing contract and ends up making more on a *quantum meruit* theory than it would have if it had performed. The precise jurisdictional argument now made by defendant, however, was explicitly rejected by the Court of Claims in *Acme.* 347 F.2d at 529. *See also* Calamari and Perillo, *supra*, at 599.[11] The action is one in contract; a remedy based on either restitution or reliance and seeking a return of benefits conferred is not jurisdictionally barred.

*The Date of Breach and the Defenses of Election, Waiver & Failure to Mitigate*

We proceed to the election defense. In our first opinion, we explained that the undisputed facts are totally at odds with a ruling that plaintiffs are barred from proceeding because they accepted benefits under the leases after grounds for rescission were apparent. *See* 68 Fed. Cl. at 558-59. We explained that the asserted additional performance–the lessees' submission of updated suspension requests–was not the consideration bargained for under the contract. As the Court held in *Mobil*, the nature of the asserted benefit matters. 530 U.S. at 622-23. Both in this case and in *Mobil*, the benefits received after breach were not those originally bargained for. As we explained, the only

[11]"It has long been recognized that the right to damages or restitution are both remedial rights based on the contract." Calamari and Perillo, *supra*, at 601.

thing plaintiffs received in this interim period were directed suspensions, not requested suspensions.

Defendant now sees in *Old Stone Corp.,* 450 F.3d 1360, a way to argue the same facts in a slightly different way, namely, as an election rather than a waiver. Defendant is correct that "election" is a different legal concept. The defense of waiver argues that the injured party has "waived the breach," i.e., elected not to treat the potential breach as an actual breach. Performance simply continues under the contract and the waiving party is deemed to have given up a remedy altogether. Election, on the other hand, suggests that the injured party has chosen one of two responses to a breach: either declaring a total breach and seeking rescission and restitution, or continuing with partial performance and seeking damages for partial breach. *See Old Stone Corp.*, 450 F.3d at 1371, n.6. Election, moreover, is not subject to the counter that the injured party has reserved its rights. The distinction nevertheless does not matter here, as the same facts are asserted for both defenses and they sustain neither one. Before directly resolving the defense, however, we have to examine a false predicate to several of the government's arguments, namely, that the breach occurred in 1990.

Defendant contends that plaintiffs' damages are not recoverable to the extent incurred after 1990. Beyond that point, it argues, damages were voluntarily incurred and plaintiffs' actions constitute performance of the contracts post-breach. Defendant contends that "the alleged breach in this case occurred no later than 1990." (Def.'s Opp'n to Pl.'s Mot. 13.) To arrive at that conclusion it relies on *Catawba Indian Tribe of South Carolina v. United States*, 982 F.2d 1564, 1570 (Fed. Cir. 1993). In *Catawba*, the Federal Circuit rejected plaintiff's argument that the adverse effects of an act did not injure the tribe until the legislation was construed by the Supreme Court, twenty-five years after enactment. *Id*. at 1570. The court held that "later judicial pronouncements simply explain, but do not create, the operative effect." *Id.*

The statute at issue in *Catawba* was adopted in 1962 and had the immediate effect of terminating tribal status and federal oversight for the Catawba tribe. The tribe commenced its Claims Court action in 1990. By 1980, however, the tribe had already been confronted with claims of adverse possession from individuals occupying former tribal lands. The Federal Circuit held, even under a generous reading of the facts, that the suit in the Claims Court should have been initiated by 1986.

*Catawba* is probably thus distinguishable on its facts. If not, however, the result here is now squarely controlled by the Supreme Court's decision in *Franconia Associates v. United States,* 536 U.S. 129 (2002). As the Court there explained:

> [T]he promisor's renunciation of a "contractual duty before the time fixed in the contract for . . . performance" is a repudiation. 4 A. Corbin, Contracts § 959, p. 855 (1951) (emphasis added); Restatement § 250 (repudiation entails a statement or "voluntary affirmative act" indicating that the promisor "will commit a breach" when performance becomes due). Such a repudiation ripens into a breach prior to the time for performance only if the promisee "elects to treat it as such." See *Roehm v. Horst*, 178 U.S. 1, 13 (1900) (repudiation "give[s] the promisee the right of electing either to . . . wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract").

