# In the United States Court of Federal Claims

Nos. 02-30C, 04-1822C, & 05-249C (consolidated)
(Originally Filed: September 12, 2007)
(Reissued September 24, 2007)[1]

* * * * * * * * * * * * * * * * * * * *

AMBER RESOURCES CO.,
*et al.*,

                   *Plaintiffs*,

v.

THE UNITED STATES,

                   *Defendant.*

* * * * * * * * * * * * * * * * * * * *

ANADARKO E&P CO. LP,
*et al.*,

                   *Plaintiffs*,

v.

THE UNITED STATES,

                   *Defendant.*

* * * * * * * * * * * * * * * * * * * * *

NYCAL OFFSHORE DEVELOPMENT
CORP.,

                   *Plaintiff*,

    v.

THE UNITED STATES,

RCFC 59(a)(1) Motion for Reconsideration; Restitution and Recission; Duty to Return Property in Substantially the Same Condition; Election of Remedies

---

[1]In accordance with the protective order in this case, publication was deferred pending the parties' review for redaction of controlled materials. The parties did not request any redactions.

*Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Steven J. Rosenbaum*, Covington & Burling, Washington, D.C., with whom was *Thomas J. Cosgrove*, also of Washington, D.C., for plaintiffs.

*Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United Stated Department of Justice, Washington, D.C., with whom were Trial Attorneys *Gregg M. Schwind* and *Allison Kidd-Miller*, Director *Jeanne E. Davidson*, and Assistant Attorney General *Peter D. Keisler*, for defendant.

————————

*OPINION AND ORDER*

————————

BRUGGINK, *Judge*.

This is an action for breach of contract brought by several holders of leases to explore and exploit submerged federal lands for oil and gas. We previously held that a 1990 amendment to the Coastal Zone Management Act ("CZMA")[2] constituted an anticipatory repudiation of those leases. *See Amber Resources Co. v. United States,* 68 Fed. Cl. 535 (2005) ("*Amber I*"). We held that plaintiffs were entitled to treat the government's 2001 cancellation of the lease suspensions as a total breach of contract, giving them the right of rescission and restitution. We also held that plaintiffs were entitled to a return of approximately $1.1 billion in up-front bonus payments that they, or their predecessors in interest, had paid for the leasehold rights. *Id*. at 560. Plaintiffs then sought to establish a right to include "sunk costs"[3] in the restitutionary award and to establish the absence of any benefit to be offset against it. We held that the recovery of sunk costs was only possible under a reliance theory of damages and that plaintiffs had to elect to pursue either recision or reliance damages. *Amber Resources Co. v. United States*, 73 Fed. Cl. 738, 748 (2006)

————————

[2]      16 U.S.C. §§ 1451-65 (2000).

[3]      "Sunk costs" refers to costs incurred by plaintiffs in the early exploration and development of the leases in preparation for drilling and extraction.

("*Amber II*").  We also held that the government was not entitled to any offset against the restitutionary award for the alleged benefit conferred upon the plaintiffs of the opportunity to explore for oil and gas or for damage to the speculative value of the leaseholds.  *Id*. at  754-757.

With the resolution of the issues establishing quantum resolved, plaintiffs filed a motion for entry of final judgment under rule 54(b).  The court granted that motion and ordered an entry of final judgment on January 11, 2007.  The parties' cross-appeals are now pending before the Federal Circuit.  Several leases were not included in that order for entry of judgment: all leases owned by plaintiff NYCAL were excluded; four leases still subject to administrative appeal; and lease OCS P-452.  Lease OCS P-452 was excluded because the government filed a motion for reconsideration of the court's recision of that lease.

That motion is the subject of this opinion.   The motion for reconsideration, filed on January 19, 2006, is brought pursuant to rule 59(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  Defendant contends that, subsequent to our decision in *Amber I*, it became aware of facts suggesting that one of the plaintiffs, Delta Petroleum Corporation ("Delta"), was participating in the extraction of oil from lease OCS P-452 via directional drilling from neighboring lease OCS P-451, a lease not subject to this suit.  The court directed plaintiff to respond to the motion, although resolution of the motion was stayed pending the decision in *Amber II* and to allow time for supplemental discovery and briefing.  Supplemental discovery and briefing was concluded on June 14, 2007.  Oral argument was heard on August 7, 2007.  For the reasons set out below, defendant's motion for reconsideration is denied in part and decision on the balance is deferred until the court hears evidence at trial on two issues.

