# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

| | |
|---|---|
| AMBER RESOURCES COMPANY, *et al.*, | |
| *Plaintiffs,*<br>v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ******************************************* | |
| ANADARKO E & P COMPANY L.P., *et. al.*, | |
| *Plaintiffs,*<br>v. | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ******************************************* | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| ******************************************* | |

**DECLARATION OF JOHN F. PEIRSON, Jr.**

John F. Peirson, Jr. declares and states as follows:

1. I am an environmental consultant with MRS, a consulting firm located in Ventura, California. I make this declaration based on my own personal knowledge and could competently testify to the matters herein if called upon to do so.

2. MRS provides environmental and permitting-related consulting services for various industries. Approximately 60% to 70% of MRS's business involves permitting work related to proposed industrial projects in the State of California. About half of that work is on behalf of companies attempting to develop industrial projects, with the remainder on behalf of government agencies that hire MRS to conduct environmental reviews of proposed projects that have permit applications. The rest of MRS's business mainly involves consulting with respect to permit compliance and environmental surveys.

3. I have over 25 years of experience as a permitting consultant. In my work on behalf of permit applicants, I typically assist clients by preparing applications for state, local, and federal permits, submitting the applications, and then representing the clients before the relevant agencies in connection with the applications. I have extensive experience representing clients before the Minerals Management Service, the California Coastal Commission, Santa Barbara County, and other local agencies.

4. I have worked on permitting issues with respect to the Rocky Point or Point Arguello unit areas since 1983, when the previous firm I worked for (ADL) was retained by Santa Barbara County, the Minerals Management Service, and the California Coastal Commission to prepare an Environmental Impact Report and Environmental Impact Statement with respect to the Point Arguello Project. Leases OCS-P 0451 and 0452, which I am informed are the subject of this litigation, are adjacent to the Point Arguello Unit and the development wells on the eastern half of Lease OCS-P 0451 have been drilled from Platform Hidalgo, one of the platforms from which the Point Arguello production wells were drilled.

5. In the 1993/1994 timeframe, I was retained by Chevron to perform an extensive Gas Reinjection Study for the Point Arguello Unit. Soon after beginning work for Chevron, I assumed broad responsibility with respect to Point Arguello permitting requirements and became Chevron's main point of contact as it related to permitting issues with Santa Barbara County. After Arguello Inc. ("Arguello"), a wholly owned subsidiary of Plains Resources Inc., replaced Chevron as the operator of the Point Arguello Unit in 1999, I was retained by and continued working on Point Arguello permitting issues for the new operator. I continued to do so after Arguello became a wholly owned subsidiary of Plains Exploration & Production Company in December 2002 as part of a corporate reorganization (collectively all of the Plains entities are referred to as "PXP").

6. When I was retained by PXP in 1999, I also assumed direct responsibility for permitting-related issues with respect to the Rocky Point Unit. In this capacity, I was personally responsible for preparing and filing Rocky Point-related permit applications that were to be submitted to Santa Barbara County, the Minerals Management Service, and the California Coastal Commission.

7. During the course of my work on Rocky Point, I was responsible for the overall management of the permitting process. I was given responsibility for determining what filings needed to be made with each relevant agency, for setting the deadlines for such filings, and for determining the contents of each filing. I was given this level of management responsibility with respect to Rocky Point because of my strong relationships with the regulatory agencies, and because PXP did not have sufficient internal capacity to prepare and file the permit applications on its own.

8. Most, if not all, of the permit-related filings and correspondence with the various regulatory agencies on Rocky Point were prepared by me or at my direction. This

included the revisions to the Point Arguello Unit Development and Production Plan to include the development of the Rocky Point Unit from the Point Arguello Unit platforms (which was later limited to the development of the East Half of Lease OCS-P 0451), the application to Santa Barbara County for Modification of the Final Development Plan For the Point Arguello Project, and the consistency analysis prepared for submission to the California Coastal Commission. In the course of preparing these applications, I was in regular contact with PXP staff and management, and regularly delegated assignments directly to PXP employees. For instance, in preparing the revisions to the Point Arguello Unit Development and Production Plan that were submitted to the Minerals Management Service, I would typically assign coverage of specific technical subjects (e.g., geology, reservoir, engineering, etc.) directly to qualified PXP employees and then incorporate the employees' work product into the final permit application. In nearly all cases, I personally filed the relevant permit applications with the regulatory agencies on PXP's behalf.

9. I also attended Rocky Point-related meetings between PXP and the Minerals Management Service, Santa Barbara County and/or the California Coastal Commission. At such meetings, I represented PXP before the agencies and spoke on the company's behalf.

10. My work with PXP is governed by a Master Services Agreement that governs all work between MRS and PXP. That agreement requires that MRS keep confidential all non-public company information. Since working for PXP, I have, in fact, maintained as confidential all non-public company information that has been provided to me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on October 18, 2007

John F. Peirson, Jr.