IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBER RESOURCES COMPANY., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

ANADARKO E&P COMPANY, L.P., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

NYCAL OFFSHORE DEVELOPMENT CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Nos. 02-30C
04-1822C
05-249C (Consolidated)
(Senior Judge Bruggink)

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE**

From the limited information in plaintiffs' privilege log and opposition to our motion to compel, it is clear that plaintiffs' assertions of privilege should be resolved via in camera review by the Court to determine whether the communications contain or reveal a confidential request for legal advice to a lawyer acting as a lawyer.

## I. Response To Plaintiffs' Procedural Arguments

Before defending the assertions of privilege, plaintiffs ask that the motion to compel be denied on the basis of timeliness. Yet plaintiffs identify no date against which to judge timeliness. Instead, plaintiffs implicitly concede that: (1) there has never been a fixed discovery cutoff date in the Lease OCS-P 0452 drainage litigation; and (2) the resolution of the motion will in no way affect the conduct of trial in this case. None of the cases cited by plaintiffs stands for the idea of imposing an arbitrary, post hoc cutoff date, unknown to the parties, after which a party is prohibited from challenging invalid assertions of privilege or otherwise improper withholding of responsive documents from discovery. See e.g., Nortel Networks Ltd. v. SMC Electronics, No. CIV-06-787-C, 2007 WL 1959281 (W.D. Okla. June 29, 2007) (motion to compel held untimely where motion was filed without explanation after fixed discovery deadline had passed and after court had warned the parties against dilatory tactics); Celgene Corp. v. Centocor, Inc., No. Civ.A. 03-5978, 2006 WL 305431 (E.D. Pa. Feb. 8, 2006) (motion to compel filed four months after expiration of discovery deadline); Buttler v. Benson, 193 F.R.D. 664 (D. Colo. 2000) (motion to compel filed over one year after close of discovery); Koch v. Convenience Indus. Assocs. LLC, No. 1:05-cv-1753, 2007 WL 2901128 (S.D. Ind. Mar. 6, 2007) (motion to compel filed four months after close of discovery). In all of the cases cited by plaintiffs, the court denied the motion to compel only where the court had previously set a firm discovery cutoff date of which the parties had notice.

In this case, the parties have responded to and complied with numerous scheduling orders governing fact and expert discovery relating to Lease OCS-P 0452. In none of the Court's scheduling orders has any party requested or agreed to a discovery cutoff date. The Court has never imposed such a deadline, electing instead to fix only briefing dates for supplemental

submissions. This is in contrast to discovery deadlines in respect of plaintiffs' claims for "sunk costs," claims that were on a parallel litigation track. See Jan. 23, 2006 Scheduling Order (Aug. 31, 2006 discovery deadline); and Sep. 7, 2006 Order (Nov. 3, 2006 discovery deadline extension). Perhaps most significantly, because the motion to compel relates to only nine documents, its disposition will not delay the trial schedule. Nor will the motion affect plaintiffs' preparation for trial; if the motion is granted, plaintiffs must simply turn over the nine documents already identified on their privilege log. The motion does not contemplate any broad document searches or productions. For these reasons, plaintiffs have no valid timeliness objection.

Second, plaintiffs argue that the document descriptions in the privilege log comply with Rule 26(b)(5). We disagree with this assertion; in the context where there are questions as to the status of certain persons and whether the "advice" contained in the communications is primarily legal, the log does not provide sufficient information. Plaintiffs' "brief discussion" of the challenged documents provides no additional facts from which the Court can assess these aspects of the privilege assertions. See Pl. Opp. at 17-18.

The observation that in-house counsel was included among the recipients of a document is not at all dispositive. A corporation can protect material as privileged only upon a "clear showing" that an in-house lawyer acted "in a professional legal capacity." In re Sealed Case, 737 F.2d 94, 99 (D.C.Cir. 1984). Communications made by and to in-house lawyers with respect to business matters, management decisions, or business advice are not protected by the privilege. United States v. Rowe, 96 F.3d 1294, 1297 (9th Cir. 1996); Hardy v. New York News, Inc., 114 F.R.D. 633, 643-44 (S.D.N.Y. 1987). Thus, "information does not become privileged simply because it came from counsel, and when documents or conversations are created pursuant to business matters, they must be disclosed." Allendale Mut. Ins. Co. v. Bull

Data Systems, Inc., 152 F.R.D. 132, 137 (N.D. Ill. 1993). "A corporation cannot be permitted to insulate its files from discovery simply by sending a 'cc' to in-house counsel." USPS v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 163-64 (E.D.N.Y. 1994). Because an in-house lawyer often has other functions in addition to providing legal advice, the lawyer's role on a particular occasion will not be self-evident as it usually is in the case of outside counsel. Minebea Co., Ltd. v. Papst, 228 F.R.D. 13, 21 (D.D.C. 2005).

From the cryptic, boilerplate information on plaintiffs' privilege log, there is reason to believe that none of the nine challenged documents is properly privileged. The main recipients of the documents are non-lawyer managers and executives; to the extent an attorney is part of the communications, he is often added as a mere copyee. The primary issues in all of the documents – development of Lease OCS-P 0451 and the concomitant cross-lease drainage of oil reserves from Lease OCS-P 0452 – suggest that the documents seek only or primarily technical and business advice. Under these circumstances, the proper course is for the Court to review the nine documents in camera and decide whether plaintiffs may properly withhold the documents from production. First Heights Bank, FSB v. United States, 46 Fed. Cl. 312 (2000).

## II. Documents Authored Or Received By Manager David Rose

Plaintiffs devote much of their opposition to their assertion that the Court should consider David Rose an attorney for purposes of applying attorney-client privilege. In fact, plaintiffs' privilege claim over a number of withheld documents rests only upon the fact that the communications were either authored or received by Mr. Rose, a Plains manager who apparently holds a law degree but was not hired by the company to function as an attorney.

Communications made to and by a true in-house attorney may be protected by the attorney-client privilege just as much as communications with outside counsel. Upjohn Co. v.

United States, 449 U.S. 383, 389-97 (1981)[1]; In re Sealed Case, 737 F.2d 94, 99 (D.C.Cir. 1984). However, communications with corporate employees who are not in-house counsel yet happen to possess a law degree require careful scrutiny to discern whether the communication truly reveals "predominately legal, as opposed to business," advice:

> The possession of a law degree and admission to the bar is not enough to establish a person as an attorney for purposes of determining whether the attorney-client privilege applies . . . . the lawyer must not only be functioning as an advisor, but the advice given must be predominately legal, as opposed to business, in nature.

Boca Investerings P'ship v. United States, 31 F. Supp. 2d 9, 11-12 (D.D.C. 1998) (citing cases).

Even if many of the facts alleged by Mr. Rose in his declaration are accurate, there is no privilege with respect to the challenged communications to and from Mr. Rose where the totality of the circumstances suggests that he was not functioning as an attorney for Plains. The Court should consider the following facts:

- Mr. Rose's only position with the company has been "Manager" or "Supervisor" of the company's "Environmental Health and Safety" department, a corporate component within Plains/Arguello's California office. Rose Decl. at 2.

- Mr. Rose was never employed, promoted, transferred, or redesignated by Arguello/Plains to serve as in-house counsel. Rose Decl. at 2.

- Plains has a legal department staffed with attorneys at its headquarters in Houston.

- Mr. Rose has never worked under the direction or control of any attorneys within Plains' legal department. "There is a presumption that a lawyer in the legal department or working for the general counsel is most often giving legal advice, while the opposite presumption applies to a lawyer . . . who works for . . . some other seemingly management or business side of the house." Boca Investerings, 31 F. Supp. 2d at 12.

- According to the corporate organizational chart, Mr. Rose is a manager who supervises only environmental and safety technicians; he supervises no attorneys, paralegals, or legal staff. Ex. A. "One important indicator of whether a lawyer is involved in giving

---

[1] The Supreme Court noted, "The communications at issue were made by Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel." Upjohn, 449 U.S at 394 (emphasis added).

legal advice or in some other activity is his or her place on the corporation's organizational chart." Boca Investerings, 31 F. Supp. 2d at 12.

- To the best of our knowledge, Mr. Rose has never identified himself as an attorney in any communication to the Minerals Management Service. See, e.g., Exs. B, C, D, E.

- Plains has provided no communication in which Arguello/Plains or Mr. Rose has ever identified Mr. Rose as an attorney for the company to anyone.

- For legal matters related to the California off-shore, Plains/Arguello uses its in-house general counsel in Houston (Gregg Maynard) and the outside law firm of Schully, Roberts, Slattery, Jaubert & Marino, not David Rose. See Ex. F.

- In a January 23, 2003 letter to MMS, Arguello/Plains executive Jim Rumsey wrote that "[outside counsel] Mr. Marino serves as our counsel on OCS [outer-continental shelf] matters and is currently reviewing items related to the Rocky Point Unit." Ex. G.

- Mr. Rose's e-mail messages do not contain a caveat that communications from him may be privileged. See, e.g., U.S. Mot. Ex. 2.

- There is no evidence that Mr. Rose is required to maintain his bar membership as a condition of his employment.

- While Mr. Rose now claims that an Arguello executive requested his legal assistance because there were no in-house counsel "who were knowledgeable about California specific regulatory issues," Rose Decl. at 3, the contraction of the Rocky Point Unit, the Lease OCS-P 0451/0452 drainage issue, and the development of Lease OCS-P 0451 do not involve any California-specific federal regulations (if any state-specific regulations even exist).

- Plains has provided no support for Mr. Rose's dubious presumption that he would not have been included in the Lease OCS-P 0451/0452 discussions had he not been providing legal advice. Rose Decl. at 4. This is simply conjecture on his part. As manager of the environmental health and safety department, he logically would have been included on many communications related to the development of Leases OCS-P 0451 and 0452.

These facts cast serious doubt upon plaintiffs' contention that Mr. Rose was somehow engaged in the practice of law or otherwise providing purely legal advice; in reality, Mr. Rose was acting squarely within the parameters of his designated job position – the only position he was ever hired for – to assist Plains in implementing environmental and safety programs for exploration and production projects, programs that would facilitate the required Federal, state,

and county approvals. This is because a necessary component of every development plan is to consider and explain the environmental impacts of and safety programs for the proposed development. See Ex. E (Revisions to Development Plan); see also U.S. Supp. Br., Ex. 3 at 14-16 (Development Plan); Ex. 11 at 2 (Table of Contents to Revisions to Development Plan); Ex. 24 at 19-21 (Revisions to Development Plan). "When a lawyer acts as a business or economic advisor, there is no special relationship to give rise to a privilege to protect his advice from disclosure." Dep't of Economic Dev. v. Arthur Andersen & Co., 139 F.R.D. 295, 300 (S.D.N.Y. 1991). Because Mr. Rose was providing only business advice consistent with his position at Plains, he was not acting as an attorney and his communications are not privileged.

Plains has the burden to demonstrate a right to withhold otherwise responsive documents from production; here, Plains has the burden to demonstrate that the communications to and from Mr. Rose are privileged. In re Sealed Case, 737 F. 2d 94 (D.C. Cir 1984). Moreover, the Court must strictly construe Plains' assertions of privilege. Energy Capital Corp. v. United States, 45 Fed. Cl. 481, 484 (2000). Under the circumstances, Plains has not carried its burden.

If the Court nonetheless determines after in camera review that any portions of the challenged documents are privileged, we request that those portions be redacted and the remainder of the documents be produced. Plains has articulated no rationale for withholding the entirety of the challenged documents.

**III. Documents To And From Plains' Consultant John Peirson**

We challenge two of the nine documents because, among other things, the documents were received or authored by an independent consultant to Plains.[2] In response, plaintiffs note

[2] Plaintiffs' opposition misleads the Court by suggesting that our only basis to question Plains' assertion of privilege was Mr. Peirson's status as an independent consultant. Pl. Opp. at 17. As explained in our motion to compel, this is inaccurate. U.S. Mot. at 8.

that this Court once held that it is possible to consider an independent consultant the employee of the client for purposes of determining whether a privilege has been waived. Pl. Opp. at 12-13 (citing Energy Capital Corp. v. United States, 45 Fed. Cl. 481, 490-91 (2000)). However, the holding in Energy Capital was limited to the unusual setting where the consultant possesses "decision-making responsibility," is "implicated in the chain of command," or bears "personal responsibility" if the corporation is liable for the activities conducted by the consultant. Id. Thus, "not every independent contractor qualifies for this special protection." Id. at 492. Here, the facts do not permit communications to and from Plains' consultant John Peirson to be privileged.

First, Mr. Pierson was only an environmental consultant paid to assist Plains in working with state and local officials in obtaining approvals to develop the eastern half of Lease OCS-P 0451. In terms used by the Court in Energy Capital, Mr. Peirson's narrowly-defined role was of a far different character from that of a contractor, such as a regular financial adviser, who occupies an "extremely sensitive and continuing position" with the client. See 45 Fed. Cl. at 489-90 (citing In re Bieter Co., 16 F.3d 929, 937 (8th Cir.1994)). Considering Mr. Peirson's work for other companies and agencies (both as an employee of Arthur D. Little and MRS) and his narrow environmental role for Plains, Mr. Peirson was certainly not the "functional equivalent" of a "regular employee" of Plains whose actions could bind the company. Id.

