# EXHIBIT F

# PXP

## Plains Exploration & Production Company

March 26, 2007

Mr. Allan Shareghi
Minerals Management Service
Pacific Region
770 Paseo Camarillo
Camarillo, California 93010

Re: Rocky Point Unit

Dear Mr. Shareghi:

Pursuant to Plains Exploration & Production Company becoming the operator in the Rocky Point Unit, we are submitting four (4) originals and one (1) copy of each of the following documents to update your records:

1. Revised Exhibit A to the Rocky Point Unit Agreement effective as of September 1, 2006;
2. Revised Exhibit B to the Rocky Point Unit Agreement effective as of September 1, 2006;
3. Revised Exhibit A to the Rocky Point Unit Operating Agreement effective as of September 1, 2006;
4. Revised Exhibit B to the Rocky Point Unit Operating Agreement effective as of September 1, 2006;
5. Designation of Unit Operator Forms for the Rocky Point Unit executed by all the current working interest owners;
6. Notice of Resignation of Unit Operator of the Rocky Point Unit;
7. Designation of Successor Unit Operator of the Rocky Point Unit;
8. Acceptance of Right and Obligations of the Unit Operator;
9. Ratification and Joinder of the Unit Operating Agreement for the Rocky Point Unit;
10. Ratification and Joinder of the Unit Agreement for the Rocky Point Unit;

Please file stamp the copies and return same to me. If you have any questions regarding the above, please contact Gregg Maynard at (713) 579-6057.

Very truly yours,

Gregg R. Maynard
Assistant General Counsel

Enclosures

RECEIVED
MAY 4 2007
RESERVOIR EVALUATION AND PRODUCTION
PACIFIC OCS REGION

SCHULLY, ROBERTS, SLATTERY, JAUBERT & MARINO
A PROFESSIONAL LAW CORPORATION
ENERGY CENTRE
1100 POYDRAS STREET, SUITE 1800
NEW ORLEANS, LOUISIANA 70163-1800
TELEPHONE (504) 585-7800
TELEFAX (504) 585-7890
EMAIL: firm@schullyroberts.com

O. FOERSTER SCHULLY III
F. NEELIS ROBERTS
GERALD F. SLATTERY, JR.
LISA S. JAUBERT
ANTHONY C. MARINO
PAUL J. GOODWINE
DAVID R. DYER
STEPHEN B. PANUS
JOHN WEATHINGTON III
JANET H. ASCHAFFENBURG

DAVID R. RICHARDSON
OF COUNSEL

Sender's Email: amarino@schullyroberts.com

March 10, 2003

RECEIVED
MAR 11 2003
PRODUCTION, DEVELOPMENT AND RESOURCE EVALUATION
PACIFIC OCS REGION

**VIA FEDERAL EXPRESS**

Mr. Allan Shareghi
Minerals Management Service
Pacific OCS Region
770 Paseo Camarillo
Camarillo, California 93010

Re: Rocky Point Unit
Contract No. 14-08-0001-18484
Our File No. 296.1834

Dear Mr. Shareghi:

Reference is made to that certain letter dated March 4, 2003, by Dr. J. Lisle Reed, Regional Director, Minerals Management Service, Pacific OCS Region, addressed to Mr. Robert Huguenard of Arguello, Inc. concerning the contraction of the Rocky Point Unit ("MMS Decision Letter"). In accordance to the request of the MMS Decision Letter, on behalf of Arguello, Inc., we hereby submit four (4) originals and one (1) copy of the following:

1. Revised Exhibits A and B to the Rocky Point Unit Agreement (Contract No. 14-08-0001-18484) dated effective April 1, 2003; and

2. Revised Exhibits A and B to the Point Arguello Unit Operating Agreement dated effective as of April 1, 2003.

As a result of the contraction, the Rocky Point Unit Area shall comprise Leases OCS-P 0452 and OCS-P 0453.

Please file-stamp a copy of each of the documents and return to me at your earliest possible convenience. If you should have any questions, please do not hesitate to contact the undersigned.

Very truly yours,

Anthony C. Marino

ACM/rlb
Enclosures
cc: Dr. J. Lisle Reed
Mr. James R. Rumsey

ROBERTS
& MARINO

D. Foerster Schully, III
Gerald F. Slattery, Jr.
Anthony C. Marino
Paul J. Goodwine
David S. Landry
Herman E. Garner, Jr.
Lynn G. Wolf
Kathleen L. Doody
Colleen E. Carr
Stephen M. Domas
Emile J. Dreuil, III
Jefferson B. Goldman

Of Counsel:
F. Neelis Roberts LLC
David R. Richardson

April 30, 2007

**VIA FEDERAL EXPRESS**
Ms. Elverlene Williams
Minerals Management Service
Pacific OCS Region
770 Paseo Camerillo
Camerillo, CA 93010

Re: Plains Exploration and Production Company
Designations of Operator Forms Submitted for Filing Purposes
**Rocky Point Unit – OCS-P 00452 and OCS-P 00453**

Dear Ms. Williams:

Enclosed please find an original and one copy of the following Designations submitted for filing which all relate to the recent change of Unit Operator for the Rocky Point Unit. Please file the enclosed originals in each respective Lease file and return one date-stamped copy to the undersigned at the address noted below.

