# EXHIBIT A

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

| | |
|---|---|
| AMBER RESOURCES COMPANY, *et al.*, | |
| *Plaintiffs,*<br>v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ****************************************** | |
| ANADARKO E & P COMPANY L.P., *et. al.*, | |
| *Plaintiffs,*<br>v. | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ****************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| ****************************************** | |

## PLAINTIFF DELTA'S DEPOSITION DESIGNATIONS

As provided by the Court's October 9, 2007 Scheduling Order, Plaintiff Delta hereby serves the following deposition designations:

| DEPOSITION DESIGNATIONS<br>FOR JAMES J. VOLKER<br>February 21, 2007 |
|---|
| |
| Page 5, line 11 through 13 |
| Page 8, line 11 through 16 |
| Page 55, line 21 through Page 56, line 3 |
| Page 60, line 13 through Page 62, line 18 |
| Page 63, line 13 through Page 64, line 17 |
| Page 65, line 22 through Page 66, line 23 |

| DEPOSITION DESIGNATIONS (VIDEO)<br>FOR DREW MAYERSON<br>July 13, 2006 |
|---|
| |
| Page 8, line 3 through Page 11, line 8 |
| Page 11, line 21 through Page 12, line 6 |
| Page 12, line 21 through Page 13, line 4 |
| Page 13, line 12 through 17 |
| Page 13, line 19 through Page 15, line 21 |
| Page 16, line 17 through Page 18, line 4 |
| Page 18, line 6 through 22 |
| Page 19, line 3 through 13 |
| Page 19, line 22 through Page 21, line 16 |
| Page 21, line 20 through Page 22, line 18 |
| Page 23, line 6 through Page 24, line 6 |
| Page 27, line 7 through Page 29, line 14 |
| Page 29, line 17 through Page 30, line 15 |
| Page 31, line 2 through 8 |
| Page 31, line 14 through 16 |
| Page 31, line 18 through Page 33, line 1 |
| Page 33, line 4 through Page 34, line 18 |
| Page 34, line 24 through Page 35, line 10 |
| Page 35, line 14 through Page 39, line 8 |
| Page 39, line 15 through Page 40, line 19 |
| Page 41, line 3 through 8 |
| Page 41, line 16 through Page 43, line 25 |
| Page 46, line 2 through 18 |
| Page 46, line 25 through Page 47, line 10 |

| DEPOSITION DESIGNATIONS<br>FOR KENT B. LINA<br>August 4, 2006 |
|---|
| |
| Page 4, line 9 through 14 |
| Page 4, line 22 through 25 |
| Page 5, line 1 through 9 |
| Page 7, line 2 through 22 |
| Page 8, line 1 through Page 10, line 9 |
| Page 12, line 16 through Page 13, line 13 |
| Page 17, line 10 through 25 |
| Page 23, line 12 through Page 24, line 23 |
| Page 25, line 10 through Page 26, line 5 |
| Page 27, line 3 through 16 |
| Page 27, line 21 through Page 28, line 15 |
| Page 28, line 18 |
| Page 32, line 15 through 20 |
| Page 33, line 7 through Page 35, line 13 |
| Page 37, line 8 through 12 |
| Page 38, line 18 through Page 39, line 4 |
| Page 39, line 18 through 22 |
| Page 40, line 3 through 10 |
| Page 45, line 2 through Page 46, line 22 |
| Page 46, line 25 through Page 47, line 1 |
| Page 53, line 25 through Page 55, line 3 |
| Page 55, line 24 through Page 56, line 3 |
| Page 57, line 24 through Page 58, line 15 |
| Page 59, line 23 through Page 60, line 3 |
| Page 60, line 6 |
| Page 65, line 5 through 8 |
| Page 69, line 13 through 17 |
| Page 69, line 23 through Page 70, line 5 |
| Page 72, line 18 through Page 73, line 18 |
| Page 82, line 8 through Page 83, line 7 |
| Page 83, line 10 through Page 84, line 6 |
| Page 84, line 8 through Page 85, line 2 |

| DEPOSITION DESIGNATIONS<br>FOR KENT B. LINA<br>VOLUME II<br>February 20, 2007 |
|---|
| |
| Page 102, line 9 through 20 |
| Page 102, line 25 through Page 103, line 3 |
| Page 103, line 18 through 24 |

| |
|---|
| Page 107, line 1 through 13 |
| Page 107, line 25 through Page 108, line 22 |
| Page 109, line 13 through 22 |
| Page 110, line 6 through 13 |
| Page 111, line 10 through Page 112, line 4 |
| Page 112, line 24 through Page 113, line 2 |
| Page 114, line 5 through 19 |
| Page 115, line 3 through 16 |
| Page 115, line 19 |
| Page 115, line 21 through 23 |
| Page 116, line 15 through Page 117, line 12 |
| Page 117, line 15 through Page 118, line 18 |
| Page 118, line 25 through Page 119, line 3 |
| Page 119, line 8 through 12 |
| Page 120, line 2 through 22 |
| Page 126, line 13 through Page 127, line 20 |
| Page 128, line 22 through 24 |
| Page 129, line 2 through 10 |
| Page 143, line 12 through 14 |
| Page 196, line 20 through Page 199, line 4 |
| Page 209, line 14 through Page 210, line 12 |
| Page 211, line 2 through 23 |
| Page 226, line 17 through Page 227, line 9 |
| Page 227, line 19 through 24 |
| Page 228, line 1 through 12 |
| Page 241, line 9 through Page 242, line 11 |
| Page 242, line 16 through Page 245, line 24 |

| **DEPOSITION DESIGNATIONS FOR WILLIAM JAMISON, Ph.D. January 4, 2007** |
|---|
| |
| Page 5, line 10 through Page 6, line 3 |
| Page 12, line 3 through 19 |
| Page 14, line 3 through Page 19, line 19 |
| Page 30, line 3 through 5 |
| Page 33, line 17 through Page 34, line 5 |
| Page 37, line 20 through Page 38, line 2 |
| Page 71, line 22 through 25 |
| Page 73, line 8 through 15 |
| Page 76, line 13 through 20 |
| Page 77, line 13 through Page 78, line 2 |
| Page 78, line 25 through Page 79, line 16 |