536 U.S. at 143.

There could not be a more compelling example of the wisdom of the principle recited in *Franconia* than the case at bar. It would have been absurd for the plaintiffs to have treated the adoption of the amendment as a breach in 1990. Even the Mineral Management Service ("MMS") agreed with plaintiffs through at least 1999 that the amendment should not be construed to apply to lease extensions. Both plaintiffs and the MMS fought the state of California's interpretation of the legislation. The import of defendant's present argument is that plaintiffs should have tendered back the leases at a time when, initially no one and then later, only the state of California, took the position that existing leases were subject to the legislation. It is patent that, if plaintiffs had initiated litigation immediately after Congress adopted the amendment, the government could have defended on the ground that the suit was, at best, premature. At worst, plaintiffs would have been acting against their own self interest.

From 1993 through November 15, 1999, the leases were subject to an MMS-imposed directed suspension. In November 1999, MMS *granted* plaintiffs' requests for requested suspensions. It was only after the Ninth Circuit ordered MMS to cancel the lease extensions in 2001 that the relevant

contracting party, the United States, performed acts which were immediately inconsistent with the leases.

In its surreply, defendant's attempts to distinguish *Franconia* lead it in remarkable new directions. It begins with the observation that "[i]t was not until the [Ninth Circuit] ordered the Government to dissolve the requested suspensions and direct suspensions that the Government was prevented from carrying out its contractual obligations." (Def.'s Sur-Reply in Opp'n to Pls.' Mot. 12-13.) Plaintiffs presumably would agree with the thrust of that statement. Defendant then makes the argument that, unlike *Franconia*, this means that here there was no "clear and unequivocal absolute refusal to perform." *See Franconia*, 536 U.S. at 143. What defendant really means becomes clear later:

> In this case, there has never been any affirmative Government refusal to grant the requested suspensions; instead a district court ordered the Executive branch to cancel previously granted suspensions. . . . [T]he *Executive* branch took no voluntary action to breach the contracts in question, aside from the President's role in enacting the 1990 CZMA Amendments.

(Def.'s Sur-Reply 14 (emphasis supplied).) Therefore, despite the fact that the government's contract obligations were not "carr[ied] out" beginning in 2001, the lease was "necessarily breached in 1990 when those statutory procedures were changed, 'narrowing' plaintiffs' 'gateway' to their exploration and development rights," *id*., and, hence, the action is untimely.

It is basic to litigation under the Tucker Act that actions are brought against the United States, not Congress, not particular Executive agencies, and not the courts. *See* 28 U.S.C. § 1491(a)(1); *Hansen v. United States,* 214 Ct. Cl. 823, 566 F.2d 1189 (1977) ("the United States is the only proper party defendant to a suit brought in the Court of Claims"). Defendant does not suggest that one of the three branches were acting *ultra vires* in this case. Yet, what it proposes here is an immunity from responsibility because Congress enacted legislation which was delayed in effect for more than six years. Or, alternatively, because "the courts made us do it." The concept of "involuntary" executive conduct suggests a schizophrenia within government that is unknown in this circuit.

In any event, the relevant lesson from *Franconia* remains undisturbed. While the United States can be held liable when Congress passes a statute that renounces a future contract obligation, the requirement to initiate suit commences only when that future obligation is in fact not satisfied. In *Franconia*, the obligation was acceptance of prepayment of mortgages; in this case it is the consideration of requests for lease extensions. To paraphrase *Franconia*, the act conveyed an announcement by the government that it would not perform as represented in the leases, if and when, at some point in the future, the lessees attempted to obtain lease extensions. *See* 536 U.S. at 146-47. Similarly, in this case, Congress repudiated the leases in 1990, and the Executive branch (even if reluctantly) only acted inconsistently with its obligations under the leases in 2001.

In sum, the repudiation was anticipatory in 1990; plaintiffs could and did elect to claim a breach in 2001. The best proof of that is the following: if the government's current argument were correct, it would be duty bound to move to dismiss for staleness. The action was brought in 2002, well over six years after the amendment was adopted. Not only has the government not asserted passage of the limitations period, it has explicitly declined to do so, having notified the court that it would not press a motion to dismiss. *See* 68 Fed. Cl. at 544 n.22.