BACKGROUND

We assume the reader's familiarity with our decisions in *Amber I* and *Amber II*.  Defendant now seeks reconsideration of our holding that plaintiff, Delta, is entitled to restitution and recision of lease OCS P-452 ("452").  Defendant contends that Delta's actions post-breach are inconsistent with an award of restitution and recision.  Defendant argues that plaintiff's extraction of oil from lease 452 via wells located on the adjoining lease OCS P-451 ("451") prohibits plaintiff from returning 452 in "substantially the same condition," typically a requirement for recision.  Defendant further argues that,

even if extraction was low relative to the total reserves on lease 452, plaintiff has significantly diminished the speculative value of the 452, which either makes recision improper altogether or allows for an offset against the restitutionary award.  Defendant also argues that plaintiff's actions in regard to lease 452 constitute an independent election to perform under the contract and to treat defendant's breach as partial, thus forfeiting the right to recision.  Defendant contends that it did not become aware of the significance of the drainage until December 2005.

Plaintiff's view differs both factually and legally.  Plaintiff begins by asserting that the actual drainage from lease 452 has been, and likely will be, very low, while the reserves were and remain very high.  Therefore, plaintiff argues that lease 452 can be returned in substantially the same condition.  Plaintiff challenges defendant's election argument by characterizing its reasons for drilling on lease 451 as entirely motivated by the extraction of oil from lease 451.  It vehemently denies that it made any attempt to maximize extraction from lease 452.  Plaintiff further contends that its actions have been consistent in treating the enactment of the CZMA as a total breach and that it has not taken any steps towards performance on lease 452.  Plaintiff also challenges defendant's argument concerning loss of speculative value by arguing that defendant will not be able to re-lease 452 because of legislative and executive moratoria prohibiting re-leasing.

It is necessary to lay out a general explanation of the circumstances surrounding lease 452 in order to fully appreciate where the parties differ.[4] Lease 452 was originally issued in 1981 by the Mineral Management Service ("MMS") to Chevron USA and Phillips Petroleum Company in equal shares. Chevron and Phillips paid $91,986,800 to acquire the lease (the bonus payment).  Lease 452 and several adjacent leases were organized into the Rocky Point Unit to facilitate management and development.  Currently, only leases 452 and 453 remain in the Rocky Point Unit.  The eastern half of lease 451 was contracted out of Rocky Point on March 3, 2006.  The western half of lease 451 is part of the adjacent Point Arguello Unit.  Point Arguello has been producing oil and gas since 1991.

---

[4]      The background facts are drawn from the parties' briefing and attachments.  We limit our recital of the facts to those deemed not to be in dispute.  These recitations remain subject, however, to the proof adduced at trial.

On June 21, 2001, the United States District Court for the District of Northern California ordered MMS to end previously-granted suspensions[5] of numerous undeveloped leases off the coast of California, including the Rocky Point Unit. *See California v. Norton*, 150 F. Supp. 2d 1046, 1057 (N.D. Cal. 2001) ("*Norton I*"). MMS complied and ordered suspension of all physical activities on the leases. The owners filed their complaint in this court on June 14, 2002, alleging anticipatory breach.

The eastern half of lease 451 was part of Rocky Point at the time of the court-ordered suspension. It was, however, unaffected by the *Norton I* decision because the entire lease production was on its western half, which was and still is part of the Point Arguello Unit. The eastern half was thus not at issue in *Norton*. On December 1, 1999, Delta, plaintiff here, purchased from Whiting Petroleum Corporation ("Whiting"), the operator of the Rocky Point Unit, its 100 percent interest in leases 452 and 453 and an 11 percent interest in 451, along with a 6 percent working interest in the Point Arguello Unit. Whiting continues as the operator of the Rock Point Unit.

In November 2000, Delta entered into an agreement ("Rocky Point Agreement") with the owners of the Point Arguello leases, including Whiting, for the development of Rocky Point via extended-reach drilling from the existing Point Arguello platforms. The Rocky Point Agreement stated that Arguello, Inc. would become the new operator of Rocky Point, would obtain all necessary permits, and would bear the cost of permitting and plan development. Upon receipt of all necessary permits, the Rocky Point owners were to offer their ownership interests in the Rocky Point leases to the Point Arguello partners so that the resulting ownership interests would match those of the Point Arguello Unit. This agreement was later modified in order to develop the eastern half of lease 451. Under the Rocky Point Agreement, Arguello assumed the position of operator of Rocky Point in November 2000. At the time of breach in 2001, Delta owned all of leases 452 and 453 and an 11 percent interest in the eastern half of 451.