Second, Mr. Peirson possessed no decision-making authority and bore no personal responsibility with respect to the development of the eastern half of Lease OCS-P 0451. In fact, his statement that "I was responsible for the overall management of the permitting process" is a gross exaggeration. Peirson Decl. at 3. Only officials at MMS, the California Coastal Commission, and the Santa Barbara County Energy Division "managed" the permitting process

within their respective agencies. Within Plains, only Project Managers Tom Gladney and Bob Huguenard had ultimate authority to sign and submit documents in order to obtain Federal, state, and county approvals. This is shown in every document bearing their names and signatures, documents that omit any reference to Mr. Peirson. See, e.g., U.S. Supp. Br., Exs. 11, 24 (Development Plans signed by Gladney/ Huguenard); Ex. 12 at ARGUELLO-00107 – 108 (Huguenard memorandum describing conversation with county official); Ex. 13 (letter from county to Huguenard); Ex. 21 (Huguenard response to county concerns); Ex. 12 (numerous e-mails); Ex. F (approval letter from CCC to Huguenard). Aside from one e-mail from Mr. Peirson provided by Plains during discovery, see U.S. Supp. Br., Ex. 12 at ARGUELLO-00115, Mr. Peirson's name is on no documents produced in this litigation. Accordingly, Mr. Peirson's ambitious visions of "management responsibility," decision-making authority, and actual supervisory oversight of Plains employees appear to be more of an artificial construct created to meet the strict prerequisites enunciated in Energy Capital than an accurate reflection of Mr. Peirson's consultancy arrangement with the company.

If the Court nonetheless determines that communications with Mr. Peirson can be privileged, in camera review is still necessary to examine the subject matter of the communications. As the court in Energy Capital stated, "the attorney-client privilege is triggered only by a client's request for legal, as contrasted with business, advice and is 'limited to communications made to attorneys solely for the purpose of the corporation seeking legal advice and its counsel rendering it.'" Energy Capital, 45 Fed. Cl. at 485 (citing In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1037 (2d Cir. 1984). The challenged documents were sent mainly to non-lawyers – indeed operations and engineering employees – at Plains and likely contain no confidential request for legal advice. The timing, subject matter, and recipients of the

documents (including a petroleum engineer) suggest that the materials relate only to purely business and technical advice – in this case obtaining state and county approvals to develop a Federal oil and gas lease – and not legal advice. Thus, the two documents related to Mr. Peirson are likely not protected by attorney-client privilege.

Finally, if the Court concludes after in camera review that any portions of the challenged documents are properly privileged, we request that those portions be redacted and the remainder of the documents be produced. Plains has presented no rationale for withholding the entirety of the challenged documents.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director

s/ Gregg M. Schwind
GREGG M. SCHWIND
ALLISON KIDD-MILLER
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 353-2345
Fax: (202) 514-8624

October 24, 2007

Attorneys for Defendant

# EXHIBIT A

# Pt. Arguello Plan of Operation Meeting

December 17, 2002

Arguello Inc., Operator

# Pt. Arguello Personnel




* See Operations Organizational Chart for Personnel Details

* Contractor

12/16/2002

# Arguello Strategy

- Maintain and enhance environmental, safety, and regulatory compliance
- Expand the resource base and maximize PAU ultimate recovery
- Increase net cash flow by exploiting volume opportunities

# EXHIBIT B

1703-02(a)(1) –
Pt. Arguello Unit
gen. Corres.

ARGUELLO

January 3, 2002

Dr. Maher A. Ibraham, Regional Supervisor
Office of Production, Development & Resource
U.S. Department of the Interior
Minerals Management Service
Pacific OCS Region
770 Paseo Camarillo
Camarillo, CA 93010

Re: Platforms Harvest (OCS P-0315), Hermosa (OCS P-0316) and Hidalgo (OCS P-0450)

Dear Dr. Ibraham,

This is a courtesy letter to inform you that on December 14, 2001 Arguello Inc. (Arguello) gave notice of termination of the operating services contract with Torch Operating Company - now Torch Energy Services – (Torch) covering the operation of the Arguello facilities. The facility names, addresses and equipment will not change. At this time, no changes in the operation of the equipment and/or performance of activities are expected to occur. Arguello will continue to perform all of the activities associated with operating the facilities and will be responsible for ongoing compliance with all regulatory requirements and permit conditions. Arguello and Torch have agreed to a transition period during which time Arguello intends to make job offers and hire Torch project employees. This is expected to be completed by mid-March 2002 at the latest.

Thank you in advance for your prompt attention to this matter in making any necessary changes to your files and/or the subject permit as a result of this change.

Please contact me at (805) 562-3608 if you have any questions.

Sincerely,

David Rose, Supervisor
Environmental Safety & Regulatory Compliance

cc: Phil Schroeder

RECEIVED
JAN -7 2002
PRODUCTION, DEVELOPMENT AND RESOURCE EVALUATION
PACIFIC OCS REGION

EXHIBIT C

File.. 703-02(i) Pt. Arg. DPP Corres
1703-02(i) Rocky Pt DPP Corres

# PXP

## ARGUELLO INC.

March 30, 2003

RECEIVED
APR 5 2004
OFFICE OF FACILITIES, SAFETY & ENFORCEMENT
PACIFIC OCS REGION

Mr. Nabil F. Masri, Chief
Office of Facilities, Safety and Enforcement
United States Department of the Interior
Minerals Management Service
Pacific OCS Region
770 Paseo Camarillo
Camarillo, CA 93010-6064

Re: Revisions to the Point Arguello Field DPP's to included Development of the Eastern Half of Lease OCS-P 0451 - - Response to your Approval Letter

Dear Mr. Masri:

Pursuant to your letter dated August 19, 2003, item number 2, wherein you required Arguello Inc. to provide an Environmental Compliance Monitoring Plan (ECMP) within 30-days prior to commencement of activities under the approved DPP revisions; we have enclosed a copy of said ECMP.

If you have any questions or comments please contact me at (805) 567-1608.

Sincerely,

for David Rose
Supervisor
Environmental, Safety & Regulatory Compliance

Enclosure

Arguello Inc., a wholly-owned subsidiary of Plains Exploration & Production Company
17100 Calle Mariposa Reina ▪ Goleta, CA 93117-9737 ▪ 805-567-1601 ▪ Fax: 805-567-1652

# Development of the Eastern Half of OCS-P 0451 Environmental Compliance Monitoring Plan (ECMP)

Point Arguello Unit, Arguello Inc. – Operator

Harvest, OCS-P 0315; Hermosa, OCS-P 0316; Hidalgo, OCS-P 0450




RECEIVED
APR 5 2004
OFFICE OF FACILITIES, SAFETY, & ENFORCEMENT
PACIFIC OCS REGION

The development of the Eastern Half of OCS-P 0451 will involve directionally drilling wells from existing well slots on Platforms Hermosa and Hidalgo. The development will require the drilling of up to eight (8) wells. Up to five (5) wells will be drilled from Platform Hermosa and three (3) wells from Platform Hidalgo.

All oil production form the Eastern Half of OCS-P 0451 will be combined with the Point Arguello Unit oil and transported to Gaviota in the existing PAPCO oil pipeline. From Gaviota, the oil will be transported to refineries in the existing All American Pipeline.

Gas from the eastern half of OCS-P 0451 will be combined with Point Arguello Unit gas on the production platforms. The combined gas will be sweetened for platform use or sale to shore via the existing PANGL pipeline. A portion of the gas will also be used for gas lift operations. Gas volumes in excess of platform needs or sales to shore will be injected into the producing reservoir for later recovery and use or sales. Sweetened gas that is sent to shore will be used as fuel for the PAPCO turbine generators that produce steam for oil heating and electricity for facility use and sales to the grid.

This Environmental Compliance Monitoring Plan (ECMP) is a matrix that lists all of the conditions placed on the development project. The matrix provides the authority for the condition, the action being taken by Arguello Inc., the due date for the action item, and the current status. A comments column has been provided that included additional information that is relevant to the specific condition.

## Environmental Compliance Monitoring Plan (ECMP)
## Development of the Eastern Half of OCS-P 0451

| Condition | Authority | Implementing Action | Due Date | Status | Comments |
|---|---|---|---|---|---|
| Annual training for platform operators covering appropriate aspects of the biology of the Brown Pelican, California Least Tern, Western Snowy Plover, and the Southern Sea Otter. | Mineral Management Service Approval Letter (Aug 19, 2003) | Arguello will prepare a training program that shall include up to date information on the Brown Pelican, California Least Tern, Western Snowy Plover, and the Southern Sea Otter. The training will cover distinguishing physical characteristics, habitat areas within the vicinity of the project, general ecology, reasons for species decline, and reasons for vulnerability to oil spills. The training program will be developed and given by a qualified biologist. This training will be included in the annual block training requirements for operators.<br><br>Arguello Inc. shall also update Section 5.7 of the Oil Spill Response Plan to the information developed as part of this training program. | First annual training session in April 2004. | Ongoing | Training plan has been sent to MMS for review and approval. MMS approved the training program on October 9, 2003. |
| Develop a pamphlet describing the measures to be taken by platform personnel if oiled wildlife (including listed species) is encountered. | Mineral Management Service Approval Letter (Aug 19, 2003) | Arguello Inc. shall prepare and distribute to operators a pamphlet that describes what measures to take should platform personnel encounter oiled wildlife including listed species. The pamphlet shall include the phone numbers for local wildlife rescue organizations, OSPR, and the Ventura USD Fish and Wildlife service office. | April 2004 training session | Ongoing | Pamphlet has been sent to MMS for review and approval. MMS approved the training program on October 9, 2003. |
| Maintain shunt depth for discharge of drilling muds and cuttings at 97 meters above the bottom for Platforms Hermosa and Hidalgo. | Arguello Inc. Environmental Evaluation Document (Feb 12, 2003) | NA | NA | Done | This is depth of the current discharge shunt for drilling muds and cuttings on both platforms. |
| Maintain immediate oil spill response and cleanup capabilities at the Point Arguello Field platforms. | Arguello Inc. Environmental Evaluation Document (Feb 12, 2003) | NA | NA | Done | As part of the existing permit conditions for the Point Arguello Field Platforms, there are specific requirements covering oil spill response as part of the Oil Spill Response Plan. Clean Seas is required to maintain a presence in the area of the Point |

## Environmental Compliance Monitoring Plan (ECMP)
## Development of the Eastern Half of OCS-P 0451

| Condition | Authority | Implementing Action | Due Date | Status | Comments |
|---|---|---|---|---|---|
| | | | | | Arguello Platforms. |
| Update the Safety, Inspection, Maintenance, and Quality Assurance Program (SIMQAP) | Santa Barbara County Approval Letter (Sept 3, 2003) | Update the SIMQAP | March 3, 2004 | Submitted to County (March 3, 2004) | The revised documents are now being reviewed by Santa Barbara County. |
| Update the Emergency Response Plan (ERP) | Santa Barbara County Approval Letter (Sept 3, 2003) | Update the ERP | March 3, 2004 | Submitted to County (March 3, 2004) | The revised documents are now being reviewed by Santa Barbara County. |
| Update the Oil Spill Contingency Plan (OSCP) | Santa Barbara County Approval Letter (Sept 3, 2003) | Update the OSCP | March 3, 2004 | Submitted to County (March 3, 2004) | The revised documents are now being reviewed by Santa Barbara County. |
| Update the Operations Manual | Santa Barbara County Approval Letter (Sept 3, 2003) | Update the Operations Manual | March 3, 2004 | Submitted to County (March 3, 2004) | The revised documents are now being reviewed by Santa Barbara County. |
| Comply with either California's Ocean Plan water quality criteria or federal 304(a) Clean Water Act criteria for the produced water discharge effluent standards (to be applied at the 100-meter mixing zone); which ever is more protective of applicable beneficial uses. | California Coastal Commission Approval Letter (August 2003) | Arguello Inc. shall conduct produced water monitoring consistent with the requirements described in the CCC approved version of the revised NPDES permit (CAG280000). Produced water monitoring will include, but is not limited to, the discharge volume measured on a daily basis, metals, volatile and semi-volatile compounds, cyanide, ammonia, and undissociated sulfides. | Quarterly Discharge Monitoring Report (DMR) during production | Pending | EPA and MMS have agreed to monitor compliance with this requirement. This condition would apply until such time as a duly authorized general or individual NPDES permit issued by the EPA that has complied with the federal consistency review requirements of the CZMA is in effect.<br><br>Additional monitoring and reporting requirements are described in the CCC approved version of the revised NPDES permit (CAG280000). |
| Comply with 1993 Clean Water Act effluent limitations for oil and grease. | California Coastal Commission Approval Letter (August 2003) | Arguello Inc. shall conduct produced water monitoring consistent with the requirements described in the CCC approved version of the revised NPDES permit (CAG280000). Oil and grease content will be measured on a weekly basis. | Quarterly Discharge Monitoring Report (DMR) during production | Pending | EPA and MMS have agreed to monitor compliance with this requirement. This condition would apply until such time as a duly authorized general or individual NPDES permit issued by the EPA that has complied with the federal consistency review requirements of the CZMA is in effect.<br><br>Additional monitoring and reporting requirements are described in the CCC approved version of the |