1. Designation of Operator dated April 2, 2007 by Delta Petroleum Corporation designating Plains Exploration & Production Company as Operator of **OCS-P 00452** (Block 466, All that portion seaward of the three geographical mile line, OCS Official Protraction Diagram NI 10-6, Santa Maria); and

2. Designation of Operator dated April 2, 2007 by Delta Petroleum Corporation designating Plains Exploration & Production Company as Operator of **OCS-P 00453** (Block 467, All that portion seaward of the three geographical mile line, OCS Official Protraction Diagram NI 10-6, Santa Maria.)

Thank you and please note that we have enclosed our PayGov receipt evidencing payment of your filing fees in this matter. Please contact me or Ms. Seelman if you have any questions or need any additional information.

Sincerely,

Diane M. Castle

Diane M. Castle
Paralegal

Enclosures
cc: Mr. Greg Maynard (w/enc.)
Mr. Anthony Marino (wo/enc.)
Ms. Joan Seelman (wo/enc.)

012.04193.2609.docs.mms.ltr.doc's

EXHIBIT G

ARGUELLO

January 23, 2003

Mr. Allan Shareghi
Minerals Management Service
Pacific Region
770 Paseo Camarillo
Camarillo, California 93010

**Re: Rocky Point Unit Operating Agreement**

Mr. Shareghi:

This letter serves as a request and grants you permission to provide a complete copy of the Rocky Point Unit Operating Agreement (including all exhibits and amendments thereto) to Anthony C. Marino with the law firm of Schully, Roberts, Slattery, Jaubert and Marino. Mr. Marino serves as our counsel on OCS matters and is currently reviewing items related to the Rocky Point Unit. Arguello Inc. will gladly pay for any expenses incurred related to this request.

If you have any questions regarding the above, please contact me at (713)-739-6766.

Very truly yours,

Jim Rumsey

James Rumsey
Senior Landman

017.1617a.1834.ltr

500 Dallas, Suite 700 ■ Houston, TX 77002 ■ 713/654-1414 ■ Fax 713/654-1523

EXHIBIT H

STATE OF CALIFORNIA – THE RESOURCES AGENCY GRAY DAVIS, GOVERNOR

CALIFORNIA COASTAL COMMISSION
45 FREMONT, SUITE 2000
SAN FRANCISCO, CA 94105-2219
VOICE AND TDD (415) 904-5200
FAX (415) 904-5400

August 8, 2003

Robert E. Huguenard
Arguello, Inc.
17100 Calle Mariposa Reina
Goleta, California 93117-9737

RECEIVED
AUG 13 2003
OFFICE OF FACILITIES, SAFETY & ENFORCEMENT
PACIFIC OCS REGION

Nabil Masri
Chief, Office of Facilities, Safety and Enforcement
United States Department of the Interior
Minerals Management Service
770 Paseo Camarillo
Camarillo, California 93010-6064

Re: **Amendment to the Platform Hermosa and Hidalgo Development and Production Plans ("DPPs") to Develop Eastern Half of Lease OCS-P 0451**

Dear Mr. Huguenard and Mr. Masri:

On April 22, 2003, the Minerals Management Service ("MMS") submitted to the Coastal Commission Arguello Inc.'s proposed revisions to the Point Arguello Development and Production Plans ("DPPs") to develop the eastern half of Lease OCS P-0451, and an accompanying consistency certification meeting the requirements of 15 CFR § 930.76(d). On June 11, 2003, Arguello, Inc. submitted to the Commission a second letter and attachment modifying its project description for the development of the eastern half of Lease OCS P-0451 to include all applicable provisions of the proposed (yet not issued) U.S. EPA NPDES permit CAG280000 that was approved by the Commission in January 2001.

Arguello Inc's proposal is to drill a maximum of eight extended-reach wells using existing well slots from two OCS platforms in the Point Arguello Unit, Platforms Hermosa and Hidalgo.[1] Drilling and production would be completed within the remaining productive life of the Point Arguello Unit.[2] Development of the eastern half of Lease OCS-P 0451 would not require any new subsea infrastructure (except for the eight extended-reach wells) or new equipment at the onshore Gaviota facility. The oil and gas would be commingled with Point Arguello Unit oil and gas production and be processed offshore at the existing platforms. The only new equipment that may be required is an oil stabilizer on Platform Hidalgo. The oil would be transported to Gaviota in an existing oil pipeline. From Gaviota, the oil is to be transported to refineries by

---

[1] Arguello, Inc. projects that five wells will be drilled from Platform Hermosa and three wells from Platform Hidalgo.

[2] The MMS estimates the Point Arguello Unit to become uneconomic in 2015-2016. It estimates the last well from the eastern half of Lease OCS-P 0451 to complete its productive life by the end of 2013.

pipeline. The gas would be processed (to remove hydrogen sulfide and carbon dioxide) for platform use or for sale to shore via an existing pipeline.