Respectfully submitted,

s/ Steven J. Rosenbaum
by s/ Thomas J. Cosgrove

Steven J. Rosenbaum
*Counsel of Record*
Thomas J. Cosgrove
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-5568
Facsimile: (202) 778-5568
Attorneys for Delta Petroleum Corporation

November 5, 2007

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify under penalty of perjury that on this 5th day of November, 2007, I caused to be delivered by United States Mail, First-Class, and electronic service, a copy of the foregoing:

**PLAINTIFF DELTA'S DEPOSITION DESIGNATIONS**

as follows:

Gregg Schwind
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

Thomas J. Cosgrove

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBER RESOURCES COMPANY., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

ANADARKO E&P COMPANY, L.P., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

NYCAL OFFSHORE DEVELOPMENT CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Nos. 02-30C
04-1822C
05-249C (Consolidated)
(Senior Judge Bruggink)

DEFENDANT'S CORRECTED OBJECTIONS TO PLAINTIFFS' EXHIBITS, WITNESSES, AND DESIGNATIONS OF DEPOSITION TESTIMONY FOR USE AT TRIAL

Pursuant to the Court's October 9, 2007 pretrial order, the United States objects as follows to exhibits, witnesses, and deposition designations identified by plaintiffs in their November 5, 2007 filings.

I. Objections To Plaintiffs' Exhibits

| Exhibit Number | Objection/ Basis |
|---|---|
| PX 6 | Incomplete document. |
| PX 7 | Hearsay. |
| PX 8 | Incomplete document; hearsay. |
| PX 9 | Hearsay. |
| PX 10 | Hearsay. |
| PX 11 | Hearsay. |
| PX 12 | Hearsay. |
| PX 13 | Hearsay. |
| PX 24 | Hearsay. |
| PX 25 | Hearsay. The author is not identified in the document or plaintiffs' description. However, we may withdraw our objection if plaintiffs are able to lay a sufficient foundation for the document's admission at trial. |
| PX 26 | Hearsay. |
| PX 28 | Hearsay. |
| PX 78-79, 93-99 | Hearsay. These exhibits are reports submitted by plaintiffs' experts. We also object in the event that admission of one or more reports is inconsistent with paragraph 4 of the Court's October 9, 2007 pretrial order. |

| | |
|---|---|
| PX 114-119 | Object to the extent these exhibits are offered as substantive evidence at trial, as opposed to demonstratives for use by expert witnesses during trial. |

II. Objections To Plaintiffs' Witnesses

None.

III. Objections And Counter-Designations To Plaintiffs' Deposition Designations

A. Deposition of James J. Volker

1. Objections. None.

2. Counter-Designations. None.

B. Deposition of Drew Mayerson

1. Objections. We object on the basis that the deposition is hearsay and no exception applies. We intend to call Mr. Mayerson at trial during our case-in-chief, removing any need for either party to offer his testimony by deposition. Plaintiffs likely will state that they believe that Mr. Mayerson was deposed pursuant to Rule 30(b)(6), and that his testimony is therefore admissible under Rule 32(a)(2). However, plaintiffs sought to take Mr. Mayerson's deposition both in his individual capacity and in his capacity as Government representative under Rule 30(b)(6). Before and throughout the deposition, plaintiffs failed to distinguish in which capacity they were questioning Mr. Mayerson, or which questions were asked and answered in his individual capacity versus his Rule 30(b)(6) capacity. Government counsel objected to the conduct of the deposition on this basis at the start of the deposition.

2. Counter-Designations. None. We intend to call this witness to testify at trial during our case-in-chief.

C. Deposition of Kent Lina

1. Objections. We object on the basis that the deposition is hearsay and no exception applies. This witness is the current Senior Vice President of Engineering at plaintiff Delta Petroleum Corporation and a key witness for all parties in this case. We intend to call Mr. Lina to testify at trial during our case-in-chief, removing any need for the parties to offer his testimony via deposition.

2. Counter-Designations. Should the Court overrule our objection and admit plaintiffs' designations of Mr. Lina's deposition, we counter-designate the entire deposition for the Court's consideration.

D. Deposition of William Jamison

1. Objections. We object on the basis that the deposition is hearsay and no exception applies. Dr. Jamison is an expert witness hired by the United States to evaluate certain well information from Lease OCS-P 0451. We intend to call Dr. Jamison to testify at trial, removing any need for the parties to offer his testimony via deposition.

2. Counter-Designations. None.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director

s/ Gregg M. Schwind
GREGG M. SCHWIND
ALLISON KIDD-MILLER
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel. (202) 353-2345

Attorneys for Defendant

November 14, 2007

# EXHIBIT C

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 02-30C, 04-1822C & 05-249C (consolidated)

| | |
|---|---|
| AMBER RESOURCES COMPANY, *et al.*, | |
| *Plaintiffs,*<br>v. | |
| THE UNITED STATES, | No. 02-30C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ***************************************** | |
| ANADARKO E & P COMPANY L.P., *et. al.*, | |
| *Plaintiffs,*<br>v. | |
| | |
| | |
| THE UNITED STATES, | No. 04-1822C |
| | (Judge Bruggink) |
| *Defendant.* | |
| ***************************************** | |
| NYCAL OFFSHORE DEVELOPMENT | |
| CORPORATION, | |
| | |
| *Plaintiff,* | |
| v. | |
| | |
| THE UNITED STATES, | No. 05-249C |
| *Defendant.* | (Judge Bruggink) |
| ***************************************** | |

**<u>NOTICE OF RULE 30(b)(6) DEPOSITION</u>**

PLEASE TAKE NOTICE that, pursuant to Court of Federal Claims Rule 30(b)(6) and consistent with the definitions set forth in Schedule A hereto, attorneys for Plaintiffs in case nos. 02-30C and 04-1822C will conduct the oral deposition of Defendant United States, which must designate a person or persons who shall testify to matters known to it with respect to each matter set forth in Schedule A.

The deposition on these topics will take place on Thursday, July 13, 2006, beginning at 9:00 a.m. at the Renaissance Agoura Hills Hotel, 30100 Agoura Road, Agoura Hills, California, and will continue from day to day (excluding holidays and weekends) until concluded. This deposition will be taken before a person duly authorized to administer oaths and will be recorded by stenographic means.