The election defense, like others addressed below, is thus built on a structural flaw, namely, the assumption that the date of breach was 1990, when Congress enacted the amendment to the CZMA, and not 2001, when MMS's performance became inconsistent with the leases. The adoption of the CZMA amendment in 1990 was an anticipatory repudiation which gave plaintiffs the right, but not the obligation, to treat it as an immediate breach. As the injured parties, the plaintiffs could, instead, await the time of actual performance and elect to file a lawsuit when it became apparent that the government would not perform.

Defendant's associated argument that the government relied to its detriment on plaintiffs' asserted inaction after 1990 is remarkable. Most of the costs complained of relate to the COOGER Study.[12] The *plaintiffs* absorbed

---

[12]The California Offshore Oil and Gas Energy Resources Study ("COOGER"), was intended to aid MMS's consideration of exploration and (continued...)

the bulk of the costs of that study, however. More important, attachments to the government's supplemental briefing relating to the decision in *Old Stone Corp.*, reflect that the study was initiated at the request of MMS and that it lead to a government-imposed suspension.

Defendant also reasserts the argument, rejected earlier, that plaintiffs' insistence, upon receipt of the Ninth Circuit opinion, that MMS attempt to comply with the order and perform a consistency review, constitutes a waiver. Now defendant argues this was also an election in favor of maintaining the leases in place. We disagree. We see no reason to apply different considerations here to an asserted election than those applied by the Supreme Court to the waiver argument in *Mobil*. The common question is whether the aggrieved party is accepting contract-based benefits. MMS was under court order to conduct the consistency review. That review was not at plaintiffs' option and it was not contemplated by the contract. The fact that plaintiffs attempted to mitigate the impact of the breach by urging MMS to do what it had to do quickly after it became subject to the Ninth Circuit decision is irrelevant to an election or waiver argument. In any event, California did object and still objects to the MMS' finding of consistency.

What we have held thus far also addresses a related government argument–that the post-1990 assignees also have no claim to they extent that they either took over a lease after 1990, or spent any money on development after 1990. According to defendant, any performance by plaintiffs after the breach was voluntary and inconsistent with a duty to mitigate damages.[13] The relevant date is 2001, however. None of the plaintiffs' costs are post 2001. Under a correct understanding of the date of breach, none of the claimed sunk

---

[12](...continued) development submissions, as well as to provide local California governments with information concerning the leases.

[13]"Restitutionary damages restore the non-breaching party to the position he would have been in had there never been a contract to breach. *Landmark*, 256 F.3d at 1372. Such damages, however, are not recoverable for actions taken voluntarily, beyond the obligations of the contract." *Southern Cal. Fed. Sav. & Loan Ass'n. v. United States*, 422 F.3d 1319, 1334 (Fed. Cir. 2005). "The law is well settled . . . that in order to be compensable as restitution, the plaintiff's contribution must have been made in performance of its contractual obligations." *Landmark,* 256 F. 3d at 1375.

costs were undertaken at a time when it would have been apparent that those investments were futile.

*Did the Expenditures Benefit the United States?*

Defendant argues that the oil and gas exploration expenditures did not benefit the government and, hence, are not recoverable. Defendant argues, for example, that plaintiffs' exploration expenditures were voluntary. It cites to several Federal Circuit decisions, all standing for the premise that costs incurred for the injured party's own purposes, and not in performance of contractual obligations, are not recoverable in restitution. *See Southern Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1334 (Fed. Cir. 2005); *Castle v. United States*, 301 F.3d 1328, 1340 (Fed. Cir. 2002); *Landmark*, 256 F.3d at 1357.

It is apparent that much of the plaintiffs' investment in oil and gas exploration did not directly benefit the government. As we explain above, this is part of our reasoning in concluding that the remedy plaintiffs seek here is actually reliance damages. Unlike the down payments, MMS was not left with cash in hand, or even parts or equipment. To the extent exploration has been unsuccessful, clearly the government has not benefitted. Even with respect to successful exploration, however, the only accurate way to determine if the sunk costs benefitted the government would be to permit further development. To the extent oil and gas were produced, the government would receive royalty payments in the future. For the present, however, these sunk costs do not, in our view, constitute benefits for purposes of restitution. We therefore agree with the government that sunk costs are unrecoverable in a restitution context.

We concluded above, however, that plaintiffs are able to pursue these costs under a reliance theory, if they so elect. We therefore will evaluate, in that context, the government's arguments concerning lack of benefit. We believe they are off the mark. Plaintiffs' expenditures were plainly undertaken in reliance on the contract and were fully foreseeable. *See Hansen Bancorp*, 367 F.3d at 1308-09.