After the breach in 2001 and due to the apparent likelihood of serious

---

[5]    The lease suspensions were effectively lease extensions. All of the leases subject to the *Norton* decision originally were to last five years. MMS and the lease owners executed various suspensions of activities under the leases in order to lengthen the time for exploration and development.

impediment to the development of the Rocky Point Unit, Arguello and its partners created a plan to develop the eastern half of 451 separate from the litigation-encumbered 452 and 453 leases.  Plains Exploration & Production ("Plains"), the 100 percent owner of Arguello, moved immediately into preparation and planning for a 451-only development.  It is clear from internal e-mail correspondence that Plains knew as early as January 2002 that strategic well placement might produce a "greater recovery from cross lease drainage to the north and east."  Def.'s Ex. 12 at ARGUELLO-00103 (January 15, 2002 e-mail from Tom Gladney to Bob Wilson).[6]  Just  10 days later, Mr. Gladney wrote to his managers and engineers that, "the [well] locations should be optimized as if 451 would be the only lease developed, i.e. well locations to take maximum economic advantage of cross lease drainage from 452 . . . ."  *Id*. at ARGUELLO-00099 (January 25, 2002 e-mail from Tom Gladney to Bob Wilson, Bill Egg, and Bob Huguenard).

By September 2002, Plains had located eight potential sites for wells, three of which it was aware would drain from lease 452.  The well locations were between 131 and 2,406 feet from the leaseline.  There was internal disagreement, however, as to the amount of potential cross-lease drainage. Santa Barbara County identified 3 wells, RP3, RP10, and RP14, as potential problems because they might drain oil from lease 452.  Mr. Wilson addressed the county's concerns internally by stating that RP3 (131 feet from 452) "would recover ~41% of its reserves from 452" and only 14% from RP10 and RP14.  *Id*. at ARGUELLO-00096 (September 17, 2002 e-mail from Bob Wilson to Bob Davis and Greg Yvarra).

Plains/Arguello responded with three reasons the possible drainage was not an issue: (1) Delta agreed not to make any contention before the relevant regulatory authorities that the cross-lease drainage would entitle it to develop leases 452 and 453; (2) all oil produced would be subject to federal royalties; and (3) *Norton* was not really applicable because the state would be able to perform its environmental review as required by law.  *Id*. at ARGUELLO-00107 (Internal Memorandum from Bob Huguenard Re: Phone Conversation with Luis Perez March 17, 2003).

The rest of the 451 partners were made aware of the possibility of cross-

---

[6]     Tom Gladney was Plain's Project Manager and Bob Wilson was his Exploitation Manager.

lease drainage by the end of September 2002. The partners were also informed during several meetings in that time period that Santa Barbara had raised its concerns. Although Delta was not represented at these meetings, it was made aware of these facts shortly thereafter.

After the Ninth Circuit affirmed *Norton I*, *see California v. Norton*, 311 F.3d 1162 (9th Cir. 2002) ("*Norton II*"), and after the filing of the present suit, the original Rocky Point Agreement had to be modified. Amendment No. 1 was executed in February and March 2003 by the Point Arguello and Rocky Point owners. By this time, Delta was the 100 percent owner of leases 452 and 453 and held an 11 percent interest in 451; Plains/Arguello held the remaining 89 percent interest in the eastern half of 451. The Amendment detailed that: Delta agreed to allow Plains to request that MMS contract[7] the eastern half of lease 451 from the Rocky Point Unit; if MMS approved the contraction, the owners would treat the eastern half as subject to the Rocky Point Agreement; and Delta agreed to pay 20 percent of its net share of damages in the present suit to the Point Arguello owners. Def.'s Ex. 16 at PLAINS-02036-40 (Amendment No. 1 to the Rocky Point Agreement). In addition, Plains and Delta entered into a supplemental agreement whereby Delta agreed to provide cooperation "in regard to Arguello's efforts to obtain all necessary governmental permits," including support for plans to place wells closer than 500 feet from the leaseline and to provide a letter of support to the state and county agencies. Def.'s Ex. 17 at PLAINS-02048 (Agreement Concerning the Conditional Withdrawal of the Eastern Half of Lease OCS-P 451 From the Rocky Point Unit). The referenced letter informed the agencies that Delta had agreed to waive any right to develop leases 452 and 453 that might otherwise be argued due to oil drainage from lease 452 resulting from drilling on 451.