## Environmental Compliance Monitoring Plan (ECMP)
## Development of the Eastern Half of OCS-P 0451

| Condition | Authority | Implementing Action | Due Date | Status | Comments |
|---|---|---|---|---|---|
| | | | | | revised NPDES permit (CAG280000).<br><br>Samples will be taken weekly via grab/composite. Daily maximum and 30-day monthly average limits will be applied for oil and grease. |
| Comply with volumetric limits for drilling discharges. | California Coastal Commission Approval Letter (August 2003) | A precise inventory of the drilling discharges for each well will be maintained. The composition of each mud system used and discharged shall be reported to EPA with the Well DMR.<br><br>Arguello Inc. shall report the following for each mud system: (1) base (generic) drilling fluid type, (2) product name and total amount (volume or weight) of each constituent in discharged drilling fluid; (3) the total volumes of drilling fluids discharged; and (4) the number of days of discharge.<br><br>Additionally, daily observations for sheen and floating solids in the receiving water, and metals analysis on the barite will be included with the DMRs. | Quarterly DMR report during drilling | Pending | EPA and MMS have agreed to monitor compliance with this requirement. This condition would apply until such time as a duly authorized general or individual NPDES permit issued by the EPA that has complied with the federal consistency review requirements of the CZMA is in effect.<br><br>Additional monitoring and reporting requirements are described in the CCC approved version of the revised NPDES permit (CAG280000).<br><br>The maximum allowable annual discharges for Platform Hermosa are 11,250 bbls of cutting per year, 41,000 bbls of drilling fluids per year and 2,000 bbls of cement discharges per year.<br><br>The maximum allowable discharges for Platform Hidalgo are 6,000 bbls of cutting per year, 23,000 bbls of drilling fluids per year and 2,000 bbls of cement discharges per year. |
| Conduct end-of-well toxicity testing for drilling discharges. | California Coastal Commission Approval Letter (August 2003) | Arguello Inc. shall demonstrate compliance with this condition for both drilling fluids and cuttings by conducting and reporting the results of a drilling fluids bioassay for each mud system which is used and discharged. Drilling fluid samples for the bioassay shall be taken at the time that maximum well footage (at least 80% of the actual permitted well footage at the time of discharge) is reached for each generic system used and discharged. | Quarterly DMR report during drilling | Pending | EPA and MMS have agreed to monitor compliance with this requirement. This condition would apply until such time as a duly authorized general or individual NPDES permit issued by the EPA that has complied with the federal consistency review requirements of the CZMA is in effect.<br><br>Additional monitoring and reporting requirements are described in the CCC approved version of the revised NPDES permit (CAG280000).<br><br>The minimum 96 hour LC50 value, using the |

## Environmental Compliance Monitoring Plan (ECMP)
## Development of the Eastern Half of OCS-P 0451

| Condition | Authority | Implementing Action | Due Date | Status | Comments |
|---|---|---|---|---|---|
| | | Additionally, if a non-generic mud is used, toxicity samples will be collected at intermediate depths (0-80 % well footage) for each mud system. | | | *Mysidopsis bahia,* for drilling fluids and cuttings discharged is 3% of the Suspended Particulate Phase ("SPP") by volume. The bioassay procedure to be used is "Drilling Fluids Toxicity Test" (Appendix 2 to Subpart A of 40 CFR Part 435). |
| Monitor produced water for chronic toxicity with red abalone. | California Coastal Commission Approval Letter (August 2003) | Arguello Inc. shall conduct monthly chronic toxicity tests with the red abalone, *Haliotis rufescens* larval development test. The chronic toxicity of the effluent shall be estimated as specified in "Short-Term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Waters to West Coast Marine and Estuarine Organisms," EPA/600/R-95/136, August 1995, Office of Research and Development (or latest edition). For toxicity samples, composite sample means no fewer than 8 individual samples taken at 3-hour intervals over 24 hours or for the duration of the discharge, whichever is shorter.<br><br>Additionally, on an annual basis a toxicity "screening" will be performed on the produced water. This will include two other species: top smelt and giant kelp in addition to the red abalone. | Quarterly DMR report during production | Pending | EPA and MMS have agreed to monitor compliance with this requirement. This condition would apply until such time as a duly authorized general or individual NPDES permit issued by the EPA that has complied with the federal consistency review requirements of the CZMA is in effect.<br><br>Additional monitoring and reporting requirements are described in the CCC approved version of the revised NPDES permit (CAG280000).<br><br>Chronic toxicity measures lethal and/or sublethal effects (e.g., reduced larval development) of test organisms exposed to an effluent compared to that of the control organisms. The chronic toxicity monitoring triggers will be expressed as both a monthly average monitoring trigger (MAMT) and a daily maximum monitoring trigger (DMMT). These triggers will be calculated based on the EPA statistical approach as described in the Technical Support Document for Water Quality-based Toxics Control (EPA/505/2-90-001) and EPA Regions 9 and 10 Guidance for Implementing Whole Effluent Toxicity Testing Programs, May 31, 1996. The MAMT and DMMT will be calculated using the quarterly dilution value.<br><br>Results shall be reported in $TU_c$, where $TU_c$ = 100/NOEC. The no observed effect concentration ("NOEC") is the highest concentration of toxicant to which organisms are exposed in a chronic test that causes no observable adverse effect on the test organisms (e.g., the highest concentration of toxicant to which the values for the observed responses are not statistically different from the controls). |

## Environmental Compliance Monitoring Plan (ECMP)
## Development of the Eastern Half of OCS-P 0451

| Condition | Authority | Implementing Action | Due Date | Status | Comments |
|---|---|---|---|---|---|
| Undertake an assessment of the availability and practicality of using on line oil and grease monitoring devices for produced water discharges. | California Coastal Commission Approval Letter (August 2003) | Arguello Inc. will prepare an engineering and feasibility study of on line oil and grease monitoring devices for produced water. | December 31, 2005 | Ongoing | EPA and MMS have agreed to monitor compliance with this requirement. This condition would apply until such time as a duly authorized general or individual NPDES permit issued by the EPA that has complied with the federal consistency review requirements of the CZMA is in effect.<br><br>Additional monitoring and reporting requirements are described in the CCC approved version of the revised NPDES permit (CAG280000). |
| Undertake a platform-specific analysis to determine (1) the relative environmental effects, and (2) the feasibility (as defined in section 30108 of the CCMP) of disposal of drilling muds and cuttings and produced water by means other than discharge into the ocean waters (e.g., barging or reinjection) as compared to such discharge. | California Coastal Commission Approval Letter (August 2003) | As part of the Environmental Assessment for the development of the eastern half of OCS-P 0451, Arguello Inc. addressed the environmental impacts of barging muds and cuttings as well as for reinjection. Arguello Inc. will expand on this study to address produced water injection as well as the feasibility of these alternatives as it relates to the Point Arguello Platforms. | December 31, 2005 | Ongoing | EPA and MMS have agreed to monitor compliance with this requirement. This condition would apply until such time as a duly authorized general or individual NPDES permit issued by the EPA that has complied with the federal consistency review requirements of the CZMA is in effect.<br><br>Additional monitoring and reporting requirements are described in the CCC approved version of the revised NPDES permit (CAG280000). |
| Undertake an evaluation of the direct lethal, sublethal and bioaccumulative effects of produced water on federally managed fish species on the Pacific OCS at key life stages occupying the mixing zone of produced water discharges. | California Coastal Commission Approval Letter (August 2003) | Arguello Inc shall undertake an evaluation of the direct lethal, sublethal and bioaccumulative effects of produced water on Federally-managed fish species on the Pacific OCS (e.g., blue rockfish, bocaccio rockfish, brown rockfish, olive rockfish, and lingcod) at key life stages (e.g. juvenile and adult) occupying the mixing zone of produced water discharges.<br><br>Produced water modeling results shall describing the dilution and dispersion plumes from each point of discharge of produced water for Platforms Hermosa and Hidalgo to determine the extent of the area in which Federally-managed fish species | Within six month of the start of production from the eastern half of OCS-P 0451. | Ongoing | EPA and MMS have agreed to monitor compliance with this requirement. This condition would apply until such time as a duly authorized general or individual NPDES permit issued by the EPA that has complied with the federal consistency review requirements of the CZMA is in effect.<br><br>Additional monitoring and reporting requirements are described in the CCC approved version of the revised NPDES permit (CAG280000). |

## Environmental Compliance Monitoring Plan (ECMP)
## Development of the Eastern Half of OCS-P 0451

| Condition | Authority | Implementing Action | Due Date | Status | Comments |
|---|---|---|---|---|---|
| | | may be adversely affected.<br><br>This analysis was included in the environmental evaluation that was part of the permit application of the eastern half of OCS-P 0451. Arguello Inc. will review this section of the application and update the information as necessary. | | | |
| Other Discharges covered by the NPDES Agreement | California Coastal Commission Approval Letter (August 2003) | Monitoring for discharges other than produced water or drilling muds and cuttings will include deck drains, Sanitary and Domestic, Well treatment and completion fluids, and the monitoring of the applicable "Miscellaneous Discharges" as defined in the CCC Agreement. | During production and chilling | Pending | Detailed monitoring and reporting requirements are described in the CCC approved version of the revised NPDES permit (CAG280000). |

# EXHIBIT D

# PXP

## ARGUELLO INC.

June 11, 2003

Mr. Nabil Masri
Chief, Office of Facilities, Safety and Enforcement
Minerals Management Service
770 Paseo Camarillo
Camarillo, CA 93010-2219

Re: Revisions to Point Arguello Field Development and Production Plans (DPP) to Include Development of the Eastern Half of OCS-P 0451

Dear Mr. Masri:

In response to the Fish and Wildlife Service Biological Opinion on the captioned project, we are submitting this letter to address specific terms and conditions dealing with reasonable and prudent measures discussed in the opinion.

The Point Arguello Unit Oil Spill Response Plan (OSRP) will be amended with a description of what measures will be taken by platform personnel if oiled wildlife (including listed species e.g. brown pelican, California least tern, western snowy plover, and southern sea otter) is encountered. The amendment will include phone numbers for local wildlife rescue organizations, the California Office of Spill Prevention and Response, and the Ventura Fish and Wildlife Service office if not currently listed in the OSRP.

Arguello Inc. will provide annual wildlife training for platform operators by a qualified biologist. The training shall include up-to-date information on the brown pelican, California least tern, western snowy plover, and southern sea otter. The training will include their life histories, their physical characteristics, habitat areas in the Point Arguello Unit area, general ecology, reasons for their species decline, and reasons for their vulnerability to oil spills (e.g., hypothermia, ingestion, etc.). In addition, the training will cover what to do in the event an oiled species is encountered. Arguello Inc. will list and describe this training in our OSRP per 30 CFR 254.29 and will keep records of the personnel trained per 30 CFR 254.41.

These changes will be submitted to MMS for approval not later than 30 days after final approval of the DPP revision. If you have any questions or comments, please contact me at (805) 567-1608.

Sincerely,

David Rose
Supervisor,
Environmental, Safety and Regulatory Compliance

Arguello Inc., a wholly-owned subsidiary of Plains Exploration & Production Company
17100 Calle Mariposa Reina ■ Goleta, CA 93117-9737 ■ 805-567-1601 ■ Fax: 805-567-1652

EXHIBIT E

PXP

Plains Exploration & Production Company

# Revisions to the Point Pedernales Field Development and Production Plan to Include Development of the Tranquillon Ridge Field

**Submitted to:**
**The Minerals Management Service**
**Pacific OCS Region**

**Submitted by:**
**Plains Exploration & Production Company**

**September 2007**

**Address Inquiries To:**

Mr. David Rose
Environmental Health and Safety Manager
Plains Exploration & Production Company
201 South Broadway
Orcutt, CA 93455
(805) 934-8220
drose@plainsxp.com

RECEIVED
SEP 28 2007
OFFICE OF FACILITIES, SAFETY, & ENFORCEMENT
PACIFIC OCS REGION

## Table of Contents

Page

Section 1 Introduction ....................1

Section 2 Proposed Development Schedule For The Tranquillon Ridge Field ....................4

Section 3 Platform Site And Construction ....................7

Section 4 Drilling Facilities ....................8
- 4.1 Introduction ....................8
- 4.2 Drilling Rig ....................8
- 4.3 Well Construction ....................9
- 4.4 Drilling Safety ....................10

Section 5 Platform Facilities ....................12
- 5.1 Introduction ....................12
- 5.2 Platform Safety Systems ....................14
- 5.3 Oil and Gas Handling and Metering for the Tranquillon Ridge Field Oil and Gas ....................16

Section 6 Pipeline System ....................17

### List of Tables

Table 1 Summary of Extension of Life Estimates from Environmental Documents ....................5
Table 2 Drill Rig Specifications ....................8
Table 3 General Data for Platform Irene ....................12

### List of Figures

Figure 1 Location of the Tranquillon Ridge Field and Associated Point Pedernales Facilities ....................3
Figure 2 Estimated Development Schedule for the Tranquillon Ridge Field ....................4

# SECTION 1
# INTRODUCTION

This document presents proposed revisions to the Point Pedernales Field Development and Production Plan (DPP). The proposed revisions to the DPP address the development and production of oil and gas from the Tranquillon Ridge Field using Point Pedernales facilities. The Tranquillon Ridge Field is located in both Federal and State Waters.

These DPP revisions have been developed to address all of the requirements specified in 30 CFR 250.204(a). The DPP supporting information, as required by 30 CFR 250.204 (b), can be found in the supporting information document, which has been submitted with this DPP revision document.

The proposal is to develop the Tranquillon Ridge Field oil and gas reserves from Platform Irene, which is part of the existing Point Pedernales Field facilities. The locations of the Tranquillon Ridge Field and the Point Pedernales facilities are shown in Figure 1.

Plains Exploration & Production Company (PXP), operator of the Point Pedernales Field, is proposing to drill development wells from Platform Irene. The proposal is to drill a maximum of thirty (30) wells for development of the Tranquillon Ridge Field (twenty-two (22) development and eight (8) utility wells). However, it should be noted that the number of wells needed to develop the field will not be known until the first few development wells have been completed, placed on production, and evaluated. In addition, ongoing geologic studies and information gained from the drilling of wells may result in changes to the location of the wells specified in this document.

As part of these DPP revisions, PXP has identified the approximate bottom hole location of 22 wells, which will be used to develop the Tranquillon Ridge Field.

All of the wells will be directionally drilled using existing well slots on the platform. The drill rig that will be used will be similar in size to drill rigs that have been used on the Platform Irene in the past. Drilling of the Tranquillon Ridge wells is expected to last up to 15 years with production lasting up to 30 years.