Pursuant to the consistency review requirements of the Coastal Zone Management Act ("CZMA") (15 CFR Part 930), the Coastal Commission previously reviewed and concurred in consistency certifications CC-12-83 and CC-24-84 for Platforms Hermosa and Hidalgo. The approved Hermosa DPP provided for a 48-slot platform (producing up to 27,000 barrels per day ("BPD") of oil and 28 million standard cubic feet for per day ("MMSCF/D"). The approved Hidalgo DPP provided for a 56-slot platform (producing up to 20,000 BPD of oil and 10 MMSCF/D of gas).[3]

The test to determine if a DPP modification is subject to additional federal consistency review by the Commission is whether (a) the modification constitutes a "major amendment" to the previously concurred-in DPP, (b) the project changes will affect coastal zone uses and resources, and (c) whether such effects are substantially different than those evaluated by the Commission in its original federal consistency review and concurrence for the particular DPP. Any changes that would cause "substantially different effects" on coastal zone resources are subject to additional federal consistency review by the Commission under section 307(c)(3)(B) of the CZMA. Thus, the question before the Commission is whether the proposal to drill into the eastern side of lease 0451 will cause coastal resource impacts substantially different than those originally reviewed by the Commission when Platforms Hermosa and Hidalgo were approved.

The term "major amendment" of a federal permit activity is defined in section 930.51(c) of the CZMA regulations as "any subsequent federal approval that the applicant is required to obtain for modification to the previously review activity...." The Commission staff believes that Arguello Inc.'s proposal to develop the eastern half of Lease OCS-P0451 constitutes a major amendment as that term is defined in the CZMA.

However, we have determined that the proposed amendment will not cause effects on California's coastal uses and resources substantially different than those originally reviewed by the Commission. Thus, the proposed modifications will not require additional federal consistency review by the Commission. A detailed discussion of the basis for the Commission staff's determination is provided in Attachment 1 to this letter.

If you have any questions about this matter, please call me at 415/904-5201 or Alison Dettmer, Manager of the Energy and Ocean Resources Unit, at 415/904-5205.

Sincerely,

Alison Dettmer for

PETER M. DOUGLAS
Executive Director

---

[3] In 1994, the Commission also approved a third Point Arguello Unit platform, Platform Harvest (CC-27-83).

RECEIVED
AUG 13 2003
OFFICE OF FACILITIES, SAFETY, & ENFORCEMENT
PACIFIC OCS REGION

# ATTACHMENT A

## NE-042-03

**Determination that Arguello Inc.'s Proposal to Modify the Point Arguello Unit Development and Production Plans ("DPPs") to Develop the Eastern Side of OCS-P 0451 Will Not Cause Effects on Coastal Resources and Uses Substantially Different Than Those Originally Reviewed By the Coastal Commission**

---

Arguello Inc. proposes to develop the eastern half of federal Outer Continental Shelf ("OCS") Lease OCS-P 0451 by drilling a maximum of eight extended-reach wells from two existing OCS platforms in the Point Arguello Unit, Platforms Hermosa and Hidalgo. The project area is located offshore about eight miles northwest of Point Conception, Santa Barbara County (Exhibit 1). Arguello Inc. anticipates drilling five wells from Platform Hermosa and three wells from Platform Hidalgo.

On April 22, 2003, the Minerals Management Service ("MMS") submitted to the Coastal Commission Arguello, Inc's proposed revisions to the Point Arguello Development and Production Plans ("DPPs") to develop the eastern half of OCS-P 0451, and an accompanying consistency certification meeting the requirements of 15 CFR § 930.76(d). On June 11, 2003, Arguello Inc. submitted to the Commission a second letter and attachment modifying its project description to include all applicable provisions of the proposed (yet not issued) U.S. Environmental Protection Agency ("EPA") NPDES permit CAG280000 that was approved by the Commission in January 2001.

The Point Arguello Unit includes three oil and gas production platforms, Platforms Hermosa, Hidalgo and Harvest, that currently produce oil and gas underlying Leases OCS-P 0315, OCS-P 0316, OCS-P 0450 and the *western half* of OCS-P 0451. Pursuant to the federal consistency review requirements of the Coastal Zone Management Act ("CZMA") (15 CFR Part 930), the Commission previously reviewed and concurred in consistency certifications CC-12-83, CC-27-83, and CC-24-84 for Platforms Hermosa, Harvest, and Hidalgo, respectively. The approved Hermosa DPP provided for a 48-slot platform (producing up to 27,000 barrels per day ("BPD") of oil and 28 million standard cubic feet for per day ("MMSCF/D") of natural gas. The approved Hidalgo DPP provided for a 56-slot platform (producing up to 20,000 BPD of oil and 10 MMSCF/D of gas). At the time the Commission concurred in the consistency certifications for the three platforms, peak Point Arguello Unit oil production was anticipated to be 100,000 BPD and 60 MMSCF/D of gas. The Commission approved 154 total wells slots.

Platform Hermosa was installed in 1985, and Hidalgo in 1986. Of the 48 wells slots approved at Hermosa, 17 have been used. Of the 56 well slots approved for Hidalgo, 17 have been used. Point Arguello production peaked in August 1993 at 89,000 BPD and 27 MMSCF/D of gas. Current production from the field is about 13,000 BPD of oil and approximately 2.7 MMSCF/D of gas.