PLEASE TAKE FURTHER NOTICE that Plaintiffs reserve the right to take further depositions of the United States pursuant to Rule 30(b)(6) on additional topics not addressed herein.

E. Edward Bruce
Steven J. Rosenbaum
*Counsel of Record*
Thomas J. Cosgrove
COVINGTON & BURLING LLC
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-5568
Facsimile: (202) 778-5568

July 3, 2006

Attorneys for All Plaintiffs in Nos. 02-30C and 04-1822C

# SCHEDULE A

## DEFINITIONS

A. The term "FRRE" means the MMS Field & Reservoir Reserves Estimates, produced by the Defendant at MMS452 100 - MMS452 116.

B. The term "Reserves Estimates" means estimates of recoverable oil reserves.

C. "Document" has the broadest meaning permissible under Court of Federal Claims Rule 34(a), and includes, without limitation, documents in electronic form. More specifically, "document" means any document or stored electronic data on any medium, as defined in Court of Federal Claims Rule 34(a), and includes the product of any method of recording information, whether by writing or otherwise, including correspondence, memoranda, notes, brochures, drawings, graphs, charts, photographs, diaries, questionnaires or commentaries, notebooks, calendars, analysis, receipts, ledger sheets, accounts, contracts, records, business records, cancelled checks, bills, tax returns, computer presentations, electronic files, electronic transmissions, computer data, computer-stored data, computer-generated data, computer diskettes, CD-ROMs, video or audio tapes, spreadsheets, summaries of telephone conversations, personal conversations, meetings, conferences, negotiations, or investigations. "Document" includes the original and every copy of a Document that is not identical to the original (whether because of notes made on or attached to such copy or otherwise), and all drafts prepared in connection with any Document, whether used or not.

D. The term "concerning" means referring to, describing, evidencing, or constituting.

E. The term "includes" or "including" means includes or including, but not limited to.

F. The connectives "and" and "or" shall be construed either disjunctively or conjunctively, as necessary, to bring within the scope of the Request all responses that might otherwise be construed to be outside of the scope.

G. The use of the singular form of any word includes the plural and vice versa.

## SUBJECTS OF TESTIMONY

1. Any Reserves Estimates for the Rocky Point and Jalama Fields as reflected in the FRRE.

2. Any and all analyses, computations, or estimations that were conducted to determine the Reserves Estimates for the Rocky Point and Jalama Fields as set forth in the FRRE, no matter when those analyses, computations, or estimations were conducted.

3. Any and all documents that were relied upon or otherwise used to determine the Reserves Estimates for the Rocky Point and Jalama Fields, including documents that were used or created during the course of any analyses, computations, or estimations that were conducted to determine such estimates.

4. The location of documents that were relied upon or otherwise used to determine the Reserves Estimates for the Rocky Point and Jalama Fields, including documents that were used or created during the course of any analyses, computations, or estimations that were conducted to determine such estimates.

5. The steps that Defendant the United States has taken to locate and retrieve documents relied upon by the Minerals Management Service in determining the Reserves Estimates for the Rocky Point and Jalama Fields as reflected in the FRRE.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify under penalty of perjury that on this 3rd day of July, 2006, I caused to be delivered by United States Mail, First-Class, and electronic service, a copy of the foregoing:

**NOTICE OF RULE 30(b)(6) DEPOSITION**

as follows:

Patricia M. McCarthy
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

Jeffrey D. Antonson
Jackson Walker, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202

Steven J. Rosenbaum

# EXHIBIT D

MS. KIDD-MILLER: If I may interrupt briefly at this point, for the record, we object to the taking of Mr. Mayerson's deposition in his individual capacity simultaneously with his 30(B)(6) deposition, and while we have tentatively agreed to proceed in this manner, we will revisit this objection should it become confusing to the witness at any point.

BY MR. ROSENBAUM:

Q. Mr. Mayerson, I see you're taking a look at the deposition notices. I take it you are aware and were aware before you arrived today that we had noticed your deposition as an individual and had also asked the government to produce an employee who could respond to questions on behalf of United States with respect to certain subjects, and you've been designated as that person; do you understand that?

A. Yes.

Q. Okay, great. You are, as I understand it, the chief of the office of resource evaluation and production for the Pacific OCS; is that correct?

A. No.

Q. Had that been your responsibility at some point?

A. No. I'm the chief of the office of reservoir evaluation.

Q. What did I say?

A. Resource evaluation.

Q. I appreciate the correction. I had it right in my notes but I misspoke. You are the chief of the Office of Reservoir Evaluation and Production for the Pacific OCS Region; is that correct?

A. That's correct.

Q. And how long have you held that position?

A. One year.

Q. Am I correct that that position is responsible for conducting and maintaining geological and petroleum engineering studies of OCS lands?

A. We do that.

Q. And am I correct that office performs reserve estimates and resource assessments?

A. Yes.

Q. How many people report to you?

A. Several.

Q. And what are their disciplines?

A. I have two geophysicists, two geologists, and two petroleum engineers and one secretary and a student intern, I didn't count her as --

Q. How long have you been employed in that office?

A. Twenty-two years in October.

Q. And what is your educational background?

A. I have a Bachelor's of Science from UCLA.

Q. In what field?
A. Geology.
Q. And what year did you receive that degree?
A. 1977.
Q. Where were you employed after receiving that degree?
A. Immediately after or?
Q. Yes.
A. I worked in a deli for about three months while I went -- took a ski vacation.
Q. And after that?
A. I was -- worked for a company called United Geophysical.
Q. And where were they located?
A. I worked as a party chief, what's known as a party chief, ran a geophysical exploration crew all over the West, and Africa.
Q. Was that with respect to oil and gas?
A. Yes.
Q. And how long did you hold that position?
A. I believe it was three years.
Q. And what was your next job position after that?
A. I took a job with a geophysical or a small consulting firm, looking at geologic hazards for offshore development.

Q. What was your next job after that?
A. Minerals Management Service.
Q. And have you been with the Office of Reservoir Evaluation and Production for that entire time period?
A. It's gone through numerous downsizings and reorganizations, so it wasn't always called reservoir evaluation and production.
Q. But the general responsibilities have been the same; is that right?
A. Actually, they've increased substantially since our original -- the way we were originally twenty-two years ago.
Q. Have you always been involved, in that twenty-two year period, in geological studies of OCS lands?
A. Yes.
Q. And I take it you've had increasing levels of responsibility as the years have gone by?
A. Yes.
MR. ROSENBAUM: Let me mark as Plaintiff Deposition Exhibit 3, I've put before you a document called "Mineral Management Service Pacific OCS Region Field and Reservoir Reserve Estimates as of December 2003." Have you seen this document before?
A. Yes.