The government's contentions are related to the one rejected above, namely, that plaintiffs have to account for the benefit of the opportunity to explore for oil and gas. In this context, defendant now argues that plaintiffs merely bargained for the opportunity to explore and develop oil and gas; any attempt actually to do so was voluntary and associated costs were not incurred

under the contract. Defendant argues that these rights of exploration were solely for plaintiffs' benefit and were in no way for the government's benefit, regardless of the royalty payments the government would receive if oil or gas were produced. To prove its point the government relies on the Supreme Court's failure to mention whether the right to explore created any benefits for the government in *Mobil*. 530 U.S. at 620 ("[g]overnment approvals so qualified the likely future enjoyment of . . . the contract . . . [that it] amounted primarily to an *opportunity* to try to obtain exploration and development rights in accordance with the procedures and under the standards specified in the cross-referenced statutes and regulations."). It also points to the following observation made by the court in *Landmark*: "in order to be compensable as restitution, the plaintiff's contribution must have been made in performance of its contract obligations." 256 F.3d at 1375. *See also Castle*, 301 F.3d at 1340 ("Our precedent makes clear that Castle and Harlan cannot recover restitutionary damages in any amount contributed voluntarily, beyond their contract obligations.").

The government does not appear to question the assertion that exploration costs were contemplated by and, hence, incurred pursuant to the leases. It could hardly do otherwise. The leases incorporated the terms of the Outer Continental Shelf Lands Act and all regulations issued pursuant to it that were in existence on the effective dates. The statutory and regulatory framework for offshore oil and gas leases, in turn, is built around the assumption that the leases are used for the purpose of producing commercial quantities of oil and gas. To achieve that end, exploration is necessary and, indeed, highly regulated by MMS. *See* 43 U.S.C. § 1337 (2000) ("An oil and gas lease issued pursuant to this section shall . . . entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area, conditioned upon due diligence requirements"); *see also id.* § 1340.

Defendant's response to this point is that money spent pursuant to the leases is not necessarily money *required* to be spent pursuant to the leases. According to defendant, plaintiffs need not have spent a penny on exploration; they were acting voluntarily because the leases did not actually have to be developed. They could have been left idle.

While perhaps literally correct, we think this is not a meaningful response. The federal government is not a disinterested bystander once leases are executed. The Secretary of Interior is required by law, in executing leases, to obtain for the United States, not only cash bonuses, but either variable

royalties, fixed royalties of at least 12½ percent, or some form of profit sharing. As plaintiffs point out, MMS claims to have earned about $89 billion in royalties from outer continental shelf oil and gas leases between 1954 and 2004.

For this reason, leases are subject to a "due diligence" requirement. *See* 43 U.S.C. § 1337(b)(4) ("An oil and gas lease issued pursuant to this section shall [be] . . . conditioned upon due diligence requirements."). Lessees are required to submit plans for exploration and development to MMS for approval. *Id.* § 1340(c). MMS staff is required to "supervise operations conducted pursuant to each lease in the manner necessary to assure due diligence in the exploration and development of the lease area . . . ." *Id.* § 1344(b)(4). By statute, MMS is prohibited from receiving bids from lessees who are "not meeting due diligence requirements on other leases." *Id.* § 1337(d). The leases incorporate these provisions by reference.

Neither the leases nor the statutes and regulations define "due diligence." Two of the representative leases attached to the briefing, however, reserve to the government the right to direct the lessees to "drill such wells and produce at such rates as the Lessor may require in order that the leased area . . . may be properly and timely developed and produced . . . ." (Oil and Gas Leases 425 and 430, Def.'s Sur-Reply, Ex. 1, 2, Sec. 10.) Plaintiffs also point to a 1999 letter from the Deputy Director of MMS to Senator Barbara Boxer. Sen. Boxer was inquiring as to the meaning of "due diligence." She was told that "due diligence for Outer Continental Shelf leases means definite and reasonable progress towards production of oil and gas in paying quantities. The Minerals Management Service requires that operators proceed toward specific and agreed upon objectives (exploration or development/production) in a safe, timely, and orderly manner." (MMS Letter to Senator Barbara Boxer (June 1, 1989), 4th Supp. Decl. of Ronald Heck, Ex. 123.)