Plains began the process of obtaining approval of the contraction in February 2003, including the submission of Delta's letter of support to Santa Barbara in order to address Santa Barbara's and MMS's concerns. After submissions of development plans, including the previously planned well locations, MMS approved the contraction plan on August 19, 2003. During

---

[7]     The term "contract" refers to the process of removing a lease or portion of a lease from its operating unit. In this case, the contraction of the eastern half of lease 451 meant that it was removed from the Rocky Point Unit and was made part of the Point Arguello Unit, which was not encumbered by *Norton*.

this period, Plains and Delta continued to acknowledge the drainage from lease 452.  In one internal presentation, Plains estimated a possible recovery from lease 452 at a ratio of one to two (452 to 451).  Def.'s Ex. 26 at PLAINS-03484 (September 9, 2003 Presentation: "East Half of 0451 Development Project aka Rocky Point").  Total oil reserves on the east-half of lease 451 were estimated at just under 20 million barrels.  *Id*.

With the necessary approvals in place, Plains began drilling extended-reach wells.  A total of six wells were actually drilled: C-12–700 feet[8] from the 452 boundary line; C-13–1,900 feet from the line; C-13ST–50 feet from line[9]; C-14–200 feet[10]; C-14ST–1800 feet but passing within 550 feet of the line; and C-15–500 feet.  Delta approved expenditures for each of the wells, thereby entitling it to a share of the recovery.  The wells were drilled between June 2004 and June 2006.  Wells C-12, C-13ST, C-14ST, and C-15 are still in production today.  There is currently no plan to drill additional wells due to the poor performance of the existing wells and the fact that Plains expects that it can extract nearly 100 percent of the available 451 reserves without further drilling.  During his deposition, Mr. Robert Huguenard, Plain's project manager, testified that he expects that the wells will ultimately produce between 5.7 and 7.2 million barrels of oil.  Def.'s Ex. 28 (Huguenard Dep. 100-101, June 7, 2006).  The 451 project has been a net loss to the involved parties due to the high costs of drilling and the low total recovery (far less than the 20 million barrels originally expected).

---

[8]    This refers to the bottom hole distance of the well.  Because the wells are drilled at an angle from existing platforms, the bottom hole is the closest to the 452 line and is thus most relevant for our purposes.

[9]    C-13ST was a second attempt at recovery from the C-13 well, from which production was halted after it began producing large quantities of water.  Because C-13ST was a new well within 500 feet of the 452 line, MMS advised Plains that it needed Delta's position on the well as the adjacent owner. Delta submitted a letter dated October 18, 2005, stating that it had no objection.  *See* Def.'s Ex. 32 (October 18, 2005 letter from Delta to MMS).

[10]    It was originally planned that C-14 would stop nearly adjacent to the leaseline.  It was, however, a complete failure and was shut down short of its original target.  C-14ST is, similar to C-13ST, a second attempt from the C-14 position.

The parties' experts differ greatly both in respect to the total amounts drained from lease 452 and the total reserves on that lease. Defendant's expert, Dr. Richard Strickland, estimates that 1.1 million barrels of the 2.5 produced from lease 451 are attributable to 452, nearly 40 percent of total recovery. He estimates that there were "6.4 million barrels of economically recoverable oil . . . present on Lease [452]." Def.'s Supplemental Br. in Supp. of Mot. for Reconsideration ("Def.'s Br. in Supp.") at 23 (citing Def.'s Ex. 36 (Strickland Decl. ¶ 46)). Therefore, defendant states that at least 17 percent of total 452 reserves have been depleted via lease 451.

Plaintiff's expert, Dr. Robert Mannon, takes a very different view. He estimates that only 85,000 barrels will be extracted from lease 452. Dr. Mannon also estimates that 32 million barrels were present on lease 452 prior to extraction, resulting in what plaintiff characterizes as a *de minimis* depletion from 452. Plaintiff also points to MMS's initial estimates that reserves on lease 452 totaled 50.6 million barrels and Plains' estimates of 20 million barrels. Both parties' experts calculated their estimates using differing factual predicates. It is thus no surprise that they come to very different conclusions. An in-depth discussion of those differences is not necessary for present purposes.

DISCUSSION

Defendant argues that *Amber I* should not be applied to lease 452 because Delta cannot return it in substantially the same condition and because Delta's actions, as an 11 percent interest-holder in lease 451, constitute an independent election to treat defendant's breach as partial and to continue to perform under the contract, thus eliminating recision as a possible remedy. Defendant argues, at a minimum, that it should receive an offset for any benefits Delta derived under the lease or for any detriment to its value. In the alternative, defendant urges trial of disputed issues.