All the production from the Tranquillon Ridge Field will be combined with the Point Pedernales Field oil and gas and transported to the Lompoc Oil and Gas Plant (LOGP) in the existing pipelines. From LOGP, the combined oil production from the Tranquillon Ridge Field and the Point Pedernales Field will be transported to the Santa Maria Refinery via pipeline. The combined gas production will either be sold and transported via pipeline or used as fuel at the LOGP.

In order to accommodate the oil and gas production from the Tranquillon Ridge Field, three existing 600-horsepower (hp) electrical shipping pumps on Platform Irene will be replaced with

three 1,250-hp electrical shipping pumps. In addition, the new Tranquillon Ridge wells will utilize electrical submersible pumps and/or utilize gas-lift technology as need to optimize production. The only additional equipment for drilling will be a new 1,600-horsepower electric pump for muds/cuttings handling, as well as some refurbishing of the mud/cutting handling system.

In brief, the development and production of the oil and gas reserves from the Tranquillon Ridge Field will be accomplished by drilling extended reach wells from the existing Platform Irene using existing well slots, pipelines, equipment and facilities. Only minor modifications to equipment and facilities will be necessary to handle the production.

This DPP revision document has been divided into six (6) major sections that include the following.

- ***Introduction*** – Provides a brief overview of the proposed DPP revisions, background information on the Tranquillon Ridge Field and a guide to the DPP revision document structure and content.

- ***Proposed Development Schedule for the Tranquillon Ridge Field*** – Presents the proposed development and production schedule for the Tranquillon Ridge Field.

- ***Platform Site and Construction*** – Discusses the fact that there are no new platform sites or construction, other then development wells, associated with development of the oil and gas reserves from the Tranquillon Ridge Field.

- ***Drilling Facilities*** – Provides an overview of the drilling facilities that will be required to develop the reserves from the Tranquillon Ridge Field.

- ***Platform Facilities*** – Contains a description of the oil and gas facilities on the existing Point Pedernales platform and the changes that would be needed to accommodate oil and gas production from the Tranquillon Ridge Field. Oil and gas production from the Tranquillon Ridge Field will use the existing oil and gas production facilities on Platform Irene. The only modifications that would be required would be the replacement of three 600-hp electrical shipping pumps with three 1,250-hp electrical shipping pumps; installation of submersible pumps on some of the new wells; and installation of a 1,600-hp electric pump for muds handling. Electrical transformer and switchgear upgrades will be ongoing.

- ***Pipeline System*** – Discusses the fact that the existing oil and gas pipeline system for Point Pedernales can handle the production from the Tranquillon Ridge Field.

**Figure 1** **Location of the Tranquillon Ridge Field and Associated Point Pedernales Facilities**



# SECTION 2
# PROPOSED DEVELOPMENT SCHEDULE FOR THE TRANQUILLON RIDGE FIELD

Figure 2 shows the projected schedule for development of the Tranquillon Ridge Field.

**Figure 2 Estimated Development Schedule for the Tranquillon Ridge Field**




Note: Production from the Tranquillon Ridge Field would continue for approximately 30 years.

Drilling of the first well should occur within three to twelve months of obtaining all regulatory approvals for the project. Production would begin three to four months after the start of the first well. The drilling of the 22 wells is projected to take 15 years.

Depending on geologic interpretation and economic conditions at the time, unsuccessful wells may be redrilled to offset locations. In view of the extended reach of the initial wells, drilling times will likely limit the number of wells drilled and completed per year to between three (3) and four (4), which in turn sets the drilling and production schedule. The delay between the drilling of some of the wells is required to keep the overall production from Platform Irene at or below the Santa Barbara County permit limit of 36 MBPD.

When Tranquillon Ridge production has no further economic potential, the field and platform abandonment process will likely commence, unless other uses for the platform arise and are approved.

The Tranquillon Ridge Project is expected to have a total life of 30 years from the time the first well is drilled; assuming that development of the Tranquillon Ridge Field is successful. It is possible that the initial wells drilled into the Tranquillon Ridge Field may not be commercially viable. Under this scenario, the full development of the Tranquillon Ridge Field would not occur. However, for the purposes of this application, it has been assumed that full development of the Tranquillon Ridge Field will occur.

Based on a 30-year life for the Tranquillon Ridge Project, the Point Pedernales facilities (Platform Irene, the associated pipelines, and the LOGP) would have a total projected life of approximately 50 years (based on startup of Point Pedernales Field operations in 1987). This assumes that the first well for Tranquillon Ridge is drilled in second or third quarter of 2008.

The 1985 Point Pedernales EIR/EIS assumed a 20-year life expectancy for Platform Irene and a 30- to 35-year life expectancy for the pipelines and the Lompoc Oil and Gas Plant (formerly the

HS&P). However, the 35 year timeframe referenced in the EIR was predicated on the use of the Point Pedernales facilities to process reserves from five additional offshore platforms located in the Central Santa Maria Basin, which were part of the document's Area Study. Two of these platforms were in the Point Pedernales Unit, one was in the Santa Maria Unit, one was in the Purisima Point Unit, and one was in the Bonito Unit. Based on improvements in drilling technology, the two additional platforms in the Point Pedernales Unit will not be needed. Full development of this unit is occurring from Platform Irene. To date, no development has occurred at the other three units. However, exploration/development plans for these three units have been submitted to the MMS.

The 1993 Point Pedernales Supplemental EIR (SEIR), which evaluated the relocation of gas processing facilities from the Battles Gas Plant in Santa Maria to the Lompoc HS&P, assumed a life expectancy of 10 to 25 years for the new gas plant. Original estimates of Point Pedernales project life as well as the estimated life of the Point Pedernales facilities with Tranquillon Ridge field development are summarized in Table 1.

**Table 1 Summary of Extension of Life Estimates from Environmental Documents**

| Existing Point Pedernales Facilities | | | |
|---|---|---|---|
| Project Component | **Original Estimated Life (Years)** | **Estimated Time Frame[a]** | **Source of Estimate** |
| Platform Irene | 20 | 1987-2007 | 1985 Pt. Pedernales EIR/EIS |
| LOGP (HS&P)<br>Gas Plant | 30-35[b]<br>10-25 | 1987-2022<br>1997-2022 | 1985 Pt. Pedernales EIR/EIS<br>1993 Supplemental EIR |
| Tranquillon Ridge | 30 | 2008-2037 | Project Application |
| **Estimated Increase in Life with Tranquillon Ridge** | | | |
| **Project Component** | **Estimated Total Life (Years)** | **Estimated Total Time Frame** | **Net Increase in Life (Years)** |
| Platform Irene | 45 | 1987-2037 | 30[c] |
| LOGP (HS&P) | 45 | 1987-2037 | 15[d] |

[a] *Current production forecasts (MMS 2004 and CSLC 2001) show a current estimated Point Pedernales project life extending to between 2010 to 2022. Thus, the original project life for Platform Irene may have been underestimated by approximately 3 to 15 years.*
[b] *This estimate goes beyond permitted development levels, and was predicated on the development of up to six offshore platforms located in the Central Santa Maria Basin.*
[c]. *Assuming the estimated life of Platform Irene was through 2007, the Tranquillon Ridge Project would extend the life of the platform by 30 years.*
[d]. *Assuming the estimated life of the LOGP was through 2022, the Tranquillon Ridge Project would extend the life of the LOGP by 15 years.*

The 20-year life expectancy of Platform Irene, assumed in the 1985 Point Pedernales EIR/EIS was based on an estimated production curve submitted by the Applicant as part of its DPP submitted to the MMS in 1984. With startup in 1987 and an estimated life of 20 years the estimate was that production would continue until 2007. Current production forecasts for the Point Pedernales Field now project that the production will continue until 2012 to 2022, which will represent a 25 to 35-year life. MMS has estimated that operations for Point Pedernales Field

will end sometime between 2010 and 2015 (MMS, 2004). These estimates are based on a number of assumptions that could change over time. CSLC (2001) has estimated that operations for the Point Pedernales Field will end around 2018-2022. This represents a life expectancy that is 9 to 15 years greater than what was assumed in the 1985 Point Pedernales EIR/EIS.

The Santa Barbara County permit governing the Point Pedernales facilities contains conditions that address the scope of the project. Condition A-12 stipulates that oil production shall be limited to the Point Pedernales Field, leases OCS-P 0441, 0437, 0438, and 0440. Thus, the permit limits production to only a portion of the offshore development that was analyzed in the 1985 Point Pedernales EIR/EIS. On the other hand, the Santa Barbara County permit (Conditions Q-8 and Q-9) does provide a basis for future discretionary decisions to bring additional production into the Point Pedernales facilities. Based on the permit conditions, the life expectancy of the LOGP would have been based on the Point Pedernales Project only (20 years).

Due to the dynamics associated with developing a coastal California Monterey oil-bearing structure, estimates of project life as well as ultimate recoveries are extremely difficult without extensive production data from a number of wells. This type of data is typically not available during the permitting phase of the project. As such, the production and project life estimates made during the permitting phase are rough estimates and typically change over the course of the project's development. Other factors that affect total recoverable reserves and project life are changes in technology (e.g., enhanced oil recovery techniques), new well development technologies, and the price of crude oil.

If development of the Tranquillon Ridge Project is successful, the expected life of the Point Pedernales Facilities will be extended beyond what was projected for the current Point Pedernales Field operations. However, it is uncertain how long the proposed Tranquillon Ridge Project will extend the life of these facilities. Based on the current projections for the Tranquillon Ridge Project (30-year life), the life expectancy of the Point Pedernales Facilities will be extended approximately 15 to 27 years beyond what the MMS and CSLC have projected for the Point Pedernales Field. However, it is possible that due to changes in technology and oil prices that production from the Tranquillon Ridge Field could extend beyond the 30-year estimate, similar to what is now projected to occur for the Point Pedernales Field.

If the life expectancy assumed in the Point Pedernales 1985 EIR/EIS and 1993 SEIR and the estimated project life expectancy of the Tranquillon Ridge Project are used as the basis for estimating extension of life, then the Tranquillon Ridge project will be expected to extend the life of Platform Irene by approximately 30 years, and the LOGP by 15 years.

## SECTION 3
## PLATFORM SITE AND CONSTRUCTION

There are no revisions needed to this section of the existing DPP for the Point Pedernales Field to address the proposed development of the Tranquillon Ridge Field. No new platforms will need to be built to develop the field. All of the development will occur from the existing Platform Irene using existing well slots and the oil and gas handling equipment on the platform. As discussed in Section 5, replacement and installation of new pumps will be required.

# SECTION 4
# DRILLING FACILITIES

## 4.1 Introduction

This section discusses the drilling facilities that are proposed for the development of the reserves from the Tranquillon Ridge Field. It is anticipated that twenty-two (22) wells will be drilled for development of the Tranquillon Ridge Field (twenty-two (22) development and eight (8) utility wells).

A new well into Tranquillon Ridge will require approximately 60 to 120 days to drill and complete. Drilling duration will depend on the directional program undertaken and the mechanical condition of the hole. Actual drilling will occur within 80 to 90 percent of this total timeframe. The total drilling program is expected to last 15 years using one rig.

The remainder of this section provides information on the drilling rig, well construction, and drilling safety.

## 4.2 Drilling Rig

The current plan is to use the existing drill rig on Platform Irene to drill the Tranquillon Ridge Field. A summary of the rig specifications are shown in Table 2.

**Table 2 Drill Rig Specifications**

| Item | Specification |
|---|---|
| Clear Working Height of Mast (feet) | 170 |
| Base Width of Mast (feet) | 30 |
| Hook Load-Gross Nominal Capacity (pounds) | 1,000,000 |
| Maximum wind load (mile per hour) | 125 |
| Motors (hp) | |
| • Drawworks | 2 at 1,000 |
| • Mud Pumps | 1 at 1,600 |
| • Rotary Table | 1 at 1,000 |
| • Top Drive | 1 at 1,000 |

Given that the drilling program for Tranquillon Ridge is 15 years long, it is possible that due to new technology or improved rig efficiencies, that a new rig could be used to drill some of the later Tranquillon Ridge wells. If a different drilling rig is needed later in the project life, it will be transported to the platform and placed on the upper main deck (i.e., drill deck). Any future drilling rig will be electrically powered and equipped with a SCR system that will distribute power to individual rig components (e.g., drawworks, mud pumps, and rotary table). A new drill rig might require some minor modifications to the transformer capacity and electrical distribution

system on the platform, but no major modifications would be anticipated for installation of a new drilling rig.

The PG&E grid will provide the electrical power that is required for the drilling operations. Additional electrical loads include operation of the drilling rig, cranes, production equipment, oil/water separators, and water injection pumps. Standby diesel generators will be used to power the rig and mud pumps during emergencies, should electrical power fail on the platform.

### 4.3 Well Construction

A new development well for the Tranquillon Ridge Field will be completed in the Monterey zone and will range in measured depth (MD) of approximately 12,000 to approximately 25,000 feet, depending on bottom hole displacement from the platform. The well construction discussion presented below is what is anticipated for a typical well. The exact casing/cementing design will be approved by the MMS and CSLC through the Application for Permit to Drill (APD) process required for each proposed well.

The 20-inch conductor casing will be set at approximately 800 feet below the ocean floor. Once set, the conductor casing will be cemented with a sufficient amount to cause a return of cement to the mud line or ocean floor. Measured depths of conductor casing may vary because of directional drilling programs and mechanical and borehole conditions, as well as formation pressures and fracture gradients. Installation of casings will follow MMS requirements.

The 13-3/8-inch surface casing will be set at approximately 5,000 and up to 7,500 feet measured depth. The surface casing will be cemented with a sufficient amount to cause a return of cement to the mud line. Measured depths of surface casing will vary slightly because of directional drilling programs and mechanical and borehole conditions, as well as formation pressures and fracture gradients.