Development of the eastern half of OCS-P 0451 would occur within the time-frame of the existing Point Arguello Unit facilities as foreseen and evaluated in the 1984 Point Arguello/Southern Santa Maria Basin Area Study Environmental Impact Report/Environmental Impact Statement ("1984 EIR/EIS"), and as understood by the Commission when it concurred in the consistency certifications for each Point Arguello platform DPP. The total number of wells drilled for the Point Arguello Unit *and* the eastern half of OCS-P 0451 would be about half of the number of wells approved for the Point Arguello Unit alone. In addition, drilling and production from the eastern half of OCS-P 0451 is to be completed within the remaining productive life of the Point Arguello Unit.

All eight proposed wells are to be directionally drilled using existing well slots. The project would require no new offshore or onshore equipment or other infrastructure (except for the eight new wells and perhaps the addition of an oil stabilizer on Platform Hidalgo).[1] Oil and gas production would use the existing oil and gas production facilities on each of the platforms.

The oil produced from the eastern half of OCS-P 0451 would be combined with Point Arguello Unit oil and transported to the Gaviota Facility in the existing PAPCO oil pipeline. From Gaviota, combined oil production from the eastern half of OCS-P 0451 and the Point Arguello Unit would be metered, heated, and transported to refineries by pipeline. Gas from the eastern half of OCS-P 0451 would be combined with Point Arguello Unit gas on the production platforms. The combined gas would be processed (to remove hydrogen sulfide and carbon dioxide) for platform use or sale to shore via the existing pipeline.

Current oil and gas production levels at the Point Arguello platforms will increase by developing the eastern half of OCS-P 0451. Arguello Inc. estimates that combined Point Arguello field and eastern half of OCS-P 0451 oil production will peak at 31,000 BPD (in 2006) and then quickly decline. Without the eastern half of OCS-P 0451, Point Arguello oil production won't exceed 21,000 BPD; beyond 2006, production volumes quickly decline. This volume of oil and gas production is substantially less than the production levels anticipated and analyzed when the Commission concurred in the consistency certifications for Platforms Hermosa, Harvest, and Hidalgo. The 1984 Point Arguello Unit EIR/EIS estimated a total production level of 500 million barrels of oil. Arguello

[1] In 1998, the MMS, County of Santa Barbara, and Coastal Commission separately approved requests by Chevron, the original operator of the Point Arguello Unit, to "reconfigure" the Point Arguello Project to process (dehydrate and stabilize) all oil offshore on Platforms Harvest and Hermosa instead of at the onshore Gaviota Facility. Once processed offshore the oil is transported in the existing PAPCO oil pipeline to the Gaviota Facility, where it is heated for transport to refineries in the All American Pipeline.

Inc. estimates total recovered reserves from the *combined* Point Arguello and eastern half of OCS-P 0451 will be around 150 million barrels.

*The Commission's Review of an Amended DPP*

The test to determine if a DPP modification is subject to additional federal consistency review by the Commission is whether (a) the modification constitutes a "major amendment" to the previously concurred-in DPP, (b) the project changes will affect coastal resources and uses, and (c) whether such effects are substantially different than those evaluated by the Commission in its original federal consistency review and concurrence for the particular DPP. Any changes that would cause "substantially different effects" on coastal zone resources are subject to additional federal consistency review by the Commission under section 307(c)(3)(B) of the CZMA. Thus, the question before the Commission is whether the proposal to drill into the eastern side of OCS-P 0451 will cause coastal resource impacts substantially different than those originally reviewed by the Commission when Platforms Hermosa and Hidalgo were approved.

The term "major amendment" of a federal permit activity is defined in section 930.51(c) of the CZMA regulations as "any subsequent federal approval that the applicant is required to obtain for modification to the previously reviewed activity...." The Commission staff believes that Arguello Inc.'s proposal to develop the eastern half of OCS-P 0451 constitutes a major amendment as that term is defined in the CZMA.

After careful review, however, the Commission staff has determined that the proposed amendment to the Point Arguello DPPs will *not* cause effects on California's coastal uses and resources substantially different than those originally reviewed by the Commission. Thus, the proposed modifications will not require additional federal consistency review by the Commission. A detailed discussion of the basis for the Commission staff's determination is provided below. The key issues addressed are: (1) possible drainage of oil and gas underlying two adjacent *undeveloped* OCS leases; (2) marine resource and water quality impacts; (3) oil spills; (4) commercial fishing; and (5) air quality.

*Drainage of Resources Underlying Adjacent Leases OCS-P 0452 and OCS-P0453*

Lease OCS-P 0451 is considered by the MMS to be a *developed* lease since the western half is developed as part of the Point Arguello Unit. Previously, the eastern half of OCS-P 0451 was part of the Rocky Point Unit, but the MMS has since contracted it out of the unit. Therefore, it is no longer unitized[2] with the remaining undeveloped leases (OCS-P 0452 and OCS-P 0453) that comprise the Rocky Point Unit. OCS-P 0452 and OCS-P 0453 are two of the 36 *undeveloped* OCS leases that were the subject of the *California v. Norton* litigation.