(Whereupon Plaintiff's Exhibit 3 was marked for identification and is attached hereto.)

BY MR. ROSENBAUM:

Q. And is this a document prepared by the Office of Reservoir and Production of the Pacific OCS?

A. Yes, it is.

Q. Were you personally involved in its preparation?

A. No.

Q. Did you supervise the people who were involved in its preparation?

A. I see it's dated July 19th, 2005. I took this position as supervisor on July 13th, 2005, so technically, for what? Six days, yes, I supervised them.

Q. Did you have any involvement in the preparation of the FRRE, which is the abbreviation I'll use for this document?

A. No, I did not.

Q. Is this the most recent Field and Reservoir Reserve Estimates prepared by the Pacific OCS Region?

A. Yes, it is.

Q. And what does the July 19, 2005 date signify?

A. I believe that's the date it was released, or

published, finished, I guess is a better term.

Q. And the document states that it's a field and reservoir reserve estimates as of December 2003; what does that mean, specifically --

A. It means that the production is accurate through 2003.

Q. The document provides a breakdown with respect to reserves between what has been produced and what is still remaining, correct?

A. And what was originally forecast to be in the field.

Q. And you're saying that, when you look at a cumulative production figure, it is that figure that is accurate as of December 2003, correct?

A. The cumulative production figure should be accurate as of 2003.

Q. For what purpose was this document prepared?

A. We refer to these as FRRE reports. They're an internal document for bookkeeping, so it's -- we use it to look at the production from the OCS fields.

Q. And who worked on this document?

A. I know possibly three to four people.

Q. Could you tell me --

A. The engineer, Armen Voskanian, possibly a geologist that's no longer with us, Scott Sorensen,

geologist Harold Simms. I believe that's about it.
Q. And what's your view as to their professional competence?
A. Very competent.
Q. If you would turn with me to the second page and, sometimes I'll be referring to these numbers in the lower right-hand corner which have been stamped as part of the process of producing the document to us in discovery in this litigation, this is MMS 452 101, is the page number. Do you see that on the second page?
A. Yes.
Q. And I just want to confirm that, so far as you know, this document is accurate in reflecting that something in excess of a billion barrels of oil and 1.3 trillion cubic feet of natural gas had been produced from the Pacific OCS as of December 2003?
A. It seems so.
Q. And that it was at that time -- let me start that question again. As of the time this document was prepared, it was the view of the Pacific OCS Office of Reservoir Evaluation and Production that, with respect to oil, there was remaining proven reserves of 303,000,000 barrels, I'm rounding these off, and unproved reserves of 1,166,079,386 barrels; am I reading that correctly?

A. It is.

Q. Similarly, there was 987 million cubic feet of proven gas reserves and 489 billion unproved reserves of natural gas; is that right?

A. Yes.

Q. Now, if I could have you look at page MMS 452-104, actually, let me back up a page, 103, this document, 103 and 104, provides fields sorted by reserves category, correct?

A. That's true.

Q. And it divides the reserves into three categories, which are PDP, UPOS, and KR, correct?

A. KR? Yes.

Q. And PDP, as the legend indicates on 104, is Proved Developed Producing reserves; UPOS is Unproved Possible Reserves; and KR are Known Resources on expired leases, correct?

A. Yes.

Q. And am I correct that, in order to qualify as proved developed producing reserves, the field had to be substantially in production?

A. Yes, it had to be on production.

Q. Now, let me show you what we'll mark as Plaintiff's Deposition Exhibit 4, a document entitled "Report to Congress: Comprehensive Inventory of U.S.

OCS Oil and Natural Gas Resources, Energy Policy Act 2005 357."

(Whereupon Plaintiff's Exhibit 4 was marked for identification and is attached hereto.)

BY MR. ROSENBAUM:

Q. Are you familiar with that document?

A. Somewhat.

Q. Does the Pacific OCS Region rely upon its FRRE reports in order to provide information with respect to national reports such as Exhibit 4?

A. We would rely on the FRRE report to the extent that it provides the production numbers, yes.

Q. What about to the respect it provides reserve numbers?

A. Well, we also produce a reserves report that is -- has been available to the public. We haven't produced one in a number of years, but the FRRE report could also be used, sure.

Q. And your most recent, correct me if I'm wrong, but I believe your most recent published reserve report, it was as of December 31, 1998; is that correct?

A. I'm not sure. When was it published? If you

could tell me that.

Q. Well, let me go ahead and mark it as Exhibit 5, it's OCS Report MMS 2000-063.

(Whereupon Plaintiff's Exhibit 5 was marked for identification and is attached hereto.)

THE WITNESS: I believe this is the latest.

BY MR. ROSENBAUM:

Q. So this is the latest published reserve report, correct?

A. I believe so.

Q. And as we've established, it's as of December 31, 1998, correct?

A. Yes, published in 2000, yes.

Q. Now, going back to the Exhibit 4, which is the report to Congress, I simply would like to draw your attention to page 107, which is part of the definition section of this MMS report that came out, I think earlier this year, and it has a definition of reserves, which I'll quote: "The quantities of hydrocarbon resources anticipated to be recovered from known accumulations from a given date forward. All reserve estimates involved some degree of uncertainty."

Is that the definition of reserve that your office follows when putting together documents such as the FRRE reports?

A. Yes.

Q. Looking, then, at the FRRE report, specifically at page 103, do you see, in the category of -- well, do you see that there is a field called the Jalama, J-A-L-A-M-A?

A. Yes.

Q. And do you see that the reserves shown -- and let me start that again. Do you see that the recoverable reserves listed for Jalama are 10,513,000 barrels of oil and 7,200,000 cubic feet of natural gas?

A. Yes.

Q. And is that the most -- so this is the most recent published estimate of the recoverable reserves for the Jalama field prepared by the Pacific OCS; is that right?

A. Like I said, the FRRE report isn't -- a term in the bookkeeping document. It's not meant for publication. These are the last reserve estimates we have.