Plaintiffs also point to the announcement of Department of Interior rules in 1980 regarding unitization:

> [T]o the extent any OCS or incorporated development plan or regulation is silent regarding the rate, extent, or location of exploration or development required on a lease tract, the common-law will recognize implied covenants of diligent development by the lessee. Such covenants include the obligation to explore within a reasonable time, to conduct

> further, reasonable development after production is obtained, and to diligently operate all wells . . . . Breach of such covenants is grounds for cancellation of the entire lease.

New OCS Unitization Rules, 87 Interior Dec. 616, 628 (Dep't of Interior Dec. 16, 1980).

During oral argument counsel for the government discounted these citations:

> There has never, in the history of MMF, been any cancellation of a lease for failure to do due diligence.
>
> . . . .
>
> It's requiring them to do what they propose they are going to do in a safe, timely and orderly manner. The requirement is imposed upon the manner, not that they . . . say, you have to incur nearly a billion dollars in costs or else we're going to cancel your lease.

(Tr. 59-60, July 10, 2006.)

We view this as non-responsive and inaccurate. It is non-responsive because timeliness implies not only that exploration and development efforts have to be undertaken expeditiously, but it plainly assumes they are done at all. It is inaccurate because due diligence is an obligation under the leases. Indeed, the government reserves to itself the right to cancel "[w]henever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease . . . ." (Oil and Gas Lease 527, Decl. of Ronald Heck, Ex. 3, Sec. 23.)

We are persuaded that plaintiffs were not volunteers within the prohibition contemplated by the defense. The United States sought entities willing to come onto federal lands and invest in oil and gas exploration and created mechanisms for making the government a partner in profitable production. That is sufficient under a reliance theory of recovery.

*Offsetting Benefits*

The government's error as to the date of breach leads it to make additional flawed arguments related to allocation of benefits, some of which are mutually contradictory. The first begins with the observation that "plaintiffs' predecessors had no 'claims' to assign prior to 1990." (Def.'s Opp'n and Cross-Mot. 10.) This statement is, in fact, correct. Indeed, even the assignments after 1990 were not claim assignments. They were assignments of contract rights. Defendant then links this observation with the assumed date of breach, to make the following argument:

> [F]or all transactions that occurred prior to 1990, plaintiffs "stepped into the shoes" of predecessors who possessed no claims of breach whatsoever against the Government. To the contrary, those predecessors enjoyed the benefit of full and complete performance of their leases by the Government. When those predecessors sold their lease interests to plaintiffs . . . those sellers received full and complete compensation for their bonus payments because they received the fair market value for their lease interests which was wholly unaffected by any alleged breach by the Government. The Government fully performed its obligations as to those predecessors and earned its right to retain the bonus payments from those predecessors.

*Id*. at 11.

The government concludes that this means that plaintiffs are only eligible for amounts they actually paid for pre-1990 assignments: "[T]he appropriate measure of restitution would be that portion of the $334 million in plaintiffs' claimed lease acquisition costs that were incurred prior to 1990. As holders of the lease interests in 1990 when the alleged breach occurred, it was plaintiffs, not their predecessors, who suffered the alleged injury." *Id.* at 12. Under this theory, plaintiffs could not claim the entire amount held by the government ($1.1 billion), but approximately only $291 million.

This argument, of course, is built on the erroneous assumption of a 1990 breach. If the limitations clock did not begin running on a breach claim until 2001, arguments based on the assignors' supposed rights vis-a-vis a presumed 1990 claim are thus factually and legally off the mark. The assignors' unique circumstances have nothing to do with the assignees' rights

under the contract. Absent some sort of collusion or fraud on the government, or some special retained rights or obligations vis-a-vis the government (none are alleged here), the relationship between the government and former lessees is over, and its relationship with the new lessees is based only on the lease. The "shoes" of the old lessees were filled by successor plaintiffs prior to the breach. There is no cause to reinsert the prior lessees into them.[14]

It bears pointing out, moreover, that defendant also argues that the government is entitled to claim as an offsetting benefit the value plaintiffs' predecessors would have received from their time as lessees. The best measure of this then-current market value, according to the government, is the price at which they sold the leases to plaintiffs, which, coincidentally, is the amount defendant contends is the maximum recovery for up front costs. In other words, the government offers the same figure as both a maximum recovery and elsewhere as an offsetting benefit. As plaintiffs observe, if we accepted both arguments, it would lead to a net zero recovery.