Plaintiff's primary response is that lease 452 can be returned in substantially the same condition because the amount of oil actually drained from lease 452 was *de minimis*. It further argues that recision is not barred when, as here, the breaching party participated in the activity that changed the condition of the property. It contends that the government, acting through MMS, played an active role in the depletion from lease 452 by approving the contraction and the well positions. Plaintiff also characterizes all of its challenged activities as having been "taken in with respect to *non-lawsuit* lease

9

451."  Pl.'s Br. in Opp'n to Def.'s Mot. for Reconsideration ("Pl.'s Br. In Opp'n") at 43.  Therefore, plaintiff argues that it has made no inconsistent election in regard to lease 452.  Plaintiff finally argues that it took no action in regard to lease 451 or 452 before the lawsuit was filed.  Plaintiff believes that its filing of the lawsuit was its election to treat the breach as total and that none of its subsequent actions indicate otherwise.

*Standard on Motion for Reconsideration*

Defendant moves for reconsideration under rule 59(a)(1).  RCFC 59(a)(1) provides that reconsideration or a new trial "may be granted . . . for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States."  In order to make a determination on such a motion, the court may take additional testimony, amend or make new findings of fact and conclusions of law, and direct the entry of a new judgment.  *Id*.

A motion for reconsideration is submitted to the court's discretion.  *Yuba Natural Res. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990).  However, such a motion should be granted only when exceptional circumstances warrant.  *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004).  In order to prevail on a motion under RCFC 59, the moving party must show: "(1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice."  *Stockton E. Water Dist. v. United States*, 76 Fed. Cl. 497, 499 (2007) (citing *Bishop v. United States*, 26 Cl. Ct. 281, 286 (1992)).  Defendant relies on the latter two grounds.  Defendant argues that it was not aware of the true potential for significant drainage from lease 452 before the court's decision in *Amber I* and that permitting the prior decision to stand would result in an injustice.

Plaintiff answers that defendant knew of the possibility of drainage from lease 452 as evidenced by the fact that MMS took the fact into consideration in its approval of the plan for lease 451.  Indeed, three of the four wells had already been drilled and were producing prior to the decision in *Amber I* (November 15, 2005).  In plaintiff's view, the evidence was not previously unavailable to defendant.  Plaintiff also argues that no manifest injustice will result because the government's drainage estimates are wrong and thus lease 452 remains in  substantially the same condition.

As to the first point, we recognize that MMS was aware of the potential for drainage from lease 452 prior to November 15, 2005.  Dr. Lisle Reed, the former Regional Director for MMS, testified, however, when asked about the drainage off of lease 452: "I remember my staff stating that the drainage was going to be very minimal, an insignificant quantity . . . ."  Def.'s Ex. 38 (Reed Dep. at 65, July 14, 2006).  The fact that parties both engaged in supplemental discovery regarding lease 452 after the filing of this motion also suggests that this evidence was, at best, conflicted at the time of *Amber I*.  Nevertheless, what we view as more relevant is that the Department of Justice was entitled to rely upon the affidavit of Mr. Ronald Heck, a consultant to Delta, quoted in defendant's original motion: "no oil or gas has ever been produced from any of the lawsuit leases."  Heck Decl. ¶ 22.

In addition, we believe an injustice would result if Delta were allowed to continue performance on 452, tender back to the government what is essentially "damaged goods," and yet receive all of the bonus payment in restitution for defendant's breach.  Consequently, if defendant is correct that Delta has either substantially altered the condition of lease 452 or has made an election to continue performance on lease 452, the court's order of recision of lease 452 should be revisited under RCFC 59(a)(1).  We therefore open the matter for reconsideration.

*Can Plaintiff Return Lease OCS P-452 in Substantially the Same Condition?*

The objective of restitution "is to return the parties, as nearly as practicable, to the situation in which they found themselves before they made the contract."  *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (quoting Restatement (Second) of Contracts § 384 cmt. a. (1979)).  Restitution is thus not available when "the non-breaching party cannot return 'any interest in property that he has received . . . in substantially as good condition as when it was received by him.'"  *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1315 (Fed. Cir. 2004) (quoting Restatement (Second) of Contracts § 384 cmt a).  This prerequisite makes particular sense in a case dealing with real property.  As the purpose of restitution and recision is to "unwind" the deal, *see Amber II*, 73 Fed. Cl. at 745, if a piece of property is substantially altered, the parties cannot truly be put back in a pre-contractual state.  That is not to say, however, that this requirement is an absolute bar to recision when property cannot be returned in its original condition.  The requirement is based on principles of equity and should be applied in that light.  *See, e.g., Delta Investing Corp v. Moore*, 366 F.2d 516, 520 (6th Cir. 1966);

*The First Nat'l Bank & Trust Co. In Macon v. Am. Sec. & Trust Co.*, 437 F. Supp. 771, 774 (D. D.C. 1977). The court must decide, considering all of the facts and circumstances, whether restoring a pre-contractual state is both possible and fair.