The 9-5/8-inch intermediate casing will be set above the reservoir zone to be produced (i.e., Monterey) and cemented with a sufficient quantity of light cement to allow for a maximum of 3,000 feet of cement above the 9-5/8-inch casing shoe. The plan is not to bring the cement cap of the intermediate casing string above the shoe of the surface casing. Using this approach, the intermediate casing string can be cut and pulled to accommodate future redrills. The intermediate casing setting depths will range from approximately 11,000 ft to 20,500 ft measured depth, depending on the geological top of the Monterey zone. All zones which contain oil or gas will be fully protected by casing and cement.

An 8-1/2-inch hole will be drilled from below the 9-5/8" intermediate casing to total depth ranging from 13,400 ft to 25,000 feet. Electric line logs may be run from the shoe of the intermediate casing to total depth. If the zones are productive, then a 7-inch casing will be run to total depth and hung from the intermediate casing, with a minimum of 150 feet of over lap inside the intermediate casing. The 7 inch casing will be cemented in place. The hydrocarbon bearing zones across the cemented 7-inch casing will be jet perforated using tubing or wireline conveyed perforating tools.

Production tubing will be lowered near 200 feet above the 7-inch liner bottom. The 4-1/2-inch tubing string may consist of a 7-inch casing packer, gas lift mandrels, chemical injection mandrel, and surface controlled subsurface safety valve to allow delivery of hydrocarbons to the wellhead. It is possible electric submersible pumps may also be used to lift the production.

### 4.4 Drilling Safety

Drilling operations will be performed with "good engineering practices" using conventional drilling equipment and procedures, and will be in compliance with the current MMS and CSLC regulations. MMS and CSLC-approved drilling operations and procedures will not be altered without the prior approval of MMS and CSLC.

A blowout prevention (BOP) system will be used to shut-in the well in the event of an emergency and is designed to prevent any well fluids from entering the environment. The system is composed of an annular preventer, blind ram, two sets of pipe rams, choke and kill lines, and a diverter system. Attachment A, which is part of the supporting information document, contains a detailed description of a typical well control program.

Lifesaving and fire suppression systems are maintained on the platform at all times. Evacuation and fire drills will be held on a regular basis to ensure familiarity with the equipment and with the responsibilities of individual crew members. Drills will be coordinated with production personnel to maximize effectiveness.

The platform is equipped with Class 1 U.S. Coast Guard-approved navigational aids. All navigational components are connected to an emergency standby generator. Sufficient numbers of escape boats, PPE, and life jackets are readily accessible in the event evacuation of the platform becomes necessary.

For all phases of the drilling operation, lighting will be in place around the rig and its components (including the derrick), the cementing unit and its components, and the drill deck itself. All electrical work for the lighting will be Class 1, Division 1 or Division 2, as outlined by API Recommended Practices 500 or API Recommended Practices 505.

Crane lifts will be conducted from attendant supply and crew boats only when meteorological, oceanic, and logistical conditions allow for safe operations. All crane operators will be trained according to the API Recommended Practice 2D. The cranes will have regularly scheduled maintenance with pre-use daily, monthly, quarterly, and annual review of specific components according to manufacturer's recommendations and as provided for in APR RP 2D. The cranes are inspected and certified annually.

The drilling or production supervisor on a regular basis—to promote safety awareness—will conduct safety meetings. These meetings will cover a wide variety of subjects relating to the current activity (e.g., cementing, well control familiarity, wireline work, etc.).

The Point Pedernales Field has an approved $H_2S$ Contingency Plan, which will be used during the drilling program. At the request of the California State Lands Commission (CSLC), revisions

to this plan were submitted to MMS and CSLC on February 7, 2005. The reader is referred to this plan for further information.

# SECTION 5
# PLATFORM FACILITIES

This section provides some general information on the Point Pedernales Field drilling and production platform, and a brief discussion of the oil and gas handling operations. The discussion presented below represents what may occur with the development of the Tranquillon Ridge Field.

## 5.1 Introduction

PXP proposed to develop the Tranquillon Ridge Field from the Point Pedernales Field platform—Platform Irene. No new offshore structures will be needed to develop the field. It is anticipated that wells will be drilled from Platform Irene using extended reach drilling (ERD) technology. Table 2 provides general information on Platform Irene. Please refer to Figure 1 for the location of the platform.

**Table 3 General Data for Platform Irene**

| Platform Irene | |
|---|---|
| Water Depth at Platform, ft | 242 |
| Platform location | Lambert Cal 5 (ft)<br>X=1,178,827<br>Y=415,274 |
| Well Slots | 72 |
| Number of Well Slots Used for the Point Pedernales Project | 25 |
| Projected Number of Well Slots Needed for the Development of the Tranquillon Ridge Field[1] | 30 |
| Projected Future Well Slots for the Point Pedernales Project | 5 |
| Well Slots Available for Future Development | 12 |
| OCS Lease | OCS-P 0441 |

*1. Actual number of new wells will depend on results for initial production wells.*

Platform Irene is located approximately six miles west of Point Pedernales, California. The platform sits in 242 feet of water on Lease OCS-P 0441. Irene was set in April 1986. A total of 72 well slots are contained on the platform. Oil and gas production is derived from the Point Pedernales Field.

Development drilling started in April 1987. Twenty-five wells were drilled, with a maximum of 14 wells producing in a given month. There are presently 12 production wells in service. The

year-to-date average production from Irene (as of July 2004) is 7,076 barrels of oil per day, 55,285 barrels of water per day, and 3.1 million standard cubic feet of gas per day.

Production is transported via pipeline to the LOGP located north of Lompoc, California. Three pipelines in a single corridor are used: a 20-inch wet oil line, an 8-inch gas line, and an 8-inch produced water return line for disposal at the platform. The three lines reach landfall just north of the Santa Ynez River and cross Vandenberg Air Force Base and PXP fee property. Oil and gas are sold and distributed via pipelines from the plant. The majority of the produced water is injected onshore at the Lompoc Oil Field with the remaining returned to Irene for offshore injection. Power is supplied to Irene via a subsea power cable from an electrical substation located on Southern Pacific Railroad property at Surf. The substation is connected to the Pacific Gas and Electric power line north of Lompoc.

Employees are housed on the platform and transported by helicopter. An average of 3 helicopter trips (round trips) per day is allowed; however, during normal operations, there are approximately 5 flights per week. The platform has a work force of 12 employees working on shift. Equipment and supplies are supplied by work boat. During normal operations, supply boat trips average 1 to 2 trips per month. During drilling, supply boat trips can increase to a maximum of 1 trip every 3 days. Manpower requirements and boat schedule can vary depending on the workload.

The following discussion details the upgrades and minor modifications that are required on Platform Irene to integrate the development of the Tranquillon Ridge Field with the current development of the Point Pedernales Field.

Development of the Tranquillon Ridge Field will require installing new pumps on Platform Irene. The three existing 600-hp electrical shipping pumps will be replaced with three 1,250-hp electrical shipping pumps. In addition, approximately 15 of the new Tranquillon Ridge wells will utilize new 500-hp electrical submersible pumps. The other production wells will utilize gas-lift technology. Ongoing maintenance and upgrades of the electrical transformers and switchgear on the platform for these additional pump loads will continue.

Drilling activities and equipment will be similar to those of ongoing drilling programs, but with different frequency and duration. The existing drilling rig on Platform Irene will be used to drill the Tranquillon Ridge wells. The only additional equipment for drilling will be a new 1,600-horsepower electric pump for muds handling, as well as some refurbishing of the existing mud system. As discussed previously, it is possible that due to new technology or improved rig efficiencies, that in the future, a new drill rig could be used to drill some of the later wells in the Tranquillon Ridge Field.

During the Tranquillon Ridge drilling operations on the platform, the muds and cuttings will be batch discharged into the ocean in accordance with the current National Pollutant Discharge Elimination System (NPDES) Permit. This permit allows for discharge of muds and cuttings from the Point Pedernales drilling operations. As proposed, this effluent will be discharged at a point approximately 150 feet below mean lower low water (MLLW). Any cuttings or muds which do not meet the current NPDES permit requirements will be stored in bins and hauled to a

permitted disposal site onshore, or injected if feasible. For example, if oil-based mud is used, the cuttings and excess muds will be stored in bins and transported to a permitted disposal site onshore, or injected offshore at the platform.

The existing 8-inch produced water return pipeline is currently used to return part of the Point Pedernales produced water from the LOGP to Platform Irene for offshore water injection (a part is injected onshore into the Lompoc Oil Field). For the proposed development of the Tranquillon Ridge Field, a part of the produced water will continue to be transported offshore. This water will either be discharged to the ocean under the NPDES permit or injected offshore in accordance with the MMS authorization. Approximately 40,000 bpd of water produced from Point Pedernales and Tranquillon Ridge combined will be shipped from the LOGP to Platform Irene for discharge. The operator is authorized to discharge to the ocean from the platform up to 153,000 barrels of water per day in accordance with the current NPDES Permit. A part of the produced water that will be shipped to Platform Irene may still be injected into Point Pedernales reservoir wells, as is currently the operation. Offshore water injection will be conducted as authorized by the MMS.

## 5.2 Platform Safety Systems

Safety systems can be broadly classified as those devices and practices that safeguard life and limb, the environment, and equipment. They relate specifically to good design practices, personnel training and operational and emergency modes. The safety features on Platform Irene include:

- Fire detection and suppression systems;
- Navigational aids;
- Corrosion control program;
- Hydrogen sulfide ($H_2S$) contingency plan;
- Emergency power and lighting;
- Communication facilities;
- Escape and lifesaving equipment; and
- Oil Spill Response Plan.

Each of these safety systems is briefly described below.

***Fire Detection and Suppression Systems***
Platform Irene is equipped with fire protection systems. This equipment includes fire and smoke/heat detectors, fire monitors, combustible gas detectors, fire alarms and alarm pulls, fire extinguishers, hose reels, and breathing apparatus systems. Foam concentrate is stored in a 300-gallon tank. Foam can be delivered to hose reels, spraying systems, and to sprinklers, which are strategically located throughout the platform. Water to the foam system can be supplied by two electrical firewater pumps or by a vertical turbine pump with a diesel engine. All three pumps use seawater. In addition, the two electrical firewater pumps can also utilize water from the 8-inch produced water return pipeline.

Because of the specifics of the offshore location, personnel are instructed to evacuate in case of any major emergency including a large fire. Survival capsules are provided for these types of emergencies.

***Navigational Aids***
Platform Irene has been painted in accordance with United States Coast Guard (USCG) recommendations to increase the visibility of the platform to ocean vessels. In addition, the platform is equipped with navigational lights and fog horns in accordance with Federal requirements. The USCG has also established a 500 meter exclusion zone around the platform.

***Corrosion Control Program***
Corrosion on the platform is controlled using corrosion-resistant coatings on the top-side structures and equipment. For the underwater portions of the jackets, a sacrificial anode system is used to control corrosion. A number of the vessels and piping on the platform have an internal coating to control corrosion. In addition, a corrosion inhibitor program is used to provide additional corrosion control.

***$H_2S$ Contingency Plans***
$H_2S$ contingency plans have been developed that detail emergency plans to be followed when encountering formations that contain $H_2S$ while drilling. The platform is equipped with self-contained breathing apparatus for all working crews and supervisors. Spare air bottles with refill capability are also available. Releases of $H_2S$ can also occur during production operations from accidents involving the gas wells or gas processing equipment. $H_2S$ sensors and alarms are located at the intake for the air ventilation system, and in other process areas where concentrations of $H_2S$ are likely to occur. In these areas, $H_2S$ sensors have both visible and audible alarms set to activate if a concentration of 10 ppm is reached.

***Emergency Power and Lighting***
Emergency AC power for lighting, communications equipment, hazard detection systems, quarters, controls, and minor utility systems is provided by a battery-backup uninterruptable power supply. Battery-powered emergency lighting units are installed in several areas of the platform to illuminate critical escape or facility work areas. Battery chargers and battery systems are provided for aids to navigation, communications, general alarm systems, generator starting, electrical switchgear control, and control and monitoring systems.

***Communication Facilities***
Platform communication utilizes hardwired speakers and handsets. Additionally, there are hand-held portable radios for operational communication. For external communication with crew boats, supply boats, helicopters, shore bases, etc., there is a wide-area radio system for the platform, as well as a microwave system to provide telephone service and circuits for the pipeline leak detection system and onshore emergency shutdown system. In addition to the above, the platform has intrinsically safe cell phones for emergency use.

***Escape and Life-Saving Equipment***
The platform is equipped with USCG-approved escape capsules or life boats, plus an adequate number of life preservers, life floats, ring life buoys, first aid kits, litters, and other lifesaving appliances as required by 33 CFR144.

***Oil Spill Response Plan***
An Oil Spill Response Plan for Platform Irene, which describes the measures that will be taken in the event of an oil spill and the personnel and equipment available to implement spill containment and cleanup procedures, has been developed and submitted to and approved by the MMS. The basic procedure for a spill is to immediately ensure personnel safety, stop the pollutant flow, begin the containment and cleanup procedure, and contact designated company personnel and Government agencies. The platform personnel would conduct the initial response activity. For a spill beyond the capability of the platform personnel and equipment, the primary sources of assistance would be the industry-sponsored spill containment cooperative—Clean Seas.

Additional information on oil spill equipment and response can be found in the Oil Spill Response Plan that has been submitted to and approved by the MMS.

### 5.3 Oil and Gas Handling and Metering for the Tranquillon Ridge Field Oil and Gas

The produced oil, gas, and water will typically be separated on the platform. The oil, gas, and water volumes will be prorated back to the individual wells based on periodic well test information for each well.