---

[2] A unit may be formed when a common reservoir underlies a group of leases. Unitizing may prevent waste and minimize the number of facilities needed to develop a reservoir.

Upon first hearing of this project, Commission staff was concerned that if the eastern half of OCS-P 0451 is developed, it might drain oil and gas reserves that underlie neighboring OCS-P 0452 and OCS-P 0453.[3] The project's geologic information suggest that 60% of the target pool of oil lies under the eastern half of OCS-P 0451 while 40% may lie under OCS-P 0452. Under federal law, drainage is considered a "rule of capture" – a lease is not considered developed if it is drained by wells located on an adjacent lease. When the same lessee does not own the two leases, the remedy for the lessee of the drained lease is to seek approval to develop and extract oil and gas from the lease. In this case, the owner of OCS-P 0452 and OCS-P 0453 is Delta Petroleum Corporation ("Delta"). Therefore, the Commission staff expressed concern to Arguello Inc. and the MMS that allowing Arguello Inc. to develop the eastern half of OCS-P 0451 might cause Delta to take the position that it is entitled under federal law to explore or develop OCS-P 0452 and 0453. If approving the development of the eastern half of OCS-P 0451 causes Delta to seek to develop OCS-P 0452 and 0453, it would, in the Commission staff's opinion, cause "substantially different effects" on coastal resources than those originally reviewed by the Commission when it approved the original Point Arguello Project.

To address this concern, on February 20, 2003, Delta submitted a letter to the Coastal Commission, the MMS, and the County of Santa Barbara committing to not "contend, before any county, state or federal government entity, that it is or should be entitled to explore or develop the OCS-P-0452 or 0453 Leases as a result of the fact that such county, state or federal entity permitted the E/2 [eastern half] of OCS-P 0451 Lease to be developed, or a result of the actual development of the E/2 of the OCS-P 0451 Lease" (Exhibit 2).

Delta's commitment to not seek an entitlement to develop OCS-P 0452 or OCS-P 0453 due to Arguello Inc.'s authority to develop or actual development of OCS-P 0451 is a key factor critical to the Commission staff's conclusion that the proposal to develop the eastern half of OCS-P 0451 will not cause effects substantially different than those originally reviewed by the Commission. If Delta fails to abide by this commitment, or if it sells its ownership in OCS-P 0452 and OCS-P 0453 to another party that then seeks an entitlement to develop OCS-P 0452 and OCS-P 0453 on the basis of drainage caused by Arguello Inc.'s development of the eastern side of OCS-P 0451, it will constitute grounds for the Commission to re-open this consistency review pursuant to section 930.65 of the regulations which implement the CZMA (15 CFR Part 930).

### *Marine Resources and Water Quality*

The potential impact-producing activities associated with the proposed project that could affect marine resources (*e.g.*, fish, marine mammals, and hard bottom) and water quality are discharges of drilling muds and cuttings and discharges of produced water from Platforms Hermosa and Hidalgo.

---

[3] The MMS "unitized" the eastern half of OCS-P 0451 and leases OCS-P 0452 and OCS-P 0453 because a common reservoir underlies these leases. Therefore, wells drilled into the eastern half of OCS-P 0451 could drain oil and gas underlying OCS-P 0452 and OCS-P 0453.

*Produced Water and Drill Muds and Cuttings*

Development of the eastern half of OCS-P 0451 will result in additional *produced water* discharges from the Point Arguello platforms as compared to existing discharges (a 27% increase over existing produced water discharges). Produced water refers to the total water discharged from the oil and gas extraction process. It is the largest single source of material discharged during oil and gas operations. Typically, produced water consists of formation water, injection water, and chemicals used in the oil and water separation process. Constituents found in produced water are iron, calcium, magnesium, sodium, bicarbonate, sulfates, and chloride. Produced water can also contain entrained petroleum hydrocarbons and measurable trace metal concentrations. Relative to ambient water, produced water contains increased organic salts and trace metals, decreased dissolved oxygen and is higher in temperature. These properties may adversely affect the marine environment by increasing the concentration of suspended solids/turbidity, oxygen demand, oil, and grease, and trace metals at the vicinity of the discharge point.

Arguello Inc. estimates the maximum discharge of produced water from the combined eastern half of OCS-P 0451 and the Point Arguello Unit to be 250,000 BPD. This total amount of produced water discharges (current Point Arguello Unit discharges combined with eastern half of OCS-P 0451) is consistent with platform discharge volumes considered by the Commission when it concurred in the consistency certification for the 1984 EPA-issued NPDES General Permit CA0110516 for platform discharges (which covers discharges from the Point Arguello platforms). (NPDES General Permit CA0110516 is discussed more below.)

When the Point Arguello Project was originally approved, the platform DPPs estimated that if all well slots were used, 536,000 barrels of *drilling mud* was to be discharged. Drilling muds are used in exploratory and production drilling to control well hydrostatic pressure, lubricate the drill bit, and remove drill cuttings from the well. They are generally composed of mixtures of water, clays, barium sulfate, lignite, lignosulfonate, and other additives. The actual amount discharged from the Point Arguello platforms has been 153,080 barrels, about 28% of the total originally estimated. Arguello Inc. projects the drilling mud discharge volume for the eight proposed wells to be 112,553 barrels.