Q. And there also is a field called the Rocky Point field, do you see that, which appears immediately after the Jalama field?

A. Yes.
Q. And for it, it shows 88,531,000 barrels of oil and 42,270,000 cubic feet of gas, natural gas, correct?
A. Yes.
Q. Am I correct in that -- well, let me withdraw that question. If we turn to page, what's marked MMS 452 108, am I correct that that indicates that all of the recoverable reserves for the Jalama field are indicated as being in the Monterey formation?
A. As far as we know.
Q. That's what the abbreviation MMONT stands for?
A. It stands for Miocene Monterey, yes.
Q. That's a single formation, correct?
A. That's correct.
Q. And if one turns to MMS 452-109 for the Rocky Point field, the indication is there are 84,261,000 barrels of oil and thirty-eight million -- excuse me, thirty-eight billion cubic feet of natural gas in the Monterey formation and 4,270,000 barrels of oil in the Sisquoc formation, together with 4,270,000 cubic feet of natural gas; is that correct?
A. Yes.
Q. Now, MMS has made available to it all of the 2-D and 3-D seismic data with respect to seismic shooting on the Pacific OCS; is that correct?

A. Are you saying that we have it in our possession or its available if we want it?
Q. Well, let me ask it in two ways, then. Is all of the 2-D and 3-D seismic data shot on the Pacific OCS available to your office if you want it?
A. As far as we know.
Q. And lessees are required to make that available as a --
A. Well, not only lessees, but permittees, too.
Q. Okay, and do you in fact have in your office the seismic data for the -- that would cover the Rocky Point and Jalama fields?
A. Yes.
Q. And was that information utilized in putting together the recoverable reserve estimates that are set forth in the FRRE that's been marked as Exhibit 3?
A. For the Rocky Point and Jalama field? These estimates were from 1989. Whether -- I have to presume, it's tradition that we would -- used all the available well and seismic data that was available to us at the time, or that we had in our possession.
Q. And is MMS also provided information from the exploratory wells that have been drilled on OCS leases?
A. Yes.
Q. And could you describe for me what kinds of

information from those wells are provided to MMS?
A. Generally, the well log information, mud log information, pretty much the entire suite of well logs are made available.
Q. And are those utilized in reaching MMS's recoverable reserve estimates as set forth in the FRRE?
A. Yes, they should be.
Q. Now, let me have you take a look at Exhibit 5, please, which is the estimated oil and gas reserves as of December 31, 1998, which I think you've identified as the most recent publication of this nature?
A. I believe so.
Q. And on page 6, one second, and this is a bit confusing, by page 6, I'm using not the dark number at the bottom but the actual number as it was in the original document, which the document at the top says "Method used for estimating reserves." Are you with me on that page?
A. Yes.
Q. And do you see that there under the heading "Fields Reported" the statement is made that, "there are 38 fields in the Pacific OCS that are recognized as containing reserves under the established criteria"?
A. Yes.
Q. And do you see that the statement is made

that -- well, let me withdraw that. On the next page, do you see that both the Jalama fields and the Rocky Point field are among the thirty-eight fields identified?
A. Yes.
Q. And do you see that the statement is made back on the previous page, page 6, that for seven producing fields, the reserve estimates were obtained from both volumetric calculations and decline curve analysis?
A. What paragraph are you referring to?
Q. The last paragraph on that page, first sentence.
A. Yes.
Q. And that for the thirty-one remaining fields, the reserve estimates were determined solely by the volumetric calculation method; do you see that?
A. Yes.
Q. Now, there is on the top -- withdraw that. And accordingly, this would indicate that the Jalama field and the Rocky Point fields were -- start that question again. The reserve estimates for the Rocky Point and Jalama fields were performed using the volumetric calculation method; is that correct?
A. Yes.
Q. And do you see at the top of that page 6, there's a description of what the volumetric calculation

method is?

A. Yes.

Q. All right, now, let me go through that, so I understand the methodology. The first sentence says, "For the volumetric calculation reserves, the amounts of original oil and gas in place are estimated from the bulk volume of the reservoir as mapped using data from boreholes and seismic profiles."

Do you see that?

A. Yes.

Q. Now, with respect to the Rocky Point and Jalama field, accordingly, was there a bulk volume of the reservoir mapped using such data?

A. Yes.

Q. And are those maps that are created by MMS itself, as opposed to maps that would be created by the lessees?

A. Yes.

Q. And then the statement is made that, "Maps of net oil and gas sand thicknesses are generated with the aid of a computer mapping system, and the results are converted to bulk reservoir volume using the appropriate equations."

Do you see that?

A. Yes.

Q. And accordingly, should there exist maps of the Jalama and Rocky Point field showing thicknesses?

A. Not of net volume. This states net oil and gas sand. Monterey formation is not sand, so those maps don't exist, not sand --

Q. Are there net thickness maps for the Jalama and Rocky Point fields?

A. I'm trying to recollect whether a average thickness from the well logs was applied to that field. I don't know for the 1989 data. I didn't do that, so. But the thickness of the productive section, the reservoir, would be taken for these fields, would be taken from the well logs.

Q. And where would one see that information?

A. On the well log.

Q. And where would you see the use of that information by MMS in calculating the bulk reservoir volume for the Jalama and the Rocky Point fields? What kind of document exists --

A. Well, we would use the aerial extent as mapped on a structural -- structure map; we would use the limits of the reservoir as taken from the exploratory wells or any other wells drilled subsequently, and then we would use a recovery factor that we apply, is generally applied to Monterey.

Q. What kind of documentation is created showing those three items, aerial extent, the limit of the reservoir, and recovery factors applied?
A. You would need a structure map, you would need the well logs, and you would need to know the recovery factor.
Q. And if you wanted, looking back, to figure out what recovery factor was applied to come up with the reserve, recoverable reserves figures for the Jalama and Rocky Point fields, where would you find that?
A. For the 1989, is what you're asking?
Q. I'm asking for whatever was used in the FRRE which I think you said --
A. Was 1989.
Q. Right.
A. You would have to either have been there at the time and known what recovery factor they apply, or you could back and calculate it approximately, and that would be.
Q. How would you do that?
A. Well, if you knew the thickness and the aerial extent, or you knew the volumetrics of the field as they had calculated them this 1989, you could then take the number that they had estimated for the reserves and divide it by the aerial extent -- I mean by the

Q. To continue on with the description of the volumetric calculation method, we've covered the first two sentences, and now the third, "Rock porosities and the amounts of water, oil, and gas in the pore space are derived from well log interpretation and his core analyses."