Defendant's final argument with respect to off-setting benefits is that plaintiffs and their predecessors in interest must account for the "benefit" of the opportunity to search for oil and gas. "Having obtained the benefits of their bargain for the past 20 to 30 years, plaintiffs, standing in the shoes of their predecessors, may not obtain restitution without returning these benefits to the Government . . . ." (Def.'s Opp'n. 27.) We have dealt with this argument in part in connection with benefits allegedly passed along from prior leaseholders. It is difficult to take it any more seriously in connection only with current leaseholders.

Defendant contends that:

> Throughout the decades, plaintiffs and their predecessors have engaged in myriad transfers of lease interests, and the parties to

---

[14]Defendant makes the peculiar assertion that, "[b]ecause plaintiffs' predecessors never asked to be restored to their pre-lease conditions, plaintiffs, as the assignees, must be held fully accountable for all of the restorative acts necessary to calculate a lawful restitutionary award." (Def.'s Opp'n and Cross-Mot. 18.) The breach did not occur prior to the assignments. Defendant does not explain how these assignors would have retained rights under the leases to be restored to their "pre-lease conditions."

> these transactions presumably used the information and data gained from exploration activities to determine fair market value of the lease interests.
>
> . . . .
>
> [Plaintiffs] admit that these activities "resulted in the discovery of significant quantities of oil and gas.". . . . This admitted discovery was among the many valuable benefits provided directly by the leases, which benefits plaintiffs and their predecessors used, among other things, to structure numerous transactions for the sale and purchase of lease interests among plaintiffs and all of their predecessors.

*Id.* at 20, 22. Defendant suggests that this "benefit" could be quantified with the help of expert witnesses.

We take it as incontestable that plaintiffs' purpose in acquiring these leaseholds was to find and produce commercial quantities of oil and gas. As defendant points out, "[i]ndeed, it is settled that this was the very benefit for which plaintiffs bargained." *Id.* at 20. We agree that this was the bargained-for benefit. None of these leases have ever gone into production, however.

Defendant suggests that the court has to discount plaintiffs' recovery by attempting to value the benefit associated with merely holding the leases or searching for oil and gas. We disagree. Stock companies are accountable to shareholders for how they spend their money. Exploring for oil and gas is not like fox hunting or catch-and-release fly fishing; at the end of the day, the "thrill of the chase" has to be converted into production. If there is any merit to the benefits argument, it did not come through in the briefing or oral argument.

*Offset for "Damage" to the Property*

We arrive at the final defense common to either characterization of the restitution claim, namely, that plaintiffs must tender back what it received from the government in substantially the same condition as it was received. The defense is summarized in the Restatement:

> § 384. Requirement That Party Seeking Restitution Return Benefit

> (1) Except as stated in Subsection (2), a party will not be granted restitution unless
>
> (a) he returns or offers to return, conditional on restitution, any interest in property that he has received in exchange in substantially as good condition as when it was received by him, . . . .
>
> (2) The requirement stated in Subsection (1) does not apply to property
>
> (a) that was worthless when received or that has been destroyed or lost by the other party or as a result of its own defects,
>
> (b) that either could not from the time of receipt have been returned or has been used or disposed of without knowledge of the grounds for restitution if justice requires that compensation be accepted in its place and the payment of such compensation can be assured . . . .
>
> The commentary to the Restatement indicates its purpose:
>
> A party who seeks restitution of a benefit that he has conferred on the other party is expected to return what he has received from the other party. The objective is to return the parties, as nearly as is practicable, to the situation in which they found themselves before they made the contract.

*Id.* cmt. a. *See also Hansen*, 367 F.3d at 1315.

Defendant argues that plaintiffs substantially diminished the speculative value of the leases through their exploration activities and that the government is entitled to a claim for recoupment for the lost value of the leases caused by the exploration. Presumably this concern relates only to any exploratory drilling that did not locate oil and gas reserves. As we indicated earlier, the government's desire for an accounting in this respect does not extend to plaintiffs' successful efforts. Apparently the government believes it can keep those benefits without paying for them.