This was the approach taken the by the Federal Circuit in *Hansen*, a case in which it allowed the possibility of a recovery in restitution despite the fact that the plaintiffs had converted the acquired bank's assets to a higher risk loan portfolio. The Federal Circuit recognized that this made the unwinding of the transaction difficult but concluded that returning the property in "substantially as good condition" was not impossible. *Hansen*, 367 F.3d at 1318-19. It held, however, that a diminishment of the character or value of the property traceable to the plaintiffs' mismanagement could lead to an offset. *Id*. at 1319. The *Hansen* court was mindful that some circumstances–there it was the complex arrangements surrounding the acquisition and merger of banks–make it difficult to recreate the status quo ante. Nevertheless, so long as the non-breaching party was not left in a superior position to the one it reasonably would have occupied prior to breach, the restitution claim could proceed. *Id.* at 1318 (citing *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003)).

Thus, while restitution is typically not available  when the property in question has been substantially altered, the court must consider the unique circumstances.  An offset may salvage restitution in some cases in which there has been a change in condition.

In the present case, the parties differ greatly as to the facts necessary for a determination of whether the property can be returned in substantially the same condition.  Defendant posits that some 1.1 million barrels of oil have been drained from lease 452.  Plaintiff, on the other hand, predicts that only 85,000 barrels ultimately will be produced from lease 452.  The disparity does not end there.  Defendant's expert, Dr. Strickland, believes that there were 6.4 million barrels present on lease 452 before extraction via 451.  Thus, according to Dr. Strickland, even assuming no future drainage, 17 percent of lease 452's reserves have already been drained via lease 451.  Plaintiff counters with Dr. Mannon's estimates that there were 32 million barrels present before drilling on lease 451.  If plaintiff's numbers are used, less than one percent of lease 452's reserves will ever be drained.

Neither party is able to cite any percentage change which is consistently

treated as insubstantial for purposes of applying the recision remedy. Nevertheless, plaintiff contends that, assuming what it argues is the maximum percentage of depletion to lease 451, 17 percent, this change in condition is per se *de minimis*. To support that view, plaintiff presents the court with citations to various statutory and regulatory settings in which 75-80 percent is treated as substantial performance. Plaintiff suggests, therefore, that a 17 percent depletion in reserves does not constitute substantial change in the condition of lease 452. We find plaintiff's references unhelpful. They represent a string of widely dissimilar situations in which Congress has, by statute, permitted "leaners" to count. Three examples come from the world of tax law, for instance, in which the government frequently has to resort to rounding up in order to protect the Treasury. Others come from worker-friendly statutes or regulations, which consistently are treated generously in favor of the worker.

We are in the world of contract law, however, where neither player should be treated with any particular deference. In that context, when dealing with a uniform, fungible, commodity like oil, we believe a 17 percent loss to be substantial. It is certainly not *de minimis*. We reject therefore plaintiff's argument that the amount drained, even if assumed to be 17 percent, would defeat the motion for reconsideration.

Nor do we agree that defendant's role in approving the development of lease 451 bars it from seeking reconsideration. MMS's approval of the development of lease 451, plaintiff argues, enabled the drainage from 452. Plaintiff cites the first Restatement of Restitution for the proposition that "restoration by the plaintiff is not necessary when the thing 'has become . . . impossible of restoration by act of the other.'" Pl.'s Br. in Opp. at 5 (quoting Restatement (First) of Restitution § 65(d) (1937)). Plaintiff also cites the draft third Restatement of Restitution and Unjust Enrichment for basically the same proposition that the fault of the defendant is relevant.[11] Plaintiff relies heavily on a Maryland Court of Appeals case, *Funger v. Mayor and Council of the Town of Somerset*, 223 A.2d 168 (1966), as an illustration of this principle.

Defendant answers by arguing that fault cannot be attributed to its actions in regards to the drainage from lease 452 via 451. It characterizes its role in the approval of the 451 development as merely regulatory– a fulfilling

---

[11]     *See* Restatement (Third) of Restitution and Unjust Enrichment § 53 (Preliminary Draft No. 8, September 20, 2006).

of its statutory duty to regulate offshore oil and gas leases.  Defendant does not deny that it stood to benefit from oil recovery via royalties but insists that MMS acted consistent with all relevant regulations and had no statutory or regulatory reason to deny the Rocky Point contraction or the positioning of the wells.  Therefore, in defendant's view, no fault can be attributed to it in an equitable consideration of the propriety of restitution and recision.  Defendant points out that Delta was the initiator and driving force behind the plan and the execution of the activities that potentially damaged lease 452.  We agree with the defendant.

MMS did approve of the contraction of the eastern half of lease 451 out of the Rocky Point Unit.[12]  MMS's also approved of all of the wells placed within 500 feet of the lease line.  Indeed, the record is replete with examples of various officials at MMS having knowledge of the potential for cross-lease drainage.  *See, e.g.,* Reed Dep. at 28.  It is also undeniable that MMS was fully supportive of the development of lease 451.  Nor does defendant dispute that it receives royalties on every barrel produced.  Despite these circumstances, we conclude that the actions of MMS's are not of the sort contemplated by the drafters of the restatements as precluding objection to recision and restitution.

We believe that plaintiff's argument, like an analogous government argument we deal with below, is somewhat less than realisic.  The notion that plaintiff was an innocent bystander while government agents tinkered with the leaseholds, or that plaintiff was not the primary mover here will not fly.  We agree with the defendant that MMS was essentially acting as a regulatory body,

---

[12]     In a March 4, 2003 letter in reply to the request for contraction, MMS stated, "[w]e have received your letter . . . requesting our concurrence for contraction of the Rocky Point Unit by removing the E ½ of [lease 451] from the Unit.  For the reasons set out below, and in accordance with the [Rocky Point Agreement], we hereby demand the contraction of the E ½ . . . out of the Rocky Point Unit."  Cosgrove Decl., Tab 10 (March 4, 2003 Letter from Dr. Lisle Reed to Robert Huegenard).  Although the word "demand" is used, it would be misleading to characterize MMS as the initiator.  As the quoted language shows, MMS was responding to a request by Arguello for the contraction.  While there is no doubt that MMS saw the development of lease 451 as advantageous to it, the record does not indicate that MMS would have ordered the contraction without the prior request of Arguello.

regardless of the fact that it stood to receive royalties from the proposed development.  MMS could disapprove of the oil companies' plan if: (1) the lessee failed to demonstrate that the plan was in compliance with applicable federal laws; (2) the plan did not meet state approval; (3) national security; or (4) exceptional circumstances such as serious harm to life, property, mineral deposits, national security, or the environment.  30 C.F.R. § 250.2041(1) (2002) (now found at § 250.271) Under the first factor, MMS had a duty to consider the rights of adjacent lease holders whose leases could be drained by the proposed operations.  *See Id*. § 250.1101(b).  With Delta's acquiescence to the well positions, MMS had no statutory or regulatory reason to deny the plan.  The fact that it also stood to benefit from the plan due to potential royalties does not change its role in the process.

Nor does the holding in *Funger* change our reasoning. In *Funger*, the plaintiff, a developer, entered into an agreement with the town of Somerset, Maryland, whereby the town agreed not to oppose the rezoning of a particular tract of land before the county in exchange for the grant of another tract of land to the town and a grant of an easement on a third tract of land.  After the plaintiff had secured the rezoning, the town passed an ordinance preventing the proposed use of the land.  The developer brought suit against the town seeking, among other things, restitution and return of the property it conveyed.  The Maryland trial court sustained the town's demurrer to recision because the property, having been rezoned, could not be returned in the same condition  it was in pre-contract.

The Court of Appeals overruled, however, holding that the defendant town could not avoid the return of the property it received from plaintiff because "[c]learly the Town knew that once the rezoning was granted, [the plaintiffs] could not restore the previous rezoning, because this possibility rested with a public official body not subject to the will or control of the [parties]." *Funger*, 223 A.2d at 175.  The court went on concluding that, "in this sense the Town caused the impossibility of restoration of which it now complains." *Id*.

Unlike *Funger,* in other words, Delta had, and in some senses still has, the power to turn off the oil spigot.  It would not have required the cooperation of the government for Delta *not* to have drained oil from lease 452, thereby precluding defendant's current argument about substantial diminution.  It was not the action of some independent third party that caused the change in condition.  The change in condition was the extraction of oil via lease 451, in

which Delta played a role as the owner of lease 452 and interest-holder in 451. If the extraction of oil from lease 452 was significant, and if that fact cannot, if appropriate, be accommodated through some adjustment, recision will be unavailable to the plaintiff.

We now arrive at what we view to be an argument by defendant that is equally unrealistic.  In the event that recision is allowed by the court, defendant argues that "plaintiffs must still account for (1) the value of the benefit received through the use of the lease from 2003 to the present, namely the valuable investment opportunity in what appeared to be a promising oil field; and (2) the loss of value to the United States." Def.'s Reply Mem. in Supp. ("Def.'s Reply") at 21.  Defendant believes that it would be owed an offset for the opportunity to drill for oil, valued at the time it was obtained, "fixed at the time of purchase," *id*. at 27, and for the loss in value of lease 452 irrespective of whether oil was actually produced, and irrespective of whether there are legal impediments to production.

We rejected this argument in *Amber II*, holding that government was not entitled to an accounting for the loss of speculative value because oil and gas production was the goal of these leases.  73 Fed. Cl. at 756-57.  In addition, however, we agree with plaintiff that it comes with an ill grace for the government to contend that it cannot market rescinded leases, when there are executive, judicial, and legislative moratoria in place that would preclude the government's assertion from being put to the test.  *See, e.g.*, Department of the Interior, Environmental, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-54, § 104, 119 Stat. 499, 521 (Aug. 2, 2005).[13]  Indeed, the assumption behind an offset for "diminished marketability" would be fundamentally inconsistent with the finding of breach.  The government, in other words, bears the risk that plaintiff made a bad bargain if it commits a total breach prior to plaintiff's ability to fully exploit the leases.

*Were Plaintiff's Actions in Relation to Lease OCS P-452 an Independent Election to Treat as Partial Breach?*

---

[13] Further information concerning the legislative and executive moratoria can be  found on the MMS website.  *See generally* What is the 5-year Program?, http://www.mms.gov/5-year/WhatIs5YearProgram.htm (last visited Sept. 11, 2007).

Defendant also argues that restitution is inappropriate because, in its view, Delta's actions as the owner of lease 452 and partial-interest holder in lease 451 constituted an election to treat defendant's breach as partial and to continue with performance, thereby eliminating restitution as a remedy. Plaintiff answers that its actions were not motivated by the extraction of oil from lease 452 but were rather centered on the development of lease 451. Plaintiff believes the fact that it took none of the relevant actions before the filing of the present suit (its declaration of total breach) is particularly relevant to this question.

It is well settled that, upon material breach, the non-breaching party has a choice: it can choose to terminate the contract and seek restitution, or it can elect to continue performance and prove its damages. *Old Stone Corp. v. United States*, 450 F.3d 1360, 1371 (Fed. Cir. 2006). The court in *Old Stone*, laid out two possible tests for election: (1) mere continued performance or acceptance of performance constitutes a bar to restitution; or more strictly, (2) that there must be either detrimental reliance on the part of the breaching party or a benefit to the non-breaching party as a result of continued performance. *Id*. at 1372. The Federal Circuit declined to rule which was the proper test because it held that both prongs of the stricter test were met in that case. *Id*. (holding that there was both detrimental reliance on the part of the government in continuing to demand payment from plaintiff and that the plaintiff continued to accept benefits by operating its thrift).

Given the present state of the record, the court cannot rule on whether plaintiff's actions constituted a waiver because, in our view, plaintiff's motivations are relevant and disputed with respect to its participation in the development of lease 451. Nor is the record clear as to what plaintiff knew or believed in regard to the reserves on lease 452 and the amount of drainage likely to occur from lease 452 via lease 451. An election assumes a choice, a willful or deliberate action taken in furtherance of some goal. It is undeniable that some depletion of oil from lease 452 resulted from the wells on 451. Although it is true that Delta certainly knew that oil would be extracted from lease 452 via the wells on 451, from the record as presented, the court cannot determine if its actions were, in meaningful part, motivated by a desire or willingness to exploit lease 452. The court must hear and weigh evidence at trial in order to make an informed decision.

In this regard, plaintiff's insistence that it took no actions in regard to lease 452 prior to the filing of its suit is not dispositive. Although Delta may

have declared defendant's breach to be total with the filing of this suit, if it took actions inconsistent with a total breach, even after its declaration of total breach, restitution will not be available. Plaintiff cannot both declare a total breach and attempt to derive the benefits of a rescinded bargain.

## CONCLUSION

For the foregoing reasons, defendant's motion for reconsideration is denied as to any offset for the loss of speculative value or for the "benefit" of explorative opportunity. Ruling on the rest of the motion is reserved until after a trial has been conducted on the issues of (1) whether lease 452 can be returned in substantially the same condition; and (2) whether plaintiff elected to continue performance on lease 452. The parties are directed to consult, and, consistent with the court's views expressed at oral argument, file a joint status report on or before September 27, 2007, proposing a schedule for trial.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge

18