The wells for the Tranquillon Ridge Field and Point Pedernales will be allocated their fair share of production based on the well test information applied to the allocation meter readings. At the LOGP the oil will pass through another meter (leak detection only), be treated and heated, and finally pass through a lease automatic custody transfer (LACT) meter. This LACT is the meter that determines the volumes of oil that are subject to royalty.

When and if development of the Tranquillon Ridge Field is approved, changes to the Measurement and Allocation Plan in effect for Point Pedernales will be needed, which would include a full description of the measurement points, allocation procedures, and products subject to royalty for the Tranquillon Ridge production streams.

## SECTION 6
## PIPELINE SYSTEM

There are no revisions needed to this section of the existing DPP for the Point Pedernales Field to address the proposed development of the Tranquillon Ridge Field. No new pipelines will need to be built to develop the field. The existing pipelines from Platform Irene to the LOGP will be used to move the production from the Tranquillon Ridge Field.

# EXHIBIT F

PXP

**Plains Exploration & Production Company**

March 26, 2007

Mr. Allan Shareghi
Minerals Management Service
Pacific Region
770 Paseo Camarillo
Camarillo, California 93010

Re: Rocky Point Unit

Dear Mr. Shareghi:

Pursuant to Plains Exploration & Production Company becoming the operator in the Rocky Point Unit, we are submitting four (4) originals and one (1) copy of each of the following documents to update your records:

1. Revised Exhibit A to the Rocky Point Unit Agreement effective as of September 1, 2006;

2. Revised Exhibit B to the Rocky Point Unit Agreement effective as of September 1, 2006;

3. Revised Exhibit A to the Rocky Point Unit Operating Agreement effective as of September 1, 2006;

4. Revised Exhibit B to the Rocky Point Unit Operating Agreement effective as of September 1, 2006;

5. Designation of Unit Operator Forms for the Rocky Point Unit executed by all the current working interest owners;

6. Notice of Resignation of Unit Operator of the Rocky Point Unit;

7. Designation of Successor Unit Operator of the Rocky Point Unit;

8. Acceptance of Right and Obligations of the Unit Operator;

9. Ratification and Joinder of the Unit Operating Agreement for the Rocky Point Unit;

10. Ratification and Joinder of the Unit Agreement for the Rocky Point Unit;

700 Milam, Suite 3100 ▪ Houston TX 77002 ▪ 713-579-6000 ▪ Fax: 713-579-6500

Please file stamp the copies and return same to me. If you have any questions regarding the above, please contact Gregg Maynard at (713) 579-6057.

Very truly yours,

Gregg R. Maynard
Assistant General Counsel

Enclosures

RECEIVED
MAY 4 2007
RESERVOIR EVALUATION AND PRODUCTION
PACIFIC OCS REGION

SCHULLY, ROBERTS, SLATTERY, JAUBERT & MARINO
A PROFESSIONAL LAW CORPORATION
ENERGY CENTRE
1100 POYDRAS STREET, SUITE 1800
NEW ORLEANS, LOUISIANA 70163-1800
TELEPHONE (504) 585-7800
TELEFAX (504) 585-7890
EMAIL: firm@schullyroberts.com

O. FOERSTER SCHULLY III
F. NEELIS ROBERTS
GERALD F. SLATTERY, JR.
LISA S. JAUBERT
ANTHONY C. MARINO
PAUL J. GOODWINE
DAVID R. DYER
STEPHEN B. PANUS
JOHN WEATHINGTON III
JANET H. ASCHAFFENBURG

DAVID R. RICHARDSON
OF COUNSEL

Sender's Email: amarino@schullyroberts.com

March 10, 2003

RECEIVED
MAR 11 2003
PRODUCTION, DEVELOPMENT AND RESOURCE EVALUATION
PACIFIC OCS REGION

**VIA FEDERAL EXPRESS**

Mr. Allan Shareghi
Minerals Management Service
Pacific OCS Region
770 Paseo Camarillo
Camarillo, California 93010

Re: Rocky Point Unit
Contract No. 14-08-0001-18484
Our File No. 296.1834

Dear Mr. Shareghi:

Reference is made to that certain letter dated March 4, 2003, by Dr. J. Lisle Reed, Regional Director, Minerals Management Service, Pacific OCS Region, addressed to Mr. Robert Huguenard of Arguello, Inc. concerning the contraction of the Rocky Point Unit ("MMS Decision Letter"). In accordance to the request of the MMS Decision Letter, on behalf of Arguello, Inc., we hereby submit four (4) originals and one (1) copy of the following:

1. Revised Exhibits A and B to the Rocky Point Unit Agreement (Contract No. 14-08-0001-18484) dated effective April 1, 2003; and

2. Revised Exhibits A and B to the Point Arguello Unit Operating Agreement dated effective as of April 1, 2003.

As a result of the contraction, the Rocky Point Unit Area shall comprise Leases OCS-P 0452 and OCS-P 0453.

Please file-stamp a copy of each of the documents and return to me at your earliest possible convenience. If you should have any questions, please do not hesitate to contact the undersigned.

Very truly yours,

Anthony C. Marino

ACM/rlb
Enclosures
cc: Dr. J. Lisle Reed
Mr. James R. Rumsey

ROBERTS
& MARINO

D. Foerster Schully, III
Gerald F. Slattery, Jr.
Anthony C. Marino
Paul J. Goodwine
David S. Landry
Herman E. Garner, Jr.
Lynn G. Wolf
Kathleen L. Doody
Colleen E. Carr
Stephen M. Domas
Emile J. Dreuil, III
Jefferson B. Goldman

Of Counsel:
F. Neelis Roberts LLC
David R. Richardson

April 30, 2007

**VIA FEDERAL EXPRESS**
Ms. Elverlene Williams
Minerals Management Service
Pacific OCS Region
770 Paseo Camerillo
Camerillo, CA 93010

Re: Plains Exploration and Production Company
Designations of Operator Forms Submitted for Filing Purposes
**Rocky Point Unit – OCS-P 00452 and OCS-P 00453**

Dear Ms. Williams:

Enclosed please find an original and one copy of the following Designations submitted for filing which all relate to the recent change of Unit Operator for the Rocky Point Unit. Please file the enclosed originals in each respective Lease file and return one date-stamped copy to the undersigned at the address noted below.

1. Designation of Operator dated April 2, 2007 by Delta Petroleum Corporation designating Plains Exploration & Production Company as Operator of **OCS-P 00452** (Block 466, All that portion seaward of the three geographical mile line, OCS Official Protraction Diagram NI 10-6, Santa Maria); and

2. Designation of Operator dated April 2, 2007 by Delta Petroleum Corporation designating Plains Exploration & Production Company as Operator of **OCS-P 00453** (Block 467, All that portion seaward of the three geographical mile line, OCS Official Protraction Diagram NI 10-6, Santa Maria.)

Thank you and please note that we have enclosed our PayGov receipt evidencing payment of your filing fees in this matter. Please contact me or Ms. Seelman if you have any questions or need any additional information.

Sincerely,
Diane M. Castle
Diane M. Castle
Paralegal

Enclosures
cc: Mr. Greg Maynard (w/enc.)
Mr. Anthony Marino (wo/enc.)
Ms. Joan Seelman (wo/enc.)

012.04.19a.2009.docs.mms.ltr.doc

# EXHIBIT G

ARGUELLO

January 23, 2003

Mr. Allan Shareghi
Minerals Management Service
Pacific Region
770 Paseo Camarillo
Camarillo, California 93010

**Re: Rocky Point Unit Operating Agreement**

Mr. Shareghi:

This letter serves as a request and grants you permission to provide a complete copy of the Rocky Point Unit Operating Agreement (including all exhibits and amendments thereto) to Anthony C. Marino with the law firm of Schully, Roberts, Slattery, Jaubert and Marino. Mr. Marino serves as our counsel on OCS matters and is currently reviewing items related to the Rocky Point Unit. Arguello Inc. will gladly pay for any expenses incurred related to this request.

If you have any questions regarding the above, please contact me at (713)-739-6766.

Very truly yours,

Jim Rumsey

James Rumsey
Senior Landman

017.1617a.1834.ltr

500 Dallas, Suite 700 ■ Houston, TX 77002 ■ 713/654-1414 ■ Fax 713/654-1523

# EXHIBIT H

STATE OF CALIFORNIA—THE RESOURCES AGENCY GRAY DAVIS, GOVERNOR

CALIFORNIA COASTAL COMMISSION
45 FREMONT, SUITE 2000
SAN FRANCISCO, CA 94105-2219
VOICE AND TDD (415) 904-5200
FAX (415) 904-5400

August 8, 2003

Robert E. Huguenard
Arguello, Inc.
17100 Calle Mariposa Reina
Goleta, California 93117-9737

RECEIVED
AUG 13 2003
OFFICE OF FACILITIES, SAFETY & ENFORCEMENT
PACIFIC OCS REGION

Nabil Masri
Chief, Office of Facilities, Safety and Enforcement
United States Department of the Interior
Minerals Management Service
770 Paseo Camarillo
Camarillo, California 93010-6064

Re: **Amendment to the Platform Hermosa and Hidalgo Development and Production Plans ("DPPs") to Develop Eastern Half of Lease OCS-P 0451**

Dear Mr. Huguenard and Mr. Masri:

On April 22, 2003, the Minerals Management Service ("MMS") submitted to the Coastal Commission Arguello Inc.'s proposed revisions to the Point Arguello Development and Production Plans ("DPPs") to develop the eastern half of Lease OCS P-0451, and an accompanying consistency certification meeting the requirements of 15 CFR § 930.76(d). On June 11, 2003, Arguello, Inc. submitted to the Commission a second letter and attachment modifying its project description for the development of the eastern half of Lease OCS P-0451 to include all applicable provisions of the proposed (yet not issued) U.S. EPA NPDES permit CAG280000 that was approved by the Commission in January 2001.

Arguello Inc's proposal is to drill a maximum of eight extended-reach wells using existing well slots from two OCS platforms in the Point Arguello Unit, Platforms Hermosa and Hidalgo.[1] Drilling and production would be completed within the remaining productive life of the Point Arguello Unit.[2] Development of the eastern half of Lease OCS-P 0451 would not require any new subsea infrastructure (except for the eight extended-reach wells) or new equipment at the onshore Gaviota facility. The oil and gas would be commingled with Point Arguello Unit oil and gas production and be processed offshore at the existing platforms. The only new equipment that may be required is an oil stabilizer on Platform Hidalgo. The oil would be transported to Gaviota in an existing oil pipeline. From Gaviota, the oil is to be transported to refineries by

[1] Arguello, Inc. projects that five wells will be drilled from Platform Hermosa and three wells from Platform Hidalgo.

[2] The MMS estimates the Point Arguello Unit to become uneconomic in 2015-2016. It estimates the last well from the eastern half of Lease OCS-P 0451 to complete its productive life by the end of 2013.

pipeline. The gas would be processed (to remove hydrogen sulfide and carbon dioxide) for platform use or for sale to shore via an existing pipeline.

Pursuant to the consistency review requirements of the Coastal Zone Management Act ("CZMA") (15 CFR Part 930), the Coastal Commission previously reviewed and concurred in consistency certifications CC-12-83 and CC-24-84 for Platforms Hermosa and Hidalgo. The approved Hermosa DPP provided for a 48-slot platform (producing up to 27,000 barrels per day ("BPD") of oil and 28 million standard cubic feet for per day ("MMSCF/D"). The approved Hidalgo DPP provided for a 56-slot platform (producing up to 20,000 BPD of oil and 10 MMSCF/D of gas).[3]

The test to determine if a DPP modification is subject to additional federal consistency review by the Commission is whether (a) the modification constitutes a "major amendment" to the previously concurred-in DPP, (b) the project changes will affect coastal zone uses and resources, and (c) whether such effects are substantially different than those evaluated by the Commission in its original federal consistency review and concurrence for the particular DPP. Any changes that would cause "substantially different effects" on coastal zone resources are subject to additional federal consistency review by the Commission under section 307(c)(3)(B) of the CZMA. Thus, the question before the Commission is whether the proposal to drill into the eastern side of lease 0451 will cause coastal resource impacts substantially different than those originally reviewed by the Commission when Platforms Hermosa and Hidalgo were approved.

The term "major amendment" of a federal permit activity is defined in section 930.51(c) of the CZMA regulations as "any subsequent federal approval that the applicant is required to obtain for modification to the previously review activity...." The Commission staff believes that Arguello Inc.'s proposal to develop the eastern half of Lease OCS-P0451 constitutes a major amendment as that term is defined in the CZMA.

However, we have determined that the proposed amendment will not cause effects on California's coastal uses and resources substantially different than those originally reviewed by the Commission. Thus, the proposed modifications will not require additional federal consistency review by the Commission. A detailed discussion of the basis for the Commission staff's determination is provided in Attachment 1 to this letter.

If you have any questions about this matter, please call me at 415/904-5201 or Alison Dettmer, Manager of the Energy and Ocean Resources Unit, at 415/904-5205.

Sincerely,

Alison Dettmer for

PETER M. DOUGLAS
Executive Director

---

[3] In 1994, the Commission also approved a third Point Arguello Unit platform, Platform Harvest (CC-27-83).

RECEIVED
AUG 13 2003
OFFICE OF FACILITIES, SAFETY, & ENFORCEMENT
PACIFIC OCS REGION

# ATTACHMENT A

## NE-042-03

**Determination that Arguello Inc.'s Proposal to Modify the Point Arguello Unit Development and Production Plans ("DPPs") to Develop the Eastern Side of OCS-P 0451 Will Not Cause Effects on Coastal Resources and Uses Substantially Different Than Those Originally Reviewed By the Coastal Commission**

---

Arguello Inc. proposes to develop the eastern half of federal Outer Continental Shelf ("OCS") Lease OCS-P 0451 by drilling a maximum of eight extended-reach wells from two existing OCS platforms in the Point Arguello Unit, Platforms Hermosa and Hidalgo. The project area is located offshore about eight miles northwest of Point Conception, Santa Barbara County (Exhibit 1). Arguello Inc. anticipates drilling five wells from Platform Hermosa and three wells from Platform Hidalgo.

On April 22, 2003, the Minerals Management Service ("MMS") submitted to the Coastal Commission Arguello, Inc's proposed revisions to the Point Arguello Development and Production Plans ("DPPs") to develop the eastern half of OCS-P 0451, and an accompanying consistency certification meeting the requirements of 15 CFR § 930.76(d). On June 11, 2003, Arguello Inc. submitted to the Commission a second letter and attachment modifying its project description to include all applicable provisions of the proposed (yet not issued) U.S. Environmental Protection Agency ("EPA") NPDES permit CAG280000 that was approved by the Commission in January 2001.

The Point Arguello Unit includes three oil and gas production platforms, Platforms Hermosa, Hidalgo and Harvest, that currently produce oil and gas underlying Leases OCS-P 0315, OCS-P 0316, OCS-P 0450 and the *western half* of OCS-P 0451. Pursuant to the federal consistency review requirements of the Coastal Zone Management Act ("CZMA") (15 CFR Part 930), the Commission previously reviewed and concurred in consistency certifications CC-12-83, CC-27-83, and CC-24-84 for Platforms Hermosa, Harvest, and Hidalgo, respectively. The approved Hermosa DPP provided for a 48-slot platform (producing up to 27,000 barrels per day ("BPD") of oil and 28 million standard cubic feet for per day ("MMSCF/D") of natural gas. The approved Hidalgo DPP provided for a 56-slot platform (producing up to 20,000 BPD of oil and 10 MMSCF/D of gas). At the time the Commission concurred in the consistency certifications for the three platforms, peak Point Arguello Unit oil production was anticipated to be 100,000 BPD and 60 MMSCF/D of gas. The Commission approved 154 total wells slots.

Platform Hermosa was installed in 1985, and Hidalgo in 1986. Of the 48 wells slots approved at Hermosa, 17 have been used. Of the 56 well slots approved for Hidalgo, 17 have been used. Point Arguello production peaked in August 1993 at 89,000 BPD and 27 MMSCF/D of gas. Current production from the field is about 13,000 BPD of oil and approximately 2.7 MMSCF/D of gas.

Development of the eastern half of OCS-P 0451 would occur within the time-frame of the existing Point Arguello Unit facilities as foreseen and evaluated in the 1984 Point Arguello/Southern Santa Maria Basin Area Study Environmental Impact Report/Environmental Impact Statement ("1984 EIR/EIS"), and as understood by the Commission when it concurred in the consistency certifications for each Point Arguello platform DPP. The total number of wells drilled for the Point Arguello Unit *and* the eastern half of OCS-P 0451 would be about half of the number of wells approved for the Point Arguello Unit alone. In addition, drilling and production from the eastern half of OCS-P 0451 is to be completed within the remaining productive life of the Point Arguello Unit.

All eight proposed wells are to be directionally drilled using existing well slots. The project would require no new offshore or onshore equipment or other infrastructure (except for the eight new wells and perhaps the addition of an oil stabilizer on Platform Hidalgo).[1] Oil and gas production would use the existing oil and gas production facilities on each of the platforms.

The oil produced from the eastern half of OCS-P 0451 would be combined with Point Arguello Unit oil and transported to the Gaviota Facility in the existing PAPCO oil pipeline. From Gaviota, combined oil production from the eastern half of OCS-P 0451 and the Point Arguello Unit would be metered, heated, and transported to refineries by pipeline. Gas from the eastern half of OCS-P 0451 would be combined with Point Arguello Unit gas on the production platforms. The combined gas would be processed (to remove hydrogen sulfide and carbon dioxide) for platform use or sale to shore via the existing pipeline.

Current oil and gas production levels at the Point Arguello platforms will increase by developing the eastern half of OCS-P 0451. Arguello Inc. estimates that combined Point Arguello field and eastern half of OCS-P 0451 oil production will peak at 31,000 BPD (in 2006) and then quickly decline. Without the eastern half of OCS-P 0451, Point Arguello oil production won't exceed 21,000 BPD; beyond 2006, production volumes quickly decline. This volume of oil and gas production is substantially less than the production levels anticipated and analyzed when the Commission concurred in the consistency certifications for Platforms Hermosa, Harvest, and Hidalgo. The 1984 Point Arguello Unit EIR/EIS estimated a total production level of 500 million barrels of oil. Arguello

[1] In 1998, the MMS, County of Santa Barbara, and Coastal Commission separately approved requests by Chevron, the original operator of the Point Arguello Unit, to "reconfigure" the Point Arguello Project to process (dehydrate and stabilize) all oil offshore on Platforms Harvest and Hermosa instead of at the onshore Gaviota Facility. Once processed offshore the oil is transported in the existing PAPCO oil pipeline to the Gaviota Facility, where it is heated for transport to refineries in the All American Pipeline.

Inc. estimates total recovered reserves from the *combined* Point Arguello and eastern half of OCS-P 0451 will be around 150 million barrels.

*The Commission's Review of an Amended DPP*

The test to determine if a DPP modification is subject to additional federal consistency review by the Commission is whether (a) the modification constitutes a "major amendment" to the previously concurred-in DPP, (b) the project changes will affect coastal resources and uses, and (c) whether such effects are substantially different than those evaluated by the Commission in its original federal consistency review and concurrence for the particular DPP. Any changes that would cause "substantially different effects" on coastal zone resources are subject to additional federal consistency review by the Commission under section 307(c)(3)(B) of the CZMA. Thus, the question before the Commission is whether the proposal to drill into the eastern side of OCS-P 0451 will cause coastal resource impacts substantially different than those originally reviewed by the Commission when Platforms Hermosa and Hidalgo were approved.

The term "major amendment" of a federal permit activity is defined in section 930.51(c) of the CZMA regulations as "any subsequent federal approval that the applicant is required to obtain for modification to the previously reviewed activity...." The Commission staff believes that Arguello Inc.'s proposal to develop the eastern half of OCS-P 0451 constitutes a major amendment as that term is defined in the CZMA.

After careful review, however, the Commission staff has determined that the proposed amendment to the Point Arguello DPPs will *not* cause effects on California's coastal uses and resources substantially different than those originally reviewed by the Commission. Thus, the proposed modifications will not require additional federal consistency review by the Commission. A detailed discussion of the basis for the Commission staff's determination is provided below. The key issues addressed are: (1) possible drainage of oil and gas underlying two adjacent *undeveloped* OCS leases; (2) marine resource and water quality impacts; (3) oil spills; (4) commercial fishing; and (5) air quality.

*Drainage of Resources Underlying Adjacent Leases OCS-P 0452 and OCS-P0453*

Lease OCS-P 0451 is considered by the MMS to be a *developed* lease since the western half is developed as part of the Point Arguello Unit. Previously, the eastern half of OCS-P 0451 was part of the Rocky Point Unit, but the MMS has since contracted it out of the unit. Therefore, it is no longer unitized[2] with the remaining undeveloped leases (OCS-P 0452 and OCS-P 0453) that comprise the Rocky Point Unit. OCS-P 0452 and OCS-P 0453 are two of the 36 *undeveloped* OCS leases that were the subject of the *California v. Norton* litigation.

[2] A unit may be formed when a common reservoir underlies a group of leases. Unitizing may prevent waste and minimize the number of facilities needed to develop a reservoir.

Upon first hearing of this project, Commission staff was concerned that if the eastern half of OCS-P 0451 is developed, it might drain oil and gas reserves that underlie neighboring OCS-P 0452 and OCS-P 0453.[3] The project's geologic information suggest that 60% of the target pool of oil lies under the eastern half of OCS-P 0451 while 40% may lie under OCS-P 0452. Under federal law, drainage is considered a "rule of capture" – a lease is not considered developed if it is drained by wells located on an adjacent lease. When the same lessee does not own the two leases, the remedy for the lessee of the drained lease is to seek approval to develop and extract oil and gas from the lease. In this case, the owner of OCS-P 0452 and OCS-P 0453 is Delta Petroleum Corporation ("Delta"). Therefore, the Commission staff expressed concern to Arguello Inc. and the MMS that allowing Arguello Inc. to develop the eastern half of OCS-P 0451 might cause Delta to take the position that it is entitled under federal law to explore or develop OCS-P 0452 and 0453. If approving the development of the eastern half of OCS-P 0451 causes Delta to seek to develop OCS-P 0452 and 0453, it would, in the Commission staff's opinion, cause "substantially different effects" on coastal resources than those originally reviewed by the Commission when it approved the original Point Arguello Project.

To address this concern, on February 20, 2003, Delta submitted a letter to the Coastal Commission, the MMS, and the County of Santa Barbara committing to not "contend, before any county, state or federal government entity, that it is or should be entitled to explore or develop the OCS-P-0452 or 0453 Leases as a result of the fact that such county, state or federal entity permitted the E/2 [eastern half] of OCS-P 0451 Lease to be developed, or a result of the actual development of the E/2 of the OCS-P 0451 Lease" (Exhibit 2).

Delta's commitment to not seek an entitlement to develop OCS-P 0452 or OCS-P 0453 due to Arguello Inc.'s authority to develop or actual development of OCS-P 0451 is a key factor critical to the Commission staff's conclusion that the proposal to develop the eastern half of OCS-P 0451 will not cause effects substantially different than those originally reviewed by the Commission. If Delta fails to abide by this commitment, or if it sells its ownership in OCS-P 0452 and OCS-P 0453 to another party that then seeks an entitlement to develop OCS-P 0452 and OCS-P 0453 on the basis of drainage caused by Arguello Inc.'s development of the eastern side of OCS-P 0451, it will constitute grounds for the Commission to re-open this consistency review pursuant to section 930.65 of the regulations which implement the CZMA (15 CFR Part 930).

### *Marine Resources and Water Quality*

The potential impact-producing activities associated with the proposed project that could affect marine resources (*e.g.*, fish, marine mammals, and hard bottom) and water quality are discharges of drilling muds and cuttings and discharges of produced water from Platforms Hermosa and Hidalgo.

---

[3] The MMS "unitized" the eastern half of OCS-P 0451 and leases OCS-P 0452 and OCS-P 0453 because a common reservoir underlies these leases. Therefore, wells drilled into the eastern half of OCS-P 0451 could drain oil and gas underlying OCS-P 0452 and OCS-P 0453.

*Produced Water and Drill Muds and Cuttings*

Development of the eastern half of OCS-P 0451 will result in additional *produced water* discharges from the Point Arguello platforms as compared to existing discharges (a 27% increase over existing produced water discharges). Produced water refers to the total water discharged from the oil and gas extraction process. It is the largest single source of material discharged during oil and gas operations. Typically, produced water consists of formation water, injection water, and chemicals used in the oil and water separation process. Constituents found in produced water are iron, calcium, magnesium, sodium, bicarbonate, sulfates, and chloride. Produced water can also contain entrained petroleum hydrocarbons and measurable trace metal concentrations. Relative to ambient water, produced water contains increased organic salts and trace metals, decreased dissolved oxygen and is higher in temperature. These properties may adversely affect the marine environment by increasing the concentration of suspended solids/turbidity, oxygen demand, oil, and grease, and trace metals at the vicinity of the discharge point.

Arguello Inc. estimates the maximum discharge of produced water from the combined eastern half of OCS-P 0451 and the Point Arguello Unit to be 250,000 BPD. This total amount of produced water discharges (current Point Arguello Unit discharges combined with eastern half of OCS-P 0451) is consistent with platform discharge volumes considered by the Commission when it concurred in the consistency certification for the 1984 EPA-issued NPDES General Permit CA0110516 for platform discharges (which covers discharges from the Point Arguello platforms). (NPDES General Permit CA0110516 is discussed more below.)

When the Point Arguello Project was originally approved, the platform DPPs estimated that if all well slots were used, 536,000 barrels of *drilling mud* was to be discharged. Drilling muds are used in exploratory and production drilling to control well hydrostatic pressure, lubricate the drill bit, and remove drill cuttings from the well. They are generally composed of mixtures of water, clays, barium sulfate, lignite, lignosulfonate, and other additives. The actual amount discharged from the Point Arguello platforms has been 153,080 barrels, about 28% of the total originally estimated. Arguello Inc. projects the drilling mud discharge volume for the eight proposed wells to be 112,553 barrels.

Additionally, the platform DPPs projected *cuttings* discharges of 447,492 barrels if all available well slots had been used. Cuttings are small pieces of formation rock cut way by the drill bit. They are carried to the surface of the well with circulation of the drilling muds and are separated from the muds on the platform. The actual amount of cuttings discharged was 34,020 barrels (or 8% of the original estimate). Arguello Inc. projects the cuttings discharge volume for the eight proposed wells to be 40,685 barrels. This, combined with discharges from the Point Arguello Unit wells, falls within the volume of cuttings considered when the Commission originally reviewed and approved the platform DPPs.

Arguello Inc. is currently discharging produced water, and drill muds and cuttings, under the terms and conditions of 1984 NPDES General Permit CA0110516. The EPA originally issued this general permit in February 1982 with an expiration date of January 1984. In January 1984, the Commission concurred in the EPA's consistency certification to extend the term of CA0110516 for an additional six months, through June 1984 (CC-26-83). In 1986, the Commission objected to EPA consistency certifications for two new EPA-proposed NPDES general permits (one for development/production operations and the other for exploratory operations). The Commission based its objections on findings that the proposed NPDES general permits (1) provided insufficient protection of site-specific, sensitive marine resources, (2) did not comply with state water quality standards or fully explain reasons for excluding feasible standards; and (3) did not provide adequate monitoring and enforcement. The 1986 general NPDES permits were thus never issued, and the EPA did not propose a revised or new general NPDES permit until 2000. In January 2001, the Commission concurred in a revised general NPDES permit, but the EPA has not yet issued it. Since 1984, the EPA has taken the position that NPDES General Permit CA0110516 has been extended by operation of law (5 USC § 558(c); 40 CFR § 122.6; see, however, *Kitlusisti v. ARCO*, 592 F.Supp. 832, 843 (D. Alaska 1984), vac. 782 F.2d 900 (9th Cir. 1986) (general permits do not qualify for extension under section 558(c).).

In Arguello Inc.'s April 2003 submittal to the Coastal Commission to develop the eastern half of OCS-P 0451, it stated that the project would be carried out consistent with all discharge requirements of the 1984 NPDES general permit, unless and until it is superceded by an a new or revised general NPDES permit issued by the EPA. The Commission staff discussed with Arguello Inc. its concerns that (1) Arguello Inc. has committed to meet only *old* federal discharge limits contained in the 1984 NPDES general permit and not the proposed revised NPDES discharge standards, and (2) that Arguello Inc.'s submittal does not address the proposed project's conformity with California Ocean Plan requirements (which, pursuant to section 307(f) of the CZMA and 15 CFR § 923.45, are incorporated into and thus comprise an integral part of California's federally-certified coastal management program (CCMP)).[4]

On June 12, 2003, Arguello Inc. sent a letter and attachment to the Commission modifying its project description for development of the eastern half of OCS-P 0451 to incorporate the relevant requirements of the latest Commission-approved version of the revised NPDES permit (CAG280000) (hereinafter, "The Agreement"). The Agreement would cover all discharges from Platforms Hermosa and Hidalgo, and would only be preempted or superceded by any duly authorized general or individual NPDES permit issued by the EPA that has complied with the federal consistency review requirements of the CZMA.

[4] On May 14, 2003, the Commission staff sent a letter to Arguello Inc. requesting an analysis of the proposed project's conformity with California Ocean Plan requirements.

The terms and conditions of the Commission-approved version of the revised NPDES general permit CAG280000, as committed to by Arguello Inc. for Platform Hermosa and Hidalgo discharges, offers potentially significant water quality improvements over the requirements of existing NPDES General Permit CA0110516. Under the agreement Arguello Inc. agrees to:

- Comply with either California's Ocean Plan water quality criteria or the federal 304(a) Clean Water Act criteria for produced water discharge effluent standards (to be applied at the 100-meter mixing zone), whichever is more protective of applicable beneficial uses;
- Comply with 1993 Clean Water Act effluent limitations for oil and grease;
- Comply with volumetric limits for drilling discharges at each platform;
- Conduct end-of-well toxicity testing for drilling discharges;
- Monitor produced water for chronic whole effluent ("WET") testing on red abalone;
- Undertake an assessment of the availability and practicality of using on line oil and grease monitoring devices for produced water discharges;
- Undertake a platform-specific analysis to determine (1) the relative environmental effects, and (2) the feasibility (as defined in section 30108 of the CCMP) of disposal of drill muds and cuttings and produced water by means other than discharge into ocean waters (*e.g.*, barging and reinjection) as compared to such discharge. Arguello Inc. has agreed to amend the DPPs for Platforms Hermosa and Hidalgo to provide for an alternative manner or method of disposal of produced water and/or drill muds and cuttings if the Coastal Commission determines that such alternative is feasible and the less environmentally damaging alternative than direct ocean discharge; and
- Undertake an evaluation of the direct lethal, sublethal, and bioaccumulative effects of produced water on federally managed fish species on the Pacific OCS at key life stages occupying the mixing zone of produced water discharges. If the information provided indicates that substantial adverse impacts are occurring to Federally-managed fish species or Essential Fish Habitat, Arguello Inc. acknowledges that it will constitute grounds for the Commission to re-open its consistency review pursuant to 15 CFR 930.65.

The Agreement contains the same reporting and monitoring requirements that are contained in the proposed revised NPDES general permit. All reports, studies and notifications, including discharge monitoring reports and notifications of non-compliance, would be submitted to EPA and MMS. The EPA and MMS have agreed to monitor compliance with the requirements of the Agreement.

Exhibit 3 to this attachment compares the historical averages of 14 monitored constituents of produced water from Platforms Hermosa and Hidalgo (*e.g.*, oil and grease, arsenic, cadmium, chromium, copper and cyanide) and the existing and proposed revised general NPDES federal discharge limits and the California Ocean Plan limits. This table illustrates that (1) the revised, updated federal water quality criteria and the California Ocean Plan requirements are, for most produced water constituents, more stringent than those contained in the 1984 NPDES General Permit, and (2) Platform Hermosa and Hidalgo's historic discharges meet the newer federal criteria and current California Ocean Plan requirements.

For the reasons identified above, the Commission staff has concluded that the volume of platform discharges and the nature and magnitude of impacts caused by discharges from OCS-P 0451 wells combined with the Point Arguello Unit discharges fall within the scope of impacts considered by the Commission when it approved the original project. Furthermore, implementation at platforms Hermosa and Hidalgo of the discharge requirements contained the latest 2001 Commission-approved version of the general NPDES permit offer water quality and marine resource *improvements* as compared to existing discharge standards. Accordingly, the Commission staff believes that the proposed project's discharges will not cause "substantially different effects" on coastal resources or uses than those originally evaluated by the Commission.

*Oil Spills*

Federal regulations concerning oil spill response plans ("OSRPs") for OCS facilities require operators to calculate worst-case discharge volumes using the criteria specified in 30 CFR §254.47. These include (1) the maximum capacity of all oil storage tanks and flow lines on the facility, (2) the volume of oil calculated to leak from a break in any pipelines connected to the facility, and (3) the daily production volume from an uncontrolled blowout of the highest capacity well associated with the facility. These are worst-case estimates, intended to insure than an operator has the capacity to respond to the largest oil spill as required by MMS regulations in 30 CFR §254.26.

The MMS estimates the most likely maximum size of an oil spill from the proposed development of the eastern side of OCS-P 0451 is the maximum volume of oil calculated to be spilled from a break in the longest Point Arguello Unit pipeline, the Hermosa-to-shore PAPCO oil pipeline. The MMS calculates this worst-case spill volume to be 2,217 barrels of oil. This figure is substantially less than the 7,600 calculated as part of the 1984 EIR/EIS for the Point Arguello Project, a worst-case spill calculation relied upon by the Commission when it concurred in the DPPs for the Platforms Hermosa and Hidalgo. The current estimate of 2,217 barrels of oil is based on the actual maximum throughput volume and operating pressure for the pipeline (much lower than estimated in 1984), the installation of modern, automatic oil spill leak detection systems, and the actual elevation profile and water cut (the proportion of water in the pipeline stream) of the existing PAPCO pipeline.

The MMS estimates a 3.3 – 3.9 percent probability of an oil spill equal to or greater than 1,000 barrels from the proposed project.

The original Point Arguello platform DPPs included oil spill prevention measures and an oil spill contingency (response) plan. Critical to the Commission's decision to concur in the consistency certifications for the platforms was Chevron's commitment to adopt "maximum feasible mitigation measures" for responses to spills. These included: (a) adequate onsite oil spill containment and cleanup equipment (open ocean boom, skimmers, sorbents, and deployment vessels); (2) adequate procedures for responding to large spills; and (3) membership in the Clean Seas oil spill response organization[5].

Since the Commission's original federal consistency concurrences in the DPPs for Platform Hermosa and Hidalgo, many changes have occurred in oil spill response resources and regulatory requirements. The federal Oil Pollution Act of 1990 ("OPA 90") passed, and the MMS adopted new regulations governing oil spill response.

OPA 90 and MMS regulations at 30 CFR Part 254 require that each OCS facility have a comprehensive oil spill response plan ("OSRP"). Response plans include an emergency response action plan, and supporting information that includes an equipment inventory, contractual agreements with subcontractors and oil spill response cooperatives, a worst-case discharge scenario, and details on training and drills. These OSRPs are reevaluated and updated every two years. The Commission's Oil Spill Program staff has been reviewing OSRP updates as amendments to each particular DPP. In November 2002, the MMS approved the current OSRP for the Point Arguello facilities. After reviewing the updated OSRP, the Commission staff concluded that the oil spill response capability in place now for the Point Arguello Project is at least equivalent to if not better than the spill response capability for the Point Arguello platforms originally reviewed and concurred in by the Commission. The Commission staff believes that the added development of the eastern half of OCS-P 0451 does not alter this finding. The development of the eastern half of OCS-P 0451, combined with the production from the Point Arguello Unit, falls within the nature and magnitude of impacts and oil spill risk considered by the Commission when it originally concurred in the platform DPPs. Additionally, the level of oil spill response capability in place today for the Point Arguello Project is equivalent to if not better than that originally approved by the Commission.

---

[5] Since 1970, oil companies operating in the Santa Barbara Channel and Santa Maria Basin have funded and operated a non-profit oil spill response organization called Clean Seas. Clean Seas provides an inventory of state-of-the-art oil spill response equipment and trained personnel. Clean Seas personnel and equipment are on standby, ready to respond to an oil spill, 24 hours a day, 365 days per year. The primary oil spill response for the Point Arguello facilities is provided by Clean Seas' oil spill response vessel, *Mr. Clean III*. *Mr. Clean III* is normally moored adjacent to Platform Harvest, or when sea conditions dictate, in the Cojo Bay anchorage about eight nautical miles from the Platform Hermosa. *Mr. Clean II*, moored outside the Santa Barbara Harbor, provides secondary oil spill response and can arrive at the Point Conception area within 5-6 hours. Clean Seas also maintains smaller response vessels based in the Santa Barbara Harbor and the Clean Seas' Carpinteria facility that could reach the Point Arguello platforms within 3-4 hours. Clean Seas is equipped and prepared to response to oil spill threats to sensitive shoreline areas identified by the U.S. Coast Guard and the California Office of Spill Prevention and Control.

*Commercial Fishing*

The proposed project is located in the southern Santa Maria Basin. The area is productive due to upwelling and favorable habitat for commercially important fish species. The gear types most used in the area include: trawl (shrimp, prawn, sea cucumbers, some rockfish and various species of sole), drift gillnets (in federal waters), purse seines (squid, mackerel, sardine and anchovy), and traps (crab and lobster). Commercial fishing-related issues associated with the proposed development of the eastern half of OCS-P 0451 are the potential socioeconomic impacts on fishermen due to (a) preclusion from fishing grounds, (b) damage and loss of fishing gear, and (c) lost fishing time due to (a) or (b).

Any impacts to commercial fishing due to the development of the eastern side of OCS-P 0451 should be insignificant. No new equipment or facilities are needed to develop and produce the eastern half of OCS-P 0451. The drilling operations are to be supported by 2-3 supply boat trips per week over a three-year period. This would be in addition to the current level of six boat trips per month to support ongoing Point Arguello Unit production. After the drilling period (2-3 years), supply boat trips would return to current levels. All service traffic would remain in the traffic corridors established by the Joint Oil/Fisheries Liaison Committee. The proposed project will not cause further preclusion or space-use conflicts beyond what presently exists and were previously analyzed when the Commission concurred in the consistency certifications for the platforms. The Commission staff has therefore concluded that the project will not cause commercial fishing impacts substantially different that what the Commission considered when it originally approved the platforms.

***Air Quality***

The Point Arguello Project is an existing emission source within Santa Barbara County, and its emissions are reflected in the ambient air quality. The project's current emission levels are considerably less than what was analyzed by decision-makers when the platforms were originally approved, and less than the allowable emissions. The platforms are existing emission sources regulated by the Santa Barbara County Air Pollution Control District ("SBCAPCD"). Pursuant to its Permit to Operate, Arguello Inc. must provide emission offsets for the maximum allowable project emission.

Emissions resulting from the development of the eastern half of OCS-P 0451 may have the potential to increase concentrations of pollutants onshore. The primary pollutants of concern in Santa Barbara County are oxides of nitrogen ($NO_x$), and reactive organic compound ("ROC"). Both $NO_x$ and ROC are precursors to ozone formation, for which Santa Barbara County is presently in "nonattainment". The major pollutant of concern here are $NO_x$ emissions due to the use of propulsion and stationary combustion equipment.

The project's major emission sources are: (a) increased loads due to the turbines (during well drilling), (b) emissions from crew/supply vessels needed to support drilling

operations, and (c) fugitive emissions associated with additional wells. The MMS has concluded that the increased emissions from the drilling operations are within allowable emission levels currently permitted by the SBCAPCD, and have been fully offset in accordance with SBCAPCD rules and regulations. All crew and supply boats are registered and permitted by SBCAPCD, and the additional emissions generated by the wells will be covered by existing emission-offset agreements. Estimated fugitive emissions are considered by SBCAPCD to be deminimus and do not require emission offsets.

The Point Arguello Unit's current and future estimated emissions, combined with the emissions generated by development of the eastern half of OCS-P 0451, fall within the emission estimates evaluated when the Commission originally reviewed and concurred in the overall Point Arguello Unit Project DPPs. The Commission staff has thus concluded that the proposed project will not cause substantially different effects than those evaluated by the Commission in its original consistency review and concurrence.

***Conclusion***

In conclusion, based on the above evidence, the Commission staff has determined that Arguello Inc.'s proposed revisions to the Point Arguello Unit DPP's to develop the eastern half of OCS-P 0451 will not cause effects on California's coastal zone resources and uses substantially different than those originally reviewed by the Commission when it approved the Point Arguello Unit Project. Thus, the proposed revisions will not require additional federal consistency review by the Commission.