Additionally, the platform DPPs projected *cuttings* discharges of 447,492 barrels if all available well slots had been used. Cuttings are small pieces of formation rock cut way by the drill bit. They are carried to the surface of the well with circulation of the drilling muds and are separated from the muds on the platform. The actual amount of cuttings discharged was 34,020 barrels (or 8% of the original estimate). Arguello Inc. projects the cuttings discharge volume for the eight proposed wells to be 40,685 barrels. This, combined with discharges from the Point Arguello Unit wells, falls within the volume of cuttings considered when the Commission originally reviewed and approved the platform DPPs.

Arguello Inc. is currently discharging produced water, and drill muds and cuttings, under the terms and conditions of 1984 NPDES General Permit CA0110516. The EPA originally issued this general permit in February 1982 with an expiration date of January 1984. In January 1984, the Commission concurred in the EPA's consistency certification to extend the term of CA0110516 for an additional six months, through June 1984 (CC-26-83). In 1986, the Commission objected to EPA consistency certifications for two new EPA-proposed NPDES general permits (one for development/production operations and the other for exploratory operations). The Commission based its objections on findings that the proposed NPDES general permits (1) provided insufficient protection of site-specific, sensitive marine resources, (2) did not comply with state water quality standards or fully explain reasons for excluding feasible standards; and (3) did not provide adequate monitoring and enforcement. The 1986 general NPDES permits were thus never issued, and the EPA did not propose a revised or new general NPDES permit until 2000. In January 2001, the Commission concurred in a revised general NPDES permit, but the EPA has not yet issued it. Since 1984, the EPA has taken the position that NPDES General Permit CA0110516 has been extended by operation of law (5 USC § 558(c); 40 CFR § 122.6; see, however, *Kitlusisti v. ARCO*, 592 F.Supp. 832, 843 (D. Alaska 1984), vac. 782 F.2d 900 (9th Cir. 1986) (general permits do not qualify for extension under section 558(c).).

In Arguello Inc.'s April 2003 submittal to the Coastal Commission to develop the eastern half of OCS-P 0451, it stated that the project would be carried out consistent with all discharge requirements of the 1984 NPDES general permit, unless and until it is superceded by an a new or revised general NPDES permit issued by the EPA. The Commission staff discussed with Arguello Inc. its concerns that (1) Arguello Inc. has committed to meet only *old* federal discharge limits contained in the 1984 NPDES general permit and not the proposed revised NPDES discharge standards, and (2) that Arguello Inc.'s submittal does not address the proposed project's conformity with California Ocean Plan requirements (which, pursuant to section 307(f) of the CZMA and 15 CFR § 923.45, are incorporated into and thus comprise an integral part of California's federally-certified coastal management programi (CCMP)).[4]

On June 12, 2003, Arguello Inc. sent a letter and attachment to the Commission modifying its project description for development of the eastern half of OCS-P 0451 to incorporate the relevant requirements of the latest Commission-approved version of the revised NPDES permit (CAG280000) (hereinafter, "The Agreement"). The Agreement would cover all discharges from Platforms Hermosa and Hidalgo, and would only be preempted or superceded by any duly authorized general or individual NPDES permit issued by the EPA that has complied with the federal consistency review requirements of the CZMA.

---

[4] On May 14, 2003, the Commission staff sent a letter to Arguello Inc. requesting an analysis of the proposed project's conformity with California Ocean Plan requirements.

The terms and conditions of the Commission-approved version of the revised NPDES general permit CAG280000, as committed to by Arguello Inc. for Platform Hermosa and Hidalgo discharges, offers potentially significant water quality improvements over the requirements of existing NPDES General Permit CA0110516. Under the agreement Arguello Inc. agrees to:

- Comply with either California's Ocean Plan water quality criteria or the federal 304(a) Clean Water Act criteria for produced water discharge effluent standards (to be applied at the 100-meter mixing zone), whichever is more protective of applicable beneficial uses;
- Comply with 1993 Clean Water Act effluent limitations for oil and grease;
- Comply with volumetric limits for drilling discharges at each platform;
- Conduct end-of-well toxicity testing for drilling discharges;
- Monitor produced water for chronic whole effluent ("WET") testing on red abalone;
- Undertake an assessment of the availability and practicality of using on line oil and grease monitoring devices for produced water discharges;
- Undertake a platform-specific analysis to determine (1) the relative environmental effects, and (2) the feasibility (as defined in section 30108 of the CCMP) of disposal of drill muds and cuttings and produced water by means other than discharge into ocean waters (*e.g.*, barging and reinjection) as compared to such discharge. Arguello Inc. has agreed to amend the DPPs for Platforms Hermosa and Hidalgo to provide for an alternative manner or method of disposal of produced water and/or drill muds and cuttings if the Coastal Commission determines that such alternative is feasible and the less environmentally damaging alternative than direct ocean discharge; and
- Undertake an evaluation of the direct lethal, sublethal, and bioaccumulative effects of produced water on federally managed fish species on the Pacific OCS at key life stages occupying the mixing zone of produced water discharges. If the information provided indicates that substantial adverse impacts are occurring to Federally-managed fish species or Essential Fish Habitat, Arguello Inc. acknowledges that it will constitute grounds for the Commission to re-open its consistency review pursuant to 15 CFR 930.65.

The Agreement contains the same reporting and monitoring requirements that are contained in the proposed revised NPDES general permit. All reports, studies and notifications, including discharge monitoring reports and notifications of non-compliance, would be submitted to EPA and MMS. The EPA and MMS have agreed to monitor compliance with the requirements of the Agreement.

Exhibit 3 to this attachment compares the historical averages of 14 monitored constituents of produced water from Platforms Hermosa and Hidalgo (*e.g.*, oil and grease, arsenic, cadmium, chromium, copper and cyanide) and the existing and proposed revised general NPDES federal discharge limits and the California Ocean Plan limits. This table illustrates that (1) the revised, updated federal water quality criteria and the California Ocean Plan requirements are, for most produced water constituents, more stringent than those contained in the 1984 NPDES General Permit, and (2) Platform Hermosa and Hidalgo's historic discharges meet the newer federal criteria and current California Ocean Plan requirements.

For the reasons identified above, the Commission staff has concluded that the volume of platform discharges and the nature and magnitude of impacts caused by discharges from OCS-P 0451 wells combined with the Point Arguello Unit discharges fall within the scope of impacts considered by the Commission when it approved the original project. Furthermore, implementation at platforms Hermosa and Hidalgo of the discharge requirements contained the latest 2001 Commission-approved version of the general NPDES permit offer water quality and marine resource *improvements* as compared to existing discharge standards. Accordingly, the Commission staff believes that the proposed project's discharges will not cause "substantially different effects" on coastal resources or uses than those originally evaluated by the Commission.

*Oil Spills*

Federal regulations concerning oil spill response plans ("OSRPs") for OCS facilities require operators to calculate worst-case discharge volumes using the criteria specified in 30 CFR §254.47. These include (1) the maximum capacity of all oil storage tanks and flow lines on the facility, (2) the volume of oil calculated to leak from a break in any pipelines connected to the facility, and (3) the daily production volume from an uncontrolled blowout of the highest capacity well associated with the facility. These are worst-case estimates, intended to insure than an operator has the capacity to respond to the largest oil spill as required by MMS regulations in 30 CFR §254.26.

The MMS estimates the most likely maximum size of an oil spill from the proposed development of the eastern side of OCS-P 0451 is the maximum volume of oil calculated to be spilled from a break in the longest Point Arguello Unit pipeline, the Hermosa-to-shore PAPCO oil pipeline. The MMS calculates this worst-case spill volume to be 2,217 barrels of oil. This figure is substantially less than the 7,600 calculated as part of the 1984 EIR/EIS for the Point Arguello Project, a worst-case spill calculation relied upon by the Commission when it concurred in the DPPs for the Platforms Hermosa and Hidalgo. The current estimate of 2,217 barrels of oil is based on the actual maximum throughput volume and operating pressure for the pipeline (much lower than estimated in 1984), the installation of modern, automatic oil spill leak detection systems, and the actual elevation profile and water cut (the proportion of water in the pipeline stream) of the existing PAPCO pipeline.

The MMS estimates a 3.3 – 3.9 percent probability of an oil spill equal to or greater than 1,000 barrels from the proposed project.

The original Point Arguello platform DPPs included oil spill prevention measures and an oil spill contingency (response) plan. Critical to the Commission's decision to concur in the consistency certifications for the platforms was Chevron's commitment to adopt "maximum feasible mitigation measures" for responses to spills. These included: (a) adequate onsite oil spill containment and cleanup equipment (open ocean boom, skimmers, sorbents, and deployment vessels); (2) adequate procedures for responding to large spills; and (3) membership in the Clean Seas oil spill response organization[5].

Since the Commission's original federal consistency concurrences in the DPPs for Platform Hermosa and Hidalgo, many changes have occurred in oil spill response resources and regulatory requirements. The federal Oil Pollution Act of 1990 ("OPA 90") passed, and the MMS adopted new regulations governing oil spill response.

OPA 90 and MMS regulations at 30 CFR Part 254 require that each OCS facility have a comprehensive oil spill response plan ("OSRP"). Response plans include an emergency response action plan, and supporting information that includes an equipment inventory, contractual agreements with subcontractors and oil spill response cooperatives, a worst-case discharge scenario, and details on training and drills. These OSRPs are reevaluated and updated every two years. The Commission's Oil Spill Program staff has been reviewing OSRP updates as amendments to each particular DPP. In November 2002, the MMS approved the current OSRP for the Point Arguello facilities. After reviewing the updated OSRP, the Commission staff concluded that the oil spill response capability in place now for the Point Arguello Project is at least equivalent to if not better than the spill response capability for the Point Arguello platforms originally reviewed and concurred in by the Commission. The Commission staff believes that the added development of the eastern half of OCS-P 0451 does not alter this finding. The development of the eastern half of OCS-P 0451, combined with the production from the Point Arguello Unit, falls within the nature and magnitude of impacts and oil spill risk considered by the Commission when it originally concurred in the platform DPPs. Additionally, the level of oil spill response capability in place today for the Point Arguello Project is equivalent to if not better than that originally approved by the Commission.

---

[5] Since 1970, oil companies operating in the Santa Barbara Channel and Santa Maria Basin have funded and operated a non-profit oil spill response organization called Clean Seas. Clean Seas provides an inventory of state-of-the-art oil spill response equipment and trained personnel. Clean Seas personnel and equipment are on standby, ready to respond to an oil spill, 24 hours a day, 365 days per year. The primary oil spill response for the Point Arguello facilities is provided by Clean Seas' oil spill response vessel, *Mr. Clean III*. *Mr. Clean III* is normally moored adjacent to Platform Harvest, or when sea conditions dictate, in the Cojo Bay anchorage about eight nautical miles from the Platform Hermosa. *Mr. Clean II*, moored outside the Santa Barbara Harbor, provides secondary oil spill response and can arrive at the Point Conception area within 5-6 hours. Clean Seas also maintains smaller response vessels based in the Santa Barbara Harbor and the Clean Seas' Carpinteria facility that could reach the Point Arguello platforms within 3-4 hours. Clean Seas is equipped and prepared to response to oil spill threats to sensitive shoreline areas identified by the U.S. Coast Guard and the California Office of Spill Prevention and Control.

*Commercial Fishing*

The proposed project is located in the southern Santa Maria Basin. The area is productive due to upwelling and favorable habitat for commercially important fish species. The gear types most used in the area include: trawl (shrimp, prawn, sea cucumbers, some rockfish and various species of sole), drift gillnets (in federal waters), purse seines (squid, mackerel, sardine and anchovy), and traps (crab and lobster). Commercial fishing-related issues associated with the proposed development of the eastern half of OCS-P 0451 are the potential socioeconomic impacts on fishermen due to (a) preclusion from fishing grounds, (b) damage and loss of fishing gear, and (c) lost fishing time due to (a) or (b).

Any impacts to commercial fishing due to the development of the eastern side of OCS-P 0451 should be insignificant. No new equipment or facilities are needed to develop and produce the eastern half of OCS-P 0451. The drilling operations are to be supported by 2-3 supply boat trips per week over a three-year period. This would be in addition to the current level of six boat trips per month to support ongoing Point Arguello Unit production. After the drilling period (2-3 years), supply boat trips would return to current levels. All service traffic would remain in the traffic corridors established by the Joint Oil/Fisheries Liaison Committee. The proposed project will not cause further preclusion or space-use conflicts beyond what presently exists and were previously analyzed when the Commission concurred in the consistency certifications for the platforms. The Commission staff has therefore concluded that the project will not cause commercial fishing impacts substantially different that what the Commission considered when it originally approved the platforms.

***Air Quality***

The Point Arguello Project is an existing emission source within Santa Barbara County, and its emissions are reflected in the ambient air quality. The project's current emission levels are considerably less than what was analyzed by decision-makers when the platforms were originally approved, and less than the allowable emissions. The platforms are existing emission sources regulated by the Santa Barbara County Air Pollution Control District ("SBCAPCD"). Pursuant to its Permit to Operate, Arguello Inc. must provide emission offsets for the maximum allowable project emission.

Emissions resulting from the development of the eastern half of OCS-P 0451 may have the potential to increase concentrations of pollutants onshore. The primary pollutants of concern in Santa Barbara County are oxides of nitrogen ($NO_x$), and reactive organic compound ("ROC"). Both $NO_x$ and ROC are precursors to ozone formation, for which Santa Barbara County is presently in "nonattainment". The major pollutant of concern here are $NO_x$ emissions due to the use of propulsion and stationary combustion equipment.

The project's major emission sources are: (a) increased loads due to the turbines (during well drilling), (b) emissions from crew/supply vessels needed to support drilling

operations, and (c) fugitive emissions associated with additional wells. The MMS has concluded that the increased emissions from the drilling operations are within allowable emission levels currently permitted by the SBCAPCD, and have been fully offset in accordance with SBCAPCD rules and regulations. All crew and supply boats are registered and permitted by SBCAPCD, and the additional emissions generated by the wells will be covered by existing emission-offset agreements. Estimated fugitive emissions are considered by SBCAPCD to be deminimus and do not require emission offsets.

The Point Arguello Unit's current and future estimated emissions, combined with the emissions generated by development of the eastern half of OCS-P 0451, fall within the emission estimates evaluated when the Commission originally reviewed and concurred in the overall Point Arguello Unit Project DPPs. The Commission staff has thus concluded that the proposed project will not cause substantially different effects than those evaluated by the Commission in its original consistency review and concurrence.

***Conclusion***

In conclusion, based on the above evidence, the Commission staff has determined that Arguello Inc.'s proposed revisions to the Point Arguello Unit DPP's to develop the eastern half of OCS-P 0451 will not cause effects on California's coastal zone resources and uses substantially different than those originally reviewed by the Commission when it approved the Point Arguello Unit Project. Thus, the proposed revisions will not require additional federal consistency review by the Commission.