Is that part of the method --

A. Not in the Rocky Point field and Jalama. It's a Monterey reservoir.

Q. So those are not done --

A. Right. Pore volume.

Q. And then the statement is made, "The estimated original amounts of oil and gas in place are converted to standard conditions through analyses of pressure, volume, and temperature relationships and by the use of standard correlations."

Is that done for the Rocky Point and Jalama fields?

A. I'm not sure whether it was done in 1989.

Q. The last statement made, "The amounts of the original oil and gas in place that can be recovered are estimated from information about the reservoir drive mechanism, well spacing, analog field recovery factors, and American Petroleum Institute recovery factor equations," citation of source material.

Is that what was done with respect to the Rocky Point and Jalama fields?
A. I'm not sure.
Q. Some kind of recovery factor was necessarily used, correct?
A. Yes.
Q. And do you know the source of information upon which the people who developed that reserve estimate, what methodology they used?
A. As I said, I'm sure they were looked -- I believe they would have looked at the, certainly the well logs, to get the thickness information, in addition to oil water contacts. They would have used the seismic data, tie the wells to the seismic data to determine aerial extent of the field, and then made a volumetric calculation and then added -- multiplied by recovery factor.
Q. And is there a standard recovery factor that's used in Monterey?
A. The standard Monterey recovery factor is fifty barrels per acre foot, yes.
Q. Where did that come from?
A. But -- I think it has been around as long as I started working with MMS, or I first became aware of the Monterey formation, that a fifty barrel per acre foot

recovery factor is a standard recovery factor, though it certainly can vary twenty, thirty percent either way.

Q. Is that a number that's used with regularity by the MMS Pacific OCS?

A. Fifty?

Q. Yes.

A. Not necessarily. We can vary it from forty to sixty. It's an estimate, after all.

Q. Let me show you what I'm going to mark as Plaintiff Deposition Exhibit 6. This document consists of three pages have the numbers MMS 452 023293, 02294, and 02295.

(Whereupon Plaintiff's Exhibit 6 was marked for identification and is attached hereto.)

BY MR. ROSENBAUM:

Q. I'll start by asking you if you can identify for me what this is.

A. This is the results of a -- the last field study we did for the Rocky Point field. MMS and the State of California teamed up to map the field.

Q. When did that take place?

A. I believe it was 1992, -three, maybe -four, time

period.
Q. So these numbers actually are newer than the numbers reflected in the FRRE report?
A. That's correct.
Q. And did you personally participate in that joint federal state study of the Rocky Point field?
A. Yes, I did.
Q. And is this, then, the most recent study done of the reserves on the Rocky Point fields, the numbers that appear on Exhibit 6?
A. Yes, it is.
Q. Who worked on this besides you?
A. The chief geologist for the State, California State Lands Commission.
Q. And anybody else from your shop?
A. No.
Q. What source material did you rely upon in performing this reserve calculation?
A. The well logs for the exploratory wells and the Rocky Point fields, the seismic data that we had available at the time.
Q. And did you have 2-D and 3-D seismic data available at that time?
A. We had both of those, the 3-D seismic. We did not have the capability at the time to utilize every

line on a computer, as some of the oil companies did at the time, but we took every tenth line from the 3-D seismic survey and interpreted it.

Q. That is a fairly standard technique, isn't it, to pick every tenth line of a 3-D seismic data set?

A. I mean with the volume of 3-D data that is acquired, and if you had to pick and choose, every tenth line seems fine.

Q. You concluded that, with respect to what you term the tested area, that there was 80,269,318 barrels of oil; is that right?

A. In the federal portion.

Q. In the federal portion, and then an additional 7,897,883 barrels on the State-tested area, correct?

A. That's correct.

Q. All right, let me show you --

MS. KIDD-MILLER: Can you hear him even without his microphone on?

MR. ROSENBAUM: I hope you've been picking up the answers.

VIDEO OPERATOR: The center mike is very sensitive.

MR. ROSENBAUM: Oh, you say the center mike is sensitive.

What's the next number?

THE REPORTER: 7.

MR. ROSENBAUM: As -- these large maps as Exhibits 7, 8 -- Plaintiff Deposition Exhibits 7, 8.

(Whereupon Plaintiff's Exhibits 7 through 8 were marked for identification and are attached hereto.)

MR. ROSENBAUM: And I believe I marked as -- I'm sorry, one second, I may have.

MS. KIDD-MILLER: This is 7 at the top and 8 behind?

MR. ROSENBAUM: I have to check, actually. Is 7 Monterey and 8 Sisquoc or the other way around?

THE WITNESS: Yes, 7 Monterey, 8 Sisquoc.

MR. ROSENBAUM: Okay.

Q. I've now put before you what I marked as Plaintiff Deposition Exhibits 7 and 8, and my first question is whether you in fact created these maps?

A. I did, with the geologist from the State Lands Commission.

Q. And were these created in the context of the joint federal state study that you described a couple minutes ago?

A. Yes.

Q. And is -- and were these maps used, at least in part, to determine the reserve estimates that appear in Exhibit 6?

A. No.

Q. They were not? What -- do these maps reflect the conclusions reached with respect to reserve estimates?

A. I spoke with the geologist who was in charge of the reserve estimates in the early nineties and questioned why these were not used as the latest reserve estimates. He felt he -- he thought they were. And they're not. They're very close. They're within less than one percent of the number that was used of the FRRE -- I mean that appears in the FRRE report.

Q. Let me just, to clarify it a bit, what you're saying is that the numbers that appear in Exhibit 6, which are the numbers you identified as being the result of the study you worked on with the State, those are actually the most recent numbers, correct?

A. They're the most recent numbers that were developed for the Rocky Point field.

Q. Yes, and your view -- and they are very close to, but not exactly the same as the numbers in the FRRE report, correct?

A. That's correct.

Q. Something we also observed.

A. Yes.

Q. And you're saying that you actually think that what's in Exhibit 6 is the best set of numbers; is that what you're saying?

A. Yes. I'd clarify that with all of these are estimates. Nothing is cast in concrete until the field is completely drained.

Q. I understand. But my question is, were Exhibits 7 and 8, and perhaps I didn't -- let me strike that. Perhaps I didn't ask this well the first time, but I just want to clarify, were Exhibits 7 and 8 created in connection with the joint federal state project that resulted in the reserve calculations that appear in Plaintiff's Exhibit 6?

A. Yes.

Q. And in fact, it looks to me like the second and third pages of Exhibit 6 contain miniaturized versions of Exhibits 7 and 8; is that correct?

A. Yes.

Q. Now, on the first page of Exhibit 6, you have provided volumetrics, what are called volumetrics by a number of different blocks, correct?

A. Yes.

Q. And am I correct that those blocks are then shown on the second and third pages of Exhibit 6?
A. Yes.
Q. And you did that by blocks both for the Monterey formation and for the Sisquoc formation, correct; they're set out separately?
A. Yes, for horizons in each one of those formations.
Q. Now, as portrayed on Exhibit 6, some of the Rocky Point field is on lease 451, some is on 452, some is on 316, some on 317 --
MS. KIDD-MILLER: Do you mean on Exhibit 7?
MR. ROSENBAUM: On Exhibit 7.
Q. Correct?
A. 451, 452, 448, 316, 317, state lands, yes.
Q. And 316 and 317, those are -- sorry, those are state lands?
A. No.
Q. I'm sorry, it's the arrow to the -- well, the state federal boundaries indicated by the blue line at the -- that is roughly at the top third of the -- of Exhibit 7, correct?
A. Yes, that's correct.
Q. For each of these blocks, there is a number indicated for the barrels of oil, correct?

A. On Exhibit 6?
Q. Yes.
A. I believe so.
Q. And next to the words "barrels per oil" at the top, there is in parenthesis (indication 40/A-F); do you see that?
A. Yes.
Q. Which I presume stands for forty barrels per acre foot recovery factor; is that right?
A. Yes.
Q. And is -- now, let's assume that one wanted to determine what portion of the reserves -- let me strike that and start again.
All right, first of all, on the first page of Exhibit 6, there's a distinction drawn between what's called the tested area and the untested area, correct?
A. Yes.
Q. And is the tested area on Exhibit 7 the area that is in the darker blue and the untested area in the lighter blue?
A. Yes.
Q. And is that the same approach taken with respect to Exhibit 8, which portrays the reserves that are in the Sisquoc formation?
A. Yes.

Q. Let's assume that you wanted to determine how much of the reserves that you're depicting in Exhibit 6 are found on Lease 452.
A. Yes.
Q. Tell me how you would do that.
A. We would -- in this case, we would have used the computer program to outline the blocks as described on 6 A and B, to get the volume, and then we would apply the recovery factor.
Q. Well, using the second -- using the third page of Exhibit 6, which is the one that portrays the Monterey formation, correct?
A. That's correct.
Q. Now, if one simply holds the third page of Exhibit 6 next to Exhibit 7, which is the map, one can pretty easily tell which block is which, correct?
A. Yes.
Q. And so, for example, take what's called the central block; you could tell that the entirety of the central block is on Lease 452, correct?
A. Except for a very small portion of the western corner that stretches into 451.
Q. And then one could look at the first page of Exhibit 6 and see that you had attributed 5,491,322 barrels of oil to the central block, correct?

A. Yes.

Q. Now, let's take the north central block --

A. Excuse me, back up, I'm looking at two central blocks here. One was the Sisquoc central block and then the Monterey central block. Your number was?

Q. My number was the Monterey number of --

A. 598 --

Q. 5,491,322 barrels.

A. Oh, I'm sorry, yes. I was looking at cubic feet, yes.

Q. Now, sticking with the Monterey formation, now let's take as an example the west block. Now, the west block is partly on 451, partly on 452, partly on 316, and I think it even goes partly onto 448, correct?

A. 448, 451, 452, and 316.

Q. Right. Now, you have attributed, for the Monterey formation, 19,491,265 barrels to the west block, correct?

A. Yes.

Q. And we know that the west block has total acre feet of 489,782, correct?

A. Yes.

Q. And has cubic feet of twenty-one billion, three hundred thirty-five million, eight hundred eighty-seven thousand, nine hundred sixty-two, correct?

A. No. 21,334,887,962.

Q. Thanks for correcting me. Now, is the thickness of that -- strike that. So tell me, then, with that information in hand, how you would go about determining what portion of that 19,491,265 barrels of oil are on Lease 452?

A. I don't believe we broke it out by what was on Lease 452. We broke it out by what was in the west block.

Q. I'm not suggesting you did. I'm asking, if you were given the assignment of determining how much of that block was on Lease 452, how would you do it?

A. I would -- let me tell you how we would do it for the entire west block, because we have an oil water contact in the west block, which is flat, and we have a structure which defines the top, we would use the computer to calculate the volumetrics for that entire block, which I am sure would calculate -- computation and gets a pretty accurate number of at least what we feel is the volume of the west block.

Now, as far as how we would rely on the computer and how it would be handled or how it would be done manually for the block in 452, I'd have to talk to some of my geophysicists and engineers to figure that out.

Q. Are you -- are you -- is the calculation based

on -- strike that. Are the volumetrics calculations based upon volume on the space between the top of the Monterey and the oil water contact?

A. They should be.

Q. And were you assuming a uniform oil water contact for the entirety of the west block in doing this calculation?

A. Yes, minus seventy-one hundred feet.

Q. And so if one took the space, if you will -- strike that. If one took the distance from the top of the Monterey in Lease 452 down to the oil water contact of minus seventy-one hundred feet, that would tell you how many acre feet are all on Lease 452, correct?

A. Repeat that.

Q. One could take the distance from the top of the Monterey to the -- down to the oil water contact of minus seventy-one hundred feet, multiplied by the area that's shown in blue on Lease 452, to determine the acre feet that are on Lease 452; is that correct?

A. I guess I'm thrown off a little by the fact that the -- the geographic lines cut through, not at 71 -- they cut through the 7100, and then proceed all the way up to the top of the structure into the fault of the structure. What you're saying, I don't think is a difficult calculation to make, but we didn't make that

calculation.

Q. But could you -- if one were to make the calculation, have I accurately described how one would do that?

A. Yes. You find the area or the volume of that portion in block 452 and multiply it by a recovery factor, yes.

Q. In this context, you'd multiply by a recovery factor of forty barrels per acre foot, correct?

A. That's correct.

Q. Do you recall why you picked forty barrels per acre foot for this calculation?

A. We, like I said, fifty -- forty to sixty is a standard Monterey recovery. We discussed it with Chevron, looked at some of their maps. Chevron was the owner of the -- lessee/operator of the Rocky Point field at the time. They provided us maps that used forty barrels per acre foot and said that they thought that was a good recovery based on their experience.

Q. Let me turn now to the Jalama field. I take it you did not do a new calculation for the Jalama field?

A. We didn't re-map the Jalama field, no.

Q. Now, for the Jalama field, and I'm back on Exhibit 3, which is the most recent FRRE report, as we've discussed, that report shows 10,513,000 barrels of

oil and 7,200,000 cubic feet of natural gas, correct?
A. Yes.
Q. Now, let me show you Exhibits 9 and 10. Exhibit 9, I believe I've marked these in order, has Bates numbers 452-0204 and 0205; is that right?
A. Yes.
Q. And 10 has 206, 207, 208 and 209, correct?
A. Yes.

(Whereupon Plaintiff's Exhibit 9 through 10 were marked for identification and are attached hereto.)

BY MR. ROSENBAUM:
Q. Now, these are maps that were produced to us by the government in response to our recent, relatively recent discovery request. And do you know whether Exhibits 9 and 10 are maps that were created in connection with or were relied upon in coming up with the recoverable reserve figures for the Jalama field that appear in the FRRE report that is Exhibit 3?
A. I'm not certain whether it was these maps.
Q. What does Exhibit 9 -- what is Exhibit 9?
A. It appears to be an Isopach or an Isochore map

of the Monterey to -- well, it's cut off here, it says lowest proven, I'm assuming that is oil, Lowest proven oil, or lowest known oil.

Q. Tell us what an Isopach map is.

A. It's a thickness map, essentially, thickness of the zone.

Q. Tell me what the numbers here represent as you understand this map. Is it zero, two hundred, four hundred, six hundred; what does that mean?

A. The thickness of the productive zone or the oil zone in the Monterey formation.

Q. And is the information on this Exhibit 9 sufficient to allow one to figure out what the -- to figure out the volume of the productive Monterey is?

A. I believe so.

Q. Could one then use that to determine what percentage of the Jalama field is thought to be on Lease 452 as opposed to 453?

A. I believe so. Well, if you're talking about the volume, yes, you could determine what volume, percentage of volume.

Q. Do you know whether a consistent recovery factor was used in determining the reserves for the Jalama field?

A. Consistent meaning --

Q. One number for the entirety of the --
A. Jalama field?
Q. -- of the Jalama field, Yes.
A. I don't know for sure.
Q. Would that be normal practice by MMS?
A. Yes.
Q. Do you know -- do you have any knowledge or information as to what recovery factor MMS has used for determining the recoverable reserves on the Jalama field?
A. No.
Q. Could one derive that by dividing the 10,513,000 barrels of recoverable reserves estimated for the Jalama field by the acre feet?
A. Should be able to.
Q. And the acre feet could be calculated by multiplying the thicknesses shown on Exhibit 9 by the aerial extent of the field as portrayed on Exhibit 9?
A. Yes. It's a stacked -- in these days they would have planimetered each contour and stacked them up to form a pyramid that they could determine the volume, yes.
Q. Are you aware of any more recent mapping of the Jalama field by MMS, more recent than Exhibit 9?
A. No, I'm not aware of any.

BY MR. ROSENBAUM:
Q. Mr. Mayerson, I just don't have more than three copies. I'm showing you what's been marked as Exhibit 11, which I'm sure you can confirm is the declaration that you submitted in this lawsuit, signed by you on page 7.
A. Yes.
Q. Now, on page 8, there's a -- excuse me, on page 5, there's a paragraph 8 which starts out talking about your reserves being, originally, for the Rocky Point field, approximately 88 million barrels of oil and 42 billion feet of gas, correct?
A. Yes.
Q. And those numbers are consistent with both the numbers in the FRRE as well as the numbers in Exhibit 6, correct?
A. Yes.
Q. Now, you then talk about how you later came up with other estimates, which were lower estimates, correct?
A. Yes.
Q. And the first lower estimate was when Arguello stated that it was going to be developing the field from the existing Point Arguello, Inc., platforms, as opposed to a new platform, correct?

A. Yes.
Q. And then there was a later proposal to develop the east half of Lease 451 with 8 wells, and that resulted in a new calculation by MMS of the amount of oil and gas that would be recovered, correct?
A. Yes.
Q. Am I correct that these revised numbers were entirely a reflection of information you were receiving from Arguello with respect to its development intentions, as opposed to a new geological interpretation by MMS?
A. The numbers -- I don't think that's entirely correct, and this I've been able to ascertain from the engineer; the numbers that were provided by Arguello were essentially that they would develop the well with fourteen -- develop the field with fourteen wells. We applied a average recovery per well of, I believe, 2.8 million barrels to arrive at the 39 million and --
Q. What was the source of the -- of that average -- I'm sorry, did you say 2.9?
A. I think it's 2.8.
Q. 298 million barrels of --
A. Did you say million? I thought you said billion. That's a big well.
Q. What was the source of the assumed 2.8 million

barrels of oil recovery per well?
A. It was based on data in our well data base, all the wells, specifically Monterey wells, and I think, in this case, relied more on either Arguello, Point Arguello field, or Point Pedernales field. Those were the two closest analogs to the Rocky Point.
Q. So you were looking at the actual production experienced on two nearby Pacific Coast OCS producing units?
A. Yes, that would be a good way to do it, yeah.
MR. ROSENBAUM: That's all I have.
MR. Schwind: Can we take a short break?
VIDEO OPERATOR: The time is 10:39 and we're going off the record.

(Whereupon a brief recess was taken.)

VIDEO OPERATOR: The time is 10:50 and we're back on the record.

EXAMINATION

BY MS. KIDD-MILLER:
Q. Mr. Mayerson, before we took the break, we were