This "heads we win, tails you lose" approach does no credit to anything other than the government's creativity. If we were inclined to throw into the benefits/offsets calculus the results of drilling, we would require the

government to acknowledge successful as well as unsuccessful exploration.

We believe that such a detailed reckoning is inappropriate for two reasons. First, we conclude that it is sufficient, in a rescission model, that plaintiffs tender back the leases without accounting for results. As we explain above, the ultimate purpose of these agreements was to generate oil and gas production. If there had been meaningful production then plaintiffs would have to account for the benefits of that production and for the depletion of the existing resource.[15] Here, with the exception of a few stray holes poked into the mantle, the resource exists precisely as initially tendered by the United States.

The second reason we conclude that it is unnecessary to do such an accounting is that, as we explain below, we do not believe plaintiffs are entitled, under a rescission remedy, to return of these expenses. The appropriate and only place, we believe, to consider sunk costs is in connection with a claim of reliance damages.

*Lack of Causation: The NEPA Defense*

Defendant contends that plaintiffs cannot establish causation because they cannot demonstrate that, even if the government had not breached, they would have been able to proceed to develop their leases. The most immediate reason this is true, according to defendant, is that, in addition to problems getting California's concurrence to lease extensions, MMS is currently subject to an order from the district court directing it to do further environmental assessments of the impact of the lease extensions pursuant to the National Environmental Policy Act ("NEPA").

As we explained in our earlier opinion:

> NEPA requires government agencies performing activities possibly affecting the quality of the human environment to make a statement concerning the environmental impact of the action, alternatives to the action, and any "irreversible and irretrievable commitments of resources which would be

---

[15] This type of performance, in any event, would complicate and perhaps jeopardize the availability of rescission and restitution.

> involved in the proposed action." 42 U.S.C. §§ 4321 et seq. (2000). NEPA's implementing regulations allow a federal agency to adopt categorical exclusions from the mandatory reporting requirements for a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4 (2001).

68 Fed. Cl. at 542. Defendant argues:

> [P]laintiffs cannot establish the required element of causation because they would be in the same position today had the alleged breach never occurred due to the interpretation of NEPA imposed by the district court in *California v. Norton* and *League for Coastal Protection v. Norton*. . . . [T]he 1990 amendments to the CZMA have had no practical effect . . . due to the concurrent effect of the district court's interpretation of NEPA upon those same suspensions.

(Def.'s Opp'n 38-39.)

We fail to see the connection between the government's failures with respect to its obligations under NEPA, arguably leading to delay in further exploration, and plaintiffs' claim for sunk costs. Whether future performance was delayed is immaterial to the claim for breach damages. We have held that there was a total breach, giving plaintiff the right to cancel the contract and seek restitution or reliance damages. Plaintiffs' expenditures were incurred long before the NEPA-related suspension, which was, in any event, prompted by the government. These costs were incurred, in other words, in reliance on the contract and prior to the government-caused delay.

*Can Plaintiffs Recover Their Predecessors' Expenses?*

As we explain above, plaintiffs' reasonable reliance interest is protected by the assumption that they would have at least recovered their expenses. The plaintiffs are not obligated to prove a profit, but the breaching party can show that plaintiffs would have lost money on the contract. In this context, however, we believe that whether plaintiffs themselves or their predecessors actually incurred an expense, including down payments, becomes a relevant inquiry. If they acquired leaseholds at less than the amounts paid by their predecessors to the government, or if they did not

themselves incur exploration costs, we believe that plaintiffs must now defend, *on reliance grounds*, the court's prior award to them of their predecessors' investments.

In sum, we hold that if plaintiffs (other than NYCAL) wish to pursue sunk costs, they can only do so under a reliance theory. Moreover, if they elect reliance damages, they will forfeit their entitlement under the prior ruling to recovery of all down payments on a rescission theory and must re-establish recoverable damages under a reliance theory. By electing reliance damages, plaintiffs also make relevant the government's argument that individual leases would have lead to a recovery of less than gross expenditures. In short, the court's prior rulings dealt only with restitution and rescission. We have not previously put plaintiffs to an election of remedies. It is appropriate now to do so. Plaintiffs are directed to evaluate this decision and make known to the court their wishes.

## CONCLUSION

We grant and deny both parties' motions in part, as set out above. The court will contact the parties shortly to convene a status conference at which plaintiffs can indicate their wishes with respect to how to proceed.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge